# EXHIBIT 7

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

⌐ Christina Berti
 Fryer Cushman LLP
 7 Times Square
 New York, NY 10836 ⌐

IDAHO SECRETARY OF STATE
10/11/2016 05:00
CK:PREPAID CT:1154 BH:1560041
1@ 6.00 = 6.00 UCC1 FILE #2
Filing Number:
B 2016-1183111-2

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Scoobeez Global, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 396 South Pasadena Avenue | Pasadena | CA | 91105 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hillair Capital Management LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 345 Lorton Avenue, Suite 303 | Burlingame | CA | 94010 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor, whether now owned or hereafter acquired, whether now existing or hereafter arising, wherever located, and all products and proceeds of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility   6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
20456.0003 - Idaho

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

**16-7550581331**

**10/11/2016 11:36**

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

57632740002  UCC 1 FILING

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Christine Berti
Pryor Cashman LLP
7 Times Square
New York, NY 10036

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Scoobeez | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 396 South Pasadena Avenue | Pasadena | CA | 91105 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hillair Capital Management LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 345 Lorton Avenue, Suite 303 | Burlingame | CA | 94010 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor, whether now owned or hereafter acquired, whether now existing or hereafter arising, wherever located, and all products and proceeds of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
20656.0003 - California

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

Exhibit 7, Page 218

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

16-7550581210

10/11/2016 11:36

**FILED**
CALIFORNIA
SECRETARY OF STATE
SOS

57632720002    UCC 1 FILING

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Christine Berti
Pryor Cashman LLP
7 Times Square
New York, NY 10036

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Scoobur LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 396 South Pasadena Avenue | Pasadena | CA | 91105 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hillair Capital Management LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 345 Lorton Avenue, Suite 303 | Burlingame | CA | 94010 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor, whether now owned or hereafter acquired, whether now existing or hereafter arising, wherever located, and all products and proceeds of the foregoing.

5. Check only if applicable and check only one box. Collateral is: ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
20656.0003 - California

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

# EXHIBIT 8

# SCOOBEEZ GLOBAL, INC.

### (OTC Pink Basic Disclosure Guidelines)

### (Information herein is unaudited)

**1)      NAME OF THE ISSUER AND ITS PREDECESSORS (IF ANY)**

Scoobeez Global, Inc. previously known as ABT Holdings, Inc. (the "Company") was incorporated under the laws of the state of Idaho in 1957 under the original name of Abot Mining Company. The Company's legal name was changed to ABT Mining Co. Inc. on March 12, 2007, then again to ABT Holdings, Inc. on August 14, 2015. Effective February 22, 2017, the Company's legal name was changed to Scoobeez Global, Inc. on February 20, 2017 pursuant to Section 53-504 of Idaho Code and the Company's Articles of Incorporation.

**2)      ADDRESS OF THE ISSUER'S PRINCIPAL EXECUTIVE OFFICES**

<u>Company Headquarters</u>
3463 Foothill Blvd,
Glendale, CA 91214
T: +1 844.726.6233
E: ir@abtholdings.com
W: www.abtholdings.com

<u>Scoobeez Headquarters</u>
3463 Foothill Blvd,
Glendale, CA 91214
T: +1 844.726.6233
E: partners@scoobeez.com
W: www.scoobeez.com

<u>IR Contact</u>
ir@scoobeez.com

**3)      SECURITY INFORMATION**

**Common Stock**

Trading Symbol: <u>SCBZ</u>
Exact title and class of securities outstanding: <u>Common</u>
CUSIP: <u>809135106</u>
Par or Stated Value: <u>0.0001</u>
Total shares authorized: 1,200,000,000        as of: <u>December 31, 2018</u>

Total shares outstanding: 167,986,270        as of: <u>December 31, 2018</u>

**Preferred Stock**

Trading Symbol: <u>None</u>
Exact title and class of securities outstanding: <u>Series A Preferred</u>
CUSIP: <u>None</u>

Par or Stated Value: 0.001
Total shares authorized: 25,000,000

Total shares outstanding: 22,021,000

**Transfer Agent**

Name: West Coast Stock Transfer, Inc
Address 1: 721 N. Vulcan Ave., Ste. 205
Address 2: Encinitas, CA 92024
Phone: 619-664-4783
Is the Transfer Agent registered under the Exchange Act?*          Yes: x  No:

*To be included in the OTC Pink Current Information tier, the transfer agent must be registered under the Exchange Act.

**List any restrictions on the transfer of security:**

None.

**Describe any trading suspension orders issued by the SEC in the past 12 months.**

None.

**List any stock split, stock dividend, recapitalization, merger, acquisition, spin-off, or reorganization either currently anticipated or that occurred within the past 12 months:**

None.

4)      **ISSUANCE HISTORY**

List below any events, in chronological order, that resulted in changes in total shares outstanding by the issuer in the past two fiscal years and any interim period.  The list shall include all offerings of equity securities, including debt convertible into equity securities, whether private or public, and all shares or any other securities or options to acquire such securities issued for services, describing (1) the securities, (2) the persons or entities to whom such securities were issued and (3) the services provided by such persons or entities.  The list shall indicate:

**COMMON STOCK AFTER APRIL 6, 2016**

On April 21, 2016, the Company issued 2,400,000 shares to Richard Dolan for an investment of $350,000.

On April 21, 2016, the Company issued 560,000 shares to The Silard Family Trust for settlement related to the subsidiary of the Company

On July 23, 2016, the Company issued 67,300 shares to unrelated parties for settlement related to the subsidiary of the Company.

On June 30, 2016, the Company issued 975,000 shares as a final settlement to Peter Rosenthal to settle all promissory notes dated September 21, 2015, September 24, 2015, and October 1, 2015.

**PREFERRED STOCK, WARRANTS, AND CONVERTIBLE NOTES AFTER APRIL 6, 2016**

On October 7, 2016, the Board of Directors have determined that it is advisable and in the best interests of the Company to amend the Certificate of Designation, Preference, and Rights of Series A Preferred Stock (the "Series A COD"). The Amendment was to increase the number of authorized shares of Series A Preferred Stock, par value $0.001 per share, from 20,000,000 to 25,000,000.

On October 7, 2016, the Company agreed to sell, and Hillair Capital Investments L.P ("Hillair"), severally and not jointly, agreed to purchase, up to an aggregate of $5,800,000 in Principal Amount of the Debentures (corresponding to an aggregate Subscription Amount of up to $5,000,000). The Company issued a Warrant registered in the name of Hillair to purchase up to certain number of shares of Common Stock equal to 100% of the initial Principal Amount of the Debenture to be issued to Hillair divided by $0.50, with an exercise price per share equal to $0.50.

In connection to the above transaction, Mr. Shahan Ohanessian ("Mr. Ohanessian") entered certain Assignment Agreement dated as of October 7, 2016, by and between Mr. Ohanessian and Hillair. According to which Mr. Ohanessian assigned 1,650,000 shares of the Company's Series A Preferred Stock to Hillair (the "Assignment").

On October 21, 2016, the Company reissued to Mr. Ohanessian 1,650,000 shares of the Company's Series A Preferred Stock to compensate him for the Subject Shares. As of December 31, 2016, and December 31, 2015, the Company has 167,986,266 and 154,569,137 shares of common stock, respectively and 21,650,000 and 20,000,000 shares of preferred stock, respectively issued and outstanding.

On January 30, 2017, the Company issued a combined Senior Secured Convertible Debenture ("CN") for $8,294,000 with Hillair Capital Investment L.P. ("Lender"). This CN combines previous Senior Secured Convertible Debenture ("CN") for $5,800,000 issued on October 7, 2016. This CN has a quarterly interest only payment that bears interest at a rate of 8% per annum.

For CN dated January 30, 2017, the Company issued a Securities Purchase Agreement to the lender, which consists of issuing 371,200 shares of Series A Preferred stock and warrants to purchase up to 5,568,000 Company's common stock with an exercise price of $0.50, exercisable on or before the expiration date.

The Company conducted due diligence and found inconsistencies in the total balances of the note documents that Hillair had provided. The Company is in the process of working with Hillair to identify the correct amount of the combined loans, as the terms were negotiated and signed electronically by the former CFO. There may be a markdown of the total amount of the loan due to moneys missing and/or renegotiating of the entire note. The Company is in an ongoing negotiations with Hillair to modify the note.

Annual REPORT

For the Year Ended December 31, 2018

# SCOOBEEZ GLOBAL, INC.

| Idaho | 3463 Foothill Blvd, Glendale, CA | 91214 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Address of principal executive offices)** | **(Zip Code)** |

| +1 818.302.0100 | ir@scoobeez.com | scoobeez.com |
|---|---|---|
| **(Phone)** | **(Email)** | **(Website)** |

FORWARD-LOOKINGSTATEMENTS This Annual Report contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All statements other than statements of historical fact are "forward-looking statements" for purposes of federal and state securities laws, including, but not limited to, any projections of earnings, revenue or other financial items; any statements of the plans, strategies and objectives of management for future operations; any statements concerning proposed new products or developments; any statements regarding future economic conditions or performance; any statements of belief; and any statements of assumptions underlying any of the foregoing. Although we believe that the expectations reflected in any of our forward-looking statements are reasonable, actual results could differ materially from those projected or assumed in any of our forward-looking statements. Our future financial condition and results of operations, as well as any forward-looking statements, are subject to change and inherent risks and uncertainties. Forward-looking statements may include the words "may," "could," "will," "estimate," "intend," "continue," "believe," "expect," "desire," "goal," "should," "objective," "seek," "plan," "strive" or "anticipate," as well as variations of such words or similar expressions, or the negatives of these words. These forward-looking statements present our estimates and assumptions only as of the date of this report. Except for our ongoing obligation to disclose material information as required by the securities laws, we do not intend, and undertake no obligation, to update any forward-looking statement. We caution readers not to place undue reliance on any such forward-looking statements. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual outcomes will likely vary materially from those indicated.

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

Consolidated Balance Sheets as of December 31, 2018 and December 31, 2017 (Unaudited)                F-2

Consolidated Statements of Operations for the Year Ended December 31, 2018 and 2017 (Unaudited)                F-3

Consolidated Statements of Stockholders' Deficit for the Year Ended December 31, 2018 (Unaudited)                F-4

Consolidated Statements of Operations for the Year Ended December 31, 2018 and 2017 (Unaudited)                F-5

Notes to the Consolidated Financial Statements (Unaudited)                F-6

Exhibit 8, Page 225

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**CONSOLIDATED BALANCE SHEET**
**(UNAUDITED)**

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash | $ 1,689,167 | $ 504,844 |
| Accounts receivable, net | 1,621,271 | 4,115,656 |
| Related party advances | 446,943 | 1,547,637 |
| Other current assets | - | 17,500 |
| Current assets | 3,757,382 | 6,185,637 |
| Property and equipment, net | 885,042 | 136,036 |
| Acquired intangible assets, net | - | 58,445 |
| Other assets | 216,451 | 85,253 |
| Goodwill | 1,415,779 | 1,421,207 |
| Total assets | $ 6,274,654 | $ 7,886,579 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 17,876,300 | $ 13,597,254 |
| Accrued liabilities | 408,803 | 908,357 |
| Merchant financing | 447,832 | 899,498 |
| Lease obligation - current | - | 20,113 |
| Notes payable - current | 527,824 | 668,474 |
| Convertible notes payable - current | 4,445,136 | 4,773,558 |
| Related party notes payable | - | 224,138 |
| Current liabilities | 23,705,895 | 21,091,392 |
| Related party notes payable - current | - | 1,323,500 |
| Total liabilities | 23,705,895 | 22,414,892 |
| Preferred stock, par value $0.001, 20,000,000 shares authorized, 20,000,000 issued and outstanding | 22,021 | 22,021 |
| Common stock, par value $0.0001, 1,200,000,000 shares authorized; 167,986,270 and 163,373,273 shares issued and outstanding, as of March 31, 2018 and December 31, 2017, respectively | 16,800 | 16,800 |
| Additional paid-in capital | 17,940,117 | 17,940,117 |
| Accumulated deficit | (34,170,538) | (31,273,219) |
| Total parent stockholders' deficit | (16,191,600) | (13,294,281) |
| Noncontrolling interest | (1,239,642) | (1,234,032) |
| Total stockholders' deficit | (17,431,242) | (14,528,313) |
| Total liabilities and stockholders' deficit | $ 6,274,654 | $ 7,886,579 |

The accompanying notes are an integral part of these consolidated financial statements

F-2

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**CONSOLIDATED STATEMENT OF OPERATIONS**
**(UNAUDITED)**

| | Year Ended, December 31, 2018 | Year Ended, December 31, 2017 |
|---|---|---|
| Revenues | $ 39,853,392 | $ 36,464,761 |
| Cost of revenues | 31,433,190 | 33,646,391 |
| Gross profit | 8,420,202 | 2,818,370 |
| | | |
| Operating expenses: | | |
| General and administrative (includes stock based compensation of $0 and $0, respectively) | 7,117,312 | 7,864,294 |
| Sales and marketing | - | 52,814 |
| Depreciation and amortization | 129,246 | 133,480 |
| Total operating expenses | 7,246,558 | 8,050,588 |
| | | |
| Operating Income (Loss) | 1,173,644 | (5,232,218) |
| | | |
| Other income (expense): | | |
| Interest expense | (4,071,470) | (5,799,841) |
| Other expense | (5,103) | (1,347,223) |
| Loss from impairment of asset | - | (3,567) |
| Total other expense | (4,076,572) | (7,150,631) |
| | | |
| Gain (Loss) before provision for income taxes | (2,902,929) | (12,382,849) |
| | | |
| Provision for income taxes | - | (148,365) |
| | | |
| Net Gain (Loss) | $ (2,902,929) | $ (12,234,484) |
| | | |
| Net Income (Loss) attributable to noncontrolling interest | (5,610) | (660,786) |
| Net Gain (Loss) attributable to controlling interest | $ (2,897,320) | $ (11,573,698) |
| | | |
| Net loss per common share, basic and diluted | $ (0.02) | $ (0.07) |
| Weighted average number of common shares outstanding - basic and diluted | 167,986,270 | 167,986,270 |

The accompanying notes are an integral part of these consolidated financial statements

F-3

Exhibit 8, Page 227

### SCOOBEZ GLOBAL, INC. (FORMERLY KNOWN AS ABT HOLDINGS, INC.) CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (UNAUDITED)

| | Preferred stock | | Common stock | | Additional Paid-in Capital | Accumulated Deficit | Total Parent Stockholders' Deficit | Noncontrolling interest | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| December 31, 2017 | 22,021,200 | $ 22,021 | 167,984,622 | $ 16,800 | $ 17,940,117 | $ (31,273,219) | $ (13,294,281) | $ (1,234,032) | $ (14,528,313) |
| Net loss (income) | - | - | - | - | - | (2,897,320) | (2,897,320) | - | (2,897,320) |
| Net income attributable to noncontrolling | - | - | - | - | - | - | - | (5,608) | (5,608) |
| December 31, 2018 | 22,021,200 | $ 22,021 | 167,984,622 | $ 16,800 | $ 17,940,117 | $ (34,170,539) | $ (16,191,601) | $ (1,239,640) | $ (17,431,242) |

The accompanying notes are an integral part of these consolidated financial statements

Exhibit 8, Page 228

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**CONSOLIDATED STATEMEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Year Ended, December 31, 2018 | Year Ended, December 31, 2017 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Net Gain (loss) | $ (2,902,929) | $ (12,234,484) |
| Adjustments to reconcile net loss to | | |
| net cash used in operating activities: | | |
| Depreciation and amortization | 129,246 | 133,480 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 2,494,385 | (781,714) |
| Prepaid and other current assets | 17,500 | 12,044 |
| Other assets | (131,196) | (46,753) |
| Accounts payable | 4,279,046 | 8,478,810 |
| Accrued liabilities | (499,555) | (999,839) |
| Deferred revenue | - | (150,005) |
| Lease obligation | | (48,000) |
| Settlement liability | - | (420,000) |
| NET CASH USED IN OPERATING ACTIVITIES | 3,386,496 | (6,056,461) |
| | | |
| **INVESTING ACTIVITIES** | | |
| Purchase of property and equipment | (814,380.3) | (6,164) |
| Acquisition of business, net of cash received | - | 3,290 |
| NET CASH USED IN INVESTING ACTIVITIES | (814,380.3) | (2,874) |
| | | |
| **FINANCING ACTIVITIES** | | |
| Proceeds from sales of common stock | - | 1,627,946 |
| Proceeds from (payments to) line of credit | - | (281,699) |
| Proceeds from merchant financing | (451,666) | (3,728) |
| Proceeds from notes payable | (140,648) | 140,650 |
| Proceeds from convertible notes payable | - | 3,726,748 |
| Proceeds from related party notes payable | (1,547,638) | - |
| Payments on convertible notes payable | (328,422) | - |
| Payments on lease obligation | (20,113) | (129,813) |
| Advance from (to) shareholder | 1,100,694 | 971,867 |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | (1,387,793) | 6,051,971 |
| | | |
| NET INCREASE (DECREASE) IN CASH | 1,184,323 | (7,364) |
| | | |
| CASH AT BEGINNING OF PERIOD | 504,844 | 512,208 |
| | | |
| CASH AT END OF PERIOD | $ 1,689,167 | $ 504,844 |
| | | |
| SUPPLEMENTAL CASH FLOW DISCLOSURE: | | |
| CASH PAID FOR: | | |
| Interest | $ 487,553 | $ 741,539 |
| | | |
| NON-CASH INVESTING AND FINANCING ACTIVITIES: | | |
| Preferred stock issued for debt discount | $ - | $ 371 |
| Conversions of notes payable into common stock | $ - | $ 1,924,602 |

The accompanying notes are an integral part of these consolidated financial statements

F- 5

Exhibit 8, Page 229

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 1. BUSINESS DESCRIPTION AND NATURE OF OPERATIONS**

Scoobeez Global, Inc. (the "Company"), was incorporated under the laws of the state of Idaho in 1957 under the original name of Abot Mining Company. The Company's legal name was changed to ABT Mining Co. Inc. on March 1, 2007. Effective August 14, 2015, the Company's legal name was changed to ABT Holdings, Inc. Effective February 22, 2017, the Company's legal name was changed to Scoobeez Global, Inc. on February 20, 2017 pursuant to Section 53-504 of Idaho Code and the Company's Articles of Incorporation.

