# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**SCOOBEEZ GLOBAL, INC., F/K/A ABT HOLDINGS, INC.**
**SCOOBEEZ, and**
**SCOOBUR LLC,**

**AND**

**HILLAIR CAPITAL ADVISORS LLC**

**Dated as of September 11, 2019**

## Table of Contents

Page

ARTICLE I        DEFINITIONS ....................................................................1
        Section 1.1        Certain Definitions .................................................1
        Section 1.2        Other Definitional and Interpretive Matters........................10
ARTICLE II        PURCHASE AND SALE OF ASSETS; ASSUMPTION OF
                LIABILITIES ............................................................11
        Section 2.1        Purchase and Sale of Assets ....................................11
        Section 2.2        Excluded Assets ...............................................13
        Section 2.3        Excluded Liabilities ..........................................15
        Section 2.4        Assumed Liabilities ...........................................16
        Section 2.5        Purchased Assets .............................................17
        Section 2.6        Further Conveyances and Assumptions ............................17
        Section 2.7        Transitional Matters ..........................................18
        Section 2.8        Non-Assignable Contracts ......................................19
ARTICLE III        CONSIDERATION ........................................................19
        Section 3.1        Purchase Price ................................................19
ARTICLE IV        CLOSING AND TERMINATION .............................................20
        Section 4.1        Closing Date .................................................20
        Section 4.2        Deliveries by Sellers .........................................20
        Section 4.3        Deliveries by Buyer.At the Closing, Buyer shall deliver to
                Sellers: ....................................................20
        Section 4.4        Termination of Agreement ......................................21
        Section 4.5        Reimbursement; Expenses .......................................23
        Section 4.6        Effect of Termination .........................................23
ARTICLE V        REPRESENTATIONS AND WARRANTIES OF SELLERS........................24
        Section 5.1        Authorization of Agreement ....................................24
        Section 5.2        No Conflicts ..................................................24
        Section 5.3        Title to Purchased Assets .....................................25
        Section 5.4        Real Property Leases ..........................................25
        Section 5.5        Tangible Personal Property ....................................25
        Section 5.6        Intellectual Property .........................................25
        Section 5.7        Financial Statements ..........................................25
        Section 5.8        Financial Advisors ............................................26
        Section 5.9        Litigation ...................................................26
        Section 5.10        Compliance with Laws .........................................26
        Section 5.11        Permits .....................................................26
        Section 5.12        [Intentionally Omitted].......................................26
        Section 5.13        Contracts ...................................................27
        Section 5.14        [Intentionally Omitted].......................................27
        Section 5.15        Labor Matters ...............................................27
        Section 5.16        No Other Agreements to Purchase ...............................27
        Section 5.17        No Other Representations and Warranties .......................27
ARTICLE VI        REPRESENTATIONS AND WARRANTIES OF BUYER ........................27
        Section 6.1        Organization and Good Standing................................27

Table of Contents
(continued)

| Section 6.2 | Authorization of Agreement | 27 |
| Section 6.3 | No Conflicts; Consents | 28 |
| Section 6.4 | Litigation | 28 |
| Section 6.5 | Sale "As is, Where is" | 28 |
| ARTICLE VII | BANKRUPTCY COURT APPROVAL | 29 |
| Section 7.1 | Competing Transaction | 29 |
| Section 7.2 | Bankruptcy Court Filings | 29 |
| ARTICLE VIII | COVENANTS | 30 |
| Section 8.1 | Access to Information | 30 |
| Section 8.2 | Further Assurances | 31 |
| Section 8.3 | Confidentiality | 32 |
| Section 8.4 | Preservation of Records | 32 |
| Section 8.5 | Publicity | 33 |
| Section 8.6 | Operation of Business | 33 |
| Section 8.7 | Section 363(b)(1)(A) | 35 |
| Section 8.8 | Adequate Assurances Regarding Purchased Contracts and Certain Real Property Leases | 35 |
| Section 8.9 | Notification of Certain Matters | 35 |
| Section 8.10 | Payment of Assumed Post-Petition Current Liabilities and Accounts Receivable | 36 |
| Section 8.11 | Working Capital Payments | 36 |
| Section 8.12 | Lease Option to Purchase | 40 |
| Section 8.13 | Release | 40 |
| Section 8.14 | Prospective Employees | 40 |
| Section 8.15 | Name Change | 41 |
| Section 8.16 | Bulk Sales Laws | 42 |
| ARTICLE IX | CONDITIONS TO CLOSING | 42 |
| Section 9.1 | Conditions Precedent to Obligations of Buyer | 42 |
| Section 9.2 | Conditions Precedent to Obligations of Sellers | 43 |
| Section 9.3 | Conditions Precedent to Obligations of Buyer and Sellers | 44 |
| Section 9.4 | Frustration of Closing Conditions | 44 |
| ARTICLE X | NO SURVIVAL | 44 |
| Section 10.1 | No Survival of Representations and Warranties | 44 |
| ARTICLE XI | TAX MATTERS | 44 |
| Section 11.1 | Transfer Taxes | 44 |
| Section 11.2 | Prorations | 44 |
| Section 11.3 | Purchase Price Allocation | 45 |
| ARTICLE XII | MISCELLANEOUS | 45 |
| Section 12.1 | Expenses | 45 |
| Section 12.2 | Submission to Jurisdiction; Consent to Service of Process | 45 |
| Section 12.3 | Waiver of Right to Trial by Jury | 46 |
| Section 12.4 | Entire Agreement; Amendments and Waivers | 46 |
| Section 12.5 | Governing Law | 46 |

Table of Contents
(continued)

| | | Page |
|---|---|---|
| Section 12.6 | Notices | 46 |
| Section 12.7 | Severability | 48 |
| Section 12.8 | Binding Effect; Assignment | 48 |
| Section 12.9 | Counterparts | 48 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Bid Procedures Order |
| Exhibit B | Sale Order |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Contracts |
| Schedule 1.1(b) | Purchased Contracts |
| Schedule 1.1(c) | Purchased Intellectual Property |
| Schedule 2.1(r) | Purchased Assets – Causes of Action |
| Schedule 2.1(s) | Purchased Assets – Specified Vendors |
| Schedule 2.1(t) | Additional Purchased Assets |
| Schedule 2.2(l) | Additional Excluded Assets |
| Schedule 2.4(a) | Assumed Secured Liabilities |
| Schedule 2.4(b) | Other Assumed Liabilities |
| Schedule 2.4(i) | Cure Amounts |
| Schedule 5.2 | No Conflicts |
| Schedule 5.4 | Real Property Lease Defaults |
| Schedule 5.8 | Financial Advisors |
| Schedule 5.9 | Litigation |
| Schedule 5.10 | Compliance with Laws |
| Schedule 5.11 | Permits |
| Schedule 8.6(h) | Affiliate Transactions |
| Schedule 8.11 | Net Working Capital |
| Schedule 8.12(b) | Increased Credit Bid Impact on Net Working Capital Payments |

5110383-12

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of September 11, 2019 (this "**Agreement**"), is entered into by and among Scoobeez Global, Inc., an Idaho corporation formerly known as ABT Holdings, Inc. ("**Global**"), Scoobeez, a California corporation ("**Scoobeez**"), Scoobur LLC, a California limited liability company ("**Scoobur**" and with Global and Scoobeez, collectively, "**Sellers**"), and Hillair Capital Advisors LLC, a Delaware limited liability company (and together with their assignees or designee(s), as provided under Section 12.8, "**Buyer**").

## W I T N E S S E T H:

**WHEREAS**, Sellers, and the Buyer are parties to the Cash Collateral Stipulation, as well as various financing and related documents;

**WHEREAS**, as of the date hereof, Sellers have commenced cases (the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code (as it may be amended from time to time, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") (the date of such commencement being referred to as the "**Petition Date**");

**WHEREAS**, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined below) and Assumed Liabilities (as defined below), as more specifically provided herein; and

**WHEREAS**, certain terms used in this Agreement are defined in Section 1.1.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    **Certain Definitions**. For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"**Accounts Receivable**" means all accounts, accounts receivable, credit card receivables, contract rights to payment, notes, notes receivable, and vendor rebates of Sellers.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Alternative Proposal**" has the meaning set forth in Section 7.1.

"**Approved Budget**" means the budget established pursuant to the Cash Collateral Order and any subsequent budget, in form and substance acceptable to Buyer, that collectively extend through and including the Closing Date, as supplemented, modified or amended with the express written consent of Buyer, or otherwise approved by the Bankruptcy Court.

"**Assumed Liabilities**" shall have the meaning set forth in <u>Section 2.4</u>.

"**Assumed Secured Liabilities**" shall have the meaning set forth in <u>Section 2.4(a)</u>.

"**Auction**" has the meaning set forth in the Bid Procedures Order.

"**Bankruptcy Cases**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court, in substantially the form attached hereto as <u>Exhibit A</u> or as otherwise approved by Buyer, approving the bid procedures with respect to the Auction, the Expense Reimbursement and the qualifications for a Qualified Bid (as defined in the Bid Procedures Order), and providing, among other things, that if no Qualified Bid is received by the Bid Deadline (as defined in the Bid Procedures Order) other than the bid incorporating this Agreement, Buyer's bid shall be determined to be the Winning Bid (as defined in the Bid Procedures Order) for the Purchased Assets.

"**Business**" means the logistics and delivery business and operations of Sellers.

"**Business Day**" means any day except Saturday or Sunday or any other day of the year on which national banking institutions in New York are required or authorized to be closed for business.

"**Buyer**" shall have the meaning set forth in the Preamble.

"**Buyer Employees**" has the meaning set forth in <u>Section 8.14</u>.

"**Buyer's Working Capital**" means all amounts Buyer is entitled to receive from distributions of Estimated Net Working Capital or Net Working Capital pursuant to <u>Section 8.11</u>.

"**Causes of Action**" means all actions, claims, causes of action, controversies, demands, Liens, indemnities, guaranties, suits, obligations, liabilities, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, third-party claims, counterclaims and crossclaims and rights of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, asserted or unasserted, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law of the Sellers. "Causes of Action" also includes all avoidance, recovery, subordination, or other actions or remedies that may be brought on behalf of the Sellers under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under

2

sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, 553 and/or 724 of the Bankruptcy Code, all rights of the Sellers of setoff or recoupment and to object to claims or interests.

"**Cash Collateral Order**" means any Order of the Bankruptcy Court approving the Cash Collateral Stipulation, as amended, extended, restated, supplemented or otherwise modified or superseded from time to time.

"**Cash Collateral Stipulation**" means that certain Second Stipulation Between the Debtors, the Committee and Hillair Capital Management for (1) Authorization to Use Cash Collateral; and (2) Appointment of Chief Restructuring Officer [Docket No. 132] entered in the Bankruptcy Cases, as amended, extended, restated, supplemented or otherwise modified or superseded from time to time in accordance with the Cash Collateral Order.

"**Closing**" shall have the meaning set forth in Section 4.1.

"**Closing Date**" shall have the meaning set forth in Section 4.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Committee**" means the Official Committee of Unsecured Creditors appointed in the Sellers' chapter 11 cases.

"**Competing Bid**" shall have the meaning set forth in Section 7.1.

"**Contract**" means any written or oral contract, indenture, commitment, purchase or sale order, note, bond, lease, Real Property Lease, Personal Property Lease, franchise agreement or other agreement (including employment and consulting agreements) to which any Seller is a party, other than the Option, as set forth on Schedule 1.1(a).

"**Credit Bid Amount**" shall have the meaning set forth in Section 3.1.

"**Cure Amounts**" means any and all amounts required, as a condition to assumption or assignment, to be paid to a non-debtor party to a Purchased Contract pursuant to Section 365(b) of the Bankruptcy Code.

"**Debenture Lender**" means Hillair Capital Investments L.P.

"**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"**Employee Claim**" means any claim, demand, action, cause of action, damage, loss, cost, Liability or expense, including legal costs, made or brought by any Employee, including, but not

3

limited to, any claim made pursuant to any applicable Laws relating to employment standards, occupational health and safety, labor relations, workers compensation, pay equity, employment equity, the Americans with Disabilities Act, the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Family and Medical Leave Act or the Fair Labor Standards Act or any other federal, state or local, statutory or decisional Law regarding employment discrimination.

"**Employee Obligations**" means all wages, bonuses, incentive, equity, equity-based or similar compensation obligations, deferred compensation arrangements, vacation pay, sick time, pension payments, overtime pay, change of control payments, severance pay and any other termination or severance obligations and any other compensation or obligation which may be due by statute, contract or Law relating to the employment of the Employees in respect of the Business.

"**Employees**" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by Sellers in connection with the Business, together with individuals who are hired in respect of the Business after the date hereof and prior to the Closing.

"**Excess NWC Adjustment**" shall have the meaning set forth in Section 8.11(b).

"**Excluded Assets**" shall have the meaning set forth in Section 2.2, subject to Section 2.7(c).

"**Excluded Contracts**" means all Contracts other than Purchased Contracts.

"**Excluded Liabilities**" shall have the meaning set forth in Section 2.3.

"**Expense Reimbursement**" means Buyer's reasonable and direct fees, costs and expenses (including consultants' and attorneys' fees, costs and expenses) incurred in connection with the transactions contemplated by this Agreement through the Termination Date,  including any such Person employed by any of Buyer's Affiliates, subject to provision of documentation detailing such expenses, including work descriptions with detailed time entries, not to exceed in the aggregate $150,000, minus amounts payable by Sellers to the Buyer for Buyer's professionals as provided in the cash collateral budget set forth in the Cash Collateral Order.

"**Final Order**" means an Order, judgment, or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"**Furniture and Equipment**" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned by Sellers, including all artwork, desks, chairs, tables, computer and computer-related hardware (including, computers, file servers, facsimile servers, scanners, printers, and networks), copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles, cash registers, point-of-sale equipment, warehouse equipment, and miscellaneous office furnishings and supplies.

4

"**GAAP**" means generally accepted accounting principles in the United States in effect from time to time.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"**Hillair Debenture**" means that certain 8% Senior Secured Convertible Debenture, dated as of January 30, 2017, issued by ABT Holdings, Inc. (now known as Global) in favor of the Debenture Lender and guaranteed by Scoobeez and Scoobur, as amended, restated, supplemented or otherwise modified from time to time and subject to the Cash Collateral Stipulation and Cash Collateral Order.

"**Hillair Obligations**" shall mean Liabilities of the Sellers on account of the Hillair Debenture, together with all fees, expenses, indemnities and reimbursement obligations due thereunder and interest thereon (in each case, if applicable) accruing both before and after the Petition Date to the extent allowable under the Bankruptcy Code, the value of which Liabilities in the aggregate shall be equal to $11,108,000, plus any further interest and fees payable pursuant to, and subject to the terms of, the Cash Collateral Stipulation and Cash Collateral Order, notwithstanding the ultimate Credit Bid Amount or any order of the Bankruptcy Court.

"**Insider Claims**" shall mean all Causes of Action of the Sellers against Persons that were "insiders," as defined in the Bankruptcy Code, of the Sellers as of the Petition Date, including Shahan Ohanessian.

