MORGAN, LEWIS & BOCKIUS LLP
Richard W. Esterkin, SBN 70769
richard.esterkin@morganlewis.com
300 S Grand Ave Fl 22
Los Angeles CA  90071-3132
Tel:     (213) 612-2500
Fax:    (213) 612-2501

Attorneys for
Amazon Logistics, Inc.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| **In re:**<br><br>**SCOOBEEZ, et al.[1],**<br><br>**Debtors and Debtors in Possession.**<br><br>Affects:<br>■ All Debtors<br>□ Scoobeez, ONLY<br>□ Scoobeez Global, Inc., ONLY<br>□ Scoobur LLC, ONLY | Case No. 2:19-bk-14989-WB<br>Jointly Administered:<br>2:19-bk-14991-WB, and 2:19-bk-14997-WB<br><br>Chapter 11<br><br>**AMAZON LOGISTICS, INC.'S REPLY IN SUPPORT OF MOTION FOR RELIEF FROM STAY; AND DECLARATION OF JAMES WILSON IN SUPPORT THEREOF**<br><br>Date:  Nov. 18, 2019<br>Time:  10:00 a.m.<br>Place.:     United States Bankruptcy Court<br>                  Edward Roybal Federal Building<br>                  255 E Temple St., Ctrm 1375<br>                  Los Angeles CA  90012<br><br>Judge:  The Hon. Julia W. Brand |

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Scoobeez (6339); Scoobeez Global, Inc. (9779); and, Scoobur, LLC (0343).  The Debtors' address is 3463 Foothill Boulevard, in Glendale, California  91214.

**Table of Contents**

I.   INTRODUCTION ................................................................................................................ 4

II.  THE AUTOMATIC STAY DOES NOT COMPEL AMAZON TO
     PROVIDE BUSINESS TO THE DEBTORS ..................................................................... 7

III. BECAUSE AMAZON LACKS ADEQUATE PROTECTION FOR
     ITS INTEREST IN THE AGREEMENT, THE AUTOMATIC
     STAY SHOULD BE TERMINATED ................................................................................ 8

IV.  AMAZON HAS NOT 'DE FACTO" TERMINATED THE
     CONTRACT ..................................................................................................................... 12

V.   CONCLUSION ................................................................................................................. 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re ATP Oil & Gas Corp.*,
  2015 WL 5965600 (S.D. Tx. Oct. 9, 2015) ...............................................................................11

*Carlisle Corp. v. Uresco Const. Materials. Inc.*,
  823 F.Supp. 271 (M.D. Pa. 1993) ............................................................................................11

*In re Colonial Center, Inc.*,
  156 B.R. 452 (E.D. Pa. 1993) ....................................................................................................9

*In re Deppe*,
  110 B.R. 898 (Bankr. Minn. 1990) ..........................................................................................12

*In re Ernie Haire Ford, Inc.*,
  403 B.R. 750 (Bankr. M.D. Fla. 2009) ...............................................................................12, 13

*In re Hawker Beechcraft, Inc.*,
  2013 WL 2663193 (Bankr. S.D.N.Y. June 13, 2013) ..............................................................11

*Johnson v. Yousoofian*,
  84 Wash. App. 755 (1996) .........................................................................................................8

*In re National Hydro-Vac Industrial Services L.L.C.*,
  262 B.R. 781 (Bankr. E.D. Ark. 2001) ...............................................................................10, 11

*In re O-Jay Foods, Inc.*,
  110 B.R. 895 (Bankr. Minn. 1989) ..........................................................................................12

*Rekhter v. State Dept. of Social Health Services*,
  180 Wash.2d 102 (2014) ........................................................................................................7, 8

*S.A.M. Electronics, Inc. v. Osaraprasop*,
  39 F.Supp.2d 1074 (N.D. Ill. 1999) .........................................................................................11

*In re Siciliano*,
  167 B.R. 999 (Bankr. E.D. Pa. 1994) .........................................................................................9

*Matter of West Electronics Inc.*,
  852 F.2d 79 (3rd Cir. 1988) .....................................................................................................13

**Statutes**

11 U.S.C. § 362(d)(1) ................................................................................................................9, 10

