# EXHIBIT C

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               LOS ANGELES DIVISION

4

      _____

5   In re:                    )   Case No.

6                             )   2:19-bk-14989-WB

7   SCOOBEEZ, et al           )   Jointly

8   Debtors and Debtors in    )   Administered:

9   Possession.               )   2:19-bk-14991-WB;

10                            )   2:19-bk-14997-WB

      _____

11

12          30(B)(6) DEPOSITION OF AMAZON

13                 MICAH McCABE

14                  10:00 A.M.

15              JANUARY 17, 2020

16              PERKINS COIE, LLP

17             1201 THIRD AVENUE

18                 SUITE 4900

19            SEATTLE, WASHINGTON

20

21   REPORTED BY:

22   JUDY BONICELLI, CSR, RPR, CCR 2322

23   JOB No. 3855212

24

25   PAGES 1 - 204

                                    Page 1

1    don't you restate what the second factor was that you

2    were looking into?

3         A.   The DSP 2.0 program, the model that Amazon is

4    building, Scoobeez and then the proposed purchasers of

5    Scoobeez do not fit that business model.

6         Q.   What is the 2.0 program?

7         A.   The 2.0 program is a -- if you look at it,

8    it's more of a single owner, just a station

9    relationship, where the owner is highly engaged in the

10   day-to-day operations of the business, and so that

11   would be the 2.0 model.

12        Q.   Was there a 1.0 model?

13        A.   There is a 1.0 contract.

14        Q.   And what is that?

15        A.   The 1.0 is more of a one owner -- sorry.  I

16   would say that from the 1.0, which is a term to what

17   contract we were using, the 1.0 contract, what the

18   output of that was, one owner to multiple stations.  So

19   you could have one company operating in 3, 6, 9, 12

20   stations.

21        Q.   And the 2.0, they would only operate in one

22   station?

23        A.   Yes.

24        Q.   Why was that a better model, in Amazon's view?

25             MR. DIAMANTATOS:  Objection to the form.

                                              Page 23

1   they've been with Amazon?

2       A.  I do not.

3       Q.  I want to turn now to the standards for DSP

4   performance.  What are first-day delivery routes?

5       A.  I'm not familiar with that.

6       Q.  Are you familiar with scorecards?

7       A.  I'm aware -- I am aware that they exist.

8       Q.  Have you ever seen any?

9       A.  Yes, I have seen one before or several.

10      Q.  Is that part of your review process when

11  you're looking at whether to consider a DSP for

12  potential termination?

13      A.  That is a filter that we have looked at to

14  determine for termination, yes.

15      Q.  You have looked at it but is it part of your

16  regular process for considering whether to terminate a

17  DSP?

18              MR. DIAMANTATOS:  Objection.  Form.

19         Go ahead.

20              THE WITNESS:  It -- for the network-wide

21  reviews, we have brought that information in to look at

22  the network and the DSPs on a ongoing week-to-week

23  basis managing escalations.  I don't pull that.

24   BY MS. NIX-HINES:

25      Q.  Did you ever look at Scoobeez' scorecards?

Page 33

1        A.   I have not looked at their individual
2    scorecards.
3        Q.   So that was not part of the process, not one
4    of the factors in considering whether or not to put
5    them on the terminations?
6                    MR. DIAMANTATOS:   Objection.   Form.
7    Mischaracterizes his testimony.
8                    THE WITNESS:   We did apply a scorecard
9    filter, a performance filter, in the original analysis
10   that we did to determine if a DSP should be exited from
11   the network.   I did not look at Scoobeez individual
12   weekly scorecards, but we did pull an aggregate.
13    BY MS. NIX-HINES:
14       Q.   And do you know for that aggregate assessment
15   what period of time that covered?
16       A.   I believe it was the first half of 2019 or up
17   to the date that we were doing the analysis.
18       Q.   And that would have been in June or July?
19       A.   Yeah.
20       Q.   And do you recall where Scoobeez fell on the
21   aggregate list?
22       A.   They had a score of fair.   Their exact
23   placement on the entire list, I don't remember what row
24   they were in.
25       Q.   And approximately how many DSPs were in that

1    review?

