Ashley M. McDow (245114)
John A. Simon (admitted Pro Hac Vice)
Shane J. Moses (250533)
**FOLEY & LARDNER LLP**
555 S. Flower St., 33rd Floor
Los Angeles, CA 90071
Telephone: 213.972.4500
Email: amcdow@foley.com
        jsimon@foley.com
        smoses@foley.com

Attorneys for Debtors and Debtors in
Possession, SCOOBEEZ, SCOOBEEZ GLOBAL,
INC., and SCOOBUR, LLC

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br>SCOOBEEZ, et al.[1]<br><br>　　　Debtors and Debtors in Possession.<br><br>Affects:<br>■ All Debtors<br>□ Scoobeez, ONLY<br>□ Scoobeez Global, Inc., ONLY<br>□ Scoobur LLC, ONLY | Case No. 2:19-bk-14989-WB<br>Jointly Administered:<br>2:19-bk-14991-WB; 2:19-bk-14997-WB<br><br>Chapter 11<br><br>**DECLARATION OF SHANE J. MOSES IN SUPPORT OF DEBTORS' SUPPLEMENTAL BRIEF (A) IN FURTHER SUPPORT OF THE DEBTORS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION TO PREVENT VIOLATION OF THE AUTOMATIC STAY, AND (B) IN OPPOSITION TO AMAZON LOGISTICS INC.'S MOTION MODIFYING THE AUTOMATIC STAY** |
| SCOOBEEZ, INC.,<br><br>　　　　　　　Plaintiff,<br>v.<br><br>AMAZON LOGISTICS, INC.,<br><br>　　　　　　　Defendant. | Hearing:<br>Date:　February 25, 2020<br>Time:　10:00 a.m.<br>Place:　Courtroom 1375<br>　　　　U.S. Bankruptcy Court<br>　　　　255 East Temple Street<br>　　　　Los Angeles, CA 90012 |

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Scoobeez (6339); Scoobeez Global, Inc. (9779); and Scoobur, LLC (0343). The Debtors' address is 3463 Foothill Boulevard, Glendale, California 91214.

1    I, Shane J. Moses, do hereby declare:

2    1.    I am an individual over the age of eighteen. I am of counsel with the law firm of

3    Foley & Lardner LLP, counsel for Scoobeez, Scoobeez Global, Inc., and Scoobur, LLC, the

4    debtors and debtors in possession (collectively "Debtors" or "Scoobeez") in the above-captioned

5    chapter 11 bankruptcy cases (collectively the "Chapter 11 Cases").

6    2.    Except as otherwise indicated, all statements made herein are based on my

7    personal knowledge or my review of relevant documents.  If called to testify as a witness in this

8    matter, I could and would competently testify under oath to the trust of the statements below.

9    3.    I make this declaration in support of the *Debtors' Supplemental Brief (A) In*

10   *Further Support of the Debtors' Emergency Motion for Preliminary Injunction to Prevent*

11   *Violation of the Automatic Stay, and (B) In Opposition to Amazon Logistics Inc.'s Motion*

12   *Modifying the Automatic Stay* (the "Brief").  Unless otherwise defined herein, all capitalized

13   terms shall have the same meaning as ascribed to them in the Brief.

14   4.    Attached as Exhibit 1 is a true and correct copy of the Transcript of Deposition of

15   James Wilson, January 28, 2020, taken in the Chapter 11 Cases (the "Wilson Transcript.").  To

16   reduce pages, Exhibit 1 includes only those portions of the Wilson Transcript cited in the Brief.

17   5.    Attached as Exhibit 2 is a true and correct copy of the Transcript of Deposition of

18   Micah McCabe, January 17, 2020, taken in the Chapter 11 Cases (the "McCabe Transcript").  To

19   reduce pages, Exhibit 2 includes only those portions of the McCabe Transcript cited in the Brief.

20   6.    Attached as Exhibit 3 is a true and correct copy of the Transcript of Deposition of

21   Scott Kaufman, January 22, 2020, taken in the Chapter 11 Cases (the "Kaufman Transcript").  To

22   reduce pages, Exhibit 3 includes only those portions of the Kaufman Transcript cited in the Brief.

23   7.    Attached as Exhibit 4 is a true and correct copy of the Transcript of Deposition of

24   David Ojeda, February 13, 2020, taken in the Chapter 11 Cases (the "Ojeda Transcript").  To

25   reduce pages, Exhibit 4 includes only those portions of the Ojeda Transcript cited in the Brief.

26   8.    Attached as Exhibit 5 is a true and correct copy of the Transcript of Deposition of

27   Vadim Kozin, January 17, 2020, taken in the Chapter 11 Cases (the "Kozin Transcript").  To

28   reduce pages, Exhibit 5 includes only those portions of the Kozin Transcript cited in the Brief.

4816-3752-2869.2

9.    Attached as <u>Exhibit 6</u> is a true and correct copy of the Transcript of Deposition of George Voskanian, January 28, 2020, taken in the Chapter 11 Cases (the "<u>Voskanian Transcript</u>").  To reduce pages, <u>Exhibit 6</u> includes only those portions of the Voskanian Transcript cited in the Brief.

10.    Attached as <u>Exhibit 7</u> is a true and correct copy of the Transcript of Deposition of Scott A. Sheikh, January 29, 2020, taken in the Chapter 11 Cases (the "<u>Sheikh Transcript</u>").  To reduce pages, <u>Exhibit 7</u> includes only those portions of the Sheikh Transcript cited in the Brief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 19th day of February, 2020 at Berkeley, California.

*/s/ Shane J. Moses*
Shane J. Moses

- 3 -

4816-3752-2869.2

# EXHIBIT 1

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3            LOS ANGELES DIVISION

4    ——————————————————————————

5    In re:                )

6    SCOOBEEZ, et al.       )

7     Debtors and Debtors    )  Case Nos.

8     in Possesion.        )  2:19-bk-14991-WB

9    vs.                )  2:19-bk-14997-WB

10   ——————————————————————————)

11

12       VIDEOTAPED DEPOSITION OF JAMES WILSON

13      TAKEN BY A CERTIFIED COURT REPORTER

14          LAS VEGAS, NEVADA

15        TUESDAY, JANUARY 28, 2020

16           at 10:09 a.m.

17

18

19

20

21

22

23   Reported By: LISA MAKOWSKI, CCR 345, CA CSR 13400

24   JOB NO:  3955993

25   PAGES 1 - 333

                            Page 1

```
 1    APPEARANCES:

 2    For Hillair Capital Management, LLC:

 3                   QUINN EMANUEL URQUHART & SULLIVAN, LLP

 4                   BY:  JENNIFER L. NASSIRI, ESQ.

 5                   BY:  FRANK G. DYLEWSKI, ESQ.

 6                   865 South Figueroa Street.

 7                   10th Floor

 8                   Los Angeles, CA 90017

 9                   (213)443-3000

10                   Jennifernassiri@quinnemanuel.com

11

12    For Scoobeez:

13                   FOLEY & LARDNER LLP

14                   BY:  SHANE MOSES, ESQ.

15                   555 California Street

16                   Suite 1700

17                   San Francisco, CA 94104

18                   (415)434-4484.

19                   Smoses@foley.com

20

21    For Amazon, Inc.:

                     MORGAN, LEWIS & BOCKUS LLP

22                   BY:  THOMAS S. HIXSON, ESQ.

                     1701 Market Street

23                   Philadelphia, PA 19103

                     (215)963-5001

24                   Klair.fitzpatrick@Morganlewis.com

      The Videographer:  John Seymore

25                       *  *  *  *  *


                                              Page 2
```

```
 1                        INDEX

 2   WITNESS                                      PAGE

 3       Examination by Ms. Nassiri                 7

 4

 5                  INDEX OF EXHIBITS

 6   EXHIBIT                                      PAGE
```

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Deposition Notice | 22 |
| Exhibit 2 | Deposition Notice | 23 |
| Exhibit 3 | New York Times Article | 118 |
| Exhibit 4 | Email from Eric Swanson | 122 |
| Exhibit 5 | Reply and Declaration | 190 |
| Exhibit 6 | Scorecard | 206 |
| Exhibit 7 | Scoobeez Data Spreadsheet | 229 |
| Exhibit 8 | Email from Stephanie Petrusha | 246 |
| Exhibit 9 | DSP Data Spreadsheet | 252 |
| Exhibit 10 | Email from Kerry Person to Jimmy Wilson | 268 |
| Exhibit 11 | Email dated 9/12/19 | 283 |

Veritext Legal Solutions
866 299-5127

```
 1              INDEX OF EXHIBITS

 2    EXHIBIT                              PAGE

 3    Exhibit 12    Amazon Logistics Inc.'s    293

 4                  Opposition to

 5                  Application for

 6                  Temporary Restraining

 7                  Order and Declarations

 8                  of James Wilson and

 9                  Richard W. Esterkin In

10                  Support Thereof

11    Exhibit 13    Proof of Claim Amazon      296

12                  Logistics, Inc.

13    Exhibit 14    Proof of Claim Amazon,     296

14                  Inc.

15    Exhibit 15    Email from Nick Solari     314

16                      -oOo-

17

18

19

20

21

22

23

24

25

                                         Page 4
```

```
 1          A.    Okay.  Perfect.

 2          Q.    -- discuss.

 3                And then one thing, I have a tendency to

 4    talk fast, and I'm going to do my best to talk

 5    slow.

 6          A.    Okay.

 7          Q.    But, also, I ask till -- you wait until I

 8    finish my question --

 9          A.    Okay.

10          Q.    -- before you answer.

11          A.    Okay.

12          Q.    It becomes -- yeah, it becomes very easy

13    to be conversational.  But the reality is, for the

14    record, it's much cleaner if I ask a question, you

15    answer, I ask the next question.  I do a lot of

16    okays, and I know that you're doing okays, but

17    let's try -- it's very hard.  It's human nature --

18    to not talk over one another.

19                Is that fair?

20          A.    Okay.

21          Q.    If you want to take a break, feel free to

22    take a break anytime.  I just would ask that you

23    wait until a question -- that a question isn't

24    pending while -- during that break.  So you answer

25    the question, and then you guys can take a break.
```

Page 9

1              Is that fair?

2       A.    Yes.

3       Q.    Okay.  You'll be given a written

4    transcript of this deposition for you to review,

5    and you want to go over it, make sure that it's

6    accurate.  But I just want to -- to caution you

7    that if you make like a substantive change, like

8    you changed a yes answer to a no, I'll also have

9    the ability to comment on that at trial, and it may

10   affect your credibility.

11             Do you understand that?

12      A.    Yes.

13      Q.    Also, I want to caution you to -- to have

14   your answers be verbal not uh-huh and uh-uh because

15   the record can be ambiguous as to whether you meant

16   a yes or a no.  So we'll try to make -- if you can

17   try to make your answers verbal, that would be

18   great.

19      A.    Okay.

20      Q.    Got that?

21             Okay.  Are you taking any medication that

22   may impact your ability to give your best testimony

23   today?

24      A.    No.

25      Q.    So before we begin, I just want to go

1   over some terms, some commonly used terms that

2   we'll use today to make sure that we both

3   understand that they mean the same thing.  And you

4   understand we're here as part of the bankruptcy

5   case of Scoobeez, which is in Chapter 11 in

6   bankruptcy court in the Central District of

7   California.

8           Do you understand that?

9       A.   Yes, I understand that's why we're here.

10      Q.   Okay.  And you understand that Amazon is

11  seeking permission from the bankruptcy court to

12  terminate the agreement between Amazon and

13  Scoobeez?

14          MS. FITZPATRICK:  Objection, calls for a

15  legal conclusion.

16          You can answer.

17          THE WITNESS:  Yes I understand.

18  BY MS. NASSIRI:

19      Q.   Okay.  One other thing I didn't note,

20  that your counsel may object from time to time to

21  my questions, but unless she instructs you not to

22  answer, I am entitled to your best response.

23          Do you understand that?

24      A.   Yes.

25      Q.   Okay.  If I say Hillair Capital or

                                            Page 11



Page 58

1          A.    -- voluntarily exiting.

2          Q.    Sure.  Okay.  Thank you.

3          A.    Sorry.  I just wanted to make sure I

4     understood what you were asking me.

5          Q.    I appreciate that.  Thank you.

Page 84

1      Q.    Okay.  And a station is a -- a delivery

2   hub or where the -- where the DSPs would pick up a

3   package and take it to the -- to the customer; is

4   that correct?

5      A.    Correct.

6      Q.    Okay.  Is station the right way to refer

7   to it or --

8      A.    Sure.

9      Q.    -- better?

10     A.    Yes.

11     Q.    So we're talking about growth.  You

12   mentioned you expect the number of packages to

13   grow.

14

15

16

17

18

19

20

21

22

23

24

25

Page 85

1    station is -- is what Amazon is -- is targeting now

2    as opposed to a larger DSP?

3              MS. FITZPATRICK:  Objection, misstates

4    testimony.

5              THE WITNESS:  I mean, I -- I can give --

6    I mean, I -- I think it's similar to -- to what I

7    just said.  I think an owner-operator in the

8    station can -- can better manage those metrics and

9    have a -- really what I would describe as a -- a --

10   a better connection with drivers that help drive

11   those metrics.

12   BY MS. NASSIRI:

13        Q.   Is the idea that a 2.0 owner-operator

14   who's on the ground at the station will only

15   operate out of one station?

16        A.   For -- for new owners onboarded?

17        Q.   Yes.

18        A.   Yes.  That is -- we're very clear on that

19   on the Logistics@amazon.com site, the expectation

20   of operating one station.

21        Q.   Are there any 2.0s that operate out of

22   more than one station currently?

23        A.   There are migrated 2.0s --

24        Q.   Okay.

25        A.   -- that operate at multiple stations.

Veritext Legal Solutions
866 299-5127

1        Q.   So tell me a little bit about that.

2    How -- if -- if you were a 1.0 -- well, strike

3    that.

4

5

6

7

8

9

10

11

12        Q.   Okay.  And so -- and I assume that the

13   2.0 DSP has a -- an agreement or a actual contract

14   that looks different than a 1.0 agreement; is that

15   correct?

16        A.   Yes.

17        Q.   So how -- do changes have to be made to

18   the 2.0 agreement by the fact that it's a migrated

19   1.0?

20             MS. FITZPATRICK:  Objection, form.

21   BY MS. NASSIRI:

22        Q.   If they work out of 12 to 13 stations,

23   how -- how would they satisfy the requirements of a

24   2.0?

25             MS. FITZPATRICK:  Objection, form.

1          Q.    Okay.  And you're saying since you've

2     been involved since January --

3          A.    Since -- since January 2019.

4          Q.    You have not approved any such migration.

5          A.    Correct.  We -- like, we have no -- no

6     DSP has actually migrated and --

7          Q.    I just want to know if anyone asked and

8     said -- was said no.

9          A.    Yeah.  Yes.  People have asked -- people

10    have asked.  I -- I -- I can't recall specifically

11    which DSPs.

12         Q.    Sure.

13         A.    But I -- I know that -- that there have

14    been requests from -- from specific on-the-road

15    managers saying, hey, this DSP is asking about

16    migrating to 2.0.  So there are a number of DSPs

17    that have asked.  We haven't really developed a

18    framework yet, and so the answer is basically we're

19    not migrating right now because we don't have a

20    framework to how we want to think about it.

21         Q.    Okay.  Is that framework being developed?

22         A.    Yes.

23         Q.    And are you the person who is working on

24    that framework?

25         A.    My team.

                                        Page 109

1   the -- the reason that we identified those 15 DSPs.

2        Q.   Okay.  And other than Scoobeez, have all

3   15 of those DSPs -- or 14 been eliminated from the

4   program?

5        A.   They --

6        Q.   Or terminated?

7        A.   The vast majority of them have been

8   terminated.  We are in process of finishing that

9   list.

10        Q.   Okay.  And in the initial -- your team's

11   initial schedule that was based on performance and

12   elimination of the 1.0s was the idea to just

13   ultimately eliminate all 1.0s from the system?

14        A.   The idea was to eliminate the 1.0

15   contract.

16        Q.   Okay.

17        A.   And so we -- we made a recommendation to

18   eliminate the contract through either termination

19   or migration.

20        Q.   Okay.  But that framework was rejected.

21        A.   Correct.

22        Q.   Okay.  Had that framework not been

23   rejected, there may be some that, barring they had

24   no performance issues, they might be migrating now

25   to the 2.0 system?

Page 146

1   where it says that "These records are created and

2   updated at or near the time the performance metrics

3   are measured and relied upon determining the

4   identity the of DSP with whom Amazon does

5   business."

6           So this chart in paragraph 7 talks about

7   Scoobeez' performance metrics from Week 27 through

8   the present.  And we -- the present would be, I

9   imagine, the date you signed this, November 11th,

10  on or about that date.

11          Do you know why Week 27 was chosen?

12      A.   That's when we launched our new

13  performance scorecard.

14      Q.   Oh, okay.  We will talk about scorecards

15  later.

