Ashley M. McDow (245114)
John A. Simon (admitted *Pro Hac Vice*)
Shane J. Moses (250533)
**FOLEY & LARDNER LLP**
555 S. Flower St., 33rd Floor
Los Angeles, CA 90071
Telephone: 213.972.4500
Email: amcdow@foley.com
         jsimon@foley.com
         smoses@foley.com

Attorneys for Debtors and Debtors in
Possession, SCOOBEEZ, SCOOBEEZ GLOBAL,
INC., and SCOOBUR, LLC

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br>SCOOBEEZ, et al.[1]<br><br>     Debtors and Debtors in Possession. | Case No. 2:19-bk-14989-WB<br>Jointly Administered:<br>2:19-bk-14991-WB; 2:19-bk-14997-WB<br>Chapter 11 |
| Affects:<br>■ All Debtors<br>□ Scoobeez, ONLY<br>□ Scoobeez Global, Inc., ONLY<br>□ Scoobur LLC, ONLY | **DISCLOSURE STATEMENT IN SUPPORT OF CHAPTER 11 JOINT PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS, HILLAIR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**<br><br>Hearing:<br>Date:   April 9, 2020<br>Time:  10:00 a.m.<br>Place:  Courtroom 1375<br>           U.S. Bankruptcy Court<br>           255 East Temple Street<br>           Los Angeles, CA 90012 |

**Dated:  February 27, 2020**

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Scoobeez (6339); Scoobeez Global, Inc. (9779); and Scoobur, LLC (0343). The Debtors' address is 3463 Foothill Boulevard, Glendale, California 91214.

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF ANY CHAPTER 11 PLAN DESCRIBED HEREIN.  ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT HAS BEEN OR WILL BE SUBMITTED FOR BANKRUPTCY COURT APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  ALL RIGHTS TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE OR IN CONNECTION WITH THE HEARING TO CONSIDER APPROVAL OF THIS DISCLOSURE STATEMENT ARE RESERVED.[2]

## DISCLAIMER

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "RISK FACTORS" SECTION HEREIN BEFORE VOTING FOR OR AGAINST THE PLAN.  *SEE SECTION VII ("CERTAIN FACTORS TO BE CONSIDERED")*.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.  PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING STOCK OF SCOOBEEZ GLOBAL, INC. OR ANY OF THE OTHER DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN,

---

[2] This text box will be removed upon Bankruptcy Court approval of the Disclosure Statement.

EVENTS IN THE CHAPTER 11 CASES OF SCOOBEEZ, SCOOBEEZ GLOBAL, INC., AND SCOOBUR, LLC (THE "<u>DEBTORS</u>"), AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT OF THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN OF REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLANS OF REORGANIZATION ON HOLDERS OF CLAIMS OR INTERESTS.

## EXECUTIVE SUMMARY[3]

On April 30, 2019 (the "Petition Date"), Scoobeez, Scoobeez Global, Inc. ("Scoobeez Global") and Scoobur, LLC ("Scoobur"), as debtors in possession in the above-captioned jointly administered cases (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court" or the "Court"). The cases are being jointly administered under the caption *In re Scoobeez, et al.*, Case No. 2:19-bk-14989-WB (the "Chapter 11 Cases").

Before the Chapter 11 Cases, the Debtors experienced financial difficulties resulting from, among other things, cash flow shortages and defaults under their debt obligations. Prior to the Petition Date, the Debtors became embroiled in a dispute with their primary secured lender, Hillair Capital Investments, L.P. ("Hillair Investments") and its affiliates, and defaulted under their loan documents. In late April, 2019, Hillair Capital Management LLC (together with Hillair Investments, "Hillair") filed a complaint against the Debtors and sought to have a receiver appointed over the Debtors, due to allegations that the Debtors' principal and largest shareholder, Shahan Ohanessian, had engaged in self dealing conduct and misappropriation of funds. These factors combined to cause the Debtors to determine in an exercise of their business judgment to file these Chapter 11 Cases in order to preserve value for all constituents.

Once under the protection of chapter 11, the Debtors, working with the Official Committee of Unsecured Creditors, on behalf of unsecured creditors, and Hillair, took steps to positively address the management and misappropriation concerns that existed prior to the Petition Date, and stabilized their business. In June, 2019, Brian Weiss was appointed as the Chief Restructuring Officer to lead the Debtors' turnaround, and independent directors (including one proposed by the Committee) were appointed to the Debtors' board of directors. Moreover, Mr. Ohanessian stepped down as Chief Executive Officer and resigned from the board of directors and agreed not to be involved in the Debtors' management or financial affairs and not to use his shareholder powers to change the board composition.

The Debtors then hired an investment banking firm and marketed their assets for a sale or recapitalization. The Debtors had multiple potential bidders interested in acquiring their business. However, in October 2019, right before the planned exit of the Debtors' business from chapter 11 bankruptcy through a sale was to come to fruition, the Debtors' largest customer, Amazon Logistics, Inc. ("Amazon"), objected to the assumption and assignment of its contract with the Debtors and instead told the Debtors that Amazon was going to terminate its contract with the Debtors (the "Amazon Contract") and cease doing business with the Debtors.

---

[3] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the *Chapter 11 Joint Plan of Reorganization as Proposed by the Debtors, Hillair and the Official Committee of Unsecured Creditors* (as amended, the "Plan"). A term used but not defined in this Disclosure Statement or the Plan has the meaning given to it in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure, as the case may be.

The Debtors and Amazon are currently in litigation (the "Amazon Litigation"), wherein the Debtors and Hillair argue that Amazon's actions violate the automatic stay and should be enjoined, and wherein Amazon argues that the automatic stay should be lifted to enable Amazon to terminate the Amazon Contract.

The Debtors, the Committee (on behalf of General Unsecured Creditors) and Hillair negotiated the terms of the Plan.  The Plan provides a $1.5 million carveout for the Debtors' estates (the "Estates"), and a trust (the "Creditor Trust") with litigation claims and potential excess from the carveout, after payment of professional fees, in which Class 4 General Unsecured Creditors share if they vote in favor of the Plan.  The Plan also reorganizes the Debtors as of the Effective Date, with Hillair receiving 80% of the equity in the Reorganized Debtors, and Class 4 General Unsecured Creditors receiving 20% of the equity in the Reorganized Debtors (through the Creditor Trust), if they vote in favor of the Plan.  The Plan also provides for Hillair to receive the first $5,000,000 of proceeds of the Amazon Litigation, with the Creditor Trust to receive 25%, and Hillair to receive 75%, of remaining recoveries from the Amazon Litigation thereafter.  Moreover, upon the Effective Date, Hillair's secured claim will be reduced from $11,108,500 to $3 million.

The Debtors, Hillair and the Committee (the "Plan Proponents") believe that the Plan provides more value to the Estates and their constituents than would result from a chapter 7 conversion.  The distribution of cash to creditors shall be in full and complete satisfaction of all claims against the Debtors' Estates.  To that end, the Plan provides for the treatment of Claims against the Debtors and Equity Interests in the Debtors.

Pursuant to the Plan, the Creditor Trust will be administered by a Creditor Trustee selected by the Committee (in the event Class 4 General Unsecured Creditors vote to accept the Plan) or by Hillair (in the event the Class 4 General Unsecured Creditors vote to reject the Plan).  The Creditor Trustee shall, among other things in his or her discretion, make determinations concerning the Estates' assets that are transferred to the Creditor Trust, resolving disputed Claims, prosecuting Causes of Action that are transferred to the Creditor Trust, and making Distributions in accordance with the Plan.

It is estimated that the Plan would enable greater distributions than would be available in a chapter 7 liquidation, and that holders of Allowed General Unsecured Claims will receive a recovery of approximately $529,000 if the Plan is confirmed, depending on the final amount of Allowed General Unsecured Claims.[4]  If the Plan is not confirmed, it is estimated that the holders of Allowed General Unsecured Claims would receive $0 in recovery under a Chapter 7 liquidation.  **Creditors are cautioned that the estimate includes a number of assumptions with respect to anticipated recoveries and the total Allowed amount of Claims. Accordingly, the actual amount of distributions may vary materially, including downward, from the amounts projected, and thus anticipated recoveries could materially vary from the projections set forth herein.**

---

[4] This does not include potential recoveries on avoidance actions, or from pending litigation with Amazon, because while these may provide a source of additional recovery to General Unsecured Creditors, the amount of any such recovery is too uncertain to estimate at this time.

4822-8239-5573.6

THIS EXECUTIVE SUMMARY IS INTENDED SOLELY AS A SUMMARY OF CERTAIN PROVISIONS OF THIS DISCLOSURE STATEMENT. YOU SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN AND EACH OF THEIR RESPECTIVE EXHIBITS AND SCHEDULES IN THEIR ENTIRETY PRIOR TO MAKING ANY DETERMINATION TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORs URGE CREDITORS TO VOTE TO ACCEPT THE PLAN. HILLAIR HAS AGREED TO VOTE TO APPROVE THE PLAN.

THE COMMITTEE ALSO BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS. THE COMMITTEE HAS ALSO PREPARED A LETTER IN SUPPORT OF CONFIRMATION OF THE PLAN, WHICH LETTER IS INCLUDED IN THE SOLICITATION PACKAGES. CREDITORS SHOULD REVIEW THE CREDITORS' COMMITTEE'S LETTER IN CONNECTION WITH EVALUATING THE PLAN AND DISTRIBUTIONS TO BE MADE UNDER THE PLAN.

## A.    SOLICITATION AND ACCEPTANCE OF PLAN

### 1.    General

This Disclosure Statement is being furnished to holders of Claims in Class 2 (Senior Secured Hillair Claims), Class 3 (Other Secured Claims) and Class 4 (General Unsecured Claims) (the "Voting Classes") for the purpose of soliciting their votes on the Plan. This Disclosure Statement, or notice of and access to it, is also being furnished to certain other creditors and other entities for notice or informational purposes. The primary purpose of this Disclosure Statement is to provide adequate information to holders of Claims in the Voting Classes to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

A copy of the Disclosure Statement Order entered by the Bankruptcy Court and a notice of, among other things, voting procedures and the dates set for objections to and the hearing on confirmation of the Plan (the "Notice of Confirmation Hearing") are also being transmitted with this Disclosure Statement. The Disclosure Statement Order and the Notice of Confirmation Hearing set forth in detail certain deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, the treatment for balloting purposes of certain types of Claims and the assumptions for tabulating Ballots. Detailed voting instructions accompany each Ballot. Each holder of a Claim within a Class entitled to vote should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

## 2.    Who Is Entitled to Vote

Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan.  To be confirmed, the Plan must be accepted by the holders of Claims in certain Classes and the Plan must be confirmed by the Bankruptcy Court.  *See Section VIII ("Voting Requirements") and Section IX ("Confirmation of the Plan")*.  Class 5, which consists of holders of Equity Interests in the Debtor, will receive no Distribution or benefits under the Plan, and, therefore, is conclusively deemed to have rejected the Plan, and holders therein are not entitled to vote.  The Debtors are seeking acceptances of the Plan from holders of Claims in Classes 2, 3 and 4.  The Claims in all other Classes are Unimpaired, and the holders of Claims in Unimpaired Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote.  For a description of the Classes, Claims and Equity Interests, and their treatment under the Plan, *see Section V.B. ("Summary of Chapter 11 Plan—Classification of Claims and Equity Interests"), Section V.C. ("Summary of Chapter 11 Plan—Treatment of Unclassified Claims Under the Plan") and Section V.C.    ("Summary of Chapter 11 Plan—Treatment of Claims and Equity Interests Under the Plan")*.

## 3.    Ballots

If you are entitled to vote to accept or reject the Plan, *see Section VIII.B.    ("Voting Requirements—Holders of Claims Entitled to Vote")*, a Ballot or Ballots, specific to the Claim held, is enclosed for voting on the Plan.  If you hold more than one Claim classified in a single class of Claims, you must vote all your Claims within that Class to either accept or reject the Plan, and may not split your votes within a particular Class; thus, a Ballot (or group of Ballots) within a particular Class that partially accepts and partially rejects the Plan shall not be counted.  Importantly, when you vote, you must use only the Ballot or Ballots sent to you (or copies if necessary) with this Disclosure Statement.  **IN ORDER FOR YOUR BALLOT TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AND RECEIVED SO THAT IT IS RECEIVED NO LATER THAN [_____], 2020 AT 5:00 P.M. (PREVAILING PACIFIC TIME) BY THE DEBTORS' COUNSEL AS SET FORTH ON THE BALLOT.  *See Section VIII.A.    ("Voting Requirements—Voting Deadline") and Section VIII.D.  1.  ("Voting Requirements—Voting Procedures—Ballots")*.**

Prior to the Voting Deadline, if you cast more than one Ballot voting the same Claim, the last received, validly executed Ballot received before the Voting Deadline shall be deemed to reflect your intent and thus to supersede any prior Ballots.  After the Voting Deadline, if you wish to change your vote, you can do so, if you meet the requirements of Bankruptcy Rule 3018(a), by filing a motion with the Bankruptcy Court with sufficient advanced notice so that it can be heard prior to the Confirmation Hearing scheduled for [DATE].  Any such application must be filed and served in accordance with the procedures set forth in detail in the Disclosure Statement Order.

## 4.    Inquiries

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact the Debtors' counsel Foley & Lardner LLP ("<u>Debtors'</u>

4822-8239-5573.6

Counsel"), by regular mail at Foley & Lardner LLP, 555 S. Flower St., 33rd Floor, Los Angeles, CA 90071, Attn:  John Simon and Ashley McDow, or email at jsimon@foley.com and amcdow@foley.com.

If you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Debtors' Counsel, by regular mail at Foley & Lardner LLP, 555 S. Flower St., 33rd Floor, Los Angeles, CA 90071, Attn:  John Simon and Ashley McDow, or email at jsimon@foley.com and amcdow@foley.com.

## B.    PLAN OF REORGANIZATION

### 1.    Overview of Plan

The following is a brief summary of certain material provisions of the Plan.  For a more detailed description of the terms of the Plan, see ***Section V ("Summary of Chapter 11 Plan")***.  These descriptions are qualified in their entirety by the provisions of the Plan.

In accordance with the Plan, (1) holders of Allowed Administrative Expense Claims, will be paid in full in Cash, subject to the provisions of the Plan with respect to non-Hillair Professional Fee Claims being paid from the Estate Cash Payment and Court approved budgets; (2) Allowed Priority Tax Claims will be paid in full within five (5) years after the Petition Date; (3) Allowed Class 1 Other Priority Claims will be paid in Cash; and (4) Allowed Class 3 Other Secured Claims will receive a like claim in the Reorganized Debtors secured by identical liens to the same extent they were secured against the Debtors and paid in full within five (5) years after the Petition Date.   In addition, Allowed Class 2 Senior Secured Hillair Claims will receive as of Plan confirmation the Post-Confirmation Hillair Claim, which will be replaced as of the Effective Date with the Post-Effective Date Hillair Claim.  Allowed Class 2 Senior Secured Hillair Claims will also receive as of the Effective Date, (i) if Class 4 votes to accept the Plan (a) the Hillair Causes of Action and (b) 80% of the New Equity Interests in the Reorganized Debtors or, (ii) if Class 4 votes to reject the Plan, (a) the Hillair Causes of Action, (b) 100% of the New Equity Interests in the Reorganized Debtors and (c) 100% of the Trust Interests in the Creditor Trust.  Further, in accordance with the Plan, Allowed Class 4 General Unsecured Claims will receive, if Class 4 votes to accept the Plan, an allocated Trust Interest entitling them to a Pro Rata share of funds available to Holders of Trust Interests (including through the Creditor Trust's receipt of 20% of the New Equity Interests in the Reorganized Debtors, recoveries upon the Creditor Trust Claims, the Amazon Creditor Trust proceeds if any, and any remaining amount of the Estate Cash Payment), or if Class 4 does not accept the Plan, Class 4 Claims will be extinguished and receive no distribution.   Equity Interests in Class 5 will not receive any distribution on account of such interests. ***See Section V.B.    ("Summary of Chapter 11 Plan— Classification of Claims and Equity Interests") and Section V.C.    ("Summary of Chapter 11 Plan—Treatment of Claims and Equity Interests Under the Plan").***

### 2.    Summary of Classification and Treatment under Plan

The following table summarizes the classification and treatment of prepetition Claims and Equity Interests under the Plan.  This classification and treatment for all Classes are

described in more detail in ***Section V (“Summary of Chapter 11 Plan”)***.  Estimated Claim
amounts set forth in the following table are based upon thse Debtors' books and records.  **There
can be no assurance that the actual Claim amounts will not be significantly different from
the estimates.**  This table is only a summary of the classification and treatment of Claims and
Equity Interests under the Plan.  Reference should be made to the entire Disclosure Statement
and the Plan for a complete description of the classification and treatment of Claims and Equity
Interests.  Accordingly, this summary is qualified in its entirety by reference to the provisions of
the Plan, a copy of which is attached as ***Exhibit B*** hereto.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Recovery for Allowed Claims |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired – not entitled to vote.<br><br>The Creditor Trustee shall pay all Allowed Claims in this Class in full, in Cash, on the later of: (i) the Effective Date; and (ii) the date on which an order allowing such Claim becomes a Final Order, and in each case or as soon thereafter as is practicable. | $0 | 100% |

ix

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Recovery for Allowed Claims |
|---|---|---|---|---|
| 2 | Senior Secured Hillair Claims | Impaired – entitled to vote.<br><br>Prior to the Effective Date, Class 2 shall retain the Post-Confirmation Hillair Claim, which shall be Allowed as of the Confirmation Date.  On the Effective Date, in full satisfaction, settlement, and release of, and in exchange for, the Effective Date cancellation of Hillair's prepetition debt, the provisions regarding the payment of Administrative Expense Claims, the funding of the Estate Cash Payment, and the waiver of the Hillair Adequate Protection Claim and the Hillair Deficiency Claim, Holders of Allowed Class 2 Senior Secured Hillair Claims shall receive (i) If Class 4 accepts the Plan: (a) the Post-Effective Date Hillair Claim; (b) the Hillair New Equity Interests, and (c) the Hillair Causes of Action; and (ii) if Class 4 does not accept the Plan, Holders of Allowed Class 2 Senior Secured Claims shall receive: (a) the Post-Effective Date Hillair Claim, (b) 100% of the New Equity Interests; (c) the Hillair Causes of Action; and (d) 100% of the Trust Interests. | $11,108,500 | 49.4% |
| 3 | Other Secured Claims | Impaired –entitled to vote.<br><br>On the Effective Date, unless a Holder of an Allowed Class 3 Claim agrees to a lesser treatment of such claim, in full satisfaction, settlement, and release of, and in exchange for, such Other Secured Claim, each Holder of an Allowed Class 3 Other Secured Claim shall receive a like such claim in the Reorganized Debtors, which claims shall (a) be secured by the identical liens to the same extent they were secured against the Debtors; and (b) be paid in full within five years following the Petition Date. | N/A | 100% or the indubitable equivalent of existing Claim |

| 4 | General Unsecured Claims | Impaired – entitled to vote.<br><br>On the Effective Date, unless a Holder of an Allowed Class 4 Claim agrees to accept a lesser treatment of such Claim, (i) if Class 4 votes to accept the Plan, each Holder of an Allowed Class 4 Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such General Unsecured Claim, an allocated Trust Interest, which shall entitle the Holder to receive its Pro Rata share of funds available to Holders of Trust Interests pursuant to the Creditor Trust Agreement, or (ii) if Class 4 does not accept the Plan, than Class 4 Claims shall be extinguished and no distribution shall be made on account of such Class 4 Claims under the Plan.<br><br>The Creditor Trustee shall make Distributions to the Holders of Allowed Class 4 Claims on account of their respective Trust Interests. All Holders of Allowed Class 4 Claims shall receive an initial Distribution of their respective Trust Interests within 120 days following an affirmative recovery on account of the Creditor Trust Claims, or on such other date as the Creditor Trustee determines to be practicable, in the exercise of its sole and absolute discretion, and shall receive thereafter Distributions of their respective Trust Interests on each 180th-day anniversary of the Effective Date, or on such other date as the Creditor Trustee determines to be practicable in the exercise of its sole and absolute discretion. Holders of Allowed Class 4 Claims shall receive any final Distribution of their respective Trust Interests within ten (10) days after the Creditor Trustee's filing of the Creditor Trustee Certification, or as soon thereafter as is practicable.<br>Conditions to Payment of Distributions: Notwithstanding any other provision to the contrary contained in the Plan, no Distribution shall be made on account of any Allowed Class 4 Claim until each of the following occurs: (i) Class 4 is determined by the Court to have accepted the Plan; (ii) the Holders of Class 2 have received (a) the Post-Effective Date Hillair Claim; (b) the Hillair New Equity Interests, and (c) the Hillair Causes of Action and (iii) an adequate reserve is established by the Creditor Trustee for purposes of managing and administering the Creditor Trust in an amount to be determined by the Creditor Trustee in the exercise of its sole and absolute discretion. | \$TBD[5] | \$529,000[6] |

4822-8239-5573.6

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Recovery for Allowed Claims |
|---|---|---|---|---|
| 5 | Equity Interests | Impaired – not entitled to vote.<br><br>As of the Effective Date, each Holder of record of an Allowed Equity Interest shall not receive a Distribution under the Plan and all Equity Interests will be deemed to be cancelled and void | N/A | 0 - Cancelled |

**All calculations of potential recovery hereunder include assumptions with respect to estimated recoveries and the amount of claims. Accordingly, the actual amount of recoveries may vary and thus recoveries could materially vary from the projections set forth herein**.