The Company's overall business strategy is to operate as a diversified holding company, which is primarily engaged in investing, acquiring, developing, operating and growing various businesses that will generate attractive returns, and provide significant free cash flow to the Company in order to maximize value of its shareholders. Consequently, during the Year ended December 31, 2018, the Company took a more diversified approach to its current and future operations, which include, but are not limited to, acquisitions of advanced technology driven assets and businesses that improve value and productivity in critical areas of the value chain, enhance the life of end-users and customer experiences, and positively impact local and global commerce as it is rolled out in the domestic and international markets.

The Company's target portfolio companies are designed to be market leaders in their respective sectors by providing critical products and services that enable them to re-imagine the current revenue model, improve customer service, and streamline the decision-making process.

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation and Principles of Consolidation*

The accompanying consolidated financial statements includes the accounts of ABT Holdings, Inc. and Scoobeez, Inc. ("Scoobeez"), excluding the 9% non-controlling interest at December 31, 2018. All significant intercompany accounts and transactions have been eliminated. The consolidated statements of operations include the results of entities acquired from the date of the acquisition for accounting purposes.

The summary of significant accounting policies presented below is designed to assist in understanding the Company's unaudited condensed financial statements. Such unaudited condensed financial statements and accompanying notes are the representations of the Company's management, who are responsible for their integrity and objectivity. These accounting policies conform to accounting principles generally accepted in the United States of America ("GAAP") in all material respects, and have been consistently applied in preparing the accompanying unaudited condensed financial statements.

*Unaudited Interim Financial Information*

The accompanying interim consolidated balance sheet as of December 31, 2018, the consolidated statements of operations, and cash flows for the Year ended December 31, 2018 and 2017, and the related information contained in the notes to the consolidated financial statements are unaudited. These unaudited interim financial statements and notes have been prepared on the same basis as the audited financial statements and, in the opinion of management, reflect all adjustments, which include only normal recurring adjustments, necessary for a fair statement of the Company's consolidated financial position as of December 31, 2018, and its results of operations and cash flows for the Year ended December 31, 2018 and 2017. The results of operations for the Year ended December 31, 2018 are not necessarily indicative of the results to be expected for any other interim period or for any other future year.

*Non-Controlling Interests*

Non-controlling interests represent the portion of equity in a subsidiary not attributable, directly or indirectly, to a parent. The Company's accompanying consolidated financial statements include all assets, liabilities, revenues and expenses at their consolidated amounts, which include the amounts attributable to the Company and the non-controlling interest. The Company recognizes as a separate component of equity and earnings the portion of income or loss attributable to non-controlling interests based on the portion of the entity not owned by the Company.

The Company adopted the provisions of the Financial Accounting Standards Board's ("FASB") authoritative guidance regarding non-controlling interests in consolidated financial statements. The guidance requires the Company to clearly identify and present ownership interests in subsidiaries held by parties other than the Company in the consolidated financial statements within the equity section. It also requires the amounts of consolidated net earnings attributable to the Company and to the non-controlling interests to be clearly identified and presented on the face of the consolidated statements of operations. At December 31, 2018, the Company owned 91% of Scoobeez and 9% is owned by the former individual shareholders; see Note 5 for additional information.

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

*Financial Statement Preparation and Use of Estimates*

The Company's consolidated financial statements were prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP"). The preparation of consolidated financial statements in conformity with GAAP requires management to make certain estimates, judgments and assumptions that affect the reported amounts of assets and liabilities and the related disclosures at the date of the financial statements, as well as the reported amounts of revenue and expenses during the periods presented. Estimates include revenue recognition, the allowance for doubtful accounts, website and internal-use software development costs, goodwill, depreciable lives of property and equipment, recoverability of intangible assets with finite lives and other long-lived assets, legal contingencies and stock-based compensation. Actual results could materially differ from these estimates.

*Cash and Cash Equivalents*

Cash includes demand deposits with banks or financial institutions. Cash equivalents include short-term, highly liquid investments that are both readily convertible to known amounts of cash, and that are so near their maturity that they present minimal risk of changes in value because of changes in interest rates. The Company's cash equivalents include only investments with original maturities of three months or less. The Company regularly maintains cash in excess of federally insured limits at financial institutions.

*Accounts Receivable*

Accounts receivable primarily represents the amount due from one customer for which almost all of our revenues are generated. Receivables from this customer are due on a net 30 days basis. There is significant doubt around the validity of the amount of accounts receivable due to lack of transparency by the counterparty, to which the amount is potentially owed. Items such as workers' compensation, interest, one-time expenses that are communicated to the Company without support of breakdown of detail give Company's management reason to believe the amount owed is far less than presented. The Company is in the process of conducting deep due diligence with the counterparty to assess the exact value owed. Bad debt expense for the Year ended December 31, 2018 and 2017 was not significant.

*Property and Equipment*

Property and equipment are stated at cost less accumulated depreciation. Depreciation is computed principally on the straight-line method over the estimated useful life of each type of asset which ranges from three to five years. Leasehold improvements are depreciated over the life of the asset or the corresponding lease agreement, whichever is shorter. Major improvements are capitalized, while expenditures for repairs and maintenance are expensed when incurred. Upon retirement or disposition, the related costs and accumulated depreciation are removed from the accounts, and any resulting gains or losses are credited or charged to income.

*Intangible Assets*

Intangible assets with finite useful lives are amortized using the straight-line method over their useful lives and are reviewed for impairment. The Company evaluates intangible assets and other long-lived assets for impairment whenever events or circumstances indicate that they may not be recoverable, or at least annually. Recoverability is measured by comparing the carrying amount of an asset group to the future undiscounted net cash flows expected to be generated by that asset group. If this comparison indicates impairment, the amount of impairment to be recognized is calculated as the difference between the carrying value and the fair value of the asset group, generally measured by discounting estimated future cash flows. There were no impairment indicators present during the Year ended December 31, 2018.

*Goodwill*

Goodwill represents the excess of the cost of an acquired business over the fair value of the assets acquired at the date of acquisition. Absent any special circumstances that could require an interim test, the Company has elected to test for goodwill impairment at September 30 of each year.
The Company tests for impairment using a two-step process. The first step of the goodwill impairment test identifies if there is potential goodwill impairment. If step one indicates that an impairment may exist, a second step is performed to measure the amount of the goodwill impairment, if any, by comparing the implied fair value of goodwill with the carrying amount. If the implied fair value of goodwill is less than the carrying amount, a write-down is recorded. The Company determined there was no significant goodwill impairment during the Year ended December 31, 2018 and 2017.

*Fair Value of Financial Instruments*

Fair value is defined as the price that would be received upon sale of an asset or paid upon transfer of a liability in an orderly transaction between market participants at the measurement date and in the principal or most advantageous market for that asset or liability. The fair value should be calculated based on assumptions that market participants would use in pricing the asset or liability, not on assumptions specific to the entity. In addition, the fair value of liabilities should include consideration of non-performance risk including our own credit risk.

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

In addition to defining fair value, the standard expands the disclosure requirements around fair value and establishes a fair value hierarchy for valuation inputs. The hierarchy prioritizes the inputs into three levels based on the extent to which inputs used in measuring fair value are observable in the market. Each fair value measurement is reported in one of the three levels which is determined by the lowest level input that is significant to the fair value measurement in its entirety. These levels are:

Level 1 – inputs are based upon unadjusted quoted prices for identical instruments traded in active markets.

Level 2 – inputs are based upon significant observable inputs other than quoted prices included in Level 1, such as quoted prices for identical or similar instruments in markets that are not active, and model-based valuation techniques for which all significant assumptions are observable in the market or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3 – inputs are generally unobservable and typically reflect management's estimates of assumptions that market participants would use in pricing the asset or liability. The fair values are therefore determined using model-based techniques that include option pricing models, discounted cash flow models, and similar techniques.

The carrying value of the Company's financial assets and liabilities, which consist of cash, prepaid expenses and other current assets, accounts payable and accrued liabilities, advances from related parties and notes payable, approximate their fair value due to the short maturity of such instruments. The Company does not have any level 2 or 3 financial instruments. Unless otherwise noted, it is management's opinion that the Company is not exposed to significant interest, exchange, or credit risks arising from these financial instruments.

*Lease Incentive Receivable and Liability*

For the Company's operating leases, the Company recognizes rent expenses on a straight-line basis over the term of the leases. Accordingly, the Company records the difference between cash rent payments and the recognition of rent expenses as a lease incentive liability in the consolidated balance sheets. The Company has landlord-funded leasehold improvements that are recorded as lease incentive receivable which are being amortized as a reduction of rent expense over the non-cancelable terms of the operating leases.

*Revenue Recognition*

On-Demand Delivery Business
In general, the Company recognizes revenue when (i) persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered to the customer, (iii) the fee is fixed or determinable and (iv) collectability is reasonably assured. The Company considers a signed agreement, a binding contract with the customer or other similar documentation reflecting the terms and conditions under which products or services will be provided to be persuasive evidence of an arrangement.

The Company generates local revenues primarily when customers place an order for delivery through our website, our mobile application or one of the Company's listed phone numbers. Revenues are generally recognized as soon as our Delivery Associate ("DA") makes the delivery.

Scoobeez generates revenues from the Enterprise Client when the Enterprise Client's customer or end-user places an order on the platform through their mobile applications for a two-hour delivery or one-hour delivery, and those order requests ("Deliverables") are delivered by Scoobeez's DAs in coordination with Scoobeez's Dispatcher or Enterprise Client' designees from delivery stations, sort centers, fulfillment centers, and/or other distribution points (including merchant locations) (collectively known as the "Distribution Points"). These deliverables are accepted by Scoobeez Monday through Sunday, 363 days a year, at times and days designated by our Enterprise Client. Revenue is recognized once delivery is made.

Tips received by our DAs are reimbursed by the Enterprise Client and paid out to DAs. The Company recognizes these tips as flow throw income and expenses.

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

In accordance with Accounting Standards Codification ("ASC") 605-45, Principal Agent Considerations, the gross sales of the Service Provider will be included/consolidated with the Company's revenues. The amount of revenue recorded by the Company is based on the entire amount generated from the reports between Scoobeez and Enterprise Client or other similar business or enterprise customers. The contractual rates with the Service Provider will be paid to the Service Provider and will be recorded as Cost of Sales. The administrative costs incurred for processing the transactions and providing support services are included in General and Administrative expenses in the consolidated statements of operations.

Other costs of revenue consist of mainly the labor costs of dispatchers and drivers.

*Concentrations of Credit Risk*

Cash
The Company maintains its cash balances at a single financial institution. The balance may at times exceed insured limits.

Revenues
During the Year ended December 31, 2018 and 2017, the Company has one significant customer. Revenues generated from this single customer represented approximately 99% and 98% of total revenue for the Year ended December 31, 2018 and 2017, respectively. Approximately 98% of accounts receivable was due from this single customer at December 31, 2018 and December 31, 2017. The loss of this customer would have a significant impact on the Company's operations.

*Accounts Payable*

There is significant doubt around the validity of the amount of accounts payable due to lack of transparency by the counterparty, to which the amount is potentially owed. Items such as workers' compensation, interest, one-time expenses that are communicated to the Company without support of breakdown of detail give Company's management reason to believe the amount owed is far less than presented. The Company is in the process of conducting deep due diligence with the counterparty to assess the exact value owed.

*Legal Proceedings*

The Company is currently involved in certain legal proceedings. The Company discloses a loss contingency if there is at least a reasonable possibility that a material loss has been incurred. The Company records its best estimate of a loss related to pending legal proceedings when the loss is considered probable and the amount can be reasonably estimated. Where a range of loss can be reasonably estimated with no best estimate in the range, the Company records the minimum estimated liability. As additional information becomes available, the Company assesses the potential liability related to pending legal proceedings and revises its estimates and updates its disclosures accordingly. The Company's legal costs associated with defending itself are recorded to expense as incurred.

*Basic and Diluted Loss per Share*

The Company follows ASC 260, Earnings Per Share, to account for earnings per share. Basic earnings per share ("EPS") calculations are determined by dividing net loss by the weighted average number of shares of common stock outstanding during the year. Diluted earnings per share calculations are determined by dividing net income by the weighted average number of common shares and dilutive common share equivalents outstanding. During periods when common stock equivalents, if any, are anti-dilutive, they are not considered in the computation. As of December 31, 2018, the Company had 300 million potentially dilutive shares related to 20 million preferred shares which were excluded from the diluted net loss per share as the effects would have been anti-dilutive. As of December 31, 2018, the Company had approximately 778.4 million potentially dilutive shares related to four convertible notes and 20 million preferred shares which were excluded from the diluted net loss per share as the effects would have been anti-dilutive.

*Recent Accounting Pronouncements*

In November 2016, the FASB issued Accounting Standards Update ("ASU") 2016-17, Income Taxes – Balance Sheet Classification of Deferred Taxes. The purpose of the standard is to simplify the presentation of deferred taxes on a classified balance sheet. Under current GAAP, deferred income tax assets and liabilities are separated into current and noncurrent amounts in the balance sheet. The amendments in ASU 2016-17 require that all deferred tax assets and liabilities be classified as noncurrent in the balance sheet. The ASU is effective beginning in the first quarter of 2017, but with early adoption permitted, and may be applied either prospectively or retrospectively. The Company has elected to early adopt ASU 2016-17 on a retrospective basis effective in the fourth quarter of 2016. The adoption of ASU 2016-17 impacted the presentation of the Company's deferred tax assets and liabilities in the consolidated balance sheets and certain disclosures, but did not have an impact on the results of operations or cash flow fair values. See Note 16 for further details.

Exhibit 8, Page 233

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

In May 2014, the FASB issued ASU No. 2014-09, Revenue from Contracts with Customers (Topic 606), which supersedes the revenue recognition requirements in Topic 605, Revenue Recognition, including most industry-specific requirements. ASU 2014-09 establishes a five-step revenue recognition process in which an entity will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. ASU 2014-09 also requires enhanced disclosures regarding the nature, amount, timing and uncertainty of revenues and cash flows from contracts with customers. In August 2016, the FASB issued ASU 2016-14, Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date, which defers the effective date of ASU 2014-09 by one year. ASU 2014-09 will be effective for the Company in the first quarter of 2018. Management is currently evaluating the impact the adoption of ASU 2014 - 09 will have on the Company's consolidated financial position, results of operations or cash flows. The Company currently anticipates applying the modified retrospective approach when adopting the standard.

In August 2014, the FASB issued ASU No. 2014-15, Presentation of Financial Statements Going Concern, which requires management to evaluate, at each annual and interim reporting period, whether there are conditions or events that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date the financial statements are issued and provide related disclosures. ASU 2014-15 is effective for annual periods ending after December 15, 2017 and interim periods thereafter. The guidance is not expected to have a material impact on the Company's consolidated financial statements.

In April 2016, FASB issued ASU 2016-03, Simplifying the Presentation of Debt Issuance Costs, which changes the presentation of debt issuance costs in financial statements. ASU 2016-03 requires an entity to present such costs in the balance sheet as a direct deduction from the related debt liability rather than as an asset. Amortization of debt issuance costs will continue to be reported as interest expense. ASU 2016-03 is effective for annual reporting periods beginning after December 15, 2016. The guidance did not have a material impact on the Company's consolidated financial statements.

In February 2017, the FASB issued ASU 2017-02, Leases (Topic 840), to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The amendments in this standard are effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years, for a public entity. Early adoption of the amendments in this standard is permitted for all entities and the Company must recognize and measure leases at the beginning of the earliest period presented using a modified retrospective approach. The Company is conducting this guidance on its consolidated financial statements and related disclosures.

*Other*

Other recent accounting pronouncements issued by the FASB (including its Emerging Issues Task Force) and the United States Securities and Exchange Commission did not or are not believed by management to have a material impact on the Company's present or future financial statements.

**NOTE 3. GOING CONCERN**

The Company's consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. The Company reported a net loss of approximately $2,903,000 (excluding noncontrolling interest) and an accumulated deficit of approximately $34,171,000 for the Year ended December 31, 2018. These factors raise substantial doubt for the Company to continue as a going concern.

The Company's ability to continue as a going concern may be dependent on the success of management's plans discussed below. The consolidated financial statements do not include any adjustments relating to the recoverability and classification of assets or the amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

To the extent the Company's operations are not sufficient to fund the Company's capital requirements, the Company may attempt to enter into a revolving loan agreement with financial institutions or attempt to raise capital through the sale of additional capital stock or through the issuance of debt. In October 2016 and January 2017, the Company issued a convertible debenture in the amount of $5,800,000 and $2,494,000 respectively with an investment company, which was used to fund growth in operations and pay debts. The Company intends to continue its efforts in growing its facilities service operations, as well as raising funds through private placement offering and debt financing.

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 4. OTHER CURRENT ASSETS AND OTHER ASSETS**

At December 31, 2018, other assets consist of approximately $62,128 in utility deposit, $12,537 in rent security deposits and $141,785 of prepaid expenses.