"**Indebtedness**" of any Person means, without duplication, (i) the principal and interest of, and premium (if any) in respect of, (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property or services, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Intellectual Property**" means all worldwide intellectual property rights of Sellers, including all (i) patents, patent applications and inventions, (ii) trademarks, service marks, trade names and trade dress, which expressly includes the goodwill and any common law rights associated with the foregoing, (iii) domain names, websites and mobile device applications, (iv) copyrights, including copyrights in computer software, (v) confidential and proprietary information, including trade secrets, confidential business information, ideas, research and

5

development, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, and know-how ("**Trade Secrets**"), (vi) licenses relating to any of the foregoing, (vi) registrations and applications for registration and renewal of the foregoing, and (vii) any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"**Inventory**" means all of Sellers' now owned or hereafter acquired inventory and goods, wherever located, including all inventory and goods that (a) are leased by any Seller as lessor, (b) are held by such Seller for sale or lease or to be furnished under a contract of service, (c) are furnished by any Seller under a Contract of service, or (d) consist of raw materials, work in process, finished goods or material used or consumed in connection with the Business, <u>provided</u>, <u>however</u>, that for the avoidance of doubt, "Inventory" does not mean any inventory or goods that have been consigned to Sellers.

"**Knowledge**" means, with respect to Sellers, actual current knowledge, after reasonable inquiry, of George Voskanian and Scott Sheikh.

"**Law**" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or Order.

"**Legal Proceeding**" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body, and any appeal from any of the foregoing.

"**Lender**" shall mean "Hillair" as defined in and under the Cash Collateral Stipulation.

"**Liability**" means any Indebtedness, liability, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement or encumbrance.

"**Material Adverse Effect**" means any event, change, circumstance or occurrence that, individually or in the aggregate, has had or could reasonably be expected to have or result in (i) a material adverse effect on the business, assets, results of operations or financial condition of Sellers, the Business or the Purchased Assets, it being understood and agreed by the Parties that Net Working Capital of Sellers of less than $1.75 million shall constitute a material adverse effect on the business of Sellers, or (ii) a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement, other than the effect of any change resulting from any action taken by Buyer or its Affiliates with respect to the transactions contemplated hereby, or any effect resulting directly from the filing of the Bankruptcy Cases; provided, however, that the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or could reasonably be expected to occur a Material Adverse Effect: (a) changes in applicable Law, (b) any changes in accounting regulations or changes in accounting policies or

6

practices that any Seller is required to adopt, (c) changes in general economic or political conditions, (d) changes generally affecting the industries in which the Business operates, (e) any outbreak or escalation of hostilities or war (whether declared or undeclared) or any act of terrorism, or (f) any action taken (or omitted to be taken) as required by this Agreement; provided further, however, that any event, change, circumstance or occurrence referred to in clauses (a) through (f) immediately above shall be taken in account in determining whether or not there has been or could reasonably be expected to occur a Material Adverse Effect to the extent that such event, change, circumstance or occurrence has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"**Net Working Capital**" means the total value of the cash, Accounts Receivable (net of reserves), Inventory (net of reserves), and prepaid expenses and other current assets of Sellers, less (i) amounts due from Shahan Ohanessian as set forth in current assets in the Sellers' most recent balance sheet prior to the Closing, (ii) the Assumed Post-Petition Current Liabilities; (iii) Assumed Secured Liabilities, if any; (iv) unpaid professional fee claims to the extent such amounts are not included in Assumed Post-Petition Current Liabilities; and (v) to the extent listed on the Sellers' most recent balance sheet prior to the Closing, any of the Assumed Liabilities.  For avoidance of confusion, the Net Working Capital computation as of June 30, 2019 and agreed to by the Parties is set forth in Schedule 8.11. Schedule 8.11 shall be updated and replaced by the Estimated Closing Statement as of the date of Closing.

"**Non-Assignable Contracts**" has the meaning set forth in Section 2.8.

"**Option**" has the meaning set forth in Section 8.12

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of the Business consistent with the past practice of the Business through the date hereof, subject to any duties and restrictions imposed on Sellers under the Bankruptcy Code.

"**Parties**" means Sellers and Buyer.

"**Permits**" means any approvals, authorizations, consents, licenses, permits or certifications of a Governmental Body necessary to conduct and operate the Business in substantially the same manner as conducted prior the Closing.

"**Permitted Access Parties**" has the meaning set forth in Section 8.1(b).

"**Permitted Exceptions**" means (i) all defects, exceptions, restrictions, easements, rights of way, encumbrances and Liens reflected in policies of title insurance which have been made available to or are obtained by Buyer and that would not interfere with the use of the Purchased Assets or conduct of the Business in accordance with historical practice; (ii) statutory Liens for Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv)  zoning, entitlement and

7

other land use and environmental regulations by any Governmental Body in the Ordinary Course of Business provided that such regulations have not been violated; (v) liens arising under original purchase price conditional sales contracts and title of a lessor under a capital or operating lease; (vi) licenses of, and any restrictions or conditions on the transfer or assignment of licenses of Intellectual Property or other proprietary rights; (vii) restrictions imposed by Law; (viii) Liens arising under the Cash Collateral Stipulation or Hillair Debenture, and (ix) imperfections in title which would not interfere with the use of the Purchased Assets.

"**Person**" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"**Personal Property Leases**" shall have the meaning set forth in Section 5.5.

"**Petition Date**" shall have the meaning set forth in the Recitals.

"**PII**" means personally identifiable information, as such term is used in section 363(b)(1) of the Bankruptcy Code, that has been collected by or is otherwise in the possession of the Sellers.

"**Previously Omitted Contract**" has the meaning set forth in Section 2.7(c)(i).

"**Previously Omitted Contract Designation**" has the meaning set forth in Section 2.7(c)(i).

"**Previously Omitted Contract Notice**" has the meaning set forth in Section 2.7(c)(ii).

"**Products**" means any and all products developed, manufactured, procured, marketed or sold by Sellers, whether work in progress or in final form.

"**Prospective Employees**" shall have the meaning set forth in Section 8.14(a).

"**Purchase Price**" shall have the meaning set forth in Section 3.1.

"**Purchased Assets**" shall have the meaning set forth in Section 2.1.

"**Purchased Contracts**" means the Contracts set forth on Schedule 1.1(b), as such Schedule may be amended from time to time in accordance with this Agreement.

"**Purchased Intellectual Property**" means all Intellectual Property and related Software and Technology of the Sellers, including as set forth on Schedule 1.1(c), except such Intellectual Property that is specifically excluded by Buyer.

"**Purchased Inventory**" means, as of the Closing, all Inventory used primarily in connection with the Business.

"**Real Property Leases**" shall have the meaning set forth in Section 5.4.

"**Remaining Hillair Obligations**" shall mean, at any time, the balance of the Hillair Obligations outstanding as of such time.

8

"**Sale and Bid Procedures Motion**" means the motion or motions of Sellers, in form and substance acceptable to Buyer and Sellers, to be filed with the Bankruptcy Court seeking approval and entry of the Bid Procedures Order, and, in the event that Buyer is the Winning Bidder at the Auction or no Competing Bid is submitted, the Sale Order.

"**Sale Order**" shall be an Order of the Bankruptcy Court, substantially in the form and content attached hereto as Exhibit B or as otherwise approved by Buyer in its sole and absolute discretion.

"**Seller Documents**" shall have the meaning set forth in Section 5.1.

"**Seller Marks**" has the meaning set forth in Section 8.15.

"**Seller Names**" has the meaning set forth in Section 8.15.

"**Sellers**" shall have the meaning set forth in the Preamble.

"**Sellers' Working Capital**" means all amounts the Sellers are entitled to receive from distributions of Estimated Net Working Capital or Net Working Capital pursuant to Section 8.11.

"**Software**" means, except to the extent generally available for purchase from third Persons, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"**Straddle Period**" means a taxable period that begins on or prior to, and ends after, the Closing Date.

"**Tax Return**" means all returns, declarations, reports, estimates, claims for refund, information returns and statements required to be filed in respect of any Taxes, including any schedule or attachment thereto and any amendment thereof.

"**Taxes**" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, Inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, escheatment or unclaimed property, and estimated taxes, and together with all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in this clause (i), (ii) any liability for the payment of any amounts of any of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of such amounts was determined or taken into account with reference to the liability of any other Person, (iii) any liability for the payment of any amounts as a result of being a party to any tax sharing or allocation agreements or arrangements (whether or not written) or with respect to the payment of any amounts

9

of any of the foregoing types as a result of any express or implied obligation to indemnify any other Person, and (iv) any liability for the payment of any of the foregoing types as a successor, transferee or otherwise.

"**Technology**" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business or in the design, development, reproduction, maintenance or modification of, any of the Products.

"**Termination Date**" shall have the meaning set forth in Section 4.4(c)(viii).

"**Trade Secrets**" shall have the meaning set forth in Section 1.1 (in the definition of Intellectual Property).

"**Transfer Taxes**" means sales, use, purchase, deed, franchise, fixed asset, stamp, documentary stamp, recording, transfer or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable by reason of or in connection with Sellers' transfer of the Purchased Assets to or assumption of the Assumed Liabilities by Buyer pursuant to this Agreement.

"**Transferable PII**" means PII relating to executory contracts that are assumed and assigned to the Buyer, except with respect to customers that have "opted out" of Sellers' privacy policy to the extent that it would otherwise permit transfer of such PII to the Buyer.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state Law related thereto, including the California Worker Adjustment and Retraining Notification Act and the Illinois Worker Adjustment and Retraining Notification Act.

Section 1.2    **Other Definitional and Interpretive Matters**.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules

annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. The Parties agree that this Agreement may be executed prior to the resolution of the Exhibits and Schedules.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)      The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1      **Purchase and Sale of Assets.** On the terms and subject to the conditions set forth in this Agreement, at the Closing Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer the Purchased Assets. "**Purchased Assets**" shall mean all of Sellers' right, title and interest in, to and under the following assets of Sellers (but excluding Excluded Assets) as of the Closing:

(a)      all Accounts Receivable of Sellers, together with any unpaid financing charges accrued thereon;

(b)      all cash, cash equivalents, bank deposits and similar cash items of Sellers, including the Buyer's Working Capital but not the Sellers' Working Capital to be paid pursuant to Section 8.11 hereof;

(c)      all Purchased Inventory;

(d)      all deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise) and other prepaid charges and expenses of Sellers other than

any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(e)    all rights of Sellers under each Real Property Lease set forth on Schedule 1.1(b), together with Sellers' interests in and to all improvements and fixtures under each such Real Property Lease, and other appurtenances thereto, and Sellers' rights in respect thereof, subject to assumption and assignment to Buyer of each such Real Property Lease;

(f)    all Furniture and Equipment, except as expressly identified by Sellers on Schedule 2.2(l);

(g)    all Purchased Intellectual Property, to the extent transferable and assignable;

(h)    all Purchased Contracts, to the extent transferable and assignable;

(i)    all Documents of Sellers, including Documents relating to Accounts Receivable, Employees, Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property and all files, customer lists, files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (e) above, but excluding Documents set forth in Section 2.2(e);

(j)    all Permits held by Sellers, to the extent transferable and assignable;

(k)    all supplies owned by Sellers and used in connection with the Business;

(l)    all insurance benefits, including rights and proceeds, arising on or after the Closing Date from or relating to the Business, the Purchased Assets or the Assumed Liabilities;

(m)    to the extent assignable, all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (other than confidentiality agreements entered into in connection with the process to sell the Business or any other business of the Sellers or to obtain financing or raise capital);

(n)    to the extent assignable, all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(o)    subject to the provisions of Section 363(b)(1)(A) of the Bankruptcy Code, all goodwill and other intangible assets associated with the Business and/or the Purchased Assets, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property owned by Sellers;

(p)    subject to the provisions of Section 363(b)(1)(A) of the Bankruptcy Code, all rights to the telephone and facsimile numbers and e-mail addresses used by Sellers, as well as rights to receive mail and other communications addressed to Sellers (including mail and communications from customers, suppliers, distributors and agents);

(q)    Transferable PII;

(r)    certain causes of action and avoidance actions of the Sellers and their estates mutually agreed upon by Sellers and Buyer, as set forth on Schedule 2.1(r),

(s)    causes of action and avoidance actions of the Sellers and their estates relating solely to vendors (i) that provided goods or services to any of the Sellers within 120 days of the Petition Date, or (ii) who are identified by Buyer as a party with whom the Buyer will continue to do business, as set forth on Schedule 2.1(s);

(t)    all other property and assets pertaining to or used or useful in the conduct of the Business or the ownership of the Purchased Assets, including but not limited to the assets set forth on Schedule 2.1(t);

(u)    Insider Claims, whether shown on the Sellers' balance sheet or otherwise, but only in the event Sellers or their estates or successors have not commenced an action to recover upon such claims within 90 days after the Closing and Buyer reasonably cooperated (to the extent reasonably requested by Sellers) with such recovery action (including provision of information by Buyer and its agents) subject to an appropriate joint prosecution agreement; and

(v)    all other assets, properties, rights and claims of any Seller of any kind or nature whatsoever not otherwise described or excluded above but that are not expressly designated as Excluded Assets or otherwise expressly excluded from the Purchased Assets.

The Parties may upon mutual agreement from time to time until the Closing amend the Purchased Assets so as to include additional assets or remove assets not previously identified that are necessary for use in the continuing business operations, and in the event of a removal, to treat such Contract, Permit and/or other asset in accordance with Section 2.7(c) or as an Excluded Asset.

Section 2.2    **Excluded Assets.** Notwithstanding any other provision of this Agreement, nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. "**Excluded Assets**" shall mean all assets, properties, interests and rights of Sellers other than the Purchased Assets, including each of the following assets:

(a)    the Sellers' Working Capital;

(b)    intercompany receivables owed by any Seller to any of the other Sellers;

(c)    all avoidance actions, and other claims and causes of action, not expressly included in the Purchased Assets;

(d)    all Excluded Contracts;

(e)    any (i) books and records that Sellers are required by Law to retain; provided, however, that Buyer shall have, to the extent allowed by applicable Law and in response to a bona fide business purpose, the right to make copies of any portions of such retained books and records; (ii) each Seller's corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock or membership interest records and corporate seals and other documents relating solely to the organization, maintenance and existence of such Seller as a corporation or limited liability company; and (iii) documents relating to proposals to acquire the Business by Persons other than Buyer;

(f)    Sellers' Tax Returns, any claim, right or interest of Sellers in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom and books and records to the extent related to the foregoing;

(g)    Subject to Section 2.1(u), the Insider Claims.

(h)    any (i) professional retainers, or (ii) prepayments, prepaid expenses and security deposits, in each case relating to any Excluded Asset;

(i)    (i) any attorney-client privilege and attorney work product protection of Sellers as a result of legal counsel representing Sellers; (ii) all documents maintained by legal counsel; (iii) all documents subject to the attorney-client privilege and work product protection described in subsections (i) and (ii); and (iv) all documents maintained by Sellers to the extent in connection with the transactions contemplated by this Agreement or any Excluded Asset;

(j)    all of Sellers' claims, warranties, guarantees, refunds, causes of action, choses in action, rights of recovery, indemnities, rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) relating to any Excluded Asset;

(k)    all of Sellers' rights under this Agreement and/or other documents and agreements executed in connection with the transactions provided for herein, including Sellers' right to the Sellers' Working Capital;

(l)    the assets set forth on Schedule 2.2(l);

(m)    any rights in, to, and under insurance policies for events, occurrences or claims made prior to the Closing Date, and any rights under any directors and officers or fiduciary insurance or employee benefits-related insurance policy, or proceeds of the foregoing;

(n)    subject to the provisions of Section 8.12, the Option.