# I.
# INTRODUCTION

It is safe to say that Amazon and the parties opposing Amazon's motion for relief from the automatic stay have dramatically different view of the Debtor.[2] What is undisputed is that Amazon provided the Debtor with substantial business from the inception of its contract with the Debtor through the date upon which the Debtor filed its chapter 11 petition. After the petition date, Amazon actually increased the amount of business that it supplied to the Debtor, until recently, when the amount of business given to the Debtor returned to a more normalized level. Recently, Amazon made the decision to sever its relationship with the Debtor and approached the Debtor in an unsuccessful effort to agree upon a consensual, gradual transition period that would have facilitated the Debtor's drivers' efforts to seek alternative employment (to the extent that the Debtor's remaining business did not require their services) and paid the Debtor a substantial sum of money.[3] As the Debtor was informed at that time, absent such an agreement, Amazon would seek to exercise its contractual termination rights, which led to the filing of the present motion.

Amazon's decision to terminate its relationship with the Debtor, which is explicitly provided for in its contract with the Debtor, was not made idly, arbitrarily, or as a result of the Debtor having filed its chapter 11 petition.[4] As Amazon explained to both the Debtor and its lender, Hillair Capital Management, LLC ("Hillair), the Debtor's business model – a large delivery service provider ("DSP") operating out of multiple stations with only lower level management at each station did not fit the business model that Amazon was seeking to promote –

---

[2] Hillair's opposition to this motion is replete with "facts" that are wholly unsupported by any admissible evidence or that grossly distort that evidence. Amazon does not intend to burden this Court by listing each such instance and would request that the Court review the admissible portions of the declarations submitted by Hillair in support of its opposition in lieu of relying upon the purported statement of facts set forth in that opposition. One example of the foregoing is the statement that "Unlike other delivery companies of its kind, the Debtor's employees receive full health insurance coverage and are paid wages for a day's work even if they finish their routes early, minimizing the likelihood of accidents due to frenetic driving." Opposition at 3:8-10. There is no admissible evidence as to the employment policies of other delivery companies. Further, there is no evidence that paying drivers for a full day's work minimizes the likelihood of accidents due to "frenetic driving."

[3] In summarizing the proposed separation agreement, Hillair fails to inform the Court that the proposed agreement was expressly conditioned upon obtaining this Court's approval of that agreement.

[4] It is undisputed that Amazon provided the Debtor with increased business in the months following the filing of the Debtor's chapter 11 petition and that Amazon's decision to sever its relationship with the Debtor was made months after the petition date.

DSPs operating from stations ewith local ownership. In addition, Amazon had become subject to multiple actions in which the Debtor's employees alleged that the Debtor failed to comply with local wage/hour laws and that Amazon was jointly and severally liable with the Debtor on those claims.[5] In short, in addition to its structural concerns, Amazon grew tired of being sued as a result of the Debtor's operations.

On May 13, 2019, Amazon sent an e-mail to all of its DSPs, including the Debtor, reminding them that their contracts with Amazon required that they obtain Amazon's written consent to any assignment of those contracts.[6] That e-mail also advised the DSPs that, "If your company intends to acquire the Amazon-related business of another DSP or to sell or assign its Amazon related business to another DSP or any other third party, please reach out directly to the Amazon On-Road Director for your region, as well as amzlcompliance@amazon.com to notify Amazon of your intention to seek Amazon's approval."[7] The Debtor simply ignored that e-mail and filed a motion seeking to assign the Amazon contract to Hillair or its assignee, to which Amazon objected.[8] Among other things, as noted in Amazon's objection to Hillair's motion to seal the Freeh report, Amazon has significant concerns regarding Hillair's ability to operate the Debtor's business, including the wisdom of its decision to continue to support the Debtor with Mr. Ohanessian in charge for over two years after learning of Mr. Ohenassian's alleged misappropriations. Also, the Debtor did not propose to cure, or provide adequate assurances that it or Hillair would cure, the prepetition defaults under the contract (*see,* Amazon's proofs of claim Nos. 31, 32, 37, 38 and 39) and failed to identify the actual party to whom the contract was to be

---

[5] The Debtor's assertion that Amazon made its decision to sever its relationship with the Debtor due to the Debtor's failure to satisfy its pre-petition indemnification obligations is incorrect. If Amazon was merely concerned with recovering on its pre-petition claims, it would not have objected to the Debtor's attempt to assume and assign its contract as assumption of the contract would have required payment in full of the pre-petition claims. Further, although there are pages of declarations recounting Amazon's interaction with the Debtor and Hillair, none of the declarants have suggested that Amazon was willing to rescind its decision if its pre-petition claims were paid.