2                        MR. DIAMANTATOS:    I'm going to object to

3    form.    Which review?

4                        MS. NIX-HINES:    He's talking about the

5    aggregate assessment of DSPs, again, in mid-2019, the

6    first half of 2019 up to June or July of 2019.

7                        THE WITNESS:    I can't remember if we ran

8    that just against the 1.0s or the 1.0s and the

9    migrating DSPs.    So the number would range from 40 to

10   about 100.

11    BY MS. NIX-HINES:

12        Q.    And of that 40 to 100, do you recall

13   approximately how many of those DSPs had a score of

14   fair?

15        A.    I do not remember the breakdown specifically.

16        Q.    What were the possible categories of ratings

17   that they could have had?

18        A.    The categories were poor, fair; and I believe

19   after that goes great, fantastic, and fantastic plus.

20   Those last two are -- I don't remember their exact

21   names.

22        Q.    Are those -- is it hard to get a fantastic?

23        A.    I don't know the calculation that goes into

24   determining that.

25        Q.    Do you recall whether any DSPs on the list had

Veritext Legal Solutions
866 299-5127

1    a ranking of fantastic or fantastic plus?

2         A.   I do not recall.

3         Q.   So -- but just to clarify, your assessment was

4    not just the ones that were marked for consideration of

5    termination?

6         A.   We looked at the population of DSPs through a

7    performance scorecard and looked at those who are

8    marked as poor and fair.

9         Q.   Only?

10        A.   As a reason to exit.

11        Q.   But in the group that you were assessing, did

12   they cover the whole gamut of ratings, from poor to

13   fantastic plus?  Or were you only looking at the ones

14   that were on the fit, poor, or fair ranking level?

15        A.   The analysis was starting with the population

16   of DSPs, pulling in their performance scorecards.  So

17   we would have pulled in all of where they ranked and

18   then from that identifying who was in the poor and the

19   fair bucket.

20        Q.   I see, okay.  And what percentage of the DSPs

21   fell into the poor or fair bucket?

22        A.   I don't know that one.

23        Q.   And would you only consider a DSP for

24   potential termination if they fell in the poor/fair

25   bucket?

Page 36

1      A.   That was my proposal.

2      Q.   Your proposal.  What had been the policy in

3  the past?

4                MR. DIAMANTATOS:  Objection.

5  Foundation.

6                THE WITNESS:  The -- I would say there

7  was no clear policy.

8   BY MS. NIX-HINES:

9      Q.   What do you mean by that?

10      A.   When I joined the DSP program, the exit

11  process wasn't established or clear.

12      Q.   How did you come to that conclusion?

13      A.   I'm inferring what I believe my leadership has

14  done, but they created the role for me to come in.

15      Q.   Your role is to bring some clarity to the

16  process?

17      A.   Yes.  Bring clarity to the exit process and

18  structure to the analysis.

19      Q.   And in the context of carrying out that

20  mandate, did you do a review of how the process had

21  been done in the past, the exit process?

22      A.   I do not do a deep dive of any of the previous

23  exits that had executed, no.

24      Q.   So how did you come to the conclusion that

25  only the fair and poor DSPs should be marked for

Page 37

```
 1    foundation.  Asked and answered.

 2                 THE WITNESS:  I am not aware of the

 3    calculation that goes into those determinations.

 4     BY MS. NIX-HINES:

 5        Q.  And that would be true for whether they were

 6    rated fair as well, correct?

 7                 MR. DIAMANTATOS:  Same objections.

 8                 THE WITNESS:  That would be true for a

 9    fair up to a fantastic.

10     BY MS. NIX-HINES:

11        Q.  Is Amazon involved with communication with DSP

12    employees communicating the decision to terminate?

13        A.  We need to clarify.  When we talk about DSP

14    employees, are we talking about their drivers?

15        Q.  Well, or the people running the DSP companies.

16        A.  When a decision is made to terminate a DSP,

17    the discussion takes place with the DSP owner to notify

18    them; and as part of our process, we want to partner

19    with them and any news that they're going to deliver to

20    their drivers to the extent that their drivers may be

21    terminated.

22        Q.  Was notifying them that they were marked for

23    termination within the scope of your responsibilities?

24        A.  Notifying the DSP owner?

25        Q.  Yes.
```