16          Okay.  So can you just walk me through

17  just like, say, the first line --

18      A.   Sure.

19      Q.   -- what DAOU means, and what this is --

20  what -- what is this communicating, this

21  performance percentile?

22          MS. FITZPATRICK:  Objection to form.

23          THE WITNESS:  So DAU1 is -- is a code for

24  a station.

25  / / /

                                    Page 199

```
 1    BY MS. NASSIRI:

 2         Q.    Okay.

 3         A.    So that's for a specific delivery station

 4    or we -- you referred to it as a hub.

 5         Q.    Okay.

 6         A.    The number of DSPs, that's how many DSPs

 7    at this time operated in that DAU1 station.

 8         Q.    Okay.

 9         A.    And that over the time period from

10    Week 27 to the present, Scoobeez was in the --

11    the -- the top 63 percent of performance of those

12    DSPs.

13         Q.    Okay.  So -- and is it 63 -- is it -- is

14    it a hundred?  Is the max someone could get was a

15    hundred percent?  I'm just trying to -- statistics

16    are a funny thing.

17              MS. FITZPATRICK:  Objection to form,

18    misstates testimony.

19    BY MS. NASSIRI:

20         Q.    I'm trying to understand what this means.

21         A.    So -- so it means that yes, basically you

22    want to be -- you -- you want to be in a higher

23    percentile --

24         Q.    Okay.

25         A.    -- means -- which mean you performed
```

Page 200

1    better.

2         Q.   Sure.

3         A.   So -- so they're in the 63rd percentile,

4    basically, of their DSPs, which means that they're

5    slightly better than average.  So average would be

6    50 --

7         Q.   Okay.

8         A.   -- percent.

9         Q.   Is -- is -- is -- okay.

10        So following week -- or -- or is this

11   just by station overall for this time period?

12        A.   Correct.  So the first row is only for

13   DAU1.

14        Q.   And where's DAU1, if you know?

15        A.   I believe that's Austin.

16        Q.   Okay.  And then DCH1, 17 DSPs operate out

17   of that station, and Scoobeez was the 47th

18   percentile?

19        A.   So slightly below average.

20        Q.   Okay.  So if we go to the bottom where it

21   says average -- the bottom of the chart on page 17

22   of your declaration, average 49.58.

23        So what does this communicate to you

24   as -- in your -- in your role at Amazon of

25   Scoobeez' performance for this time period?

Page 201

1        A.    It communicates they're almost virtually

2    average.

3        Q.    Okay.

4        A.    So if -- you know, if we use 50 percent

5    as average, so the total average line is all DSPs.

6    So if we look at all stations --

7        Q.    Not just these stations?

8        A.    Yeah.  It's the -- sorry.  Sorry.  It's

9    the average of the stations that they operate in in

10   all DSPs.

11       Q.    Okay.  And you said that these

12   percentiles come from the scorecards that were

13   introduced in or around Week 27?

14       A.    The -- the percentiles are just the

15   ranking of the scores from the scorecard.

16       Q.    Okay.

17            MS. FITZPATRICK:  I -- I'm -- I'm sorry.

18   Can I ask a clarifying question?

19            MS. NASSIRI:  Sure.

20            MS. FITZPATRICK:  I'm not sure I'm

21   following.

22            Are you saying that they -- their

23   performance was 49 percent or -- or in the case of

24   this DSX1, it was -- they're were at 39 percent on

25   their metrics or they performed worse than

                                        Page 202

1    61 percent of the other ones that operated there?

2         THE WITNESS:   Sorry.   They performed

3    worse than 61 percent of the operators -- of other

4    people.

5    BY MS. NASSIRI:

6         Q.   From -- for DSX1 --

7         A.   For DSX1.

8         Q.   For this time period?

9         A.   For this time period.

10        Q.   Based on this -- on the information from

11   the scorecards?

12        A.   Correct.

13        Q.   So can you explain to me, the score -- do

14   the scorecards each have a rating?   Does the

15   scorecard say 87 percent for Week 25?

16        A.   No.

17        Q.   What does the score -- how does the

18   scorecard translate to this number that's on your

19   chart?

20        A.   It -- it -- it -- the scorecard doesn't

21   translate to this.   What -- what the scorecard will

22   say is you'll get a scorecard for every station

23   they operate in --

24        Q.   Right.

25        A.   -- every week.

Page 203

1      Q.   Right.

2      A.   And the scorecard will say for this

3   specific week in this specific station, you

4   received a score of either, you know, fantastic

5   plus or fantastic or good --

6      Q.   Okay.

7      A.   -- or poor or fair; right?

8           MS. FITZPATRICK:  Great.

9           THE WITNESS:  Great.  Sorry.  Excuse me.

10          And -- and so you get that score once a

11  week per station.

12  BY MS. NASSIRI:

13     Q.   Okay.

14     A.   And so -- so when you aggregate those

15  scores over this time period and then you rank

16  everyone, these percentiles are the rankings of

17  Scoobeez compared to their peers in these stations.

18     Q.   Okay.  So is there a -- like a -- a scale

19  whereby fantastic plus is 90 percent, fantastic is

20  80 percent?  How -- how do you translate the

21  scorecard rating to a percentile?

22          MS. FITZPATRICK:  Objection to form.

23          THE WITNESS:  There is -- there --

24  there -- there is an actual score that's not

25  presented to a DSP.  And then we -- we -- we say if

                                        Page 204

```
 1   you score between X and Y, you're considered

 2   fantastic plus.  If you score between, you know,

 3   these two ranges -- I don't -- I don't know

 4   specifically the ranges.

 5   BY MS. NASSIRI:

 6        Q.   Sure.

 7        A.   But there are defined ranges.

 8        Q.   Okay.

 9        A.   And that determines your rating.

10        Q.   Okay.  We'll go through a scorecard so

11   you can explain --

12        A.   Sure.

13        Q.   -- explain to me what you know about that

14   and also the ratings, and we'll come back to this

15   because I'm still a little unclear of how to

16   translate.

17             But the -- the -- the factors that go

18   into this performance percentile -- well, first, is

19   it true that the factors that go into these

20   percentiles, performance percentiles come from the

21   scorecards, the information in the scorecards?

22        A.   This table is built from the information

23   from the scorecards, but these -- but these

24   percentiles are -- it's just literally a stack

25   ranking --
```

Page 205

1  provides more information about each one.

2      Q.   Okay.  I think there actually might be

3  information attached, metric definitions and

4  weights.

5      A.   Yeah.  Yes.  I -- I'm saying incremental

6  to -- to --

7      Q.   Oh.

8      A.   -- this, there's also vis -- like, I

9  don't know how to -- lack of a better term, a

10 visual guide --

11     Q.   Okay.

12     A.   -- that -- that would explain more about

13 the metric.

14     Q.   Okay.  Do you know what this -- under

15 compliance score what 30 days' notice refers to?

16     A.   That -- that would mean do they -- so we

17 talked about before, about a cure action.

18     Q.   Yeah.

19     A.   It would mean do they have an action --

20 are they actually trying to cure something.

21     Q.   Okay.  But that wouldn't apply to 1.0s,

22 does it?

23     A.   It doesn't really apply to 1.0s.

24     Q.   But there's no separate scorecard for

25 1.0s?

Page 216

1    you -- you don't know exactly what changed on the

2    scorecards from prior to Week 27?

3         A.   I -- I'm not -- I don't specifically know

4    why we -- changed the strategy and changed our

5    scorecard in Week 26.  I wasn't intimately involved

6    with the that process.

7         Q.   Okay.  Do you -- do you generally know

8    what Scoobeez' scores were for the last quarter of

9    2019?

10             MS. FITZPATRICK:  Objection to form.

11             THE WITNESS:  I actually don't.

12   BY MS. NASSIRI:

13        Q.   Okay.  Are -- are the -- are Scoobeez'

14   scores a reason why Scoobeez is slotted for

15   termination from the DSP program?

16        A.   No.  The -- the reason why they were

17   slotted were the fact they were involved in

18   multiple litigations when we made the decision on

19   August 9th.

20        Q.   Okay.  So are there -- so currently in

21   the DSP system, are there DSPs with rankings below

22   an average of 49.58 that are still operating in the

23   system?

24             MS. FITZPATRICK:  Objection, form.

25             THE WITNESS:  Just to clarify, you're --

                                        Page 218

1   of -- of a DSP you are not working with multiple

2   litigations.

3        Q.   Okay.

4        A.   That would be one example.

5        Q.   Okay.

6        A.   Another example of an opportunity costs

7   would be, you know, we from a capacity, planned

8   to -- to -- you know, to not have them in our

9   network.  And so we planned and recruited to have

10  other DSPs in the stations, that because Scoobeez

11  is still there, we're hindering their ability to

12  grow and scale their businesses.  So that could be

13  another opportunity cost.

14       Q.   But -- but Amazon -- or, sorry, Scoobeez

15  is still in those stations --

16            MS. FITZPATRICK:  Not sure --

17  BY MS. NASSIRI:

18       Q.   -- driving those routes that you had

19  slotted other DSPs to jump in and take over?

20       A.   That could potentially have been done.

21       Q.   Okay.

22       A.   That -- that would be another potential

23  example.

24            MS. FITZPATRICK:  I'm not sure if he

25  finished his answer about --

Page 222

1        Q.   At that station.  Okay.  Very helpful.

2             And this is -- this form is how we

3    received the document, and it starts in Week 26,

4    and I can represent to you it goes through Week 49.

5    And -- is that right?  Yeah.  And that would be

6    Week 26 through Week 49 of 2019; is that correct?

7        A.   Correct.

8        Q.   And does it start at Week 26 because

9    that's when the scorecard metrics were changed --

10       A.   Yes.

11       Q.   -- or do you know?

12       A.   Yes.  That's when we released the new

13   scorecards.

14       Q.   Okay.  So this is the most recent metrics

15   other than January -- the last three weeks of 2019

16   for Scoobeez' performance?

17       A.   Correct.

18            MS. NASSIRI:  Okay.  So can we sort by

19   Column E.

20   BY MS. NASSIRI:

21       Q.   Okay.  So I wanted to sort by Column E so

22   we can see total poors, fairs, overall from that

23   time period.

24       A.   This -- this looks like it's sorted of by

25   Column F, just to --

                                          Page 234



Page 239

1   Logistics, Inc.?

2        MS. FITZPATRICK:  Are you asking for a

3   legal conclusion?

4        MS. NASSIRI:  No.  Just if he knows.

5        THE WITNESS:  I do not.

6   BY MS. NASSIRI:

7        Q.   Okay.  So in -- in terms of the

8   litigation, and we can go through the underlying

9   pleadings, but if I represent to you that the Addal

10  file -- the Addal action was filed in September of

11  2018, the Key action was filed in October of '17,

12  and the Hamilton action was in 7 of '17, I have all

13  the dockets if you -- do you have any reason to

14  believe those dates are not correct, that they were

15  all pending prior to the bankruptcy?

16       A.   Do -- do I have any reason?

17       Q.   Yeah, to believe that they were not.

18       A.   I -- I don't have any reason to -- to

19  believe that you're not telling me the truth right

20  now.

21       Q.   Okay.  Okay.  So if, let's say, the Key

22  action was filed in October of 2017, do you know

23  why it wouldn't become an issue for Amazon that

24  would lead it to put it on -- to put Scoobeez on a

25  termination list until June or August of 2019, two

                                        Page 300

1    doesn't want a DSP that has multiple litigations

2    relating to employment or wage an hour in the

3    system and why -- why Amazon made that decision.

4    And we talked about the lost opportunity costs from

5    keeping a DSP in the system that is on the

6    termination list.

7            Do you recall that testimony?

8        A.   Yes.

9        Q.   Okay.  Other than those two areas that we

10   talked about, the lost opportunity costs and the

11   reasons related specifically to the litigations,

12   what other harm is there currently that Amazon is

13   suffering because Scoobeez remains a DSP in the

14   system?

15       A.   Off the top of my head, I can't think of

16   any more.  Both of those are pretty big reasons.

17   But off the top of my head, I can't think of any

18   additional.

19       Q.   Okay.

20           MS. NASSIRI:  Okay.  Mr. Moses, do you

21   have any questions?

22           MR. MOSES:  No questions.  Thank you.

23           MS. FITZPATRICK:  None for me.

24           MS. NASSIRI:  Okay.  Thank you,

25   Mr. Wilson.

                                        Page 329

```
 1              We have it down on the record, the

 2   transcript stuff, but if we can get the rough as

 3   soon as possible.

 4              And how long do you need for a final?

 5              THE COURT REPORTER:  Twelve days.

 6              MS. NASSIRI:  Twelve business days?

 7              THE COURT REPORTER:  Ten to 12 business

 8   days.

 9              MS. NASSIRI:  Could we get it by Friday,

10   the 7th?  Does that work for you?

11              MS. FITZPATRICK:  We'd like a rough as

12   well.

13              THE VIDEOGRAPHER:  Would you like a

14   video?

15              MS. FITZPATRICK:  Sure.

16              THE VIDEOGRAPHER:  You want it synced

17   with the depo?

18              MS. FITZPATRICK:  Sure.

19              THE VIDEOGRAPHER:  Okay.  Okay.  All

20   done?

21              MS. NASSIRI:  Yep.

22              THE VIDEOGRAPHER:  Okay.  We are off the

23   record.  The time is 5:38 p.m.  This concludes

24   today's testimony given by James Wilson.  The total

25   number of media units used was five and will be
```

Page 330

1    retained by Veritext Legal Solutions.

2              THE COURT REPORTER:  You want a copy?

3              MS. FITZPATRICK:  Yes.

4              (Thereupon, the taking of the deposition

5              was concluded at 5:39 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 331

1

2

3

4

5

6                              * * *

7                    DECLARATION OF DEPONENT

8       I, JAMES WILSON, deponent herein, do hereby

9    declare the within and foregoing transcription to be

10   my deposition in said action under penalty of

11   perjury; that I have read, corrected and do hereby

12   affix my signature to said deposition this ___ day of

13   _____, 2020.

14

15

16            _____

17                    JAMES WILSON

18                      Deponent

19

20

21

22

23

24

25

                                        Page 332

1           REPORTER'S DECLARATION

STATE OF NEVADA)

2   COUNTY OF CLARK)

           I, Lisa Makowski, CCR No. 345, declare as

3   follows:

4           That I reported the taking of the deposition of

5   the witness, JAMES WILSON, commencing on Tuesday,

6   January 28, 2020, at the hour of 10:09 a.m.

7           That prior to being examined, the witness was by

8   me duly sworn to testify to the truth, the whole

9   truth, and nothing but the truth; that, before the

10  proceedings' completion, the reading and signing of

11  the deposition has been requested by the deponent or

12  a party.

13          That I thereafter transcribed said shorthand

14  notes into typewriting and that the typewritten

15  transcript of said deposition is a complete, true and

16  accurate transcription of said shorthand notes taken

17  down at said time.

18          I further declare that I am not a relative or

19  employee of any party involved in said action, nor a

20  person financially interested in the action.

21          Dated at Las Vegas, Nevada this 7th day of

22  February, 2020.

23

24          _Lisa Makowski_ (signature)

25  Lisa Makowski, CCR 345

                                        Page 333

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 2

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3            LOS ANGELES DIVISION

4

    _____

5   In re:              )  Case No.

6                   )  2:19-bk-14989-WB

7   SCOOBEEZ, et al      )  Jointly

8   Debtors and Debtors in   )  Administered:

9   Possession.         )  2:19-bk-14991-WB;

10                  )  2:19-bk-14997-WB

    _____

11

12        30(B)(6) DEPOSITION OF AMAZON

13           MICAH McCABE

14            10:00 A.M.