## C.    DESCRIPTION OF OTHER NECESSARY PROCEDURES

The hearing for the Court to determine whether to confirm the Plan has been scheduled to commence on [_____], 2020, at [__] [__].m. (prevailing Pacific Time) before the Honorable Julia W. Brand, United States Bankruptcy Judge, of the United States Bankruptcy Court for the Central District of California, 255 East Temple Street, Los Angeles, CA 90012.    The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for the announcement of the adjourned date made in open court, at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing, or on the Court's docket.  In addition, except as expressly provided in the Plan, the Plan may be modified pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.    At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code have been satisfied and, if appropriate, will enter an order confirming the Plan.    ***See Section VIII ("Voting Requirements") and Section IX ("Confirmation of the Plan")***.  Both confirmation and consummation of the Plan are subject to certain conditions, which may be waived in accordance with the Plan.    ***See Section V.I. ("Summary of Chapter 11 Plan—Effectiveness of the Plan—Conditions Precedent")***.

---

[5] Schedule unsecured claims total approximately $13 million. Filed claims total approximately $95 million.

[6] Estimated total pot available for distribution, not including potential avoidance action or other contingent liquidation recoveries.

4822-8239-5573.6

## TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ................................................................................................ 1

    A.      Definitions ................................................................................................ 1

    B.      Notice to Holders of Claims in Voting Classes .................................... 2

    C.      Solicitation Package ................................................................................ 3

    D.      Voting Procedures ................................................................................... 4

    E.      Confirmation Hearing ............................................................................ 5

II.     OVERVIEW OF THE DEBTORS AND THEIR BUSINESS ............................ 7

    A.      General ...................................................................................................... 7

    B.      Corporate Structure ................................................................................ 7

    C.      The Debtors' Prepetition Indebtedness ................................................. 7

III.    CERTAIN KEY EVENTS LEADING TO THE COMMENCEMENT OF THE
    CHAPTER 11 CASES ....................................................................................... 8

IV.     OVERVIEW OF CHAPTER 11 CASE ............................................................. 9

    A.      Commencement ....................................................................................... 9

    B.      Parties in Interest .................................................................................... 9

    C.      Certain Orders in the Chapter 11 Cases ............................................. 10

    D.      Statements of Financial Affairs and Schedules of Assets and Liabilities ............. 12

    E.      Filing Deadline for Claims ................................................................... 12

    F.      The Appointment of the Debtors' Chief Restructuring Officer, the
        Reorganization of the Board of Directors and the Resignation of the
        Debtors' Former Chief Executive Officer ........................................... 12

    G.      The Debtors' Postpetition Sale Process ............................................... 13

    H.      The Amazon Litigation ......................................................................... 13

V.      SUMMARY OF CHAPTER 11 PLAN ............................................................ 14

    A.      Treatment of Unclassified Claims Under the Plan ............................. 14

    B.      Classification of Claims and Equity Interests ..................................... 16

    C.      Treatment of Claims and Equity Interests Under the Plan ................ 17

    D.      Acceptance or Rejection of the Plan .................................................... 19

    E.      Means of Implementation of the Plan .................................................. 19

    F.      Distributions Under the Plan ................................................................ 30

## TABLE OF CONTENTS
(continued)

**PAGE**

G. Provisions for Treatment of Disputed, Contingent or Unliquidated Claims and Administrative Expenses ............................................32

H. Executory Contracts and Unexpired Leases ............................................34

I. Effectiveness of the Plan ............................................35

J. Releases, Exculpation and Injunction ............................................36

K. Retention of Jurisdiction ............................................40

VI. MISCELLANEOUS PROVISIONS OF THE PLAN ............................................41

VII. CERTAIN FACTORS TO BE CONSIDERED ............................................42

A. General Considerations ............................................42

B. Certain Bankruptcy Considerations ............................................42

C. Claims Could Be More Than Projected, Assets Could Be Less Than Projected ............................................44

D. Inherent Uncertainty of the Financial Projections ............................................45

E. Termination of the Amazon Contract and Amazon Non-Payment ............................................45

F. The Debtors' Net Working Capital Could Decrease Below the Minimum Working Capital Requirement ............................................46

G. The Reorganized Debtors' Business Might Not Be Successful ............................................46

H. Scoobeez Global's Largest Shareholder Could Try to Reconstitute the Debtors' Board and Derail the Plan ............................................46

I. Disclosure Statement Disclaimer ............................................46

J. Certain Tax Considerations ............................................48

VIII. VOTING REQUIREMENTS ............................................48

A. Voting Deadline ............................................49

B. Holders of Claims Entitled to Vote ............................................49

C. Vote Required for Acceptance of Class ............................................50

D. Voting Procedures ............................................51

IX. CONFIRMATION OF THE PLAN ............................................52

A. Confirmation Hearing ............................................52

B. Deadline to Object to Confirmation ............................................52

C. Requirements for Confirmation of the Plan ............................................53

4822-8239-5573.6

## TABLE OF CONTENTS

(continued)

**PAGE**

X.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN  58

    A.  Liquidation Under Chapter 7 ..................................................................................58

    B.  Alternative Plan ....................................................................................................58

    C.  Dismissal ...............................................................................................................58

XI.  CERTAIN FEDERAL INCOME TAX CONSIDERATIONS.........................................58

    A.  Certain U.S. Federal Income Tax Consequences to Holders of Claims and
Equity Interests .....................................................................................................61

    B.  Certain U.S. Federal Income Tax Consequences to the Debtor ...........................62

    C.  Consequences of the Creditor Trust......................................................................63

    D.  Consequences of the Disputed Claims Reserve....................................................65

XII.  CONCLUSION..............................................................................................................65

4822-8239-5573.6

**TABLE OF EXHIBITS**

Exhibit A          LIQUIDATION ANALYSIS
Exhibit B          CHAPTER 11 JOINT PLAN OF REORGANIZATION
Exhibit C          DISCLOSURE STATEMENT ORDER (WITHOUT EXHIBITS)

4822-8239-5573.6

**DISCLOSURE STATEMENT FOR CHAPTER 11 JOINT PLAN OF
REORGANIZATION AS PROPOSED BY THE DEBTORS, HILLAIR AND THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

## I.    INTRODUCTION

The Debtors submit this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the *Chapter 11 Joint Plan of Reorganization as Proposed by the Debtors, Hillair and the Official Committee of Unsecured Creditors* (the "Plan"), which is attached as ***Exhibit B*** to this Disclosure Statement.

This Disclosure Statement sets forth specific information regarding the Debtors' pre-bankruptcy history, significant events that have occurred during the Chapter 11 Cases, the proposed reorganization of the Debtors, the treatment of Holders of Claims and Equity Interests under the Plan, and the administration of the Creditor Trust by the Creditor Trustee after confirmation of the Plan. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and certain risk factors. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Impaired Claims must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS, *PLEASE SEE SECTION V ("SUMMARY OF CHAPTER 11 PLAN") AND SECTION VII ("CERTAIN FACTORS TO BE CONSIDERED")*. SECTIONS II THROUGH IV FOLLOWING THIS INTRODUCTION DISCUSS THE BACKGROUND OF THE DEBTORS' BUSINESS AND THE CHAPTER 11 CASES.

## A.    Definitions

Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. A term used but not defined in this Disclosure Statement or the Plan has the meaning given to it in the Bankruptcy Code and/or the Bankruptcy Rules.

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender will include the masculine, feminine, and the neutral gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (e) captions and headings to sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (f) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (g) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or

the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

B.     **Notice to Holders of Claims in Voting Classes**

This Disclosure Statement is being furnished to holders of Claims in the Voting Classes (Class 2 Senior Secured Hillair Claims, Class 3 Other Secured Claims, and Class 4 General Unsecured Claims) for the purpose of soliciting their votes on the Plan. This Disclosure Statement or notice of this Disclosure Statement is also being furnished to other creditors and other entities for notice or informational purposes. The primary purpose of this Disclosure Statement is to provide adequate information to holders of Claims in the Voting Classes to enable such holders to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Plan.

On [_____], 2020, the Bankruptcy Court entered the Disclosure Statement Order approving the Disclosure Statement as containing information of a kind and in sufficient detail to enable holders of Claims in Voting Classes to make an informed judgment about the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN, WHEREVER LOCATED. THUS, IN PARTICULAR, ALL HOLDERS OF IMPAIRED CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

This Disclosure Statement contains important information about the Plan, the Debtors' business and operations, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any information concerning the Debtors other than the information contained herein. Other than as explicitly set forth in this Disclosure Statement, you should not rely on any information relating to the Debtors, their Estates, the value of their properties, the nature of their liabilities, or their creditors' Claims or Equity Interests.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES,

4822-8239-5573.6

ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof.  Such events may have a material impact on the information contained in this Disclosure Statement.  The Debtors do not intend to update the projections.  Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences.  Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

ANY PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, ANY PROJECTIONS HAVE NOT BEEN AUDITED.  WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ANY PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH MIGHT NOT BE ACHIEVED IN THE FUTURE. THE PROJECTIONS ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**IRS CIRCULAR 230 NOTICE**: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

C.    <u>Solicitation Package</u>

Holders of Claims in the Voting Classes as of the Voting Record Date (as defined in the Disclosure Statement Order), will receive copies of the following documents (the "<u>Solicitation Package</u>"): (a) the Disclosure Statement; (b) a Notice of Confirmation Hearing; (b) a copy of the Disclosure Statement Order (excluding exhibits attached thereto), which is annexed to this

4822-8239-5573.6

Disclosure Statement as **Exhibit B**; (c) an appropriate Ballot to vote to accept or reject the Plan; and (d) a letter from the Creditors' Committee encouraging creditors to vote to accept the Plan, as well as any other materials as the Court may direct.

If you did not receive a Ballot in your package and believe that you should have, please contact Foley & Lardner LLP, by regular mail at 555 S. Flower St., 33rd Floor, Los Angeles, CA 90071, Attn: John Simon and Ashley McDow, or email at jsimon@foley.com and amcdow@foley.com.

## D.    Voting Procedures

### 1.    General Information

Under the Bankruptcy Code, certain Classes of creditors are deemed to accept or reject the Plan, and the vote of these Classes will not be solicited. Thus, if a creditor holds Claims included within a Class that is not Impaired under the Plan, under Bankruptcy Code section 1126(f), the creditor is conclusively presumed to have accepted the Plan with respect to such Claims, and its vote of such Claims will not be solicited. Pursuant to the Bankruptcy Code, a class of claims or interests is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are altered, other than by curing defaults and reinstating maturity. The Plan provides that Class 1 is Unimpaired. Similarly, classes which are fully impaired are deemed to reject the Plan, and their vote of such Claims will not be solicited. The Equity Interests in Class 5 are fully Impaired. Any holder of a Claim in any of these Classes may, however, object to the Plan to contest the Plan's characterization of the creditor's impaired or non-impaired status.

The Bankruptcy Code provides that the holders of allowed claims are entitled to vote on a plan. A Claim to which an objection has been filed is not entitled to vote unless and until the Bankruptcy Court rules on the objection and allows the Claim. Consequently, although holders of Claims subject to a pending objection may receive Ballots, their votes will not be counted unless the Bankruptcy Court (a) prior to the Voting Deadline (as defined herein), rules on the objection and allows the Claim, or (b) on proper request under Bankruptcy Rule 3018(a), temporarily allows the Claim in an amount which the Court deems proper for the purpose of voting on the Plan. If the Debtors have served an objection or request for estimation as to a claim at least fourteen (14) days before the Voting Deadline, such claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except as ordered by the Court before the Voting Deadline.

### 2.    Voting on the Plan

If a holder of a Claim is classified in the Voting Classes under the Plan, such holder's acceptance or rejection of the Plan is important and must be in writing and filed by the Voting Deadline (as defined herein). The holder of more than one Claim classified in a single class of Claims must vote all its Claims within that Class to either accept or reject the Plan, and may not split its votes within a particular Class; thus, a Ballot (or group of Ballots) within a particular Class that partially accepts and partially rejects the Plan shall not be counted. When voting, a

creditor must use only the Ballot or Ballots sent to it (or copies if necessary) with this Disclosure Statement.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, if you received a Ballot, please check the appropriate box on the enclosed Ballot to indicate your vote to accept or reject the Plan. **PLEASE COMPLETE AND SIGN YOUR BALLOT(S) AND RETURN IT SO THAT IT IS RECEIVED BY THE DEBTORS' COUNSEL NO LATER THAN [___], 2020 AT 5:00 P.M. (PREVAILING PACIFIC TIME) (THE "VOTING DEADLINE").**

IN ORDER FOR YOUR BALLOT TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT, AND RECEIVED BEFORE THE VOTING DEADLINE BY THE DEBTORS' COUNSEL.

If you have any questions about the procedure for voting your Claim or the packet of materials that you received, please contact the Debtors' Counsel at the address indicated in subsection C above.

Prior to the Voting Deadline, if you cast more than one Ballot voting the same Claim, the last validly executed Ballot received before the Voting Deadline shall be deemed to reflect your intent and thus to supersede any prior Ballots. After the Voting Deadline, if you wish to change your vote, you can do so, if you meet the requirements of Bankruptcy Rule 3018(a), by filing a motion with the Bankruptcy Court with sufficient advance notice so that it can be heard prior to the Confirmation Hearing scheduled for [____], 2020. Any such application must be filed and served in accordance with the procedures set forth in detail in the Disclosure Statement Order.

If you wish to obtain a copy of the Plan, this Disclosure Statement, or any exhibits to such documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Debtors' Counsel, Foley & Lardner LLP, 555 S. Flower St., 33rd Floor, Los Angeles, CA 90071, Attn: John Simon and Ashley McDow, or email at jsimon@foley.com and amcdow@foley.com.

**E.    Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to commence on [_____], 2020 at [__] [__].m. (prevailing Pacific Time), or as soon thereafter as counsel may be heard, before the Honorable Julia W. Brand, United States Bankruptcy Judge, of the United States Bankruptcy Court for the Central District of California, 255 East Temple Street, Los Angeles, CA 90012. **THE BANKRUPTCY COURT HAS DIRECTED THAT OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND FILED WITH THE CLERK OF THE BANKRUPTCY COURT, TOGETHER WITH PROOF OF SERVICE, AND SERVED SO THAT THEY ARE RECEIVED ON OR BEFORE [OBJECTION DEADLINE], 2020 AT 5:00 P.M. (PREVAILING PACIFIC TIME) BY:**

Counsel for the Debtor:

FOLEY & LARDNER LLP
555 S. Flower St., 33rd Floor
Los Angeles, CA 90071
Attn: Ashley McDow and John Simon

Counsel for Hillair:

Olshan, Frome, Wolosky LLP
1325 Avenue of the Americas
New York, NY 10019
Attn: Adam Friedman

Buchalter
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017-2457
Attn: Anthony Napolitano

Counsel for the Committee:

Levene, Neale, Bender, Yoo & Brill, L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Attn:   David Neale and John-Patrick Fritz

United States Trustee:

Office of the United States Trustee for the Central District of California – Los Angeles
Division
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017
Attn: Dare Law

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made in open court, at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing, or on the Court's docket.

IN THE VIEW OF THE DEBTORS AND THE COMMITTEE, THE TREATMENT OF HOLDERS OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN A CHAPTER 7 LIQUIDATION. ACCORDINGLY, THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND, THUS, RECOMMEND THAT ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO CAST BALLOTS VOTE TO ACCEPT THE PLAN.

4822-8239-5573.6

## II.    OVERVIEW OF THE DEBTORS AND THEIR BUSINESS

### A.    General

The Debtors are a leading delivery service provider ("DSP") company, with operations in Southern California, Illinois and Texas.    The Debtors provide "last-mile" delivery solutions, including same-day, next-day and two-day door-to-door logistics and delivery services that utilize vehicles to facilitate fast deliveries of goods from merchant distribution points to consumers.    The Debtors' business generates revenues primarily when a customer pays the Debtors' fees for the delivery of products to consumers.

The Debtors have grown into a trusted provider of last mile delivery services.    The Debtors employ approximately 1000 employees, which historically increases during the holiday season.    The Debtors generated approximately $45 million of revenue in 2019.    The Debtors' employees are not subject to a collective bargaining agreement.    The Debtors' sole customer is Amazon Logistics, Inc. or its affiliates ("Amazon").    The Debtors' are currently involved in litigation with Amazon regarding the Debtors' request for injunctive relief to bar Amazon from terminating their contract with the Debtors or reducing work given to the Debtors, and Amazon's request for relief from the bankruptcy stay in order to terminate its contract with the Debtors, as further discussed below.

### B.    Corporate Structure

Scoobeez Global is a corporation whose common stock is publicly traded on the Over the Counter ("OTC") Pink market, subject to this Court's Order, Pursuant to Sections 105(a), 362(a)(3), and 541 of the Bankruptcy Code and Bankruptcy Rule 3001, Establishing Notice and Hearing Procedures for Trading in, or Certain Claims of Worthlessness with Respect to, Equity Securities [Docket No. 187].    Mr. Shahan Ohanessian owns over 90% of the common stock of Scoobeez Global.    As of February 18, 2020, Scoobeez Global had 182,486,249 shares of common stock owned by 1,651 total shareholders of record.    Scoobeez Global also has 21,650,000 shares of preferred stock outstanding.

Scoobeez Global is a holding company that owns 96% of the stock of Scoobeez, which is the operating company for the Debtors.    Scoobeez, in turn, wholly owns the equity interests of Scoobur, which is a non-operating entity that has no assets other than trademarks.

### C.    The Debtors' Prepetition Indebtedness

On October 7, 2016, Scoobeez Global and Hillair entered into a Securities Purchase Agreement pursuant to which Scoobeez Global issued to Hillair that certain 8% Senior Secured Convertible Debenture Due October 1, 2018 in the principal amount of $5,800,000 (the "First Debenture").

On January 30, 2017, Scoobeez Global and Hillair entered into a second Securities Purchase Agreement pursuant to which Scoobeez Global issued to Hillair that certain 8% Senior Secured Convertible Debenture Due January 1, 2019, in the total amount of $8,584,000 (the "Second Debenture").    Under the Second Debenture, Scoobeez Global agreed to pay Hillair the principal sum of $8,584,000 plus all other interest and charges due on or before January 1, 2019.

The Second Debenture includes the obligations of Scoobeez Global to Hillair due under the First Debenture.

On October 7, 2016, Scoobeez and Scoobur each executed a Subsidiary Guarantee, jointly and severally guarantying the repayment of Scoobeez Global's obligations to Hillair.  To secure repayment, on or about October 7, 2016, Scoobeez Global, Scoobeez and Scoobur each, jointly and severally, executed a Security Agreement granting Hillair a security interest in substantially all their assets.   Hillair filed financing statements to perfect its security interests.

As of the Petition Date, the Debtors were obligated to Hillair in the aggregate principal amount of $11,108,500.00.