**NOTE 5. ACQUISITION OF BUSINESS**

On August 27, 2015, the Company entered into a formal agreement to purchase 76% of outstanding equity (the "Purchased Shares") of Scoobeez for $36,000 in cash, a $60,000 short term note payable and $1,200,000 in convertible promissory notes totaling $1,296,000 in consideration. Scoobeez is an "On Demand" door-to-door logistics and delivery service company that primarily utilizes scooters and motorcycles along with cars to facilitate "Same Day" deliveries.

The excess of the consideration transferred in the acquisition over the net amounts assigned to the fair value of the assets acquired was recorded as goodwill, which represents the opportunity to expand the on-demand delivery services and enhance the breadth and depth of the Company's networks. The goodwill related to this acquisition of $1,424,494 is expected to be deductible for income tax purposes through amortization over 15-year period.

There were no acquisition-related costs incurred to effect the acquisition and no such costs have been expensed during the period. The Company conducted its own internal valuation analysis and no finder's fees; advisory, legal, accounting, valuation, and other professional or consulting fees were paid out. The general administrative costs, including the costs of maintaining acquisition documentation; and costs of registering and issuing debt and equity securities were incurred by the Company.

The assets acquired and liabilities assumed of Scoobeez were recorded at their estimated fair values as of the closing dates of August 27, 2015. The following table summarizes the final purchase price allocation of acquisition-date fair values of the assets and liabilities acquired in connection with the Scoobeez acquisition:

| | |
|---|---:|
| Cash and cash equivalents | $ 1,419 |
| Loan receivable from officer | 14,640 |
| Customer relationships | 119,000 |
| Non-compete | 55,000 |
| Trademarks | 89,000 |
| Goodwill | 1,424,494 |
| Accounts payable | (340) |
| | 1,703,213 |
| Total purchase price plus cash acquired | (1,419) |
| Cash acquired | (407,213) |
| Fair value of non-controlling interest | (1,260,000) |
| Fair value of notes payable issued | |
| Net cash paid | $ 34,581 |

The estimated fair values of the intangible assets acquired was determined based upon a third-party valuation using a combination of the income and cost approaches to measure the fair value of the customer relationships, non-competes and trademarks. The fair value of the non-competes was measured based on variation of income approach, typically a "with-without" enterprise cash flow analysis. The fair value of the trademarks was measured based on the relief from royalty method. The income approach, specifically the residual earnings method, was used to value the customer relationships.

F-6

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

The fair value of non-controlling interest is calculated by multiplying the fair value of the net identifiable assets acquired from Scoobeez by the non-controlling percentage:

| | |
|---|---:|
| Cash and cash equivalents | $ 1,419 |
| Loan receivable from officer | 14,640 |
| Customer relationships | 119,000 |
| Non-compete | 55,000 |
| Trademarks | 89,000 |
| Goodwill | 1,418,000 |
| Accounts payable | (340) |
| Total fair value of net identifiable assets | 1,696,719 |
| Non-controlling interest percentage of ownership | 24% |
| Fair value of non-controlling interest | $ 407,213 |

On January 22, 2016, the Company purchased an additional 15% of outstanding equity of Scoobeez for $34,224 in cash in consideration. The fair value of non-controlling interest was reduced proportionally based on the fair value of the additional interest acquired in the amount of $163,000.

## NOTE 6. GOODWILL AND ACQUIRED INTANGIBLE ASSETS

The changes in the carrying amount of goodwill for the Year ended December 31, 2018 were as follows:

| | Goodwill | Accumulated Impairment Losses | Net Book Value |
|---|---:|---:|---:|
| Balance as of December 31, 2017 | $ 1,421,207 | $ - | $ 1,421,207 |
| Acquisitions | - | | - |
| Balance as of December 31, 2018 | $ 1,421,207 | $ 4,428 | $ 1,415,779 |

F-6

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

The components of acquired intangible assets as of December 31, 2018 and December 31, 2017 were as follows:

| | December 31, 2018 | | | December 31, 2017 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
| Customer relationships | $ 119,000 | $ (119,000) | $ 0 | $ 119,000 | $ (92,556) | $ 26,444 |
| Non-compete | 55,000 | (55,000) | 0 | 55,000 | (42,777) | 12,223 |
| Trademarks | 89,000 | (89,000) | 0 | 89,000 | (69,223) | 19,777 |
| Acquired intangible assets, net | $ 263,000 | $ (263,000) | $ 0 | $ 263,000 | $ (116,889) | $ 58,444 |

Amortization expense for acquired intangible assets was $58,444, and $65,750 for the Year ended December 31, 2018 and 2017, respectively.

During the year ended September 31, 2016, the Company recorded additions to acquired intangible assets of $263,000 because of the acquisition of Scoobeez. The components of the acquired intangibles assets added during the year ended December 31, 2016 were as follows:

| | Year Ended December 31, 2016 | Amortization Period |
|---|---|---|
| | | (years) |
| Customer and vendor relationships | $ 119,000 | 3 |
| Non-compete | 55,000 | 3 |
| Trademarks | 89,000 | 3 |
| Total | $ 263,000 | |

Estimated future amortization expense of acquired intangible assets as of December 31, 2018 was as follows:

| | |
|---|---|
| 2018 | 58,444 |
| 2019 | 0 |
| Total | $ 58,444 |

As of December 31, 2018, the remaining Company's acquired intangibles was written off.

Exhibit 8, Page 237

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

## NOTE 7. PROPERTY AND EQUIPMENT

At December 31, 2018 and December 31, 2017, property and equipment consisted of:

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Furniture and fixtures | $          51,830 | $          40,652 |
| Office equipment | 66,968 | 78,852 |
| Phone | 140,313 | - |
| Leasehold improvements | 750,428 | 82,435 |
|  | 1,009,539 | 201,937 |
| Accumulated depreciation | (124,497) | (65,902) |
| **Total** | $        885,042 | $        136,036 |

During the Year ended December 31, 2018 and 2017, depreciation expense was $65,374 and $37,334, respectively. As of December 31, 2018, equipment purchased under capital leases had a cost of approximately $82,435 and accumulated depreciation of approximately $46,345.

## NOTE 8. RELATED PARTY TRANSACTIONS

During the year ended December 31, 2017, the Company received cash advances of $1,323,500 from its Chief Executive Officer. This amount was reflected in the note payable due to the same Officer, and then all offset by the Advance to shareholder.

On 5/27/2015, the Chief Executive Officer (CEO) paid expenses of approximately $500,000 on behalf of the company. This amount became a promissory note. This amount was offset against advance to CEO. As of December 31, 2018, the balance of this note is $0

During the year ended December 31, 2017, the Company received some short-term loans from the shareholders when needed. The company paid back the loans afterwards. As of December 31, 2018, the shareholders' loan had been all paid off.

During the Year ended December 31, 2018 and 2017, the Company advanced a total of approximately $800,000 and $260,000, respectively, to its Chief Executive Officer (CEO), who is also the majority shareholder. The amount is offset by the Related party notes payable to its CEO. The balance as of December 31, 2018 of approximately $446,900 is reflected on the balance sheet as advance to shareholder. The remaining balance of advance to shareholder will be expected to paid off by February 2019.

## NOTE 9. LINE OF CREDIT

On November 30, 2015, the Company obtained a $400,000 revolving line of credit from Premier Business Bank to be used to fund operations. The line of credit has a maturity date of November 3, 2016 with a variable interest rate equal to the Wall Street Journal's prime rate plus 1.50% (5.00% at December 31, 2016); and a floor of 4.75% per annum. At December 31, 2017, the Company had drawn $281,699 on the line of credit. In addition, the line of credit is secured by all of the Company's real and personal property (tangible or intangible) and contains various financial and non-financial covenants. On February 24, 2017, a third party paid off the line of credit on behalf of the Company. On September 1, 2017, The Company had a new agreement with the third party for the debt amount of $279,539. The company paid a monthly payment of $25,000 to the third party during 2017 and early 2018. As of December 31, 2018, all debt amounts have been paid off.

Exhibit 8, Page 238

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 10. NOTES PAYABLE**

**Debt Financing**

During the year ended December 31, 2018, the Company obtained several merchant loans that total approximately $6,600,000 with several lenders to fund operations. The net amount received by the Company was approximately $3,420,000 and approximately $3,180,000 was recorded as debt discount. During the Year ended December 31, 2018, approximately $3,000,000 of the debt discount was amortized and recorded as interest expense. During the Year ended December 31, 2018, the Company made payments of approximately $6,100,000. At December 31, 2018, the merchant loan net of the unamortized debt discount was approximately $447,000.

**October 2016 Securities Purchase Agreement and Debenture**

On October 6, 2016 and January 30, 2017 respectively (the "Closing Date"), the Company entered into a securities purchase agreement dated as of the Closing Date (the "Purchase Agreement") with Hillair Capital Investment L.P. (the "Purchaser" or "Hillair"). The Purchase Agreement provided that, upon the terms and subject to the conditions set forth therein, the Purchaser would invest $5,000,000 and $2,000,000 ("Investment Amount") in exchange for a Convertible Debenture (the "Debenture") in the total principal amount of $8,294,000 (the "Principal Amount"), and issuing 1,650,000 and 371,200 series A preferred stock and warrants to purchase an aggregate of 11,600,000 and 5,568,000 shares of the Company's common stock, par value $0.001 per share, for an exercise price of $0.50 per share for a period of five (5) years from the Closing Date (the "Warrants"). Pursuant to the Purchase Agreement, on the Closing Date, the Company issued the Debenture and Warrant to the Purchaser. The Debenture is secured by all of the Company's real and personal property (tangible or intangible) and contains various financial and non- financial covenants. To reiterate, the Company recently conducted due diligence and found inconsistencies in the total balances of the note documents that Hillair had provided. The Company is in the process of working with Hillair to identify the correct amount of the combined loans, as the terms were negotiated and signed electronically by the prior CFO, with whom the Company is in current litigation. There may be a markdown of the total amount of the loan due to moneys missing and/or renegotiating of the entire note.

If any Event of Default occurs, which means the Company fails to observe or perform any other covenant or agreement contained in the Debentures or the Purchase Agreement, the outstanding principal amount of this Debenture, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount.

At December 31, 2018 and subsequent to December 31, 2018, the Purchaser had not executed or enforced immediate demand payment from the Company. The Company has re-classified the debenture as a current liability.

Notes Payable – related parties

The Company's notes payable to related parties consist of the following:

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| 0% note payable to Executive Officer, principal due on demand | - | $ 155,724 |
| 0% note payable to the CEO, principal due on demand | $18,414 | $ 18,414 |
| 0% note payable to a related individual, principal due on demand | - | $ 50,000 |
| Total notes payable to related parties | $18,414 | $ 224,138 |
| Less: current | ($18,414) | ($224,138) |
| Notes payable to related parties, non-current | $ 0 | $ 0 |

Notes Payable

The Company's notes payable consists of the following:

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| 6% notes payable to a third-party, principal and accrued interest are due on demand | $ 27,824 | $ 27,824 |
| 14% notes payable to an individual, principal and accrued interest are due on demand | $ 500,000 | $ 500,000 |
| 10% notes payable to an individual, principal and accrued interest are due on demand | $ 0 | $ 140,650 |
| Total loans payable | $ 527,824 | $ 668,474 |
| Less: current | ($ 527,824) | ($668,474) |
| Loans payable, non-current | $ 0  - | $ 0 |

Exhibit 8, Page 239

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 11. COMMITMENTS AND CONTINGENCIES**

Office Facility and Other Operating Leases

The Company has various operating lease agreements for its office facilities which expire at various dates through March 2021. The terms of the lease agreements provide for rental payments on a graduated basis. The Company can, after the initial lease term, renew its leases for an additional five years under right of first offer terms at fair value at the time of renewal. The Company recognizes rent expense on a straight-line basis over the lease term.

The company used 396 S Pasadena Ave., Pasadena, California as its headquarter office most of time during the Year 2018. On May 31, 2018, the Company signed a one-year commercial lease agreement for facility located at 3463 Foothill Blvd, Glendale, California. The terms of the lease provide for equal monthly lease payments of approximately $10,500. On December 28, 2018, the company moved in to the above address from the previous office in Pasadena.

During the year ended December 31, 2018, the Company signed several commercial lease agreements for facilities located in various states. The terms of the lease agreements provide for equal monthly lease payments.

Annual rental expense was approximately $292,000 and $373,000 for the Year ended December 31, 2018 and 2017, respectively.

During the year ended December 31, 2017, the Company signed three operating vehicle lease agreements for its officers, which expire in 2019. The terms of the lease agreements provide for equal monthly lease payments of approximately $7,800. The Company made approximately $65,000 in lease payments for the Year ended December 31, 2018.

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL**
**STATEMENTS (UNAUDITED)**

Equipment Capital Leases

During the year ended December 31, 2017 and year ended December 31, 2016, the Company capitalized approximately $0 and $73,000, respectively, of office equipment with a two-year, interest free, monthly lease installment payment plan, which expire at various dates through 2017 and 2018. During the year ended December 31, 2017 and year ended December 31, 2016, the Company paid approximately $129,800, and $115,600, respectively, in lease payments. During the Year ended December 31, 2018, the company paid off the remaining lease obligation of $20,100. There were $0 Lease obligation as of December 31, 2018.

Employment Agreement

Effective May 27, 2016, the Company is obligated to pay its Chief Executive Officer a salary of $15,000 each per month with increases each succeeding year should the agreement be approved annually by the Company.

Material Pending Litigation

The following factors were considered in determining whether accrual and/or disclosure is required with respect to pending or threatened litigation and actual or possible claims and assessments:

• The period in which the underlying cause of the pending or threatened litigation or of the actual or possible claim or assessment occurred from date of hire of plaintiffs to date of conversion to employee.

• The degree of probability of an unfavorable outcome as per Company is probable, hence the Company has accrued the loss and disclosed the contingency.

• The ability to make a reasonable estimate of the amount of loss equal to is approximately as per Management's estimate.

The Company reviews these provisions at least quarterly and adjusts them accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information.

On May 19, 2017, Arturo Vega filed in the Superior Court for the State of California in the County San Diego a Private Attorney Generals Act lawsuit alleging violations of the California wage and hour laws. On May 19, 2017, Unta Key filed a similar lawsuit, which was consolidated with with the Vega Case. The Company's ability to assess this contingent liability depends upon receiving information from the Company's attorneys. Because of the nature of the case and the current status of litigation, any assessment of liability would be highly speculative.

On July 12, 2017, Imran Firoz, former Chief Financial Officer of the Company has filed retaliation and wage claims complaint with the California Department of Labor, which is currently pending. The Company's ability to assess this contingent liability depends upon receiving information from the Company's attorneys. The matter is currently pending. On January 9, 2018, the Company filed an action against Mr. Firoz arising out of his failure to competently and faithfully discharge his duties as the companies' CFO. On February 7, 2019, Mr. Firoz filed a cross-complaint against Company along with its Board of Directors alleging the same retaliation and wage claims as well as derivative claims arising out of the same underlying facts. The Company's ability to assess this contingent liability depends upon receiving information from the Company's attorneys. Because of the nature of the case and the current status of litigation, any assessment of liability would be highly speculative.

On September 25, 2017, Scoobeez SD, LLC and its principals filed an action alleging violations of the California Franchise Laws, which is currently pending. The Company will be filing an action against Scoobeez SD, LLC and its principals in the near future for various issues arising out of a contract between the parties. The Company's ability to assess this contingent liability depends upon receiving information from the Company's attorneys. Because of the nature of the case and the current status of litigation, any assessment of liability would be highly speculative.

On May 31, 2018, Marwan Griffin filed in the Superior Court for the State of California in the County San Diego a Private Attorney Generals Act lawsuit alleging violations of the California wage and hour laws. This is similar in type and scope to lawsuit to the one filed by Arturo Vega and Unta Key. The Company's ability to assess this contingent liability depends upon receiving information from the Company's attorneys. Because of the nature of the case and the current status of litigation, any assessment of liability would be highly speculative.

On October 4, 2018, Avitus, Inc., the Company's former professional employer organization filed a complaint in federal court arising out of the contract between the two parties alleging a balance due of $16,111,835.61. The Company disputes the alleged balance due. The Company also intends to file a cross-action against Avitus, Inc. for failure to faithfully and properly execute their responsibilities under the contract. The Company's ability to assess this contingent liability depends upon receiving information from the Company's attorneys. Because of the nature of the case and the current status of litigation, any assessment of liability would be highly speculative

Although some of these proceedings may result in adverse decisions or settlements, the Company's management believes that the final disposition of such matters will not have a material adverse effect on our business, financial position, results of operations or cash flows.

Exhibit 8, Page 241

**SCOOBEEZ GLOBAL, INC.**
**(FORMERLY KNOWN AS ABT HOLDINGS, INC.)**
**NOTES TO THE CONSOLIDATED FINANCIAL**
**STATEMENTS (UNAUDITED)**

## NOTE 13. STOCKHOLDERS' DEFICIT

*Authorized Shares*

As of December 31, 2018, the authorized capital stock of the Company consists of 25,000,000 shares of preferred stock, par value $0.001 per share and 1,200,000,000 shares of common stock, par value $0.0001 per share. As of December 31, 2018, the Company had 167,986,270 common shares issued and outstanding and 21,650,000 million preferred shares issued and outstanding.

In the event of any liquidation, dissolution or winding up of this Corporation, either voluntary or involuntary, the holder of Series A Preferred Stock may at his sole option elect to receive, prior and in preference senior to any distribution of any of the assets of this Corporation to the holders of common stock or other classes of preferred stock by reason of their ownership thereof, an amount per share equal to $0.001 for the outstanding shares of Series A Preferred Stock.