(o)    all PII other than Transferable PII;

(p)    any and all rights to offset and recoupment for claims arising prior to the Closing;

14

(q)      all assets, properties and rights primarily used by Sellers in any businesses other than the Business; and

(r)      any equity interests in any Seller or any subsidiary thereof.

Notwithstanding anything herein to the contrary, the Parties may upon mutual agreement, from time to time, exclude certain assets from the Purchased Assets until Closing; provided, however, that if the Cure Amount for any Purchased Contract is subject to dispute as of the Closing, then (i) if and only if the Bankruptcy Court determines the Cure Amount for such Contract to be less than or equal to the amount set forth in Schedule 2.4(i), such Purchased Contract shall be assumed and assigned on the date of such determination by the Bankruptcy Court if not stayed, and (ii) if the Cure Amount for such Contract is determined by the Bankruptcy Court to be greater than the amount set forth in Schedule 2.4(i), then Buyer shall have ten (10) days after the date of such determination by the Bankruptcy Court, if such determination has not been stayed, to (x) declare in writing such Contract to be a Purchased Contract, in which case such Purchased Contract shall be assumed and assigned on the date of such written declaration, or (y) designate in writing such Contract to be an Excluded Contract or make no designation with respect to such Contract, in which case such Contract shall be deemed an Excluded Contract for all purposes hereunder; provided, further, that no such exclusion or declaration shall result in any adjustment of the Purchase Price.

Section 2.3    **Excluded Liabilities.** Buyer will not assume or have any responsibility with respect to any Liability of Sellers (or any predecessor or Affiliate of Sellers) of any nature whatsoever not expressly included within the definition of Assumed Liabilities, including:

(a)      Taxes (i) imposed on any Seller for any period, or (ii) arising out of or related to the Business or the Purchased Assets for all Tax periods (or portions thereof) ending on or prior to the Closing;

(b)      All Liabilities relating to the litigations, claims and other matters set forth on Schedule 5.9;

(c)      Liabilities to the extent arising out of or related to the Excluded Assets, including Liabilities relating to Excluded Contracts;

(d)      Liabilities of Sellers under this Agreement or the Seller Documents;

(e)      Liabilities which may become due or owing under the Purchased Contracts (i) with respect to the period prior to the Closing (other than the Cure Amounts) or (ii) after the Closing but which arise out of or relate to any breach that occurred prior to the Closing (other than the Cure Amounts);

(f)      any Employee Obligations to any Employee arising out of such Employee's employment by Sellers prior to Closing, except as listed in Schedule 2.4(b);

(g)      any Employee Claim of any Employee arising out of such Employee's employment by Sellers prior to Closing;

15

(h)     any claim (as defined in the Bankruptcy Code) arising on or prior to Closing and not expressly assumed pursuant to this Agreement;

(i)     any Liability to any shareholder or other equity holder of any Seller or any predecessor of any Seller;

(j)     any Liability arising out of or related to any Legal Proceeding commenced or threatened against any Seller or any predecessor of any Seller arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Legal Proceeding relates to such operation prior to the Closing;

(k)     any Liability for infringement or misappropriation of any intellectual property arising out of or related to any conduct of any Seller or operation of the Business on or before the Closing;

(l)     any Liability of any Seller based upon any Seller's acts or omissions arising out of or relating to Seller's ownership or operation of the Business and the Purchased Assets prior to Closing; and

(m)     all other Liabilities and obligations for which Buyer does not expressly assume any liability (collectively, the "**Excluded Liabilities**").

Section 2.4     **Assumed Liabilities.** Notwithstanding any other provision of this Agreement, including Section 2.3, from and after the Closing Date, Buyer shall pay, perform and discharge, as and when due or as may otherwise be agreed between Buyer and the obligee, all of the Assumed Liabilities. The "**Assumed Liabilities**" are specifically as follows:

(a)     Any valid and perfected secured liens in the Sellers' assets which are senior to the liens held by Buyer that are set forth on Schedule 2.4(a) (the "**Assumed Secured Liabilities**");

(b)     all Liabilities of Sellers set forth on Schedule 2.4(b);

(c)     all Liabilities and obligations arising under or relating to the Purchased Contracts, including Real Property Leases assigned to Buyer, accruing after the Closing, other than the Cure Amounts;

(d)     all Liabilities with respect to the Business or the Purchased Assets accruing after the Closing;

(e)     all Liabilities relating to amounts required to be paid by Buyer hereunder;

(f)     all trade accounts payable, accrued expenses, accrued employee compensation, absences, vacation pay and other Liabilities of Sellers arising in the Ordinary Course of Business after the Petition Date, including accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases (the "**Assumed Post-Petition Current Liabilities**");

16

(g)     all liabilities and obligations for (i) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period beginning after the Closing Date and, with respect to any Straddle Period, for the portion of such Straddle Period beginning after Closing Date, and (ii) Taxes for which Buyer is liable pursuant to Section 11.1;

(h)     all other liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Business and the Purchased Assets upon and after the Closing; and

(i)     subject to Section 9.1(f), the Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts assumed by the Buyer (including any Contracts assumed under Section 2.7(c)(ii) or Section 2.8). Sellers have provided to Buyer a schedule set forth on Schedule 2.4(i) setting forth a good faith estimate as of the date hereof of all Cure Amounts for all Purchased Contracts, which schedule the Sellers shall update on or prior to the date that is 14 days prior to the Closing Date.

Buyer's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Buyer as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated. In addition, the Parties agree that Section 2.4(f) shall not (a) impair any right of Buyer to object to monthly fee statements or interim or final fee applications (and Buyer reserves the right to make any such objection), nor (b) impose upon the Buyer any obligation to agree to use of cash collateral under the Cash Collateral Order beyond the Approved Budget, without affecting the Sellers' rights to request cash collateral and the Buyer's or its Affiliates' rights to object to any such request.

Section 2.5     **Purchased Assets.** Subject to the provisions of (i) Section 2.2 regarding Buyer's right to declare a Contract to be an Excluded Contract if the Cure Amount for such Contract is materially greater than the amount set forth on Schedule 2.4(i), and (ii) Section 2.8 regarding Non-Assignable Contracts, and pursuant to Section 363 and Section 365 of the Bankruptcy Code, Sellers shall assign and sell to Buyer the Purchased Assets.

Section 2.6     **Further Conveyances and Assumptions.** From time to time following the Closing, Sellers and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the Seller Documents and to assure fully to Sellers and their respective Affiliates and their respective successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby. If following the Closing, the Sellers receive or become aware that they hold and may immediately transfer without any third party restriction, consent or process any property, right, claim, demand or asset which constitutes a Purchased Asset then the Sellers shall transfer such property, right, claim, demand or asset to the Buyer as promptly as practicable for no additional consideration.

5110383-12

Section 2.7   **Transitional Matters.**

(a)      From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets.

(b)      Buyer will retain and make available to Sellers, for a period of eighteen (18) months following the Closing Date, the Documents delivered by Sellers to Buyer, if reasonably needed by Sellers for liquidation, winding up, Tax reporting, avoidance actions, claims objections, plan preparation and confirmation or other bankruptcy administration, or other proper purposes; provided, that Sellers will use reasonable efforts to retain copies of Documents and the Parties otherwise will reasonably cooperate to minimize inconvenience to Buyer, provided, however, that after the period of eighteen (18) months following the Closing Date, Buyer shall notify Sellers, thirty (30) days in advance of any proposed destruction of the Documents, of its intent to destroy such Documents, and Buyer will permit Sellers (or their designee) to retain such Documents (at Sellers' or such designee's sole cost and expense). With respect to any litigation and Claims that are Excluded Liabilities, Buyer shall (at Sellers' sole cost and expense) render reasonable assistance and relevant documentation to Sellers in prosecuting or defending such litigation or claim and shall make available to Sellers for reasonable time periods, their counsel and their other agents, advisors or representatives, Buyer's personnel and representatives most knowledgeable about the matter in question.

(c)      Previously Omitted Contracts.

(i)      If prior to or following Closing it is discovered that a Contract should have been listed on Schedule 1.1(a) but was not listed on Schedule 1.1(a), (any such Contract, a "**Previously Omitted Contract**"), Sellers shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all Cure Amounts (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "**Previously Omitted Contract Designation**"). A Previously Omitted Contract designated in accordance with this Section 2.7(c)(i) as "Rejected," or with respect to which Buyer fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)      If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.7(c)(i), (A) Schedule 1.1(b) shall be amended to include such Previously Omitted Contract and (B) Sellers shall serve a notice (the "**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Amounts with respect to such Previously Omitted Contract and Sellers' intention to assign such Previously Omitted Contract in accordance with this Section 2.7(c) with no adjustment to the Purchase Price. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with seven (7) days to object, in writing to the Sellers and Buyer, to the Cure Amount and the assumption, assignment and sale of the Previously Omitted Contract. If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Amounts and approve the assumption, assignment and

sale. If no objection is timely served on Sellers and Buyer, Sellers shall obtain an Order of the Bankruptcy Court fixing the Cure Amounts and approving the assumption of the Previously Omitted Contract.  Buyer shall be responsible for payment of the relevant Cure Amount as a condition to assumption and assignment.

Section 2.8   **Non-Assignable Contracts.** To the extent that any Purchased Contract is not capable of being assumed and assigned to Buyer at the Closing under Section 365 of the Bankruptcy Code without the consent of the other party thereto or any third party (including a Governmental Body), and such consent cannot be obtained without Sellers or Buyer compromising any right, asset, or benefit or expending any amount or incurring any Liability or providing any other consideration other than as provided in Section 3.1 or Cure Amounts as provided herein (collectively, the "**Non-Assignable Contracts**"), this Agreement shall not constitute an assignment thereof, or an attempted assignment, unless and until such consent is obtained, provided, however, that the Sellers will use their reasonable efforts to facilitate Buyer's negotiation with the other party or non-consenting third party to each Non-Assignable Contract to provide Buyer the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing, and if arrangements are made such that Buyer has obtained the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing, then, as between Sellers and Buyer, such Non-Assignable Contracts shall be deemed to be assigned and Buyer shall perform all obligations and covenants thereunder. Notwithstanding the foregoing, nothing in this Section 2.8 shall require any Seller to renew, modify, or amend any Non-Assignable Contract once it has expired or expend any amount or incur any Liability to facilitate Buyer's negotiations with any party or non-consenting third party with respect to any Non-Assignable Contract. Any Non-Assignable Contract assigned pursuant to the terms of this Section 2.8 shall, when assigned, constitute a Purchased Asset for all purposes under this Agreement.

## ARTICLE III
## CONSIDERATION

Section 3.1   **Purchase Price.** In consideration of the sale of the Purchased Assets to Buyer and the other undertakings set forth herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall be $9,000,000 (the "**Credit Bid Amount**"), to be satisfied in the form of a credit against the Hillair Obligations in accordance with Section 363(k) of the Bankruptcy Code in satisfaction of all liens and claims of Buyer or its affiliates; provided that in the event any Person submits a bid in the sale process that is in excess of Buyer's then-current bid, then Buyer shall be entitled to increase the Credit Bid Amount up to the full amount of the Hillair Obligations in its sole discretion, in a writing signed by Buyer and delivered to Sellers. The Buyer's ability to credit bid is subject to (a) assignment by Hillair Capital Management LLC to the Buyer of any and all rights to and under all Liabilities (and any related Liens or documents) owed by Sellers to Buyer or its Affiliates, including Hillair Capital Management LLC and the Debenture Lender, and (b) provision to Sellers of documentation of the same.

## ARTICLE IV
## CLOSING AND TERMINATION

Section 4.1    **Closing Date.** Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2, and Section 9.3 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "**Closing**") shall take place remotely, in no event later November 1, 2019, via electronic communication (or at such other place as the Parties may designate in writing) as soon as practicable following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) and no later than a date that is three (3) Business Days after the Sale Order becomes a Final Order unless extended by Buyer in its sole discretion. The date on which the Closing occurs referred to in this Agreement as the "**Closing Date,**" and the Closing shall be deemed effective at the close of business on the Closing Date. For clarity, (a) if Buyer is the successful purchaser of the Purchased Assets approved by the Bankruptcy Court under the sale process and the Closing occurs, Buyer and its Affiliates shall waive any remaining liens and claims against the Sellers, other than rights under this Agreement; and (b) in the event the Buyer is not the successful purchaser of the Purchased Assets approved by the Bankruptcy Court under the sale process and a closing occurs with respect to an Alternative Proposal, following payment to Buyer from proceeds of such sale in accordance with the terms of this Agreement, Buyer and its Affiliates shall waive any remaining liens and claims against the Sellers, including any Remaining Hillair Obligations, other than rights under this Agreement. In no event shall Hillair receive recoveries in excess of the total amount of the Hillair Obligations.

Section 4.2    **Deliveries by Sellers.** At the Closing, Sellers shall deliver to Buyer:

(a)    a duly executed bill of sale and assignment;

(b)    duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. trademark office, and general assignments of all other Purchased Intellectual Property;

(c)    the officer's certificate required to be delivered pursuant to Section 9.1(a), Section 9.1(b) and Section 9.1(d); and

(d)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Purchased Assets to Buyer, including all assignments and consents necessary for the assignment of all of Sellers' rights, title and interest in any business arrangements with Amazon.com, Inc. and/or any of its Affiliates.

Section 4.3    **Deliveries by Buyer.** At the Closing, Buyer shall deliver to Sellers:

(a)    the officer's certificate required to be delivered pursuant to Section 9.2(a) and Section 9.2(b); and

20

(b)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Sellers, as may be necessary to convey the Purchased Assets to Buyer and for Buyer to assume the Assumed Liabilities.

Section 4.4    **Termination of Agreement.** This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by Sellers or Buyer:

(i)    if any of the conditions set forth in <u>Section 9.3</u> shall have become incapable of fulfillment other than as a result of a breach by the Sellers or Buyer, as applicable, of any covenant or agreement contained in this Agreement, and such condition is not waived by the non-breaching party; or

(ii)    if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the Parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(iii)    if there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited

(c)    by Buyer:

(i)    (A) in the event that a materially accurate statement of Sellers' Net Working Capital as of August 31, 2019 is not delivered to Buyer by September 30, 2019, or (B) if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 9.1</u> or <u>Section 9.3</u> and which breach cannot be cured or has not been cured by the earlier of (x) fifteen (15) Business Days after the giving of written notice by Buyer to Sellers of such breach and (y) the Termination Date;

(ii)    in the event (i) the Bankruptcy Court has not entered the Bid Procedures Order by September 5, 2019, and/or (ii) the Bid Procedures Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

(iii)    in the event the deadline for qualified bids with deposits, proof of financial wherewithal and a mark-up of this Agreement is extended for any party beyond October 11, 2019;

(iv)    in the event (i) the Auction, if necessary, has not been completed by October 15, 2019, (ii) the hearing to approve the Sale Order has not concluded by October 17, 2019, (iii) the Bankruptcy Court has not entered the Sale Order by October 17, 2019, and/or (iv) the Sale Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

21

(v)     if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and (i) Buyer has provided Sellers with written notice that it is prepared to consummate the Transactions, (ii) the conditions to Closing in Article IX have been satisfied (or waived, to the extent permissible, by the Party entitled to the benefit of such condition), other than those conditions that by their nature can only be satisfied at Closing) and (iii) the Closing Date does not occur within five (5) Business Days of Buyer providing Sellers with such notice;

(vi)    if, prior to the Closing, any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the Bankruptcy Cases, or appointing a trustee in any Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an Order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within fourteen (14) days after the entry thereof;

(vii)   if Sellers enter into or consummate an Alternative Proposal or Buyer is not determined to be the Winning Bidder in accordance with the Bid Procedures Order, subject to Buyer's agreement to be a "Back-Up Bidder" as provided in the Bid Procedures Order;

(viii)  if the Closing shall not have occurred on or before the close of business on November 1, 2019, or such later date as determined by the Parties (the "**Termination Date**"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any of the representations, warranties, covenants or agreements contained in this Agreement by Buyer, which would give the Sellers a right not to close pursuant to Article IX, then the Buyer may not terminate this Agreement pursuant to this Section 4.4(c)(viii) and provided further that such termination right is subject to Buyer's agreement to be a "Back-Up Bidder" as provided in the Bid Procedures Order;

(ix)    if any of the conditions to the obligations of Buyer set forth in Section 9.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer; or

(x)     if, for any reason, Buyer is unable, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid the Credit Bid Amount in payment of the Purchase Price as set forth in Section 3.1; or

(d)     by Sellers:

(i)     if any condition to the obligations of Sellers set forth in Section 9.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(ii)    if there shall be a material breach by Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.2 or Section 9.3 and which breach cannot be cured or

22

has not been cured by the earlier of (A) fifteen (15) Business Days after the giving of written notice by Buyer to Sellers of such breach and (B) the Termination Date; or

(iii)     if Buyer is not the Winning Bidder in accordance with the Bid Procedures Order, subject to Buyer's agreement to be a "Back-Up Bidder" as provided in the Bid Procedures Order.