[6] Declaration of James Wilson (Adversary Docket No. 10 at pages 10-13 ) at ¶ 10, Exhibit 1 (at page 183 of 184).

[7] *Id.*

[8] Declaration of James Wilson (Adversary Docket No. 10 at pages 10-13 ) at ¶ 11; Docket No. 349.

assigned.[9] In fact, even in its most recent filing, Hillair still fails to identify its proposed assignees, the interest that they will receive, the capital, if any, that they propose to contribute to the entity that is supposed to succeed to the contract or the role that those "investors" will play in the Debtor's operations.[10]

The Debtor's "end-game" is equally obscure. Whether the Amazon contract is assigned to a third party in a sale of the Debtor's assets or retained by the Debtor as part of a plan of reorganization (assuming that either outcome is possible), the automatic stay will terminate. Whoever winds up with the Amazon contract, the contract will never provide that Amazon must provide that entity with any business and will always provide that Amazon has the right to terminate the contract without cause on 30 days' written notice. The Amazon contract does not provide a foundation upon which the Debtor can reorganize, whether via an asset sale or a plan.

Amazon customers expect the timely delivery of packages. Amazon contracts with a number of third parties including the U.S. Postal Service, UPS, and delivery service providers ("DSPs"), such as the Debtor, to deliver packages to Amazon customers. Amazon's contract with the Debtor protects Amazon from having to do business with DSPs with whom Amazon has lost confidence by explicitly stating that the contract does not guarantee that the DSP will receive any business and granting Amazon (and the contract counterparty, such as the Debtor) the right to terminate the contract on 30 days' written notice, with or without cause. Although not required by the contract, Amazon provided the Debtor and Hillair with its rationale for severing its relationship with the Debtor (discussed above). Amazon has now filed this motion to implement that decision and flee the chaos with which it is faced. This Court should grant this motion and allow Amazon to exercise its contractual rights.

---

[9] As stated in Amazon's objection to the assumption and assignment of the Contract, the proposed asset purchase agreement provides that "Buyer [Hillair] intends to (and may, without the consent of Sellers) assign its rights, interests, and obligations hereunder to one or more of its assignees or designees." Docket No. 349 at p. 5.

[10] *See, Hillair Capital Management LLC's Initial Opposition to Amazon Logistics Motion for an Order: (A) Determining that the Stay Does not Require [Amazon] to Utilize Debtor's services and (B) Modifying the Automatic Stay* (Docket No. 418) at 5:18-21 ("When Amazon complained that it did not want to work with a DSP owned by Hillair, Hillair indicated that the "newco" would be partially owned by well-known citizens of each city, including prominent National Football League players and individuals of diverse racial backgrounds who are more reflective of the diverse demographics of the Debtors.").

## II.
## THE AUTOMATIC STAY DOES NOT COMPEL AMAZON
## TO PROVIDE BUSINESS TO THE DEBTORS

As the Debtor acknowledges, "the automatic stay prohibits any acts to terminate or modify an estate's interests in a contract."[11] The contract at issue in this case unambiguously states that "Amazon makes no promises or representations whatsoever as to the amount of business that you can expect at any time under these Terms …." Thus, the estate does not have an interest in any particular volume of business, or any business at all. If Amazon were to cease providing any business to the Debtors, it would not be modifying or terminating any right that the Debtor possesses under the contract. Rather than preserving the Debtor's rights under the contract, the Debtor seeks to use the automatic stay to enlarge those rights. There is no authority for that position.

The Committee and Debtor rely upon *Rekhter v. State Dept. of Social Health Services*, 180 Wash.2d 102 (2014) to argue that the covenant of good faith and fair dealing, as applied under Washington law, limits Amazon's discretion regarding its decision to award routes to the Debtor. That case has no application to the facts of this case.

In *Rekhter*, the Department of Health Services contracted with care providers to provide personal care services and perform household tasks for disabled individuals. "The contracts explicitly incorporate by reference the service plan of the particular client, but because the contracts are signed before the service plan is created, key terms such as tasks to be performed and authorized hours are left undefined until long after the contract is executed." 180 Wash.2d at 108. The Department adopted a "shared living rule" that provided less compensation for caregivers who lived with their clients than for other caregivers. The Court held that:

> [T]he duty of good faith and fair dealing arises when one party has discretionary authority to determine a future contract term. Here, the contracts gave DSHS the discretionary authority to pay providers for authorized hours pursuant to the service plans, which were developed at the discretion of DSHS after the contracts were finalized. Thus, the duty of good faith and fair dealing arose in connection with those contract terms.