Page 39

1      A.   Yes, it can be.

2      Q.   And is that something you did personally?

3      A.   I did deliver the news to Scoobeez, yes.

4      Q.   And how was that information communicated?

5      A.   It was a phone call.

6      Q.   Do you recall when that phone call occurred?

7      A.   It was -- I believe it's October 1st, a

8   Monday, and it was at 3:00 p.m., my time, I believe.

9      Q.   October 1st, 2019?

10      A.   Yes.

11      Q.   And do you recall with whom you spoke?

12      A.   I do not recall the exact names of the people

13   on the phone.

14      Q.   Do you recall what you communicated

15   specifically to Scoobeez?

16      A.   I do recall the conversation.

17      Q.   What did you tell them?

18      A.   I told them that we were -- that Amazon had --

19   was terminating the business relationship.  I provided

20   the two reasons which I had stated earlier as far as

21   indemnification of Amazon through the litigation, and

22   then the second reason being the business model was not

23   consistent with the DSP program, a 2.0 program.

24         I communicated that -- the separation

25   agreement that we were proposing, the amount of money

```
 1   them to go work somewhere; however, we want to, if they
 2   want to continue being a driver, we want to help
 3   facilitate the introductions.
 4        Q.  At the time you had the call with Scoobeez'
 5   owners in October of 2019, was that the first time they
 6   had heard that information, to your knowledge?
 7        A.  Yes, to my knowledge, that would be the first
 8   time.  Let me clarify.  That would be the first time
 9   that they would hear that we wanted to terminate the
10   relationship.
11        Q.  Would they have heard before about the
12   concerns about the litigation and indemnification of
13   Amazon?
14               MR. DIAMANTATOS:  Objection to form.
15               THE REPORTER:  I'm sorry.  Would you
16   repeat that?
17               MS. NIX-HINES:  Sure.  Would they have
18   heard prior to that call regarding Amazon's concerns
19   with respect to litigation and indemnification of
20   Amazon for lawsuits?
21               MR. DIAMANTATOS:  Objection.  Form.
22   Foundation.  Calls for speculation.
23          Go ahead.
24               THE WITNESS:  I'm not part of the legal
25   team so I don't know what would have been communicated
```

Page 42

1    prior.

2      BY MS. NIX-HINES:

3          Q.   To your knowledge, prior to that call on

4    October 2019, would they have had any information

5    regarding -- prior to that call would they have any

6    knowledge as to concerns about the 2.0 business model?

7                    MR. DIAMANTATOS:   Same objections as

8    before.  Form.  Foundation.  Calls for speculation.

9                    THE WITNESS:  I don't know what they

10   would have been aware of at that point.

11     BY MS. NIX-HINES:

12         Q.   Do you recall what Scoobeez' reaction was to

13   the information that you communicated to them?

14         A.   I recall that they asked me to repeat the

15   reasons.  Outside of that, I don't have a recollection

16   of what they said, besides asking me to repeat why.

17         Q.   And during that call, did you -- were you

18   communicating a final decision?

19         A.   Yes.  In that call, yes, and when we make

20   these decisions, it's -- we communicate that it is a --

21   it is our final decision and cannot be appealed.

22         Q.   Prior to the call, had you or anyone in your

23   team communicated that they might be marked for

24   termination?