15          JANUARY 17, 2020

16          PERKINS COIE, LLP

17         1201 THIRD AVENUE

18           SUITE 4900

19        SEATTLE, WASHINGTON

20

21   REPORTED BY:

22   JUDY BONICELLI, CSR, RPR, CCR 2322

23   JOB No. 3855212

24

25   PAGES 1 - 204

                             Page 1

```
 1     A P P E A R A N C E S
 2
 3     FOR THE DEBTOR SCOOBEEZ:
 4          BRITTANY NELSON (Via Teleconference)
            FOLEY & LARDNER, LLP
 5          3000 K Street, N.W., Suite 600
            Washington, D.C. 20007-5109
 6          202.295.4732
            bnelson@foley.com
 7
 8     FOR THE SECURED CREDITOR
       Hillair Capital Management, LLC:
 9          CRYSTAL NIX-HINES
10          QUINN EMANUEL URQUHART & SULLIVAN, LLP
            865 Figueroa Street, 10th Floor
11          Los Angeles, CA 90017
            213.443.3000
12          crystalnixhines@quinnemanuel.com
13
            FRANK G. DYLEWSKI
14          QUINN EMANUEL URQUHART & SULLIVAN, LLP
15          191 N. Wacker Drive
            Suite 2700
16          Chicago, Illinois 60606
17          312.705.7400
18          frankdylewski@quinnemanuel.com
19
20     FOR AMAZON:
            TINOS DIAMANTATOS
21          MORGAN LEWIS & BOCKIUS, LLP
22          77 West Wacker Drive, Suite 500
23          Chicago, IL  60601
24          312.324.1145
25          tinos.diamantatos@morganlewis.com
```

Page 2

```
 1                         I N D E X
 2

 3     WITNESS:  MICAH McCABE
       EXAMINATION:                                  PAGE
 4         MS. NIX-HINES:                                5
 5

 6
```

```
 7     EXHIBIT           EXHIBIT DESCRIPTION          PAGE
 8     Exhibit 1   Hillair Capital Management, LLC's     9
 9                 Amended Notice of Deposition of Micah
10                 McCabe
       Exhibit 2   Hillair Capital Management LLC's      9
11                 Notice of 30(b)(6) Deposition of
12                 Amazon Logistics, Inc.
13     Exhibit 3   An email from Stephanie Petrusha to  61
14                 George Trejo dated March 17, 2019
15     Exhibit 4   Email thread from Trejo to Petrusha  87
                   re ADP deadlines E000359-361
16     Exhibit 5   June 11, 2019 email regarding List of 90
17                 Escalations WBR 06-11-2019 V2
18     Exhibit 6   Email stream Petrusha to McCabe      95
19                 6-18-19 re Weekly compliance and
                   Audit Review E000364 to 370
20     Exhibit 7   Email string from Carlin to McCabe re 122
21                 Station Impact of Exits, dated
                   6-26-19, E000069 to E000070
22     Exhibit 8   Email string from Fahey to Wilson and 130
23                 McCabe re AMXL exit data, dated
                   6-26-19 E000071 to E000072
24     Exhibit 9   July 8, 2019, email from Zach Harvey 135
25                 to Micah McCabe, Bates No. E000076
```

```
                                          Page  3
```

```
1                     EXHIBITS (Continued)

2

3    Exhibit 10   Email string from Petrusha to McCabe    143

4                 re Weekly Compliance and Audit

5                 Review, dated 7-10-19, E000373 to 379

6    Exhibit 11   Email from Nehal Desai to McCabe re     145

7                 Audit Compliance History, dated

8                 7-18-19

9    Exhibit 12   Email string from Norman to McCabe      154

10                regarding Scoobeez ADP-API Proposal &

                  SOW, Bates No. E000077

11   Exhibit 13   Email string from Norman to McCabe re    156

12                Scoobeez/ADP-API Proposal & SOW dated

13                8-22-19 E000514 to 515

14   Exhibit 14   Email string from McCabe to             159

15                Haraldsdottir "Re: DSP Exits, dated

                  9-13-19, Bates No. E000131

16   Exhibit 15   Email from Swanson to McCabe and        170

17                others, Bates No. E000516

18   Exhibit 16   Email string from Wilson to Swanson     184

19                Re: Need two FAQs, dated 9-30-19

20                E000702 to E000707

21   Exhibit 17   Email string from Person to Wilson      185

22                Re: Need two FAQs, dated 9-30-19

23                E000708 to E000713

24   Exhibit 18   Email string dated July 8, 2019,        187

25                Bates No. H002451 to H002469
```

Page 4

1              SEATTLE, WASHINGTON; JANUARY 17, 2020

2                        10:00 A.M.

3                         --oOo--

4

5                      MICAH McCABE,

6      sworn as a witness by the Certified Court Reporter,

7                   testified as follows:

8                       EXAMINATION

9    BY MS. NIX-HINES:

10         Q.  Good morning.

11         A.  Good morning.

12         Q.  I'm Crystal Nix-Hines from Quinn Emanuel, and

13   with me is Frank Dylewski from Quinn Emanuel.  Just

14   wanted to begin by going over the ground rules.

15              Have you ever been deposed before?

16         A.  No, I have not.

17         Q.  If you don't understand anything that I say,

18   tell me, and I will explain further.  Will you do that?

19         A.  Yes.

20         Q.  You've just taken an oath to tell the truth

21   and the whole truth to each question I ask.  It's the

22   same oath you would be given if you were testifying in

23   court.  Do you understand that?

24         A.  I do.

25         Q.  The law expects that witnesses who are

                                              Page 5

1  was a senior product manager when I moved there.

2       Q.  And what years were you in that position?

3       A.  I moved there in 2016.  I took that role, and

4  then I was there through 2018.

5       Q.  When did you -- what was your next job after

6  that?

7       A.  After that, I was a senior product manager for

8  what we call brand gap.  It's part of the recruitment

9  and development division.

10      Q.  And what were the years that you were in that

11  position?

12      A.  I was in that role for about 2018 through

13  2000 -- beginning of 2019.

14      Q.  And in either this role or the previous one,

15  did you deal with DSPs at all?

16      A.  No, I did not.

17      Q.  What was your next job after that?

18      A.  That's when I joined the delivery service

19  partner, DSP program in April of 2019.

20      Q.  What is your title?

21      A.  I'm a senior program manager of network

22  health.

23      Q.  And what are your specific responsibilities in

24  this job?

25      A.  I own the exit process.

Page 15

1        Q.  And what does that mean?

2        A.  When it's been decided that a DSP will exit

3    the network, I work with the DSP and the partner teams

4    to help on the transition.

5        Q.  Do you deal with any DSP issues prior to the

6    decision that they will be marked for termination?

7        A.  I am part of the process of gathering the

8    information prior to the determination.

9        Q.  And when you say "you own the process," does

10   that mean you're the supervisor of the whole process?

11       A.  I report into a manager who I believe has

12   ultimate oversight, but I am the point person or the

13   program manager that all of our partner teams would --

14       Q.  And who do you report to?

15       A.  Jimmy Wilson.

16       Q.  Are there any other categories of DSPs that

17   fall within the scope of your responsibilities other

18   than the ones that are marked for termination or are

19   being considered for termination?

20       A.  Yes.  There is a -- we own a process where if

21   the DSP is in breach of a contract, my team owns

22   sending the notification.

23       Q.  So just to clarify, you have no involvement in

24   the selection of companies to become DSPs at Amazon?

25       A.  That is correct, I do not.

1    Q.  No involvement in the routes DSPs are given?

2    A.  That is correct, I do not.

3    Q.  No involvement in the policies DSPs are

4  expected to follow, such as use of vehicles or

5  timekeeping cards or other business functions?

6    A.  That is correct, I do not.

7    Q.  So your sole role, broadly speaking, is to

8  address DSPs who may be considered for termination and

9  then to implement the process of termination?

10         MR. DIAMANTATOS:  Object to form.

11         THE WITNESS:  Yes.  I wouldn't say it's

12  my sole, but yes, that is the process of -- the main

13  process of what I can cover.

14  BY MS. NIX-HINES:

15    Q.  Other than the functions that you've already

16  told us about, are there any other responsibilities

17  that you have that you have not yet mentioned?

18    A.  Yes.  My team also are -- it's coming through

19  me, but handles ownership transfer.  If a DSP decides

20  that they want to sell their business, that would

21  eventually flow through to my team.

22    Q.  And what would you do in that capacity of

23  ownership transfer?

24    A.  If a request comes for ownership transfer,

25  part of the process is to vet the new owner.

Page 17

1          Going back to your earlier question, I don't

2    own the onboarding or vetting process, but it's the

3    connection of teams to make sure they get passed along

4    to that team to have them vet the candidate.

5          Q.  Did Scoobeez come to your attention in that

6    regard?

7          A.  No, they did not.

8          Q.  And you mentioned that you gathered

9    information on terminating DSPs.  What kind of

10   information do you gather?

11         A.  We'll look at compliance history.  We'll

12   gather information regarding number of drivers they

13   have, vehicles they may have leased through the

14   program, what stations they're in, are a few examples.

15         Q.  Are all those factors relevant to your

16   decision as to whether to terminate DSPs?

17              MR. DIAMANTATOS:  Objection to form.

18         Go ahead.

19              THE WITNESS:  No.  The facts are

20   that those data points are not how many drivers they

21   have or how many vans they have are not in

22   consideration for why they would exit.  Information

23   like compliance history, if there is a -- if they have

24   not been compliant with the program policy, part of the

25   program agreement, that may have had influence on the

                                              Page 18

```
 1    decision.

 2     BY MS. NIX-HINES:

 3         Q.   What kind of factors go into whether they've

 4    complied or not?  Complied with what, specifically?

 5         A.   So I'll step back and first say, I'm not on

 6    the compliance team.  So there is a team that looks at

 7    the compliance -- the DSPs' compliance with our program

 8    policies and program agreements.  And so it's their, I

 9    guess you could say, charter to identify where DSPs are

10    not following.  They will -- they would loop my team in

11    for an escalation for DSPs who are not -- that they

12    have identified as not being compliant.

13         Q.   And who runs that compliance team?

14         A.   Carey Richardson was the director.

15         Q.   You say "was."  Is she still?

16         A.   Yes, thank you.  She's retiring, and Dina --

17    and I don't remember Dina's last name -- is taking

18    over.

19         Q.   Dina hasn't started yet?

20         A.   They're in a transition.

21         Q.   Do you have an understanding of what this

22    dispute is about?

23         A.   I would say a basic understanding.

24         Q.   What is your understanding?

25         A.   That Scoobeez believes that we are terminating
```

Page 19

1     A.   Yes, it can be.

2     Q.   And is that something you did personally?

3     A.   I did deliver the news to Scoobeez, yes.

4     Q.   And how was that information communicated?

5     A.   It was a phone call.

6     Q.   Do you recall when that phone call occurred?

7     A.   It was -- I believe it's October 1st, a

8  Monday, and it was at 3:00 p.m., my time, I believe.

9     Q.   October 1st, 2019?

10     A.   Yes.

11     Q.   And do you recall with whom you spoke?

12     A.   I do not recall the exact names of the people

13  on the phone.

14     Q.   Do you recall what you communicated

15  specifically to Scoobeez?

16     A.   I do recall the conversation.

17     Q.   What did you tell them?

18     A.   I told them that we were -- that Amazon had --

19  was terminating the business relationship.  I provided

20  the two reasons which I had stated earlier as far as

21  indemnification of Amazon through the litigation, and

22  then the second reason being the business model was not

23  consistent with the DSP program, a 2.0 program.

24          I communicated that -- the separation

25  agreement that we were proposing, the amount of money

                                        Page 40

1  lawsuits that we had identified as part of the analysis

2  or were provided to me.

3      Q.  And that that was one of the two reasons that

4  you gave to Scoobeez as part of why they were being

5  marked for termination?

6                  MR. DIAMANTATOS:  Objection.

7  Mischaracterizes his testimony.

8                  THE WITNESS:  The point of the

9  litigation were identified as a reason for leading back

10  to that -- that reason.

11  BY MS. NIX-HINES:

12      Q.  For termination?

13      A.  Yes, to terminate the relationship.

14      Q.  And was it the mere number of lawsuits that

15  led to that determination?

16      A.  Yes.  The analysis was to look at the number

17  of litigation cases that DSP had.

18      Q.  Was any analysis done as to whether those

19  lawsuits had merit?

20      A.  No.  The analysis was to look at the number of

21  litigation cases the DSP had.

22      Q.  Was any determination made as to the outcome

23  of those lawsuits?

24      A.  No.  The analysis was just to look at the

25  number of litigation cases against the DSP.

Page 49



Page 99

1  ████████████████████████████████████████

2      Q.  Going back to Scoobeez for a moment, you

3  testified earlier that you, in fact, notified the owner

4  of Scoobeez in October of 2019 that they were -- had

5  been -- that they were going to be terminated; is that

6  correct?

7      A.  That is correct.

8      Q.  But as we sit here now, Scoobeez is still

9  working for Amazon as a delivery service provider; is

10  that right?

11      A.  That is correct.  They continue to run routes

12  today.

13      Q.  Have you -- with respect to Scoobeez

14  specifically, have you seen any consequences to Amazon,

15  any harms caused by the fact that Scoobeez is still a

16  DSP?

17      A.  I would say I have not monitored their metrics

18  or their performance to see how they are performing.

19  When it comes to harm from the continued relationship,

20  I would point to the time and money being invested into

21  this process as a result of the ongoing litigation in

22  the bankruptcy and the filings.  The other thing I

23  would highlight is the hindrance just to business

24  planning of an unknown, the timeline.

25      Q.  What kind of hindrance?

Page 199

1            MR. DIAMANTATOS:  Objection.  Asked and

2    answered.

3            THE WITNESS:  When we're planning

4    capacity, when we're planning, let's say, the

5    backfilling right now.  When we're looking to exit a

6    DSP, you know that we don't have -- there is still a

7    big question mark around the timing of when everything

8    is going to be -- when things are going to happen now,

9    which is continuing to drag out.

10   BY MS. NIX-HINES:

11      Q.  And what would additional certainty about a

12   date certain, how would that impact the company?

13            MR. DIAMANTATOS:  Objection.

14   Foundation.

15            THE WITNESS:  The lack of there being

16   vagueness around the timeline allows DSPs, the

17   business, to plan for, let's say, peak, for example.

18   As we're ramping a station, the capacity team needs to

19   be aware of who is going to be in the station, who are

20   going to be good business partners.  So I would

21   imagine, although I'm not part of the capacity process,

22   having certainty around whether a DSP is going to be

23   continuing to operate the route through the peak cycle

24   is an important part of their decision-making process.

25

Page  200

1    BY MS. NIX-HINES:

2        Q.  And those issues are true for all DSPs that

3    are marked for termination, correct?

4        A.  I would say those issues are true for all

5    where we have communicated -- where we've communicated

6    to the owner but are unable to move forward post that

7    notification.

8        Q.  So that concern would apply not only to

9    Scoobeez but to other DSPs in that category?

10       A.  I would say yes, with a caveat that the

11   negotiation period for exits does not usually drag on

12   this long.

13       Q.  Well, you had stated earlier that sometimes

14   there is a delay as long as six months between

15   notification and exit; is that correct?

16       A.  Yes, I have seen that before.

17       Q.  And Scoobeez was notified on October 29, and

18   it's only the middle of January.  So that's only three

19   months, right?

20       A.  Yes, but with an exit there is still, I'm

21   assuming, one would apply.  So there is an additional

22   60 days already on top of this.  So we would be

23   approaching the six-month period.

24       Q.  What additional 60 days?

25       A.  The WARN Act.  I'm assuming that Scoobeez

Page 201

1    was -- with the exit that Scoobeez will probably

2    terminate some of their drivers.  Under federal law and

3    some state laws they may have to file necessary

4    paperwork.

5        Q.  And the consequences that you mentioned of the

6    uncertainty and all that, if Amazon had agreed not to

7    terminate Scoobeez, those concerns would go away; is

8    that correct?

9        A.  No, I disagree.  We would still be in partner

10   with a DSP that has a history of litigation.

11   Litigation, when Amazon is brought into it, costs

12   money.  It costs time for attention for employees to

13   address it, and then there is also a PR risk associated

14   with the litigation related to DSPs.

15       Q.  What PR risk is that?

16       A.  I would point to a Buzz Feed article that came

17   out several months ago associated with DSPs that have

18   poor DA practice -- pay practices, and there was

19   accidents that were resulting from their -- those

20   drivers.  Those are DSPs that we may or may not choose

21   to be in relationship with because of how they're --

22   because of their litigation history.

23       Q.  Is Scoobeez mentioned in that Buzz Feed

24   article?

25       A.  I don't recall specifically who was mentioned.

Page 202

1              MS. NIX-HINES:  Let me turn to my

2    colleague, see if you have any additional questions

3    you'd like to ask.

4              All right, thank you for your time.

5              THE WITNESS:  Thank you.

6              (Signature waived.)