During the period leading up to the Petition Date, in an attempt to continue operations outside of a chapter 11 proceeding, the Debtors also obtained significant loans from unsecured merchant cash advance lenders.

## III.    CERTAIN KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

The Debtors filed these Chapter 11 Cases due to cash flow issues and prepetition litigation claims, which jeopardized their ability to pay their obligations in the ordinary course of business.

Prior to the Petition Date and the agreed separation of their former Chief Executive Officer and largest shareholder, Shahan Ohanessian, the Debtors faced allegations of financial mismanagement committed by the former Chief Executive Officer.   On March 15, 2017, the Debtors' former Chief Financial Officer sent a letter to the Board of Scoobeez Global, alleging various actions by Mr. Ohanessian, resulting in the alleged misappropriation of $1.7 million of the Debtors' funds.   The Debtors subsequently experienced cash flow shortages, despite borrowing additional funds from merchant cash advance companies.

Subsequently, the Debtors defaulted on their obligations under the Second Debenture, including due to the fact that Scoobeez Global did not pay its obligations under the Second Debenture in full by the January 1, 2019 maturity date.  Hillair provided the Debtors with notice of the default on March 19, 2019. Hillair alleged that the misappropriation of funds caused the Debtors to eventually default under their obligations.

As a result, the Debtors became embroiled in litigation with Hillair.  On or about April 22, 2019, Hillair filed a three-count complaint against the Debtors, alleging breach of contract, breach of guaranty and replevin and delivery, which is currently pending as case number 19GDCV00492 in the Superior Court of the State of California, County of Los Angeles, North Central District (the "Los Angeles Case"). On or about April 24, 2019, Hillair filed an Ex Parte Application to Appoint Receiver, Issue Temporary Restraining Order and Set Order to Show Cause Why Receiver Should Not Be Confirmed and Why Preliminary Injunction Should Not Be Issued (the "Ex Parte Application") in the Los Angeles Case.  Hillair alleged, among other things, that the Debtors had suffered large losses prior to the Petition Date, and the Debtors' principal and largest shareholder, Shahan Ohanessian, had engaged in self-dealing and conduct that damaged creditors and shareholders, citing among other things the letter from the former

Chief Financial Officer.  The hearing on the Ex Parte Application was set for May 1, 2019 at 1:30 p.m.

Meanwhile, the Debtors also faced other significant litigation claims.  These consisted of employee, wage and hour and breach of contract and collection litigation claims, including a complaint by the former Chief Financial Officer alleging wrongful termination and a lawsuit by Avitus, Inc. seeking over $16 million.

Based upon the defaults under the Second Debenture, the impending action by Hillair to have a receiver appointed, and the other litigation and collection efforts the Debtors faced, and the Debtors' inability to operate without further financing or use of cash, the Debtors had no viable alternative to a Chapter 11 filing.  The Debtors filed these Chapter 11 Cases on April 30, 2019, prior to the scheduled May 1, 2019 final hearing on the Ex Parte Application by Hillair.

## IV.    OVERVIEW OF CHAPTER 11 CASE

### A.    <u>Commencement</u>

On April 30, 2019, the Debtors filed voluntary petitions in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors' Chapter 11 Cases are being jointly administered under the caption *In re Scoobeez, et al.*, Case No. 2:19-bk-14989-WB.

### B.    <u>Parties in Interest</u>

1. <u>Court</u>

The Chapter 11 Cases are pending in the Bankruptcy Court before the Honorable Julia W. Brand, United States Bankruptcy Judge for the Central District of California.

2. <u>Advisors to the Debtor</u>

The Debtors retained Foley & Lardner LLP ("<u>Foley</u>") as their general bankruptcy counsel by order dated July 26, 2019 [Docket No. 224].  The Debtors also retained the following additional advisors:

- Brian Weiss of Force Ten Partners LLC was retained by the Debtors as Chief Restructuring Officer, by order dated July 12, 2019 [Docket No. 192].

- Conway MacKenzie, Inc. ("<u>Conway</u>") was retained by the Debtors to provide certain financial advisory services, by order dated July 26, 2019 [Docket. No. 223].

- Armory Securities LLC ("<u>Armory</u>") was retained by the Debtors to provide investment banking services, by order dated September 4, 2019 [Docket No. 302].

4822-8239-5573.6

3.   Official Committee of Unsecured Creditors and Advisors

On May 20, 2019, the U.S. Trustee appointed the Committee to represent the interests of unsecured creditors of Scoobeez and Scoobeez Global, Inc.  The members of the Committee are Nexgen Capital, LLC, Avitus, Inc., and Minas Sarafian.

The Committee retained Levene, Neale, Bender, Yoo & Brill, L.L.P. as its general bankruptcy counsel, by order dated July 17, 2019 [Docket No. 205].

**C.    Certain Orders in the Chapter 11 Cases**

Although after the Petition Date, the Debtors continued to operate as debtors and debtors-in-possession, certain matters, required the Bankruptcy Court's approval, following notice and the opportunity for a hearing in accordance with the Bankruptcy Code and the Bankruptcy Rules. Accordingly, the Debtors requested entry of specific orders from the Bankruptcy Court authorizing the Debtors to, for instance, pay certain prepetition claims and to continue specific prepetition practices essential to its continued business operations during the pendency of the Chapter 11 Cases.  The Bankruptcy Court granted several "first day" and similar orders concerning various matters related to the Debtors' continued business operations.  Included in such orders were the following:

1.   Employee Wage and Benefit Motion

On May 1, 2019 the Debtors filed their *Emergency Motion for Order Authorizing (1) The Payment of Prepetition Wages; (2) the Continuation of Employee Programs Postpetition; (3) the Withholding and Payment of Payroll Related Taxes, and (4) the Payment of Prepetition Claims Relating to Employee Programs* [Docket No. 8] (the "Employee Wage and Benefit Motion").  In the Employee Wage and Benefit Motion, the Debtors sought entry of an order, among other things:

- authorizing, but not directing, the Debtors, to make payments for wage obligations and benefits, and to reimburse reasonable business expenses of the Debtors' employees; and

- authorizing and directing banks and financial institutions to receive, honor, process, and pay related checks and electronic payment requests made by the Debtors.

The Bankruptcy Court entered an order granting in part and denying in part the Employee Wage and Benefit Motion by order dated May 15, 2019 [Docket No. 54].

2.   Cash Collateral Motion

On May 1, 2019, the Debtors filed their *Emergency Motion for Interim Order Authorizing Use of Cash Collateral on an Interim Basis* [Docket No. 13] (the "Cash Collateral Motion").

10

Through the Cash Collateral Motion, the Debtors sought authority to use Cash Collateral covered by liens of Hillair pursuant to a proposed budget.  Hillair objected to the Cash Collateral Motion.

The Court entered an order [Docket No. 52], approving the Cash Collateral Motion on a specified budget through and including May 14, 2019.

The Debtors and Hillair entered into subsequent stipulations including budgets, upon which the Court granted orders, extending the Debtors' use of cash collateral.

The Debtors are currently operating under the Third Stipulation [Docket No. 486] regarding their use of cash collateral, agreed among the Debtors, Hillair and the Committee.  The Third Stipulation was approved by Order of the Court dated December 10, 2019 [Docket No. 490].

3.    Utilities Motion

On May 16, 2019, the Debtors filed their *Emergency Motion for an Order Pursuant to Sections 105(a) and 366: (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (II) Determining Adequate Assurance of Payment for Future Utility Services, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 65] (the "Utilities Motion").  In the Utilities Motion, the Debtors sought entry of an order, among other things:

- prohibiting utility companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding, or on account of any perceived inadequacy of the Debtors' proposed adequate assurance (as set forth in the Utilities Motion) pending entry of the final order;

- approving the Debtors' proposed adequate assurance (as set forth in the Utilities Motion) and the procedure for requesting such adequate assurance; and

- determining that the utilities companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code through the process provided in the Utilities Motion.

The Bankruptcy Court granted the Utilities Motion by order dated June 7, 2019 [Docket No. 134].

4.    Securities Trading Procedures Motion

On May 28, 2019, the Debtors filed their *Emergency Motion for Order, Pursuant to Sections 105(a), 362(a)(3), and 541 of the Bankruptcy Code and Bankruptcy Rule 3001, Establishing Notice and Hearing Procedures for Trading In, or Certain Claims of Worthlessness with Respect to Equity Securities in Debtor Scoobeez Global, Inc.* [Docket No. 104] (the "Securities Trading Procedures Motion"). In the Securities Trading Procedures Motion, the Debtor Scoobeez Global sought entry of an order, among other things, establishing notice and

11

hearing procedures with respect to trading in Scoobeez Global's equity securities, and claims for tax purposes that such securities are worthless, in order to protect the Debtors' tax attributes.

The Bankruptcy Court granted the Securities Trading Motion by order dated July 11, 2019 [Docket No. 11].

## D.    Statements of Financial Affairs and Schedules of Assets and Liabilities

The Debtors filed their Statements of Financial Affairs and Schedules of Assets and Liabilities (the "Schedules") on May 29, 2019 [Docket No. 112].  The Schedules reflect the assets and liabilities of the Debtors as reflected in the Debtors' books and records as of the Petition Date.

## E.    Filing Deadline for Claims

On July 9, 2019, the Debtors filed their *Motion for Order: (1) Fixing Last Date for Filing Proofs of Claim or Interest Other than Administrative Claims; and (2) Approving Form of Notice of Bar Date* [Docket No. 181] (the "Bar Date Motion").  The Bar Date Motion sought entry of an order (a) establishing deadlines and related procedures for filing proofs of claim in respect of prepetition claims, including any claims under section 503(b)(9) of the Bankruptcy Code, secured claims, and priority claims against the Debtors and (b) approving the form and manner of notice thereof.

The Bankruptcy Court granted the Bar Date Motion by order dated August 2, 2019 (the "Bar Date Order") [Docket No. 244].  The Bar Date Order established September 6, 2019 as the deadline for all entities (other than governmental units) holding claims against the Debtors to file a Proof of Claim, and November 4, 2019 as the deadline by which a governmental unit was required to file a Proof of Claim.

## F.    The Appointment of the Debtors' Chief Restructuring Officer, the Reorganization of the Board of Directors and the Resignation of the Debtors' Former Chief Executive Officer

After filing these Chapter 11 Cases, working with the Committee and Hillair, the Debtors took decisive action to address the management and misappropriation concerns that existed prior to the Petition Date and stabilize their business.  The Debtors obtained use of cash collateral from Hillair under agreed stipulations and orders.  In connection with obtaining the use of cash collateral from Hillair, and resolving concerns of the Committee and then-present requests by the Office of the United States Trustee to appoint a chapter 11 trustee, the Debtors obtained the agreement of Shahan Ohanessian to (i) step down as Chief Executive Officer; (ii) remove himself and his wife and a family member and the rest of the prepetition board of directors, and appoint Brian Weiss, the Chief Restructuring Officer, and two independent members to the board (one of whom was selected by the Committee); (3) not exercise his shareholder powers to change the board composition and (4) generally not be involved with the management or financial affairs of Scoobeez or Scoobeez Global.   The Debtors also established that the Chief Restructuring Officer would have the exclusive right to review and authorize expenses in excess of $10,000, in order to address any financial misappropriation concerns going forward.

12

On June 12, 2019, the Court entered an order appointing Brian Weiss of Force Ten Partners, LLC as the Debtors' Chief Restructuring Officer, after the restructuring of the Debtors' board of directors.

## G.    The Debtors' Postpetition Sale Process

Having stabilized their business, the Debtors embarked on a process to secure a value-maximizing path for the Debtors' business to exit these Chapter 11 Cases.  The Debtors determined, in conjunction with their professionals and in consultation with the Committee and Hillair, that pursuing a sale or reorganization under Chapter 11 of the Bankruptcy Code provided the best option for the Debtors, their customer base, and their creditor constituents.

In June 2019, the Debtors hired Armory Securities, LLC as their investment banker, to market the Debtors' business for a sale or recapitalization.  The Debtors conducted a fulsome marketing process, contacting over 200 parties considered after research to be the most likely interested bidders, and numerous parties made inquiries as to their interest in the Debtors' business.

On August 29, 2019, the Debtors filed a motion to establish sale and contract assumption and assignment procedures to sell their assets to Hillair, as the stalking horse bidder, or to another higher bidder at an auction, with terms agreed to among the Debtors, Hillair and the Committee.  The sale was projected to close in late October or early November, 2019, and would have resulted in the exit of the Debtors' cleansed and restructured business from chapter 11.  After addressing the difficult alleged prepetition management and financial misappropriation issues, and the initial stages of financial instability and dispute amongst the key parties in these Chapter 11 Cases, it seemed that a conclusion for the benefit of all constituents was close at hand.

However, on October 1, 2019, Amazon objected to the assumption and assignment of its contract with the Debtors.  Furthermore, after lying in wait since the early stages of the Chapter 11 Cases, Amazon then advised the Debtors and Hillair, in various calls and communications, of its decision to terminate its business relationship and contract with the Debtors, notwithstanding the Debtors' good performance as a Delivery Service Provider.  Moreover, Amazon reduced the routes that would otherwise have been assigned to the Debtors.  This caused the destruction of the Debtors' sale process.

The Debtors, Hillair and the Committee subsequently worked towards formulation of the Plan to preserve value in these cases for the Debtors' estates and constituents, while maintaining the Debtors' claims against and contract and litigation rights against Amazon.

## H.    The Amazon Litigation

The Debtors believe that Amazon's actions in respect of the Amazon Contract violate the automatic stay and should be enjoined.

On October 25, 2019, the Debtors filed against Amazon their *Complaint for: (1) Violation of the Automatic Stay [11 U.S.C. § 362]; (2) Declaratory Judgment; (3) Injunctive Relief; and (4) Breach of the Duty of Good Faith and Fair Dealing* (the "<u>Complaint</u>"),

13

commencing Adversary Proceeding No. 2:19-ap-01456 (the "Adversary Proceeding").    On October 25, 2019, the Debtors also filed in the Adversary Proceeding their *Notice of Motion and Emergency Motion for Temporary Restraining Order and Preliminary Injunction to Prevent Violation of the Automatic Stay* [A.P. Docket No. 2].

On October 28, 2019, Amazon filed *Amazon Logistics, Inc.'s Notice of Motion and Motion for an Order: (A) Determining That the Automatic Stay Does Not Require Amazon to Utilize Debtor's Services and (B) Modifying the Automatic Stay* [Docket No. 393].

Hillair and the Committee also oppose Amazon's position, and the dispute in the Amazon Litigation is before the Court, including pursuant to the foregoing pleadings and responses and supplements in respect of the same. The parties have conducted discovery, including the exchange of documents, and deposition of witnesses.

On February 19, 2020, the Debtors, Amazon and Hillair filed supplemental pleadings in respect of the Amazon Litigation.    The Court has set a further hearing date on the Amazon Litigation for March 16, 2020.

## V.    SUMMARY OF CHAPTER 11 PLAN

### A.    <u>Treatment of Unclassified Claims Under the Plan</u>

#### 1. In General

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance herewith and in accordance with the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

#### 2. Adequate Protection Claims

The Hillair Adequate Protection Claim shall be waived as of the Effective Date in partial exchange for the treatment provided to the Holder as part of its Class 2 Claim.

#### 3. Administrative Expenses

Subject to the allowance procedures and deadlines provided herein, the Creditor Trustee (or its agent) shall pay to each Holder of an Allowed Administrative Expense Claim, on account of the Allowed Administrative Expense Claim, and in full satisfaction thereof, Cash equal to the amount of such Allowed Administrative Expense Claim, unless the Holder agrees to other treatment. Except as otherwise provided herein or in a prior order of the Bankruptcy Court: (i) payment of an Administrative Expense Claim that is an Allowed Claim as of the Effective Date shall be made on the later of the Effective Date or the date such payment would have become due for payment of such Allowed Administrative Expense Claim in the absence of the Chapter 11 Cases, whether pursuant to contract or applicable nonbankruptcy law; and (ii) payment of an Administrative Expense Claim that becomes an Allowed Claim following the Effective Date shall be made on or before the date that is thirty (30) days after an order deeming such

Administrative Expense Claim an Allowed Claim becomes a Final Order.  Until the Effective Date, Administrative Expense Claims (with the exception of monthly, interim or final allowed non-Hillair Professional Fee Claims which shall be paid under the court approved cash collateral budgets or from the Estate Cash Payment) shall be paid (i) in the ordinary course of business from cash on hand and cash flow based on the contractual terms with each respective vendor or in the case of any payroll obligation, when the obligation becomes due and payable and (ii) as required for confirmation and effectiveness of the Joint Plan.  Notwithstanding anything in the Plan to the contrary, outstanding and future unpaid and allowed Professional Fee Claims (except for Hillair Professional Fees) shall be paid in accordance with the amounts set forth in the Court-approved cash collateral budgets (the "Budgeted Professional Fees") and the Estate Cash Payment.   The Budgeted Professional Fees shall be paid solely from the Debtors in accordance with the applicable Court-approved cash collateral budgets (and shall be capped at the line items therein without allowance for any variance and the Estate Cash Payment).   The remaining balance of the Estate Cash Payment, if any, after reserves in accordance with this Term Sheet, shall be transferred to the Creditor Trust on the Effective Date, or retained by the Debtors.  For the avoidance of doubt, the Estate Cash Payment and Court-approved budgets shall be the sole source of payment of Budgeted Professional Fees, provided confirmation of the Joint Plan is achieved on or before May 15, 2020.

4.   Deadlines for Filing Administrative Expense Claims

Subject to the allowance procedures and deadlines provided below, the Creditor Trustee (or its agent) shall pay to each holder of an Allowed Administrative Expense Claim, on account of the Allowed Administrative Expense Claim, and in full satisfaction thereof, Cash equal to the amount of such Allowed Administrative Expense Claim, unless the holder agrees to other treatment. Except as otherwise provided in the Plan or in a prior order of the Bankruptcy Court: (i) payment of an Administrative Expense Claim that is an Allowed Claim as of the Effective Date shall be made on the later of the Effective Date or the date such payment would have become due for payment of such Allowed Administrative Expense Claim in the absence of the Chapter 11 Cases, whether pursuant to contract or applicable non- bankruptcy law; and (ii) payment of an Administrative Expense Claim that becomes an Allowed Claim following the Effective Date shall be made on or before the date that is thirty (30) days after an order deeming such Administrative Expense Claim an Allowed Claim becomes a Final Order.

All applications for final compensation of Professional Persons for services rendered and for reimbursement of expenses incurred on or before the Effective Date pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b), 507(a)(1) or 1103 (except only for post-petition obligations incurred through the Effective Date in the ordinary course of the Debtors' post-petition business and obligations under section 1930 of title 28 of the United States Code) shall be filed no later than forty-five (45) days after the Effective Date and be paid in accordance with and shall comply with the Budget. Professional Persons and others that do not File such requests on or before the Administrative Expense Claims Bar Date shall be barred from asserting such Administrative Expense Claims against the Debtors, the Estates, the Reorganized Debtors, the Creditor Trust, the Creditor Trustee, or any of their respective property. Objections to applications of Professional Persons or others for compensation or reimbursement of expenses must be Filed and served on the Creditor Trustee and its counsel, as well as the Professional Persons and others to whose application the objection is addressed, in accordance with the

15

Bankruptcy Code, the Bankruptcy Rules or pursuant to any other procedure set forth by an order of the Bankruptcy Court.

### 5. Priority Tax Claims

Allowed Priority Tax Claims shall be paid in full within 5 years of the Petition Date in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. Except as otherwise provided in section 503(b)(l)(D) of the Bankruptcy Code and 28 U.S.C. § 960, all requests for payment of Claims by a governmental unit (as defined under section 101(27) of the Bankruptcy Code) for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established or is governing must be Filed on or before the later of: (a) sixty (60) days following the Effective Date; or (b) ninety (90) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Except as otherwise provided in section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any Holder of a Claim for taxes is required to File a request for a payment of the post-petition taxes and other monies due related to such taxes. Except as otherwise provided in section 503(b)(l)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any Holder of a Claim for taxes which does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Claim against the Debtors, the Estates, the Reorganized Debtors, the Creditor Trust, the Creditor Trustee, or any of their respective property, whether any such Claim is deemed to arise prior to, on, or subsequent to the Effective Date, and shall receive no Distribution under the Plan or otherwise on account of such Claim.