## NOTE 14. RECLASSIFICATIONS MADE TO THE PRIOR 10K FILING

There is uncertainty surrounding some of the payables and receivables due to a few vendors' inability to either produce records or simply not being forthcoming. In light of more discoveries post deeper due diligence, albeit not yet fully conclusive, The Company decided to either write off or reclassify balances to the prior 10K, which may change again as more discoveries are made. The Company made changes on the 2017 Balance Sheet that was filed along with the 2017 10K as follows: Accounts Receivable changed from $4,467,834 to $4,115,656. The $352,178 difference is due to (1) Richmond Capital overpayment receivable changed from $719,412 to $400,000, and (2) $32,766 Eat24 A/R Allowance was been written off. Related Party Advances changed from $1,624,356 to $1,547,637. The $76,717 difference is due to the reclassification from Related party advances to operating expense. Merchant Financing balance changed from $657,930 to $899,498. The $241,568 difference is due to (1) $74,424 more for ABT Empire Funding, (2) $61,390 more for ABT Ram Capital Funding, and (3) $107,495 more for ABT Yellowstone Funding. Accumulated Deficit amount changed from $30,645,684 to $31,273,219. The $627,535 difference is due to (1) Richmond Capital Interest Expense of $68,386, (2) Legal Order Interest for Yellowstone of $10,080, (3) Legal Order Interest Expense for Core Funding of $38,328, (4) Queen Funding Interest Expense of $157,200, (5) Additional $243,309 Interest Expenses for 3 Capital Funds due to recalculation, (6) $8,458 Other Interest Expense Increase (7) Write-off Eat24 A/R Allowance of $32,766 and (8) $76,719 reclassification from Related party advance to operating expense. Non-controlling Interest changed from $1,191,102 to $1,234,032. The $42,930 difference is due to the calculation of non-controlling interest after more Accumulated Deficit Amount.

**6)    DESCRIBE THE ISSUER'S BUSINESS, PRODUCTS AND SERVICES**

**A.  A description of the issuer's business operations;**

The Company's overall business strategy is to operate as a diversified holding company, which is primarily engaged in investing, acquiring, developing, managing, and growing various revenue generating businesses. Most of the revenues were derived from one Customer delivering goods during same or next day timeframes.

**Government Regulations**

To the best of its knowledge, there are currently no known existing or probable government regulations that may adversely affect the Company's business, as the company operates in the online sector, specifically related to cellular phone applications, as well as product delivery services. However, if the regulations related to cellular phone applications and software or product delivery services change or become regulated by a federal or state agency, it could affect the amount of revenue generated by our Company, as we may need to use revenue or working capital to comply with any new regulations.

The Company will be subject to local and international laws and regulations that relate directly or indirectly to its operations, such as the Securities Act of 1933, the Securities and Exchange Act of 1934, and the Idaho Corporations Act. It will also be subject to common business and tax rules and regulations pertaining to the operation of its business, such as the United States Internal Revenue Tax Code, and the Idaho State Tax Code. The Company will also be subject to proprietary regulations such as United States Trademark and Patent Law as it applies to the intellectual property of third parties. The Company believes that the effects of existing or probable governmental regulations will be additional responsibilities of the management of the Company to ensure that the Company is in compliance with securities regulations as they apply to the Company's products as well as ensuring that the company does not infringe on any proprietary rights of others with respect to its products. The Company will also need to maintain accurate financial records in order to remain compliant with securities regulations as well as any corporate tax liability it incurs.

**Employees**

As of the date of this registration, the Company had 60 full-time employees as defined by the Affordable Care Act. The Company has 700 full time and part-time employees, who work on average of 25-30 hours a week and in some case over 30 hours a week on an ongoing basis. The fluctuation in hours makes it difficult to determine the exact range of employees who are full time but is approximated to be around 300. The median age of employees is 34.

There are currently no employment agreements with our officers and directors, and although the Company does not believe this will occur, our officers and directors may choose to terminate their employment at any time. The Company's activities are managed by the Company's Directors and Officers.

The officers of the company have the same powers and duties with respect to the management of the business affairs for the Company and the oversight of the day-to-day management operations for the Company as officers of a business would have. They perform such other reasonable duties (taking into consideration the person's position in the Company) as may be prescribed by the Board of Directors of the Company from time to time. They are obligated to use best efforts to serve the Company faithfully and promote its best interests and shall devote all his or her business time, attention and services to the faithful and competent discharge of such duties.

**B.  The issuer's primary and secondary SIC Codes;**

6719/1044

**C.  The issuer's fiscal year end date;**

December 31

**D.  Principal products or services, and their markets;**

Currently, the Company's main businesses are divided into two main segments:

Currently, the Company's main businesses are divided into two main segments:

**Scoobeez, Inc. – On-Demand Delivery Business**

Scoobeez business model consists of a Same Day/Next Day door-to-door logistics and real-time delivery service that primarily utilizes cars along with scooters and motorcycles to facilitate same day deliveries. Scoobeez generates revenues primarily when customers place an order for delivery through its website, its mobile application or one of the Company's listed phones. The Company is the majority shareholder in Scoobeez and manages its day-to-day operations.

Scoobeez currently operates in Southern California, Illinois and Texas. Scoobeez has pre-existing contractual arrangements ("Main Contract") with on-demand mobile apps, retailers, e-tailers, logistic companies, and carriers. These entities are engaged in the business of transporting products, including groceries, food from restaurants, alcohol, and other product lines carried by supermarket chains and retail warehouses to their customers/end-users from delivery stations, sort centers, fulfillment centers, and other distribution points, including merchant locations.

Scoobeez has contract agreements with large enterprise client(s), whereby Scoobeez (also known as the Delivery Service Provider, "DSP") provides last mile logistics necessary to deliver packages to Enterprise Client's customers. Scoobeez receives fees for services which are usually directly tied to planned routes. These routes are the number of deliveries in each area that Enterprise Client plans for a single person and Vehicle for delivery on a specific shift and day and that in turn is assigned by Scoobeez to a person and Vehicle for delivery on a specific shift and day. Scoobeez trains its drivers (Delivery Associates) for approximately two full weeks; which consist of in-house presentations and working full-length shifts, during which they perform numerous practice deliveries and dry runs. At the fulfillment centers, Scoobeez dispatchers work side by side with enterprise client's dispatchers in assigning work to and monitoring the Delivery Associates.

## 7)    DESCRIBE THE ISSUER'S FACILITIES

See footnotes to the financial statement

## 8)    OFFICERS, DIRECTORS, AND CONTROL PERSONS

*Shahan Ohanessian, CEO, President, Chairman, Director of Scoobeez Global, Inc.*

Business history of Mr. Ohanessian follows:

With more than 25 years of marketing experience at several software and business development companies, Mr. Ohanessian leads the Company with strong marketing, management and organizational skills. He has built companies and had successful exits from mid-sized to large companies.

Prior to acquiring Scoobeez, Mr. Ohanessian led one of the first online claims management companies in 2001. The start-up company started in one location in Southern California and grew to include offices nationwide, managing more than 4,000 vendors and handling thousands of claims. Mr. Ohanessian also led online video streaming and encoding companies ranging from startups to large caps.

Mr. Ohanessian studied computer science and engineering at University of Southern California (USC).

1. Full name: Shahan Ohanessian

2. Business address: 3463 Foothill Blvd, Glendale, CA 91214 ("Glendale Office").

3. Board memberships and other affiliations: None.

*George Voskanian, CFO*

George has spent over 12 years in financial services with 5 years in public accounting as a CPA, auditing financial institutions, hedge funds and brokered deals. Prior to earning his MBA from Cornell University, George worked as a financial analyst at Ares Management, responsible for 90 plus liquid debt and private equity fund revenue and expense forecasts. After receiving his MBA, George worked in investment banking helping clients in M&A and capital raising transactions.

1. Full name: George Voskanian

2. Business address: 3463 Foothill Blvd, Glendale, CA 91214 ("Glendale Office").

3. Board memberships and other affiliations: None.

***Legal Proceedings.***

Neither Shahan Ohanessian nor George Voskanian have been subject to the following in the past 10 years:

1.  A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses);

2.  The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities;

3.  A finding or judgment by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated;

4.  The entry of an order by a self-regulatory organization that permanently or temporarily barred suspended or otherwise limited such person's involvement in any type of business or securities activities.

**Beneficial Shareholders. Provide a list of the name, address and shareholdings or the percentage of shares owned by all persons beneficially owning more than ten percent (10%) of any class of the issuer's equity securities. If any of the beneficial shareholders are corporate shareholders, provide the name and address of the person(s) owning or controlling such corporate shareholders and the resident agents of the corporate shareholders.**

| Name & Address [1] | Number of Shares Beneficially Owned | Class | Percentage of Class [2] |
|---|---|---|---|
| Shahan Ohanessian, President | 150,000,000 | Common | 89.50% |
| Imran Firoz, CFO (former) | 282,609 | Common | 00.17% |
| All Directors & Officers | 150,282,609 | Common | 89.67% |

[1] Unless noted otherwise, the address for all persons listed is c/o The Company at 3463 Foothill Blvd, Glendale, CA 91214.

[2] The above percentages are based on 167,599,137 shares of common stock outstanding as of December 31, 2018.

| Name & Address [3] | Number of Shares Beneficially Owned | Class | Percentage of Class [4] |
|---|---|---|---|
| Shahan Ohanessian, President | 18,400,000 | Preferred | 85.00% |
| Imran Firoz, CFO (former) | 1,600,000 | Preferred | 7.00% |
| Hillair Capital Investment L.P. | 1,650,000 | Preferred | 8.00% |
| All Directors & Officers | 21,650,000 | Preferred | 100.00% |

[3] Unless noted otherwise, the address for all persons listed is c/o The Company at 3463 Foothill Blvd, Glendale, CA 91214.

[4] The above percentages are based on 21,650,000 shares of Series A preferred stock outstanding as of December 31, 2018.

**9)      Third Party Providers**

**LEGAL COUNSEL**

**Krista M. Cabrera**
Foley & Lardner LLP
3579 Valley Centre Drive.
Suite 300
San Diego, CA 92130
P: +1 858.847.6718
E: KCabrera@foley.com

**AUDITOR**

**DBBMCKENNON**
**Russ Boyer**
CEO, President, Director
Certified Public Accountants /
Registered Firm - PCAOB
T: 858-217-4035

Office - San Diego
T:949-200-3292

Office - Newport Beach
F: 949-200-3281

www.dbbmckennon.com
San Diego
16959 Bernardo Center Drive,
Ste 202
San Diego, CA 92128
Orange County
20321 SW Birch St, Ste 200
Newport Beach, CA 92660
Accountant – Scoobeez

**IR & MARKETING CONSULTANT**

ir@scoobeez.com

**OTHER ADVISOR**

N/A

**10)      ISSUER CERTIFICATION**

I, Shahan Ohanessian, certify that:

1.  I have reviewed this annual disclosure statement of Scoobeez Global, Inc.;

2.  Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

3.  Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

Date: April 12, 2019

/s/ Shahan Ohanessian
Shahan Ohanessian

Chief Executive Officer, Director

Scoobeez Global, Inc.

# EXHIBIT 9

4263284



**Secretary of State
Articles of Incorporation of a
General Stock Corporation**

ARTS-GS

**FILED** 𝓔𝓶
Secretary of State
State of California

**APR 03 2019**

JCC

This Space For Office Use Only

**IMPORTANT — Read Instructions before completing this form.**

**Filing Fee — $100.00**

**Copy Fees** — First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note: Corporations may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to https://www.ftb.ca.gov.*

**1. Corporate Name** (Go to *www.sos.ca.gov/business/be/name-availability* for general corporate name requirements and restrictions.)

The name of the corporation is **Scoobeez Deliveries, Inc**

**2. Business Addresses** (Enter the complete business addresses.)

| a. Initial Street Address of Corporation - **Do not list a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 3463 Foothill Blvd | Glendale | CA | 91214 |

| b. Initial Mailing Address of Corporation, if different than Item 2a | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 12710 Oxnard St | North Hollywood | CA | 91606 |

**3. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** — Complete Items 3a and 3b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| George | | Voskanian | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 12710 Oxnard St | North Hollywood | CA | 91606 |

**CORPORATION** — Complete Item 3c. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b |
|---|
| |

**4. Shares** (Enter the **number of shares** the corporation is authorized to issue. **Do not leave blank or enter zero (0).)**

This corporation is authorized to issue only one class of shares of stock.
The total number of shares which this corporation is authorized to issue is _____ 100 _____.

**5. Purpose Statement** (Do not alter the Purpose Statement.)

The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

**6. Read and Sign Below** (This form must be signed by each incorporator. **See Instructions for signature requirements.**)

Signature

George Voskanian

Type or Print Name

ARTS-GS (REV 04/2017)

# EXHIBIT 10

Exhibit 10. Page 250

**BY US CERTIFIED MAIL**

**To the Board of Directors of ABT Holdings:**

Shahan Ohanessian
Mahesh Shetty
Lance Brinker

Cc:    Gil Cabrera, Esq., The Cabrera Firm, APC
        Kenneth Bart, Esq.
        Dick Dolan, Noteholder, Shareholder
        Javan Khazali ·
        Marc J. Ross, Esq.,
        Henry Niser
        Neal Kaufman, Hillair Capital
        William B. Barnett, Esq.

Please be informed that unilateral action dated March 14, 2017, taken by Mr. Shahan Ohanessian (Mr. Ohanessian) by invoking Article 10 (3) of ABT Holdings, Inc. (aka Scoobeez Global, Inc., "ABT") Articles of Incorporation is invalid. This action is binding only in the absence of fraud. Further, this action by Mr. Ohanessian is in violation of 2011 Idaho Code, Title 30, Chapter 1, Part 7, 30-1-704, Action Without Meeting.

This document covers all major items, events, discussions (non-exhaustive) relating to unauthorized transfer of monies by Mr. Ohanessian from ABT and Scoobeez business account to - **Business Account xxx-xxx-4724**, where he is the ultimate benficial owner.

**Discoveries and Findings by Imran Firoz**
On March 1, 2017, Justin Cary, CPA reported a major difference between balance sheet of ABT (Loan Receivable from Scoobeez) and Scoobeez, Inc. (Loan Payable to ABT).

From March 3 to March 4, 2017, upon further investigation conducted by me as the CFO of the. Company, it was evident that Mr. Ohanessian transferred a total sum of $1,698,500 from ABT Business Account xxx-xxx-7830 ($2,000) and Scoobeez Business Account xxx-xxx-1330 ($1,696,000) to his **Business Account xxx-xxx-4724.**

Please note, Mr. Ohanessian is the ultimate beneficiary owner of this **Business Account xxx-xxx-4724** account. I've documented details of these transfers to Business xxx-xxx-4724 documented in **Exhibit A.**

As the CFO and Director of the Company, I asked Mr. Ohanessian for the explanation for these transfers. On March 5, 2017, Mr. Ohanessian provided view access to Business xxx-xxx-4724 accounts, and following conclusions were made:

    a)  Mr. Ohanessian made a collective payments of $149,012 to Enterprise Rent-A-Car, San Antonio (Business Expense). There were no other significant business related expenses from this account.

    b)  Mr. Ohanessian transferred **$390,580** from Business xxx-xxx-4724 to his personal Premier Checking xxx-xxx-2672.

    c)  Mr. Ohanessian made a collective cash withdrawn of **$715,006** at Wynn Hotel, Las Vegas.

Exhibit 10. Page 251

    d)  Mr. Ohanessian made a collective cash withdrawn of $473,699 at various Wells Fargo Branches.

    e)  The balance on the account was a combination of bank fees, ATM fees, funds transferred to
        Scoobeez Business Account xxx-xxx-1330 and ending balance.

I recorded these cash withdrawals as a shareholder loan taken (or owed) by Mr. Ohanessian until the
Company, and the Board come to a proper resolution.

**Meeting with Hillair Capital Pasadena, CA and Newport Beach, CA**
Mr. Ohanessian and I met with Neal Kaufman, Partner/Founding Member of Hillair Capital dated
02/10/17 at 396 S. Pasadena, Pasadena, CA 91105. At the end of the meeting Neal Kaufman wanted to
have further discussion on Company's plan to raise additional capital from public market. Neal Kaufman
requested a follow up meeting on March 8, 2017, to understand the revenue/hub model of Scoobeez
(**Exhibit B**). In his email, he asked of us to provide him profitability of the Company at the hub and
corporate level, and a genral update on 10-K and Form 10. On March 8, 2017, at Duke Hotel, Newport
Beach, Juniper Boardroom – following individuals attended the meeting to discuss items listed in Exhibit
B:

Mr. Ohanessian (ABT), Imran Firoz (ABT), Neal Kaufman (Hillair), Sean McAvoy (Hillair) and Javan
Khazali (Independent/friend).

From Scoobeez balance sheet, it was self evident that Mr. Ohanessian unilaterllay took a shareholder loan
of significant amount. During the meeting, I disclosed all of the above findings to Hillair Capital,
including the Company's inability to meet its short term and long term obligations. Among many things,
these discussions included Company's ability to meet obligations with other account payables,
noteholders – Avitus Group, Mr. Dick Dolan's and Mr. Peter Rosenthal's note. At the end of the meeting,
all parties in principle agreed that Hillair **may consider** (not obligated to) additional working capital in
the Company as a 'white knight' if Company's Board make certain necessaery changes. Hillair made
these recommendations to keep the market integrity, protect all shareholders from potential unlawful
activities, act on its own fidicuary responsbilities and comply with all legally binding clauses in the
convertible debenture and stock purchase agreement. Hillair capital infusion was also conditioned upon
the economic viability of Company's business model. From March 9 to March 13, a signifcant work was
done between Hillair and myself to evaluate commercial viability of the Company.