Section 4.5     **Reimbursement; Expenses.**

(a)     Subject to the entry of the Bid Procedures Order, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, if this Agreement is terminated pursuant to Section 4.4(c)(v)-(vi), (ix) or Section 4.4(d)(iii) and Sellers consummate an Alternative Proposal for all or substantially all of the Purchased Assets, Sellers shall pay the Expense Reimbursement to Buyer from the cash proceeds of such Alternative Proposal on the date of the closing of the Alternative Proposal.

(b)     If this Agreement is terminated pursuant to Section 4.4(c)(vii) or Section 4.4(d)(iii), and Sellers consummate an Alternative Proposal for the sale of all or substantially all of the Purchased Assets to a third party for consideration in excess of $9,000,000, then Buyer shall be paid at the closing of such Alternative Proposal from the proceeds thereof an amount equal to the sum of (i) $9,000,000, plus (ii) 50% of any cash (or cash equivalent) proceeds resulting from such sale in excess of $9,000,000, up to the satisfaction of the Hillair Obligations.

(c)     Notwithstanding Section 4.6(b), in the event that Buyer is entitled to payment of the Expense Reimbursement pursuant to Section 4.5(a) above, such Expense Reimbursement shall be Buyer's sole and exclusive remedy against Sellers with respect to all claims of any nature whatsoever relating to this Agreement or the transactions contemplated hereunder.

(d)     For clarity, in the event any Alternative Proposal takes the form of a chapter 11 plan, which is eventually confirmed and effective, Sellers shall pay the Expense Reimbursement to Buyer in accordance with Section 4.5(a) and the payment under Section 4.5(b) is not required to be made pursuant to this Agreement, without waiver of any rights of Buyer to contest such chapter 11 plan or otherwise affecting Buyer's or its Affiliate's rights separate from this Agreement.

Section 4.6     **Effect of Termination.**

(a)     In the event that this Agreement is validly terminated in accordance with Section 4.4, this Agreement shall terminate and each of the Parties shall be relieved of its respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Sellers; *provided*, *however*, that the obligations of the Parties set forth in Section 4.5, Section 7.1, Section 8.3, Section 8.5, and Article XII hereof shall survive any such termination and shall be enforceable hereunder.

(b)     Remedies. All remedies under Section 4.5(a) are cumulative and are not exclusive of any other remedies provided by Law except as otherwise specifically provided.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Buyer that:

Section 5.1    **Authorization of Agreement.** Subject to the entry of the Sale Order and approval from the Bankruptcy Court: (a) each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and each Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement (the "**Seller Documents**"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; and (b) this Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with their respective terms.

Section 5.2    **No Conflicts.**

(a)    Except as set forth on Schedule 5.2, none of the execution and delivery by any Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will result in the creation of any Lien upon the Purchased Assets, or conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of any Seller; (ii) subject to entry of the Sale Order, any material Contract or material Permit to which any Seller is a party or by which any of the properties or assets of any Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to any Seller or any of the properties or assets of any Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations, modifications, accelerations or cancellations that would not reasonably be expected to be material to the ownership and operation of the Business.

(b)    Subject to entry of the Sale Order, and except as set forth on Schedule 5.2, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by any Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by such Seller of any other action contemplated hereby or thereby, except for such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not be material to the ownership and operation of the Business.

24

Section 5.3    **Title to Purchased Assets.**  Other than the real property subject to the Real Property Leases and the personal property subject to the Personal Property Leases, Sellers have good title to the Purchased Assets, in each case free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. The Purchased Assets constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used or held for use by Sellers in connection with the Business, or otherwise necessary for Buyer to conduct and operate the Business in substantially the same manner as conducted prior the Closing. No Person other than Sellers hold rights, title and interest in, the Purchased Assets.

Section 5.4    **Real Property Leases.**  Schedule 1.1(a) sets forth a complete list of all real property and interests in real property leased by Sellers (individually, excluding the Option, a "**Real Property Lease**" and collectively, the "**Real Property Leases**") as lessee or lessor in connection with the Business and which are part of the Purchased Assets. Sellers have a valid and enforceable leasehold interest under each Real Property Lease under which it is a lessee, free and clear of all Liens of any nature whatsoever except Permitted Exceptions. Buyer has received true and complete copies of the Real Property Leases and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date hereof. Each Real Property Lease is in full force and effect, and is valid and enforceable in accordance with its terms. To the Knowledge of the Sellers, except as set forth on Schedule 5.4, no Seller has received any written notice of any default or event that with notice or lapse of time, or both, would constitute a default by any Seller under any of the Real Property Leases that are currently in effect and eligible to be assumed by Buyer. Except as set forth on Schedule 5.4, there has been no default or event that with notice or lapse of time, or both, would constitute a default by the Company or any Subsidiary under any of the Real Property Leases.

Section 5.5    **Tangible Personal Property.**  Schedule 1.1(a) sets forth all leases of personal property ("**Personal Property Leases**") relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business. Each Seller has a valid and enforceable leasehold interest under each Personal Property Lease under which it is a lessee. No Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by any Seller under any of the Personal Property Leases.

Section 5.6    **Intellectual Property.**  Schedule 1.1(c) sets forth an accurate and complete list of all Intellectual Property. Sellers exclusively own all right, title and interest to, or are licensees with respect to, the Purchased Intellectual Property, and can convey such property free and clear of Liens pursuant to the Sale Order. To the Knowledge of Sellers, (i) no Person is engaging in any activity that infringes any Purchased Intellectual Property and (ii) no claim has been asserted to any Seller that the use of any Purchased Intellectual Property or the operation of the Business as currently conducted infringes or violates the Intellectual Property of any third party. The Purchased Intellectual Property and the rights under the Purchased Contracts include the rights to use all Intellectual Property required to conduct and operate the Business in substantially the same manner as conducted prior the Closing.

Section 5.7    **Financial Statements.**  Sellers have delivered to Buyer copies of (i) the unaudited consolidated balance sheets of Sellers as of December 31, 2018 and December 31, 2017

5110383-12

and the related unaudited consolidated statements of income and of cash flows of Sellers for the years then ended, and (ii) the unaudited consolidated balance sheet of the Sellers as of June 30, 2019, and the related consolidated statement of income and cash flows of Sellers for the six (6) months then ended, each of which was prepared in good faith. Sellers have also (i) filed copies of the monthly operating reports through July 2019 in the Bankruptcy Cases which are true and complete to the best of the Sellers' Knowledge and (ii) delivered to Buyer the weekly cash collateral reporting documents prepared by the Sellers in connection with the Bankruptcy Cases. The Net Working Capital statement set forth on <u>Schedule 8.11</u> is materially accurate to the best of the Sellers' Knowledge.

Section 5.8 **Financial Advisors.** No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Buyer or Sellers in respect thereof, except as set forth on <u>Schedule 5.8</u> and except that Conway MacKenzie, Inc. is providing services to the Sellers and is entitled to charge the Sellers (but not Buyer) on an hourly fee basis and Armory Securities, LLC is providing investment banking services to the Sellers and is entitled to charge the Sellers (but not Buyer) on a fixed fee basis.

Section 5.9 **Litigation.** Except as set forth on <u>Schedule 5.9</u> and other than in connection with the Bankruptcy Cases, there is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to Sellers' Knowledge, threatened against or relating to any Seller or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby and Sellers have no Knowledge of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

Section 5.10 **Compliance with Laws.** Except as set forth on <u>Schedule 5.10</u>, Sellers have conducted and are presently conducting the Business in material compliance with all Laws applicable to the Business. Except as set forth in <u>Schedule 5.10</u>, no Seller has received any written notice of or been charged with the violation of any Laws, except where such violation would not reasonably be expected to be material to the ownership and operation of the Business.

Section 5.11 **Permits.** <u>Schedule 5.11</u> sets forth all material Permits used by Sellers and that are necessary for Buyer to conduct and operate the Business in substantially the same manner as currently conducted. Sellers are in compliance with the material terms of all such Permits, and all such Permits are valid and in full force and effect, and no Legal Proceeding is pending or, to the Knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any Permit material to the operation of the Business, except as provided on <u>Schedule 5.11</u>. No Seller is in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party, except where such default or violation would not be material to the ownership and operation of the Business, except as provided on <u>Schedule 5.11</u>.

Section 5.12 **[Intentionally Omitted]**.

Section 5.13 **Contracts.** Schedule 1.1(a) contains a complete list of all Contracts, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement. Except as set forth in Schedule 1.1(a), no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract. The Purchased Contracts include all Contracts material to the ownership and/or operation of the Business as currently conducted. To Sellers' Knowledge, Seller is not in breach of or in default under any Purchased Contract, except to the extent such breach or default will be cured as a result of the payment of the applicable Cure Amounts. Each Purchased Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

Section 5.14 **[Intentionally Omitted]**.

Section 5.15 **Labor Matters.** No Seller is a party to any labor or collective bargaining agreement or workplace rules with respect to its Employees. To the Knowledge of Sellers, no Employee of any Seller is represented by any labor organization and no labor organization or group of Employees of any Seller has made a pending demand for recognition or request for certification. To the Knowledge of Sellers, there are no representation or certification proceedings or petitions seeking a representation election presently pending, or threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller.

Section 5.16 **No Other Agreements to Purchase.** With the exception of an Alternative Proposal, Competing Bid, or sale process overseen by the Bankruptcy Court, Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option purchase or acquire from Sellers any Purchased Asset, other than purchase orders in the Ordinary Course of Business.

Section 5.17 **No Other Representations and Warranties.** Except for the representations and warranties contained in this Article V (including the related portions of the Exhibits and Schedules), neither Sellers nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Sellers, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its representatives, or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in Law.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that:

Section 6.1 **Organization and Good Standing.** Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.

Section 6.2 **Authorization of Agreement.** Buyer has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby and thereby, to perform their its obligations hereunder,

27

and to consummate the transactions contemplated hereby and thereby subject to the Bankruptcy Court's entry of the Sale Order (the "**Buyer Documents**"). The execution, delivery and performance by Buyer of this Agreement and each Buyer Document have been duly authorized by all necessary action on behalf of Buyer, subject to the Bankruptcy Court's entry of the Sale Order. This Agreement has been, and each Buyer Document will be at or prior to the Closing, duly and validly executed and delivered by Buyer, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer, in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity) subject to the Bankruptcy Court's entry of the Sale Order.

Section 6.3    **No Conflicts; Consents.**  The execution, delivery and performance by Buyer of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby to which Buyer or any of its Affiliates is a party do not and will not: (a) result in a violation or breach of any provision of the certificate of formation or operating agreement of Buyer or such Affiliate, as the case may be; (b) result in a violation or breach of any provision of any Law or Order applicable to Buyer or such Affiliate, as the case may be; or (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any material agreement to which Buyer or such Affiliate, as the case may be, is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby. With the exception of those proceedings required by the Bankruptcy Court, no consent, approval, Permit, Order, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby, except for such filings, consents, approvals, Permits, Orders, declarations, filings or notices which would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and thereby.

Section 6.4    **Litigation.**  There is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Buyer's knowledge, threatened against or relating to Buyer or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might materially and adversely affect the ability of Buyer to enter into this Agreement or to consummate the transactions contemplated hereby.

Section 6.5    **Sale "As is, Where is".**  Buyer acknowledges and agrees that, except as specifically and expressly set forth in Article V of this Agreement (subject to Article X of this Agreement), (a) the Sellers make no representation or warranty, express or implied, at law or in equity, relating to the Purchased Assets, the Assumed Liabilities or the Business, including any

28

representation or warranty as to the value, merchantability, fitness for a particular purpose or for ordinary purposes or any other matter; (b) the Sellers make no, and hereby disclaim any, other representation or warranty regarding the Purchased Assets, the Assumed Liabilities or the Business and (c) the Purchased Assets and the Assumed Liabilities are conveyed on an "as is, where is" basis as of the Closing at the Buyer shall rely upon its own review thereof.

## ARTICLE VII
## BANKRUPTCY COURT APPROVAL

Section 7.1    **Competing Transaction**. This Agreement is subject to approval by the Bankruptcy Court and the consideration and potential acceptance by Sellers of higher or better competing bids (each a "**Competing Bid**") without the approval of Buyer and Buyer hereby consents to any sale conducted in accordance with the sale process contemplated by this Agreement. From the date of this Agreement until the completion of the Auction or as otherwise directed by the Bankruptcy Court, Sellers may cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, Sellers shall be permitted to respond to any inquiries or offers to purchase all or any part of the Purchased Assets (each, an "**Alternative Proposal**"), provided that such Person enters into a non-disclosure agreement in favor of Sellers and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Business and the assets of Sellers to prospective buyers. Within twenty-four (24) hours of Sellers' determination that an Alternative Proposal is a Qualified Bid as such term is defined in the Bid Procedures Order, Sellers shall provide to Buyer, any Qualified Bidders (including Buyer) and the Committee a copy of any such Alternative Proposal. At the conclusion of any Auction, the Sellers' Chief Restructuring Officer, on behalf of the Sellers, in consultation with the Committee and the Buyer (unless the Buyer or an Affiliate thereof is one of the bidders whose bid is under consideration, in which case, the only party with whom the Chief Restructuring Officer need consult is the Committee), shall have the sole authority to evaluate any overbid(s) received in excess of the Buyer's initial bid, and, in the exercise of his sound business judgment, determine which bid is the "highest and best" bid. The Sellers' determination shall be based upon an evaluation of the value to be received by the estates upon closing of the sale. This evaluation shall only be relevant in the event of an initial cash overbid in excess of Hillair's initial Credit Bid Amount of $9,000,000 that meets the requirements to be a Qualified Bid under the Bid Procedures Order.