---

[11] *Debtors' Opposition to Amazon Logistics, Inc.'s Notice of Motion and Motion for an Order: (A) Determining that the Automatic Stay does not Require Amazon to Utilize the Debtor's Services, and (B) Modifying the Automatic Stay* (Docket No. 419) at 9:12-13.

180 Wash.2d at 112.  In so holding, the Court noted that "the implied covenant of good faith and fair dealing cannot add or contradict express contractual terms and does not impose a free-floating obligation of good faith on the parties.  Instead, "'the duty [of good faith and fair dealing] arises only in connection with terms agreed to by the parties..'"  *Id.*  The Court also cited with approval *Johnson v. Yousoofian,* 84 Wash. App. 755, 762 (1996), relied upon by Amazon in its motion, for the proposition that "The implied duty of good faith is derivative, in that it applies to the performance of specific contractual obligations.  If there is no contractual duty, there is nothing that must be performed in good faith."

Here, Amazon is not purporting to dictate terms not provided for in the contract.  Rather, Amazon is requesting authority to enforce the terms of a fully integrated agreement that spell out the parties' rights and obligations in detail.[12]  That contract explicitly provides that Amazon has the right to decide whether it wishes to use the Debtor's services and the terms upon which those services will be rendered.  Thus, to apply the covenant of good faith and fair dealing as urged by the Debtor and the Committee would, in contravention of Washington law, contradict the express provision of the contract providing that Amazon is not guaranteeing the Debtor any particular volume of business, or any business at all.  Finally, because there is no contractual duty to provide business, under *Johnson*, there is no contractual duty that must be performed in good faith.

The parties' contract does not compel Amazon to use the Debtor's services and the automatic stay cannot be twisted so as to compel Amazon to do so.  This Court should declare that Amazon is free to use, or not use, the Debtor's services at its discretion.

### III.
### BECAUSE AMAZON LACKS ADEQUATE PROTECTION FOR ITS INTEREST IN THE AGREEMENT, THE AUTOMATIC STAY SHOULD BE TERMINATED

Quite simply, cause exists to modify the automatic stay because the automatic stay, as viewed by the Debtor, prevents Amazon from utilizing a DSP of its choice, even if that

---

[12] *See,* Terms at ¶ 12(j) ("These Terms (together with the Program Policies, which are incorporated in these Terms by reference), any Work Orders, and any NDA constitute the complete and final agreement of the parties pertaining to the Services and supersede and replace the parties' prior agreements, understandings, representations and discussions (whether written or oral) relating to the Services.

alternative DSP is viewed as more qualified or offers better business terms to Amazon. In contrast, continuing the automatic stay in effect cannot confer any lasting benefit on the Debtor's estate because, eventually, the automatic stay will terminate and Amazon will be free to enforce its contractual rights. As noted in Amazon's motion, numerous courts have held that, when the estate can obtain no benefit from the continuance of a contract, cause exists to grant the contract counterparty relief from the stay to terminate the contract.[13]

The contention that the Debtor is performing well under the contract is not correct. In fact, on average, the Debtor is in the bottom half of all DSPs operating from the stations from which the Debtor operates.[14] Thus, not only does the perpetuation of the automatic stay impose lost opportunity costs on Amazon, but, assuming that it applies at all, it also forces Amazon to do business with an entity that it believes to be a sub-par performer.

Relying upon *In re Siciliano*, 167 B.R. 999 (Bankr. E.D. Pa. 1994), the Committee argues that this Court has discretion to deny relief, even if the requirements of § 362(d)(1) have been met. First, the *Siciliano* court concluded that the requirements of § 362 had not been met in the case and, therefore, the language relied upon by the Committee is *dicta*. Second, the creditor in *Siciliano* was seeking to annul the stay to validate its prior foreclosure sale, not seeking prospective relief. Obtaining an annulment of the stay involves equitable considerations that are not present when seeking prospective relief, as in this case. Third, *Siciliano* relies upon *In re Colonial Center, Inc.*, 156 B.R. 452 (E.D. Pa. 1993) and cases cited therein. Those cases make it clear that relief may be denied when the requirements of § 362(d)(2) (lack of equity and not necessary to an effective reorganization) have been met, ***provided that*** the secured creditor's interest is otherwise adequately protected. Here, for the reasons stated in Amazon's motion and this reply, Amazon's contractual rights are not adequately protected – contrary to those rights, Amazon is being forced to continue to use, and pay for, the Debtor's services and is being precluded from utilizing other DSPs that Amazon views as better qualified or who have offered Amazon better economic terms. Hence, *Siciliano* does not support denying Amazon the relief

---

[13] *See, Motion* at pp. 6-7.