25                    MR. DIAMANTATOS:   Objection.

                                        Page 43

1    Foundation.

2                    THE WITNESS:   To the scope of my role,

3    I'm not aware of anybody communicating that.

4    BY MS. NIX-HINES:

5        Q.   In general, prior to you picking up the phone

6    and making those kind of final decisions that you're

7    communicating to DSPs, what is the process leading up

8    to that to inform DSPs that there are concerns about

9    their performance?

10        A.   I am not in the stations to understand what

11   performance reviews are being taken or on the

12   compliance team to understand what notices that they

13   have sent prior to those.  So I can't really speak to

14   what additional communication or reviews the business

15   had prior.

16        Q.   And you mentioned earlier that you had made a

17   proposal that DSPs that are being scored as a poor or a

18   fair be the ones marked for termination.  Is that a

19   correct restatement of your testimony?

20        A.   Yes.  That would be a part of an initial

21   proposal I made.

22        Q.   And was that proposal ever acted upon by your

23   supervisors?

24                    MR. DIAMANTATOS:  Objection.  Calls for

25   speculation.  Foundation.

                                        Page 44

1   compliance with the laws are a few that I know.

2       Q.   And what does ongoing litigation refer to?
3   You mentioned that that was the other factor that was
4   recommended to be included?

5       A.   Yes, thank you for asking.   It wasn't
6   necessarily ongoing litigation.   It was litigation --
7   it could be current or historical.

8       Q.   Were there any particular kinds of litigation
9   that were of particular concern?

10      A.   Related to DA pay practices.

11      Q.   What is that?

12      A.   Drivers suing their DSPs for incorrect pay,
13  related items.

14      Q.   Did Scoobeez have any such complaints?

15      A.   In the data that was provided to me, yes.

16      Q.   Do you recall how many?

17      A.   I don't recall the exact number.   I believe it
18  was three or four.

19              MS. NIX-HINES:   We've been going about
20  an hour.   Why don't we take a short break.

21              (Recess taken 10:57 a.m. to 11:04 a.m.)

22   BY MS. NIX-HINES:

23      Q.   You mentioned a concern with Scoobeez having
24  three or four lawsuits; is that correct?

25      A.   Yes.   I mentioned that there are three or four

Page  48

1    lawsuits that we had identified as part of the analysis

2    or were provided to me.

3         Q.   And that that was one of the two reasons that

4    you gave to Scoobeez as part of why they were being

5    marked for termination?

6              MR. DIAMANTATOS:    Objection.

7    Mischaracterizes his testimony.

8              THE WITNESS:    The point of the

9    litigation were identified as a reason for leading back

10   to that -- that reason.

11    BY MS. NIX-HINES:

12        Q.   For termination?

13        A.   Yes, to terminate the relationship.

14        Q.   And was it the mere number of lawsuits that

15   led to that determination?

16        A.   Yes.   The analysis was to look at the number

17   of litigation cases that DSP had.

18        Q.   Was any analysis done as to whether those

19   lawsuits had merit?

20        A.   No.   The analysis was to look at the number of

21   litigation cases the DSP had.

22        Q.   Was any determination made as to the outcome

23   of those lawsuits?

24        A.   No.   The analysis was just to look at the

25   number of litigation cases against the DSP.

Page 49

1        Q.  So even if a DSP had successfully won those

2    lawsuits, the number of lawsuits would still have been

3    a concern?

4                    MR. DIAMANTATOS:  Objection.

5    Foundation.

6                    THE WITNESS:  The analysis was just to

7    look at the number of litigation cases.

8    BY MS. NIX-HINES:

9        Q.  You mentioned that a second concern was with a

10   business model of Scoobeez and as a 1.0 rather that

11   than a 2.0; is that correct?

12       A.  Yes, that is correct.

13       Q.  And that was a factor in the termination

14   decision?

15       A.  Yes, that is correct.

16       Q.  Was any analysis done as to whether Scoobeez

17   could transition to becoming a 2.0?

18       A.  No, there was nothing to my knowledge.

19       Q.  Was any analysis done as to whether any DSPs

20   could transition from a 1.0 to a 2.0?