7              (Deposition concluded at 4:44 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page  203

```
1                      REPORTER'S CERTIFICATE

2

3          I, JUDY BONICELLI, the undersigned Certified

4    Court Reporter, pursuant to RCW 5.28.010 authorized to

5    administer oaths and affirmations in and for the State

6    of Washington, do hereby certify:

7          That the sworn testimony and/or proceedings, a

8    transcript of which is attached, was given before me at

9    the time and place stated therein; that any and/or all

10   witness(es) were duly sworn to testify to the truth;

11   that the sworn testimony and/or proceedings were by me

12   stenographically recorded and transcribed under my

13   supervision, to the best of my ability; that the

14   foregoing transcript contains a full, true, and

15   accurate record of all the sworn testimony and/or

16   proceedings given and occurring at the time and place

17   stated in the transcript; that I am in no way related

18   to any party to the matter, nor to any counsel, nor do

19   I have any financial interest in the event of the

20   cause.

21         WITNESS MY HAND and DIGITAL SIGNATURE this

22   29th day of January, 2020.

23

24         JUDY BONICELLI, RPR, CCR

25         Washington Certified Court Reporter, CCR 2322

                                              Page  204
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 3

Page 1

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re:

    SCOOBEEZ, et al.,

        Debtors and Debtors

        in Possession.

                               No. 2:19-bk-14989-WB

                               Jointly Administered:

                               2:19-bk-14991-WB, and

                               2:19-bk-14997-WB

Affects:

All Debtors

VIDEOTAPED DEPOSITION OF SCOTT KAUFMAN

30(B)(6) WITNESS

Stenographically Reported by

ANGELA SINCLAIR, CCRR, CRR, RPR, CSR No. 13902

January 22, 2020

Magna Legal Services

866-624-6221

www.MagnaLS.com



```
 1                    I N D E X

 2   Examinations                              Page

 3   EXAMINATION BY MS. FITZPATRICK               7

 4

 5

 6

 7

 8                  E X H I B I T S

 9

     No.            Description                 Page
10

     Exhibit 1     E-mail exchange              41
11                 (HILLAIR237-239)

12   Exhibit 2     Morgan Consulting Management  73
                   Review Report
13                 (HILLAIR1897-1900)

14   Exhibit 3     Overview of ABT Holdings      75
                   Investment (ABOT)
15                 (HILLAIR1906-1921)

16   Exhibit 4     Declaration of Scott Kaufman  96

17   Exhibit 5     E-mail exchange              102
                   (HILLAIR149)
18

     Exhibit 6     Letter from Imran Firoz to   181
19                 the board of directors of
                   ABT Holdings
20                 (HILLAIR584-615)

21   Exhibit 7     E-mail exchange              197
                   (HILLAIR275-277)
22

     Exhibit 8     Limited waiver dated         226
23                 September 29, 2017
                   (SCOOBEEZ284-286)
24

     Exhibit 9     E-mail exchange              236
25                 (HILLAIR416-417)
```



Page 3

1    Exhibit 10    E-mail exchange                    238
                   (HILLAIR421)
2
     Exhibit 11    E-mail exchange                    240
3                  (HILLAIR108-109)
4    Exhibit 12    E-mail exchange                    247
                   (HILLAIR463)
5
     Exhibit 13    Restructuring agreement            288
6                  (HILLAIR787-791)
7    Exhibit 14    Scoobeez meeting notes dated       315
                   July 31, 2019
8                  (HILLAIR1298-1300)
9    Exhibit 15    E-mail exchange                    341
                   (SCOOBEEZ1317)
10
     Exhibit 16    Adequate assurance package         354
11                 dated October 11, 2019
                   (HILLAIR136-142)
12
     Exhibit 17    E-mail exchange                    363
13                 (HILLAIR170-172)
14   Exhibit 18    E-mail exchange                    368
                   (HILLAIR628-635)
15
     Exhibit 19    E-mail exchange                    372
16                 (HILLAIR798-799)
17
18
19
20
21
22
23
24
25



Page 4

```
 1                    DEPOSITION OF SCOTT KAUFMAN
 2
 3           BE IT REMEMBERED, that pursuant to Notice, and
 4  on the 22nd day of January 2020, commencing at the hour
 5  of 9:00 a.m., in the offices of Morgan Lewis & Bockius,
 6  Spear Street Tower, One Market Street, Suite 2800, San
 7  Francisco, California, before me, ANGELA SINCLAIR, a
 8  Certified Shorthand Reporter, personally appeared
 9  SCOTT KAUFMAN, produced as a witness in said action, and
10  being by me first duly sworn, was thereupon examined as
11  a witness in said cause.
12
13                       ---o0o---
14
15  APPEARANCES:
16  For the Plaintiff SCOOBEEZ, INC.:
17                 SHANE MOSES
                   FOLEY & LARDNER LLP
18                 555 California Street, Suite 1700
                   San Francisco, California 94104
19                 (415) 434-4484
                   smoses@foley.com
20
    For the Creditor HILLAIR CAPITAL MANAGEMENT, LLC:
21
                   CRYSTAL NIX-HINES and
22                 JENNIFER NASSIRI
                   QUINN EMANUEL
23                 865 Figueroa Street, 10th Floor
                   Los Angeles, California 90017
24                 (213) 443-3332
                   crystalnixhines@quinnemanuel.com
25                 jennifernassiri@quinnemanuel.com
```



Page 5

1    For AMAZON LOGISTICS, INC.:

2                    A. KLAIR FITZPATRICK
                    MORGAN, LEWIS & BOCKIUS, LLP
3                    1701 Market Street
                    Philadelphia, Pennsylvania 19103
4                    (215) 963-4935
                    klair.fitzpatrick@morganlewis.com
5
    Also Present:
6
                    Austin Duncan, Videographer
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 6

1           THE VIDEOGRAPHER:  We are now on record.  This

2     begins Videotape Number 1 in the deposition of

3     Scott Kaufman in the matter of In Re Scoobeez, et al.,

4     debtor.  Today's date is January 22nd, 2020, and the

5     time is approximately 9:01 a.m.  This deposition is

6     being taken at One Market Street, San Francisco,

7     California 94105 at the request of Morgan, Lewis &

8     Bockius, LLP.

9           The videographer is Austin Duncan of Magna

10    Legal Services; the court reporter is Angela Sinclair of

11    Magna Legal Services.

12          Would counsel and all parties present please

13    state their appearances and whom they represent.

14          MS. FITZPATRICK:  Sure.  Klair Fitzpatrick on

15    behalf of Amazon.

16          MS. NIX-HINES:  Crystal Nix-Hines from

17    Quinn Emanuel on behalf of Hillair.

18          MS. NASSIRI:  Jennifer Nassiri, Quinn Emanuel,

19    on behalf of Hillair.

20          MR. MOSES:  Shane Moses, Foley & Lardner, on

21    behalf of Scoobeez.

22          THE VIDEOGRAPHER:  And would the court reporter

23    swear in the witness.

24          (Oath administered by the reporter.)

25          THE WITNESS:  I do.



Page 7

1                    SCOTT KAUFMAN,

2                 affirmed as a witness,

3                 testified as follows:

4    EXAMINATION BY MS. FITZPATRICK:

5         Q.  Great.  Thank you, Mr. Kaufman, for being here

6    today.  We met briefly off the record.  As I mentioned,

7    my name is Klair Fitzpatrick.  I'm here representing

8    Amazon, and I appreciate your time today.

9              So have you ever been deposed before?

10        A.  I have.

11        Q.  Okay.  So I know you're familiar with it then,

12   but I'm still going to go through some preliminary

13   introductions just as a reminder.

14             The court reporter will be transcribing the

15   deposition and can only record one person at a time.  So

16   to make things easier, it's best if we don't interrupt

17   you and you let me finish a question before you respond.

18             Does that make sense?

19        A.  It does.

20        Q.  Okay.  You have to respond verbally rather than

21   head nods or gestures because the court reporter cannot

22   record those things, so please respond with a yes or no

23   or whatever the answer calls for.

24        A.  Okay.

25        Q.  If you don't understand a question or you don't



Page 237

1     A.  Yeah.  I think it's accurate, correct.

2     Q.  Okay.  And do you know if this deal that's

3  summarized here came to fruition?

4     A.  To my recollection, this was never consummated.

5     Q.  Okay.

6     A.  It was never signed.

7     Q.  Why not?

8     A.  I don't think Shahan ever signed it.

9     Q.  Did they make the payments, though?

10    A.  They did make the payments.

11    Q.  In April of 2018 did you suggest that Hillair

12  prepare a default notice?

13        MS. NIX-HINES:  Objection as to form.

14        THE WITNESS:  I did.

15  BY MS. FITZPATRICK:

16    Q.  Why?

17    A.  Well, I think that with the deal terms not

18  being lived up to, that we should have dropped a default

19  notice in.  But seemingly Shahan -- so that's why.

20    Q.  Okay.  And did you do that in 2018?

21    A.  I don't recall if it was ever drafted or not.

22    Q.  Did you file a default notice?

23    A.  We did not.

24    Q.  Why not?

25    A.  The company started making these payments --



Page 300

1   functioning at a very high level, that the last thing

2   that we wanted to do was disrupt this apple cart.  We

3   feel that the company needed some parental guidance over

4   George and Scott at this point, but the last thing we

5   wanted to -- and that's what we represented to Amazon

6   is, is that we feel it's functioning very well which is

7   indicative of the only metric that we had, were the

8   report cards coming back from Amazon which were in an

9   upward trend historically.

10          So --

11      Q.  In 2019?

12      A.  In 2019; right?  Since the company went into

13  bankruptcy.  For lack of better words, the

14  transgressions of the past have been stopped that we

15  didn't know about.  Now that we've known about them,

16  they've been fixed; they've been stopped.  The company

17  has tremendous reporting standards to the government, to

18  the bankruptcy courts.  And it's performed very well for

19  Amazon.

20          We actually -- personally I have gone and I've

21  shaken the hands of a significant amount of the drivers

22  and met the dispatchers and have watched the comradery

23  amongst these thousand, roughly 800,000 employees grow

24  and the pride for the company.

25          And so our comment to Amazon is we don't really



Page 352

1    that's how I led the conversation which was maybe a two-

2    or three-minute introduction.  And then the people at

3    Amazon said, look, we're not interested in having that

4    conversation.  We're just letting you know that it's

5    being terminated.  They were not interested in hearing

6    or trying to work with us to find -- they just wanted to

7    let us know that it didn't matter what we said.  Nothing

8    we could say would change their mind.

9         Q.  Got it.

10        A.  Which was -- so that's why the call was so

11   short.

12        Q.  Got it.

13        A.  And they said that.  They told us that they

14   were going to -- they said they were going to take all

15   of your employees and put them into a different company

16   and for that we pay you a million dollars.

17        Q.  They said they were going to take your

18   employees?

19        A.  Yeah.  They said --

20        Q.  How did they say they were going to take the

21   employees?

22        A.  They said they are going -- I think they -- I

23   forget the exact word they use.

24        Q.  Did they offer to have a job fair?

25        A.  No, no, no.  They just said they were going to



Page 376

1            THE REPORTER:  And Counsel, Mr. Moses?

2            MR. MOSES:  Yes.

3            THE REPORTER:  Okay.

4            THE VIDEOGRAPHER:  It is approximately

5    5:40 p.m.  We are off the record.

6            (The deposition concluded at 5:40 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 377

1          DECLARATION UNDER PENALTY OF PERJURY

2

3          I, SCOTT KAUFMAN, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on January 22, 2020;

6    that I have made such corrections, if any, as appear

7    noted on the Deposition Errata Page signed by me; that

8    my testimony as contained herein, or as corrected, is

9    true and correct.

10

11          Dated this _____ day of _____,

12    2020, at _____,

13    California.

14

15

16

17

18

19

20

21

22

23

24

25



Page 378

```
 1                    DEPOSITION ERRATA SHEET

 2

 3     Page No._____ Line No. _____

 4     Change:_____

 5     Reason for change:_____

 6     Page No._____ Line No. _____

 7     Change:_____

 8     Reason for change:_____

 9     Page No._____ Line No. _____

10     Change:_____

11     Reason for change:_____

12     Page No._____ Line No. _____

13     Change:_____

14     Reason for change:_____

15     Page No._____ Line No. _____

16     Change:_____

17     Reason for change:_____

18     Page No._____ Line No. _____

19     Change:_____

20     Reason for change:_____

21     Page No._____ Line No. _____

22     Change:_____

23     Reason for change:_____

24     _____    _____

25     SCOTT KAUFMAN                   Dated
```



Page 379

1                    REPORTER'S CERTIFICATE
2
3          I, ANGELA SINCLAIR, a Stenographic Certified
   Shorthand Reporter, holding a valid and current license
4  issued by the State of California, duly authorized to
   administer oaths, do hereby certify:
5
           That SCOTT KAUFMAN, in the foregoing deposition
6  named, was present and by me sworn as a witness in the
   above-entitled action at the time and place therein
7  specified.
8          That said deposition was taken before me at
   said time and place, and was taken down in shorthand by
9  me and was thereafter transcribed into typewriting, and
   that the foregoing transcript constitutes a full, true
10 and correct report of said deposition and of the
   proceedings that took place.
11
           The dismantling, unsealing, or unbinding of the
12 original transcript will render the Reporter's
   Certificate null and void.
13
           Should the signature of the witness not be
14 affixed to the deposition, the witness shall not have
   availed himself/herself of the opportunity to sign or
15 the signature has been waived.
16         I further certify that I am neither counsel for
   nor related to any party in the foregoing deposition and
17 caption named nor in any way interested in the outcome
   thereof.
18
           That before completion of the proceedings,
19 review of the transcript was requested pursuant to
   Federal Rule 30(e).
20
           IN WITNESS WHEREOF, I have hereunder subscribed
21 my hand this 31st day of January 2020.
22
23
                        _____
24                      ANGELA SINCLAIR, CCRR, CRR, RPR,
                        CSR 13902
25                      State of California



# EXHIBIT 4

1            UNITED STATES BANKRUPTCY COURT
           CENTRAL DISTRICT OF CALIFORNIA

2               LOS ANGELES DIVISION

3  IN RE:                    §
                         §

4  SCOOBEEZ, ET ALr          §   CASE NO. 2:19-BK-14989-WB
   DEBTORS AND               §

5  DEBTORS IN POSSESSION     §   JOINTLY ADMINISTERED:
                         §   2:19-BK-14991-WB

6                          §   2:19-BK-14997-WB

7

8

9

10

          ORAL AND VIDEOTAPED DEPOSITION OF

11                  DAVID OJEDA
              FEBRUARY 13, 2020

12

13

14

15        ORAL AND VIDEOTAPED DEPOSITION OF DAVID OJEDA,
   produced as a witness at the instance of the Secured

16  Creditor and duly sworn, was taken in the above
   styled and numbered cause on Thursday, February 13,

17  2020, from 9:09 a.m. to 1:02 p.m., before TAMARA
   CHAPMAN, CSR, CRR, RPR in and for the State of

18  Texas, reported by computerized stenotype machine,
   at the offices of Bracewell, LLP, 111 Congress

19  Avenue, Austin, Texas, pursuant to the Federal Rules
   of Civil Procedure and any provisions stated on the

20  record herein.

21

22

23

24

25    Job No. 3980828

                                             Page 1

```
 1                  A P P E A R A N C E S
 2
       FOR HILLAIR CAPITAL MANAGEMENT, LLC:
 3          Eric Winston
            QUINN EMANUEL URQUHART & SULLIVAN, LLP
 4          865 S. Figueroa Street, 10th Floor
            Los Angeles, California 90017
 5          213-443-3000
            ericwinston@quinnemanuel.com
 6
 7       FOR AMAZON:
            Tinos Diamantatos
 8          MORGAN LEWIS & BOCKIUS
            77 West Wacker Drive
 9          Chicago, Illinois 60601
            312-324-1145
10          tinos.diamantatos@morganlewis.com
11          -and-
12          Brett A. Janich
            MORGAN LEWIS & BOCKIUS
13          1701 Market Street
            Philadelphia, Pennsylvania 19103
14          215-963-5844
            brett.janich@morganlewis.com
15
16       FOR THE DEBTOR:
            Brittany J. Nelson
17          FOLEY & LARDNER, LLP
            3000 K Street, N.W., Suite 600
18          Washington, D.C. 20007-5109
            Phone 202-672-5300
19          bnelson@foley.com
20
21       ALSO PRESENT:
             Peter Zierline, Videographer
22
23
24
25

                                              Page 2
```

```
 1                    I N D E X
 2
                                                PAGE
 3
 4   APPEARANCES...................................    2
 5       DAVID OJEDA
 6   EXAMINATION
          By Mr. Winston...........................    6
 7
 8   CORRECTION PAGE.............................   181
     SIGNATURE PAGE..............................   182
 9   REPORTER'S CERTIFICATION....................   183
10
                    E X H I B I T S
11
                                           PAGE  LINE
12   Exhibit 1,                              8    25
     Notice of Deposition
13   (No Bates - 3 pages)
     Exhibit 2,                             67    20
14   DSP Delivery Excellence Performance -
     SCBZ at DAU1 - Week 32 - 2019
15   (AMAZON_H000191 - AMAZON_H000197)
     Exhibit 3,                             70    19
16   DSP Delivery Excellence Performance -
     SCBZ at DAU1 - Week 49 - 2019
17   (AMAZON_H000322 - AMAZON_H000329)
     Exhibit 4,                             72    14
18   DSP Delivery Excellence Performance -
     SCBZ at DDA1 - Week 38 - 2019
19   (AMAZON_H000867 - AMAZON_H000873)
     Exhibit 5,                             75     9
20   DSP Delivery Excellence Performance -
     SCBZ at DDA1 - Week 47 - 2019
21   (AMAZON_H000930 - AMAZON_H000936)
     Exhibit 6,                             78    15
22   DSP Scorecard - SCBZ at DDA2 - Week 27
     - 2019
23   (AMAZON_H000953 - AMAZON_H000956)
     Exhibit 7,                             81     2
24   DSP Delivery Excellence Performance -
     SCBZ at DDA2 - Week 47 - 2019
25   (AMAZON_H001092 - AMAZON_H001099)


                                          Page  3
```

```
 1              E X H I B I T S (Continued)
 2    Exhibit 8,                                81   25
      DSP Scorecard - SCBZ at DDA3 - Week 30
 3    - 2019
      (AMAZON_H001134 - AMAZON_H001137)
 4    Exhibit 9,                                83    9
      DSP Delivery Excellence Performance -
 5    SCBZ at DDA3 - Week 49 - 2019
      (AMAZON_H001276 - AMAZON_H001283)
 6    Exhibit 10,                              150   24
      4/10/17 email from Shahan Ohanessian
 7    to various recipients, Subject "Re:
      New Work Order"
 8    (SCOOBEEZ-0000588 - SCOOBEEZ-0000589)
      Exhibit 11,                              153    8
 9    1/15/19 email from Shahan Ohanessian
      to David Ojeda, Subject "Payments -
10    Important"
      (SCOOBEEZ-0001564)
11    Exhibit 12,                              155   15
      2/28/19 email from Shahan Ohanessian
12    to Kerry Person and David Ojeda,
      Subject "Re: Discussion"
13    (SCOOBEEZ-0001583 - SCOOBEEZ-0001584)
      Exhibit 13,                              165   11
14    9/30/19 email from David Ojeda to
      various recipients, Subject "Week 39
15    Austin - Houston Review"
      (AMAZON_E000522 - AMAZON_E000525)
16    Exhibit 14,                              168   15
      10/4/19 email from David Ojeda to Eric
17    Swanson and Jimmy Wilson, Subject "RE:
      SCBZ History"
18    (AMAZON_E000126)
19
                 PREVIOUSLY MARKED EXHIBITS
20
                                          PAGE LINE
21    Exhibit 62                               130   22
22
23
24
25
                                              Page  4
```

```
 1                    THE VIDEOGRAPHER:   Good morning.