### 6. Intercompany Claims

All Intercompany Claims between and among the Debtors are deemed cancelled as of the Effective Date.

### B.    Classification of Claims and Equity Interests

The following table (a) designates the Classes of Claims against, and Equity Interests in, the Debtors, (b) specifies the Classes of Claims and Equity Interests that are Impaired by the Plan and therefore are deemed to reject the Plan or are entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) specifies the Classes of Claims and Equity Interests that are Unimpaired by the Plan and therefore are conclusively presumed to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Description | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to have accepted) |
| 2 | Senior Secured Hillair Claims | Impaired | Yes |
| 3 | Other Secured Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |

16

| 5 | Equity Interests in Debtor | Impaired | No (deemed to have rejected) |

## C.    Treatment of Claims and Equity Interests Under the Plan

The treatment of Claims and Equity Interests under the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Holder or a Claim or Holder of an Equity Interest may have in or against the Debtors or their property. This treatment supersedes and replaces any agreements or rights which those entities have in or against the Debtors or their property. **NO DISTRIBUTIONS SHALL BE MADE, AND NO RIGHTS SHALL BE RETAINED, ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM**.

1. Class 1: Other Priority Claims

   (a)    *Classification*:  *Class* 1 consists of all Claims entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, except Priority Tax Claims and Administrative Expense Claims.

   (b)    *Treatment*:    The Creditor Trustee shall pay all Allowed Claims in this Class in full, in Cash, on the later of: (i) the Effective Date; and (ii) the date on which an order allowing such Claim becomes a Final Order, and in each case or as soon thereafter as is practicable. Class 1 is not Impaired, and the holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2: Senior Secured Hillair Claims

   (a)    *Classification*:  Class 2 consists of Senior Secured Hillair Claims which Claims are hereby deemed Allowed in full as of the Confirmation Date

   (b)    *Treatment*:  Prior to the Effective Date, Class 2 shall retain the Post-Confirmation Hillair Claim, which shall be Allowed as of the Confirmation Date.  On the Effective Date, in full satisfaction, settlement, and release of, and in exchange for, the Effective Date cancellation of Hillair's prepetition debt, the provisions regarding the payment of Administrative Expense Claims, the funding of the Estate Cash Payment, and the waiver of the Hillair Adequate Protection Claim and the Hillair Deficiency Claim, Holders of Allowed Class 2 Senior Secured Hillair Claims shall receive (i) If Class 4 accepts the Plan: (a) the Post-Effective Date Hillair Claim; (b) the Hillair New Equity Interests, and (c) the Hillair Causes of Action; and (ii) if Class 4 does not accept the Plan, Holders of Allowed Class 2 Senior Secured Claims shall receive: (a) the Post-Effective Date Hillair Claim, (b) 100% of the New Equity Interests; (c) the Hillair Causes of Action; and (d) 100% of the Trust Interests.   Class 2 is

17

Impaired, and the Holders of Claims in Class 2 are entitled to vote to accept or reject the Plan.

3. Class 3: Other Secured Claims

    (a)    *Classification*:  Class 3 Consists of all Other Secured Claims.

    (b)    *Treatment*:  On the Effective Date, unless a Holder of an Allowed Class 3 Claim agrees to a lesser treatment of such claim, in full satisfaction, settlement, and release of, and in exchange for, such Other Secured Claim, each Holder of an Allowed Class 3 Other Secured Claim shall receive a like such claim in the Reorganized Debtors, which claims shall (a) be secured by the identical liens to the same extent they were secured against the Debtors; and (b) be paid in full within five years following the Petition Date.  Class 3 is Impaired, and the Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4: General Unsecured Claims

    (a)    *Classification*:  Class 4 Consists of all General Unsecured Claims.

    (b)    *Treatment*:  On the Effective Date, unless a Holder of an Allowed Class 4 Claim agrees to accept a lesser treatment of such Claim, (i) if Class 4 votes to accept the Plan, each Holder of an Allowed Class 4 Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such General Unsecured Claim, an allocated Trust Interest, which shall entitle the Holder to receive its Pro Rata share of funds available to Holders of Trust Interests pursuant to the Creditor Trust Agreement, or (ii) if Class 4 does not accept the Plan, than Class 4 Claims shall be extinguished and no distribution shall be made on account of such Class 4 Claims under the Plan.  Class 4 is Impaired, and the Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

5. Class 5: Equity Interests

    (a)    *Classification*:  Class 5 Consists of Equity Interests.

    (b)    *Treatment*:  As of the Effective Date, each Holder of record of an Allowed Equity Interest shall not receive a Distribution under the Plan and all Equity Interests will be deemed to be cancelled and void.  Class 5 is Impaired and such Holders are deemed conclusively to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore the Holders of Interests in Class 5 are not entitled to vote to accept or reject the Plan.

4822-8239-5573.6

D.    **Acceptance or Rejection of the Plan**

1.    Voting Classes

Each Holder of an Allowed Class 2, Allowed Class 3 and Allowed Class 4 Claim shall be entitled to vote to accept or reject the Plan. No other Holder of a Claim or Interest Equity shall be entitled to cast a vote with respect to the Plan.

2.    Voting Rights of Holders of Disputed Claims

A Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, provided an objection to such Claim has been filed no later than seven (7) calendar days prior to the deadline for casting ballots on the Plan, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a).

3.    Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) more than one-half in number of the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of such Allowed Claims actually voting in such Class have voted to accept the Plan.

4.    Presumed Acceptance/Rejection of the Plan

Class 1 is unimpaired under the Plan and, therefore, are conclusively presumed by the Bankruptcy Code to accept the Plan. Class 5 is not receiving a Distribution under the Plan and therefore, for the purpose of the Plan, is conclusively presumed by the Bankruptcy Code to reject the Plan.

E.    **Means of Implementation of the Plan**

1. Estate Cash Payment

The Estate Cash Payment shall be paid into the Escrow Cash Escrow Account on the Confirmation Date and shall be held in trust by the Debtors through the Estate Cash Escrow Account exclusively for the payment of outstanding unpaid and accrued post-petition Professional Fees (excluding Hillair Professional Fees), with any remaining balance after reserves for accrued non-Hillair Professional Fees payable to the Creditor Trust  (or, if the Effective Date does not occur on or before December 1, 2020 or such later date as the Debtors, in consultation with the Committee, may agree in writing, the Debtors' estates, with the Debtors' use of such funds being subject to consultation with the Committee).  Hillair shall not retain or receive any lien, right, title or interest in the Estate Cash Payment after it is made and the Estate Cash Payment shall not be subject to the claims of any chapter 7 trustee.

4822-8239-5573.6

The Debtors shall provide notice to the Committee prior to making payments from the Estate Cash Payment. On or soon as practicable after the Effective Date, the following shall occur with respect to the implementation of the Plan: (i) all acts, documents and agreements appropriate to implement the Plan shall be executed; (ii) the Creditor Trustee, as disbursing agent under the Plan, shall make all Distributions required to be made on or about the Effective Date of the Plan in accordance with the terms and conditions of the Plan; and (iii) the Creditor Trustee, as disbursing agent under the Plan, shall fund reserves required to be funded pursuant to the Plan.

Upon the Effective Date, all transactions and matters provided for under the Plan shall be deemed to have been authorized and approved by the Debtors without any requirement of further action by the Debtors, or Holders of Equity Interests in the Debtors.

2. Transfer of the Hillair Causes of Action

On the Effective Date, the Hillair Causes of Action and all of the rights of the Estates to pursue such Hillair Causes of Action shall transfer to Hillair for its own benefit, subject solely to the contingent obligation to share the Amazon Creditor Trust Proceeds, if any, free and clear of all liens, claims, encumbrances, charges and other interests, and Hillair will be deemed to have standing to pursue such claims for all purposes. On and after the Effective Date, the vesting of the Hillair Causes of Action from the Estates to Hillair, will be deemed final and irrevocable.

3. Vesting of the Remaining Assets and Transfer

On the Effective Date, the Remaining Assets, including the Remaining Causes of Action, and all rights of the Estates to pursue such Remaining Causes of Action, and remaining cash of the Debtors not used or transferred to the Creditor Trust and reserved to satisfy Allowed Administrative Expense Claims (including Claims arising under section 503(b)(9) of the Bankruptcy Code), Allowed Priority Tax Claims, or Allowed Other Priority Claims (including claims required to be paid upon confirmation and effectiveness of the Plan), and Budgeted Professional Fees, separate from the Estate Cash Payment, will vest in the Reorganized Debtors free and clear of all claims, liens, encumbrances, charges and other interests. On and after the Effective Date, the vesting of the Remaining Assets from the Estates to the Reorganized Debtors, will be deemed final and irrevocable subject to the terms of the Plan.

In connection with the foregoing, the Confirmation Order will provide for the vesting of the Remaining Assets to the Reorganized Debtors and for the officers and directors of the Remaining Assets to take all actions necessary to effectuate same and to prosecute, settle and compromise (including by set-off or recoupment) any and all Remaining Causes of Action, without any need for notice to creditors or order or approval of the Bankruptcy Court. As of the Effective Date, the Remaining Assets will be free and clear of all liens, claims and interests of Holders of Claims and Equity Interests, except as otherwise provided in the Plan.

4. The Reorganized Debtors

(a)    Corporate Action of the Reorganized Debtors

On and after the Effective Date, the Reorganized Debtors shall have full authority and are authorized to take such actions and execute such documents as may be necessary to effectuate

20

the transactions provided for in the Plan. The Reorganized Debtors' post-Effective Date authority shall include the right to operate their business as a going concern to purchase and/or sell assets; to commence and prosecute actions and proceedings; to open, maintain and close bank accounts and/or other investments on behalf of the Estates; to engage or retain professionals and to pay the fees and disbursements thereof; to file tax information and returns as required and, in connection therewith, to make such determinations of tax liability, challenge assessments, make tax elections, pay taxes and take other, related actions. Subsequent to the Effective Date, the Debtors' charter shall be amended to prohibit the issuance of non-voting securities and to otherwise comply with the terms and conditions of section 1123(a)(6) of the Bankruptcy Code.

On and after the Effective Date, the members of the Board of Directors of the Reorganized Debtors are authorized to, and may direct an officer to, issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such action as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of, and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those required pursuant to the Plan.

The adoption of the Amended Certificate and Bylaws, the selection of directors and officers of Reorganized Debtors, and all other actions contemplated by the Plan shall be authorized and approved in all respects (subject to the provisions of the Plan) by the Confirmation Order. All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors of the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirements or further action by the security holders, directors, or managers of the Debtors or Reorganized Debtors. On the Effective Date, as applicable, the appropriate officers of the Debtors and /or Reorganized Debtors and members of the boards of directors or managers of the Debtors and/or Reorganized Debtors are authorized and directed to issue, execute and deliver, and cause the Reorganized Debtors to perform, the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of the Debtors and/or Reorganized Debtors.

*(b)    Issuance of New Equity Interests*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall authorize 1,000 shares of New Common Stock, each in the case of Scoobeez and Scoobeez Global, each as reorganized, and 1,000 New Membership Interests in the case of Scoobur as reorganized. The issuance of the New Equity Interests under the Plan is authorized without the need for any further corporate action or without any further action by any Holder of Claims or Interests. The New Equity Interests issued under the Plan shall not be subject to dilution by any additional shares of common stock within two years after the Effective Date. The Reorganized Debtors shall be authorized to enter into and adopt an incentive stock option plan for employees and management, as may be determined by the Reorganized Debtors' Board of Directors.

All of the New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable.

21

<em>(c)       Securities Registration Exemption</em>

The securities to be issued pursuant to the Plan are to be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.  To the extent section 1145 of the Bankruptcy Code is inapplicable, these issuances are exempt from registration under the Securities Act or any similar federal, state or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

<em>(d)       Effective Date Funding</em>

Claims will be funded from the Estate Cash Payment (made on the Confirmation Date) and cash on hand as provided for in the Plan.  The proceeds of such funding will be used to, among other things to repay the Effective Date cash distributions under the Plan and to fund the Creditor Trust. A minimum of $25,000 of the Estate Cash Payment shall be used to fund the Creditor Trust.  Under no circumstances shall Hillair be obligated to fund the Creditor Trust other than its consent for the making of the Estate Cash Payment.

The Reorganized Debtors may execute all documents and enter into all agreements as may be necessary and appropriate in connection with such funding.

<em>(e)       Corporate Governance and Management of the Reorganized Debtors</em>

On the Effective Date, the Boards of Directors, management structure and initial officers of the Reorganized Debtors shall consist of those Persons chosen by Hillair and set forth in the Plan Supplement.

5. <u>Withdrawal of the Committee Challenge</u>

On the Confirmation Date and upon the payment and delivery of the Estate Cash Payment, the Creditors' Committee shall irrevocably waive any and all challenges to Hillair's Claims against the Debtors and related liens and the Challenge Period (as defined in the Cash Collateral Orders) shall terminate.

6. <u>Working Capital Requirement</u>

The Debtors shall maintain the Minimum Working Capital Requirement until the Effective Date.

7. <u>Estate Causes of Action</u>

Subject to the terms of the Plan, the right to enforce, file, litigate, prosecute, settle, adjust, retain, enforce, collect and abandon on behalf of the Debtors and the Estates any and all Estate Causes of Action, is deemed automatically transferred on the Effective Date from the Estates to Hillair, the Creditor Trust, and the Reorganized Debtors, and as divided amongst them respectively as set forth in the Plan (each, a "<u>Post-Effective Date Claimant</u>").

22

As of the Effective Date, each Post Effective Date Claimant shall be authorized to exercise and to perform the rights, powers and duties held by the Estates with respect to the respective Estate Causes of Action assigned or vested to it under the Plan and, from and after the Effective Date, each Post-Effective Date Claimant, solely with respect to the applicable Estate Causes of Action assigned or vested to it under the Plan, shall have the sole and exclusive right, to file, litigate, prosecute, settle, adjust, retain, enforce, collect and abandon claims and interests of the Estates with respect to the such Estate Causes of Action without the consent or approval of any third party, and without any further approval or order of the Bankruptcy Court.

Unless an Estate Cause of Action is expressly waived, relinquished, released, compromised, or settled in the Plan or in any Final Order, such Estate Cause of Action is expressly reserved for later adjudication by the respective Post-Effective Date Claimant (including any Estate Causes of Action of which the Debtors presently may be unaware, or which may arise or exist by reason of facts or circumstances unknown to the Debtors at this time, or facts or circumstances which may change or be different from those which the Debtors now believe to exist) and, therefore, neither the failure of the Debtors to list any such Estate Causes of Action in their schedules or elsewhere, nor any preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to the applicable Post-Effective Date Claimant's prosecution of Estate Causes of Action based on the Disclosure Statement, the Plan, or the Confirmation Order. Without limiting the generality of the foregoing, any Person with respect to which the Debtors has incurred an obligation (whether on account of services, purchase or sale of property, or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, should assume that such obligation, transfer, or transaction may be evaluated by the Reorganized Debtors subsequent to the Effective Date and may be the subject of an Avoidance Action or other action or proceeding filed after the Effective Date. Without limiting the foregoing reservation of rights, a non-exclusive description of Estate Causes of Action shall be included in the Plan Supplement.

**THE PLAN PROPONENTS HAVE NOT COMPLETED ANY INVESTIGATION REGARDING THE EXISTENCE OF ESTATE CAUSES OF ACTION. AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY PARTICULAR ESTATE CAUSE OF ACTION MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN, PLAN SUPPLEMENT OR SCHEDULES, AN ESTATE CAUSE OF ACTION MAY BE FILED AGAINST ANY CREDITOR OR OTHER PARTY AS THE CREDITOR TRUSTEE, HILLAIR, OR REORGANIZED DEBTORS, AS APPLICABLE, MAY DETERMINE, IN THE EXERCISE OF THEIR SOLE AND ABSOLUTE DISCRETION.**

8. Establishment of the Creditor Trust

    (a)    Generally

On the Effective Date the Creditor Trust Agreement will become effective, and, if not previously signed, the Debtors and the Creditor Trustee will execute the Creditor Trust Agreement. The Creditor Trust is organized and established as a trust for the benefit of the

23

Beneficiaries and is intended to qualify as a Creditor Trust within the meaning of Treasury Regulation Section 301.7701-4(d).

(b)      *Beneficiaries*

In accordance with Treasury Regulation Section 301.7701-4(d), the Beneficiaries of the Creditor Trust will be the Holders of all Allowed Class 4 Claims against the Debtors but, if Class 4 does not accept the Plan, the Beneficiaries of the Creditor Trust will be the Holders of all Allowed Class 2 Claims. The Holders of such Allowed Claims will receive an allocation of the Creditor Trust Assets as provided for in the Plan and the Creditor Trust Agreement. The Beneficiaries of the Creditor Trust shall be treated as the grantors and owners of such Beneficiaries' respective portion of the Creditor Trust.

(c)      *Implementation of the Creditor Trust*

On the Effective Date, the Debtors, on behalf of the Estate, and the Creditor Trustee will be authorized and directed to take all such actions as required to transfer to the Creditor Trust, from the Debtors and Estates, the Debtors' Assets in accordance with the Plan. From and after the Effective Date, the Creditor Trustee will be authorized to, and will, take all such actions to implement the Creditor Trust Agreement and the provisions of the Plan as are contemplated to be implemented by the Creditor Trustee, including directing Distributions to Holders of Allowed Claims, objecting, compromising and settling Claims (including exercising set-off or recoupment rights and/or seeking the subordination and/or reclassification of Claims), prosecuting or otherwise resolving Creditor Trust Claims and causing Distributions from the Creditor Trust to be made to the Beneficiaries. The funding of the Creditor Trust will be from the Debtors' Cash on hand as of the Effective Date (which in turn is funded from the contributions of the Senior Secured Creditor), the remainder of the Estate Cash Payment (which shall not be less than $25,000) and the proceeds of the Creditor Trust Assets.

(d)      *Transfer of the Creditor Trust Assets*

On the Effective Date, pursuant to the Plan and sections 1123, 1141 and 1146(a) of the Bankruptcy Code, the Debtors are authorized to transfer, grant, assign, convey, set over, and deliver to the Creditor Trustee all of the Debtors' and Estate's right, title and interest in and to the Creditor Trust Assets, including all Creditor Trust Claims, free and clear of all liens, Claims, encumbrances or interests of any kind in such property, except as otherwise expressly provided in the Plan. To the extent required to implement the transfer of the Creditor Trust Assets from the Debtors and Estates to the Creditor Trust, all Persons will cooperate with the Debtors and Estates to assist the Debtors and Estates to implement said transfers.

(e)      *Appointment of Creditor Trustee*

On the Effective Date, the appointment of the Creditor Trustee shall become effective and the Creditor Trustee shall begin to administer the Creditor Trust pursuant to the terms of the Creditor Trust Agreement and the Plan and may use, acquire and dispose of property of the Creditor Trust free of any restrictions imposed under the Bankruptcy Code. The Creditor Trustee shall have the rights, powers and duties provided for by the Plan, the Creditor Trust Agreement, and by the Confirmation Order. The Creditor Trustee, in the exercise of its reasonable business

judgment, shall be responsible for asserting the Creditor Trust Claims of the Debtors, and for making Distributions to Holders of Claims in as efficient, effective and economical manner as is reasonably practicable so as to produce for Holders of Claims as favorable a recovery on their Claims as is reasonably possible under the circumstances of this case.

The Confirmation Order will provide the Creditor Trustee with express authority to convey, transfer and assign any and all of the Creditor Trust Assets and to take all actions necessary to effectuate same and to prosecute, settle and compromise (including by set-off or recoupment) any and all Creditor Trust Claims and Disputed Claims, without any need for notice to creditors or order or approval of the Bankruptcy Court. As of the Effective Date, the Creditor Trust Assets will be free and clear of all liens, claims and interests of Holders of Claims and Equity Interests, except as otherwise provided in the Plan.