On March 9, 2017, I informed Mahesh Shetty, Board Member of ABT and provided him of my findings
and instructed him to contact and inform Lance Brinker, Board Member of ABT. I further explained to
Mahesh Shetty breifly the 'white knight' offer from Hillair.

All parties (including Mr. Ohanessian) agreed that the following actions should be taken:

    a)  Shoushana and Shahan Ohanessian's resignation from the Board of ABT and CEO of ABT and
        Scoobeez respectively. (03/10/17, signed and notarized)

    b)  Appoint Javan Khazali to the Board as the fifth member. (03/13/17, Board Meeting held on the
        phone in the presence of Marc Ross and Henry Niser as witnesses)

    c)  Appoint Imran as the interim CEO of ABT/Scoobeez. (03/13/17, Agreed by all parties in a Board
        Meeting held on the phone in the presence of Marc Ross and Henry Niser as witnesses)

Exhibit 10. Page 252

    d)  To remove access of Mr. Ohanessian, Shoushana Ohanessian, and Minas Sarafian from all Company's Bank accounts to avoid potential unauthorized transactions.

    e)  To give access to all bank accounts to Imran Firoz, and to Mahesh Shetty in due course to implement proper checks and balances

**Known and Unknown Negative Impact of These Unauthorized Transactions**
As a result of this these unauthorized transactions, the Company is unable to account for $1,579,285. Therefore, the Company will not be able to complete its Fiscal 2016 audit by April 14, 2017. If the Company is unable to become a fully reporting company, it will impede its chances to raise necessary capital from the public and private markets. The Company has to withdraw its Form 10 to avoid being in violation of the Securities Exchange Act of 1934.

There is a strong possibility that our auditor DBB Mckennon may withdraw their opinion on fiscal 2014 and 2015 audit and review of nine-month period ending September 30, 2016, including the Form 10. Moreover, due to these unauthorized off balance sheet transactions, the Company financial reporting to the general public would not have been accurate. For example, $149,012 was paid from Business xxx-xxx-4724 to Enterprise Rent-A-Car, San Antonio. The Company is not aware of these expenses as of 10/01/16 since these are being deducted from Business xxx-xxx-4724. This will cause our Cost of Sales and Net Operating Loss to be understated by this amount.

As a publicly trading company, it is our responsibility to keep the integrity of the public market. Mr. Ohanessian actions has created legal and reputational liability to the Company, the Board and me.

Further, these activities violated several covenants of Hillair Convertible Debenture dated 10/07/16 and 01/31/17. These violations will trigger not only Hillair conversion, diluting all existing shareholders, but also create a total asset lien on the Company and its subsidiaries. Further, it will result in legal and reputational harm to the Company, the Board and its Officers which at minimum could be more than Hillair's face value of the note, accrued interest, and penalties (>$10,000,000).

Because of these unauthorized transfers, the Company did not have available cash from 10/16 to 03/17, despite receiving close to $5 million and $2 million from Hillair Debenture dated 10/07/16 and 01/31/17. The Company was unable to meet following business activities:

    a)  Working Capital
    b)  Payment Due salaries (See below),
    c)  Payment Outstanding loans/interests of Mr. Dick Dolan and Mr. Peter Rosenthal, and
    d)  Payment Outstanding balance with Avitus, Scoobeez's Professional Employer.Organization.

Due to lack of availability of funds, Mr. Ohanessian took 17 high interest cash advances loans on ABT (5) and Scoobeez (12). He gave personal guarantees to many of these loans with affidavit of advanced judgment taken against him and the Company should there be a default. These loans caused the Company close to $2 million in fees and interest payments. Mr. Ohanessian was made aware that any loan which is more than $50,000 during normal course of business will violate Hillair Convertible Debenture dated 10/07/16. Mr. Ohanessian and Neal Kaufman had the similar conversation before Hillair invested additional monies in 01/31/17. However, Mr. Ohanessian continued to claim that if he did not take these loans and pay Avitus, then Avitus will not make payroll to our employees, which includes Drivers, Officer Staff, Dispatchers, and others. Company funds were available in Mr. Ohanessian's account Business xxx-xxx-4724. At this moment, I'm unable to assess the financial and legal liability of the Company in line with various state and federal labor laws.

Exhibit 10. Page 253

To make the matter worse, Mr. Ohanessian transferred funds from his personal/business account back to the Company's (ABT/Scoobeez) from January 2017 to date (See Exhibit C). He claimed that this is his loan to the Company. Regardless of one's intention and money returned, this creates a misleading information on our financial reporting.

**Immediate Remedies**

a) As per Article X, due to fraudulent, unauthorized transactions on Company's business account, the email dated 03/14/17 by Gil Cabrera is invalid as it is in direct violation of our Articles of Incorporation (See attached).

b) Both Mahesh Shetty and I are still the Directors of the Company.

c) Due to above discoveries and findings, any actions by Mr. Ohanessian invoking Article 10 (3) as the majority shareholder is null and void.

d) The Company needs to take necessary actions to remove Officers and Individuals who have caused harm to the Company.

e) The Company to commence negotiating terms with Hillair Capital to continue as a going concern.

f) If this issue is not resolved internally between the Board, Mr. Ohanessian and Hillair Capital and follow the US laws, I will have no choice but to inform proper regulatory and relevant authorities, including but not limited to Securities Exchange Commission, FINRA, IRS and the US Postal Inspectors.

**Termination of Imran Firoz as the CFO**

Based on the above findings and discoveries, my termination as the CFO of the Company by Mr. Ohanessian constitutes unlawful retaliation and wrongful termination. The Company and the Board is hereby informed that Federal law protects me from such retaliation, or revenge, for participating in protected activities, such as reporting unlawful activities or participating in an investigation into the practices of the employer.

I strongly believe that my discoveries as the CFO on activities of Mr. Ohanessian is both reasonable and in good faith for all concerned. I believe these activities by Mr. Ohanessian is in violation of our by-laws, articles of incorporation, tax codes, mail and wire fraud, the Patriot Act which amends the Bank Secrecy Act and IRS tax fraud.

I'm further stating that the Company owes me unpaid salaries from both ABT and Scoobeez as below:

a) Net = $281,433 from January 2012 to March 14, 2017, for services rendered to ABT as its Officer (CEO from January 2012 to May 2015, and CFO from May 2015 to March 2017).

b) Net = $277,500 from August 2015 to March 14, 2017, for services rendered to Scoobeez as its CFO and Director.

**Total Unpaid Salary = $558,933**

c) The past few days have caused an emotional diststress. I take my fiduciary responsibility very seriously and execute my duties with extreme pride in being an officer of a publicly traded company.

Exhibit 10. Page 254

I urge the Board to take necessary actions immediately to secure the financial wellbeing of the Company and restore the integrity of its business and protect its stakeholders. Further, I would appreciate if my unpaid salaries are paid in full by March 22, 2017, and I'm also open to a reasonable payment plan.

Yours truly,

*Imran Firoz*

(Imran Firoz)

Exhibit 10. Page 255

# EXHIBIT A

## RED FLAG REPORT

**BACKGROUND**

ABT Holdings, Inc. ("ABT") is a holding company that has ~ 90% equity interest in Scoobeez, Inc ("Scoobeez").

Scoobeez is the only operating entity of ABT as of fiscal year ended 12/31/16. There are two operating units of Scoobeez:

- **Scoobeez (Enterprise)**, which mainly deals with B2B side of the business and includes clients like Amazon, Yelp – Eat 24 and Thistle.

- **Scoobeez (Glendale)**, which is Scoobeez legacy business and includes local business customers in the GTLA are.

**KEY PERSONNEL**
Shahan Ohanessian, CEO, Director of ABT and Scoobeez
Imran Firoz, CFO, Director of ABT and Scoobeez
Justin Cary, CPA (external), Consolidated Financial Statements, Account Notes
Diane Horm, Accounts Receivables, Revenues, Cost of Sales
Tanya Saucedo, Bookkeeper, Account Payables/Expenses Entries

**Auditors – DBBMckennon**
Russ Boyer, Partner
Marianne D'Elia, Manager

Exhibit 10. Page 256

## BANKING

ABT has only one checking account at Wells Fargo, ████7830. Imran Firoz opened the account in January 2012.

At present, Shahan Ohanessian (CEO) and Imran Firoz (CFO) have complete access and authority to manage this account. There are two debit cards assigned to these individuals.

Bookkeepers have view only access to this account.

Scoobeez Enterprise (Main account for Amazon related transactions) has only one checking account at Wells Fargo, ████1330. Shahan Ohanessian opened the account in August 2015, after the acquisition of Scoobeez by ABT.

At present, Shahan Ohanessian (CEO), Minas Sarafian (Accountant at Scoobeez) have complete access and authority to manage this account. There are two debit cards assigned to these individuals.

Imran Firoz and Bookkeepers have view only access to this account.

Scoobeez Glendale has only one checking account at US Bank, ████1330. Grigori Sedrakyan/Beno Art (founders of Scoobeez) opened the account in January 2015.

At present, Grigori Sedrakyan has complete access and authority to manage this account.

[This account is immaterial for this report]

Exhibit 10. Page 257

**EVENT 1 – 02/28/17, Completion of Books for Fiscal 2016**

ABT finished its Form 10 filings on 02/14/17. From 02/15/17 to 02/28/17, staff completed books for both ABT and Scoobeez (including Glendale) for fiscal year ended 2016.

Subsequently, financial statements were handed to Justin Cary to consolidate financial statements of ABT, Scoobeez Enterprise, Scoobeez Glendale.

Exhibit 10. Page 258

**EVENT 2 – 03/01/17, Error in Loan Elimination between Funds Transferred From ABT to Scoobeez**

**From:** Justin Cary [mailto:jcary.cpa@gmail.com]
**Sent:** Wednesday, March 1, 2017 11:31 PM
**To:** imran@scoobeez.com
**Subject:** FS status

Hi Imran. I've put together a consolidation for the entities and it appears there will be some work related to reconciling the intercompany accounts. The main difference is the following:

Per ABT loan to Scoobeez: $5,559,029
Per Scoobeez loan from ABT: $3,159,029

That's a difference of $2.4M. That one may be easy but there is also some other various entries that I'll need to track down and reconcile from other intercompany accounts, including booking the non-controlling interest income from 2015 in the main Scoobeez entity. Please let me know though if you know offhand what the aforementioned $2.4M variance is when you're available.

Justin Cary, CPA
307 32nd Street
Newport Beach, CA 92663
Phone: 269-209-7566
JCary.CPA@gmail.com

**From:** Imran - Scoobeez [mailto:imran@scoobeez.com]
**Sent:** Thursday, March 2, 2017 12:56 AM
**To:** Justin Cary <jcary.cpa@gmail.com>
**Cc:** Diane - Scoobeez <diane@scoobeez.com>
**Subject:** RE: FS status

Thank you. Let me have a look; the loan should be $5,559,029 on Scoobeez books.

Imran

Sent via the Samsung Galaxy S7 edge, an AT&T 4G LTE smartphone

Exhibit 10. Page 259

**EVENT 3 – 03/03/17, Imran Firoz evaluated the discrepancy of $2.4 million**

**Shahan transferred $1,000,000 from ABT Account (xxx-7830) to Scoobeez (xxx-1330) from Hillair 1 funding.**

| | | | | |
|---|---|---|---|---|
| 10/20/2016 | Expense | WITHDRAWAL MADE IN A BRANCH/STORE | 10000 WF-■■■■7830 | 500,000.00 |
| 10/31/2016 | Expense | WITHDRAWAL MADE IN A BRANCH/STORE | 10000 WF-■■■■7830 | 250,000.00 |
| 11/04/2016 | Expense | WITHDRAWAL MADE IN A BRANCH/STORE | 10000 WF-■■■■7830 | 250,000.00 |

The above transfers were misclassified to Avitus Payroll Credit. So there was no foul.

However, upon reviewing the details in QuickBooks, the remaining balance of $1.4 million (as of 12/31/16) was transferred to an account named 'AutoClaim, Inc. Business ■■■■4724'. This account belongs to Shahan Ohanessian.

Details of these transfers to AutoClaim, Inc. Business xxx-4724 is documented below (See AutoClaim Inc.xls).

| Posted Transactions | | Debit | Credit |
|---|---|---|---|
| 3/2/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB037JLDHL ON 03/01/17 | | $2,000.00 |
| 2/28/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB0377W6RG ON 02/27/17 | | $5,000.00 |
| 2/22/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB036TXMB8 ON 02/22/17 | | $5,000.00 |
| 2/17/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB036JFZZT ON 02/17/17 | | $3,000.00 |
| 2/10/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB035WM2S5 ON 02/10/17 | | $10,000.00 |
| 2/7/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB035PCWML ON 02/07/17 | | $5,000.00 |
| 1/30/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB034YQ3FF ON 01/30/17 | | $10,000.00 |
| 1/17/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB034CZ8BZ ON 01/16/17 | | $40,000.00 |
| 1/17/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB034CFLZC ON 01/15/17 | | $40,000.00 |
| 1/10/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBENC6RWZP ON 01/10/17 | | $40,000.00 |
| 1/4/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBER86SYDM ON 01/04/17 | | $10,000.00 |
| 1/3/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBER86HGRY ON 01/03/17 | | $30,000.00 |
| 1/3/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEY28WCTS ON 01/01/17 | | $50,000.00 |
| 1/3/2017 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEY28PDDG ON 12/31/16 | | $30,000.00 |
| 1/3/2017 | ONLINE TRANSFER FROM AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE5TVLZCT ON 01/03/17 | $5,000.00 | |

Exhibit 10. Page 260

**Posted Transactions**

| | | Debit | Credit |
|---|---|---|---|
| 12/30/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEGJZ4SYS ON 12/30/16 | | $50,000.00 |
| 12/28/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEV56FKJ9 ON 12/28/16 | | $20,000.00 |
| 12/21/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEY26KV3K ON 12/21/16 | | $35,000.00 |
| 12/16/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE8QRP29K ON 12/16/16 | | $25,000.00 |
| 12/15/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBER72NS4B ON 12/14/16 | | $25,000.00 |
| 12/14/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE5TPM6TG ON 12/14/16 | | $75,000.00 |
| 12/12/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEV52GS66 ON 12/11/16 | | $85,000.00 |
| 12/7/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB033J39KS ON 12/07/16 | | $5,000.00 |
| 12/5/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IB033GY8VH ON 12/05/16 | | $5,000.00 |
| 11/14/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBER7QLZKQ ON 11/13/16 | | $15,000.00 |
| 11/14/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEV4RWJ38 ON 11/12/16 | | $20,000.00 |
| 11/14/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEV4RNWNL ON 11/11/16 | | $30,000.00 |
| 11/9/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE8QG4NMK ON 11/09/16 | | $50,000.00 |
| 11/9/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE5TDKG5S ON 11/08/16 | | $50,000.00 |
| 11/4/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBENBLQRV2 ON 11/04/16 | | $10,000.00 |
| 11/1/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE5T9TN36 ON 11/01/16 | | $30,000.00 |
| 10/31/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEV4N2RFX ON 10/31/16 | | $60,000.00 |
| 10/31/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEV4MWTX8 ON 10/31/16 | | $50,000.00 |
| 10/21/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE5T6YQS6 ON 10/21/16 | | $40,000.00 |
| 10/20/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBECM9QVBL ON 10/20/16 | | $60,000.00 |
| 10/20/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBECM9K6R5 ON 10/20/16 | | $60,000.00 |
| 10/19/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE2X4TFGQ ON 10/19/16 | | $50,000.00 |
| 10/17/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEKFCNYGY ON 10/17/16 | | $20,000.00 |
| 10/17/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE2X3YNPZ ON 10/15/16 | | $40,000.00 |
| 10/17/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBECM8DZ4K ON 10/15/16 | | $50,000.00 |
| 10/17/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEXZJZVYW ON 10/15/16 | | $50,000.00 |
| 10/14/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEGJ9DMNV ON 10/14/16 | | $100,000.00 |
| 10/11/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEKF9SJXN ON 10/11/16 | | $30,000.00 |
| 10/11/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBENBBYQ92 ON 10/10/16 | | $30,000.00 |
| 10/11/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBT77L855G ON 10/09/16 | | $40,000.00 |
| 10/7/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBENBBHKMR ON 10/07/16 | | $50,000.00 |
| 10/6/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE8Q4533P ON 10/06/16 | | $45,000.00 |
| 10/4/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEGJ6BDMW ON 10/03/16 | | $20,000.00 |
| 10/3/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBEGJ62PXF ON 10/03/16 | | $20,000.00 |
| 10/3/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBER7BCP2J ON 10/02/16 | | $25,000.00 |
| 9/26/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBE2WVL24M ON 09/25/16 | | $20,000.00 |
| 9/26/2016 | ONLINE TRANSFER TO AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 REF #IBECLZWQ6Z ON 09/25/16 | | $25,000.00 |
| Totals | | $5,000.00 | $1,695,000.00 |

Exhibit 10. Page 261

**EVENT 4 – 03/03/17, Shahan asked to provide explanation for these transfers to his business account.**

From: Scoobeez - Imran [mailto:imran@scoobeez.com]
Sent: Friday, March 3, 2017 9:06 AM
To: 'shahan@scoobeez.com' <shahan@scoobeez.com>
Subject: Auto Claim Transfers


Hi Shahan:


These are transfers from Scoobeez to AutoClaim Inc. for over $1.6 million


What are these for and what is this AutoClaim Inc. business checking account? This does not make any sense.


Imran

_____

Shahan claimed the funds from these accounts are used for Business purposes:

   a) Enterprise Rentals
   b) Payments to Technology Team (Roman/Steven/Sytepoint)
   c) Client entertainment

Shahan did not provide access to this bank account as of 03/04/17.