Section 7.2    **Bankruptcy Court Filings.** Sellers shall (A) use commercially reasonable efforts to obtain entry of the Bid Procedures Order by September 5, 2019 and (B) use commercially reasonable efforts to obtain entry of the Sale Order by October 17, 2019. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining the Bid Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code. Sellers shall consult with Buyer and its representatives concerning any Order of the Bankruptcy Court relating to this Agreement and the Bankruptcy Cases and provide Buyer with copies of applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. If any Order of

the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such Order), Sellers agree to take all reasonable steps, and use their reasonable best efforts to defend against such appeal, petition or motion, and shall use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion; provided, that Sellers shall consult with Buyer regarding the status of any such actions and Buyer shall reasonably cooperate in such efforts. Any changes to the form of the Bid Procedures Order or the Sale Order applying to the sale hereunder must be mutually approved by Sellers and Buyer (such approval not to be unreasonably withheld). Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

### ARTICLE VIII
### COVENANTS

Section 8.1    **Access to Information**.

(a)    Sellers agree that, prior to the Closing Date, subject to Buyer's execution of a confidentiality agreement with Sellers in a form reasonably acceptable to Buyer, Buyer shall be entitled, through its officers, employees and representatives (including their respective legal advisors and accountants), to make such reasonable investigation and inspection of any and all properties, businesses and operations of Sellers and the Business and such examination of the books, records and financial condition of Sellers, the Business, the Purchased Assets and the Assumed Liabilities as they reasonably request and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under the supervision of Sellers' personnel and in such a manner as not to interfere with the conduct of the Business or any other businesses of Seller, and shall be subject to restrictions under applicable Law. Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer and its representatives shall cooperate with Sellers and their respective representatives and shall use their reasonable efforts to minimize any disruption to the Business. All requests by Buyer for access pursuant to this Section 8.1 shall be submitted or directed exclusively to Eben Perison or Jonathan Brownstein of Armory Group or such other individuals as Sellers may designate in writing from time to time. Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to disclose any information to Buyer if such disclosure would, in Sellers' reasonable discretion: (x) cause significant competitive harm to Seller and its businesses, including the Business, if the transactions contemplated by this Agreement are not consummated; (y) jeopardize any attorney-client or other privilege; or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Prior to the Closing, without the prior written consent of Sellers, which consent shall not be unreasonably withheld or delayed, Buyer shall have no right to perform invasive or subsurface investigations of the Real Property.

(b)    In order to facilitate Sellers' efforts to administer and close the Bankruptcy Cases (including the preparation of filings in the Bankruptcy Cases and state, local and federal tax returns and other filings, preparation of a chapter 11 plan and actions in accordance with such plan, recovery on the Insider Claims, reconciliation of claims filed in the Bankruptcy Cases, removal of corporate and other records and information relating or belonging to entities other than Sellers), for a period of three (3) years following the Closing, (i) the Buyer shall permit Sellers' counsel and other professionals and counsel for any successor to Sellers and its respective professionals (collectively, **"Permitted Access Parties"**) reasonable access to the financial and other books and records relating to the Property or the Business and the systems containing such information, books and records, which access shall include (x) the right of such Permitted Access Parties to copy or remove, as applicable, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (y) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Buyer for the reasonable costs and expenses thereof, and (ii) Buyer shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to Buyer's personnel during regular business hours to assist Sellers and the other Permitted Access Parties in their post-Closing activities (including preparation of tax returns), provided that such access does not unreasonably interfere with the Buyer's business operations, and provided further, however, that nothing in this Section shall require Buyer to retain Documents for a period longer than as set forth in Section 2.7(b).

Section 8.2    **Further Assurances**.

(a)    Each of Sellers and Buyer shall use commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement on or prior to the Termination Date and (ii) cause the fulfillment of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

(b)    Notwithstanding anything to the contrary set forth in this Agreement, in no event shall Buyer or any of its Affiliates be required to (A) proffer to, or agree to, sell, divest, lease, license, transfer, dispose of or otherwise encumber or hold separate and agree to sell, divest, lease, license, transfer, dispose of or otherwise encumber before or after the Closing, any of the Purchased Assets or any material assets, licenses, operations, rights, product lines, businesses or interest therein of Buyer or any of its Affiliates (or to consent to any sale, divestiture, lease, license, transfer, disposition or other encumbrance by Sellers of any of the Purchased Assets or to any agreement by any Seller to take any of the foregoing actions) or to agree to any material change (including through a licensing arrangement) or restriction on, or other impairment of Buyer's ability to own or operate any of the Purchased Assets, or (B) take any other action under this Section 8.2 if the U.S. Department of Justice or the U.S. Federal Trade Commission authorizes its staff to seek a preliminary injunction, restraining order or other Legal Proceeding to enjoin consummation of the transactions contemplated by this Agreement

(c)    Notwithstanding anything to the contrary set forth in this Agreement, in no event shall Sellers or any of their Affiliates be required to (A) expend any non-de minimis amount, provide any consideration, incur any Liability, or engage in litigation or other proceeding in

31

connection with efforts under this Section 8.2, (B) take any other action under this Section 8.2 if the U.S. Department of Justice or the U.S. Federal Trade Commission authorizes its staff to seek a preliminary injunction, restraining order or other Legal Proceeding to enjoin consummation of the transactions contemplated by this Agreement, or (C) make any material payments, other than filing fees required by Law, or provide any other material consideration in connection with any waiver or consent reasonably necessary, proper or advisable to consummate and make effective the transactions contemplated hereby (or to consent to any material payment, other than filing fees required by Law, or provide any other material consideration in connection with such waivers or consents).

Section 8.3    **Confidentiality**.

(a)    Buyer acknowledges that the confidential information provided to Buyer in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms and conditions of any confidentiality provision set forth in the Cash Collateral Stipulation.

(b)    Following the Closing, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware. Sellers hereby further agree, unless disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, espionage, loss and theft. In furtherance and not in limitation of the foregoing, Sellers shall not, and shall cause their respective Affiliates not to, unless required by applicable Law, disclose to any Person any confidential information regarding the Business, provided, that Sellers shall be entitled to disclose (A) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Cases, other Persons bidding on assets of Sellers, (B) any information required to be disclosed by Sellers pursuant to any applicable Law (including the Bankruptcy Code), Legal Proceeding or Governmental Body, (C) any information to Sellers' counsel or professionals, or (D) information to any parties who the Sellers believe may be interested in a transaction with the Sellers, subject to such party's entry into a confidentiality agreement with Sellers in Sellers' discretion. Notwithstanding anything in this Section 8.3 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any Trade Secrets of the Business or Buyer shall be maintained for so long as such Trade Secrets continue to be entitled to protection as Trade Secrets of the Business and Buyer, respectively.

Section 8.4    **Preservation of Records.** Sellers (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee or a plan administrator) and Buyer agree that each of them shall preserve and keep the books and records held by it or their respective Affiliates relating to the pre-Closing Business for a period of eighteen (18) months from the Closing Date and shall make such books and records available to the other parties (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims, Legal Proceedings or Tax audits against or governmental investigations of

32

Sellers or Buyer or any of their Affiliates, or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records during such eighteen (18) month period, such Party shall first give thirty (30) days' prior written notice to the other and such other Party shall have the right at its option and sole expense, upon prior written notice given to such Party within that thirty (30) day period, to take possession of the records within thirty (30) days after the date of such notice.

Section 8.5    **Publicity.** Neither Sellers, on the one hand, nor Agent or Buyer, on the other hand, shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Parties hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Buyer or Sellers, disclosure is otherwise required by applicable Law or with respect to filings to be made with the Bankruptcy Court in connection with this Agreement. Notwithstanding the foregoing, the Parties may publicly disclose the existence of this Agreement.

Section 8.6    **Operation of Business.** Until the Closing, Sellers shall, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, operate the Business in the Ordinary Course of Business and in accordance with the Approved Budget (among other things, Sellers will not incur unreasonable liabilities, including inappropriate increases in Inventory or factoring of Accounts Receivable). Sellers shall (A) preserve intact their respective business organizations, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and Employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), (E) pay all of their respective post-petition obligations in the Ordinary Course of Business and in accordance with the Approved Budget, and (F) continue to operate the Business in all material respects in compliance with all Laws applicable to the Business and Sellers. Without limiting the generality of the foregoing, and except (i) as otherwise expressly provided in or contemplated by this Agreement, or (ii) required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, on or prior to the Closing Date, Sellers may not, without the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), take any of the following actions with respect to the Business:

(a)    (i) modify in any manner the compensation of any of the directors, Employees, or officers, or accelerate the payment of any such compensation (other than in the Ordinary Course of Business), (ii) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any director, Employee or officer, or (iii) change the title, authority or duties of any director, Employee or officer (except as necessary in the Ordinary Course of Business);

(b)    remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Inventory (other than de minimis amounts in the Ordinary Course of Business or in connection with the sales of Inventory in the Ordinary Course of Business);

33

(c)    sell, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber any Purchased Asset (other than sales of Inventory in the Ordinary Course of Business and other than any Liens provided for in the Cash Collateral Order or any other order of the Bankruptcy Court);

(d)    amend, terminate or renew any Purchased Contract or Real Property Lease;

(e)    fail to pay any required filing, processing or other fee, or fail to maintain the validity of Sellers' rights in, to or under any Purchased Intellectual Property;

(f)    fail to maintain all Permits used in the operation of the Business;

(g)    make any unusual or extraordinary efforts to collect any outstanding Accounts Receivable or intercompany obligation, liability or Indebtedness, give any discounts or concessions for early payment of such Accounts Receivable or intercompany obligation, liability or Indebtedness, other than the usual discounts given by the Business in the Ordinary Course of Business and make any sales of, or, convey any interest in, any Accounts Receivable or intercompany obligation, liability or Indebtedness to any third party, other than any Liens provided for in the Cash Collateral Order or any other order of the Bankruptcy Court;

(h)    other than transactions pursuant to agreements or arrangements in effect on the Petition Date as set forth on Schedule 8.6(h), engage in any transaction with any Affiliate, subsidiary, shareholder, officer or director of any Seller (other than in the Ordinary Course of Business), incur or assume any long term or short term debt with or on behalf of any such Person or guarantee, endorse or otherwise be liable or responsible (whether directly, indirectly, contingently or otherwise) for the obligations of any such Person, other than as provided for in the Cash Collateral Order or any other order of the Bankruptcy Court;

(i)    make any change in their method of accounting, except in accordance with GAAP;

(j)    other than with respect to a Competing Bid or Alternative Proposal, enter into any Contract that would survive the Closing (other than in the Ordinary Course of Business and provided that the term of such Contract does not exceed one (1) year and that such Contract does not create an obligation of any Seller in excess of $50,000), provided that such restriction does not apply to any renewal or new contract with an existing vendor;

(k)    return Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

(l)    fail to maintain any insurance policy in effect on the date hereof or amend any such policy;

(m)    accelerate the payment of any obligation, Liability or Indebtedness of any Seller;

(n)    subject any of the Purchased Assets to any Lien, except for Permitted Exceptions or any Liens created under the Cash Collateral Stipulation or any other order of the Bankruptcy Court; or

(o)    acquire any material properties or assets or sell, assign, license, transfer, convey, lease or otherwise dispose of any material properties or assets (except pursuant to an existing Contract for fair consideration in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets).

Nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct Sellers' operations prior to the Closing, and nothing contained in this Agreement shall give Sellers, directly or indirectly, the right to control or direct Buyer's operations prior to the Closing. Prior to the Closing, each of Sellers and Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 8.7    **Section 363(b)(1)(A).** Buyer shall honor and observe any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

Section 8.8    **Adequate Assurances Regarding Purchased Contracts and Certain Real Property Leases.** With respect to each Purchased Contract and Real Property Lease set forth on Schedule 1.1(c), Buyer shall provide adequate assurance of the future performance of such Purchased Contract and Real Property Lease by Buyer as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable.

Section 8.9    **Notification of Certain Matters.** Sellers shall promptly inform Buyer in writing of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would cause any of the representations or warranties in this Agreement of any Seller to be untrue or inaccurate in any material respect at or prior to the Closing Date and (ii) any material failure of any Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement; provided, however, that except as set forth in this Section 8.9 the delivery of any notice pursuant to this Section 8.9 shall not limit or otherwise affect the remedies available to Buyer under this Agreement. From time to time prior to the Closing, Sellers shall promptly supplement or amend the Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof, which, if existing, occurring or known at the date of this Agreement, would have been required to be set forth or described in the Schedules (each a "**Schedule Supplement**"). Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the termination rights contained in this Agreement or of determining whether or not the conditions set forth in Section 9.1(a) have been satisfied; provided, however, that if Buyer has the right to, but does not elect to, terminate this Agreement within ten (10) Business Days of its receipt of such Schedule Supplement, then Buyer shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter.

Section 8.10   **Payment of Assumed Post-Petition Current Liabilities and Accounts Receivable.** Following the Closing, Buyer shall have the right and authority to collect all Accounts Receivable and other items included in the Purchased Assets (but not Excluded Assets) and to endorse for Buyer's account with the name of any Seller any checks received on account of such Accounts Receivable or other Purchased Assets. Sellers will instruct all account debtors obligated with respect to the Accounts Receivable assigned to Buyer to mail or deliver payments on such Accounts Receivable directly to Buyer at its address herein below set forth or at such other location as Buyer may specify in a written notice to Sellers. Such instructions shall not be rescinded or modified without Buyer's prior written consent. Except as expressly provided for herein, Sellers agree that they will, within five Business Days of receipt, transfer, assign and deliver to Buyer all cash and other property which it may receive with respect to any such Accounts Receivable from and after the Closing Date, and pending any such delivery to Buyer of any such property, Sellers shall hold any such property in trust for the benefit of Buyer with the exception that Sellers may retain any amounts due to Sellers under this Agreement following the distribution of the initial $1,750,000 of available cash to Buyer in accordance with the procedures set forth in Section 8.11. Buyer agrees that it will, within three Business Days after receipt, transfer, assign and deliver to Sellers all cash and other property which it may receive to the extent Sellers are entitled to such cash or other property under this Agreement and in accordance with Section 8.11. The parties' rights to retain property are subject to reconciliation under Section 8.11. Buyer shall, after the Closing Date, use reasonable efforts to collect such Accounts Receivable, and Sellers shall reasonably assist and cooperate with Buyer in the collection of all Accounts Receivable, as reasonably requested by Buyer. Notwithstanding the foregoing, all proceeds from payment of any Accounts Receivable shall be distributed among Buyer and Sellers in accordance with Section 8.11.

Section 8.11   **Working Capital Payments.** Subject to Section 8.10, the Net Working Capital of Sellers shall be distributed in accordance with subsections (a) – (g) below.

(a)      By October 10, 2019, the Sellers shall deliver to Buyer a statement updating the Net Working Capital calculation provided on Schedule 8.11, which calculation shall confirm the Sellers' Net Working Capital as of September 30, 2019. On the Closing Date, the Sellers shall deliver to Buyer a statement updating the Net Working Capital calculation provided on Schedule 8.11 (such updated statement, the "**Estimated Closing Statement**") setting forth the Sellers' good faith estimate of Net Working Capital as of the Closing Date (the "**Estimated Net Working Capital**") along with Sellers' bank statements, a report of all of Sellers' accounts receivable and a report of all of Sellers' accounts payable, in each case updated as of the Closing Date. The Estimated Closing Statement shall be prepared in accordance with GAAP, as applied in a manner consistent with the definition of Net Working Capital herein and accounting methods, policies, categorizations, definitions, principles, practices, techniques and procedures reasonably satisfactory to Buyer, but shall not include any changes in assets or liabilities as a result of changes arising from or resulting as a consequence of the Closing. On the Closing Date, subject to the Excess NWC Adjustment, to the extent the available cash included in the Estimated Net Working Capital: (1) is less than or equal to $1,750,000, Sellers shall pay all such available cash to Buyer; (2) is greater than $1,750,000 but less than or equal to $3,500,000, Sellers shall pay $1,750,000 to the Buyer and Sellers shall retain any remaining amount; or (3) exceeds $3,500,000, such amount of available cash shall be split evenly at Closing between the Buyer on the one hand and the Sellers on the other hand provided that in all circumstances Buyer's Working Capital shall be limited to

36

the amount required to satisfy any Remaining Hillair Obligations.  In the event any cash is distributed to Sellers in accordance with this <u>Section 8.11</u> prior to the completion of the Net Working Capital reconciliation procedures set forth herein, Sellers shall hold and not distribute any such cash until the completion of such procedures and the resolution of any disputes related thereto.