[14] Declaration of James Wilson at ¶ 7.

that it seeks.

Finally, this argument flies in the face of the express language of § 362(d). That section states:

> On request of a party in interest and after notice and a hearing, the court **shall** grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> (1) for cause, including lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. § 362(d)(1) (emphasis added). The section uses the mandatory word "shall," not the permissive word "may." Thus, § 362(d) requires that this Court provide Amazon with relief, provided that it concludes that Amazon lacks adequate protection for its interest in the agreement.

Reliance upon *In re National Hydro-Vac Industrial Services L.L.C.*, 262 B.R. 781 (Bankr. E.D. Ark. 2001) to argue that the existence of an at will termination provision in a contract does not constitute cause under § 362(d) is equally unavailing. What the court in that case actually held was that, because the non-debtor party to the contract was attempting to cancel the contract because of the Debtor's bankruptcy filing and financial condition, to permit the non-debtor to terminate the contract would violate the Congressional policy, expressed in § 365(e)(1), prohibiting the enforcement of *ipso facto* clauses.

> As a Bank employee testified, under the terminable at will provision, the Bank cancelled the Agreement when it learned of the Debtor's bankruptcy. Under the rule in *In re B. Siegel*, the Bank may not exercise its right to terminate for this reason because it contravenes the legislative purposes of the very statute the Bank employs to argue for relief from stay.

262 B.R. at 787. Thus, *National Hydro-Vac* does not stand for the proposition that the presence of an at will termination provision cannot provide cause for relief from the stay. Rather, it holds that an at-will termination clause cannot be exercised when the reason for doing so is that the debtor filed a bankruptcy petition. Here, this is no evidence that would support a conclusion that Amazon is attempting to exercise its termination right based upon the Debtor's bankruptcy filing. Instead, Amazon continued to do business with the Debtor for months after it filed is chapter 11 petition, increased the business that it provided to the Debtor after the filing and has articulated

substantial other reasons for its decision. Thus, Amazon's decision to exercise its at will termination rights (following an order modifying the automatic stay to permit it to do so) does not contravene any public policy and *National Hydro-Vac* is inapposite.

Citing *In re O-Jay Foods, Inc.*, 110 B.R. 895 (Bankr. Minn. 1989), Hillair argues that Amazon is not entitled to adequate protection because the Amazon contract is an executory contract and, as a result, Amazon's rights are governed solely by § 365. But the Amazon contract is not an executory contract because it does not impose any material obligations on Amazon. As stated in Amazon's opposition to the Debtor's request that it be allowed to assume and assign the Amazon contract, Amazon had no executory obligations under that contract because the contract does not obligate Amazon to provide any business to the Debtor. In response, the Debtor argued that, because Amazon owed monies to the Debtor as of the petition date based upon the Debtor's performance of pre-petition services, Amazon had material unperformed obligations that rendered the contract executory.

The Debtor's argument ignores that fact that courts treat master agreements where the non-debtor is not obligated to request services or goods from the debtor and the agreements resulting from requests for services or goods as separate divisible contracts. "'A master service agreement is not an executory contract. . . . An executory contract is an agreement to do something in the future. A master service agreement is an agreement to abide by certain terms *if* the parties agree to do something in the future." *In re ATP Oil & Gas Corp.,* 2015 WL 5965600 (S.D. Tx. Oct. 9, 2015) quoting *Moser v. Aminoil U.S.A., Inc.*, 618 F.Supp. 774, 779 (W.D.La. 1985) (emphasis in original). Master agreements, such as the Amazon contract, are treated as though they were option agreements, giving the non-debtor the option of requesting, or not requesting, goods or services; and the agreements resulting from the exercise of that option as separate contracts. *See, In re Hawker Beechcraft, Inc.*, 2013 WL 2663193 (Bankr. S.D.N.Y. June 13, 2013). *See also, Carlisle Corp. v. Uresco Const. Materials. Inc.,* 823 F.Supp. 271 (M.D. Pa. 1993) (Distribution agreement creating potential for future sales is a separate contract from the contracts formed when products were ordered); *S.A.M. Electronics, Inc. v. Osaraprasop*, 39 F.Supp.2d 1074 (N.D. Ill. 1999) (same). Thus, while the specific contracts that resulted from

Amazon's requests for pre-petition services from the Debtor may well have been executory contracts, those contracts do not cause the master agreement that spells out their terms and conditions to become an executory contract. As a result, *O-Jay Foods* has no application to this case.