21       A.  Not to my knowledge.

22       Q.  So DSPs that fell within the 1.0 category were

23   all terminated?  Is that your testimony?

24                    MR. DIAMANTATOS:  Objection.  Form.

25   Mischaracterizes testimony.

Veritext Legal Solutions
866 299-5127

1                     MR. DIAMANTATOS:  Objection.  Foundation

2      and form.

3                     THE WITNESS:  I cannot speak to my

4      leadership's thought processes.  My take is that a

5      private equity owner of a DSP does not fit the DSP 2.0

6      model.

7      BY MS. NIX-HINES:

8           Q.  And why is that?

9           A.  The DSP 2.0 model is an owner to a single

10     station and having that owner be specifically invested

11     in working in the stations with their employees.  A

12     private equity firm would not be in the station, to my

13     knowledge, and have hands on the operations with the

14     employees.

15          Q.  And you did not think that a private equity

16     firm could hire somebody that would be hands-on at the

17     station?

18                     MR. DIAMANTATOS:  Objection.  Form.

19     Foundation.  Calls for speculation.  Mischaracterizes

20     witness's testimony.

21                     THE WITNESS:  The business -- the DSP

22     2.0 program is the owner, the owner to be connected to

23     the details.

24     BY MS. NIX-HINES:

25          Q.  Self-private equity companies sat on the board

                                              Page 60

1      Q.   Do the scorecards factor in in any way in the

2   decision to terminate a DSP?

3      A.   When I performed an analysis and issue the

4   paper or presentation I recommended, that took place in

5   July.  And the work that took place in the prior weeks,

6   we incorporate a scorecard data into that as a

7   threshold for a recommendation to terminate.

8      Q.   And did you work with Ashley Hill on that?

9      A.   I worked with a member of her team to get the

10   information.

11      Q.   Has the scorecard information been

12   incorporated into the process after you delivered that

13   presentation?

14                    MR. DIAMANTATOS:   Objection.

15   Foundation.

16                    THE WITNESS:   The output of that review

17   of incorporating the scorecard, the feedback that we

18   received was to look at the DSP population through two

19   different lenses, one which was the account of DA

20   litigation and the other one was the compliance.

21   BY MS. NIX-HINES:

22      Q.   So scorecards were not, then -- the decision

23   was not made to include scorecards as part of those

24   factors?

25      A.   The decision was to look at it from a

                                              Page 107

1    different approach, even though we already had

2    scorecard information.  We did not -- but we did not

3    use a filter of scorecards after that.

4        Q.  But you had recommended that it be a filter?

5        A.  I had, yes, I had proposed that.

6        Q.  Were there any other filters that you had

7    proposed?

8        A.  I had also proposed a percent of network

9    impact or percent of network share as something that we

10   needed to look at.

11       Q.  What does that mean?

12       A.  A DSP who may operate in 20 stations, have

13   owned -- and their routes account, for example -- it's

14   an egregious number, but 20 percent of all routes,

15   whether that is a risk to our network, given that

16   relationship and the dependency on them.

17       Q.  If you had a DSP that had that kind of market

18   share, how would that impact your decision?  Would you

19   be more inclined to terminate them or not terminate

20   them?

21               MR. DIAMANTATOS:  Objection to form.

22               THE WITNESS:  It's been a while since I

23   reviewed my paper.  I believe my recommendation was to

24   shrink the footprint.

25

Page 108

1    Foundation.

2            Go ahead.

3                THE WITNESS:  Can you clarify what you

4    mean by --

5     BY MS. NIX-HINES:

6        Q.  Yes.  So you notify a DSP that you're going to

7    terminate, but there is this delay before they're

8    actually out the door.  Do you notice any consequences

9    to Amazon as a result of the fact that they're still

10   working with Amazon, even knowing that they're going to

11   be terminated?