 2        We're on the record at 9:09 a.m. on February 13,

 3        2020.   This is Media Unit No. 1 of the recorded

 4        deposition of David Ojeda, in the matter of In

 5        re:  Scoobeez, filed in the United States          09:09

 6        Bankruptcy Court, Central District of California,

 7        Los Angeles Division.   The case number is

 8        2:19-bk-14989-WB.

 9                    This deposition is being held at

10        Bracewell, LLP located at 111 Congress in Austin,  09:10

11        Texas.   My name is Peter Zierline, here with our

12        stenographer, Tamara Chapman, and we are with

13        Veritext.

14                    Will counsel please identify

15        themselves for the record, after which the         09:10

16        stenographer will swear in the witness.

17                    MR. WINSTON:   Eric Winston of

18        Quinn Emanuel Urquhart & Sullivan for secured

19        creditor, Hillair Capital Management.

20                    MR. DIAMANTATOS:   Tinos               09:10

21        Diamantatos of Morgan Lewis on behalf of Amazon.

22                    MR. JANICH:   Brett Janich, Morgan

23        Lewis & Bockius, on behalf of Amazon.

24                    MR. WINSTON:   Would you swear in

25        the witness.                                        09:10
```

                                                     Page 5

```
 1                         DAVID OJEDA,

 2        having been first duly sworn, testified as follows:

 3                         EXAMINATION

 4        BY MR. WINSTON:

 5             Q.  Good morning, Mr. Ojeda.                    09:10

 6             A.  Good morning.

 7             Q.  Thank you for being here today.  I'm sure

 8        it's not the most fun way to spend a Thursday

 9        morning, but we'll try to be efficient.

10                  My name is Eric Winston.  I'm with the law  09:11

11        firm of Quinn Emanuel.  We represent Hillair Capital

12        Management in the Scoobeez bankruptcy case.

13                  Before we get started, have you ever been

14        deposed before?

15             A.  Yes, once.                                 09:11

16             Q.  Once.  How long ago?

17             A.  About nine years.

18             Q.  Nine years.  Okay.  So it's been a little

19        while?

20             A.  Yes.

21             Q.  So let me go over some ground rules, just

22        so that we move this along efficiently.

23             A.  Sure.

24             Q.  You've just been placed under oath, and

25        that's the same type of oath you would take as if you  09:11
```

Page 6

```
 1                  A.  Correct.

 2                  Q.  A scorecard will come out measuring that

 3      Sunday to Saturday?

 4                  A.  Correct.

 5                  Q.  How -- how long after the week ends does    10:31

 6      that week's scorecard come out?

 7                  A.  A few days.

 8                  Q.  Okay.  So if -- And it measures the entire

 9      weekly performance.  Correct?

10                  A.  Correct.                                    10:31

11                  Q.  Do you know how the information that is

12      used in the scorecard gets into the scorecard?  And

13      I'll give you an example if I can.  Presumably it

14      measures something about how many packages you

15      delivered?                                                 10:32

16                  A.  Uh-huh.

17                  Q.  How would anyone know that when they're

18      preparing the scorecard?

19                  A.  So there is internal databases that have

20      information that house the information that's being        10:32

21      scored and that's how it's ingested.

22                  Q.  Okay.  Do you have any -- any direct

23      involvement in the inputting of that internal data?

24                  A.  No.

25                  Q.  Okay.  Do you oversee people that handle    10:32
```

Page 65

1      Performance Program, which will include," and it has

2      three bullet points under that.

3             A.  Okay.

4             Q.  Do you see that?

5             A.  Yes.                                        10:37

6             Q.  Did Amazon launch that program?

7             A.  Yes.

8             Q.  Do you -- what was that program?  What

9      was -- what was the purpose of it?

10                    MR. DIAMANTATOS:  Objection;            10:37

11     foundation.

12            A.  The purpose was a -- an updated version of

13     the scorecard that measured a broader spectrum of

14     the -- of the execution of a DSP.

15            Q.  Do you know whether Scoobeez registered    10:37

16     for that program?

17            A.  I do not know.

18            Q.  Okay.  You can put this one aside.

19                  (Exhibit 3 was marked.)

20            Q.  Mark that Exhibit 3.                        10:37

21            A.  Thank you.

22            Q.  Exhibit 3 is a document Bates-stamped

23     AMAZON_H000322 to 329.

24            A.  Uh-huh.

25            Q.  It is titled, "DSP Delivery Excellence      10:38

                                                  Page 70

1          Q.  Mr. Ojeda, do you recall receiving these

2      two emails?

3          A.  I do.  But can I correct something?

4          Q.  Sure.

5          A.  On this -- I guess -- I don't know why,    12:30

6      but you went from '17 to '19 or -- and then I guess

7      the director at this time was Eric Swanson, not

8      Penny.  I think I said -- you asked Brittany.  I said

9      Penny, but it's -- it was Eric.

10         Q.  So you're looking at Exhibit 11.  Is that    12:30

11     right?

12         A.  I'm looking at Exhibit 11 and I'm --

13         Q.  So --

14         A.  What I had stated before, that Penny was a

15     director, a correction is that Eric Swanson was the    12:30

16     director at that time.

17         Q.  Okay.  Thank you for that correction.

18             All right.  Do you recall receiving these

19     two emails?

20         A.  Yes.                                          12:30

21         Q.  All right.  And on October -- sorry, not

22     October -- February 4th, 2019, do you understand

23     shahan@scoobeez.com means Mr. Ohanessian?

24         A.  Yes.

25         Q.  All right.  Mr. Ohanessian is writing to    12:31

                                                   Page 156

1                        SIGNATURE PAGE

2

        I, DAVID OJEDA, have read the foregoing
3    deposition and hereby affix my signature that same
     is true and correct, except as noted on the
4    correction page.

5

6                    _____

                     DAVID OJEDA
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 181

```
 1              UNITED STATES BANKRUPTCY COURT
              CENTRAL DISTRICT OF CALIFORNIA
 2                 LOS ANGELES DIVISION
 3   IN RE:                      §
                                 §
 4   SCOOBEEZ, ET AL.,           §   CASE NO. 2:19-BK-14989-WB
                                 §
 5                               §   JOINTLY ADMINISTERED:
     DEBTORS AND                 §   2:19-BK-14991-WB
 6   DEBTORS IN POSSESSION       §   2:19-BK-14997-WB
 7                REPORTER'S CERTIFICATION
                 DEPOSITION OF DAVID OJEDA
 8                TAKEN FEBRUARY 13, 2020
 9       I, TAMARA CHAPMAN, Certified Shorthand Reporter
10   in and for the State of Texas, hereby certify to the
11   following:
12       That the witness, DAVID OJEDA, was duly sworn
13   by the officer and that the transcript of the oral
14   deposition is a true record of the testimony given
15   by the witness;
16       That the original deposition was delivered to
17   ERIC WINSTON;
18       That a copy of this certificate was served on
19   all parties and/or the witness shown herein on
20   _____.
21       I further certify that pursuant to FRCP No.
22   30(f)(i) that the signature of the deponent:
23           was requested by the deponent or a party
24   before the completion of the deposition and that the
25   signature is to be returned within 30 days from date
```

Page 182

1    of receipt of the transcript.  If returned, the

2    attached Changes and Signature Page contains any

3    changes and the reasons therefor;

4         was not requested by the deponent or a party

5    before the completion of the deposition.

6         I further certify that I am neither counsel

7    for, related to, nor employed by any of the parties

8    in the action in which this proceeding was taken,

9    and further that I am not financially or otherwise

10   interested in the outcome of the action.

11        Certified to by me this 14th day of February, 2020.

12

13

14

15

16             Tamara Chapman, CSR, RPR, CRR

17             CSR NO. 7248; Expiration Date: 04-30-21

18             Veritext Legal Solutions

19             Firm Registration No. 571

20             300 Throckmorton Street, Suite 1600

21             Fort Worth, Texas  76102

22             800-336-4000

23

24

25

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 5

1            UNITED STATES BANKRUPTCY COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3               LOS ANGELES DIVISION

4

5     _____

6     In re: SCOOBEEZ, et al., ) Case No.

7     debtors and debtors in    ) 2:19-bk-14989-WB

8     possession.               ) Jointly

9                               ) Administered:

10                              ) 2:19-bk-14991-WB;

11                              ) 2:19-bk-14997-WB

12    _____

13

14

15            DEPOSITION OF VADIM KOZIN

16              Los Angeles, California

17             Friday, January 17, 2020

18                   Volume I

19

20    Reported by:

21    LORI M. BARKLEY

22    CSR No. 6426

23    Job No. 3854256

24

25    PAGES 1 - 246

                                        Page 1

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                 LOS ANGELES DIVISION

 4

 5      _____

 6      In re: SCOOBEEZ, et al., ) Case No.

 7      debtors and debtors in   ) 2:19-bk-14989-WB

 8      possession.              ) Jointly

 9                               ) Administered:

10                               ) 2:19-bk-14991-WB;

11                               ) 2:19-bk-14997-WB

12      _____

13

14

15

16          Deposition of VADIM KOZIN, Volume I,

17      taken at 865 South Figueroa Street, 10th Floor,

18      Los Angeles, California, beginning at 9:42 a.m., and

19      ending at 3:54 p.m., on Friday, January 17, 2020,

20      before LORI M. BARKLEY, Certified Shorthand Reporter

21      No. 6426.

22

23

24

25

                                              Page  2
```

1    APPEARANCES:

2

3    For HILLAIR CAPITAL MANAGEMENT, LLC:

4        QUINN, EMANUEL, URQUHART & SULLIVAN

5        BY:   JENNIFER NASSIRI

6                - and -

7            BECCA E. DAVIS

8        Attorneys at Law

9        865 South Figueroa Street, 10th Floor

10       Los Angeles, California 90017

11       213.443.3000

12       jennifernassiri@quinnemanuel.com

13       beccadavis@quinnemanuel.com

14

15

16   For SCOOBEEZ:

17       MCNUTT LAW GROUP

18       By:   SHANE MOSES

19       Attorney at Law

20       219 9th Street

21       San Francisco, California 94103

22       415.995.8475

23       smoses@ml-sf.com

24

25

                                    Page 3

1    APPEARANCES OF COUNSEL (continued):

2

3    For AMAZON LOGISTICS:

4        MORGAN LEWIS

5        BY:  RICHARD W. ESTERKIN

6        Attorney at Law

7        300 South Grand Ave, 22nd Floor

8        Los Angeles, California 90071-3132

9        213.612.1163

10       resterkin@morganlewis.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  4

```
 1                          INDEX

 2

 3    WITNESS                            EXAMINATION

 4    VADIM KOZIN

 5    Volume I

 6         BY MS. NASSIRI                          9

 7

 8

 9                         EXHIBITS

10    NUMBER              DESCRIPTION            PAGE

11    Exhibit 50  Hillair Capital Management, LLC's   15

12                Notice of Deposition of Vadim

13                Kozin

14

15    Exhibit 51  Eighteenth Amendment to Work    61

16                Order under the Delivery Provider

17                Terms of Service, Bates stamped

18                SCOOBEEZ-0000479 through

19                SCOOBEEZ-0000492

20

21    Exhibit 52  E-mail from Judith Lozano, dated   92

22                September 14, 2016, Bates stamped

23                AMAZON_E000051

24

25
```

Page 5

1   INDEX (Continued):

2                        EXHIBITS

3   NUMBER                  DESCRIPTION                PAGE

4   Exhibit 53  E-mail from Vadim Kozin, dated      99

5                June 20, 2016, Bates stamped

6                AMAZON_E000048

7

8   Exhibit 54  E-mail from Vadim Kozin, dated     106

9                March 5, 2017, Bates stamped

10               AMAZON_E000062

11

12  Exhibit 55  E-mail from Nick Solari, dated     110

13               April 25, 2019, Bates stamped

14               AMAZON_E000066

15

16  Exhibit 56  E-mail from Suzy Ohanessian,       115

17               dated September 17, 2018, Bates

18               stamped AMAZON_E000063

19

20  Exhibit 57  E-mail Chain, from November 2019,  127

21               Bates stamped AMAZON_E000146

22               through AMAZON_E000156

23

24

25

                                        Page  6

```
 1   INDEX (Continued):

 2                         EXHIBITS

 3   NUMBER                DESCRIPTION                PAGE

 4   Exhibit 58   E-mail Chain from July 2019,        156

 5                Bates stamped AMAZON_E000187

 6                through AMAZON_E000189

 7

 8   Exhibit 59   E-mail Chain from April 2018,       161

 9                Bates stamped AMAZON_E000177

10                through AMAZON_E000181

11

12   Exhibit 60   E-mail from Vadim Kozin, dated      169

13                September 25, 2018, Bates stamped

14                AMAZON_E000065

15

16   Exhibit 61   E-mail from David Ojeda, dated      174

17                February 12, 2018, Bates stamped

18                AMAZON_E000173 through

19                AMAZON_E000174

20

21   Exhibit 62   E-mail chain with attachments,      182

22                dated September 2019, Bates

23                stamped AMAZON_E000190

24

25
```

Page 7

1   INDEX (Continued):

2                         EXHIBITS

3   NUMBER                DESCRIPTION                 PAGE

4   Exhibit 63  E-mail from Brett Ogi to Vadim       190

5               Kozin, dated September 19, 2019,

6               with attachments, Bates stamped

7               AMAZON_E000192

8

9   Exhibit 64  Excel Spreadsheet, Bates stamped     196

10              AMAZON_E000379

11

12  Exhibit 65  E-mail Chain, dated April 14-15,     212

13              2017, Bates stamped

14              AMAZON_E000166 through

15              AMAZON_E000167

16

17  Exhibit 66  E-mail Chain from Nick Solari to     217

18              Vadim Kozin, Bates stamped

19              AMAZON_E000182 though

20              AMAZON_E000184

21

22  Exhibit 67  E-mail Chain from January 2020,      239

23              Bates stamped SCOOBEEZ-0001653

24              through SCOOBEEZ-0001655

25

Veritext Legal Solutions
866 299-5127

1      Los Angeles, California, Friday, January 17, 2020

2                          9:42 a.m.