*(f)    Representative of the Estate*

The Creditor Trustee will be appointed as the representative of the Debtors' Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to the Creditor Trust Agreement) to inter alia: (i) object to, settle and compromise Claims (including any Administrative Expense Claim) against the Debtors (including exercising set-off or recoupment rights and/or seeking the subordination and/or reclassification of Claims) and Equity Interests in the Debtors; (ii) administer, investigate, prosecute, settle and abandon all Creditor Trust Claims assigned to the Creditor Trust; (iii) make Distributions provided for in the Plan, including on account of Allowed Claims; and (iv) take such action as required to administer, wind-down, and close the Chapter 11 Cases. Except only for the filing of a final decree to close the Chapter 11 Cases pursuant to Rule 3022 of the Bankruptcy Rules, the Creditor Trustee may take, as representative of the Estate, all acts to implement and consummate the Plan and the Creditor Trust Agreement, including the acts set forth in this Section, without any need for notice to creditors or order or approval of the Bankruptcy Court. As the representative of the Estates, the Creditor Trustee will be vested with all of the rights and powers of the Debtors and Estates with respect to all Creditor Trust Claims assigned and transferred to the Creditor Trust, and the Creditor Trustee will be substituted in place of the Debtors and Estates, as applicable, as the party in interest in all such litigation pending as of the Effective Date.  For the avoidance of doubt, however, all Remaining Causes Of Action shall be transferred to the Reorganized Debtors, who shall be will be vested with all of the rights and powers of the Debtors and Estates with respect to all Remaining Causes of Action and transferred to the Reorganized Debtors, and the Reorganized Debtors will be substituted in place of the Debtors and Estates, as applicable, as the party in interest in all such litigation pending as of the Effective Date.

From and after the Effective Date, the Creditor Trustee shall, without any further notice or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and consummation of the Plan and Creditor Trust Agreement incurred by the Creditor Trust.

4822-8239-5573.6

(g)    *Creditor Trust Assets*

Unless otherwise expressly provided under the Plan, on the Effective Date, the Creditor Trust Assets will vest in the Creditor Trust free and clear of all claims, liens, encumbrances, charges and other interests, subject to the provisions of the Plan. On and after the Effective Date, the transfer of the Creditor Trust Assets from the Estate to the Creditor Trust will be deemed final and irrevocable and Distributions may be made from the Creditor Trust.

(h)    *Provisions Relating to Federal Income Tax Compliance*

A transfer to the Creditor Trust shall be treated for all purposes of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), as a transfer to creditors to the extent creditors are Beneficiaries. For example, such treatment shall apply for purposes of Internal Revenue Code sections 61(a)(12), 483, 1001, 1012 and 1274. Any such transfer shall be treated for federal income tax purposes as a deemed transfer to the beneficiary-creditors followed by a deemed transfer by the beneficiary-creditors to the Creditor Trusts. The Beneficiaries of the Creditor Trust shall be treated for federal income tax purposes as the grantors and deemed owners of the Creditor Trust.

(i)    *Cooperation with Creditor Trustee*

All Holders of Claims, Holders of Equity Interests and other parties-in-interest shall cooperate with the Creditor Trustee by executing any documents, and by taking any acts, appropriate to implement the provisions of the Plan.

(j)    *Compensation of the Creditor Trustee/Removal of the Creditor Trustee*

On the Effective Date of the Plan, the Creditor Trustee shall be appointed to serve under the Plan and the Creditor Trust Agreement. The Creditor Trustee's compensation shall be as provided in the Creditor Trust Agreement. The Creditor Trustee shall serve during the term of the Plan; provided, however, that, upon motion made with notice and an opportunity for a hearing given to the Post-Effective Date Notice Parties, any party-in-interest shall be entitled to request, for cause shown, that the Bankruptcy Court terminate the employment of the Creditor Trustee and replace it with another Person, who if appointed by Final Order of the Bankruptcy Court, will have all of the rights, powers and duties provided to the Creditor Trustee by the Plan, the Creditor Trust Agreement, the Confirmation Order and by the provisions of the Final Order of the Bankruptcy Court appointing such replacement Creditor Trustee.

Upon any resignation, death, disability or inability to serve of the Creditor Trustee ("Creditor Trustee Service Termination Event"), the members of the Committee as of the Confirmation Date may appoint a replacement Creditor Trustee after notice to the Post-Effective Date Notice Parties. In the event that no replacement Creditor Trustee is appointed within sixty (60) days after the date of any Creditor Trustee Service Termination Event, the Office of the United States Trustee may, after notice and an opportunity for hearing, request that the Chapter 11 Cases be converted to cases under chapter 7 of the Bankruptcy Code.

4822-8239-5573.6

*(k)      Funding of Post-Effective Date Plan Expenses*

The Creditor Trust shall be entitled to incur, and to be reimbursed for, Post-Effective Plan Expenses in performing its duties and obligations under the Plan and Creditor Trust Agreement. All Post-Effective Date Plan Expenses shall be expenses of the Creditor Trust. The Creditor Trustee shall have no personal liability for any Post-Effective Date Plan Expenses. The Creditor Trustee shall disburse funds from the Creditor Trust Assets for the purpose of funding the Post- Effective Date Plan Expenses.

*(l)      Post-Effective Date Professional Fees*

The Creditor Trustee may employ, without any need to give notice to Holders of Claims or other parties-in-interest or obtain any approval of the Bankruptcy Court, any professional to aid the Creditor Trustee in performing the Creditor Trustee's duties under the Plan or the Creditor Trust Agreement, as the Creditor Trust deems appropriate in the exercise of its sole and absolute discretion, including professionals who were employed by the Debtors or the Committee in the Chapter 11 Cases. Any professional employed by the Creditor Trustee after the Effective Date shall be entitled to obtain from the Creditor Trustee payment of the professional's fees and costs as a Post-Effective Date Plan Expense, in the ordinary course, without any need to give notice to Holders of Claims or other parties-in-interest or to obtain any approval or order of the Bankruptcy Court. Notwithstanding the foregoing, if the Creditor Trustee should fail to pay any post-Effective Date fees and costs of a professional entitled to such payment, within thirty (30) days after the professional's rendering of its billing statement, the professional shall be entitled to seek, by application filed in accordance with the Bankruptcy Rules, an order of the Bankruptcy Court requiring the Creditor Trustee to forthwith pay to the professional its fees and costs.

*(m)      Approval for Disposition of Assets*

From and after the Effective Date, the Creditor Trustee shall be entitled to sell, transfer, assign, encumber or otherwise dispose of any interest in any of the Creditor Trust Assets, without any need to give notice to Holders of Claims or parties-in-interest or to obtain any approval or order of the Bankruptcy Court. Notwithstanding the foregoing, the Creditor Trustee shall be entitled to seek, from the Bankruptcy Court, an order authorizing the sale of any Creditor Trust Asset free and clear of liens pursuant to the provisions of section 363(f) of the Bankruptcy Code.

*(n)      Compromise of Controversies*

From and after the Effective Date, the Creditor Trustee shall be entitled to compromise any objections to a Disputed Claim, or any controversies relating to Creditor Trust Claims after the Confirmation Date, without any need to give notice to creditors or parties-in-interest or to obtain any approval or order of the Bankruptcy Court.

*(o)      Bankruptcy Court Approval Relative to Post-Confirmation Matters*

Nothing contained in the Plan shall be deemed to impair in any manner the right of the Creditor Trustee to seek at any time after the Effective Date orders of the Bankruptcy Court

approving actions to be taken, or granting relief, consistent with the Plan as may be necessary or desirable to effectuate the provisions of the Plan.

### (p) Creditor Trustee Certification

On or before the date upon which the Creditor Trustee determines, in the exercise of its sole and absolute discretion, that all Creditor Trust Claims and objections to Disputed Claims have been resolved by Final Order, that all other Creditor Trust Assets have been liquidated or otherwise disposed of, and that all Distributions required to be made under the Plan have been made or that final Distributions are being made or will be made within ten (10) days or as soon thereafter as is practicable by the Creditor Trustee, the Creditor Trustee shall file with the Bankruptcy Court and serve upon the Office of the United States Trustee and any other Post-Effective Date Notice Party a certification attesting to such determination ("Creditor Trustee Certification").

### (q) Final Decree

Unless earlier filed by the Creditor Trustee, by the thirtieth (30th) day after the filing of the Creditor Trustee Certification, the Creditor Trustee shall file, in accordance with Rule 3022 of the Chapter 11 Bankruptcy Rules, an application with the Bankruptcy Court to obtain a final decree to close the Cases.

### (r) Other Rights, Powers and Duties of Creditor Trustee

In addition to the rights, powers and duties granted expressly to the Creditor Trustee pursuant to the Plan, the Creditor Trustee shall have such other rights, powers and duties that are appropriate to implement and to carry out the provisions of the Plan for the benefit of Holders of Claims that are not inconsistent with the provisions of the Plan.

### (s) Resolution of Disputes

In the event that a dispute should arise between the Creditor Trustee and any party-in-interest in the Chapter 11 Cases regarding any matters pertaining to the Plan, the Creditor Trust Agreement or pertaining to the Creditor Trustee's performance of its duties and exercise of its rights, powers and remedies under the Plan, either of them may request, pursuant to the provisions of the Bankruptcy Rules, that the Bankruptcy Court resolve the merits of such dispute.

### (t) Termination of Employment of Creditor Trustee

Upon the Case Closing Date, the rights, powers and duties granted to the Creditor Trustee hereunder or under the Creditor Trust Agreement shall terminate and the Creditor Trustee shall be discharged.

### (u) Bar Date for Filing Avoidance Action Payment Claims

Any Avoidance Action Payment Claim shall be forever barred, shall not be enforceable against the Debtors, the Estates or the Creditor Trust and shall not be entitled to any Distribution under the Plan, unless a proof of Claim for such Avoidance Action Payment Claim is filed and

4822-8239-5573.6

served on the Creditor Trustee within thirty (30) days after the later of (a) the date of entry of the order of the Bankruptcy Court adjudging the creditor's liability to the Debtors on account of such Avoidance Action, or (b) the Effective Date.

*(v)      Payment of Fees and Expenses of Creditor Trustee*

The fees and expenses incurred by the Creditor Trustee, in connection with the performance of its duties as disbursing agent under the Plan, shall be paid from the Creditor Trust Assets.

*(w)      Books and Records transferred to the Creditor Trustee*

Upon the Case Closing Date, the Creditor Trustee shall be authorized, in the exercise of its sole and absolute discretion, to discard or destroy any and all pre-Effective Date books and records of the Debtors that are in the Creditor Trustee's custody or control. The Creditor Trustee shall continue to preserve post-Effective Date books and records in its custody or control through the Case Closing Date, or as otherwise provided by order of the Bankruptcy Court.

9.    Cancellation of Existing Securities and Agreements

On the Effective Date, the Equity Interests in the Debtors, shall be deemed, and shall be, cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Similarly, on the Effective Date, except (a) as otherwise specifically provided for in the Plan, (b) with respect to unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to Distributions under the Plan, or (d) with respect to any Claim that is Allowed under the Plan, on the Effective Date, any instruments or documents evidencing any Claims or Interests shall be deemed automatically canceled and deemed surrendered without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under the agreements, instruments, and other documents, indentures, and certificates of designations governing such Claims and Interests, as the case may be, shall be discharged.

10.    Substantive Consolidation

At the Effective Date, the Estates of all of the Debtors are substantively consolidated, and all assets of the Debtors shall be considered to be assets of the consolidated Estates. Any Allowed Claim against any of the Debtors shall be treated as an Allowed Claim against the consolidated Estates. Any Allowed Claim asserted against any Debtor that is also asserted against any other Debtor on the grounds that such other Debtor is a co-debtor, surety, guarantor, or is otherwise liable with respect to such Allowed Claim shall be treated as a single Allowed Claim against the consolidated Estates. On the Effective Date, none of the Debtors will hold any Claims or Interests in or against any other Debtor and such Claims are disallowed.

11.    Issuance and Execution of Plan Related Documents

As of the Effective Date, the Debtors, Hillair, the Reorganized Debtors and/or the Creditor Trustee will execute such amendments, modifications, supplements, and other documents as may be reasonably appropriate to implement the Plan. The Debtors, the

4822-8239-5573.6

Reorganized Debtors and/or the Creditor Trustee are authorized to execute such amendments, modifications, supplements and other documents as provided for in the Plan without any further corporate action, and upon such execution, such amendments, modifications, supplements and other documents as provided for in the Plan shall be deemed binding upon the Debtor, the Reorganized Debtors and/or the Creditor Trustee and such other parties as applicable.

12. Dissolution of the Committee

From and after the Effective Date, the Committee shall be dissolved and the Committee shall cease to exist and its members, designated representatives and/or agents (including attorneys and other advisors and agents) shall, subject to those matters set forth below, be released and discharged from any further authority, duties, responsibilities and obligations relating to, arising from, or in connection with the Committee. The Committee shall continue to exist after such date solely with respect to all the applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any professional.

**F.**    **Distributions Under the Plan**

1. In General

Except as otherwise provided herein, or as may be ordered by the Bankruptcy Court, Distributions to be made on account of Allowed Claims, other than Allowed Class 4 Claims, shall be made on or soon as reasonably practicable after the Effective Date. The date(s) for Distributions to be made on account of Allowed Class 4 Claims shall be selected by the Creditor Trustee in accordance with the Creditor Trust Agreement.

2. Manner of Payment Under the Plan

Any payment of Cash made by the Creditor Trustee pursuant to the Plan may be made either by check drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Creditor Trustee.

3. Manner of Distribution of Other Property

Any Distribution under the Plan of property other than Cash shall be made by the Creditor Trustee (or its agent) in accordance with the terms of the Plan.

4. Set-offs.

The Creditor Trustee may set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that the Debtors, Estates or the Creditor Trust may have against the Holder of such Claim; provided that neither the failure to effect such set-off nor the allowance of any Claim that otherwise would be subject to set- off, shall constitute a waiver or release by the Debtors, Estates or Creditor Trust of any such claim that the Debtors, Estates or Creditor Trust may have against such Holder.

4822-8239-5573.6

5. <u>Distribution of Unclaimed Property</u>

Except as otherwise provided in the Plan, any Distribution of property (Cash or otherwise) under the Plan which is unclaimed after the later of (i) one hundred eighty (180) days following the Effective Date or (ii) ninety (90) days after such Distribution has been remitted to the Holder of the Allowed Claim, shall be deemed Available Cash and distributed as provided for under the Plan.

6. <u>De Minimis Distributions</u>.

No cash payment of less than fifty dollars ($50.00) shall be made by the Creditor Trustee to any Holder of a Claim unless a request therefor is made in writing to the Creditor Trustee.

7. <u>Saturday, Sunday or Legal Holiday</u>

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

8. <u>Delivery of Distributions, Address of Holder</u>

For purposes of all notices and Distributions under the Plan, the Creditor Trustee shall be entitled to rely on, and Distributions to Holders of Allowed Claims shall be made by regular U.S. first class mail to, the following name and address for the Holder of each such Claim: (a) the address set forth in the proof of Claim Filed by such Holder; (b) the address set forth in any written notice of address change delivered by the Holder to the Debtors or the Creditor Trustee after the date on which any related proof of Claim was Filed, or (c) the address reflected on the Schedules if no proof of Claim is Filed and neither the Debtors nor the Creditor Trustee have received a written notice of a change of address. The Creditor Trustee shall be under no duty to attempt to locate Holders of Allowed Claims who are entitled to unclaimed Distributions.

9. <u>Payment of Fees and Expenses of Creditor Trustee</u>

The fees and expenses incurred by the Creditor Trustee, in connection with the performance of its duties as disbursing agent under the Plan, shall be paid from the Creditor Trust Assets.

10. <u>Approval for Schedule of Proposed Distributions</u>

In the discretion of the Creditor Trustee, the Creditor Trustee shall be entitled to prepare a preliminary schedule of proposed Distributions to Holders of Claims ("<u>Distribution Schedule</u>"), and to apply, on an expedited basis, for an order of the Bankruptcy Court approving the making of such Distributions pursuant to the Distribution Schedule. Notice of any such application shall be served on the Post-Effective Date Notice Parties or as otherwise determined by the Bankruptcy Court.

11.     Further Assurances Regarding Distributions

As a condition to obtaining Distributions under the Plan, each Holder of a Claim shall execute and deliver to the Creditor Trustee, or join in the execution and delivery of, any agreement or instrument appropriate for the consummation of the Plan.

12.     Creditor's Payment of Obligations or Turn Over of Property to the Creditor Trustee

As a condition to obtaining Distributions under the Plan, any Holder of a Claim from which property is recoverable pursuant to a Final Order of the Bankruptcy Court under sections 542, 543, 550 or 553 of the Bankruptcy Code, or otherwise, or that is a transferee of a transfer avoidable pursuant to a Final Order of the Bankruptcy Court under sections 522, 544, 545, 547, 548 or 549 of the Bankruptcy Code or otherwise, shall turn over any such property or pay the amount to the Reorganized Debtors, the Creditor Trust, or Hillair (in accordance with the ownership of such property or avoidable transfer claim as set forth in the Plan) for which such Holder of a Claim is liable to the Debtors.

## G.     **Provisions for Treatment of Disputed, Contingent or Unliquidated Claims and Administrative Expenses**

1.   Resolution of Disputed Claims

As of the Effective Date, and subject to the provisions of the Plan, the Creditor Trustee shall have the sole authority to investigate, administer, monitor, implement, litigate and settle all Disputed Claims. From and after the Effective Date, the Creditor Trustee may file and prosecute objections to Claims, including Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims, but excluding the Senior Secured Hillair Claims which are deemed Allowed under and subject to the Plan. All objections shall be filed prior to the Creditor Trustee Claim Objection Deadline and served upon the Holder of the Claim to which the objection is made.

2.   Reserve for Disputed Claims

Cash which would be distributed on account of Holders of Disputed Claims, in the event that such Disputed Claims become Allowed Claims, shall instead be placed in the Disputed Claims Reserve maintained by the Creditor Trustee. Such Cash in the Disputed Claims Reserve will be reserved for the benefit of Holders of such Disputed Claims pending determination of their entitlement thereto. Unless the Bankruptcy Court orders otherwise, the Creditor Trustee will reserve Pro Rata Distributions for such Disputed Claims based upon the full amount of the Disputed Claims or, in the case of a Disputed Claim that is an Administrative Expense Claim, Priority Tax Claim or Other Priority Claim, Cash in the full amount of such Disputed Claim. No reserve shall be required for any Disputed Claim to the extent of any effective insurance coverage therefor. Such Cash so reserved shall be distributed by the Creditor Trustee to the holder of a Disputed Claim to the extent that such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.

To the extent that a Disputed Claim ultimately is disallowed or allowed in an amount less than the amount of Cash that has been reserved, the resulting surplus Cash shall be allocated among Holders of Allowed Claims in the Class in which the Disputed Claim was classified as provided in the Plan.

To the extent that any portion of a Disputed Claim is not disputed, the Creditor Trustee shall establish a reserve in the Disputed Claims Reserve only on account of that portion of the Disputed Claim that is in dispute and shall make one or more interim Distributions on account of the portion of such Disputed Claim that is not in dispute.

The Creditor Trustee may, at the Creditor Trustee's sole discretion, file a tax election to treat the Disputed Claims Reserve as a Disputed Ownership Fund ("DOF") within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes, rather than tax such reserve as a part of the grantor Creditor Trust. If the election is made, the Creditor Trustee shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including the filing of a separate federal income tax return for the DOF and the payment of federal and/or state income tax due.

3. Exclusive Right to Object to Claims

From and after the Effective Date, the Creditor Trustee shall have the sole and exclusive right to file, litigate and settle objections to Disputed Claims, except Professional Fee Claims. As the representative of the Estate, the Creditor Trustee shall succeed to all of the rights and powers of the Debtors and the Estate with respect to all objections to Disputed Claims, and shall be substituted for, and shall replace, the Debtors and the Estates as the party-in-interest in all litigation regarding Disputed Claims pending as of the Effective Date.

4. Investigation Regarding Disputed Claims

Notwithstanding the fact that the Creditor Trustee shall have, after the Effective Date, the sole and exclusive right to file objections to Disputed Claims, nothing contained herein shall be deemed to obligate the Creditor Trustee to file any objection to a Claim, which action shall be determined by the Creditor Trustee in the exercise of its sole and absolute discretion.