Exhibit 10. Page 262

Since I had no access to this account, I confirmed with Roman/Steven if they have received funds from Business Account xxx-xxx-4724. Roman confirmed that he has never received payments from this account. Steven has received $1,200.00 in July 2015:

--------------------------

**From:** Roman Tsarovsky [mailto:roman@scoobeez.com]
**Sent:** Saturday, March 4, 2017 9:53 AM
**To:** Scoobeez - Imran <imran@scoobeez.com>
**Subject:** Re: Payments Received


Yes confirmed!

Thank you,


Roman Tsarovsky

Cell: (818) 606-9522


On Mar 4, 2017, at 7:00 AM, Scoobeez - Imran <imran@scoobeez.com> wrote:

Hi Roman:

Thank you for the breakdown and details of the invoices needed for our audit. It also confirms that you (dba Appeni – IT Company) have not received any payments from the AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 below for development of AutoClaim App, Beezkeeper/Instabeez, and any other projects on behalf of ABT/Scoobeez since September of 2016.


All the payments you have received are from Scoobeez WF Business Account – xxx-xxx-1330.


Please confirm.


Best,


| | | |
|---|---|---|
| **Imran Firoz – CFO** | | Los Angeles |
| p: 844-Scoobeez | | m: 818-300-5792 |
| w: www.Scoobeez.com | | e: imran@scoobeez.com |

Exhibit 10. Page 263

---------------------------

**From:** Steven Karapetyan [mailto:steven@sytepoint.com]
**Sent:** Saturday, March 4, 2017 10:14 AM
**To:** Scoobeez - Imran <imran@scoobeez.com>
**Subject:** Re: Sytepoint Expenses - From Business Checking xxx-xxx-4724

Hi Imran,

From what I have on file, there is one check from AUTOCLAIM, INC. – 4724

Check No: 1001

To: BizCrate (previous business)

Date: 07/11/2015

Amount: 1,200

Steven Karapetyan - Designer, Developer

--

Sytepoint / 323.988.5600

Exhibit 10. Page 264

At 06:00 PM, after making several requests via text and on the phone, Imran Firoz officially sent the request to Shahan as per following email:

From: Scoobeez - Imran [mailto:imran@scoobeez.com]
Sent: Friday, March 3, 2017 6:01 PM
To: 'Shahan@Scoobeez.com' <Shahan@Scoobeez.com>
Subject: RE: Unaccounted Funds from ABT/Scoobeez

Shahan:

I confirm the $1 million cash withdrawn on 10/20/16, 10/31/16 and 11/04/16 from ABT is accounted and recorded in Scoobeez account.

I need full access to AutoClaim Business account, where the total transfer of $1,695,000 from Scoobeez Account has taken place for the period from 09/26/16 to 03/03/17. We need to know how and where the monies were spent from that account so that our true income statement and the balance sheet is reported to the auditors. This is an off balance sheet transaction and needs to be disclosed in our filings.

You need to inform the Board on how much money has been spent on AutoClaim App development, as this money has to be added to the book value of the App to obtain fair value.

ABT acquired the App in May 2015, with the premise that App was ready for launch with the beta testing (software developed, UI completed, back-end completed, a database developed, etc.). Based on these claims, the Company (ABT) issued $500,000 note, 150 million common stock, and 18.6 million preferred stock. I think the Board and I would like to know what level the App was in May 2015 (the date of Acquisition).

Best,

Imran

Exhibit 10. Page 265

**EVENT 4 – 03/04/17, Meeting Shahan, Imran and Javan at Shahan's Residence from 02:00 PM to 06:00 PM**

Exhibit 10. Page 266

**EVENT 5 – 03/05/17, Shahan provided view only access to his account AutoClaim, Inc. Business xxx-4724. Transaction details in Checking XXX-XXX-4724.xls.**

**SUMMARY REPORT:**

| | Debit | Credit | UBO [1] |
|---|---|---|---|
| **Event 1 (From 09/01/16 to 03/08/17)** | | | |
| Funds Transfer from Scoobeez Checking Account xxx-xxx-1330 | 1,696,500 | | Scoobeez |
| Funds Transfer to Shahan/AutoClaim Checking Account xxx-xxx-4724 | | 1,696,500 | Shahan |
| | 1,696,500 | 1,696,500 | |
| **Event 2 (From 09/01/16 to 03/08/17)** | | | |
| Funds Transfer from Shahan/AutoClaim Checking Account xxx-xxx-4724 | 1,696,500 | | Shahan |
| Funds from Shahan Personal Account (Premier Checking xxx-xxx-2672) | 16,110 | | Shahan |
| Funds from ABT Holdings (Business Checking xxx-xxx-7830) | 2,800 | | Shahan |
| Funds Deposited by Shahan (Source Unkown) | | | Shahan |
| Funds to Shahan Personal Account (Premier Checking xxx-xxx-2672) | | 390,580 | Shahan |
| Cash Withdrawal by Shahan at Wynn | | 715,006 | Shahan |
| ATM Fees at Wynn | | 10,774 | Wynn |
| Cash Withdrawal by Shahan at the Branch | | 473,699 | Shahan |
| **Business Related** | | | |
| Funds Transfer to Scoobeez Checking Account xxx-xxx-1330 | | 5,000 | Scoobeez |
| Enterprise | | 149,012 | Enterprise |
| Bank Fees | | 121 | Wells Fargo |
| Ending Balance | 28,782 | | |
| | 1,744,192 | 1,744,192 | 0 |

Exhibit 10. Page 267

2011 Idaho Code
TITLE 30 CORPORATIONS
CHAPTER 1 GENERAL BUSINESS CORPORATIONS

PART 7. SHAREHOLDERS
30-1-704 ACTION WITHOUT MEETING.

Universal Citation: ID Code § 30-1-704 (2011 through Reg Sess)
30-1-704. Action without meeting. (1) Action required or permitted by this chapter to be taken at a shareholders' meeting may be taken without a meeting if the action is taken by all the shareholders entitled to vote on the action. The action must be evidenced by one (1) or more written consents bearing the date of signature and describing the action taken, signed by all the shareholders entitled to vote on the action, and delivered to the corporation for inclusion in the minutes or filing with the corporate records.

(2) If not otherwise fixed under section 30-1-703 or 30-1-707, Idaho Code, the record date for determining shareholders entitled to take action without a meeting is the date the first shareholder signs the consent under subsection (1) of this section. No written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest date appearing on a consent delivered to the corporation in the manner required by this section, written consents signed by all shareholders entitled to vote on the action are received by the corporation. A written consent may be revoked by a writing to that effect received by the corporation prior to the receipt by the corporation of unrevoked written consents sufficient in number to take corporate action.

(3) A consent signed under this section has the effect of a meeting vote and may be described as such in any document.

(4) If this chapter requires that notice of proposed action be given to nonvoting shareholders and the action is to be taken by unanimous consent of the voting shareholders, the corporation must give its nonvoting shareholders written notice of the proposed action at least ten (10) days before the action is taken. The notice must contain or be accompanied by the same material that, under this chapter, would have been required to be sent to nonvoting shareholders in a notice of meeting at which the proposed action would have been submitted to the shareholders for action.

Exhibit 10. Page 268

**From:**      Justin Cary
**To:**        Imran@scoobeez.com
**Subject:**   FS status
**Date:**      Wednesday, March 1, 2017 11:31:40 PM

Hi Imran. I've put together a consolidation for the entities and it appears there will be some work related to reconciling the intercompany accounts. The main difference is the following:

Per ABT loan to Scoobeez: $5,559,029
Per Scoobeez loan from ABT: $3,159,029

That's a difference of $2.4M. That one may be easy but there is also some other various entries that I'll need to track down and reconcile from other intercompany accounts, including booking the non-controlling interest income from 2015 in the main Scoobeez entity. Please let me know though if you know offhand what the aforementioned $2.4M variance is when you're available.

Justin Cary, CPA

307 32nd Street
Newport Beach, CA 92663
Phone: 269-209-7566
JCary.CPA@gmail.com

Exhibit 10. Page 269

| | |
|---|---|
| **From:** | Imran - Scoobeez |
| **To:** | Justin Cary |
| **Cc:** | Diane - Scoobeez |
| **Subject:** | RE: FS status |
| **Date:** | Thursday, March 2, 2017 12:55:38 AM |
| **Attachments:** | Untitled attachment 02150.txt |
| | Untitled attachment 02153.txt |
| | Untitled attachment 02156.htm |
| | Untitled attachment 02159.txt |

Thank you. Let me have a look, the loan should be $5,559,029 on Scoobeez books.

Imran

Sent via the Samsung Galaxy S7 edge, an AT&T 4G LTE smartphone

Exhibit 10. Page 270

| | |
|---|---|
| **From:** | Scoobeez - Imran |
| **To:** | "shahan@scoobeez.com" |
| **Subject:** | Auto Claim Transfers |
| **Date:** | Friday, March 3, 2017 9:05:00 AM |
| **Attachments:** | AutoClaim Inc..xlsx |

Hi Shahan:

These are transfers from Scoobeez to AutoClaim Inc. for over $1.6 million

What are these for and what is this AutoClaim Inc. business checking account? This does not make any sense.

Imran

Exhibit 10. Page 271

| | |
|---|---|
| From: | Scoobeez - Imran |
| To: | "Shahan@Scoobeez.com" |
| Subject: | RE: Unaccounted Funds from ABT/Scoobeez |
| Date: | Friday, March 3, 2017 6:00:00 PM |
| Attachments: | image002.png |
| | image004.png |
| | image006.png |

Shahan:

I confirm the $1 million cash withdrawn on 10/20/16, 10/31/16 and 11/04/16 from ABT is accounted and recorded in Scoobeez account.

I need full access to AutoClaim Business account, where the total transfer of $1,695,000 from Scoobeez Account has taken place for the period from 09/26/16 to 03/03/17. We need to know how and where the monies were spent from that account so that our true income statement and the balance sheet is reported to the auditors. This is an off balance sheet transaction and needs to be disclosed in our filings.

You need to inform the Board on how much money has been spent on AutoClaim App development, as this money has to be added to the book value of the App to obtain fair value.

ABT acquired the App in May 2015, with the premise that App was ready for launch with the beta testing (software developed, UI completed, back-end completed, a database developed, etc.). Based on these claims, the Company (ABT) issued $500,000 note, 150 million common stock, and 18.6 million preferred stock. I think the Board and I would like to know what level the App was in May 2015 (the date of Acquisition).

Best,

Imran

From: Shahan@Scoobeez.com [mailto:Shahan@Scoobeez.com]
Sent: Friday, March 3, 2017 4:07 PM
To: Scoobeez - Imran <imran@scoobeez.com>
Subject: Re: Unaccounted Funds from ABT/Scoobeez

### 10/31/2016  - Money transferrred from ABT to Scoobeez

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 10/31 | | Deposit Made in A Branch/Store | 250,000.00 | | |
| 10/31 | | Purchase authorized on 10/26 Omni Fort Worth Fort Worth TX S586298704050203 Card 5837 | | 1,055.67 | |

### $500K transferred from ABT to Scoobeez

| | | | | | |
|---|---|---|---|---|---|
| 10/20 | | Purchase Return authorized on 10/19 Southwes 528245 800-435-9792 TX 662029464826082 Card 1303 | 544.98 | | |
| 10/20 | | Deposit Made in A Branch/Store | 500,000.00 | | |
| 10/20 | | Purchase authorized on 10/17 Omni Fort Worth Fort Worth TX S306290616101444 Card 5837 | | 18.72 | |

11/4

### $250 K transferred from ABT to Scoobeez

| | | | | | |
|---|---|---|---|---|---|
| 11/4 | | Purchase Return authorized on 11/02 Wynn Las Vegas Hot 702-770-2540 NV S83203085470250B3 Card 1303 | 165.88 | | |
| 11/4 | | Deposit Made in A Branch/Store | 250,000.00 | | |
| 11/4 | | Purchase authorized on 11/02 Wynn Las Vegas Hot 702-770-2540 NV S386305044976821 Card 1303 | | 10.16 | |

Exhibit 10. Page 272

Thanks

Shahan - Scoobeez Global
Cell: (818) 400-0338
Office: 844-Scoobeez

Email: Shahan@Scoobeez.com
Website: www.Scoobeez.com



NOTICE: This e-mail and any attachments are confidential and legally privilege. If you the reader of this message are not the intended recipient(s), be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. This communicated is not intended as a waiver or comprehensive statement of our rights, or legal contentions with regards to this matter, all of which are hereby expressly reserved. Thank you for your cooperation. Scoobeez, Inc. Visit us on the web at www.Scoobeez.com

On Friday March 3, 2017, at Friday 3:36 PM, Scoobeez - Imran <imran@scoobeez.com> wrote:

Hi Shahan:

WF called and confirmed the Branch and address where these withdrawals were made:

10/20/16 – Las Vegas Tower, 3800 Howard Hughes Parkway, Las Vegas, NV 89169, Shahan Ohanessian (WF Branch)

10/31/16 - 250,000 3433 S. Maryland Parkway, Las Vegas, NV 89169, Shahan Ohanessian (WF Branch)

11/04/16 - 250,000, 201 Main Street, Fort Worth, Texas 76102, Shahan Ohanessian (WF Branch)

I'm sure it matches with your travel itinerary.

Are you sure that you still did not withdraw these monies?

Best,

Imran

From: Scoobeez - Imran [mailto:imran@scoobeez.com]
Sent: Friday, March 3, 2017 3:14 PM
To: 'shahan@scoobeez.com' <shahan@scoobeez.com>
Subject: RE: Unaccounted Funds from ABT/Scoobeez

Hi Shahan:

Wells Fargo just confirmed that Shahan Ohanessian withdrew the monies in cash on 10/20/16, 10/31/16 and 11/04/16.

I will go to the bank tomorrow to get this confirmation in writing.

Exhibit 10. Page 273

Imran

**From:** Scoobeez - Imran [mailto:imran@scoobeez.com]
**Sent:** Friday, March 3, 2017 12:58 PM
**To:** 'shahan@scoobeez.com' <shahan@scoobeez.com>
**Subject:** Unaccounted Funds from ABT/Scoobeez

HI Shahan:

We need to account for these funds that were withdrawn by you:

**From ABT Account after Hillair 1 funding = $1,000,000:**

| | | | | |
|---|---|---|---|---|
| 10/20/2016 | Expense | WITHDRAWAL MADE IN A BRANCH/STORE | 10000 WF-████830 | 500,000.00 |
| 10/31/2016 | Expense | WITHDRAWAL MADE IN A BRANCH/STORE | 10000 WF-████7830 | 250,000.00 |
| 11/04/2016 | Expense | WITHDRAWAL MADE IN A BRANCH/STORE | 10000 WF-████7830 | 250,000.00 |

Scoobeez did not receive the above funds.

**Transfer to AutoClaim Inc./Shahan Account Business Checking xxx4724:  $1,695,000**

**Total = $2,695,000.**

Please provide details of this transaction and view only access to account 4724.

Best,



| | |
|---|---|
| **Imran Firoz – CFO** | Los Angeles |
| p: 844-Scoobeez | m: 818-300-5792 |
| w: www.Scoobeez.com | e: Imran@scoobeez.com |

Exhibit 10. Page 274

| | |
|---|---|
| **From:** | Roman Tsarovsky |
| **To:** | Scoobeez - Imran |
| **Subject:** | Re: Payments Received |
| **Date:** | Saturday, March 4, 2017 9:52:52 AM |

Yes confirmed!

Thank you,

Roman Tsarovsky
Cell: (818) 606-9522

On Mar 4, 2017, at 7:00 AM, Scoobeez - Imran <imran@scoobeez.com> wrote:

> HI Roman:
>
> Thank you for the breakdown and details of the invoices needed for our audit. It also
> confirms that you (dba Appeni – IT Company) have not received any payments from the
> AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724 below for development of
> AutoClaim App, Beezkeeper/Instabeez, and any other projects on behalf of
> ABT/Scoobeez since September of 2016.
>
> All the payments you have received are from Scoobeez WF Business Account – xxx-xxx-
> 1330.
>
> Please confirm.
>
> Best,
>
> <image001.png> | **Imran Firoz – CFO**        Los Angeles
>                    p: 844-Scoobeez            m: 818-300-5792
>                    w: www.Scoobeez.com        e: imran@scoobeez.com

> From: Roman Tsarovsky [mailto:roman@scoobeez.com]
> Sent: Friday, March 3, 2017 9:06 PM
> To: Imran Scoobeez <imran@scoobeez.com>
> Subject: Payments Received

Exhibit 10. Page 275

Hello,

please find the breakdown.

Sent with Unibox

Exhibit 10. Page 276

| | |
|---|---|
| **From:** | Steven Karapetyan |
| **To:** | Scoobeez - Imran |
| **Subject:** | Re: Sytepoint Expenses - From Business Checking xxx-xxx-4724 |
| **Date:** | Saturday, March 4, 2017 10:14:15 AM |
| **Attachments:** | image001.png |

Hi Imran,

From what I have on file, there is one check from AUTOCLAIM, INC. – 4724

Check No: 1001

To: BizCrate (previous business)

Date: 07/11/2015

Amount: 1,200

Steven Karapetyan - Designer, Developer

--

Sytepoint / 323.988.5600

**From:** Scoobeez - Imran <imran@scoobeez.com>

**Date:** Saturday, March 4, 2017 at 6:50 AM

**To:** Steven Karapetyan <steven@sytepoint.com>

**Subject:** Sytepoint Expenses – From Business Checking xxx-xxx-4724

Hi Steven:

I hope you are doing well.