(b)    The amount of Net Working Capital paid to the Buyer or retained or due to Sellers as described in <u>Section 8.11(a)</u> shall be subject to an adjustment as set forth in this subparagraph (the "**Excess NWC Adjustment**"). In the event the Credit Bid Amount exceeds $9,000,000, an amount equal to the product of (i) the quotient of (A) the amount by which such Credit Bid Amount exceeds $9,000,000, divided by (B) $100,000, multiplied by (ii) $750,000, and multiplied by (iii) 4.74383% shall be deducted from the Buyer's Working Capital payable under <u>Section 8.11(a)</u> ("**Excess NWC Reduction**") and shall be added to the Sellers' Working Capital retained and payable hereunder ("**Excess NWC Addition**"), *provided however that* no Excess NWC Reduction shall in any event reduce the Buyer's Working Capital to be paid hereunder to an amount less than $1,000,000. <u>Schedule 8.12(b)</u> sets forth an example of the impact an increase in the Credit Bid above $9,000,000 will have on the amount of Net Working Capital to be distributed to the Parties. Following the Closing, the Buyer shall continue to collect the Accounts Receivable in accordance with <u>Section 8.10</u> and distribute the proceeds thereof, and the proceeds of any other non-cash components of Net Working Capital which are monetized, within three Business Days after receipt of such cash proceeds and in accordance with this <u>Section 8.11</u> as if all such proceeds were available cash included in the Estimated Net Working Capital at Closing until all cash from the Business, including the proceeds of Accounts Receivable collected post-Closing, has been distributed in accordance herewith.

(c)    To confirm the accuracy of the Estimated Net Working Capital and any applicable adjustments in relation thereto, as soon as reasonably practicable after the Closing Date, and in any event, within 30 days thereof, Buyer shall prepare and deliver to the Sellers a statement (the "**Closing Statement**") setting forth the calculation of the Net Working Capital and supporting documentation and computations for each component of Net Working Capital as of the Closing Date. The Closing Statement shall be prepared in accordance with GAAP, as applied in a manner consistent with the definition of Net Working Capital herein and accounting methods, policies, categorizations, definitions, principles, practices, techniques and procedures consistent with Sellers' practices subsequent to the Petition Date, but shall not include any changes in assets or liabilities as a result of changes arising or resulting from the Closing.

(d)    After receipt of the Closing Statement from Buyer, Sellers shall have 10 days to review the Closing Statement (the "**Review Period**") and notify Buyer in writing prior to the expiration of the Review Period of any dispute or objection thereto, setting forth in reasonable detail the particular items of any such dispute or objection (such written notice, the "**Objection**"). If Sellers have not notified Buyer of an Objection within the Review Period, then the Closing Statement shall be deemed to have been accepted by the Parties and shall become final, binding and conclusive. If an Objection is delivered by Sellers to Buyer within the Review Period, the Sellers and Buyer shall, within 10 days (or such longer period as the Sellers and Buyer may mutually agree in writing) following delivery of an Objection to Buyer (the "**Resolution Period**"), attempt in good faith to resolve their differences, and any resolution mutually agreed by them as to any disputed amounts shall be final, binding and conclusive. Any items agreed to by the Sellers

and Buyer in writing, together with any items not disputed or objected to by the Sellers in the Objection, are collectively referred to herein as the "**Resolved Matters**".

(e)    From and after the Closing, for purposes of reviewing the Closing Statement, Buyer shall, during normal business hours (i) provide Sellers and their representatives with reasonable access to the books, records (including work papers, schedules, memoranda and other documents) and supporting data used in the preparation of the Closing Statement, (ii) give reasonable access to employees and (iii) use commercially reasonable efforts to make available its accountants or other advisors that participated in the preparation of the Closing Statement or the information contained therein. Buyer and the Sellers shall cooperate with each other and its or their representatives in connection with their respective review of the Closing Statement and the Objection, as the case may be, including providing on a timely basis all other information and copies of records or other documents of the Purchased Assets and Assumed Liabilities necessary or useful in connection with the review of the Closing Statement and the Objection as is reasonably requested by such other Party or its or their representatives; *provided*, *however*, that the accountants of Buyer or the Sellers shall not be obliged to make any work papers available to Buyer or the Sellers (as applicable) or their respective representatives except in accordance with such accountant's normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such accountants.

(f)    If at the end of the Resolution Period the Sellers and Buyer have been unable to resolve any differences that they may have with respect to the matters specified in the Objection, the Sellers and Buyer shall refer all matters that remain in dispute with respect to the Objection (the "**Unresolved Matters**") to a nationally recognized independent public accounting firm that has not provided material services to either Buyer or any of the Sellers or their respective Affiliates in the preceding three (3) years as jointly selected by the Sellers and Buyer or, if the Sellers and Buyer are unable to agree within five (5) Business Days from the end of the Resolution Period, then such nationally recognized independent public accounting firm jointly selected by the Sellers' and Buyer's independent accountants within five (5) Business Days thereafter (such firm, as finally selected, the "**Accounting Firm**"). The Sellers and Buyer each agree to promptly sign an engagement letter, in commercially reasonable form, as may reasonably be required by the Accounting Firm. Each of Buyer and the Sellers shall submit to the Accounting Firm (with a copy delivered to the other party on the same day), within 15 Business Days after the date of the engagement of the Accounting Firm, a memorandum (which may include supporting exhibits) setting forth their respective positions with respect to the Unresolved Matters. Each of Buyer and the Sellers may (but shall not be required to) submit to the Accounting Firm (with a copy delivered to the other party on the same day), within 15 Business Days after the date of the engagement of the Accounting Firm, a memorandum responding to the initial memorandum submitted to the Accounting Firm by the other party. Unless requested by the Accounting Firm in writing, no party hereto may present any additional information or arguments to the Accounting Firm, either orally or in writing. None of the Sellers, Buyer or any of their respective Affiliates or representatives shall have any ex parte communications or meetings with the Accounting Firm regarding the subject matter hereof without the other party's prior written consent. The Accounting Firm shall be given reasonable access to all relevant records of the Purchased Assets and Assumed Liabilities to calculate the Closing Statement. The Accounting Firm shall act as an arbitrator and not as an expert to calculate, based solely on the written submissions of Buyer, on the one hand, and the

38

Sellers, on the other hand, and only with respect to the Unresolved Matters submitted and without independent investigation, whether and to what extent the Closing Statement requires adjustments and shall be instructed that its calculation (A) must be made in strict accordance with the terms of this Agreement, without regard to principles of equity, and (B) with respect to each Unresolved Matter, must be within the range of values established for such amount as determined by reference to the value assigned to such amount by the Sellers in the Objection and by Buyer in the Closing Statement. The Sellers and Buyer shall request the Accounting Firm to (i) submit its final written determination to the Sellers and Buyer as soon as practicable, but in any event within 30 days after the Accounting Firm's engagement, and (ii) prepare the Final Closing Statement (which shall be consistent with the Resolved Matters and the final determination of the Accounting Firm of the Unresolved Matters). The Accounting Firm's final written determination shall be conclusive and binding upon the Sellers and Buyer. The "**Final Closing Statement**" shall be (i) in the event that no Objection is delivered by the Sellers to Buyer prior to the expiration of the Review Period, the Closing Statement delivered by Buyer to the Sellers pursuant to Section 8.11(c), (ii) in the event that an Objection is delivered by the Sellers to Buyer prior to the expiration of the Review Period, the Closing Statement delivered by Buyer to the Sellers pursuant to Section 8.11(c) as adjusted pursuant to the agreement of the Sellers and Buyer in writing or (iii) in the event that an Objection is delivered by the Sellers to Buyer prior to the expiration of the Review Period and the Sellers and Buyer are unable to agree on all matters set forth in such Objection, the Closing Statement delivered by Buyer to the Sellers pursuant to Section 8.11(c) as adjusted by the Accounting Firm to be consistent with the Resolved Matters and the final determination of the Accounting Firm of the Unresolved Matters in accordance with this Section 8.11(f). In the event the Final Closing Statement is determined (x) pursuant to clause (i) or (ii) of the immediately preceding sentence, Buyer shall prepare the Final Closing Statement in strict accordance with the terms of this Agreement, and deliver such items to the Sellers within three Business Days following the determination thereof or (y) pursuant to clause (iii) of the immediately preceding sentence, the Accounting Firm shall prepare the Final Closing Statement (which shall be consistent with the Resolved Matters and the final determination of the Accounting Firm of the Unresolved Matters) in strict accordance with the terms of this Agreement, and deliver such items to the Sellers and Buyer within three Business Days following the delivery of the final written determination of the Accounting Firm to the Sellers and Buyer.

(g)     It is the intent of the Parties to have any determination of Unresolved Matters by the Accounting Firm proceed in an expeditious manner; *provided*, *however*, any deadline or time period contained herein may be extended or modified by mutual agreement of the Parties, and the Parties agree that the failure of the Accounting Firm to strictly conform to any deadline or time period contained herein shall not be a basis for seeking to overturn any determination rendered by the Accounting Firm. The costs and expenses of the Accounting Firm shall be allocated to be paid by Buyer, on the one hand, and Sellers, on the other hand, based upon the percentage that the portion of the contested amount not awarded to each such party bears to the amount actually contested by such party, as determined by the Accounting Firm. For example, if Sellers challenge the calculation by an amount of $100,000, but the Accounting Firm determines that Sellers have a valid claim for only $60,000, then Buyer shall bear 60% of the fees and expenses of the Accounting Firm and Sellers shall bear the other 40% of such fees and expenses.

(h)     To the extent the available cash included in the Net Working Capital set forth in the Final Closing Statement is different than the available cash included in the Estimated

Net Working Capital, such that the Sellers on the one hand or the Buyer on the other hand should have received a greater or lesser amount of the available cash included in the Estimated Net Working Capital at Closing, the Party which received more cash than it was otherwise entitled to from the Estimated Net Working Capital shall pay the portion of such difference to the underpaid Party necessary to effect the correct distribution of all available cash from Net Working Capital in accordance with the order of payments pursuant to Section 8.11(a).  For clarity, the Buyer's assumption of Assumed Liabilities pursuant to Section 2.4 is not dependent upon the amount of working capital acquired by Buyer.

Section 8.12  **Lease Option to Purchase.** The Purchased Assets shall not include that certain Option to Purchase – Standard Lease Addendum dated March 10, 2018 (the "**Option**"), which the Sellers shall retain and may sell, exercise or otherwise dispose of in accordance with the following:

(a)    In the event Sellers intend to sell the Option to a third-party, Sellers shall notify Buyer of such intent no later than 90 days prior to the expiration date of the Option. The net proceeds from the sale of the Option shall be split evenly as between the Sellers on the one hand and Buyer on the other, *provided that* Buyer shall only receive proceeds in accordance with this Section up to the amount which is equal to the Remaining Hillair Obligations outstanding as of the date of such sale, with such payment to be remitted to Buyer no later than 10 Business Days following the closing of the sale of the Option.

(b)    In the event that Sellers intend to exercise the Option, Sellers shall notify Buyer of such intent no later than 90 days before the expiration of the Option, and shall exercise the Option by no later than its expiration date. Following the exercise of the Option, Sellers shall market and sell the underlying real property 3463 Foothill Boulevard, Glendale, California 91214 (the "**Property**") such that the closing of the sale of the Property shall occur by no later than August 31, 2020. The net proceeds from the sale of the Property shall be split evenly as between the Sellers on the one hand and Buyer on the other, *provided that* Buyer shall only receive proceeds in accordance with this Section up to the amount which is equal to the Remaining Hillair Obligations outstanding as of the date of such sale, with such payment to be remitted to Buyer no later than 10 Business Days following the closing of the sale of the Option.

(c)    In the event, by the date which is 90 days before the expiration date of the Option, that Sellers decide to not sell the Option or exercise the Option, Sellers shall notify Buyer of such intent and promptly assign the Option to Buyer.

(d)    Notwithstanding any other provision of this Agreement, the Buyer's Working Capital shall not include proceeds of the Option.

Section 8.13  **Release**. Sellers and Buyer shall make reasonable efforts to execute mutual release documentation at Closing providing for the release of claims each such Party may have against the other and their respective present and former officers and directors, employees and representatives with respect to claims arising prior to the Petition Date, except such claims relating to certain parties to be expressly named in such mutual releases.

Section 8.14  **Prospective Employees**.

(a)     Buyer intends to offer to employ all employees of Sellers ("**Prospective Employees**") upon terms and conditions substantially similar to those contained in their respective employment arrangements with Sellers.  Such Prospective Employees who become employees of Buyer shall be collectively referred to as the "**Buyer Employees**."  Sellers shall use commercially reasonable efforts to assist Buyer to engage the services of the Prospective Employees. Sellers shall not, and shall not attempt to, engage or transfer the services of any of the Prospective Employees to any other business operated by Sellers or their successors for a period ending one year after the Closing Date; provided, however, that in the event Buyer engages and then later terminates the services of any Prospective Employee, Sellers may later re-engage the services of such individuals. Buyer shall, in consultation with Sellers, be provided access to, and be allowed to communicate with, such Prospective Employees.  Following Closing, the Buyer shall indemnify Sellers from and against the amount of any and all losses and liabilities arising from Buyer's failure to offer employment to Prospective Employees, including liability under the WARN Act solely due to the failure to make such offers.

(b)     Sellers shall, subject to restrictions imposed by the Bankruptcy Code, as such may be modified by order of the Bankruptcy Court, and without affecting Buyer's obligations hereunder as to Assumed Post-Petition Current Liabilities, be responsible for payment of all compensation due to Prospective Employees with respect to the period prior to the Closing Date, including, but not limited to any unpaid wages, salary, unused vacation or sick leave earned and accrued (to the extent not paid), health benefits, severance, or change of control obligations.

(c)     Nothing herein expressed or implied is intended to confer on any Person other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Section 8.14.

(d)     Nothing contained in this Section 8.14 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Prospective Employee or Buyer Employee or any change in the employee benefits available to any individual Prospective Employee or Buyer Employee, except as expressly set forth in this Section 8.14. Nothing herein shall obligate Buyer to employ any Prospective Employee or Buyer Employee for any particular length of time.