Strangely, Hillair also relies upon *In re Deppe*, 110 B.R. 898 (Bankr. Minn. 1990), decided by the same judge as *O-Jay Foods*. In *Deppe*, the Court concluded that the debtor in that case had committed incurable breaches of the contract, thus precluding the debtor from assuming the contract. As a result, the court concluded that there was "cause" to modify the automatic stay.

> Given the inevitable outcome of any context over the estate's claim to administer those rights, it should restrain [the non-debtor party] no longer. [The non-debtor party] may enforce its right to terminate all remaining aspects of the franchise relationship on the grounds that it assert, by giving the statutory notice of termination.

110 B.R. at 906-907. So too in this case. There is no purpose to be served by continuing the automatic stay in place. The Amazon contract is not an executory contract that can be assumed or assigned. Even if it were, if it were assigned to a third party, such as Hillair, Amazon would not be obligated to request any services from Hillair and could terminate the contract on 30 days written notice as the automatic stay would no longer apply. Similarly, if the Debtor were to assume the Contract as part of a plan of reorganization, once the plan became effective, Amazon would be free to exercise its contractual rights. Given the inevitability of Amazon being able to exercise its contractual rights, there is simply no reason to prejudice Amazon by keeping the stay in place.

## IV.
## AMAZON HAS NOT 'DE FACTO" TERMINATED THE CONTRACT

Relying upon *In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 760 (Bankr. M.D. Fla. 2009), the Committee and Debtor argue that Amazon has violated the stay by "de facto" terminating the Contract. As a matter of fact, this is untrue. Amazon has continued to provide the Debtor with substantial business while this Court adjudicates the parties' rights and obligations.[15] In fact, the number of routes assigned to the Debtor places the Debtor in the top 5% of all DSPs utilized by

---
[15] Wilson Decl., ¶¶ 2 and 3.

Amazon.[16] That Amazon has made it clear that it intends to exercise its rights under its contract, once those rights are clarified by this Court or the automatic stay modified, cannot possibly constitute a violation of the stay – the rights have yet to be exercised. Finally, as noted in Amazon's opposition to the Debtor's request for a temporary restraining order, *Ernie Haire Ford* has no application to this case: (a) unlike the contract counterparty in *Ernie Haire Ford*, Amazon did not determine to terminate its relationship with the Debtor based upon the Debtor's bankruptcy filing and (b) the *Ernie Haire Ford* court relied upon the covenant of good faith and fair dealing as applied under Florida law, whereas the Contract provides for the application of Washington law, which, as stated above, does not apply the covenant where there is no obligation that must be performed or contrary to a contract's express terms.

## V.
## CONCLUSION

In *Matter of West Electronics Inc.*, 852 F.2d 79 (3rd Cir. 1988), the Circuit reversed a bankruptcy court order denying relief from the automatic stay sought to permit a non-debtor to terminate a contract that could not be assumed, concluding that, under those circumstances, "the debtor in possession did not have a legally cognizable interest in the contract . . . ." 852 F.2d at 84. In this case, the Debtor does not have a legally cognizable interest in receiving business from Amazon. In addition, the Amazon contract does not provide any party with any legally cognizable interest beyond the right to a 30 day termination notice. Thus, the contract is not an asset that can be sold and cannot form the foundation for the Debtor's reorganization. So long as the automatic stay remains in effect, Amazon's right to select the DSP with whom it desires to do business is in doubt and Amazon is precluded from exercising its termination right. Given the estate's minimal interest in the contract, the stay should be modified to permit Amazon to exercise the rights granted to it in the contract.

---

[16] *Id.*

| | | |
|---|---|---|
| Dated: November 11, 2019 | | MORGAN, LEWIS & BOCKIUS LLP |
| | By: | */s/ Richard W.* Esterkin |
| | | Richard W. Esterkin |
| | | Attorneys for Amazon Logistics, Inc. |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
COSTA MESA

DB2/ 37772292.2

- 14 -

# DECLARATION OF JAMES WILSON

I, James Wilson, declare:

1. My job title is Senior Manager, Amazon Logistics. In that capacity, I am familiar with the engagement of delivery service providers ("DSPs"), such as Scoobeez, Inc. ("Scoobeez"), by Amazon Logistics, Inc. ("Amazon Logistics") to deliver packages ordered from Amazon.com and related online sites.