12               MR. DIAMANTATOS:  Same objection.

13               THE WITNESS:  I would say there are two

14   things I would point out.  One is between the period of

15   us notifying the owner and us notifying the drivers,

16   there is a risk of drivers finding out in some other

17   manner besides a partnership between Amazon and the DSP

18   notifying the drivers.  So there is a risk associated

19   with that area.  So it's not necessarily a harm, but

20   it's a risk I'm very aware of.

21               In regards to harm, the dragging out of a

22   relationship between Amazon and the DSP of which Amazon

23   does not want to be in partnership with any more, it

24   does impact the planning and timing.  It's -- I don't

25   know how to quantify or describe that harm, but there

1    is a harm for continued into a forced relationship that

2    at that time has already become a tense relationship

3    because there is a known termination date coming up.

4     BY MS. NIX-HINES:

5         Q.  Have you seen any tangible consequences as a

6    result of that tension?

7                   MR. DIAMANTATOS:  Objection to form.

8          Go ahead.

9                   THE WITNESS:  I would say tangible from

10    a planning standpoint.  This is more of an operational

11    thing.  A common question I get from my peers is when

12    is the last date so they can plan accordingly from a

13    recruitment standpoint or from a capacity standpoint.

14           From a relationship in the stations, I guess

15    it would be hearsay.  I have not seen it directly, but

16    compliance with some of our day-to-day operational

17    requirements begins to slip.  So those would be

18    examples I can think of.

19     BY MS. NIX-HINES:

20         Q.  Have you ever seen the reverse, where

21    improvement improves even though they've been

22    designated for termination?

23         A.  I would say that I haven't looked for it, and

24    so I can't say whether it has improved.  I know there

25    are exits that take place where people -- we do leave

Page 121

```
 1   was -- with the exit that Scoobeez will probably

 2   terminate some of their drivers.  Under federal law and

 3   some state laws they may have to file necessary

 4   paperwork.

 5        Q.  And the consequences that you mentioned of the

 6   uncertainty and all that, if Amazon had agreed not to

 7   terminate Scoobeez, those concerns would go away; is

 8   that correct?

 9        A.  No, I disagree.  We would still be in partner

10   with a DSP that has a history of litigation.

11   Litigation, when Amazon is brought into it, costs

12   money.  It costs time for attention for employees to

13   address it, and then there is also a PR risk associated

14   with the litigation related to DSPs.

15        Q.  What PR risk is that?

16        A.  I would point to a Buzz Feed article that came

17   out several months ago associated with DSPs that have

18   poor DA practice -- pay practices, and there was

19   accidents that were resulting from their -- those

20   drivers.  Those are DSPs that we may or may not choose

21   to be in relationship with because of how they're --

22   because of their litigation history.

23        Q.  Is Scoobeez mentioned in that Buzz Feed

24   article?

25        A.  I don't recall specifically who was mentioned.
```

Page 202

1                   REPORTER'S CERTIFICATE

2

3          I, JUDY BONICELLI, the undersigned Certified

4    Court Reporter, pursuant to RCW 5.28.010 authorized to

5    administer oaths and affirmations in and for the State

6    of Washington, do hereby certify:

7          That the sworn testimony and/or proceedings, a

8    transcript of which is attached, was given before me at

9    the time and place stated therein; that any and/or all

10   witness(es) were duly sworn to testify to the truth;

11   that the sworn testimony and/or proceedings were by me

12   stenographically recorded and transcribed under my

13   supervision, to the best of my ability; that the

14   foregoing transcript contains a full, true, and

15   accurate record of all the sworn testimony and/or

16   proceedings given and occurring at the time and place

17   stated in the transcript; that I am in no way related

18   to any party to the matter, nor to any counsel, nor do

19   I have any financial interest in the event of the

20   cause.

21         WITNESS MY HAND and DIGITAL SIGNATURE this

22   29th day of January, 2020.

23         *Judy Bonicelli*

24         JUDY BONICELLI, RPR, CCR

25         Washington Certified Court Reporter, CCR 2322

                                          Page 204