3

4                        VADIM KOZIN,

5      having been administered an oath, was examined and

6      testified as follows:

7

8                        EXAMINATION

9      BY MS. NASSIRI:

10         Q.   Good morning.                              10:05:28

11         A.   Good morning.                              10:05:29

12         Q.   Can you state and spell your name for the  10:05:30

13     record, please?                                     10:05:32

14         A.   Vadim Kozin, V-A-D-I-M.  Last name         10:05:33

15     K-O-Z-I-N.                                          10:05:38

16         Q.   And I'm Jennifer Nassiri, counsel for      10:05:38

17     Hillair, and my colleague is Becca Davis.           10:05:43

18              And then counsel.                          10:05:48

19              MS. MOSES:  Hi.  I'm Shane Moses, counsel   10:05:48

20     for Scoobeez.                                       10:09:48

21              MR. ESTERKIN:  And Richard Esterkin, Morgan 10:05:54

22     Lewis, on behalf of Amazon Logistics.               10:05:57

23     BY MS. NASSIRI:                                     10:06:00

24         Q.   Mr. Kozin, have you ever been deposed       10:06:01

25     before?                                             10:06:03

                                                        Page 9

```
 1        Q.   Do you consider Scoobeez, look at all the      15:13:54

 2   DSPs that you deal with, subpar compared to the          15:14:04

 3   others?                                                  15:14:07

 4            MR. ESTERKIN:  Objection, vague.                15:14:07

 5            THE WITNESS:  Yeah, that's --                   15:14:11

 6   BY MS. NASSIRI:                                          15:14:12

 7        Q.   Okay.  So if you had a bell curve -- you are   15:14:12

 8   familiar with a bell curve, right?  Economics, right?   15:14:14

 9   Is Scoobeez at the bottom end -- in your experience,    15:14:18

10   I'm just asking your experience, your personal          15:14:21

11   experience --                                           15:14:23

12            MR. ESTERKIN:  Objection, vague.                15:14:24

13   BY MS. NASSIRI:                                          15:14:25

14        Q.   -- where would Scoobeez fall in that          15:14:26

15   overall?                                                 15:14:28

16        A.   That's a really difficult and vague question  15:14:29

17   to answer.                                               15:14:31

18        Q.   Why?                                           15:14:32

19        A.   Because, one, I'm not too familiar with the   15:14:33

20   performance at DLA3.  I haven't seen --                 15:14:36

21        Q.   I'm only asking your experience among the     15:14:38

22   DSPs that you interact with and see how they perform    15:14:42

23   and get reports on, that's what I'm asking you.  I'm    15:14:45

24   not asking you to tell me about Chicago or other        15:14:47

25   stations that you're not involved in, so just in your   15:14:51
```

Page 231

```
 1   experience.                                            15:14:54

 2       A.   From what I could see, they're average,       15:14:56

 3   yeah.                                                  15:15:01

 4           MS. NASSIRI:  Okay.  I want to take a short     15:15:02

 5   break.                                                 15:15:09

 6

 7           (Recess taken.)

 8                                                          15:37:00

 9   BY MS. NASSIRI:

10       Q.   Remember you're still under oath?             15:37:02

11       A.   Yes.                                          15:37:04

12       Q.   We were talking before the break about DSP    15:37:04

13   employees that may move around from one DSP to         15:37:11

14   another when the other DSP is being exited from the    15:37:14

15   system.                                                15:37:17

16           Do you recall that conversation?               15:37:18

17       A.   Yes.                                          15:37:19

18

19

20

21

22

23

24

25
```

Page 232

1       I declare under penalty of perjury under the laws

2    of the State of California that the foregoing is true

3                        and correct.

4            Executed on _____, 2020, at

5       _____, _____.

6

7

8

9            _____

10                    VADIM KOZIN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 245

1    STATE OF CALIFORNIA        ) ss.

2    COUNTY OF LOS ANGELES      )

3

4          I, Lori M. Barkley, CSR No. 6426, do hereby

5    certify:

6          That the foregoing deposition testimony

7    taken before me at the time and place therein set

8    forth and at which time the witness was administered

9    the oath;

10          That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me, and

13   were thereafter transcribed under my direction and

14   supervision, and that the foregoing pages contain a

15   full, true and accurate record of all proceedings and

16   testimony to the best of my skill and ability.

17          I further certify that I am neither counsel

18   for any party to said action, nor am I related to any

19   party to said action, nor am I in any way interested

20   in the outcome thereof.

21          IN WITNESS WHEREOF, I have subscribed my

22   name this 28th day of January, 2020.

23

24

25          LORI M. BARKLEY, CSR No. 6426

                                              Page  246

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 6

Page 1

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION


In re:

SCOOBEEZ, et al.                    Case No. 2:19-bk-14989-WB
                                    Jointly Administered:
 Debtors and Debtors in             2:19-bk-14991-WB;
 Possession.                        2:19-bk-14997-WB
_____

Affects:

 All Debtors

 Scoobeez, ONLY

 Scoobeez Global, Inc., ONLY

 Scoobur LLC, ONLY

_____



VIDEOTAPED 30(b)(6) DEPOSITION OF SCOOBEEZ

GEORGE VOSKANIAN

JANUARY 28, 2020

10:27 a.m.


300 South Grand Avenue, 24th Floor
Los Angeles, California


Diana Janniere, CSR-10034


Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 2

APPEARANCES OF COUNSEL

For the Debtors and Debtors in Possession, Scoobeez,
Scoobeez Global, Inc., and Scoobur, LLC:

FOLEY & LARDNER
JOHN A. SIMON, ESQ.
ONE DETROIT CENTER
500 WOODWARD AVENUE, SUITE 2700
DETROIT, MICHIGAN 48226-3489
313.234.7117
jsimon@foley.com

For Amazon Logistics, Inc.:
MORGAN LEWIS
TINOS DIAMANTATOS, ESQ.
ANDREW BARBER, ESQ.
77 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-5094
312.324.1145
tinos.diamantatos@morganlewis.com
andrew.barber@morganlewis.com

For Hillair Capital Investments:
QUINN EMANUEL URQUHART & SULLIVAN
JENNIFER NASSIRI, ESQ.
865 SOUTH FIGUEROA STREET, 10TH FLOOR
LOS ANGELES, CALIFORNIA 90017
213.443.3554
jennifernassiri@quinnemanuel.com

The Videographer:
VINCENT MAZZA

Page 3

INDEX OF EXAMINATION
WITNESS: GEORGE VOSKANIAN
EXAMINATION                          PAGE
By Mr. Diamantatos                   6

INDEX OF EXHIBITS
EXHIBIT      DESCRIPTION            PAGE
1    AMAZON LOGISTICS,INC'S NOTICE OF
     30(b)(6) DEPOSITION OF SCOOBEEZ    14

2    LINKED-IN PROFILE OF MR. VOSKANIAN    26

3    DELIVERY PROVIDER TERMS OF SERVICE    102

4    FIRST AMENDMENT TO WORK ORDER UNDER
     THE DELIVERY PROVIDER TERMS OF SERVICES    104
5    DELIVERY PROVIDER TERMS OF SERVICE
     (LAST UPDATED: JUNE 21, 2016)
     AMAZON BATES H000011            109
6    DELIVERY PROVIDER TERMS OF SERVICE
     (LAST UPDATED: JUNE 21, 2016)
     KEY VEGA 000001                111
7    3/28/16 EMAIL TO IMRAN FROM SHAHAN
     RE AUDIT QUESTIONS - AMAZON CONTRACT
     ATTACHED NEW PRICING           116
8    10/10/19 EMAIL STRING RE WE'RE THE
     ONLY ONE IN THE SYSTEM ADHERING TO
     ALL COMPLIANCE REQUIREMENTS     197
9    DEBTORS' NOTICE OF MOTION AND
     EMERGENCY MOTION FOR TRO AND
     PRELIMINARY INJUNCTION TO PREVENT
     VIOLATION OF THE AUTOMATIC STAY;
     DECLARATIONS OF MR. WEISS,
     MR. VOSKANIAN, MR. SHEIKH AND
     MS. MCDOW IN SUPPORT THEREOF    214

Page 4

INDEX OF EXHIBITS
EXHIBIT      DESCRIPTION            PAGE
10   12/18/17 EMAIL TO MR. KABBANI FROM
     SHAHAN RE RETURNED PACKAGE      267

11   2/28/19 EMAIL TO K. PERSON FROM
     SHAHAN RE DISCUSSION            272
12   5/13/19 EMAIL TO AMAZON LOGISTICS
     COMPLIANCE FROM AMAZON LOGISTICS
     COMPLIANCE RE POLICY REMINDER - DSP
     OWNERSHIP TRANSFER             295

13   NOTICE OF EXECUTED STALKING HORSE
     PURCHASE AGREEMENT             305
14   MANAGEMENT REVIEW REPORT CONDUCTED
     9/24/16                        321

15   3/15/17 EMAIL STRING RE LETTER TO
     ABT HOLDINGS, ATTACHED ABOT LETTER,
     ARTICLE OF INCORPORATION       346

16   TO THE BOARD OF DIRECTORS OF ABT
     HOLDINGS                       346
17   MR. VOSKANIAN'S HANDWRITTEN NOTES    408

(Original Exhibits 1 - 17 are attached
hereto.)


INSTRUCTED NOT TO ANSWER - COMMON-INTEREST PRIVILEGE
     PAGE  LINE
     312   20

Page 5

VIDEOTAPED 30(b)(6) DEPOSITION OF SCOOBEEZ
GEORGE VOSKANIAN
JANUARY 29, 2020

THE VIDEOGRAPHER: We are now on the record.

This begins Videotape No. 1, in the
deposition of George Voskanian, in the matter of
In Re: Scoobeez, et al., in the United States
Bankruptcy Court, Central District of California,
Los Angeles Division.

Today is January 29, 2020, and the time is
10:27 a.m. This deposition is being taken at 300
South Grand Avenue, 24th Floor, Los Angeles,
California 90071, at the request of Morgan Lewis.

The videographer is Vincent Mazza of
Magna Legal Services, and the court reporter is Diana
Janniere of Magna Legal Services.

Will counsel and all parties present state
their appearances and whom they represent.

MR. SIMON: John Simon of Foley & Lardner
representing the debtors Scoobeez, et al.

MS. NASSIRI: Jennifer Nassiri, Quinn
Emanuel, on behalf of Hillair.

MR. BARBER: Andrew Barber, Morgan Lewis, on
behalf of Amazon.



Page 6

1    MR. DIAMANTATOS: Tinos Diamantatos also on
2  behalf of Amazon.
3    THE VIDEOGRAPHER: Will the court reporter
4  please swear in the witness.
5
6    GEORGE VOSKANIAN,
7  having been first duly sworn, testifies as follows:
8
9    EXAMINATION
10  BY MR. DIAMANTATOS:
11    Q   Great. Good morning, Mr. Voskanian.
12    A   Good morning.
13    Q   Will you please state for us and spell your
14  full name?
15    A   George Voskanian. George, G-E-O-R-G-E,
16  V-O-S-K-A-N-I-A-N.
17    Q   Thank you.
18    Mr. Voskanian, as you just heard, my name is
19  Tinos Diamantatos, along with my colleague Andrew
20  Barber. We are both lawyers for Amazon, one of the
21  parties in this lawsuit; okay?
22    So we are here today, as you know, as part
23  of a lawsuit where certain claims have been made by
24  Scoobeez as they relate to Amazon.
25    Are you familiar generally with the nature

Page 7

1  of the lawsuit?
2    A   Yes.
3    Q   Okay. Did you have an opportunity to review
4  any pleadings associated with the filings that have
5  been made in the Bankruptcy Court?
6    A   Yes.
7    Q   Okay. Have you ever been deposed before?
8    A   No.
9    Q   Have you ever had to prepare for a
10  deposition before?
11    A   Other than this one?
12    Q   Yes.
13    A   No.
14    Q   Have you ever testified in a court
15  proceeding on the witness stand under oath before?
16    A   No.
17    Q   This is your first time?
18    A   Yes. I am not in the habit of getting
19  lawsuits.
20    Q   Okay. I am just going to cover, very
21  briefly, a few of the ground rules for today just to
22  make sure that we are on the same page before we start
23  digging into some of the substance.
24    All right. Are you represented by a lawyer
25  here today?

Page 8

1    A   Yes. The gentleman that's -- myself or the
2  company?
3    Q   You can answer both, so yourself and the
4  company?
5    A   Myself, no, but the company, John Simon.
6    Q   Okay. Excellent.
7    Mr. Simon is seated to your left; correct?
8    A   Yes.
9    Q   Okay. Great. So the court reporter, who is
10  here today, is taking down everything that we are
11  saying on the record, which means that we have to be
12  really mindful to not speak over one another, and I've
13  got to be careful not to interrupt your answers. And
14  I would just ask that you also try not to speak over
15  us to the extent possible. Okay?
16    Another important point is that all of our
17  answers have to be verbal, as do the questions. So
18  that means that head nods or "um-hmm" answers, which
19  might work in conversation, don't work for purposes of
20  the record.
21    So to the extent an answer is yes, I would
22  ask that you say, "yes." If an answer is no, I would
23  ask that you say, "no."
24    Does that make sense?
25    A   Yes.

Page 9

1    Q   If during the course of today we forget
2  that, I will try to perk up and maybe ask a follow-up
3  question and ask you to confirm if it's a yes or a no.
4  I am not being confrontational.
5    I'm just making sure, hopefully, that our
6  record is clear on that. Sound good?
7    A   Yeah.
8    Q   As you know, this is a video-taped
9  deposition. So you are also being video-recorded
10  during the course of today's deposition.
11    All right. When I ask a question, to the
12  extent a question of mine does not make sense, please
13  let me know that.
14    If you don't understand the question or need
15  me to rephrase it, I'd ask that you tell me that. So
16  that I can do my job and ask you a good, clean
17  question to make sure that you understand it before
18  you go ahead and commit to answering it. All right?
19    A   Cool.
20    Q   During the course of the day, we will be
21  taking periodic breaks. There's portions of the
22  testimony that I expect might be a good stopping point
23  to take a break.
24    We will try to take a break every hour, hour
25  and a half or so, depending on where we are at with



Page 274

1     A   I think he was trying to look engaged that
2   he was interested in 2.0 not to come across that we
3   didn't want it.
4     Q   Okay.
5     A   But at the same time, he was just -- it's a
6   delay tactic. Like, I don't think we ever wanted to
7   go to 2.0 because, as I said, it doesn't make sense
8   for DSPs who have a lot of debt.
9     Q   What about in your individual capacity
10  during this time period, did you have an understanding
11  of what was going on?
12    A   My understanding was if you go to 2.0, we
13  are going to close doors because our pricing is higher
14  than the competitors, and given we were one of the,
15  sort of, first DSPs, we had taken on stuff that we
16  should not have taken on. We had gone into a lot of
17  debt. And to service the debt, the 2.0 wouldn't cover
18  that. The 2.0 worked for new DSPs, not old ones.
19    Q   I understand.
20    A   And my suggestion was, like: Look, if you
21  go to 2.0, it is a catch 22. If you don't -- your
22  only client is telling you to move there, but if you
23  do, you are closing doors because, financially, it
24  just simply didn't make sense, given the small pieces
25  of information we were getting.

Page 275

1     Q   Okay. All right. I understand. Thank you
2   for your answer. That's --
3         So is it fair to say that Scoobeez had no
4   intention of moving to a DSP 2.0 model ever?
5     A   No, that's not -- that is not fair to say.
6   What is fair to say is, our goal was to stay with 1.0
7   as long as possible.
8     Q   Okay. With the understanding that if you
9   didn't switch to DSP 2.0, you would be terminated by
10  Amazon potentially; correct?
11    A   No. No, not terminated, but just to think
12  that there is that risk, you don't want to take that
13  risk because we knew there were other DSP's that were
14  1.0, so -- and then given our size, it is difficult to
15  terminate us; right?
16        It just -- Scoobeez has always been --
17  that's what is frustrating is, like, it has always
18  been so focused on Amazon's satisfaction, and it's
19  done everything possible to make sure Amazon is happy.
20        This was one of the things they were like,
21  okay, we need to switch; but we need to figure out a
22  way to switch and the timing of things.
23    Q   All right. Let me go back,
24  Mr. Ohanessian -- I'm sorry -- Mr. Voskanian, to a few
25  things that you have just said. So --

Page 276

1         All right. So Scoobeez, as you sit here as
2   a corporate representative of Scoobeez, understood
3   that it was on the DSP 1.0 model and always has been
4   with Amazon; correct?
5     A   Right.
6     Q   Scoobeez understood that at least as early
7   as 2018, if not as early as 2017, based on that first
8   E-mail that we looked at, that Amazon started to have
9   communications with Scoobeez about switching to a DSP
10  2.0 model; correct?
11    A   Correct. But -- yes.
12    Q   Hold on.
13    A   Yeah.
14    Q   And Scoobeez, I think you've indicated, as
15  you sit here, understood that it wouldn't be
16  profitable for Scoobeez or cost-effective given
17  Scoobeez --
18        Yeah. I'd just, please, ask you not to
19  communicate with your lawyer with phone and messages
20  and all of that while the deposition is -- is going
21  on.
22        If you need to communicate with your lawyer,
23  you can do that outside during a break. Okay?
24    A   Okay.
25    Q   Thank you.