**THE PLAN PROPONENTS HAVE NOT COMPLETED ANY INVESTIGATION REGARDING THE CLAIMS IN THE CHAPTER 11 CASES AND THE FILING OF OBJECTIONS TO DISPUTED CLAIMS. THIS INVESTIGATION IS ONGOING AND, SUBJECT ONLY TO THE CREDITOR TRUSTEE CLAIM OBJECTION DEADLINE, MAY OCCUR AFTER THE CONFIRMATION DATE. AS A RESULT, HOLDERS OF CLAIMS AND OTHER PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT AN OBJECTION TO A DISPUTED CLAIM MAY BE FILED AT ANY TIME, SUBJECT ONLY TO THE CREDITOR TRUSTEE CLAIM OBJECTION DEADLINE. THE CREDITOR TRUSTEE SHALL HAVE THE RIGHT TO OBJECT TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE DEBTORS, OR THAT ARE REFLECTED IN THE DEBTORS' BOOKS AND RECORDS, AND WHICH ARE FOUND TO BE OBJECTIONABLE IN ANY RESPECT.**

5.  Distribution After Allowance

Within fourteen (14) days following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Creditor Trustee, as disbursing agent under the Plan, shall distribute to the Holder of such Allowed Claim any Cash or other property that would have been distributable to such Holder as if, at the time of the making of any Distribution to the Class of which such Holder is a member, such Claim had been an Allowed Claim and not a Disputed Claim.

**H.    Executory Contracts and Unexpired Leases**

1.  Rejection

On the Effective Date, the treatment of which are described further below, any and all agreements executed by the Debtors before the Effective Date, other than agreements that were previously either assumed and assigned or rejected either by a Final Order or under Bankruptcy Code section 365, to the extent that these agreements constitute executory contracts or unexpired leases under Bankruptcy Code section 365, shall be rejected. The Confirmation Order shall constitute a Final Order approving this rejection. All Allowed Rejection Damage Claims shall be treated as Class 4 Claims under the Plan.

2.  Bar Date for Rejection Damage Claims

Any Rejection Damage Claims arising from rejection under the Plan of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served on the Creditor Trustee and its counsel within thirty (30) days after the Effective Date. Any Rejection Damage Claims that are not timely filed and served will be forever barred and unenforceable against the Debtor, the Estate, the Creditor Trust, the Creditor Trustee, and their property, and the entities holding these Claims will be barred from receiving any Distributions under the Plan on account of their Rejection Damage Claims. The Creditor Trustee shall have the right to object to any such Rejection Damage Claims; provided, however, that any such objections must be served and filed not later than one hundred twenty (120) days after the Effective Date.

3.  Assumption

As of the Effective Date, the Debtors shall assume the executory contracts and unexpired leases as determined by Hillair in its discretion.  The cure of all monetary defaults in connection therewith in accordance with section 365 of the Bankruptcy Code shall be made pursuant to a cure schedule to be provided by the Debtors, which cure payments shall be made from cash on hand, provided that it shall not be a default excusing Hillair from performance in connection with the Joint Plan if the Debtors are unable to assume and assign the Amazon contracts or if the Debtors do not pay cure under such contracts with their own funds (including the Estate Cash Payment).

4.  Insurance Policies

For the avoidance of doubt, all of the Debtors' rights with respect to all insurance policies under which any of the Debtors may be a beneficiary (including all insurance policies that may

have expired prior to the Petition Date, all insurance policies in existence on the Petition Date, all insurance policies entered into by the Debtors after the Petition Date, and all insurance policies under which the Debtors hold rights to make, amend, prosecute and benefit from claims) are retained according to their respective terms and will be transferred or assigned to the Reorganized Debtors pursuant to the Plan.

Notwithstanding the foregoing and any provision providing for the rejection of executory contracts in the Plan, any insurance policy that is deemed to be an executory contract shall neither be rejected nor assumed by operation of the Plan and shall be the subject of a specific motion by the Reorganized Debtors who shall retain the right to assume or reject any such executory contract pursuant to and subject to the provisions of section 365 of the Bankruptcy Code following the Effective Date; until such time as the Reorganized Debtors rejects any such executory contract, all rights, interests, and remedies under such executory contract shall be retained fully by the Reorganized Debtors.

## I.    <u>Effectiveness of the Plan</u>

1. <u>Conditions Precedent</u>

The Effective Date shall not occur until the following condition(s) (the "<u>Conditions Precedent</u>") have been satisfied or waived:

a. the Bankruptcy Court shall have entered an order granting approval of the Disclosure Statement and finding that it contains adequate information pursuant to section 1125 of the Bankruptcy Code and that order shall have become a Final Order;

b. the Bankruptcy Court shall have entered a Confirmation Order that is in form and substance satisfactory to Hillair;

c. the earlier of (a) the entry of a final, non-appealable order resolving the existing Amazon Litigation; and (b) the passage of a period of time at Hillair's discretion not to exceed six months following the Confirmation Date provided that the Debtors' estate at all times has sufficient resources to pay Administrative Expense Claims (excluding Professional Fees, which shall be capped at the line items therein without allowance for any variance and the Estate Cash Payment) or a binding commitment by Hillair to fund any shortfall of the same, exists during such period; and

d. no stay of the Confirmation Order is in effect.

Notwithstanding the foregoing, with respect to Condition Precedents (i) and (iv) any such Condition Precedent may be waived provided that each of the Plan Proponents agree to such waiver (such waiver shall not require any notice, Bankruptcy Court order, or any further action) and with respect to Condition Precedents (ii) and (iii) such Condition Precedent may be waived solely by agreement of Hillair and the Debtors (such waiver shall not require any notice, Bankruptcy Court order, or any further action).

2.  The Effective Date

The Plan will not be consummated or become binding (except as to the provisions regarding (i) the irrevocable carve out, (ii) payment of the Estate Cash Payment into trust for the purposes set forth in the Plan upon Confirmation, and (iii) the release of the Hillair Released Parties and the termination of the Committee's challenge rights upon the Confirmation) unless and until the Effective Date occurs. The Effective Date will be the date on which all Conditions Precedent have been satisfied or otherwise waived in accordance with Section VIII.A. of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

3.  Confirmation Request

In the event that all of the applicable requirements of section 1129(a) are met other than section 1129(a)(8), the Debtors request confirmation of the Plan under section 1129(b). If and to the extent applicable, the Debtors will provide further support for Confirmation of the Plan under the "cram down" provisions of section 1129(b) in its brief to be filed in support of the Plan.

4.  Notice of the Effective Date

As soon as practicable after the Effective Date has occurred, the Reorganized Debtors shall file with the Bankruptcy Court an informational notice specifying the Effective Date, as a matter of record.

**J.    Releases, Exculpation and Injunction**

1.  **Exculpation**

*None of the Exculpated Parties shall have or incur any liability for any act or omission in connection with, related to, or arising out of, the filing or administration of the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, implementation, confirmation, or approval of the Plan, the administration of the Plan, or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan, provided, however, that the foregoing provisions shall not (i) affect the liability of any Person that would result solely from any such act or omission to the extent that act or omission is determined by a Final Order by a court of competent jurisdiction to have constituted willful misconduct or gross negligence; or (ii) be deemed to release, waive or discharge any rights or obligations under the Plan.  The Debtors and the Committee (and their respective relevant members, postpetition agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the Bankruptcy Code and applicable law with regard to solicitation and distributions pursuant to the Plan and therefore are not and on account of the same shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, discharges, arguments and any other applicable law, court order, or rules protecting such Persons from liability.*

2. **Releases**

    *a.  Release of the Estate Released Parties*

    *As of the Effective Date, the Debtors and their Estates shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each of the Estate Released Parties of and from any and all past, present and future legal actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, amounts paid in settlement, costs, fees, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind, character or nature whatsoever, whether in law, equity or otherwise (including those arising under Chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, and any and all alter ego, lender liability, indemnification or contribution theories of recovery, and interest or other costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against the Estate Released Parties occurring from the beginning of time to and including the Effective Date related in any way, directly or indirectly, arising out of, and/or connected with any or all of the Debtors, their Estates, the Chapter 11 Cases, the Plan, solicitation of the Plan, and that could have been asserted by or on behalf of the Debtors, the Estates, the Creditor Trust, the Committee, (whether individually on or collectively) on behalf of the holder of any Claim or Equity Interest or other entity.*

    *b.  Release of Hillair Released Parties*

    *As of the Confirmation Date, the Debtors and their Estates shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged each of the Hillair Released Parties of and from any and all past, present and future legal actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, amounts paid in settlement, costs, fees, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind, character or nature whatsoever, whether in law, equity or otherwise (including those arising under Chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, and any and all alter ego, lender liability, indemnification or contribution theories of recovery, and interest or other costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against the Hillair Released Parties occurring from the beginning of time to and including the Confirmation Date related in any way, directly or indirectly, arising out of, and/or connected with any or all of the Debtors, their Estates, the Chapter 11 Cases, the Plan, solicitation of the Plan, and that could have been asserted by or on behalf of the Debtors, the Estates, the Creditor Trust, the Committee, (whether individually on or collectively) on behalf of the holder of any Claim or Equity Interest or other entity.*

### c. Release by Holders of Claims

*As of the Effective Date, each holder of a Claim in Class 1, and each holder of Claims in Class 3 or Class 4 that does not opt out of the releases provided in this section, shall be deemed to release and forever waive and discharge the Debtors, the Estate Released Parties, and the Hillair Released Parties of and from any and all past, present and future legal actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, amounts paid in settlement, costs, fees, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind, character or nature whatsoever, whether in law, equity or otherwise (including those arising under Chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, and any and all alter ego, lender liability, indemnification or contribution theories of recovery, and interest or other costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue from the beginning of time to and including the Effective Date related in any way, directly or indirectly, arising out of, and/or connected with any or all of the Debtors, their Estates, the Chapter 11 Cases, the Plan, or solicitation of the Plan, and that could have been asserted by or on behalf of the Debtors, the Estates, the Creditor Trust, the Committee, (whether individually on or collectively) on behalf of the holder of any Claim or Equity Interest or other entity; provided however, that nothing in this section shall be construed to release the right of any holder of a Claim in Class 1, Class 3 or Class 4 to receive distributions from the Debtors and Creditor Trust on account of an Allowed Claim pursuant to the Plan.*

3. <u>Exception from All Releases</u>

Notwithstanding anything to the contrary in the Plan, Article X of the Plan does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

4. <u>No Liability for Solicitation or Participation</u>

As specified in section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

5. <u>Good Faith</u>

Confirmation of the Plan shall constitute a finding that the Plan was proposed, and that acceptances of the Plan were solicited, in good faith and in compliance with applicable provisions of the Bankruptcy Code.

4822-8239-5573.6

6.  <u>Injunction Enjoining Holders of Claims Against Debtors</u>

The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Equity Interests.  To that end, except as expressly provided in the Plan, at all times on and after the Effective Date, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtors, arising prior to the Effective Date, will be permanently enjoined from taking any of the following actions, on account of any such Claim or Equity Interest, against the Debtors, the Estates, the Reorganized Debtors, the Creditor Trust or its property (other than actions brought to enforce any rights or obligations under the Plan):

a.  commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtors, the Estates, the Reorganized Debtors, the Creditor Trust, or the Creditor Trustee, their successors, or their respective property or assets (including all suits, actions, and proceedings that are pending as of the Effective Date which will be deemed to be withdrawn or dismissed with prejudice);

b.  enforcing, levying, attaching, executing, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against the Debtors, the Estates, the Reorganized Debtors, the Creditor Trust, or the Creditor Trustee, their successors, or their respective property or assets;

c.  creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien, security interest or encumbrance against the Debtors, the Estates, the Reorganized Debtors, the Creditor Trust, or the Creditor Trustee, their successors, or their respective property or assets; and

d.  proceeding in any manner in any place whatsoever against the Debtors, the Estates, the Reorganized Debtors, the Creditor Trust, or the Creditor Trustee, their successors, or their respective property or assets that does not conform to or comply with the provisions of the Plan.

From and after the Effective Date, to the extent of the releases and exculpation granted in the Plan, holders of Claims or Equity Interests as applicable shall be permanently enjoined from commencing or continuing in any manner against the Estate Released Parties, the Hillair Released Parties and the Exculpated Parties and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or exculpated pursuant to Article X of the Plan.

4822-8239-5573.6

7. <u>Discharge</u>

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise provided herein or in the Confirmation Order, each Person that is a Holder (as well as any trustees and agents on behalf of such Person) of a Claim or Interest and any affiliate of such Holder shall be deemed to have forever waived, released, and discharged the Debtors and the Reorganized Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided herein, upon the Effective Date, all such Holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtors.

## K. **Retention of Jurisdiction**

The Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. The Bankruptcy Court will retain and have exclusive jurisdiction to the fullest extent permissible over any proceeding (i) arising under the Bankruptcy Code or (ii) arising in or related to the Chapter 11 Cases or the Plan, including the following:

(a)     To hear and determine pending motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases, if any are pending as of the Effective Date, the determination of any cure payments related thereto, and the allowance or disallowance of Claims resulting therefrom;

(b)     To determine any and all adversary proceedings, applications, motions, and contested matters instituted prior to the closing of the Chapter 11 Cases;

(c)     To ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

(d)     To hear and determine any objections to Administrative Expense Claims and to proofs of Claims filed both before and after the Effective Date (including whether all or any part of any Claim set forth in any such proof of Claim or Administrative Expense Claim is subject to partial or complete subordination pursuant to applicable law), and to allow or disallow any Disputed Claim in whole or in part, provided, however, that, for the avoidance of doubt, the Creditor Trustee may settle or compromise (including by set-off) any Disputed Claim without further Order of the Court;

(e)     To hear and determine all applications for compensation and reimbursement of expenses of Professional Persons under sections 330, 331, and 503(b) of the Bankruptcy Code;

(f)     To hear and determine any disputes arising in connection with the interpretation, implementation, execution, or enforcement of the Plan, the Creditor Trust Agreement, the Confirmation Order, or any other order of the Bankruptcy Court;

4822-8239-5573.6

(g)     To hear or determine any action to recover assets of the Estate, wherever located;

(h)     To hear and determine any actions or matters related to Estate Causes of Action, whether or not such actions or matters are pending on the Effective Date, provided that in the cases of  Estate Causes of Action, the Bankruptcy Court's jurisdiction shall be deemed non-exclusive;

(i)     To hear and determine any matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(j)     To hear and determine any objections to the allowance of Claims or Administrative Expense Claims, whether filed before or after the Confirmation Date, including any objections to the classification of any Claim, and any proceedings to allow, disallow, determine, liquidate, estimate, or establish the priority or the secured or unsecured status of any Claim, or to establish reserves pending the resolution of Disputed Claims;

(k)     To hear and determine any proceeding to modify the Plan, after confirmation of the Plan, and, if in the best interests of Holders of Claims, modification of the Plan even after the Plan has been substantially consummated;

(l)     To consider the issuance of injunctions or other orders as may be necessary or appropriate to aid in the implementation of the Plan or to restrain interference by any entity with the consummation or the enforcement of the Plan;

(m)     To hear any other matter not inconsistent with the Bankruptcy Code;

(n)     To hear any other matter deemed relevant by the Bankruptcy Court; and

(o)     To enter a final decree closing the Chapter 11 Cases.

## VI.    MISCELLANEOUS PROVISIONS OF THE PLAN

Article XI of the Plan provides for certain additional miscellaneous provisions including, but not limited to the following: preserving Causes of Action; exemption of the transactions in connection with the Plan from any stamp, real estate transfer, mortgage recording or other similar tax pursuant to section 1146(a) of the Bankruptcy Code; that the Plan is binding on the Debtors' Estates, holders of Claims and Equity Interests and their successors or assigns; governing law; withholding, reporting and payment of taxes; effectuating documents and further transactions, notices, severability of Plan provisions, provisions regarding the destruction of books and records upon the modification of the Plan, and revocation or withdrawal of the Plan. In addition, all quarterly fees due and payable to the Office of the United States Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code shall be duly paid in full on or before the Effective Date, as required by section 1129(a)(12) of the Bankruptcy Code. The Creditor Trust shall be responsible for timely payment of such quarterly fees due and payable after the Effective Date and until the Chapter 11 Cases are closed, pursuant to section 1930(a)(6) of title 28 of the United States Code, with respect to cash disbursements made by the Creditor Trustee under the Plan. After the Effective Date and until the Chapter 11 Cases are closed, the Creditor

41

Trustee shall file with the Office of the United States Trustee monthly financial reports specifying all disbursements made pursuant to the Plan and shall make all payments based upon such disbursements as required by applicable law.

## VII.    CERTAIN FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS IN THE VOTING CLASSES SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR REFERRED TO HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    General Considerations

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case.  The Plan sets forth the means for satisfying the various Claims against the Debtors.

### B.    Certain Bankruptcy Considerations

#### 1.    Parties-in-Interest May Object to the Debtors' Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim in a particular class only if such Claim is substantially similar to the other Claims in such class.  The Debtors believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created five (5) Classes of Claims, each encompassing Claims that are substantially similar to the other Claims in each such class. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

#### 2.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.   In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

#### 3.    Risk of Non-Confirmation of Plan; Feasibility

Even if all Impaired Classes of Claims accept or are deemed to have accepted the Plan, or, with respect to a Class that rejects or is deemed to reject the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under section 1129(a) and (b) of the Bankruptcy Code.  ***See Section IX.C.    ("Confirmation of the Plan— Requirements for Confirmation of the Plan")***.   Section 1129(a) of the Bankruptcy Code requires, among other things, a demonstration that the confirmation of the Plan will not be

4822-8239-5573.6

followed by liquidation or need for further financial reorganization of the Debtors and that the value of distributions to creditors who vote to reject the Plan not be less than the value of distributions such creditors would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. *See Section IX.C. ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Requirements of Section 1129(a) of Bankruptcy Code")*. Although the Debtors believe that the Plan will meet the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

In order to confirm the Plan, the Debtors must pay Allowed Administrative Expense Claims as required by the Bankruptcy Code. To the extent there are not funds to pay Allowed Administrative Expense Claims subject to the terms of the Plan, and the holders of such claims do not agree otherwise, the Plan might not be confirmed or become effective.

### 4.  Non-Consensual Confirmation

If any Impaired Class of Claims rejects the Plan by the requisite statutory voting thresholds provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Debtors may (i) seek confirmation of the Plan from the Bankruptcy Court by employing the "cramdown" procedures set forth in section 1129(b) of the Bankruptcy Code and/or (ii) modify the Plan in accordance with its terms. In order to confirm the Plan under section 1129(b), the Bankruptcy Court must determine that, in addition to satisfying all other requirements for confirmation, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that has not accepted the Plan. *See Section IX.C. ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Requirements of Section 1129(b) of Bankruptcy Code")*.

If the Bankruptcy Court determines that the Plan violates section 1129 of the Bankruptcy Code in any manner, including the cramdown requirements under section 1129(b) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in such manner so as to satisfy the requirements of section 1129 of the Bankruptcy Code. Such amendments may include, but are not limited to, the alteration or elimination of Distributions to various Classes.

### 5.  The Debtors or the Creditor Trustee May Object to the Amount of a Claim

Except as otherwise provided in the Plan, the Debtors (before the Effective Date) and the Creditor Trustee (after the Effective Date) reserve the right to object to the amount of any Claim. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6.  Contingencies Not to Affect Votes of Voting Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the

43

Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by any Impaired Classes.

      7.   <u>Risk of Chapter 7 Liquidation</u>

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to a liquidation under chapter 7 of the Bankruptcy Code, or that any alternative plan would be on terms as favorable to holders of Claims as the terms of the Plan. If a liquidation under chapter 7 of the Bankruptcy Code were to occur, the distributions to holders of Allowed Claims under the Plan would be reduced. The Debtors believe that, in a liquidation under chapter 7, before holders of Allowed Claims received any distributions, additional administrative expenses of a chapter 7 trustee and such trustee's attorneys, accountants, and other professionals would cause a substantial diminution in the value of the Estate. Moreover, in a chapter 7 liquidation, the Debtors' Estates would not receive the Estate Cash Payment of $1.5 million. Furthermore, in a chapter 7 liquidation, Hillair would be expected to foreclose on the Debtors' assets, taking value from creditors lower in priority than Hillair which otherwise would flow to such creditors under the Plan. In addition, in a chapter 7 liquidation, the Class 4 General Unsecured Creditors would not receive a share of equity in the Reorganized Debtors as proposed in the Plan. Finally, a chapter 7 liquidation would also take additional time to administer and delay recoveries to creditors.