Please email me total funds received by Sytepoint or you from AutoClaim Business Account ending as:

AUTOCLAIM, INC. BUSINESS CHECKING XXXXXX4724

If you have not received any payments from the above account, please let me know. I do have all the payments from Scoobeez WF account ending xxx-xxx-1330 to Sytepoint.

Best,



**Imran Firoz – CFO**
p: 844-Scoobeez
w: www.Scoobeez.com

Los Angeles
m: 818-300-5792
e: imran@scoobeez.com

Exhibit 10. Page 277

| | |
|---|---|
| **From:** | Neal Kaufman |
| **To:** | Imran Firoz; Shahan Ohanessian |
| **Cc:** | Vienna Chen; Sean M. McAvoy |
| **Subject:** | Meeting tomorrow (Wed) |
| **Date:** | Tuesday, March 7, 2017 9:46:55 PM |
| **Attachments:** | image001.png |

Shahan / Imran

Tomorrow I should be available around 11am, and I'll come right to the meeting.  I have a hard stop at 3pm for a Board Call, so – if it's okay with you guys – it would be great if I could use the conference room for that call.

In addition to reviewing the financials (income statement, balance sheet) for 2016 and Jan / Feb 2017, I am especially interested in understanding the economics of each of the 4 major locations: Chicago, LA, SF, Texas.  I would like to see projections for March for each location:

- Number of routes (Same Day, Next Day, 10 hour and 6 hour)
- Revenue per route from Amazon
- Revenue from Amazon for dispatchers and fuel (does this match the actual expenditures in each location?)
- Driver compensation per hour (how much the drivers receive, and then fully loaded with benefits and workman's comp)
- Fuel and maintenance costs
- Personnel in each region - # of dispatchers, admin, etc., and monthly cost per employee fully loaded with benefits.  Total personnel costs per region
- This should give us the amount of profit / loss that we have per region at an operational level
- Then, it would be good to understand the corporate costs (payroll, rent, etc.).  This should take into account the impact of allocating benefits and workmans comp to the regions.

Look forward to seeing you guys tomorrow.

Thanks
NK

**Neal Kaufman**
*Partner / Founding Member*

HILLAIR
CAPITAL
NealK@HillairCapital.com
415-420-6600

Exhibit 10. Page 278

| | |
|---|---|
| **From:** | Neal Kaufman |
| **To:** | Shahan Ohanessian; Imran Firoz |
| **Cc:** | Javan Khazali; Sean M. McAvoy; Neal Kaufman |
| **Subject:** | Path forward for ABOT / Hillair |
| **Date:** | Thursday, March 9, 2017 11:55:46 AM |
| **Attachments:** | image001.png |

Shahan and Imran

Thank you for taking the time to meet with Sean and I yesterday in Irvine, CA. It was helpful to get an update on the situation at ABOT, and hopefully we can work together to build a successful business.

Hillair is interested in working on a follow-up investment in ABOT, if the following measures are taken by Friday, March 9, we could start working on docs early next week with the objective of formalizing the transaction as soon as possible:

- Shahan resigns as CEO, and Imran is appointed interim CEO
- Shahan's wife resigns from the Board of Directors
- Shahan contributes at least $170,000 to ABOT between March 9 and March 14, which can be returned upon successful completion of the larger investment by Hillair
- Shahan will be removed from having signatory power on any ABOT bank accounts, including all subsidiaries. The signatory power will only reside with Imran, one other Board member, and any other people in the finance department identified by Imran and approved by the independent Board members.

Upon successful negotiation with Amazon regarding the go forwards payment terms such that the company generates cash on a go forwards basis, the terms below cover the key points of a follow-on investment:

- Hillair would have the right to invest additional capital (amount to be determined based on Amazon arrangement, analysis of financial model, Board approval) to enable ABOT to continue to grow. In exchange for the investment, Hillair would:
    - Receive preferred stock that would convert into 55% of the common stock of the company. This preferred stock would have an 8% PIK coupon, and would have 2 4 to 1 voting rights.
    - Hillair's debentures would remain in place
- Shahan's arrangement would be as follows:
    - Shahan would convert all preferred shares into common, and would surrender all of his shares such that he had 25% of the outstanding common shares after the conversion of the Hillair preferred shares
        - Shahan would have the option to purchase shares representing up to 10% of the Hillair shares at a fixed price, to be mutually determined
    - Shahan would receive a cash salary as Chairman, at a level of at least $180,000 per year

Exhibit 10. Page 279

# EXHIBIT 11

Electronically FILED by Superior Court of California, County of Los Angeles on 02/07/2019 06:05 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Hernandez, Deputy Clerk

1  BRENT M. FINCH, ESQ. [SBN 202866]
   bfinch@brentfinchlaw.com
2  FINCH LAW
   A PROFESSIONAL CORPORATION
3  27200 Agoura Road, Suite 102
   Calabasas, California 91301
4  Tel:   (818) 436-6411
   Fax:   (818) 223-8303
5

6  Attorneys for Defendant and Cross-Complainant Imran Firoz

7          SUPERIOR COURT OF THE STATE OF CALIFORNIA
8                  COUNTY OF LOS ANGELES

9

10 SCOOBEEZ GLOBAL, INC., an Idaho          Case No.: EC067690
   corporation, formerly known as ABT
11 HOLDINGS, INC, an Idaho corporation;
   SCOOBEEZ, a California corporation,       CROSS-COMPLAINT FOR:
12
                                            1. BREACH OF FIDUCIARY DUTY
13          Plaintiff,                          (DERIVATIVE CLAIM);
                                            2. CONVERSION (DERIVATIVE
14     vs.                                      CLAIM)
                                            3. BREACH OF CONTRACT
15 IMRAN FIROZ, an individual, and DOES 1       (EXECUTIVE EMPLOYMENT
   through 50, inclusive,                       AGREEMENT);
16                                          4. WRONGFUL TERMINATION;
          Defendants.                       5. RETALIATION (*GOVERNMENT
17                                             CODE* §12940, ET SEQ.);
   _____        6. RETALIATION (*LABOR CODE* §§
18 IMRAN FIROZ, an individual,                 98.6 AND 1102.5);
                                            7. VIOLATION OF *BUSINESS &*
19          Cross-Complainant,                 *PROFESSIONS CODE* §17200, ET
                                              SEQ.; AND
20     vs.                                  8. VIOLATION OF THE PRIVATE
                                              ATTORNEYS GENERAL ACT
21 SCOOBEEZ GLOBAL, INC., an Idaho             (*LABOR CODE* § 2698, ET SEQ.)
   corporation, formerly known as ABT
22 HOLDINGS, INC, an Idaho corporation;     *Complaint Filed:* January 9, 2018
   SCOOBEEZ, a California corporation, SHAHAN
23 OHANESSIAN, an individual; RICHARD A.
   (DICK) DOLAN, an individual; LANCE
24 BRINKER, an individual; SHOUSHANA
   OHANESSIAN, an individual; and JOWITA
25 CHOMENTOWSKA, an individual; Third-Party
   Defendant(s) and DOES 1 through 50, inclusive,
26
27          Cross-Defendants.
   _____
28

                              1

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

Cross-Complainant Imran Firoz ("Cross-Complainant" or "Firoz"), for his Cross-Complaint against Cross-Defendant SCOOBEEZ GLOBAL, INC., an Idaho corporation ("Scoobeez Global"), formerly known as ABT HOLDINGS, INC, an Idaho corporation ("ABT"); SCOOBEEZ, a California corporation ("Scoobeez"): SHAHAN OHANESSIAN, an individual; RICHARD A. (DICK) DOLAN, an individual; LANCE BRINKER, an individual; SHOUSHANA OHANESSIAN, an individual; JOWITA CHOMENTOWSKA, an individual (collectively, the "Individual Defendants"); and DOES 1 through 50, (collectively, "Cross-Defendants") inclusive, hereby allege as follows:

## THE PARTIES

1. Cross-Complainant Firoz is, and at all times herein mentioned was, an individual residing in the County of Orange, State of California.

2. Cross-Complainant is informed and believes, and thereon alleges, that Cross-Defendant Scoobeez Global is, and was at all times herein mentioned, an Idaho corporation with its principal place of business at 396 S. Pasadena Ave., Pasadena, CA 91105, and at all relevant times licensed to do business in California. Prior to March 29, 2017, Scoobeez Global was known as ABT Holdings, Inc. ("ABT"). Cross-Complainant is informed and believes, and thereon alleges, that Cross-Defendant Scoobeez is a California corporation, serving as the operating company, and that Scoobeez Global is the majority shareholder of Scoobeez, serving as the holding company. Collectively, Scoobeez Global and Scoobeez shall be referred to herein as the "Company."

3. Cross-Complainant is informed and believes, and thereon alleges, that Cross-Defendant Shahan Ohanessian ("Ohanessian") is, and at all times herein mentioned was, an individual residing in the County of Los Angeles, State of California. At all relevant times herein alleged, Ohanessian was the CEO, Board Member, and Majority Shareholder of Scoobeez Global, and he also is the CEO of Scoobeez.

FINCH LAW
22360 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

2

4.  Cross-Complainant is informed and believes, and thereon alleges, that Cross-Defendant Richard A. Dolan ("Dolan") is, and at all times herein mentioned was, an individual residing in Clark County, Nevada. Dolan was a Board Member of Scoobeez Global, effective March 14, 2017.

5.  Cross-Complainant is informed and believes, and thereon alleges, that Cross-Defendant Lance Brinker ("Brinker") is, and at all times herein mentioned was, an individual residing in the County of Wood, State of Texas.   Brinker was a Board Member of Scoobeez Global, effective January 18, 2017.

6.  Cross-Complainant is informed and believes, and thereon alleges, that Cross-Defendant Shoushana Ohanessian is, and at all times herein mentioned was, an individual residing in the County of Los Angeles, State of California. Ms. Ohanessian was a Board Member of Scoobeez Global, effective March 14, 2017. She is also the Operations Manager of Scoobeez.

7.  Cross-Complainant is informed and believes, and thereon alleges, that Cross-Defendant Jowita Chomentowska ("Chomentowska") is, and at all times herein mentioned was, an individual residing in the County of Los Angeles, State of California. Chomentowska was a Board Member of Scoobeez Global, effective March 14, 2017. She is also the Director of Operations of Scoobeez.

8.  Cross-Complainant is informed and believes, and thereon alleges, that each of the Cross-Defendants named herein, fictitiously or otherwise, was at all relevant times, the agent, employee, alter ego or representative of the remaining Cross-Defendants, and while incurring the debts herein alleged, was at all times acting within the scope of such alter ego, agency, employment or representation, and that Cross-Defendants, and each of them, combined and conspired to do each of the things hereinafter alleged and are jointly severally liable for the acts complained of herein.

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

3
**CROSS-COMPLAINT**

Exhibit 11. Page 283

Exhibit 4, Page 000070

FINCH LAW
27300 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

9.  Cross-Complainant is informed and believes, and thereon alleges, that each of the Cross-Defendants sued herein, including the Cross-Defendants named Does 1 through 50, inclusive, is and was negligently, tortiously, contractually, comparatively and/or in some other manner responsible, in whole or in part, for the acts and injuries which Cross-Complainants herein allege.

## GENERAL ALLEGATIONS

10. The Company provides on-demand delivery services to its clients' customers in various markets across the country.  The Company's website address is: www.scoobeez.com.

11. On or around July 2, 2012, Cross-Complainant executed his Executive Employment Agreement (the "Agreement") with the Company, wherein he agreed to be employed as the President/CEO of the Company.  A true and correct copy of the Agreement is attached as **Exhibit "A."**

12. Further, under the Agreement, as of July 1, 2014, Cross-Complainant had earned 150,000,000 restricted shares, all of which had vested.  The Company never issued these shares to Firoz.

13. Further, on or around March 6, 2015, the Company issued Firoz 1,600,000 preferred shares as an off-set against $76,500 of his accrued salary.

14. In addition, on or around May 19, 2015, the Company had a reverse stock split and, as a result, Firoz's 150,000,000 restricted shares split into 65,217 shares.

15. Cross-Complainant is informed and believes, and thereon alleges, that on or around April 2017, Firoz asked the Transfer Agent to convert his 1,600,000 preferred shares into 24,000,000 shares of common stock, which at the time, was valued at $0.20 per share.  The Company did not authorize the Transfer Agent to convert these shares.  The Transfer Agent still holds the certificate for Firoz's preferred shares.

4

**CROSS-COMPLAINT**

Exhibit 11. Page 284

Exhibit 4, Page 000071

16. Cross-Complainant is informed and believes, and thereon alleges, that the current stock price is only around $0.07 per share. As of December 1, 2018, Firoz could have sold 10,000,000 shares of common stock (at the rate of 1,670,000 shares every 90 days) if the Company had authorized the conversion as of April 2017. Thus, Cross-Complainant is informed and believes and thereon alleges that the Company caused Firoz to suffer $1,300,000 in losses, at $0.13 per share, since its failure and refusal to convert his shares on April 2017.

17. Cross-Complainant is informed and believes, and thereon alleges, that in May 2015, Scoobeez Global signed two Asset Purchase Agreements with Cross-Defendant Shahan Ohanessian to purchase the domain name and all the rights, title, interests, and benefits of proprietary technology app for accident documentation and claim mobile management. As a result of the transaction, Shahan Ohanessian became the majority shareholder of Scoobeez Global.

18. Cross-Complainant is informed and believes, and thereon alleges, that beginning in May 2015 and through the present, Cross-Defendant Ohanessian was the CEO, Board Member, and Majority Shareholder of Scoobeez Global, and he also is the CEO of Scoobeez.

19. At this time (May 2015), Cross-Complainant agreed to remain employed as the CFO and Board Member of the Company under the Agreement, and the Company did not terminate the Agreement.

20. Cross-Complainant is informed and believes, and thereon alleges, that in May 2015 and August 2015, Ohanessian also took control of all banking transactions of the Company.

21. Cross-Complainant is informed and believes, and thereon alleges, that Ohanessian has withdrawn approximately $3,305,000 from the Company and deposited $1,695,000 into his personal account(s) and withdrew approximately $1,610,000 in cash in several transactions from Scoobeez's bank account at the Wynn Las Vegas Hotel and Casino.

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

5

**CROSS-COMPLAINT**

Exhibit 11. Page 285

Exhibit 4, Page 000072

using the Company's debit card, with no authority from the Board or any agreement between Ohanessian and Scoobeez.

22. Cross-Complainant is informed and believes, and thereon alleges, that the Company was unable to pay its employees their owed wages because of Ohanessian's misappropriation of the Company's funds.

23. Cross-Complainant is informed and believes, and thereon alleges, that the Company was unable to pay Firoz and its other employees their owed wages because of Ohanessian's misappropriation of the Company's funds.

24. Cross-Complainant is informed and believes, and thereon alleges, that because of Ohanessian's misappropriation of the Company's funds, the Company was specifically unable to pay Scoobeez SD, LLC in San Diego; Scoobeez SF, LLC in San Francisco; and Scoobeez NV, LLC in Las Vegas (collectively known as "Licensee(s)") their agreed revenue share ("Commission"). As a result, Licensee(s) were unable to pay their employees, including Drivers, their owed wages.

25. Cross-Complainant is informed and believes, and thereon alleges, that because of Ohanessian's misappropriation of the Company's funds, the Company was unable to pay its accounts payable to Avitus, Inc., the Company's professional employer organization that increased accounts payable of more than $5,700,000 at or before March, 2017.

26. Cross-Complainant is informed and believes, and thereon alleges, that because of Ohanessian's misappropriation of the Company's funds, Ohanessian took a total of seventeen (17) high-interest cash advances loans on the Company totaling $3,700,000, which cost the Company approximately $2,000,000 in fees, charges, and interest payments.

FINCH LAW
27200 AGOURA ROAD, SUITE 10C
CALABASAS, CALIFORNIA 91301

6
**CROSS-COMPLAINT**

Exhibit 11. Page 286

Exhibit 4, Page 000073

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

27. Cross-Complainant is informed and believes, and thereon alleges, that because of Ohanessian's misappropriation of the Company's funds, the Company defaulted on its Senior Convertible Note, which adversely affected any future financing of the Company.

28. Cross-Complainant is informed and believes, and thereon alleges, that because of Ohanessian's misappropriation of the Company's funds and unverifiable withdrawal of large amount of cash from Scoobeez's bank account at the Wynn Las Vegas Hotel and Casino, using the Company's debit card adversely affected audibility of Company's financial statements. This caused irreparable harm to make the Company a fully reporting company under Securities Exchange Act of 1934 and negatively affected the share price and liquidity of Company's shares.

29. In sum, Cross-Complainant is informed and believes, and thereon alleges, that Ohanessian failed to perform and faithfully execute his duties as majority shareholder, Board Member, CEO, and President of the Company by, amongst other things:

    a.  Embezzling and/or misappropriating money from the Company into his own personal accounts;

    b.  Misappropriating confidential and material information and disclosing insider information to non-corporate officers and to parties that are in direct business conflict with the Company;

    c.  Failing to report financial information to the Board of Directors properly;

    d.  Wrongfully terminating Cross-Complainant Firoz;

    e.  Failing to pay employees agreed-upon salaries after misappropriating corporate funds.