Section 8.15     **Name Change.** Within fourteen (14) days after the Closing, Sellers shall take all steps necessary to effect a change in their respective legal names to remove the words "Scoobeez" and "Scoobur" (collectively, the "**Seller Names**") from such names. Sellers agree that they shall (i) as soon as practicable after the Closing Date and in any event within fourteen (14) days following the Closing Date, cease to make any use of the Seller Names or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or any of the Purchased Intellectual Property or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "**Seller Marks**"), and (ii) immediately after the Closing, cease to hold themselves out as having any affiliation with the Business, provided, however, that Sellers shall be permitted to use the Seller Names in connection with matters relating to the Bankruptcy Cases as their former names for legal and noticing purposes and for other administrative purposes while subject to the jurisdiction of the Bankruptcy Court, and in connection with Sellers' efforts to dispose of Excluded Assets, or to fulfill Seller's obligations hereunder. As promptly as practicable but in no event later than thirty (30) days

41

following the Closing Date, Sellers shall remove, strike over, cover, block or substantially obliterate all Seller Marks from any vehicles, displays, signs, promotional materials or other similar materials then owned by them.

Section 8.16  **Bulk Sales Laws.** Except as directed by the Bankruptcy Court, the Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that might otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

## ARTICLE IX
## CONDITIONS TO CLOSING

Section 9.1  **Conditions Precedent to Obligations of Buyer.** The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)  The representations and warranties of Sellers set forth in this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(b)  Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(c)  Sellers shall have delivered, or caused to be delivered, to Buyer all of the items set forth in Section 4.2;

(d)  From the date hereof through the Closing Date, (i) there shall have been no Material Adverse Effect and (ii) each Seller shall have delivered to Buyer a certificate, dated as of the Closing Date, to such effect;

(e)  The Purchased Assets shall be assumed, assigned and sold to Buyer, as the case may be, by Order of the Bankruptcy Court satisfactory to Buyer in its sole and absolute discretion;

(f)  The aggregate Cure Amounts as determined by the Bankruptcy Court for the Purchased Contracts shall not be more than 110% of the aggregate Cure Amounts set forth on Schedule 2.4(i) for such Contracts, unless otherwise agreed in writing by Buyer in its sole and absolute discretion;

42

(g)     The period to challenge or contest the validity, amount, perfection, or priority of the claims of the Buyer under the Cash Collateral Stipulation and the Debenture Lender under the Hillair Debenture shall have expired with no such challenge or contest having been asserted, or any such challenge or contest having been resolved to the satisfaction of the Buyer in its sole and absolute discretion;

(h)     So long as the Buyer obtains the protections of 363(m) of the Bankruptcy Code, the Bid Procedures Order shall have been entered on the docket of the Bankruptcy Court and shall not have been stayed, vacated, modified or supplemented (unless this condition shall have been waived in writing by Buyer);

(i)     So long as the Buyer obtains the protections of 363(m) of the Bankruptcy Code, the Bid Procedures Order shall not have been stayed, vacated, modified or supplemented (unless this condition shall have been waived in writing by Buyer), the Sale Order shall have been entered on the docket of the Bankruptcy Court and shall not have been stayed, vacated, modified or supplemented (unless this condition shall have been waived in writing by Buyer); and

(j)     The Closing shall have occurred on or prior to the Termination Date.

Section 9.2     **Conditions Precedent to Obligations of Sellers.** The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     The representations and warranties of Buyer set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and to the extent that any inaccuracy in such representations and warranties, individually or in the aggregate would not reasonably be expected to materially and adversely affect Buyer's ability to consummate the transactions contemplated by this Agreement; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect;

(b)     Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated on the Closing Date, to the foregoing effect;

(c)     So long as the Buyer obtains the protections of 363(m) of the Bankruptcy Code, the Bid Procedures Order shall have been entered on the docket of the Bankruptcy Court and shall not have been stayed, vacated, modified or supplemented (unless this condition shall have been waived in writing by Sellers);

(d)     So long as the Buyer obtains the protections of 363(m) of the Bankruptcy Code, the Sale Order shall have been entered on the docket of the Bankruptcy Court and shall not

43

have been stayed, vacated, modified or supplemented (unless this condition shall have been waived in writing by Sellers); and

(e)    Buyer shall have provided evidence of the assignment underlying its credit bid as required under Section 3.1.

(f)    The Closing shall have occurred on or prior to the Termination Date.

Section 9.3    **Conditions Precedent to Obligations of Buyer and Sellers.** The respective obligations of Buyer and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of the following condition (any or all of which may be waived by Buyer and Sellers in whole or in part to the extent permitted by applicable Law): there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

Section 9.4    **Frustration of Closing Conditions.** Neither Sellers nor Buyer may rely on the failure of any condition set forth in Section 9.1, Section 9.2 or Section 9.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE X
## NO SURVIVAL

Section 10.1    **No Survival of Representations and Warranties.** The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms.

## ARTICLE XI
## TAX MATTERS

Section 11.1    **Transfer Taxes.** Parties agree that the Purchase Price is exclusive of any Transfer Taxes. Buyer shall be responsible for and timely pay all Transfer Taxes in connection with the transactions contemplated hereby, irrespective of who is primarily liable for such Transfer Taxes.

Section 11.2    **Prorations.** All real property Taxes, personal property Taxes and other ad valorem Taxes and similar ad valorem obligations levied with respect to the Business or the Purchased Assets (other than Taxes allocated to Buyer pursuant to Section 11.1) for a Straddle Period shall be apportioned between the Sellers and Buyer as of the Closing based on the number of days of such taxable period ending on and including the Closing Date (the "**Pre-Closing Tax Period**") and the number of days of such taxable period after the Closing Date (with respect to any such taxable period, the "**Post-Closing Tax Period**"). The Sellers shall be liable for all Taxes attributable to the Pre-Closing Tax Period, and Buyer shall be liable for all Taxes attributable to the Post-Closing Tax Period. Upon receipt of any bill for real or personal property and other ad

44

valorem Taxes and similar ad valorem obligations relating to the Business or the Purchased Assets, the Seller and Buyer, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 11.2 together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the Party owing it to the other Party within twenty (20) days after delivery of such statement. Utility charges, rent and lease payments and other customary expenses incurred in the Ordinary Course of Business shall be prorated as of the Closing based on the actual days involved. In the event that either Sellers or Buyer shall make any other payment for which it is entitled to reimbursement under this Section 11.2, the other Party shall make such reimbursement promptly but in no event later than twenty (20) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.

Section 11.3   **Purchase Price Allocation.** Within sixty (60) days following the Closing, Buyer shall deliver to Sellers a proposed allocation of the Purchase Price (including the Assumed Liabilities and any other amounts properly included therein) among the Purchased Assets in accordance with Section 1060 of the Code and Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as applicable). Sellers shall have thirty (30) days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith. If Sellers disagree with or raise objections to the Allocation Schedule, Buyer and Sellers will negotiate in good faith to resolve such objections. If the Parties are able to agree upon the allocation of the Purchase Price, Buyer and Sellers shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Buyer and Sellers shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. If, on the other hand, the Parties are unable mutually to agree upon the manner in which the Purchase Price should be allocated, Buyer and Sellers shall be free to make their own respective allocations of the Purchase Price for tax purposes.

## ARTICLE XII
## MISCELLANEOUS

Section 12.1   **Expenses.** Except for (a) Transfer Taxes (which shall be governed by Section 11.1), and (b) Expense Reimbursement that may become owed by Sellers to Buyer pursuant to Section 4.5(a), if any, each of Sellers and Buyer shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 12.2   **Submission to Jurisdiction; Consent to Service of Process.**

(a)   Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected

5110383-12

with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12.7</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have closed or the Bankruptcy Court refuses to exercise jurisdiction, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Central District of California and any appellate court thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12.7</u>.

Section 12.3     **Waiver of Right to Trial by Jury.** Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 12.4     **Entire Agreement; Amendments and Waivers**. This Agreement (including the Schedules and Exhibits hereto) represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought or, if such amendment, supplement, modification or waiver can be so construed, by both Parties. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.5     **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts made and performed in the State of California.

Section 12.6     **Notices.** All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by electronic mail (and no notice of failure of delivery was received within a reasonable time after such message was sent) or (iii) one (1) Business Day

following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and e-mail addresses (or to such other address or e-mail address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Sellers, to:

>Scoobeez Global, Inc.
>
>c/o Brian Weiss, Chief Restructuring Officer
>Force Ten Partners, LLC
>20341 SW Birch Suite 220
>Newport Beach, CA 92660
>
>Email: bweiss@force10partners.com
>
>with a copy to (which shall not constitute notice):
>
>Foley & Lardner LLP
>555 S. Flower St., Suite 3300
>Los Angeles, CA 90071
>Attention: Ashley M. McDow, Esq. and John A. Simon
>Email: amcdow@foley.com
>            jsimon@foley.com
>
>with a copy to (which shall not constitute notice):
>
>Counsel to the Committee
>Levene, Neale, Bender, Yoo & Brill L.L.P.
>10250 Constellation Boulevard
>Suite 1700
>Los Angeles, CA 90067
>Attention: David L. Neale and John-Patrick M. Fritz
>Email: dln@lnbyb.com
>            jpf@lnbyb.com

If to the Buyer, to:

>Hillair Capital Advisors LLC
>118 Alta Street
>San Francisco, CA 94133
>Attention: Scott D. Kaufman
>Email: scottk@hillaircapital.com
>
>with a copy to (which shall not constitute notice):
>
>Olshan Frome Wolosky LLP
>1325 Avenue of the Americas
>New York, New York 10019

5110383-12

Attention: Adam H. Friedman, Esq.
Email: afriedman@olshanlaw.com

Each Party entitled to notice may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving all other Parties notices in the manner herein set forth.

Section 12.7 **Severability.** If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 12.8 **Binding Effect; Assignment.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any chapter 11 trustee hereinafter appointed for Sellers' estates or any trustee appointed in a chapter 7 case if the Bankruptcy Cases are converted from chapter 11. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, on the one hand, or Buyer, on the other hand, (by operation of law or otherwise) without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Buyer intends to (and may, without the consent of Sellers) assign its rights, interests, and obligations hereunder to one or more of its assignees or designees.

Section 12.9 **Counterparts.** This Agreement may be executed in one or more counterparts (including by electronic mail), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[Signature Pages Follow]*

48

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

**SCOOBEEZ GLOBAL, INC., F/K/A ABT HOLDINGS, INC.**
**SCOOBEEZ**
**SCOOBUR LLC**

By: _____

Name: Brian Weiss

Title: Chief Restructuring Officer

**BUYER:**

**HILLAIR CAPITAL ADVISORS LLC**

By: _____

Name: SCOTT KAUFMAN

Title: Managing Member

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SELLERS DISCLOSURE SCHEDULE**

to

**ASSET PURCHASE AGREEMENT**

**(the "Agreement")**

**BY AND AMONG**
**SCOOBEEZ GLOBAL, INC., F/K/A ABT HOLDINGS, INC.**

**SCOOBEEZ, and**

**SCOOBUR LLC,**

**AND**

**HILLAIR CAPITAL ADVISORS LLC**

The representations and warranties of Sellers contained in the Agreement are made subject to the exceptions and qualifications set forth herein. This Disclosure Schedule is qualified in its entirety by reference to specific provisions of the Agreement, and is not intended to constitute, and shall not be construed as constituting, separate representations or warranties of the Sellers.

The headings and subheadings have been inserted herein for convenience of reference only and shall not have the effect of amending or changing the express description hereof as set forth in the Agreement.

The inclusion of any information in any section of this Disclosure Schedule shall not be deemed to be an admission or acknowledgment by Sellers that such information is required to be listed in such section or is material to or outside the ordinary course of the business of Sellers, nor shall such information be deemed to establish a standard of materiality (and the actual standard of materiality may be higher or lower than the matters disclosed by such information). In addition, matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be reflected in the Disclosure Schedule. Any such additional matters are set forth for informational purposes only and do not necessarily include (and shall not be deemed to include) other matters of a similar nature.

Any information disclosed in this Disclosure Schedule under any section number shall be deemed to be disclosed and incorporated in the Disclosure Schedule under any other section to the extent the relevance of such information to such other section is reasonably apparent on the face of such disclosure.

## Schedule 1.1(a)

Contracts

1. Amazon
    a. Delivery Provider Terms of Service - Work Order
    b. Delivery Provider Terms of Service
    c. First Amendment to Work Order under the Delivery Provider Terms of Service
    d. Second Amendment to Work Order under the Delivery Provider Terms of Service
    e. Third Amendment to Work Order under the Delivery Provider Terms of Service
    f. Fourth Amendment to Work Order under the Delivery Provider Terms of Service
    g. Fifth Amendment to Work Order under the Delivery Provider Terms of Service
    h. Sixth Amendment to Work Order under the Delivery Provider Terms of Service
    i. Seventh Amendment to Work Order under the Delivery Provider Terms of Service
    j. Eighth Amendment to Work Order under the Delivery Provider Terms of Service
    k. Ninth Amendment to Work Order under the Delivery Provider Terms of Service
    l. Tenth Amendment to Work Order under the Delivery Provider Terms of Service
    m. Eleventh Amendment to Work Order under the Delivery Provider Terms of Service
    n. Twelfth Amendment to Work Order under the Delivery Provider Terms of Service
    o. Thirteenth Amendment to Work Order under the Delivery Provider Terms of Service
    p. Fourteenth Amendment to Work Order under the Delivery Provider Terms of Service
    q. Fifteenth Amendment to Work Order under the Delivery Provider Terms of Service
    r. Sixteenth Amendment to Work Order under the Delivery Provider Terms of Service
    s. Seventeenth Amendment to Work Order under the Delivery Provider Terms of Service
    t. Eighteenth Amendment to Work Order under the Delivery Provider Terms of Service
2. Property Leases
    a. Standard Industrial/Commercial Single-Tenant Lease - Net for 3463 Foothill Blvd., Glendale, CA 91214
    b. Lease Agreement for 3601 Northeast Loop 820, Suite 103 Fort Worth, TX
    c. Commercial Lease for 4118 McCullough Ave., San Antonio, CA 78212
3. Vendors
    a. Hertz Master Rental Agreement for Cargo Vans
    b. Verizon Wireless
    c. AT&T Mobility
    d. Fleetwash
    e. PEX Visa Prepaid Card (Bancorp Bank)
    f. Booster Fuels, Inc.

       g.  U-Stor-It, Chicago

       h.  U-Stor-It, Lisle

4. <u>Utilities</u>

       a.  ADT Security Service

       b.  Athens Services

       c.  City of Glendale Water & Power

       d.  Crescenta Valley Water District

       e.  Ready Refresh

       f.  Southern California Gas

       g.  Spectrum Business

5. <u>Insurance</u>

       a.  Gemini Insurance Company - Commercial General Liability

       b.  Lloyd's of London - Excess Auto Liability Policy

       c.  West American Insurance Company - Property Insurance for 3463 Foothill Blvd., Glendale, CA 91214

       d.  Innovative Work Comp Solutions LLC - Workers Compensation Insurance

## **Schedule 1.1(b)**

Purchased Contracts

Schedule 1.1(a) is incorporated herein by reference.