2. In the ordinary course of its business, Amazon Logistics maintains records regarding the number of routes run by the various DSPs with whom Amazon Logistics contracts. Those records are created and updated at or near the time that the routes are run by the DSP and are relied upon by Amazon Logistics for, among other things, calculating payments due to DSPs. Those records are maintained on a week by week basis, with a week commencing on Sunday and concluding on Saturday. Thus, week 1 during 2019 concluded on January 5, 2019, week 2 concluded on January 12, 2019, etc.

3. Based upon the number of routes run, during weeks 43 and 44, Scoobeez is in the top 5% of all DSPs utilized by Amazon Logistics. Indeed, Amazon has increased the average number of routes awarded to Scoobeez following the filing of its bankruptcy petition above the average number of routes awarded to Scoobeez during 2019 in the months before Scoobeez filed its bankruptcy petition.

4. Amazon estimates the number of packages that will need to be delivered, the number of packages that can fit on a delivery vehicle of varying sizes (i.e. small van, extended van, box truck, etc.), and the type of delivery service required (i.e. standard parcel, secure parcel, pick up, etc.) in order to determine the estimated number of routes by type required from each of its delivery stations. Amazon then communicates the number of routes by type awarded to each of the DSPs over time at each of the delivery stations. Amazon's estimate as to the number of packages that require delivery, the number of packages that fit on a delivery vehicles and the number of routes awarded to each DSP are updated periodically. On September 13, 2019, Amazon launched a web-based Route Commitment tool to communicate the number of routes

awarded to DSPs. DSPs log into the Route Commitment tool so that, if they elect to do so, they can accept the routes awarded to them or raise questions regarding those route assignments.

5. The September 13, 2019 version of the Route Commitment tool included the number of routes that that Amazon anticipated awarding to Scoobeez through the remainder of calendar year 2019. That model has been updated from time to time since September 2019. Scoobeez has accepted the forecasted number of routes to be awarded to it in each iteration, including the most recent iteration of the assigned routes on October 28, 2019.

6. Although Amazon attempts to accurately predict the number of packages that will need to be delivered from each of its delivery stations, those estimates are not 100% accurate. Thus, on occasion, there are excess packages that require delivery and, on occasion, there are fewer packages that require delivery. In Scoobeez's case, Scoobeez has actually run a substantial number of routes in excess of the Amazon's forecasted allocation in the Route Commitment tool.

7. In the ordinary course of its business, Amazon Logistics tracks and records the performance metrics of the DSPs with whom Amazon Logistics contracts. Those records are created and updated at or near the time that the performance metrics are measured and are relied upon by Amazon Logistics for, among other things, determining the identity of the DSPs with whom Amazon Logistics determines to do business. Scoobeez's performance metrics as compared to the performance metrics of the other DSPs at the delivery stations from which Scoobeez operates, for the period from week 27 of 2019 through the present are as follows:

| Station | Number of DSPs | Debtor Performance Percentile |
| --- | --- | --- |
| DAU1 | 14 | 63% |
| DCH1 | 17 | 47% |
| DCH2 | 6 | 47% |
| DCH3 | 7 | 56% |
| DDA1 | 11 | 50% |
| DDA2 | 18 | 41% |
| DDA3 | 18 | 70% |

| | | |
|---|---|---|
| DLA3 | 6 | 32% |
| DLA8 | 17 | 48% |
| DLA9 | 17 | 50% |
| DPS1 | 18 | 52% |
| DSX1 | 14 | 39% |
| Average | | 49.58% |

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Cary, North Carolina on November 11, 2019

_____
James Wilson

## CERTIFICATE OF SERVICE FORM

## FOR ELECTRONIC FILINGS

I hereby certify that on November 11, 2019, I electronically filed the foregoing document, **Amazon Logistics, Inc.'s Reply in Support of Motion For Relief From Stay; and Declaration of James Wilson in Support Thereof**, with the Clerk of the United States Bankruptcy Court, Central District of California, Los Angeles Division, using the CM/ECF system, which will send notification of such filing to those parties registered to receive notice on this matter.

_____
Renee Robles