Page 277

1         You indicated that Scoobeez, as you sit here
2   today in your corporate capacity, had an understanding
3   that it would not be profitable for Scoobeez, based on
4   its pricing structure, its large footprint, and other
5   variables, to switch, actually, from a DSP 1.0 to a
6   DSP 2.0; is that fair?
7         MR. SIMON: Can you repeat the question?
8         THE WITNESS: Yeah.
9         MR. SIMON: I'm sorry.
10        THE REPORTER: Let me get it.
11        (Whereupon, the question was read
12        back as follows:
13        "Q   You indicated that Scoobeez,
14        as you sit here today in your
15        corporate capacity, had an
16        understanding that it would not be
17        profitable for Scoobeez, based on
18        its pricing structure, its large
19        footprint and other variables, to
20        switch, actually, from a DSP 1.0 to
21        a DSP 2.0; is that fair?")
22        THE WITNESS: Given the information we were
23  given -- and, again, we didn't receive the actual
24  structure of 2.0.
25

**MAGNA**
LEGAL SERVICES

Page 286

1    A   No.  That was -- because we focused on the
2  large pieces.  First, we had to figure out the large
3  pieces, but we didn't know the pricing, No. 1.
4       But what we did know was, like:  A, if -- if
5  it is streamline pricing, we are definitely giving
6  back our gains, and that's -- it is basically just
7  something that it was difficult for us to sustain
8  given our --
9    Q   Okay.  Did you have an understanding as to
10  whether or not Amazon under the 2.0 wanted it to be
11  more hands-on in terms of the owner actually
12  day-to-day operating the business at the various D.C.
13  locations?
14   A   I -- if that was their intention, maybe, but
15  I don't -- it would not affect us at all because we
16  had extensive travel of senior management to the
17  locations anyway, so it felt like we had, you know --
18   Q   Right.  So it sounds like based on the
19  criteria that you've described for us, there was one
20  positive or net positive, the fuel issue you described
21  for us and explained to us.
22      Other changes from the 1.0 to 2.0 may not
23  necessarily be favorable for Scoobeez; right?
24      So the pricing that you described, the
25  renting issues and then the whole dispatcher

Page 287

1  reimbursement, those were all negatives, candidly, for
2  Scoobeez switching to 2.0 in your estimation; correct?
3    A   Correct.
4    Q   All right.  In this E-mail exchange that we
5  are looking at in the exhibit that is in front of you,
6  according to Mr. Shahan -- I will just call him that
7  for short.
8    A   Okay.
9    Q   It is clear that he describes having
10  received an E-mail link or a contract from David --
11  right -- and that that link at some point expired; is
12  that right?
13   A   Yes.
14   Q   At the top of the E-mail, the one sent,
15  according to the time stamp on the E-mail,
16  February 28, 2019.  Mr. Ohanessian tells Cari, "Hi.  I
17  hope all is well.  I'm following" -- sorry --
18  "following up about this E-mail seeking your support
19  to migrate to the new DSP contract.  I still don't
20  have access to the link previously sent and was
21  recently informed that the DSC 1.0 migrations were put
22  on hold.  Any help you can offer would be greatly
23  appreciated," and then the E-mail goes on.
24      So am I correct that it -- in this E-mail,
25  we see that Mr. Shahan is describing, at least to Cari

Page 288

1  here, that -- with Amazon, that -- and he CC'd
2  David Ojeda -- is that right -- on this E-mail
3  according to the stamp?
4       And I know you're not on this E-mail
5  yourself.
6    A   I see the first E-mail being CC'd.  The
7  second one, I don't know who's CC'd on it.
8    Q   Got it.  Okay.  But at least the first one,
9  we see he BCC'd David Ojeda?
10   A   Yup.
11   Q   And I'm not sure why the format looks like
12  this.  This, as you know, is a document produced by
13  your lawyers, so I have the same format that you are
14  looking at.
15   A   Yeah.
16   Q   Okay.  You indicated earlier that it was
17  your understanding that trying for -- Scoobeez wanted
18  to stay on that 1.0 model as long as possible;
19  correct?  Is that fair?
20   A   I mean, we were -- we were happy to move to
21  2.0 if -- that was make it or break it -- and we
22  were -- we would find a way to, you know, be
23  sustainably positive, you know, profitable if that was
24  the case.
25      But if we know that there are other DSPs

Page 289

1  that are 1.0 and they are not moving, why should we,
2  you know, move if it is detrimental?
3    Q   I understand.  So let's break that down a
4  little bit.
5       So we've already established, Scoobeez is a
6  1.0.  You indicated a moment ago that Scoobeez would
7  be willing to move to 2.0 if it became, I think you
8  said, "make it or break it"; right?
9    A   Right.
10   Q   Okay.  Would you agree with me that it was a
11  business risk for Scoobeez to not move to 2.0, not
12  knowing how Amazon would ultimately react to that?
13   A   Yes and no, because Amazon was sort of in
14  the habit of in the past rolling out a program and
15  rolling it back.  They would always start with
16  something, and they're like oh, nevermind.
17      They would launch this program.  Oh,
18  nevermind.  And then, we heard a lot about the 2.0's
19  problems that Amazon was not happy with.
20   Q   Okay.
21   A   So the problem with the 2.0's is, they don't
22  pay overtime to drivers -- I mean, I am sorry --
23  Amazon does not pay overtime to DSPs.  Currently, we
24  get paid for overtime.
25   Q   Okay.  So, Mr. Voskanian, I don't want to be

MAGNA ►
LEGAL SERVICES

Page 410

1  copy?
2      MS. NASSIRI:  Yes, electronic only.
3      THE REPORTER:  Thank you.
4      (The deposition concluded at 7:38 p.m.)
5          * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 411

1          REPORTER'S CERTIFICATION
2
3      I, Diana Janniere, a Certified Shorthand Reporter,
4  in and for the State of California, do hereby certify:
5
6      That the foregoing witness was by me duly sworn;
7  That the deposition was then taken before me at the
8  time and place herein set forth; that the testimony
9  and proceedings were reported stenographically by me
10  and later transcribed into typewriting under my
11  direction; and that the foregoing is a true record of
12  the testimony and proceedings taken at that time.
13
14      IN WITNESS WHEREOF, I subscribed my name
15  this 7th day of February, 2020.
16
17
18
19
20      _____
21      Diana Janniere, CSR No. 10034
22
23
24
25

Page 412

1          DECLARATION ERRATA SHEET
2
3
4  Our Assignment No. 546157
5  Case Caption:  In re:  Scoobeez, et al.
6
7
8      DECLARATION UNDER PENALTY OF PERJURY
9          I declare under penalty of perjury that I
10  have read the foregoing transcript of my deposition
11  taken in the above-captioned matter or the same has
12  been read to me, and the same is true and accurate,
13  save and except for the changes and/or corrections, if
14  any, as indicated by me on the DEPOSITION ERRATA SHEET
15  hereof, with the understanding that I offer these
16  changes as if still under oath.
17      Signed on the _____ day of
18  _____, 2020.
19
20
21
22      _____
23
        GEORGE VOSKANIAN
23
24
25

Page 413

1          DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Page No._____Line No._____Change to:_____
5  _____
6  Page No._____Line No._____Change to:_____
7  _____
8  Page No._____Line No._____Change to:_____
9  _____
10  Page No._____Line No._____Change to:_____
11  _____
12  Page No._____Line No._____Change to:_____
13  _____
14  Page No._____Line No._____Change to:_____
15  _____
16  Page No._____Line No._____Change to:_____
17  _____
18  Page No._____Line No._____Change to:_____
19  _____
20  Page No._____Line No._____Change to:_____
21  _____
22  Page No._____Line No._____Change to:_____
23  _____
24  SIGNATURE:_____DATE_____
25          GEORGE VOSKANIAN



Page 414

```
 1        DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change to:_____
 3     _____
 4     Page No._____Line No._____Change to:_____
 5     _____
 6     Page No._____Line No._____Change to:_____
 7     _____
 8     Page No._____Line No._____Change to:_____
 9     _____
10     Page No._____Line No._____Change to:_____
11     _____
12     Page No._____Line No._____Change to:_____
13     _____
14     Page No._____Line No._____Change to:_____
15     _____
16     Page No._____Line No._____Change to:_____
17     _____
18     Page No._____Line No._____Change to:_____
19     _____
20     Page No._____Line No._____Change to:_____
21     _____
22     Page No._____Line No._____Change to:_____
23     _____
24     SIGNATURE:_____DATE_____
25        GEORGE VOSKANIAN
```



# EXHIBIT 7

Page 1

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION


In re:

SCOOBEEZ, et al.                    Case No. 2:19-bk-14989-WB
                                    Jointly Administered:
 Debtors and Debtors in             2:19-bk-14991-WB;
 Possession.                        2:19-bk-14997-WB
_____

Affects:

 All Debtors

 Scoobeez, ONLY

 Scoobeez Global, Inc., ONLY

 Scoobur LLC, ONLY


_____



VIDEOTAPED DEPOSITION OF SCOTT A. SHEIKH

JANUARY 29, 2020

10:06 a.m.


300 South Grand Avenue, 24th Floor
Los Angeles, California


Diana Janniere, CSR-10034


Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 2

APPEARANCES OF COUNSEL

1
2
3  For the Debtors and Debtors in Possession, Scoobeez,
   Scoobeez Global, Inc., and Scoobur, LLC:
4
   FOLEY & LARDNER
5  JOHN A. SIMON, ESQ.
   ONE DETROIT CENTER
6  500 WOODWARD AVENUE, SUITE 2700
   DETROIT, MICHIGAN  48226-3489
7  313.234.7117
   jsimon@foley.com
8
9  For Amazon Logistics, Inc.:
10   MORGAN LEWIS
     TINOS DIAMANTATOS, ESQ.
11   ANDREW BARBER, ESQ.
     77 WEST WACKER DRIVE
12   CHICAGO, ILLINOIS  60601-5094
     312.324.1145
13   tinos.diamantatos@morganlewis.com
     andrew.barber@morganlewis.com
14
15  For Hillair Capital Investments:
16   QUINN EMANUEL URQUHART & SULLIVAN
     BECCA E. DAVIS, ESQ.
17   865 SOUTH FIGUEROA STREET, 10TH FLOOR
     LOS ANGELES, CALIFORNIA  90017
18   213.443.3554
     beccadavis@quinnemanuel.com
19
20  The Videographer:
21   VINCENT MAZZA
22
23
24
25

Page 3

INDEX OF EXAMINATION

1
2  WITNESS:  SCOTT A. SHEIKH
3  EXAMINATION                    PAGE
4  By Mr. Diamantatos              9
5
6  INDEX OF EXHIBITS
7  EXHIBIT      DESCRIPTION          PAGE
8   1   DEBTORS' NOTICE OF MOTION AND
       EMERGENCY MOTION FOR TRO AND
9      PRELIMINARY INJUNCTION TO PREVENT
       VIOLATION OF THE AUTOMATIC STAY;
10     DECLARATIONS OF MR. WEISS,
       MR. VOSKANIAN, MR. SHEIKH AND
11     MS. MCDOW IN SUPPORT THEREOF      22
12   2   MR. SHEIKH'S LINKED-IN PAGE     48
13   3   ABT HOLDINGS, INC. PRESENTS SCOOBEEZ   57
14   4   DELIVERY PROVIDER TERMS OF SERVICE     112
15   5   DELIVERY PROVIDER TERMS OF SERVICE
       (LAST UPDATED:  OCTOBER 5, 2015)     115
16
17   6   DELIVERY PROVIDER TERMS OF SERVICE
       (LAST UPDATED:  JUNE 21, 2016)   117
18   7   DECLARATION OF SEAN M. MCAVOY IN
       SUPPORT OF PLAINTIFF'S EX PARTE
19     APPLICATION TO APPOINT RECEIVER     199
20   8   10/2/19 E-MAIL TO MR. KAUFMAN FROM
       MR. VOSKANIAN     246
21
22   9   12/19/19 E-MAIL STRING RE HOLIDAY
       PARTY     252
23   10   DELIVERY PROVIDER TERMS OF SERVICE
        (LAST UPDATED:  JUNE 21, 2016)   259
24
25   11   9/28/19 E-MAIL STRING RE SCBZ -
        AMAZON - HILLAIR     262

Page 4

INDEX OF EXHIBITS

1
2  EXHIBIT      DESCRIPTION        PAGE
3   12   NOTICE OF EXECUTED STALKING HORSE
        PURCHASE AGREEMENT     268
4
   13   NOTICE OF POTENTIAL ASSUMPTION AND
5       ASSIGNMENT OF EXECUTORY CONTRACTS
        AND UNEXPIRED LEASES IN CONNECTION
6       WITH SALE     270
7   14   MANAGEMENT REVIEW REPORT CONDUCTED
        9/24/16     281
8
   15   3/15/17 EMAIL TO GIL CABRERA, ET AL.,
9       FROM ABT - IMRAN FIROZ     293
10  16   TO THE BOARD OF DIRECTORS OF ABT
        HOLDINGS     296
11
   17   VERIFIED COMPLAINT - HILLAIR CAPITAL
12      MANAGEMENT VS. SCOOBEEZ GLOBAL, INC.   312
13
14  (Original Exhibits 1 - 17 are attached
15  hereto.)
16
17  INSTRUCTED NOT TO ANSWER - ATTORNEY-CLIENT PRIVILEGE
18      PAGE     LINE
19      16     9
20      18     21
21      23     5
22      26     12, 21
23      29     8
24      43     17
25      50     17

Page 5

1  INSTRUCTED NOT TO ANSWER - ATTORNEY-CLIENT PRIVILEGE
2      PAGE     LINE
3      51     2
4      53     2
5      58     12
6      66     12
7      67     2, 4, 6
8      71     6
9      89     2
10     105     22
11     111     8, 12, 17, 19
12     116     17
13     118     14
14     119     15
15     122     14
16     123     14
17     124     5, 22
18     128     24
19     129     7
20     130     1
21     132     3, 14
22     134     1, 5, 12, 17
23     140     9
24     145     12
25     147     9, 13, 15



2  (Pages 2 to 5)

Page 6

| | | |
|---|---|---|
| 1 | INSTRUCTED NOT TO ANSWER - ATTORNEY-CLIENT PRIVILEGE | |
| 2 | PAGE | LINE |
| 3 | 149 | 10 |
| 4 | 150 | 24 |
| 5 | 151 | 21 |
| 6 | 153 | 13 |
| 7 | 158 | 17 |
| 8 | 159 | 11 |
| 9 | 165 | 15 |
| 10 | 173 | 9 |
| 11 | 280 | 15 |
| 12 | 283 | 23 |
| 13 | 285 | 20 |
| 14 | 286 | 13 |
| 15 | 290 | 20 |
| 16 | 297 | 12 |
| 17 | 298 | 2 |
| 18 | 300 | 7, 20 |
| 19 | 301 | 4, 21 |
| 20 | 302 | 10 |
| 21 | 307 | 25 |
| 22 | 308 | 7 |
| 23 | 317 | 14 |
| 24 | 319 | 20 |
| 25 | 320 | 15 |

Page 7

| | | |
|---|---|---|
| 1 | INSTRUCTED NOT TO ANSWER - ATTORNEY-CLIENT PRIVILEGE | |
| 2 | PAGE | LINE |
| 3 | 334 | 8 |
| 4 | 337 | 12 |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 8

1    VIDEOTAPED DEPOSITION OF SCOTT A. SHEIKH
2    JANUARY 28, 2020
3
4        THE VIDEOGRAPHER:  We are now on the record.
5    This begins Videotape No. 1 in the deposition of Scott
6    Sheikh in the matter of In Re:  Scoobeez, et.al, in
7    the United States Bankruptcy Court, Central District
8    of California, Los Angeles Division.
9        Today is January 28, 2020, and the time is
10   10:06 a.m.  This deposition is being taken at 300
11   South Grand Avenue, 24th Floor, Los Angeles,
12   California 90071, at the request of Morgan Lewis.
13       The videographer is Vincent Mazza of Magna
14   Legal Services, and the court reporter is Diana
15   Janniere of Magna Legal Services.
16       Will counsel and all parties present state
17   their appearances and whom they represent?
18       MR. SIMON:  John Simon, counsel for the
19   debtors, Scoobeez, et al.
20       MS. DAVIS:  Becca Davis, counsel for
21   Hillair.
22       MR. BARBER:  Andrew Barber on behalf of
23   Amazon.
24       MR. DIAMANTATOS:  Tinos Diamantatos also on
25   behalf of Amazon.

Page 9

1        SCOTT A. SHEIKH,
2    having been first duly sworn, testifies as follows:
3
4        EXAMINATION
5    BY MR. DIAMANTATOS:
6        Q    Okay.  Good morning, Mr. Sheikh.
7        A    Good morning.
8        Q    If you could please state your full name for
9    us and spell the last.
10       A    Sure.  It's Scott Amin Sheikh, S-H-E-I-K-H.
11       Q    Okay.  Mr. Sheikh, as you just heard, my
12   name is Tinos Diamantatos.  I'm one of the attorneys
13   that's here today for Amazon.
14       Our purpose for being here today is to ask
15   you questions with regard to certain claims that
16   Scoobeez has made against Amazon.  Okay.  Am I correct
17   that you're an attorney?
18       A    That's correct.
19       Q    We'll get into some of your background in
20   more detail a little bit later this morning, but have
21   you ever been deposed before?
22       A    I have.
23       Q    Okay.  Approximately how many times?
24       A    Twice.
25       Q    Were those in connection with civil cases?