For the foregoing reasons, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code of the Debtors' remaining assets would result in a diminution and delay in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors believe that confirmation of the Plan will provide a substantially greater and quicker return to holders of Claims than would liquidation under chapter 7 of the Bankruptcy Code. A chapter 7 liquidation analysis is attached hereto as **<u>Exhibit A</u>**. A summary comparing estimated recoveries if the Plan is confirmed versus estimated recoveries in a chapter 7 is set forth below.

**Summary of Projected Creditor Recoveries - Chapter 11 Plan vs. Chapter 7 Liquidation Analysis**

| | Notes | Class # | Ch. 11 Plan Recovery $ | Ch. 7 Liquidation Recovery $ |
|---|---|---|---|---|
| Other Priority | | 1 | - | - |
| Senior Secured Hillair | [a] [c] | 2 | 5,492,000 | 6,391,604 |
| Other Secured | | 3 | - | - |
| General Unsecured | [a] [b] | 4 | 529,463 | - |
| Equity | | | - | - |

*Notes*

[a] Under the Plan of Reorganization, Hillair and the Class 4 claimants shall received equity interests in the reorganized debtor equal to 80% and 20%, respectively in addition to the amounts set forth herewithin.  In a chapter 7 liquidation, no equity interests are to be issued.

[b] Subject to adjustment based on the difference between the Estate Cash Payment and the current balance of the allowed professional fees less payments received and to be received.

[c] Consists of (i) weekly payments made and to be made to Hillair between the Petition Date and the Effective Date,(ii) $3.0 million on account of a post-effective date secured note, and (iii) proceeds from Hillair's share of the Amazon litigation (unknown at this time).

## C.      Claims Could Be More Than Projected, Assets Could Be Less Than Projected

The Allowed amount of Claims in each Class, and/or the allowed amount of professional fees, could be greater than projected, which in turn, could cause the amount of distributions to creditors to be reduced substantially.  Likewise, the amount of cash realized for the liquidation of the Debtors' assets could be less than projected, which could cause the amount of distributions to creditors to be reduced substantially.

## D.      Inherent Uncertainty of the Financial Projections

The projections forecast cash flows from the Debtors' business operations.  Additionally, they include various Causes of Action that belong to the Debtors' Estates and are still being evaluated.  Accordingly, the projections are based on numerous assumptions that are an integral part of the projections, including confirmation and consummation of the Plan in accordance with its terms and general business and economic conditions, many of which will be beyond the control of the Creditor Trustee, and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the value realized from the liquidation of the Debtors' assets.  These variations may be material and may affect the recoveries of holders of Claims entitled to Distributions under the Plan.  Because the actual results achieved may vary from the projected results, the projections should not be relied upon as a guarantee, representation or other assurance of the actual results that will occur.

## E.      Termination of the Amazon Contract and Amazon Non-Payment

Amazon might obtain relief from the automatic stay and terminate the Debtors' contract on short notice.  This could cause the Debtors to incur liabilities, including for example WARN Act liability, and decrease revenues.  In the event Amazon decreases routes, while the Debtors believe such action is not permitted, such a decrease could harm the Debtors' revenues.  Moreover, Amazon might breach the Amazon Contract and not pay amounts owed to the Debtors or attempt to offset amounts against Amazon owes to the Debtors.  These events might affect the Debtors' ability to meet their projections.

4822-8239-5573.6

F.    **The Debtors' Net Working Capital Could Decrease Below the Minimum Working Capital Requirement**

Unanticipated events and circumstances could cause the Debtors' Net Working Capital as defined in the Plan, to decrease below the Minimum Working Capital Requirement in the Plan, potentially affecting confirmation or effectiveness of the Plan, subject to all parties' rights in respect of such arguments.

G.    **The Reorganized Debtors' Business Might Not Be Successful**

To the extent that value under the Plan is being distributed to Class 2 creditors and, if Class 4 votes to accept the Plan, Class 4 creditors, through the New Equity Interests in the Reorganized Debtors issued as of the Effective Date, such value depends upon the performance of the Reorganized Debtors' business. The Reorganized Debtors' business prospects depend upon matters such as (1) whether and how long the sole customer Amazon remains a customer of the Debtors and (2) whether and how much additional new business the Reorganized Debtors are able to obtain from Amazon and new customers. The Debtors and Hillair believe the Reorganized Debtors have a good chance of success in their post-exit business; however, the actual performance may vary from expectations. The delivery business is very competitive.

H.    **Scoobeez Global's Largest Shareholder Could Try to Reconstitute the Debtors' Board and Derail the Plan**

In May 2019, in resolution of then-present objections by Hillair, concerns of the Committee and requests by the Office of the United States Trustee to appoint a chapter 11 trustee and issues regarding the use of cash collateral and appointment of the Chief Restructuring Officer, the 90% shareholder and former Chief Executive Officer of Scoobeez Global, Mr. Ohanessian, entered into a written agreement with Scoobeez Global and shareholder consents. In those documents, among other things, Mr. Ohanessian agreed to step down as Chief Executive Officer, appoint an independent board of directors (including the Chief Restructuring Officer and a member selected by the Committee), and not exercise his shareholder powers to change the board nor be involved in management. Mr. Ohanessian, in the agreement, agreed that the Debtors could obtain injunctive relief to enforce the agreement. Notwithstanding his agreement, in November 1, 2019, Mr. Ohanessian apparently organized other shareholders to attempt to reconstitute Scoobeez Global's board of directors, purportedly appointing himself and his wife and another individual. On February 21, 2020, Scoobeez and Scoobeez Global filed a Motion for Summary Judgment, seeking a declaration that Mr. Ohanessian's actions were void. The Motion is to be heard on April 28, 2020 at 2:00 p.m. If Mr. Ohanessian is successful, he might attempt to usurp control of the Debtors and prevent the Debtors from consummating the Plan.

I.    **Disclosure Statement Disclaimer**

1.    Information Contained Herein is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2. <u>Disclosure Statement May Contain Forward Looking Statements</u>

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

3. <u>No Legal or Tax Advice is Provided to You by this Disclosure Statement</u>

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4. <u>No Admissions Made</u>

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including the Debtors), nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims, or any other parties in interest.

5. <u>Failure to Identify Litigation Claims or Projected Objections</u>

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors and/or the Committee (as applicable and until the Effective Date) and the Creditor Trustee (on and after the Effective Date) may investigate and object to Claims and file and prosecute Causes of Action.

6. <u>No Waiver of Right to Object or Right to Recover Transfers and Assets</u>

The vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Creditor Trustee to object to that holder's Claim, or to bring additional or further Causes of Action, regardless of whether any Claims or causes of action of the Debtors or their Estates are specifically or generally identified herein.

7.  Information Was Provided by the Debtors and Was Relied upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

8.  Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

9.  No Representations Outside the Disclosure Statement are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Committee, and/or the United States Trustee for the Central District of California.

**J.  Certain Tax Considerations**

A summary of certain U.S. federal income tax considerations relevant to the Plan is provided below in ***Section XI ("Certain Federal Income Tax Considerations")***.

**VIII.  VOTING REQUIREMENTS**

On [_____], 2020, the Bankruptcy Court entered the Disclosure Statement Order that, among other things, approved this Disclosure Statement, set voting procedures and scheduled the Confirmation Hearing.  A copy of the Disclosure Statement Order and the Notice of Confirmation Hearing are included as part of the Solicitation Package.  The Disclosure Statement Approval Order sets forth in detail, among other things, procedures governing voting deadlines and objection deadlines.  The Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions attached to the Ballot should be read in connection with this section of this Disclosure Statement.

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures of the Debtors concerning the Plan have been adequate and have included information concerning Distributions made or proposed by the Debtors in connection with the Plan and the Chapter 11 Cases.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law.

In particular, in order to confirm the Plan, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that the Plan: (i) has been accepted by the requisite votes of all Impaired Classes unless approval will be sought under section 1129(b) of the Bankruptcy Code in respect of one or more dissenting Classes, which may be the case under the Plan; (ii) is "feasible," which means that there is a reasonable probability that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization; and (iii) is in the "best interests" of all holders of Claims and Equity Interests, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies all of these conditions.

## A.    <u>Voting Deadline</u>

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all holders of Claims who are entitled to vote on the Plan.

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE DEBTORS' COUNSEL NO LATER THAN 5:00 P.M. (PREVAILING PACIFIC TIME) ON [_____], 2020 (THE "<u>VOTING DEADLINE</u>"). ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.

## B.    <u>Holders of Claims Entitled to Vote</u>

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (b) reinstates the maturity of such claim or interest as it existed before the default, (c) compensates the holder of such claim or interest for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment, and (d) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

In general, a holder of a claim or equity interest may vote to accept or reject a plan if (1) the claim or interest is "allowed," which means generally that it is not disputed, contingent, or unliquidated and (2) the claim or interest is impaired by a plan.  If the holder of an Impaired Claim or Equity Interest will not receive any distribution under the Plan in respect of such Claim or Equity Interest, the Bankruptcy Code deems such holder to have rejected the Plan and provides that the holder of such Claim or Equity Interest is not entitled to vote.  If the Claim or

49

Equity Interest is not Impaired, the Bankruptcy Code conclusively presumes that the holder of such Claim or Equity Interest has accepted the Plan and provides that the holder is not entitled to vote.

In general, and subject to the voting requirements set forth in the Disclosure Statement Order, the holder of a Claim against the Debtors that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim and (2) (a) the Claim has been scheduled by the Debtors (and such Claim is not scheduled as disputed, contingent, or unliquidated) or (b) the holder timely filed a proof of Claim pursuant to sections 502(a) and 1126(a) of the Bankruptcy Code and Bankruptcy Rules 3003 and 3018. A Claim to which an objection has been filed is not entitled to vote unless and until the Bankruptcy Court rules on the objection and allows the Claim. Consequently, although holders of Claims subject to a pending objection may receive Ballots, their votes will not be counted unless the Bankruptcy Court (a) prior to the Voting Deadline, rules on the objection and allows the Claim, or (b) on proper request under Bankruptcy Rule 3018(a), temporarily allows the Claim in an amount which the Court deems proper for the purpose of voting on the Plan. If the Debtors have served an objection or request for estimation as to a claim at least fourteen (14) days before the Voting Deadline, such claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except as ordered by the Court before the Voting Deadline.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

Class 1 is deemed Unimpaired and is not entitled to vote. Each of Class 2, Class 3 and Class 4 is Impaired under the Plan and the holders of Allowed Claims in such Classes are entitled to vote on the Plan. In accordance with section 1126(g) of the Bankruptcy Code, Class 5 is conclusively deemed to have rejected the Plan and holders therein are not entitled to vote.

## C.    Vote Required for Acceptance of Class

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances. ***See Section VIII.B. ("Voting Requirements—Holders of Claims Entitled to Vote")***. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but, for that purpose, counts only those who actually vote to accept or reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in dollar amount and a majority in number actually voting cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

50

D.    **Voting Procedures**

1. Ballots

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accepts the Plan" or "Rejects the Plan."

ANY BALLOT RECEIVED THAT (I) IS NOT SIGNED, (II) IS ILLEGIBLE, OR (III) CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT, SHALL BE AN INVALID BALLOT AND SHALL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

ANY BALLOT THAT IS OTHERWISE PROPERLY COMPLETED, EXECUTED, AND TIMELY RETURNED BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, SHALL NOT BE COUNTED.

**Ballots must be delivered to the Debtors' Counsel so as to be actually received by the Voting Deadline, by mail with the envelope provided as part of the Solicitation Package, or by first class mail, hand delivery or overnight courier, at Foley & Lardner LLP, 555 S. Flower St., 33rd Floor, Los Angeles, CA 90071 (Attn: Ashley McDow and John Simon).**

**THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE HOLDER**. If such delivery is by mail, it is recommended that holders use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to assure timely delivery.

In accordance with Rule 3018(c) of the Bankruptcy Rules, the Ballots are based on Official Form No. 14, but have been modified to meet the particular needs of this case. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

2. Withdrawal or Change of Votes on Plan

A Ballot may be withdrawn by delivering a written notice of withdrawal to the Debtors' Counsel, so that the Debtors' Counsel receives such notice prior to the Voting Deadline. Thereafter, withdrawal is only permitted with the approval of the Bankruptcy Court.

In order to be valid, a notice of withdrawal must (i) specify the name of the holder who submitted the votes on the Plan to be withdrawn, (ii) contain the description of the Claims to which it relates, and (iii) be signed by the holder in the same manner as on the Ballot. The Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of votes on the Plan.

Any holder who has submitted to the Debtors' Counsel prior to the Voting Deadline a properly completed Ballot may change such vote by submitting to the Debtors' Counsel prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that bears the latest date will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received.

3.  Voting Multiple Claims

Ballot forms may be copied if necessary. Any person holding multiple Claims within a Class should use a single Ballot to vote such Claims, which will represent the aggregate amount of such claims within that Class. Please sign and return your Ballot(s) in accordance with the instructions set forth herein and in the Ballot(s).

## IX.    CONFIRMATION OF THE PLAN

### A.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing has been scheduled to commence on [DATE] at [TIME] (prevailing Pacific Time), or as soon thereafter as counsel may be heard, before the Honorable Julia W. Brand, United States Bankruptcy Judge, of the United States Bankruptcy Court for the Central District of California, Courtroom 1375, 255 East Temple Street, Los Angeles, CA 90012. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for the announcement of the adjourned date made in open court, at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing, or on the Court's docket.

### B.    Deadline to Object to Confirmation

Any objection to the confirmation of the Plan must be made in writing, and specify in detail (i) the name and address of the objector, (ii) the basis and nature, with particularity, of any objection or proposed modification to the Plan, and (iii) the amount and nature of the Claim or number and class of shares of stock of the Debtors held by the objector. Any such objection must be filed, together with proof of service, with the Bankruptcy Court, with a copy to Judge Brand's chambers, and served so that it is received by the Bankruptcy Court, chambers, and the following parties on or before [_____], 2020 at 5:00 p.m. (prevailing Pacific Time): (a) counsel for the Debtors, Foley & Lardner LLP, 555 S. Flower St., 33rd Floor, Los Angeles, CA 90071 (Attn: Ashley McDow and John Simon); (b) counsel for the Committee, Levene, Neale, Bender, Yoo & Brill, L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn: David Neale and John-Patrick Fritz); (c) counsel to Hillair, Olshan Frome Wolosky LLP, 1325 Avenue of the Americas, New York, NY 10019 (Attn: Adam Friedman) and Buchalter, 1000 Wilshire Blvd., Suite 1500, Los Angeles, CA 90017-2457 (Attn: Anthony Napolitano); and (d)

the U.S. Trustee for the Central District of California – Los Angeles Division, 915 Wilshire Blvd., Suite 1850, Los Angeles, CA 90017 (Attn: Dare Law).

**C.    Requirements for Confirmation of the Plan**

Among the requirements for confirmation of the Plan are that the Plan (i) is accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of creditors and stockholders that are Impaired under the Plan.

1. Requirements of Section 1129(a) of Bankruptcy Code

    (a)    *General Requirements*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(3)    The Plan has been proposed in good faith and not by any means proscribed by law.

(4)    Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)    The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

(6)    Any governmental regulatory commission with jurisdictions, after confirmation of the Plan, over the rates of the Debtors has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

(7)    With respect to each Class of Claims or Equity Interests, each holder of an Impaired Claim or Impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. ***See Section IX.C.    ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Requirements of Section 1129(a) of Bankruptcy Code—Best Interests Test").***

(8)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan.

(9)    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Non-Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

(10)    At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

(11)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. ***See Section IX.C.    3. ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Feasibility").***

(b)    *Best Interests Test*

As described above, the Bankruptcy Code requires that each holder of an Impaired Claim or Equity Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

4822-8239-5573.6

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets. Notably, the Estate Cash Payment is available under the Plan to satisfy additional claims in the event the Plan is confirmed but would not be available in a chapter 7 case. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation and such additional Administrative Expense Claims and Other Priority Claims that may result from the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals. These costs, expenses, fees and any other Claims that may arise in a liquidation case under chapter 7 would be paid in full from the liquidation proceeds ***before*** the balance of those proceeds would be made available to pay chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.

In addition, in a chapter 7, Hillair would foreclose on the Debtors' assets, taking value from lower priority creditors who otherwise may receive value under the Plan. Furthermore, a chapter 7 would not provide Class 2 and possibly Class 4 creditors with a share of the New Equity Interests in the Reorganized Debtors.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, as compared with the Plan (ii) the likely foreclose of all the Debtors' assets for the benefits of Hillair alone, (iii) the lack of the $1.5 million Estate Cash Payment and (iv) the fact that no value of the Reorganized Debtors would accrue to creditors under a chapter 7, the Debtors submit that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. As shown by the liquidation analysis and summary in section VII.B.    7. above, the Debtors believe there would be no recovery for creditors other than Hillair in a chapter 7, except for potential litigation claims. These amounts are unkown at this time and are assumed to the same in a chapter 7 and under the Plan.

Moreover, the Debtors believe that the value of distributions from the liquidation proceeds to each Class of Allowed Claims in a chapter 7 case, if any, would be less than the

value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the Claims and prepare for distributions. In the event litigation were necessary to resolve Claims asserted in the chapter 7 case, the delay could be further prolonged and Administrative Expense Claims further increased.

## 2. Acceptance by Impaired Classes

Each of Class 2, Class 3 and Class 4 is Impaired under the Plan and the holders of Allowed Claims in the Voting Classes are entitled to vote on the Plan. In accordance with section 1126(g) of the Bankruptcy Code, Class 5 is conclusively deemed to have rejected the Plan; and the Debtors intend to seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such Class. ***See Section IX.C.    4. ("Confirmation of the Plan—Requirements for Confirmation of the Plan—Requirements of Section 1129(b) of Bankruptcy Code")***. In addition, the Debtors reserve the right to seek nonconsensual confirmation of the Plan (without further notice) with respect to any Class of Claims that is entitled to vote to accept or reject the Plan if such Class rejects the Plan.

## 3. Feasibility

The Debtors believe that they will be able to perform their obligations under the Plan. In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to exit and determined that the Plan has a reasonable likelihood of success. There are no guaranties made as to the performance of the Reorganized Debtors, and Hillair has agreed to the Estate Cash Payment upon confirmation regardless of the post-exit performance of the Reorganized Debtors. The Debtors believe that the Minimum Working Capital Requirement is achievable and provides adequate working capital to the post-exist business of the Reorganized Debtors. Moreover, the Debtors have analyzed the ability of the Creditor Trustee to be appointed pursuant to the Plan and to meet its obligations under the Plan. The Debtors believe that there are sufficient assets available to satisfy distributions required to be made under the Plan and, accordingly, the Plan meets the feasibility requirements of the Bankruptcy Code.

## 4. Requirements of Section 1129(b) of Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

- No Unfair Discrimination. This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a chapter 11

plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

- <u>Fair and Equitable Test</u>.  This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

  - <u>Secured Claims</u>.  Either (i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

  - <u>Unsecured Claims</u>.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

  - <u>Equity Interests</u>.  Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement, notwithstanding that Class 5 is deemed to reject the Plan, because as to such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such a dissenting Class will receive or retain any property on account of Equity Interests in such Class.  The Debtors also believe that the Plan will satisfy the applicable requirements as to Class 3, if required, because the Holders of Claims in such Class retain their liens as transferred to the Reorganized Debtors and will be paid the amount of their Claims over time.   The Debtors also believe that the Plan will satisfy the applicable requirements as to Class 4, if required, because no class of Holders of Claims or Equity Interests equal or junior to Class 4 in priority will receive or retain any property under the Plan.