30. Cross-Complainant Firoz as Company's CFO and Board Member made significant efforts to obtain the actions desired from the directors of the Company, including from the Individual Defendants, and, including but not limited to:

7

**CROSS-COMPLAINT**

Exhibit 11. Page 287

Exhibit 4, Page 000074

a. On March 3, 2017 demanded Ohanessian in writing via Company's email to show cause and provide explanation of misappropriation of Company's funds on March 3, 2017.

b. On March 4, 2017 met with Ohanessian at his residence with Javan Khazali ('Consultant'), resident of Laguna Hills, California, who acted as a witness. During the meeting Firoz informed Ohanessian that such misappropriation of funds are unauthorized, illegal, fraudulent, in violation of both Senior Convertible Note and the material disclosure requirements of a publicly traded company in accordance to Form 10 filed with the SEC, which was active.

c. On March 5, 2017, upon receiving bank statements as evidence which confirmed the misappropriation of funds by Ohanessian, Firoz demanded receipts, documentation, and support of use of funds. Ohanessian failed to provide support for all cash transactions for at least $1,500,000 from October 2016 to March 2017.

d. On March 8, 2017, upon request of Hillair Capital Investments LP ('Hillair'), senior lender, a meeting was held at Duke Hotel, Newport Beach, Juniper Boardroom to discuss the financial condition of the Company. Following individuals attended the meeting: Ohanessian, Firoz, Neal Kaufman (Managing Partner, Hillair), Sean McAvoy (Managing Partner, Hillair) and Javan Khazali (Consultant). In the presence of the attendees, Ohanessian acknowledged and confirmed that he transferred the funds equal to $1,696,500 to his account.

e. On March 9, 2017, Hillair sent a list of recommendations via email to the Company to establish certain measures for any future investment in the Company. Among other things, Hillair recommended that Ohanessian resign as the CEO, and Firoz appointed as the interim CEO, Defendant Shoushana Ohanessian resign as the Board Member, Ohanessian and Defendant Shoushana Ohanessian removed from

8

**CROSS-COMPLAINT**

Exhibit 11. Page 288

Exhibit 4, Page 000075

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

action to remove existing Board by a majority vote is binding only in the absence of a fraud.

32. Cross-Complainant is informed and believes, and thereon alleges, that the Company purported to terminate Firoz from all of his positions with the Company on March 14, 2017, after Firoz gained knowledge of these fraudulent events. However, the Company failed to serve Cross-Complainant with any required notices under his Agreement.

33. Cross-Complainant is informed and believes, and thereon alleges, that from January 2012 to March 2017, the Company owes Cross-Complainant Firoz at least $281,433 in unpaid salary, and Cross-Complainant owns 1.6 million preferred shares of stock in the Company.

## FIRST CAUSE OF ACTION

### (For Breach of Fiduciary Duty—Derivative Action)

### (Against All Cross-Defendants)

34. Cross-Complainant re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 33, above.

35. Cross-Complainant Firoz was a shareholder of the Company at the time of the transactions of which he complains.

36. This derivative claim is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

37. After Firoz gained knowledge of and blew the whistle on the wrongful activities alleged herein, Firoz demanded that the Company act to address and resolve these transactions, but his demand was futile and he could not obtain the actions desired, necessitating this action, because Ohanessian conspired with Individual Defendants to illegally remove Firoz and Mahesh Shetty as Board Member in violation of Scoobeez Global's Articles.

38. Cross-Complainant is informed and believes, and thereon alleges, that by reason of their positions as officers, directors and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual

FINCH LAW
17200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

10

**CROSS-COMPLAINT**

Exhibit 11. Page 289

Exhibit 4, Page 000076

Defendants owed the Company and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.

39. Cross-Complainant is informed and believes, and thereon alleges, that each of the Individual Defendants breached this duty owed to the Company by taking the actions described above.

40. Cross-Complainant is informed and believes, and thereon alleges, that in committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.

41. Cross-Complainant is informed and believes, and thereon alleges, that for all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that Scoobeez was improperly misrepresenting the health of its business model; (ii) conceal Cross-Defendant Ohanessian's personal expenditures of the Company's funds amounting to at least $1,610,000; (iii) deceive the investing public, including shareholders of Scoobeez, regarding the Individual Defendants' management of Scoobeez's operations, the Company's health and stability, and its future business prospects that had been misrepresented by the Individual Defendants. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

42. Cross-Complainant is informed and believes, and thereon alleges, that the Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that the Company was misrepresenting its business prospects.

43. Cross-Complainant is informed and believes, and thereon alleges, that the Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release

11

CROSS-COMPLAINT

Exhibit 11. Page 290

Exhibit 4, Page 000077

improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in 8 the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44. Cross-Complainant is informed and believes, and thereon alleges, that each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

45. Cross-Complainant is informed and believes, and thereon alleges, that each of the Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

46. Cross-Complainant is informed and believes, and thereon alleges, that to discharge their duties, each of the Individual Defendants was required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Scoobeez were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

FINCH LAW
17200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

12

**CROSS-COMPLAINT**

Exhibit 11. Page 291

Exhibit 4, Page 000078

c. Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d. Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

e. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

47. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Scoobeez, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

48. The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its condition and business prospects, as detailed below, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of class action lawsuits that allege violations of securities laws. As a result, Scoobeez has expended, and will continue to expend, significant sums of money.

49. The aforementioned acts were willful, wanton, malicious, and/or oppressive, and were undertaken with the specific intent of advancing Cross-Defendants' own financial interests at the expense of, and with total disregard for, the rights and interests of Firoz. Firoz is therefore entitled to exemplary and punitive damages according to proof at trial.

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

13

**CROSS-COMPLAINT**

Exhibit 11. Page 292

Exhibit 4, Page 000079

## SECOND CAUSE OF ACTION

### (For Conversion—Derivative Action)

### (Against Cross-Defendant Ohanessian)

50. Cross-Complainant re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 49, above.

51. Cross-Complainant is informed and believes, and thereon alleges, that Ohanessian has withdrawn approximately $3,305,000 from the Company and deposited $1,695,000 into his personal account(s) and withdrew approximately $1,610,000 in cash in several transactions from Scoobeez's bank account at the Wynn Las Vegas Hotel and Casino, using the Company's debit card, with no authority from the Board or any agreement between Ohanessian and Scoobeez.

52. Cross-Complainant is informed and believes, and thereon alleges, that in or around January 2016, Ohanessian leased three cars, including two luxury BMW cars, making the payments through Scoobeez accounts. Ohanessian made these purchases without authorization of the Board nor any agreement between him and Scoobeez.

53. Ohanessian's actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure the Company and in conscious disregard of the Company's rights. As a direct and proximate result of Ohanessian's conversion of Company's funds resulting in default of Senior Convertible Note, the Company's equity has become worthless.

54. Ohanessian's actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure the Company and in conscious disregard of the Company's rights. As a direct and proximate result of Ohanessian's conversion of Company's funds resulting in violation of Licensee agreements, Professional Employer

14

**CROSS-COMPLAINT**

Exhibit 11. Page 293

Exhibit 4, Page 000080

Organization agreement, and Employment agreements, the Company's is facing several current and potential legal actions, thus making its equity worthless and causing significant harm to the reputation of Firoz and other employees.

55. Cross-Complainant is informed and believes, and thereon alleges, that Ohanessian intentionally and substantially interfered with the Company's funds by taking and misappropriating the funds for his own personal use and enjoyment.

56. Ohanessian's actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure the Company and in conscious disregard of the Company's rights. As a direct and proximate result of Ohanessian 's conversion of Company's funds, the Company has suffered damages in excess of $5,000,000, according to proof at trial.

### THIRD CAUSE OF ACTION

### (For Breach of Executive Employment Agreement)

(Against The Company)

57. Cross-Complainant re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 56, above. On or around July 2, 2012, Cross-Complainant executed his Executive Employment Agreement (the "Agreement") with the Company, wherein he agreed to be employed as the President/CEO of the Company. A true and correct copy of the Agreement is attached as **Exhibit "A."**

58. Further, under the Agreement, as of July 1, 2014, Cross-Complainant had earned 150,000,000 restricted shares (pre-split), all of which had vested.

59. Cross-Complainant is informed and believes, and thereon alleges, that he fully performed all of his duties and obligations under the Agreement, except for those obligations which were excused.

60. The Company breached the Agreement, as follows:

FINCH LAW
23200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

15

- The Company failed to give Firoz the required notice and opportunity to any alleged breach of the Agreement, as required under Section 6.
- The Company failed to pay Firoz all of his compensation due and owing to him under the Agreement, specifically, from January 2012 to March 2017, the Company owes Cross-Complainant Firoz at least $281,433 in unpaid salary, and Cross-Complainant owns 1.6 million preferred shares of stock in the Company.
- The Company failed to comply with Section 9.6 (Dispute Resolution).

61. The Company's breached caused Firoz to suffer significant damages, in an amount to be proven at the time of trial, but no less than $281,433 in unpaid salary, and Cross-Complainant owns 1.6 million preferred shares of stock in the Company.

62. Further, under Section 9.6 of the Agreement, Firoz is entitled to his attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (For Wrongful Termination)

(Against The Company)

63. Cross-Complainants re-allege and incorporate by reference the allegations contained in paragraphs 1 through 62, above.

64. For all material times, Cross-Complainant Firoz was an employee of the Company.

65. The Company purported to terminate Firoz's employment on or around March 14, 2017.

66. Cross-Complainant is informed and believes, and thereon alleges, that the Company terminated Firoz as a result of and in retaliation after Firoz gained knowledge of and blew the whistle on the wrongful activities, described above.

67. Cross-Complainant is informed and believes, and thereon alleges, that the Company retaliated against Firoz because he provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency,

16

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

or an internal investigation of the Company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders.

68. Cross-Complainant is informed and believes, and thereon alleges, that the Company retaliated against Firoz for acting as the whistleblower in providing information to the SEC, in initiating, testifying in, or assisting in any investigation or judicial or administrative act of the SEC based upon or related to such information, or in making required disclosures.

69. Cross-Complainant is informed and believes, and thereon alleges, that the Company terminated Firoz in violation of the fundamental public policy of the State of California as put forward in the Fair Employment and Housing Act ("FEHA"), *Labor Code* Section 1102.5, and the Unruh Civil Rights Act, as well as the fundamental public policy of the United States as put forward in the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964.

70. Cross-Complainant is informed and believes, and thereon alleges, that the Company subjected Firoz to an adverse employment action when he was terminated.

71. Cross-Complainant is informed and believes, and thereon alleges, that his termination was a legal cause of his damages and that his protected activities are causally linked to the adverse employment action at issue.

72. As a proximate cause of The Company's wrongful termination of Cross-Complainant, Cross-Complainant has suffered, and continues to suffer, substantial loss in earnings, embarrassment, humiliation and mental anguish, all to his damage, in an amount according to proof.

73. Cross-Complainant is informed and believes, and thereon alleges, that he is entitled to backpay, interest, reinstatement, compensatory damages under *Labor Code* Section 1105.

17

**CROSS-COMPLAINT**

Exhibit 11. Page 296

Exhibit 4, Page 000083

and attorneys' fees and litigation costs, and all other penalties and relief available under *Labor Code* Section 1102.5.

74. Cross-Complainant is informed and believes, and thereon alleges, that the actions of the Company were willful, malicious, fraudulent and oppressive under *Civil Code* section 3294, and were committed with the wrongful intent to injure Firoz and in conscious disregard of Firoz's rights, thus warranting an award of punitive damages.

## FIFTH CAUSE OF ACTION

### (For Retaliation, Under *Government Code* §12940, et seq. )

(Against The Company)

75. Cross-Complainant re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 74, above.

76. At all times hereto, FEHA was in full force and effect and was binding upon The Company.

77. These laws set forth require The Company to refrain from retaliating against an employee for engaging in protected activity.

78. Cross-Complainant engaged in the protected activity of providing information, causing information to be provided, or assisting in an investigation by a federal regulatory or law enforcement agency, or an internal investigation of the Company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders.

79. Cross-Complainant suffered the adverse employment action of being terminated.

80. Cross-Complainant is informed and believes, and thereon alleges, that his termination was a legal cause of his damages and that his protected activities are causally linked to the adverse action at issue.

**CROSS-COMPLAINT**

Exhibit 11. Page 297

81. The Company violated FEHA and the public policy of the State of California by retaliating against Cross-Complainant and terminating him for attempting to exercise his protected rights, as set forth herein.

82. Cross-Complainant is informed and believes, and thereon alleges, that the above acts of retaliation by The Company were done with the knowledge, consent, and/or ratification of, or at the direction of, The Company and its owners/managers.

83. As a proximate cause of The Company's retaliation against Cross-Complainant, Cross-Complainant has suffered, and continues to suffer, substantial loss in earnings, embarrassment, humiliation and mental anguish, all to his damage, in an amount according to proof.

84. Cross-Complainant is informed and believes, and thereon alleges, that the actions of the Company were willful, malicious, fraudulent and oppressive under *Civil Code* section 3294, and were committed with the wrongful intent to injure Firoz and in conscious disregard of Firoz's rights, thus warranting an award of punitive damages.

85. Under *Government Code* Section 12965(b), Cross-Complainant requests a reasonable award of attorneys' fees and costs, including expert fees under FEHA.

### SIXTH CAUSE OF ACTION

### (For Retaliation, Under *Labor Code* §§ 98.6 and 1102.5)

(Against The Company)

86. Cross-Complainant re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 85, above.

87. *Labor Code* Section 98.6 provides, in sum, that an employer shall not discharge an employee because the employee filed a bona fide complaint or because the employee exercised his or her rights under the *Labor Code*.

19

**CROSS-COMPLAINT**

FINCH LAW
27200 AGOURA ROAD SUITE 102
CALABASAS, CALIFORNIA 91301

Exhibit 11. Page 298

Exhibit 4, Page 000085

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

88. In addition to other remedies available, an employer who violates *Labor Code* Section 98.6 is liable for a civil penalty not exceeding $10,000 per employee for each violation, to be awarded to the employee who suffered the violation.

89. *Labor Code* Section 1102.5 provides, in sum, that an employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance.

90. In addition to other remedies available, an employer who violates *Labor Code* Section 1102.5 is liable for a civil penalty not exceeding $10,000 per employee for each violation, to be awarded to the employee who suffered the violation.

91. Cross-Complainant engaged in the protected activity of providing information, causing information to be provided, or assisting in an investigation by a federal regulatory or law enforcement agency, or an internal investigation of the Company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders.

92. The Company, in retaliation, terminated Cross-Complainant for attempting to exercise his protected rights, in violation of *Labor Code* Sections 98.6 and 1102.5.

93. As a proximate cause of The Company's retaliation against Cross-Complainant, Cross-Complainant has suffered, and continues to suffer, substantial loss in earnings, embarrassment, humiliation and mental anguish, all to his damage, in an amount according to proof.

94. Under *Labor Code* Section 98.6(b)(3), Cross-Complainant is entitled to penalties in the amount of $10,000 per violation to be assessed against The Company.

95. Under *Labor Code* Section 1102.5(f), Cross-Complainant is entitled to penalties in the amount of $10,000 per violation to be assessed against The Company.

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

# SEVENTH CAUSE OF ACTION

## (For Violation of *Business & Professions Code* §17200, *et seq.*)

### (Against The Company)

96. Cross-Complainant re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 95, above.

97. The Company's conduct, as alleged herein, is unfair, unlawful, fraudulent, and harmful to Cross-Complainant and to the general public. Cross-Complainant seeks to enforce important rights affecting the public interest within the meaning of *Code of Civil Procedure* Section 1021.5.

98. The Company's policies, activities, and actions as alleged herein, violate the *Labor Code* and the *Government Code* and constitute unlawful business practices under *Business & Professions Code* Section 17200, *et seq.*

99. Cross-Complainant is entitled to equitable relief against such unlawful business practices in order to prevent future damages to The Company's employees, for which there is no adequate remedy at law, and to avoid a multiplicity of lawsuits.

100.    As a result of The Company's unfair, unlawful, and fraudulent business practices alleged herein. The Company has reaped unfair benefits and illegal profits at the expense of Cross-Complainant and members of the public. Company should disgorge its ill-gotten gains and restore such monies to Cross-Complainant.

101.    Under *Business & Professions Code* Section 17203, Cross-Complainant is entitled to restitution of all money rightfully belonging to him that The Company wrongfully retained by means of its unfair, unlawful, fraudulent business practices.

**CROSS-COMPLAINT**

Exhibit 11. Page  300

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

## EIGHTH CAUSE OF ACTION

### (For Violation of The Private Attorneys General Act ("PAGA") (*Labor Code* § 2698, *et seq.*))

(Against The Company)

102.    Cross-Complainant re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 101, above.

103.    Cross-Complainant is an aggrieved employee under PAGA, he was employed by The Company and he suffered one or more Labor Code violations alleged herein.

104.    Accordingly, Cross-Complainant seeks to recover the PAGA civil penalties for whistleblower retaliation in violation of *Labor Code* Sections 98.6 and 1102.5.

105.    Under *Labor Code* Section 2699(g)(1), any employee who prevails in any action shall be entitled to an award of reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Cross-Complainants pray judgment against Defendants, and each of them, as follows:

1.   For compensatory damages, according to proof at time of trial in a sum believed to exceed $281,433 in unpaid salary and 1.6 million preferred shares of stock in the Company:

2.   For restitution to the full extent permitted by law;

3.   For penalties in the amount of $10,000 for each violation, under *Labor Code* Section 98.6(b)(3);

4. For penalties in the amount of $10,000 for each violation, under *Labor Code* Section 1102.5(f);

5. For an award of civil penalties under PAGA;

6. For an award of reasonable attorneys' fees and costs, including under *Labor Code* Section 2699(g);

7. For prejudgment interest at the maximum legal rate;

8. For costs of suit herein incurred;

9. For punitive damages; and

10. For such other and further relief as the court deems just and proper.

DATED: December 19, 2018

By: _____

Brent M. Finch, Finch Law
Attorneys for Defendant and Cross-Complainant, Imran Firoz

FINCH LAW
27200 AGOURA ROAD, SUITE 102
CALABASAS, CALIFORNIA 91301

23

**CROSS-COMPLAINT**

Exhibit 11. Page 302