### Schedule 1.1(c)

Purchased Intellectual Property

1. Software
   a. Scoobeez Software Modules
      i. Onboarding
      ii. Human Resources Information System (HRIS)
      iii. Scheduling
      iv. My Scoobeez
      v. Ops
      vi. BeezKeeper
   b. Scoobeez iOS and Android Apps
   c. Irrevocable perpetual software to the Software Base/Core
2. Trademark:

| | |
|---|---|
| **Word Mark** | SCOOBEEZ.COM |
| **Goods and Services** | IC 039. US 100 105. G & S: courier, messenger and delivery of food, documents, and parcels via motor scooters and mopeds. FIRST USE: 20140411. FIRST USE IN COMMERCE: 20140411 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.01.02 - Men depicted as shadows or silhouettes of men; Silhouettes of men
09.05.25 - Batting helmets; Caps, nurses; Caps, swimming; Dunce caps; Football helmets; Helmets, athletic; Helmets, construction; Helmets, military; Helmets, protective; Safety helmets
16.01.01 - Antennas; Radio antennas; Satellite dishes; Television antennas, roof and rabbit ears
18.05.02 - Mopeds; Motor cycles and motor scooters
27.01.04 - Letters forming objects; Numbers forming objects; Objects composed of letters or numerals; Punctuation forming objects |
| **Serial Number** | 86429104 |
| **Registration Number** | 4759570 |
| **Registration Date** | June 23, 2015 |
| **Owner** | (REGISTRANT) Scoobur, LLC. LIMITED LIABILITY COMPANY CALIFORNIA 3708 San Fernando Rd Glendale CALIFORNIA 91204 |

## **Schedule 2.1(r)**

Purchased Assets – Causes of Action

Schedule 2.1(s) is incorporated herein by reference.

## Schedule 2.1(s)

Purchased Assets – Specified Vendors

All causes of action and avoidance actions of the Sellers and their estates relating solely to vendors that provided goods or services to any of the Sellers within 120 days prior to the Petition Date, provided for clarity such matters shall not include any Insider Claims unless included in the Purchased Assets pursuant to Section 2.1(u).

## **Schedule 2.1(t)**

Additional Purchased Assets


All Furniture and Equipment on the premises of Sellers' business that is not leased will be acquired, unless such leased Furniture and Equipment is subject to a Purchased Contract pursuant to Schedule 1.1(b). Sellers confirm that there are no additional assets used or useful in the business which should be listed here.

## Schedule 2.2(k)

Additional Excluded Assets

None.

### Schedule 2.4(a)

Assumed Secured Liabilities

None as of the date of the Agreement; however, the Parties agree that this Schedule 2.4(a) may be updated at or prior to Closing to include any and all creditors holding valid and perfected secured liens in the Sellers' assets which are senior to the liens held by Buyer and appropriately remain on the Sellers' assets.

## **Schedule 2.4(b)**

Other Assumed Liabilities

None, except as provided under Section 8.14 of the Agreement.

## **Schedule 2.4(i)**

Cure Amounts

1. Hertz Corporation $870,230.84 (Hertz has Asserted this Amount in Proof of Claim).
2. Booster Fuels, Inc. - $79,360.71
3. Amazon – Cure is as stated herein in unknown amount (Amazon has Asserted such Claim in Proofs of Claim)
4. AT&T Mobility - $35.00
5. Ready Refresh - $189.88
6. Spectrum Business - $504.54

## **Schedule 5.2**

No Conflicts

No known conflicts.

## **Schedule 5.4**

Real Property Lease Defaults

None.

### **Schedule 5.8**

Financial Advisors

None.

**Schedule 5.9**

Litigation

1. Scoobeez is undergoing a Texas Department of Labor audit with respect to its Dallas-area locations, which is currently pending.
2. Shoushana Ohanessian, a former employee of Scoobeez, has threatened litigation in connection with disputed reimbursement amounts.
3. The following is pending pre-petition litigation:

| Case Name | County | Case No. | Plaintiff's Counsel of Record | Defendant's Counsel of Record |
|---|---|---|---|---|
| **McNair vs. Garcia, et al.** | LASC (Stanley Mosk) | BC708263 | Hamed Yazdanpanah, Esq. ( Law Offices of Hamed Yazdanpanah) | Robert Bergsten (James River for Scoobeez); Terry L. Gimenez, Esq. (Garcia) |
| **Vega, et al. vs. Scoobeez, et al.** | San Diego (Hall of Justice) | 37-2017-00018285-CU-OE-CTL | William B. Sullivan, Esq. (Sullivan Law Group, APC) | Krista Meredith Cabrera, Esq. (Foley & Lardner LLP) |
| **Griffin vs. Scoobeez, Inc., et al.** | LASC (Stanley Mosk) | BC707677 | Kashif Haque, Esq. (Aegis Law Firm) | Krista Meredith Cabrera, Esq. (Foley & Lardner LLP) |
| **Scoobeez vs. Firoz** | LASC (Stanley Mosk) | EC067690 | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) | Brent Michael Finch, Esq |
| **Garcia vs Green, et al.** | Tarrant County, TX (67th Judicial District) | 067-298184-18 | John Arthur Daspit, Esq. (Daspit Law Firm) | Daniel M. Karp, Esq. (Fee, Smith, Sharp & Vitullo LLP) |
| **Scoobeez SD, et al. vs Scoobeez, et** | San Diego (Hall of Justice) | 37-2017-00035791-CU-FR-CTL | Daniel A. Kaplan, Esq. (Law Offices of Daniel A. Kaplan) | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |

| | | | | |
|---|---|---|---|---|
| **DeGough vs. Scoobeez, Inc., et al.** | Dallas County, TX (134 District Court) | DC-18-09958 | David M. Glenn (Glenn Law Firm) | C. Ryan Curry, Esq. (Fletcher, Farley, Shipman & Salinas for Scoobeez) |
| **Avitus, Inc. vs. Scoobeez, Inc., et al.** | Federal District Court of MT | CV-18-146-BLG-SPW-TJC | David M. Wagner (Crowley Fleck PLLP) | Brian K. Gallik, Esq. (Gallik, Bremer & Molloy, P.C. for Scoobeez) |
| **Baban vs. Scoobeez Inc., et. al.** | LASC (Stanley Mosk) | BC692250 | Adam Reisner, Esq. (Reisner & King) | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Sarafian vs. Scoobeez Global, Inc.** | LASC (Stanley Mosk) | BC704771 | Shiraz Simonian, Esq. (Simonian & Simonian) | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Parra vs. Scoobeez, et al.** | Circuit Court of Cook County, IL (Fifth District) | 18L65021 | Michael Carin, Esq. (Mancini Law Group, P.C.) | Amy L. Anderson, Esq. (Brenner, Monroe, Scott & Anderson LTD for Scoobeez) |
| **Oberhauser, et al. vs Scoobeez, Inc., et al** | Travis County, Texas (261st Judicial District) | D-1-GN-18-007588 | Yusuf A. Bajwa, Esq. (Sanders Bajwa LLP) | Christopher Unger, Esq. (Dewhirst & Dolven, LLC for defendants) |
| **Walker vs. Scoobeez, et al.** | LASC (Stanley Mosk) | BC707663 (Removed to Federal District) | David Yeremian (Yeremian & Asscoiates) & Emil Davtyan (Davtyan PLC) | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Addal vs Amazon.com, et al** | LASC (Stanley Mosk) | BC719783 | Arash N. Alizadeh, Esq. (Law Office of Arash N. Alizadeh) | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC for Scoobeez); Brian D. Fahy, Esq. (Morgan, Lewis & Bockius |

| | | | | LLP for Amazon) |
|---|---|---|---|---|
| **Mathews vs Scoobeez, et al.** | County of Alemeda, CA | RG1892818 4 | Yitz E. Weiss, Esq. (Kaplan Weiss LLP) | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Hillair Capital Management LLC vs. Scoobeez, Inc., et al** | LASC (Glendale) | 19DCV004 92 | Steven M. Spector, Esq. (Buchalter, APC) | Krista Meredith Cabrera, Esq. (Foley & Lardner LLP) |
| **B-One Construction, Inc. vs. Scoobeez, et al.** | LASC (Stanley Mosk) | 19STCV05 158 | R. Sterling Hederson, Esq. (Gibbs Giden Locher Turner Senet & Wirrbrodt LLP) | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Guler vs. Fars, et al.** | San Mateo, CA (Southern Branch) | 18CIV0603 6 | Albert G. Stoll, Jr, Esq. (Albert G. Stoll, Jr., A Law Corporation) | Richard G. Garcia, Esq. (Manning & Kass, LLP for Scoobeez) |
| **Salgado vs. Scoobeez Inc., et al** | LASC (Stanley Mosk) | BC698703 | Nicholas J. Tsakas, Esq. | Scott D. Miller, Esq. (Miller Miller Gerber LLP ) |
| **Paragon Auto Leasing Co. vs. Scoobeez, et al.** | Circuit Court of Cook County, IL (First District) | 201911096 43 | Mauer & Madoff LLC 123 W. Madison St #1500, Chicago, IL 60602 | None as of yet |
| **Castellanos vs. Scoobeez, et al.** | LASC (Stanley Mosk) | BC701427 | A. Jacob Nalbanyan, Esq. (Employees' Legal Advocates, LLP | Rafael Nendel-Flores (LeClairRyan) |

| | | | |
|---|---|---|---|
| **Joharifard vs. Scoobeez** | Superior Court of Orange (Small Claims - Harbor Justice Center) | 30-2019-01046056-SC-SC-HNB | |
| **Raef Lawson vs. Scoobeez** | DLSE | 18STCP03498 | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Prince Uko vs. Scoobeez, et al.** | DLSE | 11-50459 TF | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Edvin Amzayan vs. Scoobeez, et al.** | DLSE | 11-50393 TF | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Massinissa Bechout vs. Scoobeez, et al.** | DLSE | 11-50434 TF | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Edvin Yeghian vs. Scoobeez, et al.** | DLSE | 11-50507 TF | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Debora Roberson** | DLSE | 05-69094 ADC | Scott A. Sheikh, Esq. (The Sheikh Law Firm, APC) |
| **Kenneth Burrell, Jr. vs. Scoobeez** | WCAB | ADJ12072457 | |
| **Scott Gandell vs. Scoobez** | WCAB | ADJ12278542 | |
| **Aristidez Arturo** | WCAB | ADJ12085782 | |

## **Schedule 5.10**

Compliance with Laws

1. The Sellers do not currently provide health insurance to employees and, as such, may not be in compliance with the Affordable Care Act. The Sellers are currently in the process of searching for a health insurance policy for its employees.

## **Schedule 5.11**

Permits

1. Registration to do business in each state in which Scoobeez operates (CA, IL, and TX)
2. Local Business License, where required (i.e., City of Glendale)
3. Department of Transportation Registration (not required by law but by Amazon)

## **Schedule 8.6(h)**

Affiliate Transactions

1. Ordinary course intercompany cash movement as needed, subject to the Bankruptcy Court's cash management order.

## Schedule 8.11

Net Working Capital

**Scoobeez**
**Balance Sheet**
As of June 30, 2019

|  |  | June 30, 19 |
|---|---|---:|
| **ASSETS** |  |  |
| **Current Assets** |  |  |
| Checking/Savings |  |  |
| BUSINESS CHECKING (XXXXXX 1330) |  | - |
| Wells Fargo Business Ck#6056 |  | - |
| Wells Fargo Acct#4303 |  | - |
| Scoobeez DIP Operating #3680 |  | 1,609,014 |
| WF Scoobeez DIP Tax 8399 |  | 2,386 |
| WF Scoobeez DIP Payroll 8415 |  | 44,993 |
| Wells Fargo Business Choice1982 |  | - |
| Wells Fargo Checking #4416 |  | - |
| Total Checking/Savings |  | 1,656,393 |
| Accounts Receivable |  |  |
| Accounts Receivable (A/R) |  |  |
| Amazon AMZL-Logistics |  | 5,262,183 |
| HOPSY |  | 644 |
| Accounts Receivable (A/R) - Other |  | (954) |
| Total Accounts Receivable (A/R) |  | 5,261,873 |
| Total Accounts Receivable |  | 5,261,873 |
| Other Current Assets |  |  |
| Uncategorized Asset |  | 89,023 |
| Other Current Assets |  | 173,010 |
| Other Loan Receivable |  | - |
| Loan Receivables - Shahan/Autoc |  | 1,815,528 |
| Total Other Current Assets | 2 | 2,077,561 |
| Total Current Assets | 1 | 8,995,827 |
| **Current Liabilities** |  |  |
| Accounts Payable - Post Petition |  |  |
| Accounts Payable |  | 429,145 |
| Accrued Payroll |  | 1,100,454 |
| Hillair Payments |  | (280,000) |
| Accrued Chapter 11 Professional Fees |  | 1,166,000 |
| Total Accounts Payable |  | 2,415,599 |
| Total Current Liabilities | 3 | 2,415,599 |

5147844-3
4824-3208-8997.2

**Scoobeez**
**Balance Sheet**
As of June 30, 2019

| | | June 30, 19 |
|---|---|---|
| **NET WORKING CAPITAL** | | |
| Current Assets | 1 | 8,995,827 |
| Less Amounts due from Shahan | 2 | (2,077,561) |
| | 1-2 | 6,918,266 |
| Less: | | |
| Post-Petition Current Liabilities | 3 | (2,415,599) |
| Assumed Secured Liabilities | | 0 |
| Assumed Pre-petition Claims | | (539,396) |
| Net Working Capital (Projected) | | 3,963,271 |
| Allocation of Net Working Capital | | |
| the Purchaser shall receive the first $1,750,000 of such Actual Net Working Capital | | (1,750,000) |
| the Sellers shall receive the second $1,750,000 of such Actual Net Working Capital | | (1,750,000) |
| | | 463,271 |
| the Seller and the Purchaser shall each receive 50% of the Actual Net Working Capital above $3,500,000, provided that Purchaser's recovery shall be limited to the Hillair Payoff Amount | | |
| Purchaser | | (231,635) |
| Seller | | (231,635) |
| | | - |
| **Hillair Debt Balance** | | |
| Hillair Payoff Amount | | 11,108,000 |
| Credit bid | | (9,000,000) |
| | | 2,108,000 |
| the Purchaser shall receive the first $1,750,000 of such Actual Net Working Capital | | (1,750,000) |
| | | 358,000 |
| the Seller and the Purchaser shall each receive 50% of the Actual Net Working Capital above $3,500,000, provided that Purchaser's recovery shall be limited to the Hillair Payoff Amount | | (231,635) |
| | | 126,365 |
| **Funds to the Estate** | | |
| the Sellers shall receive the second $1,750,000 of such Actual Net Working Capital | | 1,750,000 |
| the Seller and the Purchaser shall each receive 50% of the Actual Net Working Capital above $3,500,000, provided that Purchaser's recovery shall be limited to the Hillair Payoff Amount | | 231,635 |
| | | 1,981,635 |

## <u>Schedule 8.12(b)</u>

### Increased Credit Bid Impact on Net Working Capital Payments

Scoobeez
Analysis of Increase in Hillair Credit Bid Above $9,000,000 to Excess Working Capital

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Credit Bid Claim | 1 | 11,108,000.00 | | | | | | | |
| Minimum Credit Bid | 2 | 9,000,000.00 | | | | | | | |
| Difference | 3=1-2 | 2,108,000.00 | | | | | | | |
| Increase in Credit Bid | 4 | 100,000.00 | 1,000,000 | 1,250,000 | 1,500,000 | 1,750,000 | 2,000,000 | 2,108,000 |
| Excess Working Capital Subject to Reductic | 5 | 750,000.00 | | | | | | | |
| | 6=4/3 | 4.74383% | 47.43833% | 59.29791% | 71.15750% | 83.01708% | 94.87666% | 100.00000% |
| Decrease in Excess Working Capital | 7=5/6 | 35,578.75 | 355,787.48 | 444,734.35 | 533,681.21 | 622,628.08 | 711,574.95 | 750,000.00 |