3 (Pages 6 to 9)

Page 234

1    made, if any, to try to obtain scorecards of any other
2    DSP?
3        A   I don't know if he made any such efforts.
4        Q   What about mask efforts?
5        What I mean by that is get rid of the names
6    of the other DSPs, but be able to compare how you're
7    doing based on the scorecard to other DSPs with their
8    names masked.
9        Do you know whether anybody at Scoobeez made
10   any efforts to obtain that type of information?
11       A   I don't know the -- I don't know the answer.
12       Q   Do you know whether Mr. Munoz did
13   specifically or not?
14       A   No.
15       Q   Okay.  You already told us a moment ago that
16   it sounds like there was a five kind of point system
17   on the scale.
18       On the one end of the spectrum, Mr. Sheikh,
19   you started with poor, and then, it went up to fair,
20   then, it went to great; then, it went to fantastic,
21   then, it went to fantastic plus; right?
22       A   Correct.
23       Q   Obviously, given the name convention, it's
24   your understanding that poor is not -- on the not good
25   end and fantastic plus is on the fantastic plus good

Page 235

1    end; right?
2        A   Correct.
3        Q   Based on that, given that there are five
4    kind of points along the scale, is it your
5    understanding that great is essentially an -- an
6    average score?
7        A   I don't know the answer to that.  I mean, I
8    would be speculating, but, I mean, given that there
9    are five tiers -- I know that fantastic plus is
10   extremely difficult to achieve.
11       Q   Okay.
12       A   So if you take that out of the equation, you
13   have four left, I would assume that fair is, like, the
14   middling position.
15       Q   Okay.  All right.  So according to you, fair
16   is a middling position; is that what you said?
17       A   That is what I said, yes.
18       Q   Okay.  All right.  Do you have any reason to
19   dispute the authenticity or veracity of the scorecards
20   that were produced by Amazon?
21       And I can show them to you.
22       A   I mean, dispute them as to what?
23       Q   That they are what they purport to be.  I'm
24   just looking for a foundational ground point here.
25       A   Sure.  I mean, if you showed me scorecards

Page 236

1    that I'm familiar with, I could tell you if these are
2    ones that I've seen.
3        Amazon posts the scorecards, I believe, on
4    their logistics platform.  The -- the underlying data,
5    I mean, we don't store.  So I would have no way to
6    verify that.
7        So I -- I don't have reason to doubt it, but
8    I don't have any reason to believe that it's
9    completely accurate either.
10       Q   Okay.  Is the information that Scoobeez
11   posts in terms of the scorecard, is it something that
12   Scoobeez accesses on a regular basis during its own
13   course of business?
14       A   So -- you said, "Scoobeez posts."  So Amazon
15   posts.
16       Q   Sorry, Amazon posts, I misspoke.
17       A   No, no problem.  And yes, we -- we get them
18   on a weekly basis, I believe on Tuesday.
19       Q   All right.  And by weekly, they at least
20   cover the previous week's period, so they're made at
21   the time that the -- they're -- that the DSP, in this
22   case Scoobeez, is out there doing the work for Amazon;
23   correct?
24       A   So the one we get on Tuesday of this week --
25   so is today Tuesday?  Yes.

Page 237

1        Q   Yes.
2        A   Would cover the last Sunday to Saturday
3    calendar week.
4        Q   Okay.
5        A   So yes.  I haven't seen today's yet, but --
6        Q   All right.  You've described Scoobeez as a
7    high performer for Amazon; right?
8        A   During what period of time?
9        Q   During -- let's -- great -- great
10   clarification point.
11       What about -- let's take your May 10th, 2019
12   forward.
13       A   Sure.
14       Q   Would you call Scoobeez as a -- as a high
15   performer for Amazon?
16       A   So I -- I wasn't directly involved in
17   operations between May and August.  Mrs. Ohanessian
18   was.
19       Q   Okay.
20       A   I began getting involved in operations in
21   August, and I've seen an upward trajectory in the --
22   in the scorecard since then.
23       Q   Okay.  So is it your testimony you have
24   reviewed since -- what period did you start becoming
25   more operationally involved post-May 2019?

MAGNA
LEGAL SERVICES

Page 250

1    Q   -- but also some poor scores at other
2  locations, including one that improved from poor to
3  fantastic during some period of time; correct?
4    A   I mean -- and I'm going to just ask you to
5  make -- make sure I understand your question.
6    Q   Sure.
7    A   Are you asking whether Scoobeez has, in
8  fact, had scores that ranged from the poor part of the
9  spectrum to the fantastic part of the spectrum in
10 2019?
11   Q   Yes.
12   A   The answer is yes.
13   Q   Okay.  In May of 2019, where you came in and
14 started at least getting your feet wet with the
15 operational component, I know that increased as you've
16 described over time in 2019, did you have a sense of
17 how Amazon viewed Scoobeez as a performer?
18   A   Not direct knowledge.
19   Q   What about indirectly?  Did anybody at
20 Scoobeez tell you, hey, here's what Amazon thinks of
21 us?
22   A   I -- when -- up to a certain point, most of
23 what I've learned about operations was either through
24 Mr. Voskanian or Mrs. Ohanessian.  Mrs. Ohanessian
25 took the position that, you know, Amazon loved us.

Page 251

1        And when I say "us," I'm referring to
2  Scoobeez.  And Mr. Ohanessian was more data oriented
3  and would, you know, refer me to, you know, when he
4  was explaining to me what these scorecards are and
5  what they mean; and how they operate; more to -- to
6  the data side of things.
7        But whether I have any direct knowledge of
8  conversations with Amazon or statements made by
9  Amazon, the answer is no.
10   Q   Okay.  I think you just answered the last
11 piece there.  There's nothing from Amazon directly to
12 you conversation-wise that would indicate how pleased
13 Amazon was with Scoobeez; is that fair?
14   A   To -- to me, no.  I mean, I've heard from
15 our employees out on the field -- you know, for
16 example, when during peak -- this past peak season in
17 DCH-1 when they're performing well, they -- you know,
18 the local -- the local folks have different ways of, I
19 guess, passing their time.
20        I guess, at DCH-1, for example, they have
21 this WWE heavyweight belt that they hand out to what
22 they perceive as the best performing DSP; and that was
23 given to one of our -- our hub leader in DCH-1 back
24 in, I think, December or earlier this year.
25        You know, going back, I mean, I don't recall

Page 252

1  specifics, but, you know, at different points, you
2  know, I've heard through the grapevine through, again,
3  the -- our dispatchers; our hub leaders; our
4  operations lead; you know, how Amazon perceives the
5  performance; but from Amazon directly, the answer is
6  no.
7        Actually, I take that back.  Mr. Kozen, when
8  I met with him a few months ago did -- did mention
9  that he -- he -- you know, he's happy with the service
10 that Scoobeez provides -- Scoobeez provides, so --
11   Q   Amazon has site leads at each of their
12 distribution centers; correct?
13   A   I don't know how their internal structure
14 works.  I know they have a hierarchy, and presumably,
15 they have somebody at each hub.
16   Q   Okay.  Tab 60.
17   A   I apologize.  I also heard from Aarie
18 Hibbler at DCH-2 -- A-A-R-I-E, H-I-B-B-L-E-R.
19        THE REPORTER:  Slow down.  Start over.
20        THE WITNESS:  H-I-B-B-L-E-R last name.
21 Aarie, A-A-R-I-E, over at DCH-2 in Morton Grove that,
22 you know, they were pleased with Scoobeez'
23 performance.  This was a few months back.
24        (Exhibit 9 marked.)
25

Page 253

1  BY MR. DIAMANTATOS:
2    Q   I'm going to hand you what has been labeled
3  as Sheikh Exhibit 9.  It's a two-page document.  It's
4  Bates label is Hillair 00000798 through 799.
5        Take a moment to familiarize yourself with
6  that.
7    A   Okay.
8    Q   Are you familiar with that E-mail?
9    A   I am familiar with the part where it says
10 begin forwarded message.
11   Q   Great.  Okay.
12   A   I know that Mr. Voskanian sent that E-mail
13 to Mr. Kaufman.
14   Q   Okay.  So your reference saying the first
15 E-mail which appears on the bottom of 798 and spills
16 over onto 799, that E-mail you are a carbon copy
17 recipient on it; correct?
18   A   Yeah, that's the third E-mail.
19   Q   The previous two E-mails -- or the following
20 two E-mails, I should say, later in time on the --
21   A   Sure.
22   Q   -- front page of the document, you are no
23 longer on that E-mail chain.  You drop off from that.
24        So you're familiar with the E-mail that
25 you're on, of course; correct?



Page 286

1   only members of the board and lack of any independent
2   oversight?  Anything outside of your attorney-client
3   privileged communications?
4       A.  No.
5       Q   Coming in as int -- sorry, not interim.  The
6   co-CEO in May of 2019, as you became aware over the
7   next several months of some of these alleged
8   improprieties in the public filings at least that you
9   were reading, did that give you concern about how
10  Scoobeez had conducted its business in the past?
11      A   Did that give me concern?  To the extent
12  that I learned new issues during that time, yes.
13      Q   What were those concerns, obviously, and how
14  you would implement them going forward potentially
15  from an operational standpoint?
16      A   Well, I -- the concerns weren't from an
17  operational standpoint.  They were more from a -- a
18  legal standpoint, so I don't think I can answer that.
19      Q   Operationally you need to have cash flow;
20  right?
21      MR. SIMON:  Just to be technically correct,
22  I think you're not going here, but I'm just going to
23  technically object --
24      MR. DIAMANTATOS:  Okay.
25      MR. SIMON:  -- on the basis of

Page 287

1   attorney-client privilege to make sure that that's
2   noted for the record.
3       MR. DIAMANTATOS:  Okay.
4       THE WITNESS:  So, I mean, post-petition, I
5   mean, we opened a debtor in possession bank account,
6   which is monitored by the -- you know, several
7   parties, including the U.S. Trustee's Office.
8   BY MR. DIAMANTATOS:
9       Q   Sure.
10      A   And an independent board was thereafter
11  selected, consisting of the three gentlemen that I've
12  mentioned earlier.  And, you know -- and the -- and
13  those people weren't the same as the officers.
14      So I think that in that regard, you know,
15  those potential, you know, operational issues were
16  resolved.
17      Q   Okay.  So at that point, given the nature of
18  the bankruptcy oversight, you didn't have concern of
19  folks misappropriating Scoobeez' funds for some other
20  purpose; is that what you're saying?
21      A   That's correct.  I think that, you know,
22  given the oversight that's provided, I don't think
23  that's as big a concern.
24      Q   Do you know whether or not additional
25  controls were being put in place aside from, you know,

Page 288

1   your description of, you know, look, now the petition
2   had been filed, there's bankruptcy oversight?
3       Were any operational controls put in place
4   from your tenure of co-CEO May of 2019 going forward
5   to make sure that there's additional oversight of any
6   kind aside from what you've already described?
7       A   Sure.  From what I understand, there are
8   weekly -- per the cash collateral stipulation, there
9   are weekly financial reports that are provided.
10      There's also an agreement that any check
11  that is paid above -- or any payment that's made above
12  I think $10,000 is approved by the chief restructuring
13  officer.  Again, all this is in -- in the public
14  sphere.
15      Q   Okay.
16      A   I think taken together, those -- those
17  things, you know, provide sufficient oversight.
18      Q   Do you know -- what about the appointment of
19  independent board members for oversight of upper
20  management?
21      A   Sure, we -- we have three independent board
22  members.
23      Q   Okay.  What about engaging an accounting
24  firm to conduct a review or audit of the business?
25      A   I believe that for the first several months

Page 289

1   post-petition, and perhaps currently still, we had a
2   financial advisor firm that was overseeing a lot of
3   stuff.
4       Q   Okay.  Are you aware as to whether or not in
5   May -- I'm sorry, March of 2017 Shahan and Scoobeez'
6   CFO, Imran Firoz, met with Neal Kaufman and Sean
7   McAvoy to discuss emergency capital infusion into the
8   business?
9       A   No.
10      Q   Do you have any knowledge as to whether or
11  not as a result of that meeting Firoz notified Hillair
12  Partners of Shahan's financial improprieties, alleged
13  financial improprieties?
14      A   Could you repeat the question?
15      Q   Sure.
16      Do you have any knowledge as to whether or
17  not as a result of that meeting Firoz notified Hillair
18  Partners of Shahan's alleged financial improprieties?
19      A   I don't know if those were connected.
20      Q   Do you know whether or not the company did
21  need emergency capital during that time frame, March
22  of 2017?
23      A   I don't know.
24      Q   Okay.  And if you don't know that, then,
25  it's fair to say that you don't know if they did

**MAGNA**
**LEGAL SERVICES**

Page 346

REPORTER'S CERTIFICATION

I, Diana Janniere, a Certified Shorthand Reporter,
in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn;
That the deposition was then taken before me at the
time and place herein set forth; that the testimony
and proceedings were reported stenographically by me
and later transcribed into typewriting under my
direction; and that the foregoing is a true record of
the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I subscribed my name
this 7th day of February, 2020.

_____
Diana Janniere, CSR No. 10034

Page 347

DECLARATION ERRATA SHEET

Our Assignment No. 546154
Case Caption: In re: Scoobeez, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I
have read the foregoing transcript of my deposition
taken in the above-captioned matter or the same has
been read to me, and the same is true and accurate,
save and except for the changes and/or corrections, if
any, as indicated by me on the DEPOSITION ERRATA SHEET
hereof, with the understanding that I offer these
changes as if still under oath.

Signed on the _____ day of
_____, 2020.

_____
SCOTT A. SHEIKH

Page 348

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____

SIGNATURE:_____DATE_____
SCOTT A. SHEIKH

Page 349

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____
Page No._____Line No._____Change to:_____
_____

SIGNATURE:_____DATE_____
SCOTT A. SHEIKH



88 (Pages 346 to 349)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Foley & Lardner LLP, 555 South Flower Street, Suite 3300, Los Angeles, CA 90072-2411

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF SHANE J. MOSES IN SUPPORT OF  DEBTORS' SUPPLEMENTAL BRIEF (A) IN FURTHER SUPPORT OF THE DEBTORS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION TO PREVENT VIOLATION OF THE AUTOMATIC STAY, AND (B) IN OPPOSITION TO AMAZON LOGISTICS INC.'S MOTION MODIFYING THE AUTOMATIC STAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 02/19/2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) 02/19/2020, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Julia W. Brand
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1382
Los Angeles, CA 90012

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 02/19/2020, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 02/19/2020 | Sonia Gaeta | /s/ Sonia Gaeta |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
4816-3752-2869.2    **F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Richard T Baum**    rickbaum@hotmail.com, rickbaum@ecf.inforuptcy.com
- **Michael Jay Berger**    michael.berger@bankruptcypower.com,
  yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Bradley E Brook**    bbrook@bbrooklaw.com, paulo@bbrooklaw.com;brookecfmail@gmail.com
- **Richard W Esterkin**    richard.esterkin@morganlewis.com
- **John-Patrick M Fritz**    jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com
- **Riebert Sterling Henderson**    shenderson@gibbsgiden.com
- **Vivian Ho**    BKClaimConfirmation@ftb.ca.gov
- **Dare Law**    dare.law@usdoj.gov
- **Bret D Lewis**    Bretlewis@aol.com, bdlawyager@gmail.com
- **Ashley M McDow**    amcdow@foley.com,
  sgaeta@foley.com;mhebbeln@foley.com;swilson@foley.com;jsimon@foley.com
- **Stacey A Miller**    smiller@tharpe-howell.com
- **Kevin H Morse**    kmorse@clarkhill.com, blambert@clarkhill.com
- **Shane J Moses**    smoses@foley.com, vgoldsmith@foley.com
- **Akop J Nalbandyan**    jnalbandyan@LNtriallawyers.com, cbautista@LNtriallawyers.com
- **Rejoy Nalkara**    rejoy.nalkara@americaninfosource.com
- **Anthony J Napolitano**    anapolitano@buchalter.com,
  IFS_filing@buchalter.com;salarcon@buchalter.com
- **Jennifer L Nassiri**    jennifernassiri@quinnemanuel.com
- **David L. Neale**    dln@lnbyb.com
- **Sean A OKeefe**    sokeefe@okeefelc.com, seanaokeefe@msn.com
- **Aram Ordubegian**    ordubegian.aram@arentfox.com
- **Hamid R Rafatjoo**    hrafatjoo@raineslaw.com, bclark@raineslaw.com;cwilliams@raineslaw.com
- **Gregory M Salvato**    gsalvato@salvatolawoffices.com,
  calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf.inforuptcy.com
- **Daren M Schlecter**    daren@schlecterlaw.com, assistant@schlecterlaw.com
- **Jeffrey S Shinbrot**    jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com
- **Steven M Spector**    sspector@buchalter.com, IFS_efiling@buchalter.com;salarcon@buchalter.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Kimberly Walsh**    bk-kwalsh@texasattorneygeneral.gov
- **Eric D Winston**    ericwinston@quinnemanuel.com
- **Eric K Yaeckel**    yaeckel@sullivanlawgroupapc.com

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.