## X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.     Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. As discussed above, the Debtors believe that liquidation under chapter 7 would result in no distribution to creditors other than Hillair, or reduced and delayed distributions as compared with those provided for in the Plan, because of the (i) lack of the Estate Cash Payment; (ii) foreclosure of the Debtors' asset for the sole benefit of Hillair; (iii) the lack of the New Equity Interests in the Reorganized Debtors; (iv) increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee, (v) cost and expense attributable to the time value of money resulting from what is likely to be a more protracted proceeding, and (vi) application of the rule of absolute priority to distributions in a chapter 7 liquidation.

The Debtors believe that in a chapter 7 case, holders of Equity Interests in Class 5 would still receive no distributions of property.  Accordingly, the Plan satisfies the rule of absolute priority.

### B.     Alternative Plan

The Debtors believe that the Plan, as described herein, enables creditors to realize the greatest value under the circumstances as compared with any alternative plan.

### C.     Dismissal

If the Chapter 11 Cases are dismissed, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation among and between the Debtors and the Holders of Claims and Equity Interests.  Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to Confirmation of the Plan.

## XI.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF CLAIMS INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN (NON-US) TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

This discussion is provided for information purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or

promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan. To the extent that the following discussion relates to the consequences to holders of Claims or Equity Interests, it is limited to holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States or any state or political subdivision thereof;

- an estate, the income of which is subject to federal income taxation regardless of its source; or

- a trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder in light of its particular facts and circumstances, or to certain types of holders subject to special treatment under the IRC. Examples of holders subject to special treatment under the IRC are governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, holders that are or hold their Claims or Equity Interests through a partnership or other pass-through entity, dealers in securities or foreign currency, persons that have a functional currency other than the U.S. dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address other U.S. federal taxes or the foreign, state, or local tax consequences of the Plan. Furthermore, this discussion generally does not address the U.S. federal income tax consequences to holders that are unimpaired under the Plan.

The tax treatment of holders of Claims or Equity Interests and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the holder in exchange for the Claim, and whether the holder receives Distributions under the Plan in more than one taxable year; (iii) whether the holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the holder acquired

4822-8239-5573.6

the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the Claim is considered a "security" for U.S. federal income tax purposes; and (xii) whether the "market discount" rules apply to the holder. Therefore, each holder should consult such holder's own tax advisor for tax advice with respect to that holder's particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling has been or will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any holder of a Claim or Equity Interest. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, AND LOCAL INCOME TAX CONSEQUENCES, AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES, OF THE PLAN.**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS OR EQUITY INTERESTS UNDER THE IRC; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON EACH HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

4822-8239-5573.6

A.    **Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests**

A holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or deemed received) under the Plan is attributable to interest that accrued on an Allowed Claim but was not previously paid by the Debtors or included in income by the holder of the Allowed Claim.    A holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the holder's adjusted basis in its Allowed Claim and the amount realized by the holder in respect of its Allowed Claim.    The amount realized generally will equal the sum of Cash and the fair market value of other consideration received (or deemed received) by the holder under the Plan on the Effective Date or a subsequent distribution date in respect of the holder's Allowed Claim, less the amount, if any, attributable to accrued but unpaid interest.

The character of any gain or loss that is recognized as such will depend upon a number of factors, including the status of the holder, the nature of the Allowed Claim in the holder's hands, whether the Allowed Claim was purchased at a discount, whether and to what extent the holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the holder's holding period of the Allowed Claim.    If the Allowed Claim in the holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss.    Such gain or loss will constitute long-term capital gain or loss if the holder held such Allowed Claim for longer than one year, or short-term capital gain or loss if the holder held such Allowed Claim for one year or less.    Any capital loss realized generally may be used by a corporate holder only to offset capital gains, and by an individual holder only to the extent of capital gains plus $3,000 of ordinary income in any single taxable year.

A holder of an Allowed Claim who receives, in respect of the holder's Allowed Claim, an amount that is less than that holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC Section 166(a) or a worthless securities deduction under IRC Section 165(g).    The rules governing the character, timing, and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed.    Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take either deduction.    A holder that has previously recognized a loss or deduction in respect of that holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if,

61

pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold or otherwise disposed of within the meaning of IRC Section 453B.

The holders of certain Allowed Claims are expected to receive only a partial Distribution with respect to their Allowed Claims. Whether the holder of such a Claim will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of each holder and its Claim. Accordingly, a holder of such a Claim should consult such holder's own tax advisor.

Under backup withholding rules, a holder of an Allowed Claim may be subject to backup withholding with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of failure to report all dividend and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Allowed Claims may be required to establish an exemption from backup withholding or to make arrangements with regard to payment of any backup withholding.

Holders of Disallowed Claims or Equity Interests will not receive any Distribution as part of the Plan. Accordingly, because such a holder may receive an amount that is less than that holder's tax basis in such Claim or Equity Interest, such holder may be entitled to a bad debt deduction under IRC Section 166(a) or a worthless securities deduction under IRC Section 165(g). The rules governing the character, timing, and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Disallowed Claims or Equity Interests, therefore, are urged to consult their tax advisors with respect to the ability to take either deduction.

## B.    Certain U.S. Federal Income Tax Consequences to the Debtor

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year. Section 108 of the IRC provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Section 108 of the IRC requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and passive activity loss carryovers. Attribute reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the IRC further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, holders of certain Allowed Claims are expected to receive less than full payment on their Claims, and holders of Disallowed Claims are expected to receive no payments. The Debtors' liability to the holders of such Claims in excess of the amount satisfied by Distributions under the Plan will be cancelled and therefore will result in COD Income to the Debtors. The Debtors should not realize any COD Income, however, to the extent that payment of such Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD Income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to section 108 of the IRC described above, because the cancellation will occur in a case under the Bankruptcy Code, while the taxpayer is under the jurisdiction of the bankruptcy court, and the cancellation is granted by the court or is pursuant to a plan approved by the court. The exclusion of the COD Income, however, will result in a reduction of certain tax attributes of the Debtors, such as net operating losses. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, the COD Income realized by the Debtors under the Plan should not diminish the net operating losses and other tax attributes that may be available to offset any income and gains recognized by the Debtors in the taxable year that includes the Effective Date.

## C.    Consequences of the Creditor Trust

The Creditor Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Creditor Trust. Thus, the Creditor Trust is intended to be classified for federal income tax purposes as a "grantor trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684. No request for a ruling from the IRS will be sought on the classification of the Creditor Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Creditor Trust. If the IRS were to challenge successfully the classification of the Creditor Trust as a grantor trust, the federal income tax consequences to the Creditor Trust and the holders of Allowed Claims could vary from those discussed herein (including the potential for an entity-level tax).

For all U.S. federal income tax purposes, all parties with respect to the Creditor Trust (including, without limitation, the Debtors, the Creditor Trustee, and the Creditor Trust Beneficiaries) must treat the transfer of Creditor Trust Assets (other than those Creditor Trust Assets placed in the Disputed Claims Reserve) to the Creditor Trust as (i) a transfer of such Creditor Trust Assets by the Debtors to the Creditor Trust Beneficiaries, followed by (ii) a transfer of such Creditor Trust Assets by such beneficiaries to the Creditor Trust, with the beneficiaries being treated as the grantors and owners of the Creditor Trust. Each holder that is a beneficiary of the Creditor Trust generally will recognize gain or loss in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Allowed Claim and its adjusted tax basis in the Allowed Claim. The amount realized by a holder of an Allowed Claim will equal the fair market value of the Creditor Trust Assets deemed received in respect of such Claim, less the amount, if any, attributable to accrued but unpaid interest. A holder that is deemed to receive Creditor Trust Assets in respect of its Allowed Claim will then have a tax basis in such Creditor Trust Assets in an amount equal to the fair market value of such Creditor Trust Assets on the date of receipt, less the amount, if any, attributable to accrued but unpaid interest.

As further described below, because each holder's share of the Creditor Trust Assets in the Creditor Trust may change depending upon the resolution of Disputed Claims in such holder's Class, a holder may be prevented from recognizing for tax purposes all of its gain or loss from the consummation of the Plan until all Disputed Claims in such holder's Class have been resolved.

In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to IRC Sections 671 *et. seq.*, owned by the persons who are treated as transferring assets to the trust. Each holder of a beneficial interest in the Creditor Trust must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Creditor Trust. None of the Debtors' loss carryforwards will be available to reduce any income or gain of the Creditor Trust. Moreover, upon the sale or other disposition (or deemed disposition) of any of the Creditor Trust Assets not held in the Disputed Claims Reserve, each Creditor Trust Beneficiary must report on its federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Creditor Trust in exchange for the Creditor Trust asset so sold or otherwise disposed of and (2) its adjusted tax basis in its share of the Creditor Trust asset. The character of any such gain or loss to the holder will be determined as if such holder itself had directly sold or otherwise disposed of the Creditor Trust asset. The character of items of income, gain, loss, deduction, and credit to any holder of a beneficial interest in the Creditor Trust, and the ability of the holder to benefit from any deductions or losses, will depend on the particular circumstances or status of the holder.

Given the treatment of the Creditor Trust as a grantor trust and subject to the discussion below regarding the Disputed Claims Reserve, each Creditor Trust Beneficiary has an obligation to report its share of the Creditor Trust's tax items (including gain on the sale or other disposition of a Creditor Trust asset), which obligation is not dependent on the distribution of any cash or other Creditor Trust assets by the Creditor Trust. Accordingly, a Creditor Trust Beneficiary may incur a tax liability as a result of owning a share of the Creditor Trust Assets, regardless of whether the Creditor Trust distributes cash or other assets. Due to the requirement that the Creditor Trust maintain certain reserves, the Creditor Trust's ability to make current cash distributions may be limited or precluded. In addition, due to possible differences in the timing of income on, and the receipt of cash from the Creditor Trust Assets, a Creditor Trust Beneficiary may be required to report and pay tax on a greater amount of income for a taxable year than the amount of cash received by the holder during the year.

The Creditor Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Creditor Trust assets (e.g., income, gain, loss, deduction and credit). Each Creditor Trust Beneficiary will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Creditor Trust will pertain to Creditor Trust Beneficiaries who received their interests in connection with the Plan.

### D.    Consequences of the Disputed Claims Reserve

It is anticipated that the Creditor Trustee will make an election under Treasury Regulation Section 1.468B-9(c)(2)(ii) to treat the Disputed Claims Reserve as a "disputed ownership fund." Accordingly, a holder of a Disputed Claim, unlike the holder of an Allowed Claim, will not be treated as receiving any of the Creditor Trust Assets on the Effective Date due to holding such Disputed Claim. the disputed ownership fund will be treated as the owner of the assets it holds (*i.e.*, those Creditor Trust Assets transferred to the Disputed Claims Reserve) and will be taxable as a qualified settlement fund pursuant to the rules of Treasury Regulation Section 1.468B-2 due to all of the assets in the disputed ownership fund being passive investment assets. These rules generally provide that the "modified gross income" of a qualified settlement fund is taxed at the maximum rate applicable to estates and trusts under IRC Section 1(e), which is currently 39.6%.

"Modified gross income" is the qualified settlement fund's IRC Section 61 gross income computed with the modifications detailed in Treasury Regulation Section 1.468B-2(b)(1)-(4), with such modifications including deductions for administrative costs and other incidental expenses incurred in connection with the operation of the fund that would be deductible under chapter 1 of the IRC in determining the taxable income of a corporation.

If and when a Disputed Claim becomes an Allowed Claim, the holder of the now Allowed Claim will become a Creditor Trust Beneficiary and generally will recognize gain or loss in its taxable year that includes the date of the conversion of the Disputed Claim to an Allowed Claim in an amount equal to the difference between the amount realized in respect of its Allowed Claim and its adjusted tax basis in the Allowed Claim, as further described above under Consequences of the Creditor Trust.

If a Disputed Claim is resolved for an amount less than the amount contributed to the Disputed Claims Reserve with respect to such Disputed Claim, the difference will be released from the Disputed Claims Reserve and distributed to the applicable Class of Creditor Trust Beneficiaries in accordance with their respective Distribution Pro Rata Shares. Any such amount received by a Creditor Trust Beneficiary will constitute an additional amount realized by such Creditor Trust Beneficiary and will increase the gain, or reduce the loss, recognized by the Creditor Trust Beneficiary with respect to its Claim.

## XII.    CONCLUSION

The Debtors, Hillair and the Committee believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recoveries to holders of Claims. Any alternative to confirmation of the Plan, such as liquidation under chapter 7 or attempts to confirm another plan, would involve significant delays, uncertainty, and substantial additional administrative costs. Moreover, as described above, the Debtors, Hillair and the Committee believe that creditors will receive greater and earlier recoveries under the Plan than under the alternatives. FOR THESE REASONS, THE DEBTORS, HILLAIR AND THE COMMITTEE URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO ACCEPT AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED

4822-8239-5573.6

WITHIN THE TIME STATED IN THE NOTICE OF CONFIRMATION HEARING AND DISCLOSURE STATEMENT APPROVAL ORDER.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

4822-8239-5573.6

Dated: February 27, 2020

DATE: FEBRUARY 27, 2020

**FOLEY & LARDNER LLP**

By: /s/  John A. Simon

John A. Simon (*Admitted Pro Hac Vice*)
One Detroit Center
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
Telephone: (313) 234-7117

-and-

Ashley McDow (245114)
Shane Moses (250533)
555 S. Flower St., 33rd Floor
Los Angeles, CA 90071
Telephone: (213) 972-4500
amcdow@foley.com
smoses@foley.com

*Attorneys for the Debtors and Debtors in Possession*

4822-8239-5573.6

## **Exhibit A**

## **Liquidation Analysis**

**Scoobeez, Scoobeez Global Inc. & Scoobur LLC**
**Chapter 7 Liquidation Analysis / Best Interests Test**

The following tables provide detailed calculations of projected recoveries under a chapter 7 liquidation analysis as compared to the Debtor's proposed Chapter 11 Plan of Reorganization and should be read in conjunction with the accompanying notes.

| | Scoobeez | | | | | Scoobeez Global Inc. | | | | | Scoobur LLC | | | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Net Book Value @ December 31, 2019 | Adjustments | Projected Liquidation Value | Proj. Recovery | % | Net Book Value @ December 31, 2019 | Adjustments | Projected Liquidation Value | Proj. Recovery | % | Net Book Value @ December 31, 2019 | Adjustments | Projected Liquidation Value | Proj. Recovery | % | Projected Liquidation Value | Proj. Recovery | % |
| *Assets* | | | | | | | | | | | | | | | | | | |
| Cash | 2,117,237 | - | 2,117,237 | | | 50 | - | 50 | | | | | | | | 2,117,287 | | |
| Accounts Receivable | 4,093,533 | - | 4,093,533 | | | - | - | - | | | | | | | | 4,093,533 | | |
| Prepaid Expenses & Other | 101,890 | (69,111) | 32,778 | | | - | - | - | | | | | | | | 32,778 | | |
| Fixed Assets | 839,065 | (791,631) | 47,434 | | | 3,022 | (2,418) | 604 | | | | | | | | 48,039 | | |
| Security Deposit | 48,486 | (37,519) | 10,967 | | | - | - | - | | | | | | | | 10,967 | | |
| Loan Receivable - Ohanessian | 1,887,751 | (1,887,751) | - | | | - | - | - | | | | | | | | - | | |
| Trademarks | | | | | | | | | | | 89,000 | - | 89,000 | | | 89,000 | | |
| **Proceeds Available for Distribution** | 9,087,962 | (2,786,012) | 6,301,950 | | | 3,072 | (2,418) | 654 | | | 89,000 | | 89,000 | | | 6,391,604 | | |
| | Projected Claim | | Proj. Recovery | | % | Projected Claim | | Proj. Recovery | | % | Projected Claim | | Proj. Recovery | | % | | Proj. Recovery | % |
| *Less* | | | | | | | | | | | | | | | | | | |
| Secured Claims | | | | | | | | | | | | | | | | | | |
| Hillair Capital | 9,693,098 | | 6,301,950 | | 65% | 9,693,098 | | 654 | | 0% | 9,693,098 | | 89,000 | | 1% | | 6,391,604 | 66% |
| Other | TBD | | - | | 0% | | | - | | 0% | | | - | | 0% | | - | 0% |
| **Amount Available for Distribution to Creditors** | | | - | | 0% | | | - | | 0% | | | - | | 0% | | - | 0% |
| *Chapter 7 Administrative Claims* | | | | | | | | | | | | | | | | | | |
| Trustee Fees | | | | | | | | | | | | | | | | | | |
| Trustee's Legal Fees & Financial | | | | | | | | | | | | | | | | | | |
| **Amount Available for Distribution to Creditors** | | | - | | | | | - | | | | | - | | | | - | |
| *Chapter 11 Administrative Claims* | | | | | | | | | | | | | | | | | | |
| Post-Petition Liabilities (incl. Professional Fees) | 3,621,151 | | - | | 0% | - | | - | | 0% | - | | - | | 0% | | - | 0% |
| | **3,621,151** | | | | | | | | | | | | | | | | | |
| *Priority Claims* | | | | | | | | | | | | | | | | | | |
| Wages | TBD | | - | | 0% | - | | - | | 0% | - | | - | | 0% | | - | 0% |
| Taxes | TBD | | - | | 0% | - | | - | | 0% | - | | - | | 0% | | - | 0% |
| **Amount Available for Distribution to General Unsecured Creditors** | | | | | | | | | | | | | | | | | | |
| *General Unsecured Claims* | TBD | | - | | 0% | - | | - | | 0% | - | | - | | 0% | | - | 0% |
| **Amount Available for Distribution for Equity Interests** | | | | | | | | | | | | | | | | | | |

**Scoobeez, Scoobeez Global Inc. & Scoobur LLC**
Chapter 7 Liquidation Analysis / Best Interests Test

**Notes to Chapter 7 Liquidation Analysis**

The Net Book Value as of December 31, 2019 is based on the Debtor's unaudited financial statements.

*Accounts Receivable*

   Accounts Receivable consists of amounts due from Amazon.

*Loan Receivable - Ohanessian*

   Consists of amounts due from Shahan Ohanessian and the amounts will be subject to litigation.  The ultimate recovery is unknown at this time.  The recoveries under a chapter 7 liquidation and a chapter 11 plan are assumed to yield the same results.

*Prepaid Expenses & Security Deposit*

   Prepaid general liability insurance consists of the unused portion of which is refundable less 25% of total annual premium.

   The PEX deposit upon a liquidation, the deposit will likely be offset against the outstanding post-petition balance due as of 12/31/19.  The remaining balance of the deposit is projected to be recoverable.

   Prepaid Rent represents amounts paid in the current month for the subsequent month.

|  | Book Value | Adjustment | Range of Recoveries |
|---|---|---|---|
| Deposit PEX | 55,734 | (39,366) | 16,368 |
| Prepaid General Liability Insurance | 38,982 | (29,745) | 9,236 |
| Prepaid Rent | 7,174 | - | 7,174 |
| Security Deposits & Other | 48,486 | (37,519) | 10,967 |
|  | 150,376 | (106,630) | 43,745 |

*Fixed Assets & Leasehold Improvements*

   Majority of fixed assets comprises of leasehold improvements relating to the remodeling of the leased corporate office building.  Upon a liquidation and vacating of the building, the costs incurred are not recoverable.  The remaining assets consist of office furniture and computer equipment that would be sold to a liquidator.  It is assumed the liquidation value of these items is 20% of the historical cost.

*Litigation Actions*

   The value of litigation claims the Debtor may assert is unknown at this time.  Under each of a Chapter 7 and Chapter 11, the claims would be prosecuted and the net proceeds distributed to creditors.

*Secured Debt*

   The secured debt due to Hillair Capital consist of amounts due to Hillair Capital less post-petition payments made.

*Chapter 7 Administrative Claims*

   As a result of the Hillair Capital's secured claim not being fully satisfied in full it is assumed the Chapter 7 Trustee will grant relief from the automatic stay and allow for Hillair to foreclose on its collateral.

*Chapter 11 Administrative Claims*

   Post-Petition Liabilities consist of account payable, accrued expenses and accrued professional fees.

## Exhibit B

**Chapter 11 Joint Plan of Reorganization Proposed by the Debtors, Hillair and the Official
Committee of Unsecured Creditors**

## Exhibit C

**Disclosure Statement Order (Without Exhibits)**