MORGAN, LEWIS & BOCKIUS LLP
Richard W. Esterkin, SBN 70769
richard.esterkin@morganlewis.com
300 S Grand Ave Fl 22
Los Angeles CA  90071-3132
Tel:  (213) 612-2500; Fax:  (213) 612-2501

MORGAN, LEWIS & BOCKIUS LLP
Jennifer Feldsher (pro hac vice pending)
jennifer.feldsher@morganlewis.com
101 Park Ave
New York NY 10178 0060
Tel:  (212) 309-6000; Fax:  (212) 309-6001

MORGAN, LEWIS & BOCKIUS LLP
Tinos Diamantatos (admitted pro hac vice)
tinos.diamantatos@morganlewis.com
77 W Wacker Dr
Chicago IL 60601-5094
Tel:  (312) 324-1000; Fax:  (312) 324-1001

Attorneys for Amazon Logistics, Inc.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| **In re:**<br><br>**SCOOBEEZ, et al.[1],**<br><br>**Debtors and Debtors in Possession.**<br><br>_____<br><br>Affects:<br>■ All Debtors<br>☐ Scoobeez, ONLY<br>☐ Scoobeez Global, Inc., ONLY<br>☐ Scoobur LLC, ONLY | Case No. 2:19-bk-14989-WB<br>(Jointly Administered with<br>2:19-bk-14991-WB, and 2:19-bk-14997-WB)<br><br>Chapter 11<br><br>**DECLARATION OF RICHARD W. ESTERKIN IN SUPPORT OF AMAZON LOGISTICS, INC.'S:  (1) LIMITED OBJECTION TO MOTION TO ASSUME CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND REJECT CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365; AND (2) PLAN CONFIRMATION**<br><br>Date:       July 9, 2020<br>Time:       10:00 a.m.<br>Dept.:       1375 (via Zoom for Government; access to be provided at or after the Pre-Hearing Technical Status Conference)<br>Judge:  The Hon. Julia W. Brand |

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Scoobeez (6339); Scoobeez Global, Inc. (9779); and, Scoobur, LLC (0343).  The Debtors' address is 3463 Foothill Boulevard, in Glendale, California  91214.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 39177197.1

- 1 -

DECLARATION OF RICHARD W.
ESTERKIN ISO OBJECTION

1    I, Richard W. Esterkin, declare:

2        1.    I am an attorney at law, duly admitted into practice before all courts for the State

3    of California and the United States District Court for the Central District of California.  I am a

4    member of the law firm of Morgan, Lewis & Bockus, LLP, counsel for Amazon Logistics, Inc.,

5    in this bankruptcy case.

6        2.    On June 15, 2020, I took the depositions of Brian Weiss and George Voskanian in

7    connection with the pending request to confirm a plan of reorganization in this bankruptcy case.

8    Attached hereto as Exhibit 1 is a true and correct copy of Mr. Weiss's deposition transcript.

9    Attached hereto as Exhibit 2 is a true and correct copy of Mr. Voskanian's deposition transcript.

10       3.    On June 22, 2020, John Simon, one of the attorneys for Scoobeez in this

11   bankruptcy case, sent me a copy of a rough transcript of Mr. Weiss's deposition transcript on

12   which Mr. Weiss had noted a number of changes.  A true and correct copy of that rough transcript

13   is attached hereto as Exhibit 3.

14       4.    As of the date of this declaration, I have not received any proposed changes to Mr.

15   Voskanian's deposition transcript.

16       I declare under penalty of perjury that the foregoing is true and correct and that this

17   declaration was executed at Santa Monica, California on June 26, 2020.

18

19

20                 */s/ Richard W. Esterkin*_____

21                  Richard W. Esterkin

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF RICHARD W.
ESTERKIN ISO OBJECTION

DB2/ 39177197.1

# EXHIBIT 1

Exhibit 1 - page 3

1             UNITED STATES BANKRUPTCY COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3               LOS ANGELES DIVISION

4

5   _____

    In re:               ) No. 2:19-bk-14989-WB

6                    ) Jointly Administered:

        SCOOBEEZ, et al.,     ) 2:19-bk-14991-WB, and

7                    ) 2:19-bk-14997-WB

          Debtors and Debtors )

8           in Possession.    ) Chapter 11

   _____)

9

10

11

12

13             DEPOSITION OF BRIAN WEISS

14             Newport Beach, California

15              Monday, June 15, 2020

16                Volume I

17

18

19

20

21   Reported by:

22   CATHERINE A. RYAN, RMR, CRR

23   CSR No. 8239

24   Job No. 4137303-1

25   PAGES 1 - 140

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                 LOS ANGELES DIVISION

 4

 5   _____

     In re:                          ) No. 2:19-bk-14989-WB

 6                                    ) Jointly Administered:

         SCOOBEEZ, et al.,           ) 2:19-bk-14991-WB, and

 7                                    ) 2:19-bk-14997-WB

              Debtors and Debtors )

 8              in Possession.        ) Chapter 11

     _____)

 9

10

11

12

13          Deposition of BRIAN WEISS, Volume I, taken on

14   behalf of Amazon Logistics, Inc., by way of

15   video-telecommunication with the Witness appearing in

16   Newport Beach, California, beginning at 9:31 a.m. and

17   ending at 2:24 p.m., on Monday, June 15, 2020, before

18   CATHERINE A. RYAN, Certified Shorthand Reporter No.

19   8239.

20

21

22

23

24

25
```

Page  2

```
 1   APPEARANCES VIA VIDEO-TELECONFERENCE:

 2

 3   For Plaintiff Scoobeez, Inc. and the Witness:

 4

         FOLEY & LARDNER LLP
 5       BY:  JOHN A. SIMON
         Attorney at Law
 6       90 Park Avenue
         New York, New York  10016-1314
 7       (212) 338-3603
         (212) 687-2329 Fax
 8       jsimon@foley.com
 9       BY:  TINOS DIAMANTATOS
         Attorney at Law
10       77 West Wacker Drive
         Chicago, Illinois  60601-5094
11       (312) 324-1145
         (312) 324-1001 Fax
12       tinos.diamantatos@foley.com

13

14   For Amazon Logistics, Inc.:

15       MORGAN LEWIS & BOCKIUS, LLP
         BY:  RICHARD W. ESTERKIN
16       Attorney at Law
         300 South Grand Avenue, 22nd Floor
17       Los Angeles, California  90071-3132
         (213) 612-2500
18       (213) 612-2501 Fax
         richard.esterkin@morganlewis.com

19

20

21

22

23

24

25   //
```

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 6

```
 1    APPEARANCES VIA VIDEO-TELECONFERENCE (Continued):

 2

 3   For Creditor Hillair Capital Management, LLC:

 4         QUINN EMANUEL URQUHART & SULLIVAN, LLP
           BY:  CRYSTAL NIX-HINES (MORNING SESSION)

 5              JENNIFER NASSIRI  (AFTERNOON SESSION)
           Attorneys at Law

 6         865 South Figueroa Street, 10th Floor
           Los Angeles, California  90017

 7         (213) 443-3000 (Ms. Nix-Hines)
           (213) 443-3659 (Ms. Nassiri)

 8         crystalnixhines@quinnemanuel.com
           jennifernassiri@quinnemanuel.com

 9

10

11   For Creditor Committee, Official Committee of Unsecured
     Creditors:

12

           LEVENE NEALE BENDER YOO & BRILL LLP

13         BY:  JOHN-PATRICK M. FRITZ
           Attorney at Law

14         10250 Constellation Boulevard, Suite 1700
           Los Angeles, California  90067-6253

15         (310) 229-1234
           (310) 229-1244 Fax

16         jpg@lnbyb.com

17

18

19

20

21

22

23

24

25

                                         Page  4
```

```
 1                          INDEX

 2    WITNESS                              EXAMINATION

 3    BRIAN WEISS

      Volume I

 4                    BY MR. ESTERKIN                    9

 5

 6                         EXHIBITS

 7    NUMBER                DESCRIPTION                PAGES

 8    Exhibit 0001 "FIRST AMENDED CHAPTER 11 JOINT PLAN      28

 9                 OF REORGANIZATION AS PROPOSED BY THE

10                 DEBTORS, HILLAIR AND THE OFFICIAL

11                 COMMITTEE OF UNSECURED CREDITORS"; 69

12                 pages

13

14    Exhibit 0002 "Proof of Claim" on the letterhead of      41

15                 the FRANCHISE TAX BOARD; 5 pages

16

17    Exhibit 0003 "Official Form 410, Proof of Claim,      42

18                 Filed 05/14/20"; 5 pages

19

20    Exhibit 0004 "Official Form 410, Proof of Claim,      43

21                 Filed 10/03/19"; 4 pages

22

23

24

25    //
```

Page 5

```
 1                    EXHIBITS (Continued)

 2     NUMBER                 DESCRIPTION                  PAGES

 3     Exhibit 0005 "DECLARATION OF BRIAN WEISS IN SUPPORT   61

 4                  OF CONFIRMATION OF FIRST AMENDED

 5                  CHAPTER 11 JOINT PLAN OF

 6                  REORGANIZATION AS PROPOSED BY THE

 7                  DEBTORS, HILLAIR AND THE OFFICIAL

 8                  COMMITTEE OF UNSECURED CREDITORS"; 6

 9                  pages

10

11     Exhibit 0006 "FIFTH STIPULATION REGARDING CONTINUED   20

12                  USE OF CASH COLLATERAL"; 14 pages

13

14     Exhibit 0007 "CHAPTER 11 (BUSINESS), I. CASH          76

15                  RECEIPTS AND DISBURSEMENTS, A.

16                  (GENERAL ACCOUNT*), Filed 02/19/20";

17                  21 pages

18

19     Exhibit 0008 "CHAPTER 11 (BUSINESS), I. CASH          97

20                  RECEIPTS AND DISBURSEMENTS, A.

21                  (GENERAL ACCOUNT*), Filed 03/19/20";

22                  32 pages

23

24

25     //
```

Page 6

```
 1                    EXHIBITS (Continued)

 2      NUMBER              DESCRIPTION                  PAGES

 3      Exhibit 0009 "CHAPTER 11 (BUSINESS), I. CASH        99

 4                   RECEIPTS AND DISBURSEMENTS, A.

 5                   (GENERAL ACCOUNT*), Filed 04/15/20";

 6                   29 pages

 7

 8      Exhibit 0010 "CHAPTER 11 (BUSINESS), I. CASH       100

 9                   RECEIPTS AND DISBURSEMENTS, A.

10                   (GENERAL ACCOUNT*), Filed 05/18/20";

11                   19 pages

12

13      Exhibit 0011 "ORDER GRANTING INTERIM FEE          102

14                   APPLICATIONS OF FOLEY & LARDNER, LLP;

15                   CONWAY MACKENZIE, INC.; ARMORY

16                   SECURITIES, LLC; AND LEVENE NEALE

17                   BENDER YOO & BRILL, LLP"; 6 pages

18

19      Exhibit 0012 "ORDER GRANTING INTERIM FEE           81

20                   APPLICATIONS OF FOLEY & LARDNER, LPP;

21                   CONWAY MACKENZIE, INC.; O'KEEFE &

22                   ASSOCIATES; AND LEVENE NEALE BENDER

23                   YOO & BRILL, LLP"; 7 pages

24

25      //
```

Page 7

```
 1                      EXHIBITS (Continued)

 2    NUMBER                DESCRIPTION              PAGES

 3    Exhibit 0013 "DELIVERY PROVIDER TERMS OF SERVICE      119

 4                 (Last Updated: June 21, 2016)"; 12

 5                 pages

 6

 7    Exhibit 0014 "Delivery Provider Terms of Service,     119

 8                 Work Order"; 10 pages

 9

10    Exhibit 0022 "LSO FINAL MILE, REGIONAL SERVICE        132

11                 PROVIDER AGREEMENT (B2B and B2C Small

12                 Package Delivery)"; 37 pages

13

14                 (Exhibits 0015 - 0021 were not marked for

15                 identification.)

16

17

18

19

20

21

22

23

24

25
```

Page  8

```
 1            Newport Beach, California; Monday, June 15, 2020

 2                           9:31 a.m.

 3

 4                     BRIAN WEISS,

 5     having been administered an oath, was examined and

 6     testified as follows:

 7

 8                     EXAMINATION

 9     BY MR. ESTERKIN:

10        Q    Okay.  All right.  Mr. Weiss, are you there?

11        A    Yes.

12        Q    And you can hear me just fine with our remote

13     connection?

14        A    Yes, I can.

15        Q    Great.

16             Just some preliminary matters to make sure

17     that we're all on the same page with respect to these

18     matters.

19             We're taking this deposition via remote means

20     due to the restrictions on social distancing as a result

21     of the coronavirus epidemic.  I believe all parties have

22     consented to the taking of the deposition in this

23     manner.

24             Because we are not all in the same room, we

25     cannot all observe everything that happens in each of
```

Page 9

1    the participants' locations.  I would like to caution

2    you that it is important for -- that you not receive --

3    I'm sorry -- that it is improper for you to receive any

4    communications while we are on the record, other than

5    statements that are made on the record.  This includes

6    your receipt or review of text messages, emails, or

7    other communications, such as verbal gestures that

8    anyone in the room with you may make during the

9    deposition.

10           Do you understand that?

11       A    Yes, I do.

12       Q    Okay.  For the avoidance of that, this does

13    not mean that counsel cannot assert objections on the

14    record or that the witness cannot consult with counsel

15    when we are off the record.

16           I would like to caution the witness, however,

17    that we will not go off the record while there is a

18    question pending because we do not want anyone to draw

19    an inference that the answer to that question was

20    provided by anyone other than the witness.

21           Do you understand that?

22       A    Yes, I do.

23       Q    Okay.  So if you need to -- to take a break

24    for any reason or need to consult with counsel for any

25    reason, please let me know that after you finished

Page 10

```
 1   answering a pending question, and we can do that before
 2   I ask the next question.
 3              Do you understand that?
 4        A    Yes, I do.
 5        Q    If you do not understand a question, please
 6   let me know that, and I will repeat or rephrase the
 7   question, or we can have the court reporter read the
 8   question back.
 9              Do you understand that?
10        A    Yes.
11        Q    Please wait until I have finished asking a
12   question before starting your answer to the question.  I
13   will try to wait until you have completed your answer to
14   a question before asking the next question.  If you have
15   not completed your answer to a question before I start
16   to ask the next question, please let me know that, and I
17   will allow -- allow you to complete your answer.
18              Do you understand that?
19        A    Yes.
20        Q    Sometimes, during the course of a deposition,
21   a witness will realize that an answer that the witness
22   gave to a previous question was incorrect or incomplete.
23   If that happens during this deposition, please let me
24   know that, and I will allow you to correct or supplement
25   your prior answer.
```

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 14

1        Do you understand that?

2        A    Yes.

3        Q    In order that we have a clean transcript, it

4    is important that only one person speak at a time.  So,

5    once again, please be sure to wait until I have

6    completed my question before starting your answer to the

7    next question.

8        Do you understand that?

9        A    Yes.

10        Q    Your testimony today is under penalty of

11    perjury, the same as if you were testifying in a court

12    of law, and it's also the same oath that you took when

13    you signed your declaration in connection with the

14    debtors' motion to approve its plan of reorganization in

15    this case.

16        Do you understand that?

17        A    Yes.

18        Q    Are you currently under the influence of any

19    medication, or is there anything else that would prevent

20    you from providing your best testimony today?

21        A    No.

22        Q    All right.  What did you do to prepare for

23    today's deposition?

24        A    I received -- I think it was on Friday -- an

25    email from Veritext to, one, log in -- create a log-in

                                                    Page 12

1    for the Exhibit Share, and then, No. 2, is to test my

2    remote connection via their link that was -- I don't

3    remember the name of it, but it's a test link to make

4    sure that my system was working, and that's all I did to

5    prepare.

6         Q    You did not have any discussion with anybody

7    regarding the -- today's deposition other than the

8    communications with Veritext?

9         A    No, I did not.

10        Q    Did you review any documents to prepare for

11   your deposition today?

12        A    No, I have not.

13        Q    Okay.  You're currently serving as the chief

14   restructuring officer of Scoobeez and its related

15   debtors, correct?

16        A    Yes.

17        Q    And you've been doing that since mid-May of

18   2019, correct?

19        A    Yes.

20        Q    I assume you're currently sheltering in place

21   due to the COVID virus; is that correct?

22        A    Define "sheltering in place."

23        Q    Well, you're basically working from home; is

24   that correct?

25        A    Generally, I've been working from home;

                                        Page 13

1    however, today, I did go to my office to ensure that we

2    had good bandwidth and a nice quiet environment.

3         Q    Okay.  So, today, you're actually testifying

4    from your office?

5         A    Yes, I am.

6         Q    Okay.  When was the last time you visited

7    Scoobeez' offices?

8         A    It's been some time now.  Several months.

9         Q    Okay.  And that's due to the COVID situation;

10   is that correct?

11        A    Partially.

12        Q    Why else -- why else have you not visited

13   Scoobeez' office in the last several months?

14        A    Because, you know, we had the holiday season.

15   The business operations are running relatively smoothly.

16   We've been busy trying to get the plan of reorganization

17   together.  So that's --

18        Q    And you've done all of that remotely?

19        A    Yes.

20        Q    Have you had any other assignments or -- other

21   than working in conjunction with the Scoobeez case

22   during the period of time that you've served as the

23   chief restructuring officer for Scoobeez?

24        A    If you can clarify that.

25        Q    Sure.

                                              Page 14

1           You're -- you had -- you work for a consulting

2     firm, correct?

3         A     Yes.  I'm the cofounder of a restructuring

4     firm.

5         Q     And the name of that firm is what?

6         A     Force 10 Partners LLC.

7         Q     And has Force 10 Partners LLC been retained in

8     any other matters during the period of time that you've

9     been acting as the chief restructuring officer for

10    Scoobeez?

11        A     Yes.

12        Q     How many other matters?

13        A     Are you referring to Force 10 or matters that

14    I am involved with?

15        Q     Well, I'm -- right now, I'm referring to

16    Force 10.  The next question will be the extent of your

17    involvement in those matters.

18        A     Okay.  So with respect to Force 10, I mean,

19    I -- I don't know.  You know, I can go through our time

20    and billing software and kind of, you know, count the

21    number of active clients, you know, that we billed for

22    last month, two months ago, three months ago, et cetera,

23    but as we sit here today, I don't have the -- the answer

24    for that.

25        Q     Okay.  Approximately what percentage of your

Page 15

1    time during the last three months have you spent on

2    matters pertaining to Scoobeez?

3         A     Probably 20 -- 20 to 25 percent.

4         Q     And what matters, in particular, have you

5    worked on in the last three months in relationship to

6    Scoobeez?

7         A     What matters with respect to Scoobeez in

8    particular?

9         Q     Yes.

10         What -- what are the subject matters of --

11   what's the subject matter of the issues that you've been

12   working on with respect to Scoobeez over the last three

13   months?

14        A     You -- I'm sorry.  Just for clarification

15   purpose, you said "issues."

16         You mean, is it more matters like what have I

17   been doing from a -- you know, a work standpoint?  I

18   just want to make sure we're clear on, you know -- you

19   know, is "issues" represent a crisis or "issues"

20   represent matters?

21        Q     I'm trying to find out what you did over the

22   last three months in relationship to Scoobeez, just the

23   general categories of things that you worked on.

24        A     Perfect.

25         Oversight of, you know, co-CEOs, George

Page 16

1    Voskanian and Scott Sheikh; working with debtors'

2    counsel on our plan of reorganization and disclosure

3    statement; overseeing, you know, financial projections;

4    and then overseeing the preparation of cash budgets, as

5    well as reviewing and commenting on cash collateral

6    various reports; reviewing monthly financial

7    performance.

8         Q    Have you finished your answer?

9         A    Yes, I have.

10        Q    Okay.  All right.  Well, let's start with the

11   plan of reorganization.

12             You said that you worked on the plan of

13   reorganization.

14             Who else worked on the plan of reorganization?

15        A    It would have been John Simon with Foley

16   Lardner and then other associates that he has brought

17   into the case, primarily Shane Moses and, I think,

18   Tamar Dolcourt with -- and then on the secured lender

19   side, I've had communications -- various communications

20   with Scott Kaufman of Hillair Capital.

21        Q    And what about with respect to the committee?

22        A    We've had -- actually, I haven't had -- over

23   the past couple months, I haven't had direct

24   communication with the committee.

25        Q    So any communications that occurred with the

Page 17

1    committee were done through counsel; is that correct?

2        A    Yes.

3        Q    Okay.  And there's currently a cash -- the

4    current cash collateral budget was filed with a

5    stipulation on June 4th, correct?

6        A    Approximately.

7        Q    Okay.

8        A    I don't know the exact date it was filed.

9        Q    All right.  We'll show you a copy of that

10   later, and we can pinpoint the date.

11           Who worked on the -- the -- attached to that

12   stipulation there was a budget, correct?

13       A    Yes.

14       Q    And that budget went from roughly the first

15   part of June all the way through December 31st, correct?

16       A    January 1st, I think, yes.

17       Q    And who prepared that budget?

18       A    George Voskanian.

19       Q    The budget that's actually attached to this

20   stipulation, is that the original budget that

21   Mr. Voskanian proposed, or were there changes in the

22   budget over time?

23       A    In that particular budget, I believe there

24   were, you know, a couple of versions that went -- went

25   through.

Page 18

1       Q     And those versions were shared back and forth

2    with Hillair; is that correct?

3       A     Not through George, but through me, yes.

4       Q     And who at Hillair did you deal with with

5    respect to the budget?

6       A     Scott Kaufman.

7       Q     And what changes were made to the budget from

8    the initial draft that was created by Mr. Voskanian to

9    the final draft that was filed with the court?

10      A     I don't recall, except for, you know, with

11   respect for professional fees, Kaufman and I had

12   discussed -- we had made some -- a couple of iterations

13   on those, but from an operations standpoint, I don't

14   recall.

15      Q     Okay.  Well, let's talk about the professional

16   fees, then.

17            What changes were made with respect to the

18   professional fees from the original budget prepared by

19   Mr. Voskanian until the final version filed with the

20   court?

21      A     There were reductions in the fees for debtors'

22   counsel, Hillair's counsel, and, I believe, the

23   committee.

24      Q     What was the original amount of the budget for

25   debtors' counsel in the original budget that was

                                                   Page 19

1    prepared by Mr. Voskanian?

2        A    I believe it was $50,000 per month.

3        Q    That was in the original one?

4        A    Yes.

5            MR. ESTERKIN:  And -- all right.  Let's see if

6    we can actually show you an exhibit.

7            THE WITNESS:  Sure.

8            MR. ESTERKIN:  Let's see how this works.

9            (Exhibit 0006 was marked for

10           identification.)

11           MR. ESTERKIN:  All right.  So, for the record,

12   I'm going to mark this document as Exhibit 6.  I had

13   planned to show it to you somewhat later in the

14   deposition, and I numbered the exhibits sequentially.

15   So I'm going to identify this document as Exhibit 6.

16   It's a copy of the "FIFTH STIPULATION REGARDING

17   CONTINUED USE OF CASH COLLATERAL" filed with the

18   bankruptcy court on June 4th, 2020, as Document No. 786.

19           And everybody should now have that exhibit and

20   be able to see it.

21           THE WITNESS:  I don't see it.

22   BY MR. ESTERKIN:

23       Q    Have you logged on to the Exhibit Share?

24       A    I'm in Exhibit Share.

25           MR. ESTERKIN:  Okay.  Why don't we go off the

                                              Page 20

1    record for a minute while we see if we can deal with the

2    technical issues.

3                  (Discussion off the record.)

4                  MR. ESTERKIN:  Why don't we go back on the

5    record.

6                  So while we were off the record, I think we

7    were able to solve the technical issue.

8        Q    And, Mr. Weiss, you now have the exhibit in

9    front of you?

10       A    Yes.

11       Q    And you're able to review it, correct?

12       A    Yes.

13       Q    All right.  So if you would turn to -- I'm

14   going to refer to the page numbering at the top of the

15   exhibit where the court's banner appears where it says,

16   in the second line, "Main Document."

17                 Do you see that?

18       A    Yes, I do.

19       Q    Okay.  If you would turn to page 7 of 14,

20   please.  Let me know when you've -- you're there.

21                 Ah-ha, you do wear glasses.

22       A    For reading small font, yes.

23       Q    All right.  Do you have that now?

24       A    Yes, I do.

25       Q    All right.  And so if you go down about

                                              Page 21

1   two-thirds of the way down the page, there's the bold

2   print "Restructuring Cash Flows."

3         Do you see that?

4   A   Yes, I do.

5   Q   All right.  And then the first line in there

6   is debtors' counsel.

7         Do you see that?

8   A   Yes.

9   Q   And we have the luxury of actually having

10  color showing on the PDFs that we're looking at.

11        It shows $50,000 on June 19th, correct?

12  A   Yes.

13  Q   And then another 50,000 on July 27th, correct?

14  A   Yes.

15  Q   All right.  So it's approximately 50,000 a

16  month; is that correct, at least for these first three

17  months?

18  A   For the three months in the forecast period,

19  yes.

20  Q   And was that -- were those the original

21  amounts in the original budget that was proposed by

22  Mr. Voskanian?

23  A   I believe so.

24  Q   Okay.  I think you said that there were some

25  changes to the budget for the debtors' counsel from the

                                              Page 22

 1    original version prepared by Mr. Voskanian.

 2         What were the changes, now that you have this

 3    in front of you?  And you can certainly refer to the

 4    next page, if you'd like, which picks up the months

 5    through the end of the year.

 6    A    Sure.

 7         Based on my recollection, the fees for

 8    debtors' counsel in the -- you know, the period ending

 9    September 18th and forward were reduced from $50,000 a

10    month to $25,000 per month.

11    Q    And what was the -- do you recall any

12    discussions as to the rationale for that reduction?

13    A    That was a discussion I had with Scott Kaufman

14    with Hillair Capital.

15    Q    And what was the substance of that discussion?

16    A    That based on, you know, the plan hopefully

17    being confirmed in July, that subsequent to that time

18    period, there would be a little bit of clean-up work,

19    and then the case would hopefully be, you know, winding

20    down from a legal fees perspective.  So as a result, the

21    professional fees were reduced beginning in September

22    forward to account for the hopefully reduced time that's

23    going to be spent by debtors' counsel in the case.

24    Q    Okay.  And then if we can look at about --

25    what is it? -- further down towards the bottom of the

                                            Page 23

1    "Restructuring Cash Flows" section of the budget, there

2    is a line item for committee counsel.

3         Do you see that?

4    A    Yes, I do.

5    Q    And the amounts in that budget -- were those

6    the amounts -- excuse me.

7         The amounts in that line item, were those the

8    amounts that were originally proposed by Mr. Voskanian?

9    A    Well, they would have been in the budget,

10   which I gave him a template of, but the original

11   amounts, I believe, were $12,500 for the first two

12   months, which were reduced now to the 10,000.

13   Q    And what about in the month -- as I'm looking

14   at it, starting on August 21st, the committee counsel

15   fees budget is reduced to $5,000 a month, and then that

16   continues through the end of the period covered by the

17   budget.

18        Were those the original amounts proposed by

19   Mr. Voskanian?

20   A    Remember, I think I just said that I gave him

21   a budget with these numbers, and then after discussions

22   with Kaufman, we reduced these numbers -- reduced the

23   original numbers.  So the original numbers would have

24   been, I believe -- again, this is just my recollection,

25   and this is, you know, a little time ago, so -- but it

Page 24

1  was 12,500 per month that then got reduced to 10,000 per

2  month for the first two months of the forecast period,

3  then $5,000 per month thereafter.

4       Q    So the original budget was 12,500 through the

5  entire period of the budget; is that correct?

6       A    I believe so.

7       Q    All right.  Did you have any discussions with

8  anybody at debtors' counsel regarding the reduction in

9  the budget?

10           MR. SIMON:  Objection.  Attorney-client

11  privileged.

12  BY MR. ESTERKIN:

13       Q    You can answer the question.

14           THE WITNESS:  John, can I answer the question?

15           MR. SIMON:  You can answer the question.

16           THE WITNESS:  Yes, I did.  I had discussions

17  with Mr. Simon regarding the amounts set forth in the

18  budget, both the original $50,000 that was originally in

19  the budget and then the reduced amounts.

20  BY MR. ESTERKIN:

21       Q    And did debtors' counsel indicate to you that

22  the budgeted amount would be sufficient to pay their

23  fees during the period of time covered by the budget

24  and --

25           MR. SIMON:  Objection.  Attorney-client

                                        Page 25

1   privilege.

2            MR. ESTERKIN:  Excuse me.  Let me finish the

3   question, John, before you object.

4       Q    Did debtors' counsel indicate that the

5   50,000 -- that the original amount set forth in the

6   budget would be sufficient to pay their fees that they

7   believed they would incur during the period of the

8   budget?

9       A    We didn't have discussions with respect to

10  whether they were sufficient to cover the costs that

11  were being incurred.

12      Q    I'm sorry.  I just didn't hear your answer.

13  If the court reporter can read it back, or you can

14  repeat it, if you want to repeat it.

15      A    Could the court reporter repeat it back,

16  please.

17            MR. ESTERKIN:  Sure.

18            (Record read by the reporter as follows:

19                "ANSWER:  We didn't have discussions

20            with respect to whether they were

21            sufficient to cover the costs that were

22            being incurred.")

23  BY MR. ESTERKIN:

24      Q    So just to be clear, it's your testimony that

25  this budget was prepared -- even though this budget was

                                          Page  26

1    prepared, which estimated debtors' counsel's fees, you

2    did not have discussion with debtors' counsel regarding

3    whether the estimated fees would be sufficient to pay

4    the actual fees?

5        A    That is correct.

6            MR. SIMON:  Objection.  Attorney-client

7    privileged.

8            MR. ESTERKIN:  Well, to the extent there is a

9    privilege, it's been waived by his answer to the last

10   question.

11       Q    Please answer --

12           MR. SIMON:  I objected to the last question.

13           MR. ESTERKIN:  You didn't instruct him not to

14   answer, and he did answer, and, therefore, there's been

15   a waiver.

16       Q    Please answer the question.

17           THE WITNESS:  John, may I answer the question?

18           MR. SIMON:  You can answer the question.

19           THE WITNESS:  So -- and these fees are not

20   necessarily meant to cover the actual costs, but they're

21   the amounts set forth in the budget to be repaid

22   going-forward basis.

23   BY MR. ESTERKIN:

24       Q    And do you have an estimate as to what the

25   actual fees will be during the period covered by the

                                          Page  27

```
 1    budget?

 2         A    I do not.

 3         Q    Did debtors' counsel provide you with an

 4    estimate of the fees that they believed they would incur

 5    during the period covered by this budget?

 6         A    No, they did not.

 7         Q    Did you have any conversations -- or strike

 8    that.

 9              To your knowledge, were there any

10    conversations with committee counsel regarding whether

11    or not the amount set forth in the budget would be

12    adequate to cover committee counsel's fees during the

13    period covered by the budget?

14         A    I have not had discussions with the committee,

15    and I don't know what discussions my counsel had with

16    committee counsel.

17              MR. ESTERKIN:  Okay.  Let's see if I can

18    actually mark another exhibit for you.

19              (Exhibit 0001 was marked for

20              identification.)

21              MR. ESTERKIN:  Let's mark, as Exhibit 1 -- let

22    me make sure I've got the right document here -- yeah.

23    We'll mark, as Exhibit 1, a copy of the "FIRST AMENDED

24    CHAPTER 11 JOINT PLAN OF REORGANIZATION AS PROPOSED BY

25    THE DEBTORS, HILLAIR AND THE OFFICIAL COMMITTEE OF
```

Page 28

1    UNSECURED CREDITORS."  It was filed in the bankruptcy

2    case as Document 754 on April 28, 2020.

3        Q    And, Mr. Weiss, you can go ahead and open that

4    document, assuming --

5        A    I have the document open.

6        Q    Great.  All right.

7            So I'm going to ask you a series of questions

8    about the plan, and at any time during the course of the

9    questioning about -- about the plan, if you feel a need

10   to look at the plan, feel free to do so.  And during the

11   course of these questions, I may direct you to specific

12   plan provisions as well.

13           Do you understand that?

14       A    Yes.

15       Q    Great.

16           Okay.  So I believe that you testified that

17   you were involved in the -- negotiating the plan,

18   correct?

19       A    Yes.

20       Q    And would you characterize your role as the

21   lead negotiator on behalf of Scoobeez?

22       A    Yes.

23       Q    And who was the lead -- and Mr. -- I believe

24   you said Mr. Kaufman was the lead negotiator, from a

25   business perspective, on behalf of Hillair; is that

Page 29

1    correct?

2        A    Yes.

3        Q    And, to your knowledge, who is the lead

4    negotiator on behalf of the committee?

5        A    I have not had interactions with the committee

6    members themselves, so I don't know.

7        Q    Okay.  If you go to -- I think it's probably

8    the last page of this document.  Before you get to the

9    exhibit, there's what appears to be your signature.

10           You signed this plan, correct?

11       A    Yes, I did.

12       Q    And when you signed it, you had an

13   understanding of what the plan meant, correct?

14       A    Yes.

15       Q    And what was intended by the plan, correct?

16       A    Yes.

17       Q    All right.  If you would turn to page 22 of 69

18   in the plan.

19       A    Is that 22 based on the court-stamp page

20   number or the footer-page number?

21       Q    The court-stamp number.  I'm going to

22   consistently use court-stamp numbers when I direct you

23   to a particular page of a document that's been filed

24   with the court.

25       A    I'm just trying to make sure we're clear.

Page 30

```
1        Q     Yeah, no, that's fine.  I understand.

2              MR. SIMON:  Which page, Richard?

3              MR. ESTERKIN:  Twenty -- I'm sorry.

4    Twenty-two of 69.

5        Q     Mr. Weiss, let me know when you're there.

6        A     I'm here.

7        Q     Okay.  Great.

8              The third line down, there's a sentence that

9    reads as follows:  "On or before May 28, 2020, the

10   Debtors shall file for Court approval a proposed cash

11   collateral budget for the period from June 5, 2020

12   through December 31, 2020, provided all parties' rights

13   are reserved as to such budget," period.

14             Do you see that?

15       A     Yes.

16       Q     That, in fact, did not occur; is it correct?

17       A     You mean the actual date of the filing of the

18   budget?

19       Q     Correct.

20       A     Or are you referring to the cash collateral

21   budget from the period June 5th to December 31st?

22       Q     This sentence indicates that the proposed cash

23   collateral budget for the period from June 5, 2020,

24   through December 31, 2020, was supposed to be filed on

25   or before May 28th, correct?
```

                                                    Page 31

```
 1        A    Well, there's two conditions here, right?  One

 2   is a budget filed on or before May 28th, and the other

 3   is a budget for the period from June 5th to

 4   December 31st.  So if you can -- if you could please

 5   clarify for me which condition you would like me to

 6   refer to first.

 7        Q    Was the budget timely filed?

 8        A    In accordance with this May 28th date, no.

 9        Q    So the debtor defaulted under the plan prior

10   to the time --

11             MR. SIMON:  Objection --

12   BY MR. ESTERKIN:

13        Q    -- that the --

14             MR. SIMON:  -- calls for a legal conclusion.

15   BY MR. ESTERKIN:

16        Q    -- prior to the time that the plan even came

17   up for confirmation, correct?

18             MR. SIMON:  Objection.  Calls for a legal

19   conclusion.

20   BY MR. ESTERKIN:

21        Q    You can answer.

22             MR. SIMON:  Objection.  Vague.  Ambiguous.

23   Objection.  Misleading.

24             THE WITNESS:  I have not received a default

25   notice from anybody with respect to not filing the cash
```

Page 32

1    collateral budget by this date.

2    BY MR. ESTERKIN:

3        Q    All right.  So let's switch topics for a

4    moment.

5            Under the terms of the plan, there's something

6    called the "estate cash payment," correct?

7        A    Yes.

8        Q    And that's a million $500,000, correct?

9        A    Yes.

10       Q    And that's supposed to be paid into -- I'll

11   call it -- a "trust account" for the benefit of the

12   creditor trust to be formed under the plan, correct?

13       A    Yes.

14       Q    And that's supposed to be paid to the -- in

15   this trust account, on the confirmation date; that is,

16   the date the plan is confirmed, correct?

17       A    Yes.

18       Q    And under the terms of the plan -- or strike

19   that.

20           The plan prescribes the ultimate disposition

21   of those funds, correct?

22       A    Yes.

23       Q    And one of the things that those funds are

24   supposed to pay are unpaid counsel fees in excess of the

25   budget, correct?

Page 33

1      A    Yeah, debtors' counsel, committee counsel,

2   Hillair counsel.  Correct.

3      Q    It's all three?

4      A    Yes.

5      Q    And the budget that's being referred to here

6   are the cumulative cash collateral budgets from the

7   beginning of the case through the December 31st budget

8   that we looked at a few minutes ago, correct?

9      A    I'm sorry.  I -- I didn't understand that.

10     Q    Sure.

11          The -- the -- the fees in excess of budget

12   that the million $500,000 is supposed to pay, that would

13   be the cumulative fees in excess of the amounts in all

14   of the cash collateral budgets from the beginning of the

15   case through the end of the case, correct?

16     A    If I could state it a different way, it's

17   the -- just to make sure that we all understand, this is

18   the amount of unpaid fees through the end of the case,

19   would be paid from this $1.5 million.

20     Q    And the fees that are to be -- so let's make

21   sure that we understand each other.

22          From the beginning of the case to the end of

23   the case -- let's just take debtors' counsel as an

24   example.

25          Debtors' counsel will have earned fees of X.

Page 34

1           Do you understand what I'm -- what I'm saying?

2      A    Yes.

3      Q    And during the course of the case, there were

4  cash collateral budgets that permitted Scoobeez to pay

5  its counsel fees, at least in part, correct?

6      A    Yes.

7      Q    And let's just call that, the cumulative

8  amount in those budgets, Y.

9           Do you understand that?

10     A    Yes.

11     Q    And so the amount that is supposed to be paid

12  out of the million five for debtors' counsel would be X

13  minus Y, correct?

14     A    No.

15     Q    I'm sorry.  "No"?

16     A    No.

17     Q    Okay.  Perhaps, then, you can explain to me

18  what fees the million five is supposed to pay.

19     A    Sure.

20           It's supposed to pay the un- -- unpaid fees of

21  the debtor, the committee, and Hillair's counsel, not

22  just debtors' counsel.

23     Q    Correct.

24           But I was trying to get to the amount that

25  would be paid on account of debtors' counsel as

Page 35

1    distinguished from the other three.  I understand -- I'm

2    sorry -- the other two, so that we would understand

3    exactly what the million five was supposed to cover.

4           So it covers the fees throughout the course of

5    the case less the amounts that are paid during the

6    course of the case pursuant to the cash collateral

7    budgets, correct?

8       A    Yes.

9       Q    And that would be true for Hillair, the

10   debtors' counsel, and the committee counsel, correct?

11      A    Collectively, yes.

12      Q    I'm sorry.  I didn't hear the first part of

13   your answer again.

14      A    Collectively, yes.

15      Q    Thank you.  I didn't hear the "collectively."

16          Okay.  As I read the plan, the million five is

17   also supposed to pay any accrued and unpaid

18   administrative claims through December 31st, 2020; is

19   that correct?

20      A    Could you take me to the section of the plan

21   that deals with that, please.

22      Q    Sure.  You'll have to give me a minute because

23   my notes only have the section -- okay.  Yeah, if you

24   turn to page 21 of 69 --

25      A    Okay.

Page 36

1      Q    -- and in Section 3, "Administrative Expenses"

2  -- do you see that?

3      A    Yes.

4      Q    And why don't you just -- the sentence is

5  really long, so why don't you just read the beginning of

6  that paragraph rather than my reading the entire thing

7  into the record.  Let me know when you've read enough of

8  that so you can answer my question.

9      A    Okay.

10          (Pause.)

11     A    Okay.  I've read this.

12     Q    Okay.  So it starts off by saying the creditor

13  trustee shall pay to the holder of each allotted

14  administrative expense claim, et cetera.

15          So the -- the only money that the trust -- the

16  creditor trust is getting, at least initially, is the

17  million and a half dollars from the estate cash payment,

18  correct?

19     A    That's correct.

20     Q    So was it anticipated that the creditor

21  trustee would pay -- let me back up.

22          And so the administrative expense claims are

23  to be paid on the effective date, correct, or when

24  they're allowed, correct?

25     A    Yes, when allowed.

Page 37

1            MR. SIMON:  Objection.  Calls for a legal

2      conclusion.

3            You can answer.

4            THE WITNESS:  When allowed.

5      BY MR. ESTERKIN:

6        Q    And so it was anticipated, was it not, that

7      the million and a half would be used to pay

8      administrative claims?

9        A    Are you -- is that a question?

10       Q    Yes.

11           The million and a half dollars of the estate

12     cash payment was also to be utilized to pay

13     administrative claims, correct?

14       A    Yeah.  The professionally -- the professional

15     fees, yes.

16       Q    Well, it doesn't -- this says "Allowed

17     Administrative Expense Claim."  We can go through the

18     definitions.

19           That's not limited to professional fees, is

20     it?

21       A    Let's go up to -- up to the definition.

22       Q    Sure.

23           Definition 1:  "'Administrative Expense Claim'

24     means any cost or expense to administration of the

25     Chapter 11 Cases..."

                                              Page 38

1              It's not limited to professional fees,

2     correct?

3              And just for the record, that is at

4     Section II.A.1 of the plan.

5              MR. SIMON:  Objection.  Calls for a legal

6     conclusion.

7              THE WITNESS:  My understanding was that the

8     professional fees get paid from the 1.5-million-dollar

9     estate cash payment, and then the other creditor --

10    post-petition creditors, would be paid from, you know,

11    cash on hand and, you know, in the ordinary course of

12    business as the bills become due.

13    BY MR. ESTERKIN:

14       Q    All right.  Well, you signed this document.

15             Having now looked at the definition of

16    "Administrative Expense Claims," do you think that this

17    document is -- accords with your understanding as you

18    just related it on the record?

19             MR. SIMON:  Objection.  Calls for a legal

20    conclusion.

21             THE WITNESS:  Well, if I read, you know, going

22    back to page 21, that -- you know, it deals with

23    administrative expense claims, "(with the exception of

24    monthly, interim or final allowed non-Hillair

25    Professional Fee Claims which shall be paid under the

                                                    Page 39

1    court approved cash collateral budgets or from the

2    Estate Cash Payment) shall be paid... in the ordinary

3    course of business from cash on hand and cash flow based

4    on the contractual terms with each respective vendor or

5    in the case of payroll obligation, when the obligation

6    becomes due and payable and... as required for

7    confirmation and effectiveness of the Plan."

8              Based on that language, the plan is

9    accurately -- it's accurate.

10   BY MR. ESTERKIN:

11        Q    Well, what does the language -- well, the

12   beginning of this section on administrative expenses

13   said the creditor trustee shall pay the administrative

14   claims, doesn't it?

15             MR. SIMON:  Objection.  The document speaks

16   for itself.  Objection.  Calls for a legal conclusion.

17   Objection.  Asked and answered.

18   BY MR. ESTERKIN:

19        Q    Go ahead.  You can answer the question.

20        A    Based on my reading of the plan and this

21   section, the plan is accurate.

22        Q    So it's your testimony that the only

23   administrative expenses that are supposed to be paid out

24   of the million five estate cash payment are the

25   professional fees in excess of those paid under the

                                              Page 40

1    budget, correct?

2        A    Yes.

3            MR. SIMON:  Objection.  Calls for a legal

4    conclusion.

5            You can answer.

6            THE WITNESS:  That's my understanding, yes.

7            MR. ESTERKIN:  Let's go off the record for a

8    moment.

9            (Discussion off the record.)

10           MR. ESTERKIN:  Okay.  We can go back on the

11   record.

12       Q    All right.  Mr. Weiss, let's talk for a moment

13   about priority tax claims.

14           Do you have an understanding as to the source

15   of the funds that are supposed to be utilized to pay

16   priority tax claims under the plan?

17       A    Yes.

18       Q    And what's your understanding in that regard?

19       A    That there aren't any priority tax claims.

20           MR. ESTERKIN:  Okay.  I'm going to mark

21   another document as an exhibit.

22           (Exhibit 0002 was marked for

23           identification.)

24           MR. ESTERKIN:  Let's mark, as Exhibit 2, a

25   priority tax claim.  It's Claim No. 4, filed by the

                                              Page 41

1    Franchise Tax Board.

2        Q    Let me know when you have that.

3        A    I have it.

4        Q    All right.  Have you -- were you aware that

5    this claim had been filed?

6        A    Give me one second to review it.

7        Q    Sure.

8        A    I was not aware this was filed.

9            MR. ESTERKIN:  I'm going to show you another

10   exhibit in a second.  I'm waiting for my computer.

11           (Exhibit 0003 was marked for

12           identification.)

13           MR. ESTERKIN:  Let's mark, as Exhibit 3, a

14   priority tax claim filed by the Department of the

15   Treasury, Internal Revenue Service.

16           THE WITNESS:  I have this exhibit open.

17   BY MR. ESTERKIN:

18       Q    I'm sorry.  Do you have the exhibit now?

19       A    Yes.  I have it open.

20       Q    Okay.  Were you aware that this claim had been

21   filed?

22       A    I had recently been aware -- made aware of

23   this claim, yes.

24       Q    When were you first made aware of this claim?

25       A    It was probably two to three weeks ago.

                                             Page 42

1      Q     And how did this claim come to your attention?

2      A     Scott Sheikh had brought it to my attention.

3      Q     And did you have any discussions with

4    Mr. Sheikh regarding this claim?

5      A     Yes.

6      Q     What were -- what were the substance of your

7    discussions with Mr. Sheikh regarding this claim?

8            MR. SIMON:  Objection to the extent

9    attorney-client privilege based on the fact that

10   Mr. Sheikh is the general counsel of the company.

11           To the extent you can answer without waiving

12   the privilege, you may do so.

13           THE WITNESS:  Okay.  Just to see if he was

14   aware of this claim and the validity of the claim and

15   how it arose.

16   BY MR. ESTERKIN:

17     Q     And what did he say in that regard?

18     A     He is aware that the claim is valid, and he

19   explained to me why there is this liability.

20           MR. ESTERKIN:  Okay.  Give me a minute.  We've

21   got one more.

22           (Exhibit 0004 was marked for

23           identification.)

24           MR. ESTERKIN:  Let's mark, as Exhibit 4, a

25   copy of a Proof of Claim filed by the Texas Comptroller

                                                    Page 43

1    of Public Accounts.  It's Claim No. 35.

2        Q    Let me know when you have that, Mr. Weiss.

3        A    I have it.

4        Q    Okay.  Prior to the time that I just showed

5    you the claim, were you aware that this claim had been

6    filed?

7        A    I don't recall.

8        Q    All right.  Looking for -- just -- you don't

9    need -- you can pull it -- look at it if you'd like to,

10   Exhibit 3, which is the Franchise Tax Board claims.

11            Do you have any understanding as to whether or

12   not that claim is valid?

13       A    I do not.

14       Q    Okay.

15       A    It doesn't specify what these taxes relate to.

16       Q    Have you finished your statement?

17       A    Yes.

18       Q    And I believe you testified that you believe

19   the IRS claim to be valid, correct?

20       A    Yes.

21       Q    And do you have any understanding as to

22   whether the Texas Comptroller's claim is valid?

23       A    I do not.

24       Q    All right.  Let's take a look at the amended

25   plan for a moment.

                                            Page  44

 1          If you would turn to page 7 of 69.

 2     A    Okay.

 3     Q    And specifically Paragraph No. 10, the

 4  definition of "Available Cash."

 5          This concept of available cash, that was

 6  created in order to define the cash that would be

 7  available in the creditor's trust in order to pay

 8  unsecured creditors, correct?

 9          MR. SIMON:  Objection.  Misleading.

10  Objection.  Calls for a legal conclusion.

11          But you may answer.

12          THE WITNESS:  You said that this is cash

13  that's available to pay unsecured creditors?

14          MR. ESTERKIN:  Unsecured creditors and the

15  cost of administering the trust.

16          THE WITNESS:  I just read the definition

17  again.

18          Would you mind reasking the question, please.

19          MR. ESTERKIN:  Could the reporter please read

20  it back.

21          (Record read by the reporter as follows:

22               "QUESTION:  And specifically

23          Paragraph No. 10, the definition of

24          'Available Cash.'

25               "This concept of available cash, that

                                        Page 45

1                was created in order to define the cash

2                that would be available in the creditor's

3                trust in order to pay unsecured creditors,

4                correct?")

5            THE WITNESS:  The definition doesn't

6    specifically state that it's there to pay general

7    unsecured creditors.

8    BY MR. ESTERKIN:

9        Q    Okay.  All right.  Let me just ask the

10   question directly.

11           What's the -- what -- under the terms of the

12   plan, as you understand it, what is the source of the

13   funds to pay priority tax claims?

14       A    That --

15       Q    Does it come from the creditor's trust, or is

16   that something that the reorganized debtor has to pay?

17           MR. SIMON:  Objection.  Calls for a legal

18   conclusion.

19           You can answer.

20           THE WITNESS:  I believe it would come from

21   the -- not from the creditor's trust.

22   BY MR. ESTERKIN:

23       Q    So it would be a continuing obligation of the

24   reorganized debtors; is that correct?

25           MR. SIMON:  Objection.  Misleading.

                                        Page  46

1    Objection.  Calls for a legal conclusion.

2           THE WITNESS:  Yes.  It would be paid from the

3    cash on hand at the debtor -- from the debtors.

4    BY MR. ESTERKIN:

5        Q    All right.  Let's turn to page 23 of 69 and,

6    in particular, the paragraph 4 at the bottom of that

7    page that talks about priority tax claims.

8           Do you have that?

9        A    I'm scrolling to it.

10          I am on page 23.

11       Q    Okay.  Towards the bottom -- do you have it?

12       A    Yes.

13       Q    If you want to take a moment to read it, you

14   can.  Let me tell you what the first question is going

15   to be.

16          The first sentence, that "... Priority Tax

17   Claims shall be paid in full within 5 years of the

18   petition date in accordance with section 1129(a)(9)(C)

19   of the Bankruptcy Code," what is your understanding with

20   respect to the intervals under which those payments

21   would be made?  In other words, are they all paid at the

22   end of five years?  Are there installment payments

23   between the effective date of the plan and the petition

24   date?  And, if so, what are the installments?  How often

25   are they made?

                                          Page 47

1      A     Let me read the plan treatment.

2      Q     Sure.

3            MR. SIMON:  Objection.  Calls for a legal

4   conclusion.

5            THE WITNESS:  Yes, I'm done reading this

6   section.

7            MR. ESTERKIN:  Okay.  Right.

8      Q     So the question related to the timing of these

9   payments to the holders of priority tax claims.

10            How frequently are the payments made during

11   the five years prescribed in the plan?

12      A     The frequency is not set forth, you know, in

13   this section.

14      Q     All right.  Well, what is your understanding

15   as to the frequency of those payments, if you have one,

16   or don't you?  Go ahead.  You signed the plan.

17            MR. SIMON:  Objection.  Compound.  Objection.

18   Ambiguous and vague.

19            Can you restate the question?

20            MR. ESTERKIN:  Yeah.

21      Q     What is your understanding as to the frequency

22   with which the payments to priority tax claims are

23   supposed to be made under this plan?  You signed it.

24   You negotiated it.  What's your understanding?

25      A     I thought I had answered that just a second

                                                    Page 48

1    ago.

2        Q    Well, you said it doesn't seem to be

3    prescribed in this section.

4            Is there another section where it's

5    prescribed?

6        A    Let me -- let me scroll through the plan.

7    Just a minute.

8        Q    Sure.

9            As I indicated earlier --

10           (Simultaneous speaking.)

11           -- both --

12       A    You're giving me a section and then asking me

13   to conclude on -- you know, on one paragraph on a

14   69-page document.  So let me just, you know, scroll

15   through this and see if I can see if there's any other

16   provisions that deal with this.

17       Q    Sure.

18       A    Okay.  I'm done scrolling through the plan.

19       Q    Okay.

20       A    The plan does not set forth what the repayment

21   terms, other than within five years from the petition

22   date, are.  I mean, there's no explanation of the

23   frequency of the payments.

24       Q    All right.  And do you understand that the

25   amount that the priority tax claimants are supposed to

 1   receive is equal to the present value of the amount of

 2   their claims?

 3              MR. SIMON:  Objection.  Calls for a legal

 4   conclusion.  Objection.  Foundation.

 5              THE WITNESS:  Yes.

 6   BY MR. ESTERKIN:

 7       Q    And what interest rate is -- does the plan

 8   prescribe in order to present-value the stream of

 9   payments that are to be made to the priority tax

10   claimants under the plan?

11              MR. SIMON:  Objection.  Foundation.

12   Objection.  Assumes facts not in evidence.

13              MR. ESTERKIN:  Oh, I'll restate the question.

14       Q    What is your understanding as to the interest

15   rate to be used in order to present-value the stream of

16   payments to be made to priority tax claimants under the

17   plan?

18       A    Let me go back to the priority tax plan.

19              The actual interest rate on each respective

20   claim isn't set forth specifically in the plan.

21       Q    Do you have an understanding as to the

22   interest rate that's supposed to be used?

23              MR. SIMON:  Objection.  Calls for a legal

24   conclusion.  Objection.  Assumes a fact not in evidence.

25   Objection --

                                          Page 50

1            THE WITNESS:  Should I answer, John?

2            MR. SIMON:  -- at this point, foundation.

3    Vague and ambiguous.

4            You can answer.

5            THE WITNESS:  Generally, the tax claims are,

6    you know, paid at an interest rate commensurate with

7    respect to each taxing agency's requirements.

8    BY MR. ESTERKIN:

9       Q    So it would be the interest rate charged by

10   the various taxing -- particular taxing agency on

11   deferred payments to the -- I'm sorry.  Let me start

12   this question over again.

13           So the interest rate that would be used, in

14   your view, would be the interest rate that the taxing

15   agency charges on delinquent payments; is that correct?

16           MR. SIMON:  Objection.  Calls for speculation.

17   Objection.  Calls for a legal conclusion.

18           THE WITNESS:  For companies that are in

19   bankruptcy, yes.

20           MR. ESTERKIN:  All right.  The -- the plan

21   lists two con- -- executory contracts.  Let me strike

22   that.

23           We're going to move on to talk about executory

24   contracts for a -- for a moment.  I was just --

25           John, I was just advised that somebody has

                                                  Page 51

1    called into the conference.  I'm not sure who that is

2    because it's just a phone number.  If it's

3    Mr. Voskanian, perhaps you can reach out to him and ask

4    him to hang up.

5              MS. NIX-HINES:  Richard, this is me.  I'm

6    having some Internet troubles, so I'm having it on phone

7    as well.

8              MR. ESTERKIN:  I'm sorry.  Who is speaking?

9              MS. NIX-HINES:  Crystal.

10             MR. ESTERKIN:  Oh, I'm sorry.  Okay.  Thank

11   you, Crystal.

12        Q    All right.  So let's talk about -- spend a few

13   minutes talking about executory contracts.

14             The plan -- under the terms of the plan, the

15   debtor is not required to file its schedule of executory

16   contracts, to be assumed pursuant to the plan, until

17   June 18th, correct?

18        A    I'm not -- I don't know the exact dates, so

19   I'll defer to counsel, but I know that there is a

20   deadline coming up.

21        Q    Okay.  We haven't gotten to the deadline yet,

22   I guess, is the point, correct?

23        A    Correct.

24        Q    And I assume that the debtor has been at least

25   thinking about the executory contracts that it intends

                                                Page 52

```
 1   to assume, correct?

 2        A    Yes.

 3        Q    And is there a preliminary list that exists as

 4   of this time?

 5        A    There is a list that's starting to be formed,

 6   yes.

 7        Q    Okay.  And who is on that list?

 8        A    Well, it's not necessarily a list of what's

 9   going to be assumed versus not assumed, but there's a

10   list of contracts that we need to make a decision on,

11   and there -- so you're asking, you know, for that list?

12        Q    No.

13             I'm asking for the -- the -- not the entire

14   list of executory contracts, because I can read the

15   schedules to get that.

16             What I'm asking for is the debtors' current

17   thoughts on the list of contracts that it intends to

18   assume.

19        A    I --

20        Q    Understanding -- understanding --

21   understanding that the debtor still has three days

22   within which to finalize the list and that it could

23   change.

24        A    It's still a work in process, but, you know,

25   the one contract on there that we're certain we will
```

Page 53

1    assume is the Amazon contract.

2        Q    Okay.  The plan lists two contracts as, quote,

3    specified cure claims.

4             Do you recall that?

5        A    I do.

6        Q    Okay.  And one of those is Hertz.

7             Do you recall that?

8        A    Yes.

9        Q    Has the debtor made a determination as to

10    whether or not it intends to assume or reject the Hertz

11    contract?

12        A    Not at this point.

13        Q    Is there an inclination one way or the other?

14        A    It's still under discussion.

15        Q    Correct, but my question was whether there was

16    an inclination one way or the other.

17        A    There is not.

18             MR. SIMON:  Objection.  Calls for speculation.

19    Objection.  Asked and answered.

20    BY MR. ESTERKIN:

21        Q    Please answer the question.

22        A    Not at this point in time, there is not.

23        Q    Okay.  Okay.  The -- you can look at the plan

24    if you want to, or you can just take my word for it, but

25    at page 19 of 69, there's a definition, "Specified Cure

                                            Page 54

1    Claims," and it says, apparently, that the cure claim

2    for the Hertz contract is $871,230.84.

3              Is that your understanding as to the amount

4    that would be necessary to pay Hertz if the debtor made

5    a determination to assume the Hertz contract?

6         A    Without further negotiation of that amount

7    with Hertz, yes.

8         Q    Okay.  And is -- to your knowledge, is anybody

9    at the debtor currently in negotiations with Hertz to --

10   with respect to that amount?

11        A    I'm not aware of whether or not Mr. Voskanian

12   is in communication with them on this particular matter.

13        Q    I'm sorry.  I couldn't hear the last part of

14   your answer.

15        A    I'm not aware as to whether Mr. Voskanian is

16   in discussions with Hertz on this particular matter.

17        Q    Okay.  Mr. Voskanian would be the one who

18   would be engaged in those discussions if they're

19   occurring; is that correct?

20             MR. SIMON:  Objection.  Calls for speculation.

21   Objection.  Foundation.

22             MR. ESTERKIN:  All right.  I'll rephrase the

23   question.

24        Q    As you understand the division of

25   responsibilities within Scoobeez, do you believe that

                                             Page 55

1   Mr. Voskanian would be the person responsible for

2   engaging in those discussions with Hertz?

3        A    Yes.

4        Q    The other contract that's -- I'm sorry.  Was

5   someone going to say something?  No?

6             MR. SIMON:  I think I just coughed, Richard.

7             MR. ESTERKIN:  Oh.

8             MR. SIMON:  Pardon me.

9             MR. ESTERKIN:  That's okay.  I just didn't

10  want to interrupt somebody if they were getting ready to

11  say something.

12       Q    The other contract that's listed in this

13  definition is the Booster Fuels contract, and it shows a

14  cure amount of $79,360.71, correct?

15       A    Yes.

16       Q    And is that the amount that would be needed to

17  pay Booster Fuels, in your understanding, in the event

18  the Booster Fuels contract was assumed?

19       A    Yes.

20       Q    Are you aware of any discussions with

21  Booster Fuels regarding a renegotiation of that cure

22  amount?

23       A    I know Mr. Voskanian has regular

24  communications with Booster Fuels, so I'll need to -- I

25  don't have any knowledge at this time.  I can refresh my

Page 56

1    memory, or I'll confer with him.

2        Q    All right.  So, once again, as you understand

3    the division of responsibilities at Scoobeez, if there

4    were such negotiations, they would fall within

5    Mr. Voskanian's area of responsibility?

6        A    Yes, they would.

7        Q    What services or goods does Hertz provide to

8    Scoobeez?

9        A    They provide the vans.

10        Q    All of the vans?

11        A    I don't know if it's a hundred percent, but

12    it's substantial.  If it's not a hundred percent, it's

13    substantially all vans.

14        Q    Okay.  And do you know what the duration of

15    the Hertz contract -- Hertz contract is?

16        A    I don't.

17        Q    And what goods or services does Booster Fuels

18    provide to Scoobeez?

19        A    They provide fuel for the trucks.

20        Q    And do you know what the duration of the

21    Booster Fuels contract is?

22        A    No, I don't -- I don't recall.

23        Q    All right.  So we've talked about three

24    executory contracts:  The Amazon contract, the

25    Booster Fuels contract, and the Hertz contract.

Page 57

1              Well, actually, let's take a minute on the

2     Amazon contract.

3              Do you have any understanding as to what the

4     cure amount would be with respect to the Amazon

5     contract?

6         A    I do not.

7         Q    And who at Scoobeez, as you understand the

8     responsibilities, would be responsible for determining

9     the cure amount under the Amazon contract?

10        A    I believe that would be more of a legal

11    determination.

12        Q    So that would fall -- I'm sorry.  I

13    interrupted you.  Go ahead.

14        A    It would be a determ- -- we would be relying

15    upon legal for that determination.

16        Q    And so that would be either Mr. Sheikh or

17    outside counsel?

18        A    Correct.

19        Q    All right.  Are there any other executory

20    contracts that Scoobeez is seriously considering,

21    assuming besides the Amazon contract, the Hertz

22    contract, and the Booster Fuels contract?

23        A    Not that I'm aware of.

24        Q    Okay.  With respect to your tenure as chief

25    restructuring officer over the -- let's look at the last

                                              Page 58

1    three months, who reports -- who at Scoobeez reports to

2    you?

3          A    George Voskanian and Scott Sheikh.

4          Q    And they're the only two people that report to

5    you --

6          A    Yes.

7          Q    -- is that correct?  Okay.

8                And do you have access to -- without going to

9    Scoobeez' offices, do you have access to Scoobeez'

10   records?  In other words, for example, do you have a

11   computer link to Scoobeez where you could access

12   accounting records online?

13         A    No, I don't.

14         Q    So with respect to information that you have

15   obtained regarding Scoobeez' finances, you're relying

16   upon information provided to you by either Mr. Voskanian

17   or Mr. Sheikh, correct?

18         A    Yes.

19         Q    And how do they communicate with you?  Strike

20   that.

21                How does Mr. Voskanian communicate with you?

22         A    Telephone, email.

23         Q    When was the last time you met with

24   Mr. Voskanian in person?

25         A    It would have been a few months ago.

Page 59

1       Q     Okay.  And same questions for Mr. Sheikh:

2    When did -- how did Mr. Sheikh communicate with you?

3       A     Telephone and email.

4       Q     And when was the last time you met face to

5    face with Mr. Sheikh?

6       A     That would have been a few months ago also.

7       Q     Prior to the time that the COVID

8    sheltering-in-place directives came down; is that

9    correct?

10      A     That is correct.

11      Q     And in this bankruptcy case, there's three

12   debtors, correct?

13      A     Yes.

14      Q     Scoobeez, Scoobur, and Scoobeez Global,

15   correct?

16      A     Yes.

17      Q     Do you have an understanding as to the

18   relationship among the three debtors?

19      A     Generally, yes.

20      Q     What's your understanding in that regard?

21      A     That Scoobeez Global owns Scoobeez, and then

22   Scoobur is an inactive entity that I believe is also

23   owned by Scoobeez Global.

24      Q     So Scoobeez Global acts as a holding company

25   for the other two entities, correct?

Page 60

```
 1        A    Yes.
 2        Q    Does Scoobeez Global engage in any business,
 3   other than that of a holding company?
 4        A    Not that I'm aware of, no.
 5        Q    Okay.  And what business does Scoobur engage
 6   in?
 7        A    There's -- there's no business activities.
 8        Q    Are there separate books and records for each
 9   of the three debtors?
10        A    Yes, there are.
11             MR. ESTERKIN:  Okay.  I'm going to mark, as
12   the next exhibit, Exhibit 5, a copy of the declaration
13   that you -- that you signed -- or apparently signed and
14   was filed on June 11th as Document No. 791 in the
15   bankruptcy cases.
16             (Exhibit 0005 was marked for
17             identification.)
18   BY MR. ESTERKIN:
19        Q    Let me know when you have that.
20        A    I'm refreshing my screen.
21             Okay.  Okay.  I have the document open.
22        Q    Okay.  Great.
23             This is a copy of your declaration, correct?
24        A    Yes.  It is in support of the Confirmation of
25   First Amended Chapter 11 Joint Plan of Reorganization
```

Page 61

1    Proposed by the Debtors, Hillair and the Official

2    Committee of Unsecured Creditors.

3        Q    Okay.  And if you turn to page 6, that's your

4    signature right above where it says "Brian Weiss"?

5        A    Yes, it is.

6        Q    And you read this declaration before you

7    signed it, correct?

8        A    Yes, I did.

9        Q    And you understood that, when you signed it,

10   you were signing it under penalty of perjury?

11       A    Yes.

12       Q    And that that's the same oath that you would

13   take if you were testifying live in court and the same

14   oath that you were given prior to the commencement of

15   this deposition, correct?

16       A    I know I was under oath, under penalty of

17   perjury.  I don't know if it would be the same

18   declaration I'd give with respect to this deposition

19   because I think there was, you know, multiple phases of

20   it that you had read to me, but it would definitely be

21   under penalty of perjury.

22       Q    If you would turn to, actually, the last page,

23   Paragraph No. 16.

24       A    The last page.  Is that the one where it says:

25   "I declare under penalty of perjury..."?

Page 62

1        Q    Sorry.  No.  That's actually the page before

2    that.  Paragraph 16.

3        A    Okay.

4        Q    It says, in the beginning:  "Based on the

5    Debtors' projections, there will be sufficient cash,"

6    et cetera.

7             Do you see that?

8        A    Yes, I do.

9        Q    Okay.  Are the projections that you're

10   referring to at that point in your declaration the

11   budget that we discussed earlier in your deposition that

12   was attached to the cash collateral stipulation?

13       A    No.

14       Q    What projections are you referring to in that

15   sentence?

16       A    We have other financial projections that shows

17   what the financial performance of the debtor is through

18   the December 31st proposed effective date, you know,

19   that's on a more of an accrual basis as opposed to a

20   cash basis.

21       Q    Okay.  Let's go back to Exhibit 6, which is

22   the cash collateral budget -- actually, after the cash

23   collateral stipulation to which the budget is appended.

24       A    Exhibit 6.  Okay.

25       Q    This budget reflects your -- the debtors' best

                                                    Page 63

1  estimates on a cash basis as to the cash inflows and

2  outflows during the period covered by the budget; is

3  that correct?

4          MR. SIMON:  Objection.  Misstates facts not in

5  evidence.  Objection.  Foundation.  Objection.  Calls

6  for a legal conclusion.

7  BY MR. ESTERKIN:

8      Q    You can answer.

9      A    Yes.

10     Q    On the very top, it shows -- there's a line

11 for the -- for income, and it talks about invoiced

12 routes.

13         Do you see that?

14     A    Could you please refer me to a page number?

15     Q    Oh, sure.  I'm looking at -- I'm looking at

16 the budget that was attached to the cash collateral

17 stipulation, Exhibit 6.

18     A    Page 8 of 14 or 7 of 14 or 6 of -- 7?  8?

19     Q    We can just -- page 7 of 14 is fine.

20     A    Okay.

21     Q    I'm going to ask you -- I just want to ask you

22 some questions about the categories on each -- on the

23 lines, and because those categories are the same on 7

24 and 8, it doesn't really matter which of the two you

25 look at, right?

Page 64

```
 1        A    Correct.

 2        Q    Okay.  So we're on page 7 of 14, and there is

 3   a line item for invoiced routes.

 4             Do you see that?

 5        A    Yes.

 6        Q    And that's the debtors' anticipation of the

 7   routes that Amazon will award to Scoobeez and the

 8   payments that Amazon will make to Scoobeez based on

 9   those routes?

10             MR. SIMON:  Objection.  Calls for a legal

11   conclusion.  Objection.  Assumes facts not in evidence.

12   Objection.  Vague and ambiguous.

13             You can answer.

14             THE WITNESS:  So the invoiced routes is the

15   awarded routes.  You mentioned something about

16   collections, which is different than the amount of

17   invoiced routes for the same period.  So if we can

18   clarify your question so I can go forward.

19             MR. ESTERKIN:  Sure.

20        Q    The -- the budget is based on -- is

21   articulated on a cash basis, correct?

22        A    Yes.

23        Q    And Amazon pays for the services that Scoobeez

24   renders some period of time after those services are

25   actually rendered, correct?
```

                                                Page 65

1        A    Yes.

2        Q    And so this line, "Invoiced Routes," is

3   referring to the cash that Scoobeez expects to receive

4   from Amazon based upon routes that Scoobeez ran for

5   Amazon, correct?

6        A    They are invoiced routes that we expect to

7   receive cash at a future date from those routes during

8   that -- that week that services are rendered.

9        Q    So Amazon pays approximately 30 days after

10   the -- in arrears, correct?

11       A    It's about 40 days, historically, but there

12   has been -- due to the COVID-19, you know, pandemic,

13   Amazon has, up until the end of May, paid in

14   approximately seven days for -- you know, for a

15   couple-month period of time.

16       Q    Yeah.  My -- okay.  I'm not really interested

17   in necessarily debating whether it's 7 days or 30 days

18   or 40 days.

19           I guess my question is:  When we look at the

20   forecast for June 12th, it says 8- -- $900,000, I

21   believe, correct?

22       A    Yeah.

23       Q    Is that based on routes that were run at some

24   period prior to June 12, or is that based on routes that

25   would be run the week of June 12th?

Page 66

1          A     That's for the routes that we would run on the

2     week of June 12.

3          Q     All right.  And as I'm looking at the budget,

4     the payments on account of the Amazon routes are the

5     only -- is the only cash income reflected on the budget,

6     correct?

7          A     Yes.

8          Q     And, once again, just so we understand the

9     manner in which the information in the budget is

10    displayed, we're showing, in the June 12, 2020, column,

11    beginning cash of -- of 5,436,950, correct?

12         A     Yes.

13         Q     And is that inclusive of the $900,000 for the

14    Amazon routes in that week?

15         A     No.

16         Q     So -- so the amount of cash, plus the Amazon

17    routes, would be, give or take, $6.3 million and change,

18    correct?

19         A     The proper way to read it is the beginning

20    cash is your starting point for cash, and then the line

21    item below "Collections" would be additive to the cash

22    balance.  The $900,000 of invoiced routes gets collected

23    at a future period in time.

24         Q     All right.  So you're showing $950,000

25    collections the week of July 3, correct?

Page 67

```
 1        A     Yes.

 2        Q     What's the source of the -- of the -- of that

 3   $950,000?

 4        A     That would be for the work that Scoobeez

 5   performed for Amazon for the period prior to June 12th.

 6   So it would be, you know, approximately, you know, 35 to

 7   40 days of -- of AR outstanding as of that point in

 8   time.

 9        Q     Okay.  So the 900,000 in invoiced routes that

10   you're showing on June 12th -- I'm just looking --

11   you're projecting that you're going to collect the cash

12   in the week of July 20 -- July 17th?

13        A     That is correct.

14        Q     And then, in the next section below that,

15   you're showing cash disbursements, correct?

16        A     Yes, we are.

17        Q     And it then -- where -- the line that says

18   "Total Operating Cash Disbursements" is just the sum of

19   the figures above that in the Cash Disbursement section?

20        A     Correct, beginning on the line item "Fuel" and

21   ending in the line item "Other Expenses."

22        Q     Okay.  All right.  And then if you take the

23   operating -- you take the beginning cash, minus the

24   operating cash flow, which, in the week of June 12th, is

25   a negative, you come to the beginning cash balance for
```

                                                    Page 68

1    the next period?

2        A    No.

3        Q    All right.  So you have also financing cash

4    flows?

5        A    Correct.

6        Q    And then you also have restructuring cash

7    flows, correct?

8        A    Yes.

9        Q    And so what you would do, then, is below where

10   it says "Restructuring Cash Flows," you have total cash

11   flow, in/out, and in the first week it's 300 and -- I'm

12   trying to read it -- 329,650 --

13       A    Yes.

14       Q    -- negative?

15           So you take the 5 million 4, minus the

16   329,000.  You get to 5 million 107, which then becomes

17   the beginning cash flow of the next period, correct?

18       A    Yes.

19       Q    And then those numbers just flow through the

20   remainder of the budget period, correct, in the same

21   way?

22       A    Correct.

23       Q    Now, we talked earlier that there is an estate

24   cash payment of a million $500,000 that was supposed to

25   be made on the confirmation date, correct?

Page 69

1        A     Yes.

2        Q     Is that accounted for in the budget?

3        A     No, it is not.

4        Q     So if -- if we assumed, just for purposes of

5   discussion, that the plan is confirmed on July 9th for

6   the periods of time after July 9th, in order to

7   determine the actual cash, you'd have -- according to

8   the budget, you'd have to take out a million and a half

9   dollars, correct?

10       A     From the cash on hand, yes.

11       Q     I'm sorry.  You said, "From the cash on hand."

12  I didn't hear the rest of your answer.

13       A     That was it:  From the cash on hand.

14       Q     Okay.  So if we go to the end of the budget,

15  it shows the ending cash on hand, I believe, starting

16  the week of January 1, is 3,230,322, correct?

17       A     I show it as 3,844,172.

18             You're referring to that 1/1 of '21?

19       Q     Yes.

20       A     Yes.

21       Q     So this forecast shows that the cash at

22  January 1, 2021, would be 3,280,322 [sic], correct?

23       A     So -- I'm sorry -- I'm looking at the cash

24  flow stipulation on page 8 --

25       Q     Yes.

                                          Page 70

```
 1       A    -- your Exhibit 6 --

 2       Q    Yes.

 3       A    -- that shows 3,844,172 as the ending cash.

 4   You're looking at the beginning cash.

 5       Q    Yeah, I was looking at the beginning cash.

 6            Beginning on January 1, 2021, the beginning

 7   cash was 3 million 2, and then there's collections, and

 8   at the end -- the ending cash is, as you say,

 9   3 million 8 and change, right?

10       A    No.

11            Just for clarification purposes, that

12   3,230,322 would be the cash balance as of 12/25 of '20.

13   That's a beginning cash balance, beginning of the week.

14       Q    Okay.  So it's 3,844,172 at the -- at

15   January 1, 2021?

16       A    Yes.

17       Q    And you'll have to take off the million five

18   for the estate cash payment, correct?

19       A    Yes.

20       Q    So the real projected cash balance, then,

21   would be 2,344,172, correct?

22       A    Assume the plan goes effective, then yes.

23            MR. ESTERKIN:  All right.  We've been going

24   for about two hours.  I would suggest that we take a

25   five- or ten-minute break now so people can stretch
```

Page 71

```
 1    their legs, the court reporter can stretch her fingers,

 2    and then we can come back and proceed with the

 3    deposition.

 4            I do have -- I have a conference call that I

 5    have to take at 12:30, and I -- so I was planning on

 6    taking our lunch break at that time for approximately an

 7    hour, if we don't complete the deposition before then,

 8    just to give everybody a little heads-up on the future

 9    schedule.

10            So with that, it's 11:07 a.m., according to my

11    computer, at the moment.  Why don't we come back at,

12    say, 11:15.  And we can go off the record now.

13            (Recess.)

14            MR. ESTERKIN:  Okay.  Let's go back on the

15    record.

16       Q    All right.  Mr. Weiss, we're back on the

17    record now.

18            During our break, did you have any

19    conversations with anyone regarding the substance of

20    your testimony?

21       A    I had a conversation with Mr. Simon, but it

22    wasn't regarding my testimony.

23       Q    During the course of your conversation with

24    Mr. Simon, did you discuss potential areas of

25    questioning for this afternoon?
```

                                                    Page 72

```
 1        A    No.

 2        Q    I shouldn't say "this afternoon."

 3             MR. SIMON:  Objection.  Attorney-client

 4   privilege.

 5             MR. ESTERKIN:  Let me --

 6             MR. SIMON:  Mr. Weiss, if you can answer

 7   without releasing privileged information, you can

 8   answer.

 9             MR. ESTERKIN:  Let me go back and ask the

10   question again because --

11        Q    During your conversation with Mr. Simon, did

12   you have any discussions regarding potential questioning

13   in the remainder of your deposition?

14        A    No.

15        Q    All right.  Before we went off the record, we

16   were looking at your declaration in support of plan

17   confirmation, paragraph 16, where you talked about

18   debtors' projections.

19             Do you recall that?

20        A    Yes.

21             MR. ESTERKIN:  All right.  Mr. Simon, I'd like

22   to request that you provide us with a copy of those

23   projections.

24             MR. SIMON:  And I'll get back to you on that,

25   Richard.
```

Page 73

1          MR. ESTERKIN:  All right.  When do you think

2     you'll be able to get back to me on that?

3          MR. SIMON:  Hopefully late today.

4          MR. ESTERKIN:  Okay.  Great.

5          If we have to, we'll serve a formal request to

6     produce, because I think we're entitled to see the

7     projections upon which this declaration is based.

8     Q    All right.  So let's talk a minute about those

9     projections.

10         Do those projections -- I think you said that

11    those projections are stated on an accrual basis as

12    opposed to a cash basis, correct?

13    A    Correct.

14    Q    And are there any substantive differences,

15    taking into account, you know, the difference between

16    cash and accrual, between those projections and the

17    budget?

18    A    The only thing, off the top of my head, that's

19    a difference is, in those projections, we have the

20    1.5-million-dollar estate cash payment deducted from the

21    projected cash balance.  I think it starts on the

22    confirmation date.  So that's, I think, the only --

23    that's the only delta.

24    Q    Okay.  So you -- you're still projecting on

25    the same amount of cash flow from Amazon, correct?

Page 74

```
 1        A    Yes.
 2        Q    And do you have -- in those projections, do
 3   you include any income from any other source besides
 4   Amazon?
 5        A    No.
 6        Q    And how far out -- how far out in time do
 7   those projections go?
 8        A    We have them through 12/31 of '21 -- I'm
 9   sorry -- 12/31 of '23.
10        Q    I'm sorry.  7/31/2020?
11        A    Yes.
12             And then we also have some, you know,
13   longer-range projections, but those aren't really used
14   for -- those are included in that same model, but
15   they're not really being used for this purpose.
16        Q    And how far out do those longer-range
17   projections go?
18        A    2000 -- the end of 2023, I believe.
19             MR. ESTERKIN:  Okay.  John, we'd like those
20   longer-range projections as well, please.  So if you
21   could get back to us on that as well, I would appreciate
22   it.
23        Q    The longer-range projections that you just
24   referred to, those are also stated on an accrual basis;
25   is that correct?
```

1      A    Yes.

2      Q    And do those include any revenue from Amazon

3    after December 31, 2020?

4      A    See, they're draft projections.  They don't

5    really specify revenue targets.  It just has numbers in

6    there, and when the new board of directors comes on

7    board, new managers of Scoobeez, you know, then they'll

8    be covering what the business model is for Scoobeez.

9      Q    Okay.  I'm not hearing a hundred percent.

10      A    Those projections don't really have -- you

11    know, they're not published.  They're not used for any

12    real basis other than they're part of a model, but,

13    again, they're not part of the plan.

14      Q    Okay.  So you don't have any projections that

15    you would rely upon that would show what -- the debtors'

16    projected financial performance after December 31 of

17    2020; is that correct?

18      A    Correct, not that's to be relied upon.

19            MR. ESTERKIN:  Okay.

20            Okay.  I'm marking, as Exhibit 7, a copy of

21    the operating report filed by Scoobeez in the bankruptcy

22    case for the period ending January 31, 2020.  It was

23    filed as Document No. 610.

24            (Exhibit 0007 was marked for

25            identification.)

                                            Page 76

1    BY MR. ESTERKIN:

2         Q    You should have that in front of you.

3              Do you have that?

4         A    Yes, I do.

5         Q    Did you -- did you participate in the

6    preparation of this operating report?

7         A    You mean did I -- did I perform the

8    accounting, or did I review and ask the appropriate

9    questions?

10        Q    The latter.

11        A    I reviewed it and provided, you know,

12   questions and approved the filing of it.

13        Q    All right.  And who was primarily responsible

14   for assembling the information in this operating report?

15        A    That would be the accounting group for

16   Scoobeez.

17        Q    And is there somebody who is the head of the

18   accounting group at Scoobeez?

19        A    Yes.  That would be George Voskanian.

20        Q    Okay.  And did you interact with Mr. Voskanian

21   regarding the preparation of this operating report?

22        A    Yes.

23        Q    Okay.  Let's just talk about the operating

24   reports in general, and I'm only going to be dealing

25   with the operating reports starting with this one for

Page 77

1    January of 2020 and then going through the last

2    operating report that was filed, which I believe covers

3    the period through April 30 of 2020.

4           So with respect to those operating reports,

5    could you just briefly describe the process by which the

6    operating report was prepared and your role in that

7    process.

8         A    So I can describe my role in the process.  I

9    would have to defer you to George Voskanian to detail,

10   you know, his -- his preparation of his reports.

11        Q    Okay.  So I'd like to know what your role was.

12   I'd like you to tell me what, if anything, Mr. Voskanian

13   told you about how it was prepared by the time it hit

14   your desk.

15        A    Well, you know, he sent me the report.  The

16   report is prepared, you know, in accordance with -- you

17   know, with accrual-basis accounting, and, you know, he

18   lists all of the receipts and disbursements of the

19   company, as well as, you know, records the necessary

20   accruals for the financial statements.  When those are

21   sent to me, I review them and provide comments to him.

22           The one area that I specifically handle in the

23   monthly operating reports is the tracking of the

24   professional fees, and I send him the schedule on that.

25        Q    And so how do you track the professional fees?

Page 78

1        A     It's based on estimates and actual fee

2     statements that are -- that have been filed.

3        Q     So I understand the process for submitting

4     interim fee applications to the bankruptcy court.

5              So you've looked at those interim fee

6     applications, correct?

7        A     Correct.

8        Q     And there have been two interim fee

9     applications so far in the Scoobeez case, correct?

10       A     Yes.

11       Q     When I say "two," I mean there were two sets

12    of them.

13             There were multiple professionals that filed

14    each time, correct?

15       A     Correct.  The first --

16       Q     All right.

17       A     -- interim and the second interim.

18       Q     I'm sorry.  I couldn't hear your answer.

19       A     I said, the first interim application and the

20    second interim application.

21       Q     Right.

22             And so you looked at those, and you had

23    information based upon those operating report -- I'm

24    sorry -- the fee applications as to how much in fees and

25    expenses each of the professionals is requesting,

                                                    Page 79

1    correct?

2        A    Correct.

3        Q    And then the court entered an award of those

4    with respect to the applications, correct?

5        A    Correct.

6        Q    And I could show -- I'm going to show you the

7    court's orders, but, in general, the court allowed fees

8    in some number and then authorized Scoobeez to pay fees

9    in a different number, correct?

10       A    Correct.

11       Q    And the -- the difference was that the amount

12   that was permitted to be paid was in accordance with the

13   cash collateral budgets that had been approved by the

14   court, correct?

15       A    You mean with respect to what's being recorded

16   in the financial statements?

17       Q    I'm sorry.  I --

18       A    With respect to what's being recorded in the

19   financial statements?

20       Q    No, no, no.  I'm asking you about the orders.

21           The difference -- the difference between the

22   amount awarded and the amount that was authorized to be

23   paid was based upon the fact that the cash collateral

24   budgets permitted payment in amounts less than the

25   actual amounts awarded, correct?

Page 80

1     A     That's correct.

2     Q     And so, as I recall it, at least, the last

3  interim fee application covered fees between -- through

4  and including December 31, 2019.

5           Do -- do you recall that?

6     A     I don't recall the exact date, but I'll take

7  your word for it.

8     Q     Okay.  Well, let me see if I can find the

9  order and -- so you don't have to take my word for it.

10    A     Okay.

11          MR. ESTERKIN:  I'm waiting on my computer.

12  Just give me a minute, hopefully.  My computer is

13  working on it.

14          Okay.  Let's mark, as Exhibit 12 -- and once

15  again, there's a gap in the exhibit numbers -- a copy of

16  an "ORDER GRANTING INTERIM FEE APPLICATIONS OF FOLEY &

17  LARDNER, LLP; CONWAY MACKENZIE, INC.; O'KEEFE &

18  ASSOCIATES; AND LEVENE NEALE BENDER YOO & BRILL, LLP."

19  File of this document, No. 772 in the bankruptcy cases

20  on May 12, 2020.

21          (Exhibit 0012 was marked for

22          identification.)

23  BY MR. ESTERKIN:

24    Q     It should be popping up on your screen

25  momentarily, if it hasn't already.

Page 81

1        A    It just popped up.  I have it open.

2        Q    Okay.  If you just take a quick look at this,

3    and the question I had asked you was that -- to confirm

4    that the -- this second interim fee application covered

5    fees through and including December 31, 2019.

6             If you could just read this and confirm that,

7    that would be great.

8        A    Yeah, the fee application includes fees

9    through December 31st, 2019.

10       Q    Okay.  So -- and this was -- these -- this

11   order grants that the most recent fee applications have

12   been filed with the court, correct?

13       A    Yes.

14       Q    Okay.  And so for purposes of the operating

15   reports, you estimated -- or included some figure for

16   attorneys' fees for the estate professionals after

17   December 31, 2019, correct?

18       A    That is correct.

19       Q    And how did you arrive at those numbers?

20       A    So it would be, you know, looking at the fee

21   statements that were filed, you know, for example, for

22   December, and then also just estimating what the fees

23   would be, you know, per professional.

24       Q    For the period after December 31st?

25       A    Yes.

                                           Page 82

1    Q    Okay.  I'm just concentrating on the period

2    after December 31st now.

3         So after December 31st, you -- you included an

4    estimate for the fees on a monthly basis in the monthly

5    operating reports, correct?

6    A    Yes.

7    Q    And how did you arrive at that estimate?

8    A    Based on, you know, inquiries, you know, with

9    debtors' counsel, as well as, you know, looking at

10   historical trends for the committee and secure -- and

11   Hillair's counsel.

12   Q    All right.  Did you actually receive fee

13   statements from any of the professionals in order to

14   arrive at those estimates?

15   A    Yes.

16   Q    And what professionals did you receive fee --

17   fee statements from in order to arrive at those

18   estimates?

19   A    Well, it varied by month, but from -- it

20   varied by month.

21   Q    So sometimes you got them from Foley &

22   Lardner; is that correct?

23   A    Yes.

24   Q    And when you received those, you -- what --

25   they were in the same, basically -- same basic form as

Page 83

```
 1    the fee statements that were filed in support of the

 2    interim fee applications; is that correct?

 3         A    In the same form -- it wasn't through a fee

 4    application.  It was through -- they would just give me

 5    invoices.

 6         Q    Right.

 7              So there was --

 8         A    There was a lag time, so I made inquiries with

 9    John Simon, and John Simon would provide me some

10    estimates, as well as, you know, other counsel.  So at

11    the end of the month, we recorded the -- the estimates

12    and -- for prior months and come to what we thought

13    would be the most representative number.

14         Q    Okay.  So with respect to the fee statements

15    that you received, I mean, you received a detailed

16    billing that showed what attorney did the work, what --

17    the brief description of what they did, the date they

18    did it, the amount of time they spent, and then the

19    charges based on hourly rates for that work, correct?

20         A    Correct, and that's -- you referred to fee

21    statements.  I look more at special fee statements that

22    get filed with the courts and served as opposed to the

23    invoices.  So I received invoices or estimates from

24    the -- you know, from counsel to the extent there have

25    been filed fee statements.
```

Page 84

1     Q     Right.

2           But what I'm trying to confirm is that when

3     you got the invoices from counsel, they were detailed

4     invoices that had the same sort of information that was

5     included in the applications for interim compensation

6     that were filed with the court.

7           So you had information regarding the attorney,

8     what they did, how many hours, the date, and what the

9     charges were for that work?

10    A     Yes.  It was detailed information with all

11    that information.

12          THE REPORTER:  Can you repeat that?

13          THE WITNESS:  Yes.  It was detailed

14    information with all that information.

15    BY MR. ESTERKIN:

16    Q     Just as an aside, sometimes you tend to drop

17    your voice as you're completing your answer, and so

18    that's why I'm occasionally having trouble understanding

19    your answers, and I think the court reporter just had

20    the same issue.

21    A     I'm a couple feet away from my computer so

22    people can't see my mug real close up.  So I'll try to

23    speak louder.

24    Q     All right.  All right.  Let's go back to

25    Exhibit 7, which is the operating report, and if you go

                                              Page 85

1    to page 19 of 21.

2         A    Okay.  I'm on page 19.

3         Q    I just may have given you the wrong -- oh,

4    there we go.  Okay.

5              And if you look in the section about -- a

6    little more than halfway down, there's a section for

7    "Non-Operating Expenses," "Interest Expense," and then

8    "Legal and Professional."

9              Do you see that?

10        A    Yes.

11        Q    And there's a line item there for "Debtor

12   Counsel."

13             Do you see that?

14        A    Yes.

15        Q    Okay.  So it shows there the cumulative

16   post-petition balance of debtor counsel fees was a

17   million 725,588, if I'm reading it correctly.

18             Do you see that?

19        A    Yes.

20        Q    So to the best of your information, at this

21   point in time, the cumulated total fees for the debtors'

22   counsel were a million 715 -- I'm sorry.  I can't -- I'm

23   having trouble reading it -- 7- --

24        A    $1,725,588.

25        Q    Thank you.

Page 86

1              That -- that's the number for the cumulated

2      fees as of that date?

3          A    The estimated cumulated fees, yes.

4          Q    And then you have an estimate for the prior

5      month of $150,000; is that correct?

6          A    That's for the current month.

7          Q    The month of January?

8          A    Yes.

9          Q    Yes.

10         A    The prior month would have been January -- or

11     December.

12         Q    Right.

13             And the 150,000 is included within that

14     million seven, correct?

15         A    Yes, it is.

16         Q    Okay.  And then you also have a line item

17     there for "Committee Counsel," correct?

18         A    Yes.

19         Q    With an estimate of $18,000 and change?

20         A    It's actually a negative because it's a

21     true-up or an overaccrual.

22         Q    So in a prior month, you had overestimated the

23     fees, and then when the fees turned out to be less, you

24     netted the prior -- the prior overaccrual and the

25     current fees, and it turned out to be an 18,000-dollar

                                                   Page 87

1    credit as opposed to an additional fee?

2        A    Yes.

3        Q    Okay.  And then after including that, you've

4    got 474,000 in committee fees through the date of this

5    report, correct?

6        A    Yes.

7        Q    And then same for secured lender counsel,

8    correct?

9        A    Yes.

10       Q    And who is your point of contact with the

11   secured -- the secured lender is Hillair, right?

12       A    Yes.

13       Q    Okay.  Who is your point of contact at Hillair

14   in order to obtain the amount of their fees?

15       A    Scott Kaufman.

16       Q    And do you know -- so Kaufman would tell you

17   what their estimated fees were to be included in this

18   report; is that right?

19       A    Actually, it would be invoices received by

20   Tony Napolitano of Buchalter Nemer.

21       Q    And did you receive copies of those invoices,

22   or did Mr. Napolitano just report to you the amount --

23   the total amount that was being billed?

24       A    For, you know, a bunch of the months, I would

25   just take an average of what the historicals were

                                              Page 88

1   running at to the extent I didn't actually receive the

2   invoices yet.

3       Q    Okay.  But you actually did receive invoices

4   from Hillair's counsel?

5       A    Yes.  They do serve them on the noticed

6   parties.

7       Q    And the Hillair's counsel served copies of

8   their attorneys' invoices on the noticed parties; is

9   that right?

10      A    I got them.

11      Q    Okay.  And how -- how did you receive them?

12      A    Via email.

13      Q    And from Mr. Napolitano?

14      A    Yes.

15      Q    And were those also detailed fee statements

16  that included, you know, the attorney who did the work,

17  the description of the work, et cetera?

18      A    They were detailed invoices that included all

19  that information.

20      Q    And have you received those invoices for all

21  of the months in the bankruptcy case so far to the

22  current month?

23      A    I'd have to go back.  I don't know if I've

24  received May or not, but I know I received April.

25      Q    And did you receive all of the invoices for

Page 89

1    all of the months prior to April?

2        A    Yes.

3            MR. ESTERKIN:  All right.  John, we'd like to

4    get copies of those invoices, please.

5            MR. SIMON:  Gotcha.

6            MR. ESTERKIN:  Okay.  One more thing to add to

7    the list.

8        Q    The invoices that you received from Hillair's

9    counsel -- as I understand it, Hillair has two counsel.

10   They have the Buchalter firm and the Quinn Emanuel firm,

11   correct?

12       A    And one other.

13       Q    What's the other firm?

14       A    Olshan.

15       Q    And did you receive fee statements from all

16   three firms, or just some of them?

17       A    I received fee statements for Olshan,

18   Buchalter, and Tony Napolitano served to me -- or

19   provided to me the Olshan fee statements and the

20   Buchalter fee statements.

21       Q    Did you ever receive fee statements from Quinn

22   Emanuel?

23       A    No.

24       Q    The estimated fees that you have in the

25   operating reports with respect to Hillair counsel, do

1   those include any fees on account of Quinn Emanuel?

2        A    Not to my recollection.

3        Q    So if we scroll forward -- and I'm going to

4   show you the other fees -- the other operating reports,

5   but -- if you want, I can show them to you now, but as

6   we look at their line item for debt for secured lender

7   counsel, that's not going to include any Quinn Emanuel

8   fees, correct?

9        A    That is correct.

10       Q    All right.  You earlier, I believe, testified

11  that the million five estate cash payment was supposed

12  to be used -- utilized to pay professional fees by the

13  debtor, the committee, and Hillair; is that correct?

14       A    It's to be used.

15       Q    Correct.

16            It's -- that's -- the million five is to be

17  used to pay any accrued fees for those three groups of

18  professionals above those amounts set forth in the

19  budgets, correct?

20       A    Yes.

21       Q    And with respect to the secured lender fees,

22  do you believe -- do you understand that that includes

23  fees generated by Quinn Emanuel?

24       A    No, they do not.

25       Q    So it would be -- in your -- to your

Page 91

```
 1   understanding, it would just be fees by -- incurred by

 2   Buchalter and Olshan?

 3       A    On behalf of the secured lender, yes --

 4   secured lender Hillair, yes.

 5       Q    Yes.

 6            All right.  You testified earlier that the

 7   estimated fees that you included in the operating

 8   report -- or that Scoobeez included in the operating

 9   reports for the professionals sometimes were based upon

10   actual fee statements that you received, and sometimes

11   they were based just upon estimates without the fee

12   statements.

13            As you received fee statements in

14   circumstances where you had earlier just estimated the

15   fees without the fee statements, did you then adjust the

16   estimated fees for that month predicated on any

17   differences between your original estimate and the fee

18   statement that you later received?

19       A    Yes.

20       Q    When is the most -- what period of time is

21   covered by the most recent fee statement that you

22   received from debtors' counsel?

23       A    Well, let's -- if we can just clarify "fee

24   statement."

25       Q    And when I say "fee statement," I'm referring
```

Page 92

```
 1    to the invoices.  I'm not referring to interim fee
 2    applications.
 3        A    I received invoices from Foley through
 4    March 31st that I had reviewed, and I believe, on
 5    Thursday or Friday, I had received their April invoice,
 6    which I have not yet reviewed.
 7        Q    And did you briefly look at that invoice when
 8    you received it?
 9        A    For Foley I had not.
10        Q    You didn't look at it at all?
11        A    No.  It's still sitting on my --
12        Q    I'm sorry.  I couldn't hear what you just
13    said.
14        A    It is still sitting in my inbox.
15        Q    Okay.  Unopened?
16        A    Unopened.  On my to-do list after today's
17    deposition.
18        Q    All right.  What about committee counsel; when
19    is the last fee statement you got from committee
20    counsel?
21        A    I don't recall if it was April or March, one
22    of the two months.
23        Q    When you say "April or March," do you mean
24    April 30 or April 1st?
25        A    End of the month.  It would be --
```

Page 93

1        Q    April?

2        A    -- in arrears.  So it would have been either

3    the invoice for March 2020 or April of 2020.

4        Q    And what about the last invoice you received

5    from -- with respect to Buchalter fees?

6        A    I -- it would be -- it would have been either

7    April 30th or May 31st.  I -- I don't recall which date

8    off the top of my head.

9        Q    And how about for Olshan?

10       A    That would have been the same for Buchalter,

11   either April or May.  I'm not sure which -- which one of

12   those it is.

13       Q    Okay.  So if we look just -- if we look just

14   at this January operating report, it shows that the

15   accrued fees for debtor counsel were 150,000.

16            Do you see that?

17       A    For the month of April, yes -- I'm sorry.  For

18   the month of February of 2000 [sic].

19       Q    Right.  Right.

20            Because that's such an even number, do you

21   suspect that that was probably just an estimate as

22   opposed to something based upon an actual fee statement?

23       A    It was an estimate.

24       Q    Okay.  And if you look at the secured lender

25   counsel, the -- it's 176,839, correct?

                                              Page 94

1       A    Yes.

2       Q    And because it's, you know, an odd number, a

3   precise number, do you believe that would have been

4   based upon a fee statement?

5       A    No.  It would be a combination of a fee

6   statement and an estimate.

7            So if we had -- if we made an estimate of five

8   months that need to be trued up and we got a -- you

9   know, received an actual invoice, we would true that up

10  and then make an estimate going -- you know, for the

11  current month.

12      Q    Right.

13           So -- but, I mean, so if I'm looking at this,

14  by the time this operating report was prepared, it's --

15  based upon the fact that this is an odd number, it would

16  be a fair inference that you had actually received a fee

17  statement covering the month of January from the secured

18  lender counsel, correct?

19      A    Because when we receive a fee invoice from the

20  secured lender on January 30 -- you know, for

21  January 31st, you know, within, likely, the 15 days of

22  filing, so it's likely a combination of a true-up of an

23  accrual, for example, of receipt of January in- --

24  December invoices, inputting that, trueing up the

25  accrual, and then an estimate for January.

Page 95

1      Q    Got it.  Thank you.

2           All right.  So long as we're on the January

3   operating report, on page 17 of 21, if you could turn to

4   that.  Let me know when you're there.

5      A    I'm here.

6      Q    Okay.  At the top there's a box that talks

7   about "Accounts Payable Post-Petition."

8           Do you see that?

9      A    Yes.

10     Q    And it shows that -- the total accounts

11  payable post-petition:  536,851.

12     A    Yes.

13     Q    Do you see that?

14          So those would be the account -- post-petition

15  accounts payable as of January 31, 2020, correct?

16     A    Yes.

17     Q    It shows that there are 168,472 in accounts

18  payable post-petition that are over 120 days.

19          Do you see that?

20     A    Yes.

21     Q    Do you have any understanding as to why there

22  are accounts payable that have aged out to 120 days on a

23  post-petition basis?

24     A    I -- I don't want to speculate.

25          MR. SIMON:  Objection.  Speculation.  Calls

                                              Page 96

```
 1   for speculation.
 2            MR. ESTERKIN:  He hasn't said anything yet.
 3            THE WITNESS:  But my estimate would be that we
 4   had some disputed tolls for Hertz that were in dispute.
 5   So we didn't pay them until it got resolved -- until it
 6   was getting resolved.  So I believe -- and, again,
 7   Mr. Voskanian will have a little more insight on this,
 8   but I believe that's what it's for.
 9            MR. ESTERKIN:  All right.  Let's mark, as
10   Exhibit 8, the operating report for the period ending --
11   I think it's February 29th or -- excuse me -- 28 --
12   yeah, 29th, 2020.  And give me a second for it to pop up
13   on my screen.
14            File of this document, No. 693 in the
15   bankruptcy case.
16            (Exhibit 0008 was marked for
17            identification.)
18   BY MR. ESTERKIN:
19        Q    Let me know when you have that.
20        A    I have it.
21        Q    Okay.  Let's go to page 18 of 32.  Oh, boy.
22        A    Okay.  I'm on page 18.
23        Q    You beat me to it.  Okay.  Yeah, that's weird.
24            All right.  So if we go to the attorneys' fees
25   line, again, same thing:  You're showing, for each of
```

Page 97

1    the -- each of the professionals, an estimate of the

2    accrued fees during the month of February, correct?

3         A    Correct.

4         Q    And then at close over --

5         A    Not accrued fees.  Incurred fees.

6         Q    Incurred fee, yeah.  Accrued in the sense that

7    they haven't been paid yet.

8         A    Well, that would -- an accrued fee, to the

9    sense they were to be paid, would be on the balance

10   sheet under the accrued professional fees.

11        Q    All right.  So you're showing the estimated

12   fees that were incurred during the month of February,

13   correct?

14        A    Yes, net of true-ups for January.

15        Q    And then in the right-hand column, you're

16   showing the total fees, which are based upon the

17   allowed -- the interim fees awarded through

18   December 31st, plus the post-December 30 estimates,

19   right?

20        A    Yes.

21        Q    And if we go up to page 16 of 32, you're

22   showing the accounts payable again?

23        A    Yes.

24        Q    Of 621,343, correct?

25        A    Yeah, the accounts payable post-petition.

Page 98

1        Q     Correct.

2              621,343, correct?

3        A     Yes.

4              MR. ESTERKIN:  Okay.  Let's mark, as

5    Exhibit 9, the operating report for the period ending

6    March 31, 2020.

7              (Exhibit 0009 was marked for

8              identification.)

9              THE WITNESS:  I have it open.

10   BY MR. ESTERKIN:

11       Q     Okay.  And let's go to page 17 of 29.

12       A     I am at page 17.

13       Q     And, once again, we're showing the estimated

14   fees for the month of March, correct, with the true-up

15   from the prior periods?

16       A     Yes.

17       Q     Okay.  And then you've got the -- that flows

18   over into the "Total" columns, correct?

19       A     Yes.

20       Q     Okay.  Same as the other operating reports,

21   right?

22       A     Yes.

23       Q     And then if we go up to page 15, we're

24   showing, once again, the accounts payable.  This time

25   it's 751,651?

Page 99

1        A      Yes, post-petition.

2        Q      All right.  And we're still looking -- we're

3   still seeing that 168,000 in the over-120-day column,

4   but we're also now seeing 30,770 in the 61-to-90-days

5   column.

6               Do you have any understanding as to why those

7   amounts were -- had not been paid as of this time?

8        A      I don't know.

9               MR. ESTERKIN:  We're going to mark, as

10  Exhibit 10, the April operating report.  I'm just

11  waiting for my computer to upload it, deal with it.  The

12  file of this document is 774 in the bankruptcy case.

13               (Exhibit 0010 was marked for

14               identification.)

15  BY MR. ESTERKIN:

16       Q      And you should be able to look at it now.

17       A      I have it open.

18       Q      Turn to page 17.

19       A      I'm on page 17.

20       Q      And, once again, in the professional fees

21  area, we have estimates for that month and then totals

22  through the end of the month, correct?

23       A      It's the estimate for the current month and

24  then true-ups, if any, of buyer accrual amounts in the

25  prior month.

Page 100

1     Q    All right.  And as of -- so this is, I

2  believe, the most current operating report that's been

3  filed.

4         Have you reviewed the operating report for the

5  month of May 2020 yet?

6     A    Yes.

7     Q    Do you have any understanding as to when

8  that's going to be filed with the bankruptcy court?

9     A    It should be filed today or tomorrow.

10     Q    So that operating report has now been

11  finalized, and you're just waiting for counsel to file

12  it?

13     A    Correct.

14     Q    Do you have any recollection as to the

15  estimate for the debtors' professional fees in that

16  operating report?

17     A    I do not.

18     Q    How about the committee fees?

19     A    I do not.

20     Q    What about Hillair fees?

21     A    I do not.

22     Q    With respect to the preparation of the report,

23  did you follow the same procedures for estimating the

24  May fees as you've already testified to with respect to

25  the prior months?

                                        Page 101

1          A     Yes.

2                MR. ESTERKIN:  Okay.  I'm marking, as

3     Exhibit 11, a copy of the "ORDER GRANTING THE FIRST

4     INTERIM FEE APPLICATIONS OF FOLEY & LARDNER LLP; CONWAY

5     MACKENZIE, INC.; ARMORY SECURITIES, LLC; AND LEVENE

6     NEALE BENDER YOO & BRILL, LLP."  File of this document

7     is No. 563 in the bankruptcy cases.

8                (Exhibit 0011 was marked for

9                identification.)

10    BY MR. ESTERKIN:

11         Q     You should -- you should be able to view that

12    document now.

13         A     I have it open.

14         Q     Okay.  Your computer is faster than mine.

15                All right.  If you turn to the bottom of

16    page 3 of 6 -- let me know when you're there.

17         A     I am here.

18         Q     All right.  I just want to make sure that

19    we're reading this correctly in how it integrates with

20    the operating reports that were filed.

21                So I'm just going to take Foley & Lardner as

22    an example.

23                If you look at lines 13 and 14, it appears

24    Foley & Lardner was awarded total fees of 1,050,934.65;

25    is that correct?

                                        Page 102

1      A    I'm sorry.  You're looking at page -- I'm

2   sorry -- page 3.  Sorry.  Wrong page.

3      Q    Right.

4           There's a chart kind of at lines 11 and a half

5   to 21?

6      A    Yeah.

7      Q    Do you see that?

8      A    I apologize.  I was on page 4.  So I'm on

9   page 3 now.

10     Q    So the total interim award of Foley was

11  1,050,934.65, right?

12     A    Yes.

13     Q    And then if you go down to paragraph 2a, it

14  says that the debtors are authorized to pay Foley a

15  total of $748,000, correct?

16     A    Yes.

17     Q    So just -- I just want to talk approximate

18  numbers.

19          But approximately $300,000 of the interim fee

20  award was not authorized to be paid, correct?

21     A    Correct.

22     Q    And so that is currently -- assuming that the

23  court awards final fees in the amount of the interim,

24  that would be some amount -- that 30- -- 300,000 would

25  have to be paid to Foley end of the case, correct?

Page 103

1          A     At some point in time, whether it's during the

2     case or at the end of the case, correct.

3          Q     And under the terms of the plan, that 300,000

4     would be paid out of the estate cash payment, the

5     million five, right?

6          A     Yes.

7          Q     And then the same is true with respect to the

8     other professionals:   To the extent that they were

9     awarded interim fees, the final fee awards come in at

10    the same amount, and the payments that are authorized by

11    this order are less than the fee awards, correct?

12         A     Correct.

13         Q     And the -- the million-50,000-dollar figure

14    that was awarded to Foley here is a number that would be

15    included within the total fee column in the operating

16    reports that we looked at, correct?

17         A     Yeah, it would be in the -- depending on which

18    viewpoint you looked at, yes, but the amounts are

19    included and trued up on a regular basis -- monthly

20    basis, actually.

21         Q     Right.

22               So since we're all operating electronically,

23    you can't -- I don't know if you can look at two

24    exhibits at the same time, but let's just pick the April

25    fee statement as an example.   It's Exhibit 10.

1      A    I'm sorry.  Did you say April fee statement or

2   April report?

3      Q    I'm sorry.  I misspoke.  The April operating

4   report.

5           And the -- and the fees are on page 17 of 19.

6           So, you know, the total fees for debtor

7   counsel, according to this, were 2-million-odd.

8           Do you see that?

9      A    Yes.

10     Q    And the million 50 that was in the interim fee

11  award would be part of that 2-million-odd, correct?

12     A    Correct.

13     Q    And the same thing would be true for all of

14  the other professionals that are shown here, except for

15  Hillair counsel, because Hillair counsel doesn't file

16  fee applications, right?

17     A    That is correct.

18     Q    Okay.  All right.  Let's turn to Exhibit 12,

19  which is the second interim -- the second -- or the

20  order on the second interim fee application.

21     A    I'm here.

22     Q    And if you look at the chart that's on page 3

23  of 7 --

24     A    Okay.

25     Q    -- it shows -- once again, I'm just going to

Page 105

 1   use Foley as an example.

 2           It shows total interim award of 540,957.58,

 3   correct?

 4       A    Yes.

 5       Q    And it allows payment of 484,000 of that

 6   because that's the amount in the budgets, correct, with

 7   the 10 percent variance?

 8       A    Correct.

 9       Q    And so the difference between the 540,000 and

10   the 484,000 would be carried forward and have to be paid

11   at some point in time out of the estate cash payment

12   under the plan, correct?

13       A    Correct.

14       Q    And the same thing would be true with respect

15   to the other professionals, comparing their total

16   interim award to the amounts that were authorized to be

17   paid, correct?

18       A    Yes.

19           MR. ESTERKIN:  Okay.  It's 12:15 now.  I

20   indicated that we were going to break around 12:30.

21   We're going to start moving off into another area now,

22   according to my outline.  My outline probably governs.

23   So I would suggest that we take our lunch break now and

24   come back at approximately 1:30, if that's okay with

25   everybody.

```
 1              THE WITNESS:  Okay.  How much time do we have
 2    when we come back?  Because I've got another appointment
 3    at 2:00, so --
 4              MR. ESTERKIN:  We're not going to finish in
 5    half an hour.  Even if we went straight through, we
 6    wouldn't be able to finish in half an hour.
 7              So how long is your appointment at 2:00?
 8              THE WITNESS:  A couple-hour meeting, but I
 9    guess I'll -- I'll postpone it.
10              MR. ESTERKIN:  Why don't we go off the record,
11    and we can talk about scheduling.
12              (Lunch Recess.)
13              MR. ESTERKIN:  All right.  We're back on the
14    record, and we're back from our lunch break.
15       Q    Let me just start by asking, Mr. Weiss,
16    whether, during the lunch break, anything occurred to
17    you that would cause you to want to either change or
18    supplement any of the answers you gave to questions this
19    morning.
20       A    No.
21              MR. ESTERKIN:  One second here.
22       Q    All right.  Let's take a look at Exhibit 5,
23    which is your declaration, and specifically at
24    paragraph 10 and also at paragraph 17.  If you could
25    just take a moment and read those paragraphs.
```

                                                  Page 107

1          MR. SIMON:  Richard, I lost you for a minute.

2    Where are you at?

3          MR. ESTERKIN:  Exhibit 5, the declaration in

4    support of confirmation, and I had asked Mr. Weiss to

5    look at paragraphs 10 and 17.

6          MR. SIMON:  Thank you.

7          THE WITNESS:  Okay.  I've reviewed them.

8    BY MR. ESTERKIN:

9      Q    Sorry?

10     A    I have reviewed them.

11     Q    Okay.  In these paragraphs, you talk about the

12   debtors working with Hillair post-confirmation with

13   respect to the debtors' business, correct?

14     A    Yes.

15     Q    Okay.  What conversations have you had with

16   Hillair about Hillair providing assistance to the

17   debtors post-confirmation?

18     A    I've had multiple discussions with

19   Scott Kaufman.

20     Q    And what's the substance of those

21   conversations?  What sort of assistance do you expect

22   Hillair to provide to the debtors post-confirmation?

23     A    The ability to attract new customers and the

24   ability to explore going into verticals related to the

25   transportation industry.

                                              Page 108

```
 1              MR. ESTERKIN:  I'm sorry.  Could you read --
 2    Cathy, could you read the last -- the answer back?  I
 3    lost the last part of it.
 4              (Record read by the reporter as follows:
 5                   "ANSWER:  The ability to attract new
 6                   customers and the ability to explore going
 7                   into verticals related to the
 8                   transportation industry.")
 9    BY MR. ESTERKIN:
10         Q    All right.  Let's start with the ability to
11    attract new customers.
12              Have -- has Scoobeez, to date, requested that
13    Hillair assist it with regard to attracting new
14    customers?
15         A    Very little, but yes.
16         Q    And what assistance in that regard did
17    Scoobeez request?
18         A    To help them reach out to some key contacts,
19    such as Wal-Mart, to see if anybody within their network
20    that -- there's some contacts that we can, you know,
21    potentially approach there.
22         Q    Have you finished?
23         A    Yes.
24         Q    Okay.  So you mentioned Wal-Mart.
25              Are there any other potential new customers
```

                                             Page 109

```
 1    that Hillair has reached out to?

 2         A    Not that I'm aware of.

 3         Q    And when did Scoobeez first suggest to Hillair

 4    that it might be of assistance in attracting new

 5    customers, to your knowledge?

 6         A    Within the past, I would say, six months or

 7    so.

 8         Q    And when did Hillair reach out to Wal-Mart?

 9         A    I don't -- I don't know the exact date or

10    month.

11         Q    Okay.  Well, what's your best estimate as to

12    when that occurred?

13         A    Probably in Q1.

14         Q    Sorry.  February 1?

15         A    Q1/2020.

16         Q    I'm sorry.  I'm not -- I'm not understanding

17    your answer.

18         A    Okay.  Q1/2020.

19         Q    Oh, okay.  The first quarter of 2020?

20         A    Yes.  Q1, yes.

21         Q    Okay.  And do you have any understanding as to

22    how Wal-Mart responded to the Hillair contact?

23         A    I don't.

24         Q    And Scoobeez, currently, doesn't receive any

25    business from Wal-Mart, correct?
```

1        A      Correct.

2        Q      For purposes of the cash collateral budget,

3    you didn't anticipate any income from Wal-Mart, correct?

4        A      Correct.

5        Q      And for purposes of the projections that you

6    referred to at paragraph 16 of your declaration, you

7    didn't anticipate any income from Wal-Mart, correct?

8        A      Correct.

9        Q      And you also referred to some projections that

10   go out to 2023.

11            You didn't include any Wal-Mart income in

12   those projections either, did you?

13       A      No.  Those --

14            MR. SIMON:  Hey, Richard, I'm having a really

15   hard time following or not getting -- it's getting

16   broken up here.  I'm going to try to leave and come back

17   with the phone.

18            MR. ESTERKIN:  Who is speaking?

19            THE WITNESS:  That was John Simon.

20            MR. ESTERKIN:  Okay.  John, why don't you go

21   ahead and do that.  When you come back in through the

22   phone line, let us know that you're back, and I'll

23   suspend questioning until you return.

24            (Pause.)

25            MR. ESTERKIN:  All right.  John, are you back?

                                        Page 111

1              MR. SIMON:  Yes.  Thank you.

2              MR. ESTERKIN:  No problem.

3         Q    All right.  So have you had any discussions

4    with Hillair about potential sources of business for

5    Scoobeez other than Wal-Mart?

6         A    Yes.

7         Q    In other words, did they mention any other

8    names to you?

9         A    Names, no.

10        Q    And the other discussions were just generally

11   that they would reach out to their network?

12        A    Correct, and then also looking at going into

13   other verticals, such as mid-mile transportation, and

14   then once we, you know, get the plan confirmed, then

15   start doing a much, you know, broader reach on

16   attempting to attract new business.

17        Q    Okay.  And none of those discussions included

18   the names of any particular potential customers for

19   Scoobeez other than Wal-Mart, correct?

20        A    That they would be reaching out to, no.

21        Q    I'm sorry.  I couldn't -- I lost the first

22   part of your answer.

23        A    That they would be reaching out to, the answer

24   is "no."

25        Q    And what about other entities that Scoobeez

                                        Page 112

1    might reach out to, either for vertical transportation

2    or other potential prospects?

3        A    Yeah, Scoobeez has reached out to -- to

4    multiple companies.

5        Q    Okay.  We'll get to that in a minute, then.

6            Are there any other ways in which Hillair has

7    suggested that it would support Scoobeez following

8    confirmation of its plan?

9        A    Mean- -- "support" meaning in what way?

10   Financial support?  Operation support?  Business

11   development support?

12       Q    I don't know.  I mean, your -- your

13   declaration at paragraph 17 says that, "Post-Effective

14   Date, Hillair," quote, "has expressed to me that they

15   plan to support the business..."

16       A    Right, but you asked --

17       Q    I'm trying to find out what you meant.

18       A    You asked me a general question, so I'm -- I

19   wanted to try to get at more specifics.  So if you have

20   a specific question, I'd be more than happy to answer it

21   for you.

22       Q    Yeah, my specific question is:  When you said

23   that Hillair has expressed to you that they plan to

24   support the business, what is your understanding as to

25   how Hillair intends to support the business

                                              Page 113

```
 1    post-confirmation --
 2         A    Well --
 3         Q    -- other than -- other than the things we've
 4    talked about regarding seeking new business?
 5         A    Sure.
 6              So, you know, that's first and foremost, is we
 7    do want to help us in support getting new business
 8    post-effective date.  They will have -- they will be
 9    able to control the board of directors [inaudible] --
10              THE REPORTER:  I'm sorry.  Can you repeat
11    that?
12              THE WITNESS:  I think there's feedback on
13    someone's line.
14              MR. ESTERKIN:  John, did you mute the audio on
15    the Zoom?  That may be the feedback if you're on both
16    Zoom and phone.
17              THE WITNESS:  I'll repeat what I had just
18    said.
19              So from a new-business-development standpoint,
20    Hillair, post-effective date, will have, you know,
21    control of the board of directors and management and
22    will still -- you know, management and board in place to
23    help it grow its business.
24              From a financial perspective, you know,
25    Hillair has expressed to me that they do have capital to
```

Page 114

```
 1    invest in the business going forward, and, again, that's

 2    around the idea of attracting, you know, new business in

 3    both the kind of last-mile as well as the mid-mile

 4    business kind of business plan.

 5    BY MR. ESTERKIN:

 6       Q    Okay.  Has Hillair indicated how much capital

 7    they're prepared to inject into Scoobeez in order to

 8    assist it post-confirmation?

 9       A    No.

10       Q    You don't have a commitment letter, correct?

11       A    No.

12       Q    You don't have any loan documents, correct?

13       A    No.

14       Q    And it's also correct that the plan doesn't --

15    isn't contingent in any way on Hillair applying

16    post-confirmation financing, correct?

17       A    The plan is not contingent upon them providing

18    post-division financing -- or post- --

19       Q    And there's nothing in the plan about Hillair

20    providing post-confirmation financing, correct?

21       A    Correct.

22       Q    Has Hillair ever indicated to you the amount

23    of additional financial support that it might provide to

24    Scoobeez post-confirmation?

25       A    No.
```

Page 115

1      Q    And has Hillair ever discussed with you the

2   terms under which it might provide post-confirmation

3   financing?  Interest rates?  Term of loan?  Whether

4   the -- whether the financing would be equity or debt?

5   Anything like that?

6      A    No.

7      Q    You understand that, once the plan becomes

8   effective, Amazon intends to terminate the Amazon

9   contract as quickly as it can?

10     A    I have heard from counsel that that's Amazon's

11  plan.

12     Q    And have you ever heard anything different?

13     A    No.

14     Q    All right.  And do you have any understanding

15  as to any steps that Scoobeez may take in order to

16  prevent Amazon from exercising its contractual

17  termination right?

18          MR. SIMON:  Objection.  Attorney-client

19  privilege.

20          To the extent that you're not disclosing

21  attorney-client privileged information, you may respond.

22          And objection to the extent it calls for a

23  legal conclusion.

24          THE WITNESS:  I'm not aware of any instances

25  or actions.

                                        Page 116

1    BY MR. ESTERKIN:

2        Q    Have you ever reviewed the Amazon contract?

3        A    I -- yes, I have.

4        Q    Okay.  When was the last time that you took a

5    look at that contract?

6        A    The date is -- I don't know the exact date,

7    but it was when Tinos had put it in front of me during

8    my deposition.

9        Q    Okay.

10        A    Tinos, do you remember that date?

11            MR. DIAMANTATOS:  I thought it would be much

12    more memorable to you, Brian.  I think it was sometime

13    in January of this year.  I don't have the exact date in

14    front of me, but sometime in January.  Somebody can

15    correct me on this one.

16            THE WITNESS:  The depo is memorable.  It's

17    just the date.

18            MR. DIAMANTATOS:  Okay.  Good.  Then I'm not

19    offended.

20            MS. NASSIRI:  It was January 30th, I think.

21            THE WITNESS:  Thank you.

22            MR. ESTERKIN:  All right.  Well, the precise

23    date really isn't important.

24        Q    So it was a number of months ago, correct?

25        A    Yes.

Page 117

1    Q    All right.  And you recall the contract,

2   really, is composed of three different parts?  There's

3   global terms of service, a work order, and then a series

4   of 18 amendments?

5    A    I'm not aware of the specifics.  I'm not sure

6   there are three parts.  I didn't know there's 18

7   amendments.

8    Q    Okay.  Based upon your review of the contract,

9   do you have any understanding as to whether the contract

10   precluded Scoobeez from seeking additional business

11   besides the Amazon business?

12    A    I don't recall.

13    Q    Have you ever heard that Amazon precluded --

14   told Scoobeez not to go out and seek additional

15   business?

16    A    I don't recall if that's in the contract or

17   not.

18    Q    No.

19    My question was whether anybody ever told you

20   that Amazon prohibited Scoobeez from seeking additional

21   business.

22    A    Not that I'm aware of.

23    MR. ESTERKIN:  All right.  Let me show you a

24   couple of the pieces of the Amazon contract.  I'm not

25   going to go -- I'm not going to bother with the

Page 118

```
 1    amendments because there's 18 of them.  There's no point

 2    in cluttering the record with those.

 3            I'm waiting for the document to load so you

 4    can look at it.

 5            (Exhibit 0013 was marked for

 6            identification.)

 7            MR. ESTERKIN:  Okay.  I'm going to mark, as

 8    Exhibit 13, a copy of the "DELIVERY PROVIDER TERMS OF

 9    SERVICE," which I believe is part of the Amazon

10    contract.

11       Q    You should be able to look at that now.

12            Do you have it?

13       A    It has opened.

14       Q    Okay.  And you can take as much time or --

15    time as you need to to look at it.

16            Do you recognize this as being a part of the

17    Amazon contract with Scoobeez?

18       A    I'm going to rely upon your representation

19    that it is.

20            MR. ESTERKIN:  Okay.  So represented.

21            Let's mark, as Exhibit 14, the work order.

22            (Exhibit 0014 was marked for

23            identification.)

24            THE WITNESS:  Do you want me to read this

25    agreement now?
```

Page 119

```
 1              MR. ESTERKIN:  You don't need to.  I'll direct
 2     you to anything I want you to look at.  All I'm really
 3     introducing it for is so you can identify it as the
 4     contract, or you can take my representation that it's
 5     the contract, if you prefer to do that.
 6              THE WITNESS:  The latter is my preference.
 7     BY MR. ESTERKIN:
 8         Q    Okay.  Do you have Exhibit 14 in front of you?
 9         A    I now have it open.
10         Q    Okay.  And, once again, I'll represent to you
11     that this is -- this work order is the second part of
12     the Amazon contract.
13              I've now represented to you that
14     Exhibits 13 and 14 are the -- constitute the Amazon
15     contract, other than the amendments, which changed the
16     delivery stations from which Scoobeez operated and
17     the -- some of the pricing, and things like that, that
18     were specific as to delivery stations.
19              Do you have any reason to believe that my
20     representations regarding Exhibits 13 and 14 are
21     incorrect?
22         A    Yeah, I can't make the statement, you know,
23     affirming or not affirming it.
24         Q    No.  I understand.
25              My question --
```

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 123

1        A    You can make a representation to me that these

2    are the contracts, then, you know, I'll rely upon those

3    representations.

4        Q    Okay.  My question is whether or not you have

5    any reason to believe that my representations are not

6    correct.  If you don't know one way or the other, you

7    can say that, but if you think that somehow I'm trying

8    to fool you, I want to know that.

9        A    No, I don't think you're trying to fool me,

10   so ...

11       Q    Okay.  Great.

12            So if you look at the work order, it's dated

13   as of September 2, 2015.

14            Do you see that?

15       A    Yes.

16       Q    Do you have any -- and Scoobeez filed

17   bankruptcy on April 19, 2019, correct?

18            THE WITNESS:  John, was it the 19th, or was it

19   a little bit after that?  It was -- I believe it was in

20   April.  I'm not sure if it was April 19th.

21   BY MR. ESTERKIN:

22       Q    Okay.  We don't need the exact date, so let's

23   just -- can we agree it's mid-April 2019?

24       A    Let's call it April 2019.

25       Q    Okay.  So between -- do you have any reason to

                                              Page 121

1   believe that Scoobeez was undercapitalized at any time

2   between September 2, 2015, and April 2019 when it filed

3   bankruptcy?

4        A    I have not done a solvency analysis to

5   determine whether the business was undercapitalized or

6   not.

7        Q    And, therefore, you have no reason to believe

8   it was undercapitalized, correct?

9        A    I have no reason to believe it was

10  undercapitalized, adequately capitalized, or

11  overcapitalized.

12            MR. SIMON:  Objection.  Vague and ambiguous.

13  Objection.  Calls for a legal conclusion.

14  BY MR. ESTERKIN:

15       Q    And do you have any understanding as to

16  whether or not Scoobeez was attempting to obtain

17  business, other than business from Amazon, during the

18  period from September 2, 2015, through April of 2019,

19  when it filed bankruptcy?

20       A    That was prior to my appointment as a CRO, so

21  I don't have any knowledge to the affirmative or the

22  negative.

23       Q    So no one at Scoobeez ever told you what they

24  were attempting to do to attract business prior to the

25  time that you were appointed as CRO?

Page 122

1        A    No.

2        Q    Do you have any reason to believe that there

3   was any uncertainty in the business community regarding

4   Scoobeez' ability to continue in business until the time

5   that it filed bankruptcy in April of 2019?

6        A    I don't -- I don't have knowledge one way or

7   the other.

8        Q    But what you do know is that Scoobeez did not

9   acquire any substantial new business between September

10  of 2015 when the Amazon contract was signed and April of

11  2019 when it filed bankruptcy, correct?

12            MR. SIMON:  Objection.  Misleading.

13            THE WITNESS:  I can't --

14            MR. SIMON:  Objection.  Vague and ambiguous.

15            THE WITNESS:  Again, I can't opine on

16  information dating back to 2015, '16, '17, '18, early

17  '19 as a petition date.  What I can say is that Amazon

18  was the company's sole customer.

19  BY MR. ESTERKIN:

20       Q    Well, do you have any reason to believe that

21  Scoobeez acquired any substantial new business, other

22  than Amazon, between September of 2015 and April of

23  2019?

24       A    I don't have knowledge one way or the other.

25       Q    Okay.  So you became the CRO in May of 2019,

                                              Page 123

1    correct?

2        A    Correct.

3        Q    When did you start discussions with anybody at

4    Scoobeez about diversifying its client base from being

5    100 percent Amazon?

6        A    I would say probably within the first 30 to 60

7    days.

8        Q    And with whom did you have those discussions?

9        A    I would have had them with Mr. Voskanian and

10    Mr. Sheikh.

11        Q    And what was -- what did you discuss with

12    Mr. Voskanian when you first began discussing

13    diversification of the client base?

14        A    You know, basically, why we don't have

15    additional customers, and then, you know, what can we do

16    to go get additional customers.

17        Q    What did Mr. Voskanian say in response to

18    those inquiries?

19        A    That, you know, "We were so focused on the

20    Amazon -- we've been so focused on the Amazon business,

21    you know, making sure the operations continue to perform

22    for Amazon, that there just wasn't the -- there wasn't

23    enough time."

24        Q    Did Mr. Voskanian say anything about any

25    potential prospects for new business at that time?

Page 124

1        A    No.

2        Q    And how did you respond to Mr. Voskanian's

3   telling you that there just wasn't time to seek new

4   business?  Is that something that you just accepted?

5   Did you suggest to him that he should, perhaps, start

6   looking for business?

7        A    I believe --

8        Q    What was your response?

9        A    So we discussed it, but I think what we were

10  realizing is that he -- he had contacted a couple of

11  companies and, you know, including, I believe it was,

12  Wal-Mart, and, at that point, there just wasn't any

13  interest in -- in being able to work with us while we're

14  in bankruptcy.

15       Q    So it's your understanding that the reason

16  these contacts didn't come to fruition was because there

17  was no interest in having discussions due to the

18  bankruptcy?

19       A    I believe so, yes.

20       Q    And how did you obtain that information?

21       A    From Mr. Voskanian.

22       Q    He told you that?

23       A    Yes.

24       Q    Okay.  And do you remember the names of the

25  companies that he contacted and that didn't want to

Page 125

1   engage in discussions with Scoobeez because of the

2   bankruptcy besides Wal-Mart?

3       A    I know he had discussions with Target.  I

4   think there was another company -- a scooter company

5   that we had discussions with and that -- I'm not sure if

6   it was because we were in bankruptcy, but we just --

7   nothing came to fruition.

8       Q    Did the Target discussions -- did Target

9   indicate they weren't interested in discussing business

10  with Amazon -- I'm sorry -- with Scoobeez because

11  Scoobeez was in bankruptcy?

12      A    Well, we had initial discussions with, you

13  know, Wal-Mart, and I think it was with Target also,

14  and, you know, it seems like, you know, maybe there's a

15  little interest, but then, you know, with them and, I

16  believe, some other customers, we just didn't make it

17  past -- we had discussions with business folks, but then

18  when it came to the compliance, it just went radio

19  silent.

20      Q    Well, my question was whether or not it went

21  radio silent -- whether you were told that it went radio

22  silence because of the bankruptcy, or did it just go

23  radio silence and you're not sure of the reason?

24      A    It went radio silent.  I'm not sure of the

25  reason, but Mr. Voskanian said that we couldn't get past

Page 126

 1  the compliance department, which led me to believe part

 2  of it may be due to us being in bankruptcy.

 3       Q    I'm sorry.  I lost the last part of your

 4  answer again.  "Part of it may be due to" ...?

 5       A    The fact that we are in bankruptcy.

 6       Q    Mr. Voskanian didn't tell you directly that it

 7  was because Scoobeez was in bankruptcy, correct?

 8       A    Correct.

 9       Q    And that was -- and that was specific as to

10  Target, your description of how the discussions ended?

11       A    That was more specific with respect to

12  Wal-Mart.

13       Q    And what about with respect to Target?

14       A    I think it was the same thing.

15       Q    So you couldn't get past compliance; you're

16  not sure of the reason; is that correct?

17       A    Correct.

18       Q    Okay.  You mentioned the scooter company.

19            That was Lime, correct?

20       A    Lime or Bird, one of the two.  The product

21  called Lime.

22       Q    Well, I'm going to show you the documents.

23  There were documents that were produced that show some

24  emails back and forth from Lime.  I'll show them to you

25  a little bit later, but I'm right now trying to assess

Page 127

1   your recollection without having seen the document.

2          So how did the discussions with the scooter

3   company end?

4   A    I don't think it made -- my recollection is it

5   didn't make economic sense for us, Mr. Voskanian told

6   me.

7   Q    And do you recall why it did not make economic

8   sense?

9   A    Because we wouldn't make money.

10  Q    That's a pretty general answer to the

11  question, I guess.

12         And -- and do you have -- do you have an

13  understanding as to why you couldn't make money from the

14  scooter -- a customer relationship with the scooter

15  company?

16  A    I don't mean to sound, you know, facetious or

17  smart ass when I say this, but the cost of the business

18  would exceed the revenue it would generate from it.

19  Q    Okay.

20  A    It would just be unprofitable.

21  Q    Okay.  Do you recall any other overtures to

22  potential customers during the bankruptcy case other

23  than Wal-Mart, Target, and the scooter company?

24  A    Yes.

25  Q    Who else do you recall that was approached

1    about doing business with Scoobeez?

2        A    OnTrac and LSO, which I think is Lone Star

3    Overnight, as well as -- I think there's been some

4    recent discussions with Uber Freight.

5        Q    Have you completed your answer?

6        A    Yes.

7        Q    Okay.  And how -- where -- where are you with

8    regard to the discussions with OnTrac?

9        A    I believe they're going to be sending us a

10   small number of routes in the very, very near future.

11       Q    And what is that belief based on?

12       A    Discussions with Mr. Voskanian.

13       Q    What did Mr. Voskanian say to you with regard

14   to the routes that you may be receive- -- Scoobeez may

15   be receiving from OnTrac?

16       A    That they may start out by giving us a few

17   small routes for us to prove ourselves.

18       Q    And how many routes -- do you have any

19   understanding how many routes "a few small routes"

20   constitutes?

21       A    Not yet.

22       Q    Do you have any understanding as to the

23   geographic location which the routes would be run?

24       A    I believe it would be southern California.

25       Q    Anything more specific than that?

                                        Page 129

1     A     No.

2     Q     And when did Mr. Voskanian tell you that

3  OnTrac was likely to provide Scoobeez with a few small

4  routes?

5     A     Over the past month or so.

6     Q     Do you have any understanding when those

7  routes may first start being awarded to Scoobeez?

8     A     I don't have the exact timing.

9     Q     Well, do you have any general idea?

10     A     I think it should be starting -- my

11  understanding would be in the next couple of weeks to a

12  month.

13     Q     Okay.  And where do things stand with

14  Uber Freight, as you understand it?

15     A     With Uber Freight, nowhere right now.

16  Uber Freight is more of a mid-mile delivery system,

17  which would require a significant capital investment by

18  Scoobeez in order to get started.

19     Q     And when was the last time there were

20  discussions with Uber Freight?

21     A     George was having those discussions, so I

22  don't know the exact timing, but I know within the last

23  45 days or so.

24     Q     And have -- to your knowledge, has anybody at

25  Scoobeez had any conversations with Hillair about

Page 130

1    providing the capital needed to commence doing business

2    with Uber Freight?

3          A     That's something that, post-con- -- yes, and

4    that's something that, post-confirmation, we're going to

5    explore.

6          Q     Well, had there been discussions already with

7    respect to Hillair providing capital for the

8    Uber Freight business if it -- if you're able to attract

9    it?

10         A     If it makes economic sense, yes.  They said

11   they're willing to support the business.

12         Q     Well, have you had specific discussions with

13   Hillair such as how much capital they'd be willing to

14   provide to the company to support the Uber Freight

15   contract if you're able to obtain it?

16         A     No.

17         Q     So just a general sense that if -- if you can

18   attract the business and it makes economic sense,

19   Hillair would consider supporting it; is that correct?

20         A     That is correct.

21         Q     All right.  And where do things stand with

22   Lone Star?

23         A     I believe that if we haven't already, we

24   should be doing some small routes for them.  If it

25   hasn't -- if it hasn't started yet, I think it will

                                             Page 131

1   start within the next -- based on my understanding from

2   Mr. Voskanian, within the next 30 to 45 days also.

3        Q    Do you have any understanding as to the volume

4   of routes that Scoobeez expects to receive from

5   Lone Star?

6        A    No, not exact numbers, but I think, as with

7   OnTrac, it would be a small number of routes to begin

8   with.

9        Q    Do you have any understanding as to the

10  approximate revenue that the Lone Star contract or

11  routes would generate for Scoobeez?

12       A    Not at this time.

13       Q    Do -- is there a signed contract with

14  Lone Star?

15       A    I -- I haven't seen one.  I don't know if it's

16  a -- I don't know.

17            MR. ESTERKIN:  Okay.  I'm going to mark, as

18  Exhibit 22, a copy of an LSO final-mile agreement dated

19  May 1, 2020.

20            (Exhibit 0022 was marked for

21            identification.)

22  BY MR. ESTERKIN:

23       Q    Let me know when you have that.

24            Do you have it?

25       A    Nope.

Page 132

```
 1        Q    You can take a few minutes.

 2             Have you ever seen this document before?

 3        A    I said, no, I haven't received it.

 4        Q    Oh, you have not received it.  It should be on

 5   your screen.

 6        A    It's not on my screen.

 7             MR. SIMON:  I don't have it either, Richard.

 8   Maybe it's large and it's taking time to get through the

 9   system, but it's not showing in mine either.

10             MR. ESTERKIN:  Let me try it again.  Maybe

11   it's my end.

12             THE WITNESS:  Okay.  I now have it.

13             MR. ESTERKIN:  Okay.  I probably clicked on a

14   wrong button.

15             MR. SIMON:  Now I see it on mine.

16             Exhibit 22?

17             MR. ESTERKIN:  Yeah, it's 22.

18        Q    Okay.  Mr. Weiss, have you seen this document

19   before?

20        A    Yeah, I already responded that I had it open.

21        Q    I'm sorry?

22        A    I previously responded that I had it open.

23        Q    Right.

24             My question was:  Have you seen it -- did you

25   see it before today?
```

Page 133

```
 1        A     No, I had not.

 2        Q     Okay.  And so I'm assuming, Mr. Weiss, to your

 3   knowledge, this agreement has not been presented to the

 4   bankruptcy court for the purpose of seeking court

 5   authority on behalf of Scoobeez to enter into the

 6   agreement, correct?

 7        A     I don't believe it has been.

 8        Q     Okay.  All right.  Do you recall, on

 9   October 7th, there was a conference call at which Amazon

10   indicated to Scoobeez' representatives, on the call,

11   that Amazon intended to terminate the Scoobeez agreement

12   as soon as it was able to do so?

13        A     Yes.

14        Q     And following that call, did you have any

15   further discussions with anybody at Scoobeez about the

16   need for Scoobeez to find business other than the Amazon

17   business?

18        A     Yes.

19        Q     And is it -- would it be correct to say that,

20   following that call, there was an increased sense of

21   urgency in terms of finding new business for Scoobeez?

22        A     Yes.

23        Q     And you -- did you express that view to

24   Mr. Voskanian?

25        A     Yes.
```

Page 134

1      Q      Did you express that view to Mr. Sheikh?

2      A      Yes.

3      Q      And when you expressed that view to them, how

4   did they respond?

5      A      They -- you know, we went out to try to seek

6   new business.

7      Q      And as of today, are there -- is there any new

8   business in prospect immediately for Scoobeez other than

9   the Lone Star and OnTrac business?

10     A      In the immediate future, you know, we -- prior

11   to having a confirmed bankruptcy plan, no.

12     Q      All right.  Are you aware that Mr. Voskanian,

13   at one point in time, attempted to obtain new business

14   for Scoobeez from Bristol Farms?

15     A      Yeah.  Yeah.  He's -- he's contacted, you

16   know, other parties, yes.

17     Q      Okay.  Well, I'm speaking specifically now

18   about Bristol Farms.

19          So you're aware of the efforts to obtain

20   business from Bristol Farms?

21     A      Yes.

22     Q      What's the current status of those efforts?

23     A      I don't believe they've progressed.

24     Q      And you're aware that, at some point in time,

25   Mr. Voskanian attempted to obtain business --

Page 135

```
 1    middle-mile business from Amazon, correct?

 2         A    Yes.

 3         Q    And what's the status of those efforts?

 4         A    We do not have a contract.

 5         Q    And are those discussions ongoing, or are they

 6    stopped?

 7         A    I believe they stopped.

 8         Q    Okay.  You've already testified about

 9    Wal-Mart, OnTrac, and the scooter company.  Uber Freight

10    you've already talked about.

11              Are there any other discussions that are

12    currently ongoing with prospective business partners for

13    Scoobeez?

14         A    Nothing that I can remember off the top of my

15    head.

16         Q    So, I mean, just to sort of summarize

17    Scoobeez' future business prospects, once the plan is

18    confirmed, you have a small number of routes that you

19    expect to get from OnTrac, correct?

20         A    Yes.

21         Q    You have a small number of routes that you

22    expect to get from Lone Star, correct?

23              MR. SIMON:  Objection.  Speculation.

24    Objection.  Vague and ambiguous.  Objection.  Assumes

25    facts not in evidence.
```

Page 136

1    BY MR. ESTERKIN:

2        Q    You can answer the question.

3        A    Yes.

4        Q    Okay.  And you expect that the Amazon contract

5    will be terminated as soon as the automatic stay is

6    terminated, correct?

7        A    Based on your representations today, yes.

8        Q    And so it would seem that the success of the

9    plan of reorganization hinges on increased business from

10   Lone Star, increased business from OnTrac, or finding

11   business from a prospect as yet unidentified, correct?

12       A    Yes.

13           MR. ESTERKIN:  Okay.  I don't think I have

14   anything further, Mr. Weiss.

15           THE WITNESS:  Okay.

16           MR. ESTERKIN:  I thank you -- I thank you for

17   your time, and sorry that we ran into your other meeting

18   by, according to my clock, 22 minutes.  Hopefully you

19   can pick up your other meeting half an hour late or so.

20           THE WITNESS:  Tomorrow morning, 8:00 a.m.

21   That's fine.

22           MR. ESTERKIN:  All right.  Thank you again

23   very much.  We can go off the record -- actually, we

24   should talk about signing and reviewing the deposition.

25           Why don't we go off the record while we have

                                            Page 137

1    that discussion.

2              (Discussion off the record.)

3              MR. ESTERKIN:  Okay.  While we were off the

4    record, we discussed the concept of entering into a

5    stipulation with respect to the witness's reviewing and

6    signing of the transcript, and Mr. Simon, on behalf of

7    the witness, declined to enter into such a stipulation,

8    and with that, we can go off the record.  Thank you.

9              (TIME NOTED:  2:24 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 138

1           I, BRIAN WEISS, do hereby declare under

2    penalty of perjury that I have read the foregoing

3    transcript; that I have made any corrections as appear

4    noted, in ink, initialed by me, or attached hereto; that

5    my testimony as contained herein, as corrected, is true

6    and correct.

7           EXECUTED this _____ day of _____,

8    2020, at _____, _____.

              (City)                    (State)

9

10                    _____

                       BRIAN WEISS

11                     VOLUME I

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 139

1         I, the undersigned, a Certified Shorthand Reporter

2    of the State of California, do hereby certify:

3         That the foregoing proceedings were taken before

4    me at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were administered an oath; that a record of

7    the proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing is a true record of the testimony

10   given.

11        Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal Case,

13   before completion of the proceedings, review of the

14   transcript [  ] was [  ] was not requested.

15           I further certify that I am neither

16   financially interested in the action nor a relative or

17   employee of any attorney or any party to this action.

18        IN WITNESS WHEREOF, I have this date subscribed my

19   name.

20   Dated:   06/17/2020

21

22        *Catherine A. Ryan*

23           Catherine A. Ryan, RMR, CRR

24           CSR No. 8239

25

                                             Page 140

**[& - 29]**

| & |
|---|
| **&**   3:4,15 4:4,12 7:14,17,20,21,23 81:16,17,18 83:21 102:4,6,21,24 |

| 0 |
|---|
| **0001**   5:8 28:19 |
| **0002**   5:14 41:22 |
| **0003**   5:17 42:11 |
| **0004**   5:20 43:22 |
| **0005**   6:3 61:16 |
| **0006**   6:11 20:9 |
| **0007**   6:14 76:24 |
| **0008**   6:19 97:16 |
| **0009**   7:3 99:7 |
| **0010**   7:8 100:13 |
| **0011**   7:13 102:8 |
| **0012**   7:19 81:21 |
| **0013**   8:3 119:5 |
| **0014**   8:7 119:22 |
| **0015**   8:14 |
| **0021**   8:14 |
| **0022**   8:10 132:20 |
| **02/19/20**   6:16 |
| **03/19/20**   6:21 |
| **04/15/20**   7:5 |
| **05/14/20**   5:18 |
| **05/18/20**   7:10 |
| **06/17/2020**   140:20 |

| 1 |
|---|
| **1**   1:25 28:21,23 38:23 70:16,22 71:6,15 110:14 132:19 |
| **1,050,934.65** 102:24 103:11 |
| **1,725,588**   86:24 |
| **1.5**   34:19 39:8 74:20 |

**1/1**   70:18
**10**   8:8 15:6,7,13,16 15:18 45:3,23 100:10 104:25 106:7 107:24 108:5
**10,000**   24:12 25:1
**10/03/19**   5:21
**100**   7:8 124:5
**10016-1314**   3:6
**102**   7:13
**10250**   4:14
**107**   69:16
**10th**   4:6
**11**   1:8 2:8 5:8 6:5 6:14,19 7:3,8 28:24 38:25 61:25 102:3 103:4
**1129**   47:18
**119**   8:3,7
**11:07**   72:10
**11:15**   72:12
**11th**   61:14
**12**   8:4 66:24 67:2 67:10 81:14,20 105:18
**12,500**   24:11 25:1 25:4
**12/25**   71:12
**12/31**   75:8,9
**120**   96:18,22 100:3
**12:15**   106:19
**12:30**   72:5 106:20
**12th**   66:20,25 68:5 68:10,24
**13**   102:23 119:8 120:14,20
**132**   8:10
**14**   6:12 21:19 64:18,18,19 65:2 102:23 119:21

**120:8,14,20
**140**   1:25
**14989**   1:5 2:5
**14991**   1:6 2:6
**14997**   1:7 2:7
**15**   1:15 2:17 9:1 95:21 99:23
**150,000**   87:5,13 94:15
**16**   62:23 63:2 73:17 98:21 111:6 123:16
**168,000**   100:3
**168,472**   96:17
**17**   96:3 99:11,12 100:18,19 105:5 107:24 108:5 113:13 123:16
**1700**   4:14
**176,839**   94:25
**17th**   68:12
**18**   97:21,22 118:4 118:6 119:1 123:16
**18,000**   87:19,25
**18th**   23:9 52:17
**19**   7:11 54:25 66:12 86:1,2 105:5 121:17 123:17
**19th**   22:11 121:18 121:20
**1:30**   106:24
**1st**   18:16 93:24

| 2 |
|---|
| **2**   13:1 41:24 71:7 105:7,11 121:13 122:2,18 |
| **2,344,172**   71:21 |
| **20**   6:11 16:3,3 68:12 71:12 |

**2000**   75:18 94:18
**2015**   121:13 122:2 122:18 123:10,16 123:22
**2016**   8:4
**2019**   13:18 81:4 82:5,9,17 121:17 121:23,24 122:2 122:18 123:5,11 123:23,25
**2020**   1:15 2:17 9:1 20:18 29:2 31:9 31:11,12,23,24 36:18 67:10 76:3 76:17,22 78:1,3 81:20 94:3,3 96:15 97:12 99:6 101:5 110:19 132:19 139:8
**2021**   70:22 71:6,15
**2023**   75:18 111:10
**21**   6:17 8:4 36:24 39:22 70:18 75:8 86:1 96:3 103:5
**212**   3:7,7
**213**   3:17,18 4:7,7
**21st**   24:14
**22**   30:17,19 132:18 133:16,17 137:18
**229-1234**   4:15
**229-1244**   4:15
**22nd**   3:16
**23**   47:5,10 75:9
**25**   16:3
**25,000**   23:10
**27th**   22:13
**28**   5:8 29:2 31:9 97:11
**28th**   31:25 32:2,8
**29**   7:6 99:11

Veritext Legal Solutions
866 299-5127
Exhibit 1, page 144

**[29th - account]**

**29th**  97:11,12
**2:00**  107:3,7
**2:19**  1:5,6,7 2:5,6
  2:7
**2:24**  2:17 138:9
**2a**  103:13

### 3

**3**  37:1 42:13 44:10
  67:25 71:7,9
  102:16 103:2,9
  105:22
**3,230,322**  70:16
  71:12
**3,280,322**  70:22
**3,844,172**  70:17
  71:3,14
**30**  66:9,17 78:3
  93:24 95:20 98:18
  103:24 124:6
  132:2
**30,770**  100:4
**300**  3:16 69:11
**300,000**  103:19,24
  104:3
**30th**  94:7 117:20
**31**  31:12,24 76:3
  76:16,22 81:4
  82:5,17 96:15
  99:6
**310**  4:15,15
**312**  3:11,11
**31st**  18:15 31:21
  32:4 34:7 36:18
  63:18 82:9,24
  83:2,3 93:4 94:7
  95:21 98:18
**32**  6:22 97:21
  98:21
**324-1001**  3:11
**324-1145**  3:11

**329,000**  69:16
**329,650**  69:12
**338-3603**  3:7
**35**  44:1 68:6
**37**  8:12

### 4

**4**  5:21 41:25 43:24
  47:6 69:15 103:8
**40**  66:11,18 68:7
**41**  5:14
**410**  5:17,20
**4137303-1**  1:24
**42**  5:17
**43**  5:20
**443-3000**  4:7
**443-3659**  4:7
**45**  130:23 132:2
**474,000**  88:4
**484,000**  106:5,10
**4th**  18:5 20:18

### 5

**5**  5:15,18 31:11,23
  47:17 61:12 69:15
  69:16 107:22
  108:3
**5,000**  24:15 25:3
**5,436,950**  67:11
**50**  105:10
**50,000**  20:2 22:11
  22:13,15 23:9
  25:18 26:5 104:13
**500,000**  33:8 34:12
  69:24
**536,851**  96:11
**540,000**  106:9
**540,957.58**  106:2
**563**  102:7
**5th**  31:21 32:3

### 6

**6**  6:8 7:17 20:12
  20:15 62:3 63:21
  63:24 64:17,18
  71:1 102:16
**6.3**  67:17
**60**  124:6
**60601-5094**  3:10
**61**  6:3 100:4
**610**  76:23
**612-2500**  3:17
**612-2501**  3:18
**621,343**  98:24 99:2
**687-2329**  3:7
**69**  5:11 30:17 31:4
  36:24 45:1 47:5
  49:14 54:25
**693**  97:14

### 7

**7**  7:23 21:19 45:1
  64:18,18,19,23
  65:2 66:17 76:20
  85:25 86:23
  105:23
**7/31/2020**  75:10
**715**  86:22
**725,588**  86:17
**748,000**  103:15
**7484**  140:22
**751,651**  99:25
**754**  29:2
**76**  6:14
**77**  3:10
**772**  81:19
**774**  100:12
**786**  20:18
**79,360.71**  56:14
**791**  61:14
**7th**  134:9

### 8

**8**  64:18,18,24
  66:20 70:24 71:9
  97:10
**81**  7:19
**8239**  1:23 2:19
  140:24
**865**  4:6
**871,230.84.**  55:2
**8:00**  137:20

### 9

**9**  5:4 47:18 99:5
**90**  3:6 100:4
**900,000**  66:20
  67:13,22 68:9
**90017**  4:6
**90067-6253**  4:14
**90071-3132**  3:17
**950,000**  67:24 68:3
**97**  6:19
**99**  7:3
**9:31**  2:16 9:2
**9th**  70:5,6

### a

**a.m.**  2:16 9:2
  72:10 137:20
**ability**  108:23,24
  109:5,6,10 123:4
**able**  20:20 21:7,11
  74:2 100:16
  102:11 107:6
  114:9 119:11
  125:13 131:8,15
  134:12
**accepted**  125:4
**access**  59:8,9,11
**accords**  39:17
**account**  6:16,21
  7:5,10 23:22
  33:11,15 35:25

Page 2

[account - appended]

67:4 74:15 91:1
96:14
**accounted**  70:2
**accounting**  59:12
77:8,15,18 78:17
**accounts**  44:1 96:7
96:10,15,17,22
98:22,25 99:24
**accrual**  63:19
74:11,16 75:24
78:17 95:23,25
100:24
**accruals**  78:20
**accrued**  36:17
91:17 94:15 98:2
98:5,6,8,10
**accurate**  40:9,21
**accurately**  40:9
**acquire**  123:9
**acquired**  123:21
**acting**  15:9
**action**  140:16,17
**actions**  116:25
**active**  15:21
**activities**  61:7
**acts**  60:24
**actual**  27:4,20,25
31:17 50:19 70:7
79:1 80:25 92:10
94:22 95:9
**add**  90:6
**additional**  88:1
115:23 118:10,14
118:20 124:15,16
**additive**  67:21
**adequate**  28:12
**adequately**  122:10
**adjust**  92:15
**administered**  1:6
2:6 9:5 140:6

**administering**
45:15
**administration**
38:24
**administrative**
36:18 37:1,14,22
38:8,13,17,23
39:16,23 40:12,13
40:23
**advised**  51:25
**affirmative**  122:21
**affirming**  120:23
120:23
**afternoon**  4:5
72:25 73:2
**aged**  96:22
**agency**  51:10,15
**agency's**  51:7
**ago**  15:22,22 24:25
34:8 42:25 49:1
59:25 60:6 117:24
**agree**  121:23
**agreement**  8:11
119:25 132:18
134:3,6,11
**ah**  21:21
**ahead**  29:3 40:19
48:16 58:13
111:21
**al**  1:6 2:6
**allotted**  37:13
**allow**  11:17,17,24
**allowed**  37:24,25
38:4,16 39:24
80:7 98:17
**allows**  106:5
**amazon**  2:14 3:14
54:1 57:24 58:2,4
58:9,21 65:7,8,23
66:4,5,9,13 67:4
67:14,16 68:5

74:25 75:4 76:2
116:8,8,16 117:2
118:11,13,20,24
119:9,17 120:12
120:14 122:17
123:10,17,22
124:5,20,20,22
126:10 134:9,11
134:16 136:1
137:4
**amazon's**  116:10
**ambiguous**  32:22
48:18 51:3 65:12
122:12 123:14
136:24
**amended**  5:8 6:4
28:23 44:24 61:25
**amendments**
118:4,7 119:1
120:15
**amount**  19:24
25:22 26:5 28:11
34:18 35:8,11,24
49:25 50:1 55:3,6
55:10 56:14,16,22
58:4,9 65:16
67:16 74:25 80:11
80:22,22 84:18
88:14,22,23
103:23,24 104:10
106:6 115:22
**amounts**  22:21
24:5,6,7,8,11,18
25:17,19 27:21
34:13 36:5 80:24
80:25 91:18 100:7
100:24 104:18
106:16
**analysis**  122:4
**angeles**  1:3 2:3
3:17 4:6,14

**answer**  10:19
11:12,13,15,17,21
11:25 12:6 15:23
17:8 25:13,14,15
26:12,19 27:9,11
27:14,14,16,17,18
32:21 36:13 37:8
38:3 40:19 41:5
43:11 45:11 46:19
51:1,4 54:21
55:14 64:8 65:13
70:12 73:6,8
79:18 85:17 109:2
109:5 110:17
112:22,23 113:20
127:4 128:10
129:5 137:2
**answered**  40:17
48:25 54:19
**answering**  11:1
**answers**  85:19
107:18
**anticipate**  111:3,7
**anticipated**  37:20
38:6
**anticipation**  65:6
**anybody**  13:6 25:8
32:25 55:8 109:19
118:19 124:3
130:24 134:15
**apologize**  103:8
**apparently**  55:1
61:13
**appear**  139:3
**appearances**  3:1
4:1
**appearing**  2:15
**appears**  21:15
30:9 102:23
**appended**  63:23

Veritext Legal Solutions
Exhibit 1 - page 146
866 299-5127

[application - based]

| | | | |
|---|---|---|---|
| **application** 79:19 79:20 81:3 82:4,8 84:4 105:20 | **armory** 7:15 102:5 | **attempting** 112:16 122:16,24 | 118:5,22 135:12 135:19,24 |
| **applications** 7:14 7:20 79:4,6,9,24 80:4 81:16 82:11 84:2 85:5 93:2 102:4 105:16 | **arose** 43:15 | **attention** 43:1,2 | **b** |
| | **arrears** 66:10 94:2 | **attorney** 3:5,9,16 4:13 25:10,25 27:6 43:9 73:3 84:16 85:7 89:16 116:18,21 140:17 | **b2b** 8:11 |
| | **arrive** 82:19 83:7 83:14,17 | | **b2c** 8:11 |
| | **articulated** 65:21 | | **back** 11:8 19:1 21:4 26:13,15 37:21 39:22 41:10 45:20 50:18 63:21 72:2,11,14,16 73:9 73:24 74:2 75:21 85:24 89:23 106:24 107:2,13 107:14 109:2 111:16,21,22,25 123:16 127:24 |
| **applying** 115:15 | **aside** 85:16 | **attorneys** 4:5 82:16 89:8 97:24 | |
| **appointed** 122:25 | **asked** 40:17 54:19 82:3 108:4 113:16 113:18 | **attract** 108:23 109:5,11 112:16 122:24 131:8,18 | |
| **appointment** 107:2,7 122:20 | **asking** 11:11,14 49:12 53:11,13,16 80:20 107:15 | **attracting** 109:13 110:4 115:2 | |
| **appreciate** 75:21 | **ass** 128:17 | **audio** 114:14 | |
| **approach** 109:21 | **assembling** 77:14 | **august** 24:14 | |
| **approached** 128:25 | **assert** 10:13 | **authority** 134:5 | |
| **appropriate** 77:8 | **assess** 127:25 | **authorized** 80:8 80:22 103:14,20 104:10 106:16 | **balance** 67:22 68:25 71:12,13,20 74:21 86:16 98:9 |
| **approval** 31:10 | **assignments** 14:20 | | **bandwidth** 14:2 |
| **approve** 12:14 | **assist** 109:13 115:8 | | **bankruptcy** 1:1 2:1 20:18 29:1 47:19 51:19 60:11 61:15 76:21 79:4 81:19 89:21 97:15 100:12 101:8 102:7 121:17 122:3,19 123:5,11 125:14,18 126:2,6 126:11,22 127:2,5 127:7 128:22 134:4 135:11 |
| **approved** 40:1 77:12 80:13 | **assistance** 108:16 108:21 109:16 110:4 | **automatic** 137:5 | |
| **approximate** 103:17 132:10 | **associates** 7:22 17:16 81:18 | **available** 45:4,5,7 45:13,24,25 46:2 | |
| **approximately** 15:25 18:6 22:15 66:9,14 68:6 72:6 103:19 106:24 | **assume** 13:20 52:24 53:1,18 54:1,10 55:5 71:22 | **avenue** 3:6,16 | |
| | | **average** 88:25 | |
| | | **avoidance** 10:12 | |
| **april** 29:2 78:3 89:24 90:1 93:5 93:21,23,24,24 94:1,3,7,11,17 100:10 104:24 105:1,2,3 121:17 121:20,20,23,24 122:2,18 123:5,10 123:22 | **assumed** 52:16 53:9,9 56:18 70:4 | **award** 65:7 80:3 103:10,20 105:11 106:2,16 | **banner** 21:15 |
| | **assumes** 50:12,24 65:11 136:24 | **awarded** 65:15 80:22,25 98:17 102:24 104:9,14 130:7 | **base** 124:4,13 |
| | **assuming** 29:4 58:21 103:22 134:2 | | **based** 23:7,16 30:19 40:3,8,20 43:9 63:4 65:8,20 66:4,23,24 74:7 79:1,23 80:23 83:8 84:19 92:9 92:11 94:22 95:4 |
| **ar** 68:7 | **attached** 18:11,19 63:12 64:16 139:4 | **awards** 103:23 104:9,11 | |
| **area** 57:5 78:22 100:21 106:21 | **attempted** 135:13 135:25 | **aware** 42:4,8,20 42:22,22,24 43:14 43:18 44:5 55:11 55:15 56:20 58:23 61:4 110:2 116:24 | |
| **areas** 72:24 | | | |

[based - case]

95:15 98:16 118:8
129:11 132:1
137:7
**basic** 83:25
**basically** 13:23
83:25 124:14
**basis** 27:22 63:19
63:20 64:1 65:21
74:11,12 75:24
76:12 78:17 83:4
96:23 104:19,20
**beach** 1:14 2:16
9:1
**beat** 97:23
**began** 124:12
**beginning** 2:16
23:21 34:7,14,22
37:5 40:12 63:4
67:11,19 68:20,23
68:25 69:17 71:4
71:5,6,6,13,13
**behalf** 2:14 29:21
29:25 30:4 92:3
134:5 138:16
**belief** 129:11
**believe** 9:21 18:23
19:22 20:2 22:23
24:11,24 25:6
29:16,23 44:18,18
46:20 55:25 58:10
60:22 66:21 70:15
75:18 78:2 91:10
91:22 93:4 95:3
97:6,8 101:2
119:9 120:19
121:5,19 122:1,7,9
123:2,20 125:7,11
125:19 126:16
127:1 129:9,24
131:23 134:7
135:23 136:7

**believed** 26:7 28:4
**bender** 4:12 7:17
7:22 81:18 102:6
**benefit** 33:11
**best** 12:20 63:25
86:20 110:11
**billed** 15:21 88:23
**billing** 15:20 84:16
**bills** 39:12
**bird** 127:20
**bit** 23:18 121:19
127:25
**bk** 1:5,6,7 2:5,6,7
**board** 5:15 42:1
44:10 76:6,7
114:9,21,22
**bockius** 3:15
**bold** 22:1
**books** 61:8
**booster** 56:13,17
56:18,21,24 57:17
57:21,25 58:22
**bother** 118:25
**bottom** 23:25 47:6
47:11 102:15
**boulevard** 4:14
**box** 96:6
**boy** 97:21
**break** 10:23 71:25
72:6,18 106:20,23
107:14,16
**brian** 1:13 2:13
5:3 6:3 9:4 62:4
117:12 139:1,10
**brief** 84:17
**briefly** 78:5 93:7
**brill** 4:12 7:17,23
81:18 102:6
**bristol** 135:14,18
135:20

**broader** 112:15
**broken** 111:16
**brought** 17:16
43:2
**buchalter** 88:20
90:10,18,20 92:2
94:5,10
**budget** 18:4,12,14
18:17,19,20,22,23
19:5,7,18,24,25
22:21,25 24:1,5,9
24:15,17,21 25:4,5
25:9,18,19,23 26:6
26:8,25,25 27:21
28:1,5,11,13 31:11
31:13,18,21,23
32:2,3,7 33:1,25
34:5,7,11 41:1
63:11,22,23,25
64:2,16 65:20
67:3,5,9 69:20
70:2,8,14 74:17
111:2
**budgeted** 25:22
**budgets** 17:4 34:6
34:14 35:4,8 36:7
40:1 80:13,24
91:19 106:6
**bunch** 88:24
**business** 6:14,19
7:3,8 14:15 29:25
39:12 40:3 61:2,5
61:7 76:8 108:13
110:25 112:4,16
113:10,15,24,25
114:4,7,19,23
115:1,2,4,4 118:10
118:11,15,21
122:5,17,17,24
123:3,4,9,21
124:20,25 125:4,6

126:9,17 128:17
129:1 131:1,8,11
131:18 134:16,17
134:21 135:6,8,9
135:13,20,25
136:1,12,17 137:9
137:10,11
**busy** 14:16
**button** 133:14
**buyer** 100:24

---

**c**

---

**c** 47:18
**california** 1:2,14
2:2,16 3:17 4:6,14
9:1 129:24 140:2
**call** 33:11 35:7
72:4 121:24 134:9
134:10,14,20
**called** 33:6 52:1
127:21
**calls** 32:14,18 38:1
39:5,19 40:16
41:3 45:10 46:17
47:1 48:3 50:3,23
51:16,17 54:18
55:20 64:5 65:10
96:25 116:22
122:13
**capital** 4:3 17:20
23:14 114:25
115:6 130:17
131:1,7,13
**capitalized** 122:10
**carried** 106:10
**case** 12:15 14:21
17:17 23:19,23
29:2 34:7,15,15,18
34:22,23 35:3
36:5,6 40:5 60:11
76:22 79:9 89:21
97:15 100:12

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 148

[case - comparing]

103:25 104:2,2
128:22 140:12
**cases** 38:25 61:15
81:19 102:7
**cash** 6:12,14,19
7:3,8 17:4,5 18:3
18:4 20:17 22:2
24:1 31:10,20,22
32:25 33:6 34:6
34:14 35:4 36:6
37:17 38:12 39:9
39:11 40:1,2,3,3
40:24 45:4,5,6,12
45:24,25 46:1
47:3 63:5,12,20,22
63:22 64:1,1,16
65:21 66:3,7 67:5
67:11,16,20,20,21
68:11,15,18,19,23
68:24,25 69:3,6,10
69:10,17,24 70:7
70:10,11,13,15,21
70:23 71:3,4,5,7,8
71:12,13,18,20
74:12,16,20,21,25
80:13,23 91:11
104:4 106:11
111:2
**categories** 16:23
64:22,23
**catherine** 1:22
2:18 140:23
**cathy** 109:2
**cause** 107:17
**caution** 10:1,16
**central** 1:2 2:2
**ceos** 16:25
**certain** 53:25
**certainly** 23:3
**certified** 2:18
140:1

**certify** 140:2,15
**cetera** 15:22 37:14
63:6 89:17
**change** 53:23
67:17 71:9 87:19
107:17
**changed** 120:15
**changes** 18:21
19:7,17 22:25
23:2
**chapter** 1:8 2:8
5:8 6:5,14,19 7:3
7:8 28:24 38:25
61:25
**characterize** 29:20
**charged** 51:9
**charges** 51:15
84:19 85:9
**chart** 103:4
105:22
**chicago** 3:10
**chief** 13:13 14:23
15:9 58:24
**circumstances**
92:14
**city** 139:8
**claim** 5:14,17,20
37:14 38:17,23
41:25,25 42:5,14
42:20,23,24 43:1,4
43:7,14,14,18,25
44:1,5,5,12,19,22
50:20 55:1
**claimants** 49:25
50:10,16
**claims** 36:18 37:22
38:8,13 39:16,23
39:25 40:14 41:13
41:16,19 44:10
46:13 47:7,17
48:9,22 50:2 51:5

54:3 55:1
**clarification** 16:14
71:11
**clarify** 14:24 32:5
65:18 92:23
**clean** 12:3 23:18
**clear** 16:18 26:24
30:25
**clicked** 133:13
**client** 25:10,25
27:6 43:9 73:3
116:18,21 124:4
124:13
**clients** 15:21
**clock** 137:18
**close** 85:22 98:4
**cluttering** 119:2
**code** 47:19
**cofounder** 15:3
**collateral** 6:12
17:5 18:4 20:17
31:11,20,23 33:1
34:6,14 35:4 36:6
40:1 63:12,22,23
64:16 80:13,23
111:2
**collect** 68:11
**collected** 67:22
**collections** 65:16
67:21,25 71:7
**collectively** 36:11
36:14,15
**color** 22:10
**column** 67:10
98:15 100:3,5
104:15
**columns** 99:18
**combination** 95:5
95:22
**come** 43:1 46:15
46:20 68:25 72:2

72:11 84:12 104:9
106:24 107:2
111:16,21 125:16
**comes** 76:6
**coming** 52:20
**commence** 131:1
**commencement**
62:14
**commensurate**
51:6
**commenting** 17:5
**comments** 78:21
**commitment**
115:10
**committee** 4:11,11
5:11 6:8 17:21,24
18:1 19:23 24:2
24:14 28:10,12,14
28:16,25 30:4,5
34:1 35:21 36:10
62:2 83:10 87:17
88:4 91:13 93:18
93:19 101:18
**communicate**
59:19,21 60:2
**communication**
17:24 55:12
**communications**
10:4,7 13:8 17:19
17:19,25 56:24
**community** 123:3
**companies** 51:18
113:4 125:11,25
**company** 43:10
60:24 61:3 78:19
126:4,4 127:18
128:3,15,23
131:14 136:9
**company's** 123:18
**comparing** 106:15

Veritext Legal Solutions
866 299-5127
Exhibit 1, page 149

**[compensation - correct]**

compensation
85:5
complete  11:17
72:7
completed  11:13
11:15 12:6 129:5
completing  85:17
completion  140:13
compliance
126:18 127:1,15
composed  118:2
compound  48:17
comptroller  43:25
comptroller's
44:22
computer  42:10
59:11 72:11 81:11
81:12 85:21
100:11 102:14
con  51:21 131:3
concentrating
83:1
concept  45:5,25
138:4
conclude  49:13
conclusion  32:14
32:19 38:2 39:6
39:20 40:16 41:4
45:10 46:18 47:1
48:4 50:4,24
51:17 64:6 65:11
116:23 122:13
condition  32:5
conditions  32:1
confer  57:1
conference  52:1
72:4 134:9
confirm  82:3,6
85:2
confirmation  6:4
32:17 33:15 40:7

61:24 69:25 73:17
74:22 108:4,12,17
108:22 113:8
114:1 115:8,16,20
115:24 116:2
131:4
confirmed  23:17
33:16 70:5 112:14
135:11 136:18
conjunction  14:21
connection  9:13
12:13 13:2
consented  9:22
consider  131:19
considering  58:20
consistently  30:22
constellation  4:14
constitute  120:14
constitutes  129:20
consult  10:14,24
consulting  15:1
contact  88:10,13
110:22
contacted  125:10
125:25 135:15
contacts  109:18,20
125:16
contained  139:5
contingent  115:15
115:17
continue  123:4
124:21
continued  4:1 6:1
6:11 7:1 8:1 20:17
continues  24:16
continuing  46:23
contract  53:25
54:1,11 55:2,5
56:4,12,13,18
57:15,15,21,24,25
57:25 58:2,5,9,21

58:22,22 116:9
117:2,5 118:1,8,9
118:16,24 119:10
119:17 120:4,5,12
120:15 123:10
131:15 132:10,13
136:4 137:4
contracts  51:21,24
52:13,16,25 53:10
53:14,17 54:2
57:24 58:20 121:2
contractual  40:4
116:16
control  114:9,21
conversation
72:21,23 73:11
conversations
28:7,10 72:19
108:15,21 130:25
conway  7:15,21
81:17 102:4
copies  88:21 89:7
90:4
copy  18:9 20:16
28:23 43:25 61:12
61:23 73:22 76:20
81:15 102:3 119:8
132:18
coronavirus  9:21
correct  11:24
13:15,18,21,24
14:10 15:2 18:1,5
18:12,15 19:2
21:11 22:11,13,16
25:5 27:5 29:18
30:1,10,13,15
31:16,19,25 32:17
33:6,8,12,16,21,25
34:2,8,15 35:5,13
35:23 36:7,10,19
37:18,19,23,24

38:13 39:2 41:1
44:19 45:8 46:4
46:24 51:15 52:17
52:22,23 53:1
54:15 55:19 56:14
58:18 59:7,17
60:9,10,12,15,25
61:23 62:7,15
64:3 65:1,21,25
66:5,10,21 67:6,11
67:18,25 68:13,15
68:20 69:5,7,17,20
69:22,25 70:9,16
70:22 71:18,21
74:12,13,25 75:25
76:17,18 79:6,7,9
79:14,15 80:1,2,4
80:5,9,10,14,25
81:1 82:12,17,18
83:5,22 84:2,19,20
87:5,14,17 88:5,8
90:11 91:8,9,13,15
91:19 94:25 95:18
96:15 98:2,3,13,24
99:1,2,14,18
100:22 101:13
102:25 103:15,20
103:21,25 104:2
104:11,12,16
105:11,12,17
106:3,6,8,12,13,17
108:13 110:25
111:1,3,4,7,8
112:12,19 115:10
115:12,14,16,20
115:21 117:15,24
121:6,17 122:8
123:11 124:1,2
127:7,8,16,17,19
131:19,20 134:6
134:19 136:1,19

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 150

[correct - december]

136:22 137:6,11
139:6
**corrected**  139:5
**corrections**  139:3
**correctly**  86:17
102:19
**cost**  38:24 45:15
128:17
**costs**  26:10,21
27:20
**coughed**  56:6
**counsel**  10:13,14
10:24 17:2 18:1
19:22,22,25 22:6
22:25 23:8,23
24:2,14 25:8,21
26:4 27:2 28:3,10
28:15,16 33:24
34:1,1,2,23,25
35:5,12,21,22,25
36:10,10 43:10
52:19 58:17 83:9
83:11 84:10,24
85:3 86:12,16,22
87:17 88:7 89:4,7
90:9,9,25 91:7
92:22 93:18,20
94:15,25 95:18
101:11 105:7,15
105:15 116:10
**counsel's**  27:1
28:12
**count**  15:20
**couple**  17:23
18:24 19:12 66:15
85:21 107:8
118:24 125:10
130:11
**course**  11:20 29:8
29:11 35:3 36:4,6
39:11 40:3 72:23

**court**  1:1 2:1 11:7
12:11 19:9,20
20:18 26:13,15
30:19,21,22,24
31:10 40:1 62:13
72:1 79:4 80:3,7
80:14 82:12 85:6
85:19 101:8
103:23 134:4,4
**court's**  21:15 80:7
**courts**  84:22
**cover**  26:10,21
27:20 28:12 36:3
**covered**  24:16
25:23 27:25 28:5
28:13 64:2 81:3
82:4 92:21
**covering**  76:8
95:17
**covers**  36:4 78:2
**covid**  13:21 14:9
60:7 66:12
**create**  12:25
**created**  19:8 45:6
46:1
**credit**  88:1
**creditor**  4:3,11
33:12 37:12,16,20
39:9 40:13
**creditor's**  45:7
46:2,15,21
**creditors**  4:11
5:11 6:8 29:1
39:10 45:8,13,14
46:3,7 62:2
**crisis**  16:19
**cro**  122:20,25
123:25
**crr**  1:22 140:23
**crystal**  4:4 52:9,11

**crystalnixhines**
4:8
**csr**  1:23 140:24
**cumulated**  86:21
87:1,3
**cumulative**  34:6
34:13 35:7 86:15
**cure**  54:3,25 55:1
56:14,21 58:4,9
**current**  18:4 53:16
87:6,25 89:22
95:11 100:23
101:2 135:22
**currently**  12:18
13:13,20 18:3
55:9 103:22
110:24 136:12
**customer**  123:18
128:14
**customers**  108:23
109:6,11,14,25
110:5 112:18
124:15,16 126:16
128:22

# d

**date**  18:8,10 31:17
32:8 33:1,15,16
37:23 47:18,23,24
49:22 63:18 66:7
69:25 74:22 81:6
84:17 85:8 87:2
88:4 94:7 109:12
110:9 113:14
114:8,20 117:6,6
117:10,13,17,23
121:22 123:17
140:18
**dated**  121:12
132:18 140:20
**dates**  52:18

**dating**  123:16
**day**  100:3 139:7
**days**  53:21 66:9,11
66:14,17,17,18
68:7 95:21 96:18
96:22 100:4 124:7
130:23 132:2
**deadline**  52:20,21
**deal**  19:4 21:1
49:16 100:11
**dealing**  77:24
**deals**  36:21 39:22
**debating**  66:17
**debt**  91:6 116:4
**debtor**  32:9 35:21
46:16 47:3 52:15
52:24 53:21 54:9
55:4,9 63:17
86:11,16 91:13
94:15 105:6
**debtors**  1:7,7 2:7,7
5:10 6:7 12:14
13:15 17:1 19:21
19:25 22:6,25
23:8,23 25:8,21
26:4 27:1,2 28:3
28:25 31:10 34:1
34:23,25 35:12,22
35:25 36:10 46:24
47:3 53:16 60:12
60:18 61:9 62:1
63:5,25 65:6
73:18 76:15 83:9
86:21 92:22
101:15 103:14
108:12,13,17,22
**december**  18:15
31:12,21,24 32:4
34:7 36:18 63:18
76:3,16 81:4 82:5
82:9,17,22,24 83:2

Page 8

[december - effectiveness]

83:3 87:11 95:24
98:18,18
**decision** 53:10
**declaration** 6:3
12:13 61:12,23
62:6,18 63:10
73:16 74:7 107:23
108:3 111:6
113:13
**declare** 62:25
139:1
**declined** 138:7
**deducted** 74:20
**default** 32:24
**defaulted** 32:9
**defer** 52:19 78:9
**deferred** 51:11
**define** 13:22 45:6
46:1
**definitely** 62:20
**definition** 38:21
38:23 39:15 45:4
45:16,23 46:5
54:25 56:13
**definitions** 38:18
**delinquent** 51:15
**delivery** 8:3,7,12
119:8 120:16,18
130:16
**delta** 74:23
**department** 42:14
127:1
**depending** 104:17
**depo** 117:16
**deposition** 1:13
2:13 9:19,22 10:9
11:20,23 12:23
13:7,11 20:14
62:15,18 63:11
72:3,7 73:13
93:17 117:8

137:24 140:12
**describe** 78:5,8
**description** 5:7
6:2 7:2 8:2 84:17
89:17 127:10
**desk** 78:14
**detail** 78:9
**detailed** 84:15
85:3,10,13 89:15
89:18
**determ** 58:14
**determination**
54:9 55:5 58:11
58:15
**determine** 70:7
122:5
**determining** 58:8
**development**
113:11 114:19
**diamantatos** 3:9
117:11,18
**difference** 74:15
74:19 80:11,21,21
106:9
**differences** 74:14
92:17
**different** 34:16
65:16 80:9 116:12
118:2
**direct** 17:23 29:11
30:22 120:1
**direction** 140:8
**directives** 60:8
**directly** 46:10
127:6
**directors** 76:6
114:9,21
**disbursement**
68:19
**disbursements**
6:15,20 7:4,9

68:15,18 78:18
**disclosing** 116:20
**disclosure** 17:2
**discuss** 72:24
124:11
**discussed** 19:12
63:11 116:1 125:9
138:4
**discussing** 124:12
126:9
**discussion** 13:6
21:3 23:13,15
27:2 41:9 54:14
70:5 138:1,2
**discussions** 23:12
24:21 25:7,16
26:9,19 28:14,15
43:3,7 55:16,18
56:2,20 73:12
108:18 112:3,10
112:17 124:3,8
125:17 126:1,3,5,8
126:12,17 127:10
128:2 129:4,8,12
130:20,21 131:6
131:12 134:15
136:5,11
**displayed** 67:10
**disposition** 33:20
**dispute** 97:4
**disputed** 97:4
**distancing** 9:20
**distinguished** 36:1
**district** 1:2 2:2
**diversification**
124:13
**diversifying** 124:4
**division** 1:3 2:3
55:24 57:3 115:18
**document** 20:12
20:15,18 21:16

28:22 29:2,4,5
30:8,23 39:14,17
40:15 41:21 49:14
61:14,21 76:23
81:19 97:14
100:12 102:6,12
119:3 128:1 133:2
133:18
**documents** 13:10
115:12 127:22,23
**doing** 13:17 16:17
112:15 129:1
131:1,24
**dolcourt** 17:18
**dollar** 39:8 74:20
87:25 104:13
**dollars** 37:17
38:11 70:9
**draft** 19:8,9 76:4
**draw** 10:18
**drive** 3:10
**drop** 85:16
**due** 9:20 13:21
14:9 39:12 40:6
66:12 125:17
127:2,4
**duration** 57:14,20

**e**

**earlier** 49:9 63:11
69:23 91:10 92:6
92:14
**early** 123:16
**earned** 34:25
**economic** 128:5,7
131:10,18
**effective** 37:23
47:23 63:18 71:22
113:13 114:8,20
116:8
**effectiveness** 40:7

Veritext Legal Solutions
866 299-5127
Exhibit 1 - page 152

[efforts - expressed]

efforts  135:19,22
  136:3
either  58:16 59:16
  94:2,6,11 107:17
  111:12 113:1
  133:7,9
electronically
  104:22
email  12:25 59:22
  60:3 89:12
emails  10:6 127:24
emanuel  4:4 90:10
  90:22 91:1,7,23
employee  140:17
ended  127:10
engage  61:2,5
  126:1
engaged  55:18
engaging  56:2
ensure  14:1
enter  134:5 138:7
entered  80:3
entering  138:4
entire  25:5 37:6
  53:13
entities  60:25
  112:25
entitled  74:6
entity  60:22
environment  14:2
epidemic  9:21
equal  50:1
equity  116:4
estate  33:6 37:17
  38:11 39:9 40:2
  40:24 69:23 71:18
  74:20 82:16 91:11
  104:4 106:11
esterkin  3:15 5:4
  9:9 20:5,8,11,22
  20:25 21:4 25:12

25:20 26:2,17,23
  27:8,13,23 28:17
  28:21 31:3 32:12
  32:15,20 33:2
  38:5 39:13 40:10
  40:18 41:7,10,20
  41:24 42:9,13,17
  43:16,20,24 45:14
  45:19 46:8,22
  47:4 48:7,20 50:6
  50:13 51:8,20
  52:8,10 54:20
  55:22 56:7,9
  61:11,18 64:7
  65:19 71:23 72:14
  73:5,9,21 74:1,4
  75:19 76:19 77:1
  81:11,23 85:15
  90:3,6 97:2,9,18
  99:4,10 100:9,15
  102:2,10 106:19
  107:4,10,13,21
  108:3,8 109:1,9
  111:18,20,25
  112:2 114:14
  115:5 117:1,22
  118:23 119:7,20
  120:1,7 121:21
  122:14 123:19
  132:17,22 133:10
  133:13,17 137:1
  137:13,16,22
  138:3
estimate  27:24
  28:4 83:4,7 87:4
  87:19 92:17 94:21
  94:23 95:6,7,10,25
  97:3 98:1 100:23
  101:15 110:11
estimated  27:1,3
  82:15 87:3 88:17

90:24 92:7,14,16
  98:11 99:13
estimates  64:1
  79:1 83:14,18
  84:10,11,23 92:11
  98:18 100:21
estimating  82:22
  101:23
et  1:6 2:6 15:22
  37:14 63:6 89:17
event  56:17
everybody  20:19
  72:8 106:25
evidence  50:12,24
  64:5 65:11 136:25
exact  18:8 52:18
  81:6 110:9 117:6
  117:13 121:22
  130:8,22 132:6
exactly  36:3
examination  5:2
  9:8
examined  9:5
example  34:24
  59:10 82:21 95:23
  102:22 104:25
  106:1
exceed  128:18
exception  39:23
excess  33:24 34:11
  34:13 40:25
excuse  24:6 26:2
  97:11
executed  139:7
executory  51:21
  51:23 52:13,15,25
  53:14 57:24 58:19
exercising  116:16
exhibit  5:8,14,17
  5:20 6:3,11,14,19
  7:3,8,13,19 8:3,7

8:10 13:1 20:6,9
  20:12,15,19,23,24
  21:8,15 28:18,19
  28:21,23 30:9
  41:21,22,24 42:10
  42:11,13,16,18
  43:22,24 44:10
  61:12,12,16 63:21
  63:24 64:17 71:1
  76:20,24 81:14,15
  81:21 85:25 97:10
  97:16 99:5,7
  100:10,13 102:3,8
  104:25 105:18
  107:22 108:3
  119:5,8,21,22
  120:8 132:18,20
  133:16
exhibits  5:6 6:1
  7:1 8:1,14 20:14
  104:24 120:14,20
exists  53:3
expect  66:6 108:21
  136:19,22 137:4
expects  66:3 132:4
expense  37:14,22
  38:17,23,24 39:16
  39:23 86:7
expenses  37:1
  40:12,23 68:21
  79:25 86:7
explain  35:17
explained  43:19
explanation  49:22
explore  108:24
  109:6 131:5
express  134:23
  135:1
expressed  113:14
  113:23 114:25
  135:3

Page 10

[extent - form]

**extent** 15:16 27:8
43:8,11 84:24
89:1 104:8 116:20
116:22

**f**

**face** 60:4,5
**facetious** 128:16
**fact** 31:16 43:9
50:24 80:23 95:15
127:5
**facts** 50:12 64:4
65:11 136:25
**fair** 95:16
**fall** 57:4 58:12
**far** 75:6,6,16 79:9
89:21
**farms** 135:14,18
135:20
**faster** 102:14
**fax** 3:7,11,18 4:15
**february** 94:18
97:11 98:2,12
110:14
**federal** 140:12
**fee** 7:13,19 39:25
79:1,4,5,8,24 81:3
81:16 82:4,8,11,20
83:12,16,17 84:1,2
84:3,14,20,21,25
88:1 89:15 90:15
90:17,19,20,21
92:10,11,13,15,17
92:21,23,25 93:1
93:19 94:22 95:4
95:5,16,19 98:6,8
102:4 103:19
104:9,11,15,25
105:1,10,16,20
**feedback** 114:12
114:15

**feel** 29:9,10
**fees** 19:11,16,18
19:21 23:7,20,21
24:15 25:23 26:6
27:1,3,4,19,25
28:4,12 33:24
34:11,13,18,20,25
35:5,18,20 36:4
38:15,19 39:1,8
40:25 78:24,25
79:24 80:7,8 81:3
82:5,8,16,22 83:4
86:16,21 87:2,3,23
87:23,25 88:4,14
88:17 90:24 91:1
91:4,8,12,17,21,23
92:1,7,15,16 94:5
94:15 97:24 98:2
98:5,5,10,12,16,17
99:14 100:20
101:15,18,20,24
102:24 103:23
104:9 105:5,6
**feet** 85:21
**fifth** 6:11 20:16
**figueroa** 4:6
**figure** 82:15
104:13
**figures** 68:19
**file** 31:10 52:15
81:19 97:14
100:12 101:11
102:6 105:15
**filed** 5:18,21 6:16
6:21 7:5,10 18:4,8
19:9,19 20:17
29:1 30:23 31:24
32:2,7 41:25 42:5
42:8,14,21 43:25
44:6 61:14 76:21
76:23 78:2 79:2

79:13 82:12,21
84:1,22,25 85:6
101:3,8,9 102:20
121:16 122:2,19
123:5,11
**filing** 31:17 32:25
77:12 95:22
**final** 8:10 19:9,19
39:24 103:23
104:9 132:18
**finalize** 53:22
**finalized** 101:11
**finances** 59:15
**financial** 17:3,6
63:16,17 76:16
78:20 80:16,19
113:10 114:24
115:23
**financially** 140:16
**financing** 69:3
115:16,18,20
116:3,4
**find** 16:21 81:8
113:17 134:16
**finding** 134:21
137:10
**fine** 9:12 31:1
64:19 137:21
**fingers** 72:1
**finish** 26:2 107:4,6
**finished** 10:25
11:11 17:8 44:16
109:22
**firm** 15:2,4,5
90:10,10,13
**firms** 90:16
**first** 5:8 6:4 18:14
22:5,16 24:11
25:2 28:23 32:6
36:12 42:24 47:14
47:16 61:25 69:11

79:15,19 102:3
110:3,19 112:21
114:6 124:6,12
130:7
**five** 35:12,18 36:3
36:16 40:24 47:22
48:11 49:21 71:17
71:25 91:11,16
95:7 104:5
**floor** 3:16 4:6
**flow** 40:3 68:24
69:11,17,19 70:24
74:25
**flows** 22:2 24:1
69:4,7,10 99:17
**focused** 124:19,20
**foley** 3:4 7:14,20
17:15 81:16 83:21
93:3,9 102:4,21,24
103:10,14,25
104:14 106:1
**foley.com** 3:8,12
**folks** 126:17
**follow** 101:23
**following** 111:15
113:7 134:14,20
**follows** 9:6 26:18
31:9 45:21 109:4
**font** 21:22
**fool** 121:8,9
**footer** 30:20
**force** 15:6,7,13,16
15:18
**forecast** 22:18
25:2 66:20 70:21
**foregoing** 139:2
140:3,5,9,11
**foremost** 114:6
**form** 5:17,20
83:25 84:3

Veritext Legal Solutions
Exhibit 1, page 154
866 299-5127

[formal - hillair]

| | | | |
|---|---|---|---|
| **formal** 74:5 | 135:10 136:17 | 75:17 85:24,25 | **grow** 114:23 |
| **formed** 33:12 53:5 | **g** | 86:4 89:23 97:21 | **guess** 52:22 66:19 |
| **forth** 19:1 25:17 | | 97:24 98:21 99:11 | 107:9 128:11 |
| 26:5 27:21 28:11 | **gap** 81:15 | 99:23 103:13 | **h** |
| 48:12 49:20 50:20 | **general** 6:16,21 | 107:10 111:10,20 | |
| 91:18 127:24 | 7:5,10 16:23 | 118:14,25 124:16 | **ha** 21:21 |
| 140:4 | 43:10 46:6 77:24 | 126:22 137:23,25 | **half** 37:17 38:7,11 |
| **forward** 23:9,22 | 80:7 113:18 | 138:8 | 70:8 103:4 107:5 |
| 27:22 65:18 91:3 | 128:10 130:9 | **goes** 71:22 | 107:6 137:19 |
| 106:10 115:1 | 131:17 | **going** 20:12,15 | **halfway** 86:6 |
| **foundation** 50:4 | **generally** 13:25 | 21:14 23:23 27:22 | **hand** 39:11 40:3 |
| 50:11 51:2 55:21 | 51:5 60:19 112:10 | 29:7 30:21 39:21 | 47:3 70:10,11,13 |
| 64:5 | **generate** 128:18 | 41:20 42:9 47:14 | 70:15 98:15 |
| **franchise** 5:15 | 132:11 | 51:23 53:9 56:5 | **handle** 78:22 |
| 42:1 44:10 | **generated** 91:23 | 59:8 61:11 64:21 | **hang** 52:4 |
| **free** 29:10 | **geographic** 129:23 | 68:11 71:23 77:24 | **happens** 9:25 |
| **freight** 129:4 | **george** 16:25 | 78:1 80:6 91:3,7 | 11:23 |
| 130:14,15,16,20 | 18:18 19:3 59:3 | 95:10 100:9 101:8 | **happy** 113:20 |
| 131:2,8,14 136:9 | 77:19 78:9 130:21 | 102:21 105:25 | **hard** 111:15 |
| **frequency** 48:12 | **gestures** 10:7 | 106:20,21 107:4 | **head** 74:18 77:17 |
| 48:15,21 49:23 | **getting** 37:16 | 108:24 109:6 | 94:8 136:15 |
| **frequently** 48:10 | 56:10 97:6 111:15 | 111:16 112:12 | **heads** 72:8 |
| **friday** 12:24 93:5 | 111:15 114:7 | 115:1 118:25,25 | **hear** 9:12 26:12 |
| **fritz** 4:13 | **give** 36:22 42:6 | 119:7,18 127:22 | 36:12,15 55:13 |
| **front** 21:9 23:3 | 43:20 62:18 67:17 | 129:9 131:4 | 70:12 79:18 93:12 |
| 77:2 117:7,14 | 72:8 81:12 84:4 | 132:17 | **heard** 116:10,12 |
| 120:8 | 97:12 | **good** 14:2 117:18 | 118:13 |
| **fruition** 125:16 | **given** 62:14 86:3 | **goods** 57:7,17 | **hearing** 76:9 |
| 126:7 | 140:10 | **gotcha** 90:5 | **help** 109:18 114:7 |
| **fuel** 57:19 68:20 | **giving** 49:12 | **gotten** 52:21 | 114:23 |
| **fuels** 56:13,17,18 | 129:16 | **governs** 106:22 | **hereto** 139:4 |
| 56:21,24 57:17,21 | **glasses** 21:21 | **grand** 3:16 | **hertz** 54:6,10 55:2 |
| 57:25 58:22 | **global** 60:14,21,23 | **granting** 7:13,19 | 55:4,5,7,9,16 56:2 |
| **full** 47:17 | 60:24 61:2 118:3 | 81:16 102:3 | 57:7,15,15,25 |
| **funds** 33:21,23 | **go** 10:17 14:1 | **grants** 82:11 | 58:21 97:4 |
| 41:15 46:13 | 15:19 20:25 21:4 | **great** 9:15 29:6,15 | **hey** 111:14 |
| **further** 23:25 55:6 | 21:25 29:3 30:7 | 31:7 61:22 74:4 | **hillair** 4:3 5:10 6:7 |
| 134:15 137:14 | 38:17,21 40:19 | 82:7 121:11 | 17:20 19:2,4 |
| 140:11,15 | 41:7,10 48:16 | **group** 77:15,18 | 23:14 28:25 29:25 |
| **future** 66:7 67:23 | 50:18 58:13 63:21 | **groups** 91:17 | 34:2 36:9 39:24 |
| 72:8 129:10 | 65:18 70:14 72:12 | | 62:1 88:11,13 |
| | 72:14 73:9 75:7 | | 90:9,25 91:13 |

Veritext Legal Solutions
Exhibit 1 - page 155
866 299-5127

[hillair - iterations]

92:4 101:20
105:15,15 108:12
108:16,16,22
109:13 110:1,3,8
110:22 112:4
113:6,14,23,25
114:20,25 115:6
115:15,19,22
116:1 130:25
131:7,13,19
**hillair's** 19:22
35:21 83:11 89:4
89:7 90:8
**hines** 4:4,7 52:5,9
**hinges** 137:9
**historical** 83:10
**historically** 66:11
**historicals** 88:25
**hit** 78:13
**holder** 37:13
**holders** 48:9
**holding** 60:24 61:3
**holiday** 14:14
**home** 13:23,25
**hopefully** 23:16,19
23:22 74:3 81:12
137:18
**hour** 72:7 107:5,6
107:8 137:19
**hourly** 84:19
**hours** 71:24 85:8
**hundred** 57:11,12
76:9

**i**

**idea** 115:2 130:9
**identification** 8:15
20:10 28:20 41:23
42:12 43:23 61:17
76:25 81:22 97:17
99:8 100:14 102:9
119:6,23 132:21

**identify** 20:15
120:3
**ii.a.1** 39:4
**illinois** 3:10
**immediate** 135:10
**immediately** 135:8
**important** 10:2
12:4 117:23
**improper** 10:3
**inactive** 60:22
**inaudible** 114:9
**inbox** 93:14
**inclination** 54:13
54:16
**include** 75:3 76:2
91:1,7 111:11
**included** 75:14
82:15 83:3 85:5
87:13 88:17 89:16
89:18 92:7,8
104:15,19 112:17
**includes** 10:5 82:8
91:22
**including** 81:4
82:5 88:3 125:11
**inclusive** 67:13
**income** 64:11 67:5
75:3 111:3,7,11
**incomplete** 11:22
**incorrect** 11:22
120:21
**increased** 134:20
137:9,10
**incur** 26:7 28:4
**incurred** 26:11,22
92:1 98:5,6,12
**index** 5:1
**indicate** 25:21
26:4 126:9
**indicated** 49:9
106:20 115:6,22

134:10
**indicates** 31:22
**industry** 108:25
109:8
**inference** 10:19
95:16
**inflows** 64:1
**influence** 12:18
**information** 59:14
59:16 67:9 73:7
77:14 79:23 85:4
85:7,10,11,14,14
86:20 89:19
116:21 123:16
125:20
**initial** 19:8 126:12
**initialed** 139:4
**initially** 37:16
**inject** 115:7
**ink** 139:4
**inputting** 95:24
**inquiries** 83:8
84:8 124:18
**insight** 97:7
**installment** 47:22
**installments** 47:24
**instances** 116:24
**instruct** 27:13
**integrates** 102:19
**intended** 30:15
134:11
**intends** 52:25
53:17 54:10
113:25 116:8
**interact** 77:20
**interactions** 30:5
**interest** 50:7,14,19
50:22 51:6,9,13,14
86:7 116:3 125:13
125:17 126:15

**interested** 66:16
126:9 140:16
**interim** 7:13,19
39:24 79:4,5,8,17
79:17,19,20 81:3
81:16 82:4 84:2
85:5 93:1 98:17
102:4 103:10,19
103:23 104:9
105:10,19,20
106:2,16
**internal** 42:15
**internet** 52:6
**interrupt** 56:10
**interrupted** 58:13
**intervals** 47:20
**introducing** 120:3
**invest** 115:1
**investment** 130:17
**invoice** 93:5,7 94:3
94:4 95:9,19
**invoiced** 64:11
65:3,14,17 66:2,6
67:22 68:9
**invoices** 84:5,23
84:23 85:3,4
88:19,21 89:2,3,8
89:18,20,25 90:4,8
93:1,3 95:24
**involved** 15:14
29:17
**involvement** 15:17
**irs** 44:19
**issue** 21:7 85:20
**issues** 16:11,15,19
16:19 21:2
**item** 24:2,7 65:3
67:21 68:20,21
86:11 87:16 91:6
**iterations** 19:12

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 156

[january - look]

| j | know 10:25 11:6 | 123:6,24 130:24 | 68:17,20,21 86:11 |
|---|---|---|---|

**j**

**january** 18:16
70:16,22 71:6,15
76:22 78:1 87:7
87:10 94:14 95:17
95:20,21,23,25
96:2,15 98:14
117:13,14,20
**jennifer** 4:5
**jennifernassiri** 4:8
**job** 1:24
**john** 3:5 4:13
17:15 25:14 26:3
27:17 51:1,25
75:19 84:9,9 90:3
111:19,20,25
114:14 121:18
**joint** 5:8 6:5 28:24
61:25
**jointly** 1:6 2:6
**jpg** 4:16
**jsimon** 3:8
**july** 22:13 23:17
67:25 68:12,12
70:5,6
**june** 1:15 2:17 8:4
9:1 18:5,15 20:18
22:11 31:11,21,23
32:3 52:17 61:14
66:20,24,25 67:2
67:10 68:5,10,24

**k**

**kaufman** 17:20
19:6,11 23:13
24:22 29:24 88:15
88:16 108:19
**key** 109:18
**kind** 15:20 103:4
115:3,4

**know** 10:25 11:6
11:16,24 14:14
15:19,19,20,21
16:17,18,19,25
17:3 18:8,24
19:10 21:20 23:8
23:16,19 24:25
28:15 30:6 31:5
37:7 39:10,11,21
39:22 42:2 44:2
48:12 49:13,14
51:6 52:18,19
53:11,24 56:23
57:11,14,20 61:19
62:16,17,19 63:18
66:12,14 68:6,6
74:15 75:12 76:7
76:11 77:11 78:10
78:11,15,16,17,17
78:19 82:20,21,23
83:8,8,9 84:10,24
88:16,24 89:16,23
89:24 95:2,9,10,20
95:21 96:4 97:19
100:8 102:16
104:23 105:6
109:20 110:9
111:22 112:14,15
113:12 114:6,20
114:22,24 115:2
117:6 118:6
120:22 121:2,6,8
123:8 124:14,15
124:19,21 125:11
126:3,13,14,14,15
128:16 130:22,22
132:15,16,23
135:5,10,16
**knowledge** 28:9
30:3 55:8 56:25
110:5 122:21

123:6,24 130:24
134:3

**l**

**lag** 84:8
**language** 40:8,11
**lardner** 3:4 7:14
7:20 17:16 81:17
83:22 102:4,21,24
**large** 133:8
**late** 74:3 137:19
**law** 3:5,9,16 4:5
4:13 12:12
**lead** 29:21,23,24
30:3
**leave** 111:16
**led** 127:1
**legal** 23:20 32:14
32:18 38:1 39:5
39:19 40:16 41:3
45:10 46:17 47:1
48:3 50:3,23
51:17 58:10,15
64:6 65:10 86:8
116:23 122:13
**legs** 72:1
**lender** 17:18 88:7
88:11 91:6,21
92:3,4 94:24
95:18,20
**letter** 115:10
**letterhead** 5:14
**levene** 4:12 7:16
7:22 81:18 102:5
**lewis** 3:15
**liability** 43:19
**lime** 127:19,20,21
127:24
**limited** 38:19 39:1
**line** 21:16 22:5
24:2,7 31:8 64:10
65:3 66:2 67:20

68:17,20,21 86:11
87:16 91:6 97:25
111:22 114:13
**lines** 64:23 102:23
103:4
**link** 13:2,3 59:11
**list** 53:3,5,7,8,10
53:11,14,17,22
90:7 93:16
**listed** 56:12
**lists** 51:21 54:2
78:18
**little** 23:18 24:25
72:8 86:6 97:7
109:15 121:19
126:15 127:25
**live** 62:13
**llc** 4:3 7:16 15:6,7
102:5
**llp** 3:4,15 4:4,12
7:14,17,23 81:17
81:18 102:4,6
**lnbyb.com** 4:16
**load** 119:3
**loan** 115:12 116:3
**location** 129:23
**locations** 10:1
**log** 12:25,25
**logged** 20:23
**logistics** 2:14 3:14
**lone** 129:2 131:22
132:5,10,14 135:9
136:22 137:10
**long** 37:5 96:2
107:7
**longer** 75:13,16,20
75:23
**look** 23:24 29:10
44:9,24 54:23
58:25 64:25 66:19
82:2 84:21 86:5

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 152

[look - motion]

| | | | |
|---|---|---|---|
| 91:6 93:7,10 94:13,13,24 100:16 102:23 104:23 105:22 107:22 108:5 117:5 119:4,11,15 120:2 121:12 | **mark** 20:12 28:18 28:21,23 41:20,24 42:13 43:24 61:11 81:14 97:9 99:4 100:9 119:7,21 132:17 | **memory** 57:1 **mention** 112:7 **mentioned** 65:15 109:24 127:18 **messages** 10:6 **met** 59:23 60:4 | **moment** 33:4 41:8 41:12 44:25 47:13 51:24 72:11 107:25 **momentarily** 81:25 |

**looked** 34:8 39:15 79:5,22 104:16,18
**looking** 22:10 24:13 44:8 64:15 64:15 67:3 68:10 70:23 71:4,5 73:16 82:20 83:9 95:13 100:2 103:1 112:12 125:6
**los** 1:3 2:3 3:17 4:6 4:14
**lost** 108:1 109:3 112:21 127:3
**louder** 85:23
**lpp** 7:20
**lso** 8:10 129:2 132:18
**lunch** 72:6 106:23 107:12,14,16
**luxury** 22:9

**m**

**m** 4:13
**machine** 140:7
**mackenzie** 7:15,21 81:17 102:5
**main** 21:16
**making** 124:21
**management** 4:3 114:21,22
**managers** 76:7
**manner** 9:23 67:9
**march** 93:4,21,23 94:3 99:6,14

**marked** 8:14 20:9 28:19 41:22 42:11 43:22 61:16 76:24 81:21 97:16 99:7 100:13 102:8 119:5,22 132:20
**marking** 76:20 102:2
**mart** 109:19,24 110:8,22,25 111:3 111:7,11 112:5,19 125:12 126:2,13 127:12 128:23 136:9
**matter** 16:11 55:12,16 64:24
**matters** 9:16,18 15:8,12,13,17 16:2 16:4,7,10,16,20
**mean** 10:13 15:18 16:16 31:17 49:22 77:7 79:11 80:15 84:15 93:23 95:13 113:9,12 128:16 136:16
**meaning** 113:9
**means** 9:19 38:24
**meant** 27:20 30:13 113:17
**medication** 12:19
**meeting** 107:8 137:17,19
**members** 30:6
**memorable** 117:12,16

**mid** 13:17 112:13 115:3 121:23 130:16
**middle** 136:1
**mile** 8:10 112:13 115:3,3 130:16 132:18 136:1
**million** 33:8 34:12 34:19 35:12,18 36:3,16 37:17 38:7,11 39:8 40:24 67:17 69:15 69:16,24 70:8 71:7,9,17 74:20 86:17,22 87:14 91:11,16 104:5,13 105:7,10,11
**mind** 45:18
**mine** 102:14 133:9 133:15
**minus** 35:13 68:23 69:15
**minute** 21:1 36:22 43:20 49:7 58:1 71:25 74:8 81:12 108:1 113:5
**minutes** 34:8 52:13 133:1 137:18
**misleading** 32:23 45:9 46:25 123:12
**misspoke** 105:3
**misstates** 64:4
**model** 75:14 76:8 76:12

**monday** 1:15 2:17 9:1
**money** 37:15 128:9,13
**month** 15:22 20:2 22:16 23:10,10 24:13,15 25:1,2,3 66:15 83:19,20 84:11 87:5,6,7,10 87:22 89:22 92:16 93:25 94:17,18 95:11,17 98:2,12 99:14 100:21,22 100:23,25 101:5 110:10 130:5,12
**monthly** 17:6 39:24 78:23 83:4 83:4 104:19
**months** 14:8,13 15:22,22 16:1,5,13 16:22 17:23 22:17 22:18 23:4 24:12 25:2 59:1,25 60:6 84:12 88:24 89:21 90:1 93:22 95:8 101:25 110:6 117:24
**morgan** 3:15
**morganlewis.com** 3:18
**morning** 4:4 107:19 137:20
**moses** 17:17
**motion** 12:14

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 158

[move - okay]

**move**  51:23
**moving**  106:21
**mug**  85:22
**multiple**  62:19
  79:13 108:18
  113:4
**mute**  114:14

**n**

**name**  13:3 15:5
  140:19
**names**  112:8,9,18
  125:24
**napolitano**  88:20
  88:22 89:13 90:18
**nassiri**  4:5,7
  117:20
**neale**  4:12 7:16,22
  81:18 102:6
**near**  129:10
**necessarily**  27:20
  53:8 66:17
**necessary**  55:4
  78:19
**need**  10:23,24 29:9
  44:9 53:10 56:24
  95:8 119:15 120:1
  121:22 134:16
**needed**  56:16
  131:1
**negative**  68:25
  69:14 87:20
  122:22
**negotiated**  48:24
**negotiating**  29:17
**negotiation**  55:6
**negotiations**  55:9
  57:4
**negotiator**  29:21
  29:24 30:4
**neither**  140:15

**nemer**  88:20
**net**  98:14
**netted**  87:24
**network**  109:19
  112:11
**new**  3:6,6 76:6,7
  108:23 109:5,11
  109:13,25 110:4
  112:16 114:4,7,19
  115:2 123:9,21
  124:25 125:3
  134:21 135:6,7,13
**newport**  1:14 2:16
  9:1
**nice**  14:2
**nix**  4:4,7 52:5,9
**non**  39:24 86:7
**nope**  132:25
**noted**  138:9 139:4
**notes**  36:23
**notice**  32:25
**noticed**  89:5,8
**number**  5:7 6:2
  7:2 8:2 15:21
  30:20,20,21 52:2
  64:14 80:8,9
  84:13 87:1 94:20
  95:2,3,15 104:14
  117:24 129:10
  132:7 136:18,21
**numbered**  20:14
**numbering**  21:14
**numbers**  24:21,22
  24:23,23 30:22
  69:19 76:5 81:15
  82:19 103:18
  132:6

**o**

**o'keefe**  7:21 81:17
**oath**  9:5 12:12
  62:12,14,16 140:6

**object**  26:3
**objected**  27:12
**objection**  25:10,25
  27:6 32:11,18,22
  32:23 38:1 39:5
  39:19 40:15,16,17
  41:3 43:8 45:9,10
  46:17,25 47:1
  48:3,17,17 50:3,4
  50:11,22,23,24,25
  51:16,17 54:18,19
  55:20,21 64:4,5,5
  65:10,11,12 73:3
  96:25 116:18,22
  122:12,13 123:12
  123:14 136:23,24
  136:24
**objections**  10:13
**obligation**  40:5,5
  46:23
**observe**  9:25
**obtain**  88:14
  122:16 125:20
  131:15 135:13,19
  135:25
**obtained**  59:15
**occasionally**  85:18
**occur**  31:16
**occurred**  17:25
  107:16 110:12
**occurring**  55:19
**october**  134:9
**odd**  95:2,15 105:7
  105:11
**offended**  117:19
**office**  14:1,4,13
**officer**  13:14
  14:23 15:9 58:25
**offices**  14:7 59:9
**official**  4:11 5:10
  5:17,20 6:7 28:25

  62:1
**oh**  50:13 52:10
  56:7 64:15 86:3
  97:21 110:19
  133:4
**okay**  9:10 10:12
  10:23 13:13 14:3
  14:6,9 15:18,25
  17:10 18:3,7
  19:15 20:25 21:19
  22:24 23:24 28:17
  29:16 30:7 31:7
  35:17 36:16,23,25
  37:9,11,12 41:10
  41:20 42:20 43:13
  43:20 44:4,14
  45:2 46:9 47:11
  48:7 49:18,19
  52:10,21 53:7
  54:2,6,23,23 55:8
  55:17 56:9 57:14
  58:24 59:7 60:1
  61:5,11,21,21,22
  62:3 63:3,9,21,24
  64:20 65:2 66:16
  68:9,22 70:14
  71:14 72:14 74:4
  74:24 75:19 76:9
  76:14,19,20 77:20
  77:23 78:11 81:8
  81:10,14 82:2,10
  82:14 83:1 84:14
  86:2,4,15 87:16
  88:3,13 89:3,11
  90:6 93:15 94:13
  94:24 96:6 97:21
  97:22,23 99:4,11
  99:17,20 102:2,14
  105:18,24 106:19
  106:24 107:1
  108:7,11,15

Veritext Legal Solutions
866 299-5127

**[okay - payable]**

109:24 110:11,18
110:19,21 111:20
112:17 113:5
115:6 117:4,9,18
118:8 119:7,14,20
120:8,10 121:4,11
121:22,25 123:25
125:24 127:18
128:19,21 129:7
130:13 132:17
133:12,13,18
134:2,8 135:17
136:8 137:4,13,15
138:3
**olshan**  90:14,17,19
92:2 94:9
**once**  12:5 57:2
67:8 81:14 99:13
99:24 100:20
105:25 112:14
116:7 120:10
136:17
**ongoing**  136:5,12
**online**  59:12
**ontrac**  129:2,8,15
130:3 132:7 135:9
136:9,19 137:10
**open**  29:3,5 42:16
42:19 61:21 82:1
99:9 100:17
102:13 120:9
133:20,22
**opened**  119:13
**operated**  120:16
**operating**  68:18
68:23,24 76:21
77:6,14,21,23,25
78:2,4,6,23 79:23
82:14 83:5 85:25
86:7 90:25 91:4
92:7,8 94:14

95:14 96:3 97:10
99:5,20 100:10
101:2,4,10,16
102:20 104:15,22
105:3
**operation**  113:10
**operations**  14:15
19:13 124:21
**opine**  123:15
**opposed**  63:19
74:12 84:22 88:1
94:22
**order**  7:13,19 8:8
12:3 45:6,7 46:1,3
50:8,15 70:6 81:9
81:16 82:11 83:13
83:17 88:14 102:3
104:11 105:20
115:7 116:15
118:3 119:21
120:11 121:12
130:18
**orders**  80:7,20
**ordinary**  39:11
40:2
**original**  18:20
19:18,24,25 20:3
22:20,21 23:1
24:10,18,23,23
25:4,18 26:5
92:17 140:12
**originally**  24:8
25:18
**outflows**  64:2
**outline**  106:22,22
**outside**  58:17
**outstanding**  68:7
**overaccrual**  87:21
87:24
**overcapitalized**
122:11

**overestimated**
87:22
**overnight**  129:3
**overseeing**  17:3,4
**oversight**  16:25
**overtures**  128:21
**owned**  60:23
**owns**  60:21

**p**

**p.m.**  2:17 138:9
**package**  8:12
**page**  9:17 21:14,19
22:1 23:4 30:8,17
30:19,20,23 31:2
36:24 39:22 45:1
47:5,7,10 49:14
54:25 62:3,22,24
63:1 64:14,18,19
65:2 70:24 86:1,2
96:3 97:21,22
98:21 99:11,12,23
100:18,19 102:16
103:1,2,2,8,9
105:5,22
**pages**  1:25 5:7,12
5:15,18,21 6:2,9
6:12,17,22 7:2,6
7:11,17,23 8:2,5,8
8:12
**paid**  33:10,14
34:19 35:11,25
36:5 37:23 39:8
39:10,25 40:2,23
40:25 47:2,17,21
51:6 66:13 80:12
80:23 98:7,9
100:7 103:20,25
104:4 106:10,17
**pandemic**  66:12
**paragraph**  37:6
45:3,23 47:6

49:13 62:23 63:2
73:17 103:13
107:24,24 111:6
113:13
**paragraphs**
107:25 108:5,11
**pardon**  56:8
**park**  3:6
**part**  18:15 35:5
36:12 55:13 76:12
76:13 105:11
109:3 112:22
119:9,16 120:11
127:1,3,4
**partially**  14:11
**participants**  10:1
**participate**  77:5
**particular**  16:4,8
18:23 30:23 47:6
51:10 55:12,16
112:18
**parties**  9:21 31:12
89:6,8 135:16
**partners**  15:6,7
136:12
**parts**  118:2,6
**party**  140:17
**patrick**  4:13
**pause**  37:10
111:24
**pay**  25:22 26:6
27:3 33:24 34:12
35:4,18,20 36:17
37:13,21 38:7,12
40:13 41:15 45:7
45:13 46:3,6,13,16
55:4 56:17 80:8
91:12,17 97:5
103:14
**payable**  40:6 96:7
96:11,15,18,22

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 160

[payable - prior]

98:22,25 99:24
**payment** 33:6
  37:17 38:12 39:9
  40:2,24 69:24
  71:18 74:20 80:24
  91:11 104:4 106:5
  106:11
**payments** 47:20
  47:22 48:9,10,15
  48:22 49:23 50:9
  50:16 51:11,15
  65:8 67:4 104:10
**payroll** 40:5
**pays** 65:23 66:9
**pdfs** 22:10
**penalty** 12:10
  62:10,16,21,25
  139:2
**pending** 10:18
  11:1
**people** 59:4 71:25
  85:22
**percent** 16:3 57:11
  57:12 76:9 106:7
  124:5
**percentage** 15:25
**perfect** 16:24
**perform** 77:7
  124:21
**performance** 17:7
  63:17 76:16
**performed** 68:5
**period** 14:22 15:8
  22:18 23:8,18
  24:16 25:2,5,23
  26:7 27:25 28:5
  28:13 31:11,13,21
  31:23 32:3 64:2
  65:17,24 66:15,24
  67:23 68:5 69:1
  69:17,20 76:22

78:3 82:24 83:1
  92:20 97:10 99:5
  122:18
**periods** 70:6 99:15
**perjury** 12:11
  62:10,17,21,25
  139:2
**permitted** 35:4
  80:12,24
**person** 12:4 56:1
  59:24
**perspective** 23:20
  29:25 114:24
**pertaining** 16:2
**pertains** 140:11
**petition** 39:10
  47:18,23 49:21
  86:16 96:7,11,14
  96:18,23 98:25
  100:1 123:17
**phases** 62:19
**phone** 52:2,6
  111:17,22 114:16
**pick** 104:24
  137:19
**picks** 23:4
**pieces** 118:24
**pinpoint** 18:10
**place** 13:20,22
  60:8 114:22 140:4
**plaintiff** 3:3
**plan** 5:8 6:5 12:14
  14:16 17:2,11,12
  17:14 23:16 28:24
  29:8,9,10,12,17
  30:10,13,15,18
  32:9,16 33:5,12,16
  33:18,20 36:16,20
  39:4 40:7,8,20,21
  41:16 44:25 46:12
  47:23 48:1,11,16

48:23 49:6,18,20
  50:7,10,17,18,20
  51:20 52:14,14,16
  54:2,23 61:25
  70:5 71:22 73:16
  76:13 104:3
  106:12 112:14
  113:8,15,23 115:4
  115:14,17,19
  116:7,11 135:11
  136:17 137:9
**planned** 20:13
**planning** 72:5
**please** 10:25 11:5
  11:11,16,23 12:5
  21:20 26:16 27:11
  27:16 32:4 36:21
  45:18,19 54:21
  64:14 75:20 90:4
**plus** 67:16 98:18
**point** 51:2 52:22
  54:12,22 63:10
  67:20 68:7 86:21
  88:10,13 104:1
  106:11 119:1
  125:12 135:13,24
**pop** 97:12
**popped** 82:1
**popping** 81:24
**possession** 1:8 2:8
**post** 39:10 86:16
  96:7,11,14,18,23
  98:18,25 100:1
  108:12,17,22
  113:13 114:1,8,20
  115:8,16,18,18,20
  115:24 116:2
  131:3,4
**postpone** 107:9
**potential** 72:24
  73:12 109:25

112:4,18 113:2
  124:25 128:22
**potentially** 109:21
**precise** 95:3
  117:22
**precluded** 118:10
  118:13
**predicated** 92:16
**prefer** 120:5
**preference** 120:6
**preliminary** 9:16
  53:3
**preparation** 17:4
  77:6,21 78:10
  101:22
**prepare** 12:22
  13:5,10
**prepared** 18:17
  19:18 20:1 23:1
  26:25 27:1 78:6
  78:13,16 95:14
  115:7
**prescribe** 50:8
**prescribed** 48:11
  49:3,5
**prescribes** 33:20
**present** 50:1,8,15
**presented** 134:3
**pretty** 128:10
**prevent** 12:19
  116:16
**previous** 11:22
**previously** 133:22
**pricing** 120:17
**primarily** 17:17
  77:13
**print** 22:2
**prior** 11:25 32:9
  32:16 44:4 60:7
  62:14 66:24 68:5
  84:12 87:4,10,22

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 161

[prior - real]

87:24,24 90:1
99:15 100:25
101:25 122:20,24
135:10 140:5
**priority** 41:13,16
41:19,25 42:14
46:13 47:7,16
48:9,22 49:25
50:9,16,18
**privilege** 26:1 27:9
43:9,12 73:4
116:19
**privileged** 25:11
27:7 73:7 116:21
**probably** 16:3
30:7 42:25 94:21
106:22 110:13
124:6 133:13
**problem** 112:2
**procedures** 101:23
**proceed** 72:2
**proceedings** 140:3
140:5,7,13
**process** 53:24 78:5
78:7,8 79:3
**produce** 74:6
**produced** 127:23
**product** 127:20
**professional** 19:11
19:15,18 23:21
38:14,19 39:1,8,25
40:25 78:24,25
82:23 86:8 91:12
98:10 100:20
101:15
**professionally**
38:14
**professionals**
79:13,25 82:16
83:13,16 91:18
92:9 98:1 104:8

105:14 106:15
**progressed** 135:23
**prohibited** 118:20
**projected** 71:20
74:21 76:16
**projecting** 68:11
74:24
**projections** 17:3
63:5,9,14,16 73:18
73:23 74:7,9,10,11
74:16,19 75:2,7,13
75:17,20,23 76:4
76:10,14 111:5,9
111:12
**proof** 5:14,17,20
43:25
**proper** 67:19
**proposed** 5:9 6:6
18:21 22:21 24:8
24:18 28:24 31:10
31:22 62:1 63:18
**prospect** 135:8
137:11
**prospective**
136:12
**prospects** 113:2
124:25 136:17
**prove** 129:17
**provide** 28:3 57:7
57:9,18,19 73:22
78:21 84:9 108:22
115:23 116:2
130:3 131:14
**provided** 10:20
31:12 59:16 77:11
90:19
**provider** 8:3,7,11
119:8
**providing** 12:20
108:16 115:17,20
131:1,7

**provisions** 29:12
49:16
**public** 44:1
**published** 76:11
**pull** 44:9
**purpose** 16:15
75:15 134:4
**purposes** 70:4
71:11 82:14 111:2
111:5
**pursuant** 36:6
52:16
**put** 117:7

| q |
| --- |

**q1** 110:13,20
**q1/2020** 110:15,18
**quarter** 110:19
**question** 10:18,19
11:1,2,5,7,8,12,12
11:14,14,15,16,22
12:6,7 15:16
25:13,14,15 26:3
27:10,12,16,17,18
37:8 38:9 40:19
45:18,22 46:10
47:14 48:8,19
50:13 51:12 54:15
54:21 55:23 65:18
66:19 73:10 82:3
113:18,20,22
118:19 120:25
121:4 126:20
128:11 133:24
137:2
**questioning** 29:9
72:25 73:12
111:23
**questions** 29:7,11
60:1 64:22 77:9
77:12 107:18

**quick** 82:2
**quickly** 116:9
**quiet** 14:2
**quinn** 4:4 90:10,21
91:1,7,23
**quinnemanuel.c...**
4:8,8
**quote** 54:2 113:14

| r |
| --- |

**radio** 126:18,21,21
126:23,24
**ran** 66:4 137:17
**range** 75:13,16,20
75:23
**rate** 50:7,15,19,22
51:6,9,13,14
**rates** 84:19 116:3
**rationale** 23:12
**reach** 52:3 109:18
110:8 112:11,15
113:1
**reached** 110:1
113:3
**reaching** 112:20
112:23
**read** 11:7 26:13,18
36:16 37:5,7,11
39:21 45:16,19,21
47:13 48:1 53:14
62:6,20 67:19
69:12 82:6 107:25
109:1,2,4 119:24
139:2
**reading** 21:22
37:6 40:20 48:5
86:17,23 102:19
**reads** 31:9
**ready** 56:10
**real** 71:20 76:12
85:22

[realize - representative]

**realize** 11:21
**realizing** 125:10
**really** 37:5 64:24
66:16 75:13,15
76:5,10 111:14
117:23 118:2
120:2
**reasking** 45:18
**reason** 10:24,25
120:19 121:5,25
122:7,9 123:2,20
125:15 126:23,25
127:16
**recall** 19:10,14
23:11 44:7 54:4,7
57:22 73:19 81:2
81:5,6 93:21 94:7
118:1,12,16 128:7
128:21,25 134:8
**receipt** 10:6 95:23
**receipts** 6:15,20
7:4,9 78:18
**receive** 10:2,3 50:1
66:3,7 83:12,16
88:21 89:1,3,11,25
90:15,21 95:19
110:24 129:14
132:4
**received** 12:24
32:24 83:24 84:15
84:15,23 88:19
89:20,24,24 90:8
90:17 92:10,13,18
92:22 93:3,5,8
94:4 95:9,16
133:3,4
**receiving** 129:15
**recess** 72:13
107:12
**recognize** 119:16

**recollection** 23:7
24:24 91:2 101:14
128:1,4
**record** 10:4,5,14
10:15,17 20:11
21:1,3,5,6 26:18
37:7 39:3,18 41:7
41:9,11 45:21
72:12,15,17 73:15
107:10,14 109:4
119:2 137:23,25
138:2,4,8 140:6,9
**recorded** 80:15,18
84:11
**records** 59:10,12
61:8 78:19
**reduced** 23:9,21
23:22 24:12,15,22
24:22 25:1,19
**reduction** 23:12
25:8
**reductions** 19:21
**refer** 21:14 23:3
32:6 64:14
**referred** 34:5
75:24 84:20 111:6
111:9
**referring** 15:13,15
31:20 63:10,14
66:3 70:18 92:25
93:1
**reflected** 67:5
**reflects** 63:25
**refresh** 56:25
**refreshing** 61:20
**regard** 41:18
43:17 60:20
109:13,16 129:8
129:13
**regarding** 6:11
13:7 20:16 25:8

25:17 27:2 28:10
43:4,7 56:21
59:15 72:19,22
73:12 77:21 85:7
114:4 120:20
123:3
**regional** 8:10
**regular** 56:23
104:19
**reject** 54:10
**relate** 44:15
**related** 13:14
39:18 48:8 108:24
109:7
**relationship** 16:5
16:22 60:18
128:14
**relative** 140:16
**relatively** 14:15
**releasing** 73:7
**relied** 76:18
**rely** 76:15 119:18
121:2
**relying** 58:14
59:15
**remainder** 69:20
73:13
**remember** 13:3
24:20 117:10
125:24 136:14
**remote** 9:12,19
13:2
**remotely** 14:18
**rendered** 65:25
66:8
**renders** 65:24
**renegotiation**
56:21
**reorganization** 5:9
6:6 12:14 14:16
17:2,11,13,14

28:24 61:25 137:9
**reorganized** 46:16
46:24
**repaid** 27:21
**repayment** 49:20
**repeat** 11:6 26:14
26:14,15 85:12
114:10,17
**rephrase** 11:6
55:22
**report** 59:4 76:21
77:6,14,21 78:2,6
78:15,16 79:23
85:25 88:5,18,22
92:8 94:14 95:14
96:3 97:10 99:5
100:10 101:2,4,10
101:16,22 105:2,4
**reported** 1:21
**reporter** 2:18 11:7
26:13,15,18 45:19
45:21 72:1 85:12
85:19 109:4
114:10 140:1
**reports** 17:6 59:1
59:1 77:24,25
78:4,10,23 82:15
83:5 90:25 91:4
92:9 99:20 102:20
104:16
**represent** 16:19
16:20 120:10
**representation**
119:18 120:4
121:1
**representations**
120:20 121:3,5
137:7
**representative**
84:13

Veritext Legal Solutions
Exhibit 1 - page 163
866 299-5127

representatives 134:10
represented 119:20 120:13
request 73:22 74:5 109:17
requested 109:12 140:14
requesting 79:25
require 130:17
required 40:6 52:15
requirements 51:7
reserved 31:13
resolved 97:5,6
respect 9:17 15:18 16:7,12 17:21 19:5,11,17 26:9,20 32:25 47:20 51:7 55:10 58:4,24 59:14 62:18 78:4 80:4,15,18 84:14 90:25 91:21 94:5 101:22,24 104:7 106:14 108:13 127:11,13 131:7 138:5
respective 40:4 50:19
respond 116:21 125:2 135:4
responded 110:22 133:20,22
response 124:17 125:8
responsibilities 55:25 57:3 58:8
responsibility 57:5
responsible 56:1 58:8 77:13

rest 70:12
restate 48:19 50:13
restrictions 9:20
restructuring 13:14 14:23 15:3 15:9 22:2 24:1 58:25 69:6,10
result 9:20 23:20
retained 15:7
return 111:23
revenue 42:15 76:2,5 128:18 132:10
review 10:6 13:10 21:11 42:6 77:8 78:21 118:8 140:13
reviewed 77:11 93:4,6 101:4 108:7,10 117:2
reviewing 17:5,6 137:24 138:5
richard 3:15 31:2 52:5 56:6 73:25 108:1 111:14 133:7
richard.esterkin 3:18
right 9:10 12:22 15:15 17:10 18:9 20:5,11 21:13,23 21:25 22:5,15 25:7 28:22 29:6 30:17 32:1 33:3 39:14 41:12 42:4 44:8,24 46:9 47:5 48:7,14 49:24 51:20 52:12 55:22 57:2,23 58:19 62:4 64:25 67:3

67:24 68:22 69:3 71:9,23 72:16 73:15,21 74:1,8 77:13 79:16,21 83:12 84:6 85:1 85:24,24 87:12 88:11,18 89:9 90:3 91:10 92:6 93:18 94:19,19 95:12 96:2 97:9 97:24 98:11,15,19 99:21 100:2 101:1 102:15,18 103:3 103:11 104:5,21 105:16,18 107:13 107:22 109:10 111:25 112:3 113:16 116:14,17 117:22 118:1,23 127:25 130:15 131:21 133:23 134:8 135:12 137:22
rights 31:12
rmr 1:22 140:23
role 29:20 78:6,8 78:11
room 9:24 10:8
roughly 18:14
routes 64:12 65:3 65:7,9,14,15,17 66:2,4,6,7,23,24 67:1,4,14,17,22 68:9 129:10,14,17 129:18,19,19,23 130:4,7 131:24 132:4,7,11 136:18 136:21
run 66:23,25 67:1 129:23

running 14:15 89:1
ryan 1:22 2:18 140:23

s

saying 35:1 37:12
says 21:15 38:16 55:1 62:4,24 63:4 66:20 68:17 69:10 103:14 113:13
schedule 52:15 72:9 78:24
schedules 53:15
scheduling 107:11
scoobeez 1:6 2:6 3:3 13:14 14:7,13 14:21,23 15:10 16:2,6,7,12,22 29:21 35:4 55:25 57:3,8,18 58:7,20 59:1,9,9,11,15 60:14,14,21,21,23 60:24 61:2 65:7,8 65:23 66:3,4 68:4 76:7,8,21 77:16,18 79:9 80:8 92:8 109:12,17 110:3 110:24 112:5,19 112:25 113:3,7 115:7,24 116:15 118:10,14,20 119:17 120:16 121:16 122:1,16 122:23 123:4,8,21 124:4 126:1,10,11 127:7 129:1,14 130:3,7,18,25 132:4,11 134:5,10 134:11,15,16,21 135:8,14 136:13 136:17

Veritext Legal Solutions
Exhibit 1 - page 164
866 299-5127

[scoobur - someone's]

scoobur  60:14,22
  61:5
scooter  126:4
  127:18 128:2,14
  128:14,23 136:9
scott  17:1,20 19:6
  23:13 43:2 59:3
  88:15 108:19
screen  61:20 81:24
  97:13 133:5,6
scroll  49:6,14 91:3
scrolling  47:9
  49:18
season  14:14
second  21:16 42:6
  42:10 48:25 79:17
  79:20 82:4 97:12
  105:19,19,20
  107:21 120:11
section  24:1 36:20
  36:23 37:1 39:4
  40:12,21 47:18
  48:6,13 49:3,4,12
  68:14,19 86:5,6
secure  83:10
secured  17:18
  88:7,11,11 91:6,21
  92:3,4 94:24
  95:17,20
securities  7:16
  102:5
see  20:5,8,20,21
  21:1,17 22:3,7
  24:3 28:17 31:14
  37:2 43:13 49:15
  49:15 63:7 64:13
  65:4 74:6 76:4
  81:8 85:22 86:9
  86:13,18 94:16
  96:8,13,19 103:7
  105:8 109:19

121:14 133:15,25
seeing  100:3,4
seek  118:14 125:3
  135:5
seeking  114:4
  118:10,20 134:4
seen  128:1 132:15
  133:2,18,24
send  78:24
sending  129:9
sense  98:6,9 128:5
  128:8 131:10,17
  131:18 134:20
sent  78:15,21
sentence  31:8,22
  37:4 47:16 63:15
separate  61:8
september  23:9,21
  121:13 122:2,18
  123:9,22
sequentially  20:14
series  29:7 118:3
seriously  58:20
serve  74:5 89:5
served  14:22
  84:22 89:7 90:18
service  8:3,7,10
  42:15 118:3 119:9
services  57:7,17
  65:23,24 66:8
serving  13:13
session  4:4,5
set  25:17 26:5
  27:21 28:11 48:12
  49:20 50:20 91:18
  140:4
sets  79:11
seven  66:14 87:14
shane  17:17
share  13:1 20:23
  20:24

shared  19:1
sheet  98:10
sheikh  17:1 43:2,4
  43:7,10 58:16
  59:3,17 60:1,2,5
  124:10 135:1
sheltering  13:20
  13:22 60:8
shorthand  2:18
  140:1,7
show  18:9 20:6,13
  42:9 70:17 76:15
  80:6,6 91:4,5
  118:23 127:22,23
  127:24
showed  44:4 84:16
showing  22:10
  67:10,24 68:10,15
  97:25 98:11,16,22
  99:13,24 133:9
shown  105:14
shows  22:11 56:13
  63:16 64:10 70:15
  70:21 71:3 86:15
  94:14 96:10,17
  105:25 106:2
sic  70:22 94:18
side  17:19
signature  30:9
  62:4 140:22
signed  12:13 30:10
  30:12 39:14 48:16
  48:23 61:13,13
  62:7,9 123:10
  132:13
significant  130:17
signing  62:10
  137:24 138:6
silence  126:22,23
silent  126:19,21,24

simon  3:5 17:15
  25:10,15,17,25
  27:6,12,18 31:2
  32:11,14,18,22
  38:1 39:5,19
  40:15 41:3 43:8
  45:9 46:17,25
  48:3,17 50:3,11,23
  51:2,16 54:18
  55:20 56:6,8 64:4
  65:10 72:21,24
  73:3,6,11,21,24
  74:3 84:9,9 90:5
  96:25 108:1,6
  111:14,19 112:1
  116:18 122:12
  123:12,14 133:7
  133:15 136:23
  138:6
simultaneous
  49:10
sit  15:23
sitting  93:11,14
situation  14:9
six  110:6
small  8:11 21:22
  129:10,17,19
  130:3 131:24
  132:7 136:18,21
smart  128:17
smoothly  14:15
social  9:20
software  15:20
sole  123:18
solve  21:7
solvency  122:4
somebody  51:25
  56:10 77:17
  117:14
someone's  114:13

[somewhat - take]

**somewhat** 20:13
**soon** 134:12 137:5
**sorry** 10:3 16:14
  26:12 31:3 34:9
  35:15 36:2,12
  42:18 51:11 52:8
  52:10 55:13 56:4
  58:12 63:1 70:11
  70:23 75:9,10
  79:18,24 80:17
  86:22 93:12 94:17
  103:1,2,2 105:1,3
  108:9 109:1
  110:14,16 112:21
  114:10 126:10
  127:3 133:21
  137:17
**sort** 85:4 108:21
  136:16
**sound** 128:16
**source** 41:14
  46:12 68:2 75:3
**sources** 112:4
**south** 3:16 4:6
**southern** 129:24
**speak** 12:4 85:23
**speaking** 49:10
  52:8 111:18
  135:17
**speaks** 40:15
**special** 84:21
**specific** 29:11
  113:20,22 120:18
  127:9,11 129:25
  131:12
**specifically** 45:3
  45:22 46:6 50:20
  78:22 107:23
  135:17
**specifics** 113:19
  118:5

**specified** 54:3,25
**specify** 44:15 76:5
**speculate** 96:24
**speculation** 51:16
  54:18 55:20 96:25
  97:1 136:23
**spend** 52:12
**spent** 16:1 23:23
  84:18
**stamp** 30:19,21,22
**stand** 130:13
  131:21
**standpoint** 16:17
  19:13 114:19
**star** 129:2 131:22
  132:5,10,14 135:9
  136:22 137:10
**start** 11:15 17:10
  51:11 106:21
  107:15 109:10
  112:15 124:3
  125:5 129:16
  130:7 132:1
**started** 130:18
  131:25
**starting** 11:12
  12:6 24:14 53:5
  67:20 70:15 77:25
  130:10
**starts** 37:12 74:21
**state** 34:16 46:6
  139:8 140:2
**stated** 74:11 75:24
**statement** 17:3
  44:16 92:18,21,24
  92:25 93:19 94:22
  95:4,6,17 104:25
  105:1 120:22
**statements** 10:5
  78:20 79:2 80:16
  80:19 82:21 83:13

83:17 84:1,14,21
  84:21,25 89:15
  90:15,17,19,20,21
  92:10,12,13,15
**states** 1:1 2:1
**stations** 120:16,18
**status** 135:22
  136:3
**stay** 137:5
**steps** 116:15
**stipulation** 6:11
  18:5,12,20 20:16
  63:12,23 64:17
  70:24 138:5,7
**stopped** 136:6,7
**straight** 107:5
**stream** 50:8,15
**street** 4:6
**stretch** 71:25 72:1
**strike** 28:7 33:18
  51:21 59:19
**subject** 16:10,11
**submitting** 79:3
**subscribed** 140:18
**subsequent** 23:17
**substance** 23:15
  43:6 72:19 108:20
**substantial** 57:12
  123:9,21
**substantially**
  57:13
**substantive** 74:14
**success** 137:8
**sufficient** 25:22
  26:6,10,21 27:3
  63:5
**suggest** 71:24
  106:23 110:3
  125:5
**suggested** 113:7

**suite** 4:14
**sullivan** 4:4
**sum** 68:18
**summarize** 136:16
**supplement** 11:24
  107:18
**support** 6:3 61:24
  73:16 84:1 108:4
  113:7,9,10,10,11
  113:15,24,25
  114:7 115:23
  131:11,14
**supporting** 131:19
**supposed** 31:24
  33:10,14,24 34:12
  35:11,18,20 36:3
  36:17 40:23 41:15
  48:23 49:25 50:22
  69:24 91:11
**sure** 9:16 12:5
  13:4 14:25 16:18
  20:7 23:6 26:17
  28:22 30:25 34:10
  34:17,21 35:19
  36:22 38:22 42:7
  48:2 49:8,17 52:1
  64:15 65:19 94:11
  102:18 114:5
  118:5 121:20
  124:21 126:5,23
  126:24 127:16
**suspect** 94:21
**suspend** 111:23
**switch** 33:3
**system** 13:4
  130:16 133:9

t

**take** 10:23 34:23
  36:20 44:24 47:13
  54:24 58:1 62:13
  67:17 68:22,23

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 166

[take - track]

69:15 70:8 71:17
71:24 72:5 81:6,9
82:2 88:25 102:21
106:23 107:22,25
116:15 119:14
120:4 133:1
**taken** 2:13 140:3
**talk** 19:15 41:12
51:23 52:12 74:8
77:23 103:17
107:11 108:11
137:24
**talked** 57:23 69:23
73:17 114:4
136:10
**talking** 52:13
**talks** 47:7 64:11
96:6
**tamar** 17:18
**target** 126:3,8,8
126:13 127:10,13
128:23
**targets** 76:5
**tax** 5:15 41:13,16
41:19,25 42:1,14
44:10 46:13 47:7
47:16 48:9,22
49:25 50:9,16,18
51:5
**taxes** 44:15
**taxing** 51:7,10,10
51:14
**technical** 21:2,7
**telecommunicati...**
2:15
**teleconference** 3:1
4:1
**telephone** 59:22
60:3
**tell** 47:14 78:12
88:16 127:6 130:2

**telling** 125:3
**template** 24:10
**ten** 71:25
**tend** 85:16
**tenure** 58:24
**term** 116:3
**terminate** 116:8
134:11
**terminated** 137:5
137:6
**termination**
116:17
**terms** 8:3,7 33:5
33:18 40:4 46:11
49:21 52:14 104:3
116:2 118:3 119:8
134:21
**test** 13:1,3
**testified** 9:6 29:16
44:18 91:10 92:6
101:24 136:8
**testifying** 12:11
14:3 62:13 140:6
**testimony** 12:10
12:20 26:24 40:22
72:20,22 139:5
140:9
**texas** 43:25 44:22
**text** 10:6
**thank** 36:15 52:10
86:25 96:1 108:6
112:1 117:21
137:16,16,22
138:8
**thing** 37:6 74:18
90:6 97:25 105:13
106:14 127:14
**things** 16:23 33:23
114:3 120:17
130:13 131:21

**think** 12:24 17:17
18:16 21:6 22:24
24:20 30:7 39:16
56:6 62:19 74:1,6
74:10,21,22 85:19
97:11 114:12
117:12,20 121:7,9
125:9 126:4,13
127:14 128:4
129:2,3 130:10
131:25 132:6
137:13
**thinking** 52:25
**third** 31:8
**thirds** 22:1
**thought** 48:25
84:12 117:11
**thoughts** 53:17
**three** 15:22 16:1,5
16:12,22 22:16,18
34:3 36:1 42:25
53:21 57:23 59:1
60:11,18 61:9
90:16 91:17 118:2
118:6
**thursday** 93:5
**time** 12:4 14:6,8
14:22 15:8,19
16:1 18:22 23:17
23:22 24:25 25:23
29:8 32:10,16
44:4 53:4 54:22
56:25 59:23 60:4
60:7 65:24 66:15
67:23 68:8 70:6
72:6 75:6 78:13
79:14 84:8,18
86:21 92:20 95:14
99:24 100:7 104:1
104:24 106:11
107:1 111:15

117:4 119:14,15
122:1,25 123:4
124:23,25 125:3
130:19 132:12
133:8 135:13,24
137:17 138:9
140:4
**timely** 32:7
**timing** 48:8 130:8
130:22
**tinos** 3:9 117:7,10
**tinos.diamantatos**
3:12
**today** 12:10,20
13:11 14:1,3
15:23 74:3 101:9
133:25 135:7
137:7
**today's** 12:23 13:7
93:16
**told** 78:13 118:14
118:19 122:23
125:22 126:21
128:5
**tolls** 97:4
**tomorrow** 101:9
137:20
**tony** 88:20 90:18
**top** 21:14 64:10
74:18 94:8 96:6
136:14
**topics** 33:3
**total** 68:18 69:10
86:21 88:23 96:10
98:16 99:18
102:24 103:10,15
104:15 105:6
106:2,15
**totals** 100:21
**track** 78:25

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 167

[tracking - waiting]

tracking 78:23
transcribed 140:8
transcript 12:3
    138:6 139:3
    140:12,14
transportation
    108:25 109:8
    112:13 113:1
treasury 42:15
treatment 48:1
trends 83:10
trouble 85:18
    86:23
troubles 52:6
trucks 57:19
true 36:9 87:21
    95:9,22 98:14
    99:14 100:24
    104:7 105:13
    106:14 139:5
    140:9
trued 95:8 104:19
trueing 95:24
trust 33:11,12,15
    37:15,16 45:7,15
    46:3,15,21
trustee 37:13,21
    40:13
try 11:13 85:22
    111:16 113:19
    133:10 135:5
trying 14:16 16:21
    30:25 35:24 69:12
    85:2 113:17 121:7
    121:9 127:25
turn 21:13,19
    30:17 36:24 45:1
    47:5 62:3,22 96:3
    100:18 102:15
    105:18

turned 87:23,25
twenty 31:3,4
two 15:22 22:1
    24:11 25:2 31:4
    32:1 36:2 42:25
    51:21 54:2 59:4
    60:25 64:24 71:24
    79:8,11,11 90:9
    93:22 104:23
    127:20

**u**

uber 129:4 130:14
    130:15,16,20
    131:2,8,14 136:9
ultimate 33:20
un 35:20
uncertainty 123:3
undercapitalized
    122:1,5,8,10
undersigned 140:1
understand 10:10
    10:21 11:3,5,9,18
    12:1,8,16 29:13
    31:1 34:9,17,21
    35:1,9 36:1,2
    46:12 49:24 55:24
    57:2 58:7 67:8
    79:3 90:9 91:22
    116:7 120:24
    130:14
understanding
    30:13 39:7,17
    41:6,14,18 44:11
    44:21 47:19 48:14
    48:21,24 50:14,21
    53:20,20,21 55:3
    56:17 58:3 60:17
    60:20 85:18 92:1
    96:21 100:6 101:7
    110:16,21 113:24
    116:14 118:9

122:15 125:15
    128:13 129:19,22
    130:6,11 132:1,3,9
understood 62:9
unidentified
    137:11
united 1:1 2:1
unopened 93:15
    93:16
unpaid 33:24
    34:18 35:20 36:17
unprofitable
    128:20
unsecured 4:11
    5:11 6:8 29:1 45:8
    45:13,14 46:3,7
    62:2
updated 8:4
upload 100:11
ups 98:14 100:24
urgency 134:21
urquhart 4:4
use 6:12 20:17
    30:22 106:1
utilized 38:12
    41:15 91:12

**v**

vague 32:22 48:18
    51:3 65:12 122:12
    123:14 136:24
valid 43:18 44:12
    44:19,22
validity 43:14
value 50:1,8,15
vans 57:9,10,13
variance 106:7
varied 83:19,20
various 17:6,19
    51:10
vendor 40:4

verbal 10:7
veritext 12:25
    13:8
version 19:19 23:1
versions 18:24
    19:1
versus 53:9
vertical 113:1
verticals 108:24
    109:7 112:13
video 2:15 3:1 4:1
view 51:14 102:11
    134:23 135:1,3
viewpoint 104:18
virus 13:21
visited 14:6,12
voice 85:17
volume 1:16 2:13
    5:3 132:3 139:11
voskanian 17:1
    18:18,21 19:8,19
    20:1 22:22 23:1
    24:8,19 52:3
    55:11,15,17 56:1
    56:23 59:3,16,21
    59:24 77:19,20
    78:9,12 97:7
    124:9,12,17,24
    125:21 126:25
    127:6 128:5
    129:12,13 130:2
    132:2 134:24
    135:12,25
voskanian's 57:5
    125:2

**w**

w 3:15
wacker 3:10
wait 11:11,13 12:5
waiting 42:10
    81:11 100:11

Veritext Legal Solutions
866 299-5127

Exhibit 1 - page 168

[waiting - zoom]

101:11 119:3
**waived** 27:9
**waiver** 27:15
**waiving** 43:11
**wal** 109:19,24
110:8,22,25 111:3
111:7,11 112:5,19
125:12 126:2,13
127:12 128:23
136:9
**want** 10:18 16:18
26:14 47:13 54:24
56:10 64:21 91:5
96:24 102:18
103:17 107:17
114:7 119:24
120:2 121:8
125:25
**wanted** 113:19
**way** 2:14 18:15
22:1 34:16 54:13
54:16 67:19 69:21
113:9 115:15
121:6 123:6,24
**ways** 113:6
**wb** 1:5,6,7 2:5,6,7
**we've** 14:16 17:22
43:20 57:23 71:23
114:3 124:20
**wear** 21:21
**week** 66:8,25 67:2
67:14,25 68:12,24
69:11 70:16 71:13
**weeks** 42:25
130:11
**weird** 97:23
**weiss** 1:13 2:13
5:3 6:3 9:4,10
21:8 29:3 31:5
41:12 44:2 62:4
72:16 73:6 107:15

108:4 133:18
134:2 137:14
139:1,10
**went** 18:14,24,24
73:15 107:5
126:18,20,21,24
135:5
**west** 3:10
**whereof** 140:18
**willing** 131:11,13
**winding** 23:19
**witness** 2:15 3:3
5:2 10:14,16,20
11:21,21 20:7,21
25:14,16 27:17,19
32:24 38:4 39:7
39:21 41:6 42:16
43:13 45:12,16
46:5,20 47:2 48:5
50:5 51:1,5,18
65:14 85:13 97:3
99:9 107:1,8
108:7 111:19
114:12,17 116:24
117:16,21 119:24
120:6 121:18
123:13,15 133:12
137:15,20 138:7
140:18
**witness's** 138:5
**witnesses** 140:5
**word** 54:24 81:7,9
**words** 47:21 59:10
112:7
**work** 8:8 15:1
16:17 23:18 53:24
68:4 84:16,19
85:9 89:16,17
118:3 119:21
120:11 121:12
125:13

**worked** 16:5,23
17:12,14 18:11
**working** 13:4,23
13:25 14:21 16:12
17:1 81:13 108:12
**works** 20:8
**wrong** 86:3 103:2
133:14

| x |
|---|

**x** 34:25 35:12

| y |
|---|

**y** 35:8,13
**yeah** 28:22 31:1
34:1 36:23 38:14
48:20 66:16,22
71:5 82:8 97:12
97:23 98:6,25
103:6 104:17
113:3,22 120:22
133:17,20 135:15
135:15
**year** 23:5 117:13
**years** 47:17,22
48:11 49:21
**yoo** 4:12 7:17,23
81:18 102:6
**york** 3:6,6

| z |
|---|

**zoom** 114:15,16

Page 26

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit 1 - page 170

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit 1 - page 171

# EXHIBIT 2

Exhibit 2 - page 172

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                 LOS ANGELES DIVISION

 4

 5     _____

       In re:                        ) No. 2:19-bk-14989-WB

 6                                    ) Jointly Administered:

            SCOOBEEZ, et al.,        ) 2:19-bk-14991-WB, and

 7                                    ) 2:19-bk-14997-WB

            Debtors and Debtors )

 8            in Possession.         ) Chapter 11

       _____)

 9

10

11

12

13

14          DEPOSITION OF GEORGE VOSKANIAN

15              Glendale, California

16            Monday, June 15, 2020

17                   Volume I

18

19

20

21    Reported by:

22    CATHERINE A. RYAN, RMR, CRR

23    CSR No. 8239

24    Job No. 4137303-2

25    PAGES 1 - 116
```

Page 1

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                 LOS ANGELES DIVISION

4

5     _____

      In re:                      ) No. 2:19-bk-14989-WB
6                                  ) Jointly Administered:
           SCOOBEEZ, et al.,       ) 2:19-bk-14991-WB, and
7                                  ) 2:19-bk-14997-WB
              Debtors and Debtors  )
8             in Possession.       ) Chapter 11
      _____)

9

10

11

12

13            Deposition of GEORGE VOSKANIAN, Volume I,

14    taken on behalf of Amazon Logistics, Inc., by way of

15    video-telecommunication with the Witness appearing in

16    Glendale, California, beginning at 2:39 p.m. and ending

17    at 5:40 p.m., on Monday, June 15, 2020, before CATHERINE

18    A. RYAN, Certified Shorthand Reporter No. 8239.

19

20

21

22

23

24

25

                                                    Page  2

```
 1    APPEARANCES VIA VIDEO-TELECONFERENCE:
 2
 3   For Plaintiff Scoobeez, Inc. and the Witness:
 4
          FOLEY & LARDNER LLP
 5        BY:  JOHN A. SIMON
          Attorney at Law
 6        90 Park Avenue
          New York, New York  10016-1314
 7        (212) 338-3603
          (212) 687-2329 Fax
 8        jsimon@foley.com
 9        BY:  TINOS DIAMANTATOS
          Attorney at Law
10        77 West Wacker Drive
          Chicago, Illinois  60601-5094
11        (312) 324-1145
          (312) 324-1001 Fax
12        tinos.diamantatos@foley.com
13
14   For Amazon Logistics, Inc.:
15        MORGAN LEWIS & BOCKIUS, LLP
          BY:  RICHARD W. ESTERKIN
16        Attorney at Law
          300 South Grand Avenue, 22nd Floor
17        Los Angeles, California  90071-3132
          (213) 612-2500
18        (213) 612-2501 Fax
          richard.esterkin@morganlewis.com
19
20
21
22
23
24
25   //
```

Page 3

```
 1   APPEARANCES VIA VIDEO-TELECONFERENCE (Continued):

 2

 3   For Creditor Hillair Capital Management, LLC:

 4        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          BY:  JENNIFER NASSIRI

 5        Attorney at Law
          865 South Figueroa Street, 10th Floor

 6        Los Angeles, California  90017
          (213) 443-3659

 7        jennifernassiri@quinnemanuel.com

 8

 9   For Creditor Committee, Official Committee of Unsecured
     Creditors:

10
          LEVENE NEALE BENDER YOO & BRILL LLP

11        BY:  JOHN-PATRICK M. FRITZ
          Attorney at Law

12        10250 Constellation Boulevard, Suite 1700
          Los Angeles, California  90067-6253

13        (310) 229-1234
          (310) 229-1244 Fax

14        jpg@lnbyb.com

15

16

17

18

19

20

21

22

23

24

25

                                            Page  4
```

```
 1                           INDEX
 2    WITNESS                                  EXAMINATION
 3    GEORGE VOSKANIAN
      Volume I
 4                    BY MR. ESTERKIN                    7
 5
 6                          EXHIBITS
 7    NUMBER              DESCRIPTION              PAGES
 8    Exhibit 0001 "FIRST AMENDED CHAPTER 11 JOINT PLAN    38
 9                 OF REORGANIZATION AS PROPOSED BY THE
10                 DEBTORS, HILLAIR AND THE OFFICIAL
11                 COMMITTEE OF UNSECURED CREDITORS"; 69
12                 pages
13
14    Exhibit 0005 "DECLARATION OF BRIAN WEISS IN SUPPORT   54
15                 OF CONFIRMATION OF FIRST AMENDED
16                 CHAPTER 11 JOINT PLAN OF
17                 REORGANIZATION AS PROPOSED BY THE
18                 DEBTORS, HILLAIR AND THE OFFICIAL
19                 COMMITTEE OF UNSECURED CREDITORS"; 6
20                 pages
21
22    Exhibit 0006 "Fifth Stipulation Regarding Continued   32
23                 Use of Cash Collateral"l 14 pages
24
25    //
```

Page 5

```
1                    EXHIBITS (Continued)

2    NUMBER                DESCRIPTION                PAGES

3    Exhibit 0010 "CHAPTER 11 (BUSINESS), I. CASH        45

4                 RECEIPTS AND DISBURSEMENTS, A.

5                 (GENERAL ACCOUNT*)"; 19 pages

6

7    Exhibit 0016 Email series, "Subject:  RE:           88

8                 Bristol-Scoobeez"; Bates

9                 SCOOBEEZ-0002340 - SCOOBEEZ-0002341

10

11   Exhibit 0018 Email series dated November 19, 2019,   91

12                 "Subject:  RE: EXT: Scoobeez - Last

13                 Mile Delivery Service Provider"; Bates

14                 SCOOBEEZ-0002342 - SCOOBEEZ-0002343

15

16   Exhibit 0019 Email series, "Subject:  RE: OnTrac     92

17                 RSP Qualification - Scoobeez Inc.";

18                 SCOOBEEZ-0002353 - SCOOBEEZ-0002356

19

20   Exhibit 0022 "LSO FINAL MILE, REGIONAL SERVICE       81

21                 PROVIDER AGREEMENT (B2B and B2C Small

22                 Package Delivery)"; 37 pages

23

24   (Exhibits 0002-0004, 0007-0009, 0011-0015, 0017, and

25        0020-0021 were not marked for identification.)

                                              Page  6
```

```
 1              Glendale, California; Monday, June 15, 2020

 2                        2:39 p.m.

 3

 4                   GEORGE VOSKANIAN,

 5    having been administered an oath, was examined and

 6    testified as follows:

 7

 8                        EXAMINATION

 9    BY MR. ESTERKIN:

10       Q    Okay.  Mr. Voskanian, my name is

11    Richard Esterkin.  I'm an attorney for Amazon Logistics.

12    I'm here to take your deposition today.

13            First, a brief explanation as to how we're

14    going to conduct the deposition.

15            We're taking this deposition via remote means

16    due to restrictions on social distancing as a result of

17    the coronavirus epidemic.  All parties have consented to

18    the taking of the deposition in this manner.  Because we

19    are not all in the same room, we cannot all observe

20    everything that happens in each of the participants'

21    locations.

22            I would like to caution you that it is

23    improper for you to receive any communications while we

24    are on the record, other than statements that are made

25    on the record.  This includes your receipt or review of
```

Page 7

1    text messages, emails, or other communications, such as

2    verbal gestures that anyone else in the room with you

3    may make during the deposition.

4            Do you understand that?

5        A    Yes.

6        Q    Okay.  And just for the record, I did read

7    your deposition transcript from the first time you were

8    deposed in connection with the Scoobeez bankruptcy, and

9    I know, during the course of that deposition, you were,

10   from time to time, consulting, I believe, your iPhone or

11   your personal device to try to be helpful in terms of

12   providing information, but I'm going to ask you not to

13   do that in connection with this deposition.

14           Do you understand that?

15       A    Yes.

16       Q    Okay.  Also, for the avoidance of doubt, the

17   restriction on what everybody is saying doesn't apply to

18   any objections that counsel may assert on the record or

19   that you can't consult with your counsel when we are off

20   the record.  If you'd like to go off the record, please

21   let me know that, and once you've answered whatever any

22   pending question is, we can do that, and you can either

23   take a short break, or, if you need to, you can consult

24   with your counsel.

25           Do you understand that?

Page 8

```
 1        A    Yes.
 2        Q    All right.  We are not -- and, also, just to
 3   be clear, we will not go off the record while there's a
 4   question pending; because if we do that, an inference
 5   could be drawn that we've gone off the record at your
 6   request so that you can obtain an answer to the question
 7   from some source other than your own memory and that
 8   what we're getting is testimony from that other source
 9   as opposed to from your memory.
10             Do you understand that?
11        A    Yes.
12        Q    If you don't understand a question, please let
13   me know that, and I will repeat or rephrase the
14   question, or we can have the court reporter read the
15   question back.  If you answer a question, I am going to
16   assume that you understood the question.
17             Do you understand that?
18        A    Yes.
19        Q    Please wait until I have finished asking a
20   question before starting your answer to the question.  I
21   will try to wait until you've completed your answer to a
22   question before asking the next question.  If you have
23   not completed your answer to a question before I ask the
24   next question, please let me know that, and I will allow
25   you to complete your answer.
```

Page  9

1          Do you understand that?

2      A    Yes.

3      Q    Sometimes, during the course of a deposition,

4  a witness will realize that an answer that the witness

5  gave to a previous question was incorrect or incomplete.

6  If that happens during this deposition, please let me

7  know that, and I will allow you to correct or supplement

8  your prior answer.

9          Do you understand that?

10     A    Yes.

11     Q    In order that we have a clean transcript, it

12  is important that only one person speak at a time.  So,

13  once again, please be sure to wait until I have

14  completed my question before starting your answer to the

15  question.

16          You understand that?

17     A    Yes.

18     Q    Your testimony today is under the penalty of

19  perjury, the same as if you were testifying in a court

20  of law.

21          Do you understand that?

22     A    Yes.

23     Q    Are you currently under the influence of any

24  medication, or is there anything else that would prevent

25  you from providing your best testimony today?

Page 10

```
 1        A     No.

 2        Q     Okay.  Is there any reason not to proceed with

 3   your deposition at this time?

 4        A     No.

 5        Q     All right.  Did you do anything to prepare for

 6   today's deposition?

 7        A     Other than the instructions, just looked over

 8   my notes, understanding the -- well, obviously I

 9   prepared, yes.

10        Q     All right.  What did you do to prepare?

11        A     I received instructions, what we've covered,

12   and I went through the documents that I have in my

13   possession and just looked over them.

14        Q     And by "the instructions," you mean the

15   instructions technically about how to access the Zoom

16   conference?

17        A     Zoom conference and also the topics that would

18   potentially be covered.

19        Q     And what did you look at with respect to the

20   topics that would potentially be covered in the

21   deposition?

22             MR. SIMON:  Objection.  Attorney-client

23   privilege.

24             THE WITNESS:  Oh.

25             MR. SIMON:  To the extent that there's a way
```

Page 11

1 | you can answer the question without revealing

2 | attorney-client privileged information, you may answer.

3 |        THE WITNESS:  New clients and what the

4 | business is doing to diversify revenue.

5 | BY MR. ESTERKIN:

6 |    Q    You understood that that would be the topic of

7 | today's deposition?

8 |    A    Approximately, yes.

9 |    Q    And how did you come to that understanding?

10 |        MR. SIMON:  Objection.  Attorney-client

11 | privilege.

12 |        To the extent you can answer without revealing

13 | attorney-client privileged information, you may do so.

14 |        THE WITNESS:  We -- well, I understand this is

15 | what this deposition is about, roughly.

16 | BY MR. ESTERKIN:

17 |    Q    And my question was:  How did you come to that

18 | understanding?

19 |    A    We had a discussion about that.

20 |    Q    And with whom did you have that discussion?

21 |    A    Our attorneys.

22 |    Q    And the name of the attorney that you had that

23 | discussion with was what?

24 |    A    John Simon.

25 |    Q    All right.  And how many discussions did you

Page 12

1   have with Mr. Simon regarding the subject matter of

2   today's deposition?

3        A    Two.

4        Q    Okay.  And was anybody else present during

5   either of those conversations?

6        A    No.

7        Q    And when was the first of those two

8   conversations?

9        A    A specific date?  Last week.

10       Q    And how long did that conversation last?

11       A    A couple hours.

12       Q    Okay.  And when was the second of those

13   conversations?

14       A    Yesterday.

15       Q    And how long did that conversation last?

16       A    Roughly, about a couple hours.

17       Q    So altogether you spoke with Mr. Simon for

18   about four hours regarding the deposition; is that

19   correct?

20       A    Give or take.

21       Q    And did you look at any documents to prepare

22   for today's deposition?

23       A    As I said, I just reviewed general documents

24   surrounding this topic.

25       Q    And what general documents did you review?

Page 13

```
 1        A     My communication with potential customers.

 2        Q     Emails and such?

 3        A     Correct.

 4        Q     Did you review any text messages?

 5        A     I did not communicate via text messages, to my

 6   knowledge, with clients.

 7        Q     Okay.  And other than the emails with

 8   potential customers, did you look at any other

 9   documents?

10        A     Some models that we internally prepared, yes.

11        Q     And what was being modeled in those internal

12   models?

13        A     When you talk to outside parties, they give

14   you some sort of a rough estimate of what the numbers

15   would look like, and you run the numbers internally

16   whether it makes sense or not.

17        Q     So just to -- I'm just trying to understand

18   exactly what you're talking about.

19              So just to take a hypothetical example, so

20   you're talking to a customer and the customer says,

21   "Okay, you know, we may be interested in doing business

22   with you.  If so, here's how we would be able to

23   compensate you," and then you go back and run a model to

24   determine whether or not that compensation would be

25   sufficient to enter Scoobeez in doing business with the
```

Page 14

```
 1    potential customer?

 2         A    Correct.

 3         Q    Okay.  And which customers did you receive

 4    financial information from that enabled you to run

 5    models?

 6         A    OnTrac, LSO, and -- yeah, that's it.

 7         Q    Just the two?

 8         A    Yep.

 9         Q    Okay.  And, then, how did they forward to you

10    the foot -- strike that.  Let's talk about OnTrac first.

11              OnTrac forwarded you financial information

12    regarding a potential business relationship with OnTrac;

13    is that correct?

14         A    Correct.  Yes.

15         Q    And when did they do that?

16         A    Months ago.  Early 2020.  Conversations began

17    late 2019, but they sent stuff after year-end.

18         Q    So January, February 2020?

19         A    Approximately, yes.

20         Q    Okay.  And how many different communications

21    did you receive from OnTrac regarding financial

22    information?

23         A    It's just a guess.  Five to ten.

24              MR. SIMON:  George, don't guess.  You can't

25    guess.
```

1           Objection.  To the extent it calls for

2    speculation, I object.

3    BY MR. ESTERKIN:

4        Q    Okay.  Mr. Voskanian, your counsel raises a

5    good point.  So let's just be clear.

6           You know, if I were to ask you how many

7    bedrooms there are in my house where I'm taking this

8    deposition right now, you wouldn't know the answer to

9    that because you've never been to my house, right?

10       A    Yeah, I guess.  Yeah.

11       Q    Okay.  And so, I mean, you might kind of

12   speculate that I probably don't have 20 or 30 bedrooms

13   in my house, but it would just be speculation because

14   you don't have any information about that, right?

15       A    Correct.

16       Q    Okay.  On the other hand, if I were to ask

17   you, as I just did, how many different communications

18   you got from OnTrac regarding financial information,

19   since you were the recipient of the information, you

20   probably have -- you have some information about that,

21   and you would be able -- you can estimate how many

22   different communications they did -- you received, which

23   is what you did, five to ten, and an estimation is fine.

24   A speculation is not fine.

25           So it's your testimony that you believe you

                                                    Page 16

1    received something in the neighborhood of five to ten

2    communications from OnTrac regarding financial

3    information; is that correct?

4         A    Correct.

5              And some was on the phone, yeah, so I guess,

6    to distinguish, you folks sent out emails.  We received

7    five to ten emails.  There were phone calls, follow-ups,

8    so on, so forth.

9         Q    Okay.  How many of the five to ten were

10   emails?

11        A    All of them, but there were phone calls

12   surrounding those.

13        Q    Right, but what I'm asking you is about the

14   financial information.

15             So how many emails did you receive from OnTrac

16   that contained potential -- financial information

17   regarding the potential relationship?

18        A    Again, five to ten; because, look, I'm not in

19   the habit of sitting there and counting emails.  So my

20   guess is -- it's a rough estimate of five to ten.

21        Q    Right.

22        A    So if you want, I can count to you right now

23   and come back with an exact number.  I just don't have

24   it.

25        Q    No.  That's fine.  We don't need to hold up

                                        Page 17

```
1    the deposition while you do that.  Five to ten is fine.

2            And you said there were phone conversations

3    with OnTrac as well, correct?

4       A    Correct.  Yes.

5       Q    And you had those phone conversations with

6    OnTrac, correct?

7       A    I did, yes.

8       Q    Okay.  And did you take any notes during those

9    conversations?

10      A    Typically, no, because they're around the

11   numbers, so whatever was in the model, those are my

12   notes.  So, no, I don't take notes.

13      Q    When you say that you ran a financial model,

14   how did you go about doing that?  Was it an Excel

15   spreadsheet?  Was there some other program, or was it

16   something you just did by hand?  How did you run a

17   financial model?

18      A    Excel spreadsheet.

19      Q    And how many financial models did you run with

20   respect to the OnTrac relationship?

21      A    Just one.

22      Q    And do you still have a copy of that financial

23   model?

24      A    I do.

25      Q    Okay.  And did you also receive financial
```

Page 18

1    information from LSO?

2        A    I did.

3        Q    And was that over -- was that via emails?

4        A    There were phone conversations about the

5    numbers, but, yes, by email.  Yes.

6        Q    Okay.  And how many emails did you get from

7    LSO regarding financial -- financial information?

8        A    Up to five.

9        Q    So one to five?

10       A    Yes.

11       Q    And those were emails that you, yourself,

12   received, correct?

13       A    Either -- no.  They were forwarded to me from

14   Scott Sheikh.

15       Q    Okay.  And did you have any phone

16   conversations with people at LSO?

17       A    I was on one conference call, but I'm not the

18   main point of contact for that relationship.

19       Q    When was the one call that you were on?

20       A    I can't remember the date, but this was

21   last -- within the last 30 days.

22       Q    And so who was on that call besides yourself?

23       A    It was me, Scott, and a few folks from LSO.

24       Q    How many LSO folk?

25       A    Two.

Page 19

1          Q     Do you recall their names?

2          A     One of them was Jason, and the other one I

3     can't remember the name.

4          Q     Okay.  Do you recall Jason's last name?

5          A     No, I don't.

6          Q     Okay.  And did you also run a modeling with

7     respect to the LSO financial information?

8          A     I did.

9          Q     And that was also on an Excel spreadsheet?

10         A     Correct.

11         Q     And do you still have that Excel spreadsheet?

12         A     I do.

13         Q     When you were preparing for this deposition,

14    did you go back and look at the financial -- the -- the

15    emails regarding financial information that you saw from

16    OnTrac?

17         A     I did, yes.

18         Q     Okay.  Did you also go -- did you also go back

19    and look at the Excel spreadsheet that you prepared with

20    respect to OnTrac?

21         A     I did.

22         Q     Okay.  Same question with regard to LSO.

23               Did you -- in your preparation for today's

24    deposition, did you go back and look at the emails that

25    you received respecting LSO?

Page  20

1       A    Yes.

2       Q    Okay.  And you also went back -- did you also

3  go back and look at the Excel spreadsheet that you

4  prepared with regard to LSO?

5       A    Yes.

6       Q    Okay.  So I believe, before we got into the

7  details of OnTrac and LSO, that I was asking you what

8  documents you looked at to prepare for today's

9  deposition.

10          Other than the documents that we have

11 discussed regarding OnTrac and LSO, did you look at any

12 other documents?

13      A    That's a broad question.  As far as for this

14 deposition, other than OnTrac, no.  So I looked -- yes,

15 I did.

16      Q    Okay.  What other documents did you look at to

17 prepare for today's deposition besides the LSO and

18 OnTrac documents that we've already discussed?

19      A    My communication with other potential clients.

20      Q    Okay.  What other clients are you referring

21 to?

22      A    Bristol Farms, Uber, Wal-Mart.

23      Q    Have you completed your answer?

24      A    Yes.

25      Q    Okay.  Are you aware that we served a request

Page  21

1    to produce documents on Scoobeez so that we could obtain

2    documents in advance of this deposition?

3        A    Yes.

4        Q    And did you participate in gathering the

5    documents that were produced as a result of that

6    response?

7        A    I was not the person who was gathering them,

8    but, yes, I was asked to put documents, and I provided

9    them.

10        Q    Did you supervise the -- the individuals who

11    were responsible for actually gathering the documents?

12        A    No.  As I said, I was not the one gathering

13    the documents.

14        Q    Who was the one gathering the documents?

15        A    Scott.

16        Q    Scott Sheikh?

17        A    Yeah.

18        Q    And how do you know that Mr. Sheikh was the

19    one gathering the documents?

20        A    He was asking for documents from me.

21        Q    So he told you that the document request had

22    been received, and he asked you to provide him with

23    copies of any of the documents that would be responsive

24    to those -- to the requests; is that right?

25        A    Correct.  And whether he was gathering or

Page 22

1    John Simon or in combination, I'm -- I'm not sure, but

2    my point of contact was him initially.

3        Q    Okay.  And you provided documents to

4    Mr. Sheikh; is that correct?

5        A    Correct.

6        Q    What documents did you provide to Mr. Sheikh?

7        A    The email communications you were talking

8    about, some of our financials.

9        Q    So it's your testimony that you provided

10   Mr. Sheikh with copies of these emails regarding the

11   financial information provided by OnTrac; is that

12   correct?

13       A    That's not at all what I just said, but I said

14   the email communications and some of our financials.

15       Q    Correct.

16            And my question was:  And you've testified

17   that you received -- I believe it was five and ten.  Let

18   me go back and look at my notes -- yeah, between

19   five and ten emails from OnTrac that contained financial

20   information regarding a potential business relationship

21   with OnTrac, and I'm asking you whether you provided

22   those emails to Mr. Sheikh in response to the document

23   request.

24       A    I did, and those -- I don't know how they come

25   to you.  Did they come to you in the form of a PDF, or

Page 23

1    did they come to you in the form of an email?  Because

2    if they come to you in the form of an email, then you

3    would have the attachments within them.  If they came to

4    you as a PDF, then you would not have those videos -- I

5    mean the attachments.

6         Q    Okay.  Well, right now I'm not -- I don't want

7    to -- I'm just trying to find out what you did in order

8    to respond to the document request, and --

9         A    I gathered all the information that I had

10   between the customers.

11        Q    Okay.  Did you also provide Mr. Sheikh with

12   copies of the Excel spreadsheet in which you performed

13   modeling with respect to OnTrac?

14        A    You're talking about the models they provided,

15   or the models that I prepared?

16        Q    The model that you prepared.

17        A    I don't believe so.  I'll check and get back

18   to you.

19        Q    Okay.  And then with respect to LSO, you said

20   that you got between one and five emails from them with

21   financial information.

22             Did you provide those emails to Mr. Sheikh?

23        A    I did.

24        Q    And when you provided the emails, they had

25   whatever documents were attached to them, correct?

Page 24

1        A    Correct.

2        Q    And the same thing with regard to the OnTrac

3   emails?  To the extent there were documents attached to

4   the emails, you provided the attachments to Mr. Sheikh,

5   correct?

6        A    Correct.

7        Q    Did you provide Mr. Sheikh with a copy of the

8   Excel spreadsheet on which you modeled the financial

9   information that you received from LSO?

10       A    If I received it, yes, it was included.  If I

11  prepared it, again, I'll have to check and get back to

12  you.

13            MR. ESTERKIN:  John?

14            MR. SIMON:  Yes.

15            MR. ESTERKIN:  We did not receive any of that

16  financial information along with the documents that were

17  produced.  I would appreciate it if you could go back

18  and try to figure out why that happened, and if -- and

19  provide us with that -- those documents once you've

20  ascertained that.

21            MR. SIMON:  Right.

22            And just to be clear, I mean, what I was -- I

23  was following the conversation, and it sounded like that

24  there might not have been provided the models that

25  George prepared, but the financial information that LSO

                                                  Page 25

1  and OnTrac provided, that was produced to you?  Do you

2  know, or no?

3           MR. ESTERKIN:  No.  No.  I believe the

4  witness's testimony is that he's unsure whether his

5  models were provided to Mr. Sheikh -- I think they

6  should have been -- and produced, but they weren't.

7           And, secondly, the witness's testimony, I

8  believe, is that he provided both -- he provided the

9  emails from both OnTrac and LSO to Mr. Sheikh for

10 production, along with the attachments.  I'm going to

11 show him some of the emails later on in the deposition,

12 but I can tell you right now that none of the

13 attachments were provided, in other words, none of the

14 financial information.

15          MR. SIMON:  Okay.  I will follow up on that

16 ASAP.

17 BY MR. ESTERKIN:

18     Q    Okay.  Mr. -- I almost called you

19 Mr. Ohanessian.  I apologize.

20          Mr. Voskanian, we've now -- we've now talked

21 about some document review.  We've now talked about two

22 meetings you had with Mr. Simon.

23          Is there anything else that you did to prepare

24 for your deposition today?

25     A    That covers it all, yeah.

                                          Page 26

1      Q    Okay.  Great.

2           I understand that you're currently the chief

3    financial officer for Scoobeez; is that correct?

4      A    Yes.

5      Q    When did you first assume that title?

6      A    July 2017.

7      Q    And was that when you first became employed by

8    Scoobeez?

9      A    That's when I came on board, yes.

10     Q    And you became the co-CEO of Scoobeez on or

11   about May 1st, 2019, correct?

12     A    Correct.

13     Q    And that was about the time that

14   Mr. Ohanessian departed from Scoobeez, correct?

15     A    Correct.

16     Q    Could you just briefly describe for me what

17   your duties had been as the chief financial officer for

18   Scoobeez?  And let's just say from the time that the

19   bankruptcy petition was filed in April of 2019.

20     A    You mean what I did here?

21     Q    Yeah.  What --

22     A    I'm not sure I'm following.

23     Q    -- do you do as an employee of Scoobeez?  What

24   are your areas of responsibility?

25     A    Areas of responsibility is oversee the

                                                    Page  27

1   finances of the company, whatever that entails, and

2   oversee operations, personnel -- every aspect of the

3   business.

4       Q    And I understand that the other co-CEO is

5   Mr. Sheikh, correct?

6       A    Correct.

7       Q    What is the division of responsibilities, if

8   there is one, between you and Mr. Sheikh?

9       A    On -- on the financial side, it's just -- it's

10  me; he's not involved -- versus he oversees more closely

11  the HR and legal aspects of it.  And operations and

12  overall strategic decisions are split, you know, between

13  him and I, and we -- before we make decisions, we

14  discuss items.  As you can imagine, we have about a

15  thousand employees, and we're the only C-level people in

16  the company.

17      Q    In terms of attempting to attract new

18  business, is there -- are either one of you, or

19  Mr. Sheikh generally, more responsible for that aspect

20  of the company?

21      A    We're both involved.  He does whatever he can.

22  I do whatever I can.  If we identify a target, we make

23  sure we talk about it and see if we have any

24  connections, and we try to focus on it, you know,

25  individually, so we don't reach out -- you know, both of

                                        Page 28

1    us reach out to the same company and the same person,

2    but whether, like, we have more luck or not, like, is a

3    different story, but we're both involved in that.  Like,

4    it's not my responsibility or his responsibility.

5         Q    Is one of you more or less involved in seeking

6    new business than the other?

7         A    No, we're both involved.  No, he's trying as

8    much as I am.

9         Q    You're aware that, as part of the bankruptcy

10   case, operating reports need to be filed with the

11   bankruptcy court every month; is that correct?

12        A    Yes.

13        Q    And what is your role in preparing the

14   operating reports?

15        A    I oversee the process.  And I prepare them.

16        Q    And you run those by Mr. Weiss before they're

17   filed, correct?

18        A    Correct.

19        Q    So in terms of actually preparing the report,

20   you're the one who, for want of a better term, finalizes

21   the report, submits it to Mr. Weiss for his review and

22   approval, assuming no changes.  Then it gets filed with

23   the court; is that right?

24        A    Correct.

25        Q    And if he has comments about it, the two of

Page 29

1    you talk about it, correct?

2         A    Correct.  Correct.

3         Q    Okay.  And the actual information in the

4    report is derived from Scoobeez' books and records,

5    correct?

6         A    Correct.

7         Q    The operating reports have a line on them

8    where it reports the professional fees that are being

9    incurred in connection with the bankruptcy case.

10             Are you familiar with that?

11        A    Yes.

12        Q    And can you tell me how -- let's just take the

13   debtors' counsel as an example.

14             How are those figures arrived at?

15        A    It's a complicated process.  It's approved by

16   the parties who have, you know -- who have authority to

17   approve them.  Then as time goes by, whatever work is

18   done is -- billing statements, and Brian Weiss oversees

19   that process.

20        Q    I'm sorry.  So Brian Weiss oversees that

21   process?

22        A    Correct.

23        Q    So when you prepare the initial draft or the

24   initial -- of an operating report, you don't complete

25   that portion of it?  You give that to Brian and let

                                              Page 30

1    Brian complete that portion of the report; is that

2    correct?

3        A    Correct.  That portion is provided to me, and

4    that goes into the reports.

5        Q    And it's provided to you by whom?

6        A    Brian.

7        Q    The reports also have an area where it talks

8    about the accounts payable.

9            Do you recall that?

10       A    Correct.  Yes.

11       Q    And that's just pulled from the accounting

12   records of Scoobeez; is that correct?

13       A    Correct.

14       Q    You're familiar with the fact that, in order

15   to utilize alleged cash collateral, Scoobeez is needed

16   to file stipulations with the court to obtain orders,

17   correct?

18       A    Correct.

19       Q    And those stipulations contain budgets that

20   reflect how much money Scoobeez anticipates collecting

21   and how much it's permitted to spend, correct?

22       A    Yes.

23       Q    And could you briefly describe for me the

24   process by which those budgets are created.

25       A    Budgets are created by me with specific line

Page 31

```
 1   items, such as professional fees provided by Brian, and

 2   a budget goes to interested parties, such as Hillair and

 3   unsecureds, and there's a process by which the -- there

 4   are meetings, agreements, discussions, and then it's

 5   finalized.

 6            MR. ESTERKIN:  Okay.  I'm going to show you

 7   what we're going to mark as Exhibit 6.

 8            And give me a second.  I'll tell you what that

 9   is.

10            THE WITNESS:  Okay.  Do I go to Exhibit Share?

11            MR. ESTERKIN:  Yeah.

12            THE WITNESS:  The folder is empty.

13            MR. ESTERKIN:  It will be there in a minute, I

14   think.

15            (Exhibit 0006 was marked for

16            identification.)

17            MR. ESTERKIN:  Exhibit 6 is the Fifth

18   Stipulation Regarding Continued Use of Cash Collateral

19   filed at Document No. 786 in the bankruptcy case.

20       Q    You should be able to see that now.

21       A    Okay.

22       Q    Now, it --

23       A    I'm looking at it now.

24       Q    Okay.  Great.

25       A    Yep.
```

Page 32

1    Q    What I'm interested in is not just the

2    stipulation, it's the budget, which starts --

3    A    Okay.

4    Q    You see it starts with page 7 of 14?

5         Do you have that?

6    A    I do.

7    Q    Okay.  So I'm going to probably be showing

8    you, during the course of the deposition, a number of

9    documents that have been filed in the bankruptcy case.

10   They all have these ribbons at the top that reflect the

11   case number, the document number, and then on the

12   bankruptcy docket, et cetera, and then, underneath that,

13   it says:  "Main Document Page 7 of 14."  I'm going to

14   try to use those page numbers consistently throughout

15   the deposition so that you can go to a specific page as

16   opposed to any page numbering that may actually be in

17   the document itself.

18        Do you understand that?

19   A    Yeah.

20   Q    Great.  All right.

21        Do you recognize this as the most recent cash

22   collateral budget?

23   A    Correct.

24   Q    Okay.  And you prepared the initial draft of

25   this, correct?

Page 33

```
 1        A    Yes.

 2        Q    And then it was circulated to Hillair and the

 3   committee for comment, correct?

 4        A    Yes.

 5        Q    And so my question is:  Do you recall any

 6   changes that were made to this budget as a result of

 7   that review process by either Hillair or the committee?

 8        A    Professional fees.  I left them blank because

 9   I saw they were populated.

10        Q    Okay.  Anything else that you recall as being

11   changed from the initial draft that you prepared?

12        A    We reduced the legal amounts, and we moved the

13   collections period because Amazon had put us to

14   seven-day period payout, and then they circulated an

15   email saying they would go to 45-day, and we didn't know

16   when that 45-day was going to hit.  So that collections

17   number moved back and forth to different weeks.

18        Q    Okay.  Any other changes that you recall from

19   your initial draft?

20        A    Not that I recall.  I think that covers

21   everything.

22        Q    Okay.  Why did the vehicle disbursements

23   change?

24        A    Historically, we were under budget.  So you

25   wanted to be more on target.
```

Page 34

1      Q    You increased the amount of the vehicle

2   disbursements, correct?

3      A    We reduced them.

4      Q    Excuse me.  Okay.

5           And so you testified Mr. Weiss populated

6   the -- that area, restructuring cash flows with the fees

7   for the professionals, correct?

8      A    No, I did not say that.  I said I sent it to

9   him.  I don't know who populated it.  It could have been

10  him.  It could have been someone else.  I don't know who

11  did it, but he was the final.

12     Q    Got it.

13          Do you recall any changes being made to those

14  line items from which the budget was originally

15  populated?

16     A    Originally it was blank.  So it was populated

17  by some -- we sent it -- I sent it blank, and it was

18  populated.

19     Q    Okay.  I understand that.  So it was initially

20  populated with some numbers.

21          And my question is:  Once it was initially

22  populated with some numbers, did those numbers change

23  between that point in time and the final budget that

24  you're looking at?

25     A    I think it was changed, because there was an

Page 35

```
 1   error in the rows' alignment, but it was not an

 2   intentional change, but between secured and unsecured

 3   attorneys, I think the rows were all messed up, because

 4   it's just a big spreadsheet, small, you know, fonts, but

 5   nothing was changed, intentionally, later.  It's just,

 6   unintentionally, rows were all screwed up, and then they

 7   were fixed --

 8        Q    Okay.  So that this --

 9        A    -- between unsecured and -- yeah.

10        Q    Okay.  So the substance of the document wasn't

11   changed; it was just that what was intended wasn't

12   displayed properly, correct?

13        A    Correct.  Yes.

14        Q    And that's the only change in this area of

15   restructuring cash flows that you can recall?

16        A    That I could recall, yes.

17        Q    All right.  My understanding is that there's

18   three different entities that are in bankruptcy.

19   There's Scoobeez Global, Scoobur, and Scoobeez; is that

20   correct?

21        A    Scoobeez, Scoobeez Global, Scoobur.

22        Q    Okay.  And what's the relationship between

23   those three entities?

24        A    Scoobeez is the operating entity where their

25   model is tied to.  Scoobeez Global was the parent
```

Page 36

1    company that Hillair's note was pulling through, no

2    operations.  And Scoobur was a company entity that was

3    set up years ago.  Predates me.  I believe it was the

4    company that was acquired back in 2014, '15.  It's never

5    had operations for the time that I've been here.  It's

6    just a company that's just been sitting there.

7           But, initially, whatever goals they had -- and

8    I'm not sure what they were, but that's how the Global

9    and operating were set up; that the Global was a parent,

10   and the loan came through Global, but it didn't have any

11   operations.  Operating Scoobeez -- just Scoobeez itself

12   is the operating company that has all the ins and outs

13   of operating cash flow.

14       Q    And does -- do each of Scoobeez, Scoobur, and

15   Scoobeez Global have separate books and records?

16       A    Scoobeez -- yes, they all do, except for

17   Scoobur.  We don't -- since there's nothing in it, we

18   don't have any QuickBooks.  We just -- we do the monthly

19   operating reports, and it's just bank fees, like,

20   literally, 14 bucks a month, and every three months we

21   pay the trustee fee.

22           MR. ESTERKIN:  Okay.  I'm going to show you

23   what we're going to mark as Exhibit 1.  That is the

24   Amended Plan of Reorganization in the -- the bankruptcy

25   cases.  It's filed as Docket No. 754.

Page 37

```
 1              (Exhibit 0001 was marked for

 2              identification.)

 3              MR. ESTERKIN:  And that should be --

 4              THE WITNESS:  Do I refresh on -- okay.

 5   BY MR. ESTERKIN:

 6        Q    Let me know when you can see it.

 7        A    I can see it.

 8        Q    Okay.  Great.

 9              Just, generally, do you recognize this as the

10   Amended Plan of Reorganization that's currently before

11   the court?

12        A    If nothing has changed, yes, I do.

13        Q    Okay.  And did you take any part in the

14   negotiations leading up to this plan?

15        A    No.  When you say "any," I don't know what

16   "any" means, but directly I was not involved.

17        Q    Okay.  And who was involved on behalf of

18   Scoobeez, if you know?

19        A    It must have been Brian.

20              MS. NASSIRI:  Hey, guys.  John Simon just told

21   me that his connection stopped.  So we should probably

22   put it on hold for a second.

23              MR. ESTERKIN:  Sure.  Why don't we go off the

24   record.

25              (Discussion off the record.)
```

                                              Page 38

```
 1              MR. ESTERKIN:  I think we can go back on the
 2    record now.
 3         Q    Mr. Voskanian, we're back on the record.
 4              You understand that?
 5         A    Yes.
 6         Q    Okay.  And you're still under oath.
 7              You understand that?
 8         A    I do.
 9         Q    Okay.  I think, before we went off the record,
10    you indicated that Mr. Weiss was the primary negotiator
11    of the plan on behalf of Scoobeez, correct?
12         A    Correct.
13         Q    What role, if any, did you play in the
14    discussions leading up to the plan?
15         A    I was not directly involved with the plan.
16         Q    Did you have discussions with Mr. Weiss about
17    the plan?
18         A    Maybe pieces of it.  It's a big document.  I
19    think there's -- one section we discussed was the
20    exemptions and the individuals mentioned, which was --
21    yeah.
22         Q    I'm sorry.  I couldn't hear your response.  I
23    don't know if the court reporter was able to catch it or
24    not?
25         A    The -- there are several -- there's -- the
```

Page 39

1  board members and officers are exempted from litigation.

2  That's the piece that we discussed.

3      Q    Okay.  Do you understand that their plan

4  has -- calls for a estate cash payment of a million

5  $500,000 into a fund to be controlled by the creditors'

6  trust?

7      A    I do.

8      Q    And do you have any understanding as to how

9  that million $500,000 number was arrived at?

10     A    No.  Do I understand how it was arrived, or,

11 like, was I part of the negotiation?  So --

12     Q    Well --

13     A    -- all I know is there's a number of 1.5-, and

14 that's -- how they came up with that number, no.

15     Q    You don't know how they came up with that

16 number, correct?

17     A    No.

18     Q    And so you weren't consulted about whether

19 that number should be 1 million, 1 million 5-,

20 2 million, or anything in between; is that correct?

21     A    Directly, no.

22     Q    Well, what about indirectly?

23     A    Well, indirectly covers a million different

24 things.  You look at the budget.  Is there enough money

25 directly?  No.  Indirectly, I can't answer you, like,

Page 40

```
 1    if -- I don't know what went into coming up with that

 2    number, so if different things were taken into account,

 3    such as the cash flow that I created, then I am

 4    indirectly involved without my knowledge, if that makes

 5    sense.

 6          So I can't -- I can't tell you I wasn't

 7    indirectly involved because I don't know if I was or

 8    not.

 9      Q    Okay.  Do you understand that the plan

10    prescribes how that million $500,000 is supposed to be

11    distributed?

12      A    Yes.

13      Q    Okay.  And did anybody consult with you over

14    whether the million $500,000 would be sufficient to pay

15    the various expenses that the plan says were supposed to

16    be paid with the million 500 --

17          MR. SIMON:  Objection.  Vague.

18    BY MR. ESTERKIN:

19      Q    -- thousand dollars?

20          MR. SIMON:  Objection.  Vague.  Objection.

21    Ambiguous.  Objection.  Assumes facts not in evidence.

22    Objection.  Foundation.

23    BY MR. ESTERKIN:

24      Q    You can answer the question, Mr. Voskanian.

25      A    No.
```

Page 41

```
 1        Q    Do you have any understanding as to --
 2   Mr. Voskanian, just so you know, you're holding your
 3   hands up and playing with what looks like some Scotch
 4   tape, and that's coming right between your face and your
 5   camera, so nobody can see --
 6        A    Sorry.  The camera is at the bottom.  I'm
 7   sorry.  I thought it was at the top.  Sorry about that.
 8        Q    No.  I didn't think it was intentional.  I
 9   just, once again, am mentioning it.
10             So do you have any understanding as to the
11   uses to which the million $500,000 is supposed to be
12   put?
13        A    I do.
14        Q    What is your understanding in that regard?
15        A    The understanding is that there are certain
16   obligations that need to be met, and if there is any
17   leftover cash, it goes into unsecured.
18        Q    Okay.  And what are the obligations that have
19   to be met out of the million $500,000, as you understand
20   it?
21        A    Professional fees, bankruptcy-related costs.
22        Q    And with respect to professional fees, there's
23   a lot of professionals involved in this bankruptcy,
24   right?
25        A    I mean, define "a lot."  I haven't been a part
```

Page 42

1    of any other case --

2        Q    Okay.  So --

3        A    -- to know if this is a lot or --

4        Q    All right.  The professional fees, that

5    includes the fees for Foley & Lardner, correct?

6        A    It includes them, yes.

7        Q    Okay.  It includes the fees for Levene Neale,

8    the counsel to the creditor's committee, correct?

9        A    Correct.

10        Q    It includes the fees for the Buchalter law

11    firm that represents Hillair, correct?

12        A    Yes.

13        Q    It includes the fees for the Olshan law firm

14    that represents Hillair, correct?

15        A    Correct.

16        Q    It includes the fees incurred by Quinn Emanuel

17    as counsel to Hillair, correct?

18        A    I do not know that because it's not --

19    Quinn Emanuel is not directly billing the company.

20        Q    Okay.  And so you've seen bills from the Foley

21    law firm, correct?

22        A    I have seen bills, yes.

23        Q    Okay.  And what's the most recent bill that

24    you've seen from Foley?  What -- what period of time

25    does that cover?

                                    Page 43

1      A    This one I've seen is from 2019.

2      Q    I'm sorry.  Once again, I couldn't catch your

3  answer.  Could you either repeat it or answer the

4  question again?

5      A    2019, but as I mentioned before, I'm not the

6  liaison for those.  Brian Weiss sort of handles the

7  professional fees.

8      Q    All right.  So you don't remember seeing a

9  Foley fee statement at any time after 2019?

10     A    No.

11     Q    Let me rephrase the question.

12          A fee statement that covers fees generated at

13  any time after December 31, 2019.

14     A    No.

15     Q    Okay.  What about with respect to the

16  Levene Neale firm; do you recall seeing any bills from

17  that firm covering any period of time after December 31

18  of 2019?

19     A    No.

20     Q    Okay.  What about the Buchalter law firm;

21  when -- what's the last period of time do you recall

22  seeing bills from that firm?

23     A    2019.

24     Q    And how about Olshan?

25     A    Same.

```
 1              MR. ESTERKIN:  All right.  I'm going to mark,
 2    as Exhibit 10, what appears to be the operating report
 3    filed with the bankruptcy court as Document No. 774.  It
 4    covers the period through and including April 30, 2020.
 5              (Exhibit 0010 was marked for
 6              identification.)
 7    BY MR. ESTERKIN:
 8        Q    Let me know when you have that, Mr. Voskanian.
 9        A    I'm looking at it now.
10        Q    Great.
11             Do you recognize this as the April 30
12    operating report?
13        A    Yes.
14        Q    And you supervised the preparation of this
15    report, other than the section of the report that speaks
16    to the professional fees, correct?
17        A    Yes.
18        Q    Okay.  And to the best of your knowledge, the
19    information in this report is correct; isn't that right?
20        A    Correct.  Yes.
21        Q    Okay.  If you would turn to page 15 of 19.
22        A    Okay.
23        Q    At the top it shows "Accounts Payable
24    Post-Petition."
25             Do you see that?
```

Page 45

1        A    Correct.

2        Q    And so this figure, 613,206, is taken from

3    Scoobeez' books and records; is that right?

4        A    Correct.

5        Q    Okay.  It shows there's about 148,852 that's

6    over 120 days.

7             Do you see that?

8        A    Correct.

9        Q    Do you have an understanding as to why those

10    payables have aged to that extent?

11       A    Yeah.  Those are toll numbers.  We were

12    negotiating with them on the pricing, which they brought

13    down.

14            The way the tolls are billed to us are dated,

15    and then when they're dated, they cause -- they trigger

16    some late fees that are not our fault.  We negotiated

17    those, and that number should be zero as of the latest

18    filing that we did.  I'll have to check, but it's --

19    it's related to tolls.

20       Q    Okay.  The "they" that you're referring to is

21    who?  Hertz?

22       A    Correct -- well, Hertz is the -- sort of the

23    funnel, but there's other parties involved, the cities

24    and their processors and so on and so forth.  It's -- by

25    the time it gets to us, it exchanges several hands.

                                              Page 46

1      Q    Okay.  And so as of -- as of -- well, unless

2   it was filed earlier today, the May operating report

3   still hasn't been filed.

4          That's been prepared already; is that correct?

5      A    I believe so.  I'll have to go back and look

6   at that specific number, because, as you can imagine,

7   it's a long report, but -- yeah.

8      Q    Okay.  The -- there's also $41,310 in the

9   31-to-60-day column line.

10         Do you see that?

11     A    Yeah, I do.

12     Q    Do you have any understanding as to why those

13  payables have not been paid?

14     A    I believe it's either Hertz or tolls.  I'll

15  have to check, but the reason is, for both Hertz and

16  tolls, they're a month behind, because we rent over 400

17  vans, and up to 20 percent of our vans could swap out

18  during a month -- or any period.  And when that happens,

19  that delays the billing process.  This is not because we

20  chose not to pay.  It's just the circumstances with the

21  vendor that caused that delay, but it's not something

22  that we consciously delayed a payment.

23     Q    Okay.  You are aware that, among other things,

24  the plan gives Scoobeez the right to assume executory

25  contracts?

Page 47

1        A     Yes.

2        Q     Okay.  And Scoobeez is supposed to file a

3    motion to do that on or before June 18th, correct?

4        A     I don't know the specific dates.  I'm not

5    involved in the legal sort of paperwork-filing process,

6    but I'm not sure I can say "yes" or "no."

7        Q     Okay.  You're not sure of the exact date; is

8    that correct?

9        A     Correct.

10       Q     That you -- are you aware that the date is

11   coming up pretty quickly?

12             MR. SIMON:  Asked and answered.

13             THE WITNESS:  Yes.

14   BY MR. ESTERKIN:

15       Q     Okay.  And have you had discussions with

16   anybody regarding which executory contracts Scoobeez is

17   going to assume?

18       A     I have had general discussions with Scott.

19       Q     And with anybody else?

20       A     No.

21       Q     Okay.  My understanding, from having deposed

22   Mr. Weiss, is that one of those contracts is the Amazon

23   contract; is that correct?

24       A     If you talked to Brian about it, I can't speak

25   to what he said to you or didn't say.

                                           Page 48

1        Q      Okay.

2               MR. SIMON:  Objection.  Speculation.

3    BY MR. ESTERKIN:

4        Q      Do you have an understanding as to whether or

5    not Scoobeez intends to assume the Amazon contract as

6    part of its plan of reorganization?

7               MR. SIMON:  Objection.  Calls for speculation.

8               THE WITNESS:  Sorry, John.  Are you asking me

9    not to answer?

10              MR. SIMON:  You can answer, George.  You can

11   answer.  I was objecting because this question calls for

12   speculation.

13              THE WITNESS:  Again, I don't know what -- you

14   know, what your discussion was with him or what he's

15   intending to do with it.

16   BY MR. ESTERKIN:

17       Q      So you don't know, one way or the other,

18   regarding the Amazon contract; is that correct?

19       A      I can't tell you what Brian is intending to do

20   with it.

21       Q      Well, you're the -- you're the co-CEO of the

22   company, aren't you?

23       A      Right, but you asked me if -- you know,

24   what --

25              MR. SIMON:  Objection.  Argumentative.

                                                  Page 49

1          THE WITNESS:  -- he --

2          MR. SIMON:  He's answering the question,

3    Richard.

4    BY MR. ESTERKIN:

5      Q    So my question is:  Based on your

6    understanding, sitting here today, do you have an

7    understanding, one way or the other, as to whether

8    Scoobeez intends to attempt to assume the Amazon

9    contract as part of its claim?  What's your

10   understanding?

11     A    My understanding is that -- yes.

12     Q    Okay.  And do you have an understanding as to

13   whether or not Scoobeez intends to attempt to assume any

14   other executory contracts as part of its claim?

15     A    Executory contract as in our contract with

16   Hertz and all, you know, other vendors?

17     Q    Yes.

18     A    We do need those, obviously; otherwise, we

19   can't operate.  We have critical vendors that we need to

20   continue doing business with.  Yes.

21     Q    Okay.  And so you mentioned Hertz is one of

22   those critical vendors, correct?

23     A    Correct.

24     Q    And who were the other critical vendors whose

25   contract Scoobeez intends to assume?

                                            Page 50

1      A      Booster, which is a fuel company, and Amazon

2   works with them.

3      Q      Okay.  Are there any others?

4      A      Again, I'm not involved, and Scott's more

5   involved in this because it's a -- more of a legal

6   aspect of the business, but as far as I'm concerned, the

7   office and any direct vendor that has direct impact on

8   our business -- as far as I understand, we're going to

9   assume those contracts.

10      Q      What other direct vendors are there besides

11   Amazon -- Amazon is not a vendor, but what other direct

12   vendors are there besides Hertz and Booster Fuel [sic]?

13      A      We have -- I'm trying to remember all the

14   uniforms.  We buy -- you know, we go off our vans.

15   Like, you know, I could go down the list of all the line

16   items on our income statement, but we -- we intend to

17   continue doing business with all of them.

18      Q      Okay.  Let's talk about Hertz for a minute.

19            Do you have any understanding as to how much

20   Scoobeez would have to pay in order to assume the Hertz

21   contract?

22      A      It's around 500,000, I believe, but they came

23   up with a different amount, and that's something we need

24   to discuss; because, again, tolls is one area where the

25   number has come down significantly because we reduced

Page 51

1    the numbers, and prior to that reduction, they had a

2    different number in mind.  So, approximately, it's

3    around 500,000.

4        Q    That's the current number, correct, as you --

5    that you believe to be required to pay Hertz?

6        A    Correct.

7        Q    All right.  Could you turn to Exhibit 1,

8    please.  That's the plan.

9        A    I'm there.

10       Q    Okay.  Page 19 of 69?

11       A    I'm there.

12       Q    Okay.  Paragraph 95?

13       A    Mm-hmm.

14       Q    Okay.  It indicates there that the cure for

15   the Hertz contract is $871,230.84.

16            Do you see that?

17       A    I do.

18       Q    So this is the original number you thought

19   might be owed under the contract, and now you think you

20   reduced that down to about 500,000; is that your

21   testimony?

22       A    Correct.

23       Q    And how much do you think is owed to this

24   Booster Fuels in order to assume their contract?

25       A    The exact amount that's on there:  79,360.

Page 52

1      Q    And so that number remains a good number,

2    correct?

3      A    Yeah, plus-minus 2-, $3,000 here and there,

4    double-billing, but this number seems to be accurate.

5      Q    Okay.  Are you aware that Mr. Weiss filed a

6    declaration in support of the confirmation of the plan

7    of reorganization?

8      A    I'll have to make an assumption.  I did

9    myself.  So he did as well, I'm assuming, yeah.

10     Q    You say you filed a declaration in support of

11   the plan?

12     A    I take that back.  I -- I can't remember

13   exactly, but -- I filed so many declarations.

14     Q    You've become a professional litigant, huh?

15     A    You just sign a lot of documents.

16          MR. SIMON:  Can you repeat that question?

17          MR. ESTERKIN:  I'll withdraw the question.

18     Q    So my question was:  Are you aware that

19   Mr. Weiss filed a declaration in support of the debtor's

20   attempt to confirm the plan of reorganization?

21     A    I -- I can't remember specifically, but I want

22   to say, yes, he did, but I can't remember specifically

23   because, again, there's just so many files flying

24   around, and I'm not a lawyer, so -- but the assumption

25   is, yes, he would have filed it.

Page 53

1      Q    Do you --

2            MR. SIMON:  Without assuming it, George, do

3    you know whether Brian filed a declaration for the plan

4    or not, without assuming?

5            THE WITNESS:  I don't -- I don't know.  I

6    don't remember.

7            MR. ESTERKIN:  Okay.  I'll mark, as No. 5, a

8    copy of Mr. Weiss's declaration, and -- so the witness

9    can take a look at it.

10           (Exhibit 0005 was marked for

11           identification.)

12           MR. ESTERKIN:  And for the court reporter's

13   benefit, the exhibits that we're marking are the same

14   exhibits as those used at Mr. Weiss's deposition.  So if

15   there's duplicates, they'll just --

16           THE WITNESS:  I'm looking --

17           MR. ESTERKIN:  Their numbers are the same.

18     Q    Okay.  You should have Mr. Weiss's declaration

19   available to you.

20     A    I'm looking at it now.

21     Q    Okay.  Great.

22           Just -- my question is -- is whether or not

23   this refreshes your recollection regarding Mr. Weiss's

24   declaration.

25     A    I haven't seen this one.

Page 54

1      Q    Okay.  And as you can see, just looking at the

2    document, the document states it was signed on June 11,

3    2020.

4          Do you see that?

5      A    Mm-hmm.  Yes.

6      Q    Okay.  Did Mr. Weiss -- do you recall any

7    conversations with Mr. Weiss in which he asked you for

8    information to enable him to prepare a declaration in

9    support of the confirmation of the plan?

10     A    No, not directly.

11     Q    Well, what -- what about indirectly?

12     A    Well, it's such a broad question.  I mean, I'm

13   looking at these numbers.  Was I participant in this

14   11.108 number compilation?  Yes, but that was a year

15   ago.  So it's impossible to answer that question.  I was

16   not directly involved in preparing this --

17     Q    All right.

18     A    -- certain piece, yeah.

19     Q    All right.  What I'm trying to find out is,

20   you know, at some point in time shortly before

21   June 11th, did Mr. Weiss contact you and say, "Look, I

22   have to file a declaration in order -- in order to

23   support the plan, and I'd like to get some information

24   from you with respect to that declaration"?

25          Was there any kind of conversation like that?

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 227

1        A     Well, he could have asked me for information

2   and not tied to the declaration that he would have used

3   for the declaration.  That's why I don't know how to

4   answer that question, but --

5        Q     Well, I'm asking you specifically whether he

6   tied it -- his -- any request for information to the --

7   to a declaration to be filed in support of the plan.

8   That's what I'm asking you.

9        A     Well, the 3 million, for example, yes, I -- I

10  know about that because that's part of the

11  reorganization model.  But was a declaration mentioned

12  specifically?  No.  But that 3 million was part of a

13  model that I created for the reorg plan.  I don't know

14  if that helps you or not, but there's pieces of this

15  that came from me and him, like our discussions.  But

16  was I involved in this declaration preparation?  No.

17       Q     Okay.  Well, since you mentioned the

18  3 million, how was that number arrived at?

19       A     I do not know.

20       Q     Well, you just said you provided the number.

21       A     I was provided that number --

22             MR. SIMON:  He didn't --

23             THE WITNESS:  -- for the model.

24             MR. SIMON:  -- say that.  Objection.

25  Argumentative.  Misleading the witness.

Page 56

1           MR. ESTERKIN:  Madam Court Reporter, could you

2     please read back what the witness said before Mr. Simon

3     interrupted him -- or while Mr. Simon interrupted him.

4           (Record read by the reporter as follows:

5                "QUESTION:  Well, you just said you

6           provided the number.

7                "ANSWER:  I was provided that

8           number --

9                "MR. SIMON:  He didn't --

10               "THE WITNESS:  -- for the model.

11          MR. SIMON:  -- say that.  Objection.

12          Argumentative.  Misleading the witness.")

13    BY MR. ESTERKIN:

14        Q    Okay.  Who provided you with the

15    3-million-dollar number, Mr. Voskanian?

16        A    Brian Weiss.

17        Q    So he told you that, under the plan, the

18    Hillair secured debt would be reduced to $3 million and

19    asked you to include that number in a financial model;

20    is that right?

21        A    Correct.  Correct.

22        Q    And what financial model did you include that

23    in?

24        A    It's the restatement model that is the

25    reorganization plan, what the company looks like

                                                Page 57

```
 1   post-reorg.
 2        Q    And that -- is that model prepared on a cash
 3   basis or an accrual basis?
 4        A    It's on a -- it's both.  It's a
 5   three-statement model.  Yes, it's both accrual and cash.
 6        Q    I missed part of your answer.  You said it was
 7   a something model, both accrual and cash.
 8             What was -- what was the word that I'm
 9   missing?
10        A    It's a three-statement model.  Three-statement
11   models have both cash and accrual.
12        Q    And when you say "three statements," what
13   statements are you referring to?
14        A    Cash flow, income statement, and balance
15   sheet.
16        Q    And so this was, what, a pro -- pro forma
17   financial statements for the reorganized debtor as of
18   the effective date; is that correct?
19        A    Correct.  Yes.
20        Q    And what effective date did you assume when
21   you prepared that model?
22        A    What effective date as in starting date?
23        Q    Yeah, it was a balance sheet.
24             Balance sheet speaks as of a particular date,
25   correct?
```

Page 58

1          A     It's -- yes and no.  Well, it starts out as

2     June 30th, and it had historical numbers in it, but

3     June 30th is when effective date is considered.

4          Q     June 30th -- June 30 of what year?

5          A     2020.

6          Q     So you're assuming an effective date of

7     June 30, and your model has a balance sheet for Scoobeez

8     as reorganized as of June 30, correct?

9          A     Correct.

10         Q     And you have a cash flow statement which

11    speaks to what period of time?

12         A     I believe it was a three-year model,

13    forward-looking.

14         Q     Okay.  And you said there was an income

15    statement.

16               What period of time does the income statement

17    speak to?

18         A     They're all the same.  They're matching.

19         Q     So that -- that would be three years, correct?

20         A     Correct.

21         Q     So you're projecting an income statement out

22    for three years from June 30 of 2020, correct?

23         A     Correct.

24         Q     And then based upon the cash flow and the

25    income statement, you also -- you also project out

                                                    Page 59

1    pro forma balance sheets for a period of time subsequent

2    to June 30, 2020?

3        A    Correct.

4        Q    And what dates did you project out balance

5    sheets for?  You didn't do it every day for three years,

6    I assume, correct?

7        A    Correct.  It's monthly through end of 2020 and

8    then quarterly beyond that.

9        Q    I'm sorry.  The last monthly date was June 30

10   of what year?  I'm sorry?

11       A    No.

12       Q    The monthly --

13       A    No.

14       Q    When you stopped getting monthly and started

15   doing quarterly with that, what was the date on which

16   you switched from monthly to quarterly?

17       A    You end on December 31, 2020, is the monthly

18   end, and then beyond that it's quarterly.

19       Q    Thank you.

20            And for purposes of those projections, did you

21   assume that Scoobeez would continue to do business with

22   Amazon?

23       A    I did.

24       Q    And did you assume that Scoobeez would acquire

25   any other -- strike that.

Page 60

1          For purposes of those projections, did you

2    assume that Scoobeez would acquire business from any

3    other party besides Amazon?

4          A    No.

5          Q    And you understand that Amazon has indicated

6    that it intends to terminate the Scoobeez contract as

7    soon as it's able to do so once the automatic stay is

8    terminated, correct?

9          A    It's -- I don't know what your intentions are,

10   but I am -- yes, that's what I'm understanding.

11         Q    Okay.  And you understand that the automatic

12   stay will terminate when the Scoobeez plan goes

13   effective, correct?

14         A    I do.

15         Q    Who asked you to prepare these projections?

16         A    Brian.

17         Q    And when he asked you to do that, when did he

18   ask you to do that?

19         A    On a couple of occasions, because the court

20   date got pushed several times, but early 2020, first

21   time.

22         Q    Okay.  And when he asked you to prepare the

23   projections predicated on the continuation of the Amazon

24   contract, did you say, "What's the" -- did you ask him

25   why?  Because the Amazon contract is going to be

                                                   Page 61

1   terminated.

2       A    Well, I don't know if it's going to be

3   terminated, right?  Like, it's an assumption.

4       Q    Well, it's a pretty fair assumption, given the

5   communications that you've sat in with Amazon, isn't it?

6       A    Well, judging by our scorecards, this might be

7   a lifelong partnership.

8           MR. SIMON:  Objection.  Calls for speculation.

9   Objection.  Calls for a legal conclusion.

10  BY MR. ESTERKIN:

11      Q    So, Mr. Voskanian, didn't you participate in a

12  phone call on October 7th with Amazon representatives

13  regarding the Scoobeez contract?

14      A    I did.

15      Q    Okay.  And during that conversation, there

16  were Amazon representatives on the call, correct?

17      A    Yes.

18      Q    And they -- and in that conversation, didn't

19  they indicate that Amazon intended to terminate the

20  contract?

21      A    They did.

22      Q    And didn't they indicate that the decision to

23  terminate the contract would not be revisited?

24      A    Yes.

25      Q    And did it occur to you then that you were

                                            Page 62

```
 1   wasting your time preparing projections predicated on

 2   the assumption that the Amazon contract would continue?

 3            MR. SIMON:  Objection.  Calls for speculation.

 4   Objection.  Calls for a legal conclusion.  Objection.

 5   Assumes facts not in evidence.

 6            You can answer.

 7            THE WITNESS:  I guess, what are you

 8   suggesting?  Not do the model?  I mean, the -- you --

 9   you know, you perform as well as you can, and if it goes

10   on, it goes on.

11   BY MR. ESTERKIN:

12       Q    Yeah, once again, I'm not trying to be

13   critical of you for preparing the projections.  I'm just

14   wondering if you had this conversation with Mr. Weiss

15   where you said, you know, "I'm not sure why you're

16   asking me to do this because the -- you know the

17   assumption on which I'm preparing projections is not

18   going to happen, or is extremely unlikely to happen."

19       A    There's always that hope, right?

20       Q    Well, did you have any reason to hope, given

21   the fact that Amazon, unequivocally, told you, on

22   October 7th, that it intended to terminate the contract

23   and --

24            MR. SIMON:  Objection --

25   //
```

                                                    Page 63

1    BY MR. ESTERKIN:

2         Q    -- and given the fact that Amazon -- let me

3    finish -- and given the fact that Amazon sought relief

4    from the stay in order to do precisely that?

5              MR. SIMON:  Objection.  Calls for speculation.

6    Objection.  Calls for a legal conclusion.  Objection.

7    Assumes facts not in evidence.  Objection.  And, Rich,

8    you're getting argumentative.

9    BY MR. ESTERKIN:

10        Q    You can answer the question.

11        A    I mean, we prepared a model.  I guess you're

12   wondering why I did that.

13        Q    No.

14             I'm trying to figure out if you -- when

15   Mr. Weiss asked you to prepare the model, you respond --

16   you, in any way, indicated, "Why are we bothering?"

17        A    Because even if you have the remote

18   possibility that it's going to go on, it's one of the

19   things you have to do.

20        Q    Okay.  At the time -- at the time you thought

21   it was pretty speculative that the Amazon contract would

22   continue, correct?

23             MR. SIMON:  Objection.  Speculation.

24             THE WITNESS:  Every model is -- every model is

25   speculative.  Like, for anyone to guess where the

                                              Page 64

1    numbers are going to be, there's not a single person who

2    could forecast three months out and be accurate.

3    Everything is speculation on a model.  It's educated

4    guessing.

5    BY MR. ESTERKIN:

6        Q    Okay.  And the same thing would be true with

7    respect to the budget that was attached to the cash

8    collateral stipulation, because that goes out for three

9    months, correct?

10       A    No.  It goes out through the end of the year.

11       Q    Right, so that's more than three months.

12            So that's speculative, correct?

13            MR. SIMON:  Objection.  Calls for speculation.

14            THE WITNESS:  It's not speculative.

15            MR. SIMON:  You can answer.

16            THE WITNESS:  You look at historical numbers

17   and you try to make a sound judgment, call what the

18   future is going to look like, and your hope is to hit

19   the targets as close as possible.

20   BY MR. ESTERKIN:

21       Q    Okay.  And so any projections as to how

22   Scoobeez might operate following the effective date of

23   the plan, assuming the effective date is December 31st,

24   is speculative, correct?  Because that's going out four

25   months.

Page 65

1            MR. SIMON:  Objection.  Calls for speculation.

2    Objection.  Calls for a legal conclusion.  Objection.

3    Assumes facts not in evidence.

4            THE WITNESS:  The -- I mean, again, every

5    model -- I don't know if it's -- "speculative" is the

6    right word to say, but every model is -- you have

7    assumptions you put in, and those assumptions may pan

8    out or not.  That's true for this business and any other

9    business.

10   BY MR. ESTERKIN:

11       Q    And the further out you go in time, the more

12   speculative the models become; is that correct?

13           MR. SIMON:  Objection --

14           THE WITNESS:  Generally speaking --

15           MR. SIMON:  -- calls for -- objection.

16   Assumes facts not in evidence.  Objection.  Calls for a

17   legal conclusion.

18           You can answer.

19           THE WITNESS:  Generally speaking, it's -- it's

20   less reliable.  Not just for this company, every company

21   out there.

22   BY MR. ESTERKIN:

23       Q    Okay.  And -- and -- and so let me just ask

24   you:  The confirmation hearing is on July 9th, correct?

25       A    Yes, as far as I know.

                                                    Page 66

1        Q    If I were to ask you to project Scoobeez'

2   performance for, say, 60 days following that July 9th

3   confirmation hearing, you'd have a lot more confidence

4   in the accuracy of those projections than if I asked you

5   to project out six months or eight months from that

6   date; is that correct?

7             MR. SIMON:  Objection.  Calls for speculation.

8   Objection.  Assumes facts not in evidence.  Objection.

9   Calls for a legal conclusion.

10            THE WITNESS:  That's not necessarily correct,

11  because you could completely botch your 60-day model,

12  and you could do a really good job on a 120-day model.

13  BY MR. ESTERKIN:

14       Q    Well, but I'm asking you:  If you were to

15  prepare projections for Scoobeez' financial performance

16  for the period 60 days following July 9th, if you were

17  to do that today, you'd have more confidence in the

18  accuracy of those projections than projections that

19  covered the period after December 31, 2020, correct?

20  Because it's closer in time and, therefore, more likely

21  to be accurate.

22       A    Again, not necessarily, because given our

23  historical sort of trends with Amazon, you could fairly

24  accurately predict on where the numbers are going to be,

25  and we've been close with our projections so far, but,

Page 67

1   generally speaking, in the world of finance, that's an

2   accurate statement.  Whether it applies here, I don't

3   know.

4        Q    All right.  If you -- go back, if you would,

5   and look at Exhibit 6.  It's the cash collateral

6   stipulation.

7        A    Okay.

8        Q    Under the terms of the plan, a million

9   $500,000 is supposed to be put into the -- into a

10  separate account for the benefit of creditor trust,

11  correct?  We talked about that earlier in the

12  deposition.

13       A    Yes.

14       Q    And the budget that you have here does not

15  include any payment of that million five, correct?

16       A    It does not.

17       Q    And so if you were to look at the dates after

18  the date that the estate cash payment is supposed to be

19  paid, the cash balances reflected on the budget would be

20  a million five less, correct?

21       A    Correct.  But it's not reflected here.

22       Q    Right, but that's what I'm saying.

23            So if on -- if you assume the plan is

24  confirmed on July 9th, the cash balances on every -- on

25  this budget after July 9th are a million dollars over --

Page 68

1    a million five overstated because the budget doesn't

2    include the estate cash payment, right?

3        A    Correct, but it would go into a line item

4    where, you know, it would be between AR and cash, so it

5    would be reflected somewhere, and the accounts payable

6    would go down.  But, yeah, it's not reflected here

7    and -- yeah.

8        Q    Have you had any discussions with anybody at

9    Hillair regarding Hillair's relationship with Scoobeez

10   or intentions with regard to Scoobeez following the

11   effective date of the plan?

12       A    General question.  But, yes, we've had many

13   discussions.

14       Q    Okay.  And what have you discussed with

15   Hillair in that regard?

16       A    Expansion of the business, as much as

17   possible, into different revenue streams.

18       Q    And have you had any discussions with Hillair

19   about providing financing to expand the business?

20       A    General discussions, but, yes.

21       Q    Okay.  And what is the nature of the general

22   discussions?  What have you talked to them about in that

23   regard?

24       A    Any business expense would require some sort

25   of capital, but no specifics as to how much or what --

Page 69

1    in what form until we, you know, obviously get a

2    specific customer and have a better idea of what that

3    would look like.

4         Q    So, essentially, Hillair has indicated that it

5    might provide finance -- additional capital once it --

6    once the deal is in place that required additional

7    capital, correct?

8         A    Correct.

9         Q    And right now there is no deal in place that

10   would require additional capital, correct?

11        A    Correct.

12        Q    And Hillair has not provided any sort of

13   written commitment to provide financing, correct?

14        A    Correct.

15        Q    Has Hillair indicated to you any parameters

16   for the amount of additional financing that it might

17   provide?

18        A    Nothing specifically.

19        Q    Well, I mean, just to take an example, have

20   they indicated:  "Well, you know, if you want a hundred

21   million dollars, we don't -- you know, that's way too

22   much.  We don't have it," or some other number where --

23   above which they would not be interested in providing

24   financing?

25        A    A hundred million dollars is beyond the scope

                                                    Page 70

1    of anything that would be required to do the revenue

2    diversification.  You're looking at small amounts of 1

3    to $5 million of any line of business you would go into.

4        Q    So has Hillair indicated to you those amounts

5    would be even beyond the amount it would be willing to

6    invest in Scoobeez?

7        A    They have not indicated anything like that.

8        Q    Okay.  Have they indicated whether any

9    investment would be in the form of debt or equity?

10       A    No specifics.

11       Q    When you say "no specifics," you mean that

12   topic has not been addressed, or there have been

13   discussions and they haven't gotten specific yet?

14       A    Well, at that point it would be irrelevant,

15   right?  If they're equity holders, whether it's debt or

16   equity, it's -- you know, whatever would make sense as

17   an equity holder for themselves, they could do that, so

18   it doesn't really matter what form it comes in, whether

19   it's debt or equity.

20       Q    Well, it does matter, doesn't it?

21       A    They're both the same.  It's business

22   expansion.

23       Q    Pardon?

24            It does make -- it does make a difference,

25   doesn't it, because the unsecured creditors own

Page 71

```
 1   20 percent of the equity in the company, correct, under

 2   the plan?

 3       A    Right, but the -- if someone is paying in cash

 4   to expend revenue, it would benefit the unsecureds

 5   directly and indirectly.

 6       Q    Right.

 7            But if the cash comes in as debt, it's

 8   structurally senior to the equity the unsecureds hold.

 9   If it comes in as equity, it's hard -- it's hard to

10   pursue with the unsecureds, correct, so it does make a

11   difference?

12            MR. SIMON:  Objection.

13            THE WITNESS:  Right, but they both have

14   benefits.  I mean --

15            MR. SIMON:  Objection.  Calls for speculation.

16   Objection.  Calls for a legal conclusion.

17            You can answer.

18            THE WITNESS:  I mean, both have pros and cons,

19   right?  Because equity would dilute the minority

20   holders; whereas, that wouldn't dilute the minor.  So

21   there is -- we haven't gotten far enough to discuss the

22   details like that because it gets pretty complex at that

23   point, and everybody would have a voice in it.  But

24   expansion would benefit the unsecureds as well as the

25   secureds --
```

Page 72

1          MR. ESTERKIN:  Right.

2          THE WITNESS:  -- at that point.

3          MR. ESTERKIN:  Right.

4     Q    All I'm trying to do is find if you've had

5  discussions about whether they're thinking of injecting

6  capital as debt or equity.  If you haven't had

7  discussions, just say so.  If there have been

8  discussions on that issue, I'd like to know what they

9  are.

10    A    Well, discussions have been, again, general.

11 Like, would it require capital?  My answer has been

12 "yes."  Whether they will infuse or not, we have not

13 gone into that.

14    Q    Okay.  And whether -- if they did infuse,

15 whether it would be in the form of debt or equity, you

16 haven't gone into that either, correct?

17    A    No, but when you say "either," you're implying

18 that we -- something else, but, no, we haven't talked

19 about equity or debt, but we've talked about growth

20 would require capital, and they have indicated that they

21 would be happy to do so if the circumstances are -- if

22 the circumstances are right.

23    Q    And right now, as far as you know, there's

24 nothing on the horizon that would require an injection

25 of additional capital, correct?

                                               Page 73

```
 1        A     Not at the moment, no.

 2        Q     Okay.

 3              MR. SIMON:  Richard, do you want to break for,

 4    like, ten minutes?

 5              MR. ESTERKIN:  Yeah.  I -- that's fine.  We

 6    can break now.  It's 4:22 -- or 4:23.  My clock just

 7    switched over.  4:35 good for everybody?

 8              MR. SIMON:  Okay.

 9              MR. ESTERKIN:  Okay.  Let's go off the record.

10              (Recess.)

11    BY MR. ESTERKIN:

12        Q     Mr. Voskanian, what I'd like to do now is turn

13    our attention the Scoobeez' effort to attract business

14    other than Amazon business.

15              So the first question is -- and I'd be happy

16    to show you a copy of the Amazon contract, if you'd like

17    to look at it.  But is it your understanding that

18    there's nothing in the contract between Scoobeez and

19    Amazon that prevents Scoobeez from attempting to provide

20    services to some other client?

21        A     Yes.

22        Q     Okay.  And, in fact, your deposition was taken

23    on January 28th, 2020.

24              Do you recall that?

25        A     Yes.
```

Page 74

1        Q    And at page 93, line 21 of your deposition,

2   you testified, quote:  We were always attempting to

3   diversify, end quote.

4             Is that -- is that testimony accurate?

5        A    Yes.  I mean, we're not -- we weren't

6   actively -- I mean, we were looking, but not really very

7   hard at the time, because Amazon kept growing and taking

8   all of our resources, but it was always something that

9   we attempted to do, and Bristol Farm is one of them.

10  We've been, you know -- we started dialogue them a long

11  time ago.

12       Q    Okay.  All right.  Sir, you started with

13  Scoobeez in July of 2017.

14            At any point in time from that date to today,

15  did Scoobeez render services to any other parties

16  besides Amazon?

17       A    Yes.

18       Q    And who else did Scoobeez render service to

19  besides Amazon?

20       A    Yelp Eat24.  We did business with -- we're

21  doing work for LSO now, and we've done business with

22  Hopsy, which was a, you know, alcohol delivery services

23  for -- for them.

24       Q    And -- I'm sorry -- I didn't hear the first

25  company that you mentioned.

Page 75

```
 1        A      Eat24, Yelp.

 2        Q      And OLS, you mentioned?

 3        A      "LSO."

 4        Q      "LSO."

 5               Okay.  And when did Amazon -- I'm sorry.

 6               Scoobeez is no longer doing business with

 7     Hopsy, correct?

 8        A      Correct.

 9        Q      When did that stop?

10        A      2018.

11        Q      And Scoobeez decided it wished to terminate

12     that relationship because it wasn't profitable, correct?

13        A      No.  There's -- it's a lot more complicated

14     than that.

15        Q      Okay.  Why did the relationship cease?

16        A      Back in 2017 and '18, the company had been in

17     business with Amazon for three or four years, and when

18     you expand really rapidly, you go -- you know, you make

19     a lot of up-front investments, and during that time, we

20     were focused on cost restructuring of the company to

21     make it sustainable, and Amazon was giving us so much

22     business that we couldn't get distracted with smaller

23     players like that in order to make the company

24     profitable and meet the demands of Amazon, of

25     exponential growth.  So it didn't make sense to do
```

Page 76

```
1    business with them.  It's not that it wasn't profitable;

2    it just wasn't profitable enough for us to keep doing

3    business with them, and we focused our efforts on

4    Amazon.

5         Q    Amazon -- is it a correct statement that the

6    Amazon contract was more profitable than the Hopsy

7    contract?

8         A    Well, at the time it wasn't because we were

9    losing money, but it was just a priority for us because

10   Amazon kept throwing more business at us, and we wanted

11   to make sure that Amazon was happy, and while at the

12   same time we were working on the cost structure of the

13   business to make sure it's profitable.

14        Q    Right.

15             But -- so, I mean, essentially, the Scoobeez

16   business model is that you rent trucks from rental

17   companies like Hertz, correct?

18        A    Yes.

19        Q    And you use those trucks to make deliveries

20   for your clients, correct?

21        A    Yes.

22        Q    And so there was no reason why you -- if --

23   you couldn't rent more trucks if you needed trucks to

24   cover both the Amazon work and the Hopsy work, correct?

25        A    Well, it's not that simple.  Like, it's not a
```

Page 77

1  flip of a switch, right?  It's a complex business with

2  12 hubs, and as I mentioned, when the company started

3  from zero -- going from zero to 30, 40 million in

4  revenue, it had taken on a lot, and to take on a lot,

5  some of the contracts were not done properly, and to

6  restructure those contracts took a lot of effort while

7  maintaining the growth with Amazon.

8           So this is not, like -- you know, this is not

9  a local liquor store we're talking about.  So it's not:

10  You could have done this; you could have done that.  No,

11  it's not that simple.

12      Q    Okay.  Let me read you from your prior

13  deposition, page 95, line 2.  This is your answer to the

14  question -- the question that was posed:

15           I think Hopsy and Eat24 kind of

16           spilled over to 2018, but we discontinued

17           Eat24 and Hopsy because of the lack of

18           profitability.

19           Is that testimony accurate testimony?

20      A    Yes.

21      Q    And then the questioning goes on:

22           Okay.  So in 2018, Scoobeez made the

23           decision that Eat24 was not profitable and

24           stopped doing work for Eat24, correct?

25                ANSWER:  Correct, the lack of sort of

 1              volume and so on and so forth.

 2              And then the next question:

 3                  All right.  And then it sounds like

 4              the same business decision on behalf of

 5              Scoobeez went into play with Hopsy in

 6              2018, and Scoobeez stopped working with

 7              Hopsy in 2018.

 8              Yes -- I'm sorry.  Question --

 9                  ANSWER:  Yes.

10              That's accurate testimony?

11      A    Yes, but you have to put it in context, right?

12      Because if that's the only thing you have --

13      Q    You answered my question.  Thank you.

14      A    All right.

15      Q    Scoobeez continued to search for additional

16      clients after it filed bankruptcy, correct?

17      A    Yes.

18      Q    And then following the October 7 telephone

19      call when Amazon informed you that -- Scoobeez and

20      others that it intended to terminate its contract with

21      Scoobeez, the search for additional business was --

22      became a matter of additional urgency, correct?

23      A    Yes.

24      Q    And that sense of urgency has continued

25      through to today, correct?

                                                Page 79

1        A    Yes.

2        Q    And -- let's see.  You mentioned companies

3   Hopsy; Eat24, Yelp; and LSO.

4             What work has Scoobeez done for Yelp?

5        A    Food deliveries for them.

6        Q    And when or what period of time was that

7   occurring?

8        A    It predated me, but I believe we terminated

9   around 2018.

10       Q    Okay.  And so Scoobeez hasn't performed any

11  food delivery services for Yelp since 2018; is that

12  correct?

13       A    I believe so, yes.

14       Q    Okay.  And then you mentioned LO- -- I'm

15  sorry.  LSO, right?

16       A    Yes.

17       Q    Has Scoobeez started doing work for LSO?

18       A    Yes.

19       Q    And when did that start?

20       A    Beginning of June 2020.

21       Q    Okay.  And how many routes is Scoobeez running

22  for LSO?

23       A    At the moment, I think we're doing four.  We

24  started with two, and we're going to ramp up slowly, but

25  I think it's four as of two days ago.

Veritext Legal Solutions
866 299-5127
Exhibit 2 - page 252

1        Q     And is that four routes per day or four routes

2    over what period of time?

3        A     Per day.

4        Q     And what's the gross income that Scoobeez

5    receives from those four routes?

6        A     We're still billing them.  Like, it's not

7    clear.

8        Q     It's not clear.  Okay.

9              Do you have an approximation as to the amount

10   that you bill for those routes?

11       A     As of today, for only four routes, we're

12   looking at anywhere from 5- to 10,000 a month.

13             MR. ESTERKIN:  Okay.  Let's mark, as

14   Exhibit 22, what appears to be a copy of the LSO

15   contract.

16             (Exhibit 0022 was marked for

17             identification.)

18             THE WITNESS:  One sec.  I'm trying to get

19   there.

20             MR. ESTERKIN:  Yeah, it probably hasn't popped

21   up yet.

22             THE WITNESS:  Okay.  I see it.  I'm there.

23   BY MR. ESTERKIN:

24       Q     Okay.  First question:  You recognize this as

25   the agreement with LSO?

Page 81

1    A    Yes.

2    Q    Okay.  And is it -- is it your understanding

3    that LSO is not promising any minimum number of routes

4    pursuant to this agreement?

5    A    Yes.

6    Q    So, in other words, this agreement is,

7    essentially, an agreement under which, if LSO decides it

8    wants to use Scoobeez' services, then it will let you

9    know, and those services will be rendered under the

10   terms of this agreement, correct?

11   A    Correct, but we're given continuous routes on

12   a daily basis.  They don't -- they don't go up and down.

13   It's not a:  Hey, every morning you tell us how many

14   routes.  We -- we are given consistent routes similar to

15   Amazon.

16   Q    Okay.  And that -- all right.  If you turn to

17   paragraph 2.3 --

18   A    Which page is it on?

19   Q    It -- looking at the Bates numbers at the very

20   bottom, it says "SCOOBEEZ," and then there are some

21   leading zeros.

22        Do you see that?

23   A    Yeah.  Yeah.

24   Q    It's on page -2423.

25   A    Okay.

Page 82

1          Q    Okay.  And just take a moment to read that

2     paragraph.

3          A    Okay.

4          Q    So you understand that the contract is limited

5     to the geographic area that's described in Appendix A to

6     the agreement?

7          A    Yes.

8          Q    Okay.  Let's take a look at Appendix A.  That

9     is on page -2436.

10         A    Okay.  I'm there.

11         Q    Okay.  And if you go back halfway down the

12    page, it says:  "Geographic Area:  Service Provider

13    agrees to provide services within the defined area

14    described below, which is referred to as Service

15    Provider's Geographic Area..."

16              Do you see that?

17         A    Yes.

18         Q    And there's no geographic area specified

19    there, correct?

20         A    There's not.

21         Q    Okay.  Do you have an understanding as to what

22    the geographic area that should have been included in

23    there might be?

24         A    Texas proper and parts of Oklahoma.

25         Q    I'm sorry.  Texas -- I heard "Texas."

                                                  Page 83

1    A    Texas area.  Like, they only work in Texas,

2    and it spills over to Oklahoma a little bit.

3    Q    So it's your understanding that the geographic

4    area included all of Texas and parts of Oklahoma?

5    A    Initially Dallas, but, yes, eventually it's

6    going to go to all of Texas.

7         MR. ESTERKIN:  I'm sorry.  Madam Court

8    Reporter, could you read that back, please?

9         (Record read by the reporter as follows:

10            "ANSWER:  Initially Dallas, but, yes,

11            eventually it's going to go to all of

12            Texas.")

13   BY MR. ESTERKIN:

14   Q    So it's your understanding, at the present

15   time, the geographic area is limited to Dallas; is that

16   correct?

17   A    Yes.

18   Q    And there's a hope that, at some point in

19   time, it will expand into other areas, correct?

20   A    I wouldn't call it a hope, but that's our

21   target, yes.

22   Q    And the -- Texas and portions of Oklahoma are

23   the only areas in which LSO operates, correct?

24   A    Yes.

25   Q    Now, the -- any income from this contract is

Page 84

1    not included in any of the projections, correct -- in

2    the budget, correct?

3         A    Correct.

4         Q    And it wasn't included in any of the

5    projections that you talked about earlier that went

6    through, I believe, 2023 that Mr. Weiss asked you to

7    prepare?

8         A    Correct.

9         Q    Let's take a look at 3.1 in the contract.

10        A    File 3.1?

11        Q    Yes.

12        A    Is it paragraph 3.1 or file 3.1?

13        Q    Paragraph 3.1 on page -2423.

14        A    Okay.  I'm there.

15        Q    And if you read the first sentence, it says:

16   "During the term of this Agreement, Service Provider

17   agrees to provide LSO FM transportation related services

18   through the use of an appropriate type of vehicle [sic]

19   for the services" rendered "under" the "Agreement...

20   described in Appendix B."

21             Do you see that?

22        A    Yes.

23        Q    So the vehicles that -- is it your

24   understanding that the vehicles that Scoobeez

25   anticipated using to provide services under this

Page 85

```
 1    contract were supposed to be listed in Appendix B?

 2         A    Correct.

 3         Q    All right.  Let's turn to Appendix B.

 4         A    Okay.  I'm there.

 5         Q    That's on page -2438.

 6         A    Mm-hmm.

 7         Q    Do you have that?

 8         A    Yes.

 9         Q    And so as I'm looking at Appendix B, there's

10    one vehicle listed, correct?

11         A    Correct.

12         Q    And it's a Ram truck of some sort, correct?

13         A    Mm-hmm.  Yes.

14         Q    What type of truck is -- what type of vehicle

15    is that, if you know?

16         A    It's the same one that we use for Amazon:

17    Ram, Dodge Ram Promaster.

18         Q    Is that a panel delivery truck?

19         A    It's a cargo van that we use for Amazon.

20         Q    Okay.  And there's just one -- one vehicle

21    listed there, correct?

22         A    Correct, but this agreement is as of May 1.

23    So by then we know how many routes are running, and this

24    is just one car listed because, I mean, that's how many

25    routes we're running.
```

Page 86

1      Q    Okay.  Has this agreement ever been modified,

2    to your knowledge, in writing?

3      A    No.  But we can't modify an agreement every

4    time we swap out a van.  It happens on a very regular

5    basis.

6      Q    All right.  Some of the documents that were

7    produced to us by Scoobeez in response to our document

8    request were some emails back and forth between you and

9    representatives of Bristol Farms.

10          Are you familiar with the discussions with

11   Bristol Farms?

12     A    Yes.

13     Q    And, at present, there's no ongoing

14   discussions between Scoobeez and Bristol Farms about

15   providing -- Scoobeez providing services to

16   Bristol Farms, correct?

17     A    What do you mean by "at present"?

18     Q    Are you currently having discussions with

19   Bristol Farms about the possibility of Scoobeez

20   providing delivery services to Bristol Farms?

21     A    Yes.  Last time we had the discussion, it was

22   open-ended.  So we're -- that's still ongoing.

23     Q    Okay.  Isn't it correct that, between the time

24   of your discussions with Bristol Farms and today,

25   Bristol Farms retained another delivery service?

Page 87

```
 1        A      No.  They retained them before, but they
 2   indicated that they may not stick with that contract.
 3        Q      And when did they indicate that?
 4        A      Early 2020, in my emails.
 5             MR. ESTERKIN:  All right.  Well, let's take a
 6   look at the emails.
 7             THE WITNESS:  I'm not seeing them.
 8             MR. ESTERKIN:  I have to upload them for you.
 9   It will take me a minute.
10             All right.  Let's mark, as Exhibit 16, emails
11   regarding Bristol Farms with you, Mr. Voskanian.
12             (Exhibit 0016 was marked for
13             identification.)
14             THE WITNESS:  Okay.  I'm there.
15   BY MR. ESTERKIN:
16        Q      Okay.  There's an email from you to
17   Bristol Farms, the top one dated March 28, 2020.
18             Do you see that?
19        A      Yes.  The top one?
20        Q      Yep.
21        A      Yep.
22        Q      Is that the most recent email that you have
23   with Bristol Farms?
24        A      I believe so, yes.
25        Q      And that was March 28th, 2020, correct?
```

                                              Page 88

1        A    Yep.

2        Q    Okay.  And at your deposition, you indicated

3    that:  We're speaking to Bristol Farms -- and this is at

4    the bottom -- this is page 92, line 23.  You testified

5    that you would be -- that they're testing out some

6    other -- Bristol Farms are testing out another service

7    provider, and you testified, quote:  So at the earliest,

8    it won't be for another minimum six months if that

9    relationship falters.

10            Do you recall that testimony?

11       A    I do.

12       Q    And was that testimony accurate when given?

13       A    It was accurate.

14       Q    And you haven't resumed any discussions with

15    Bristol Farms since the March 28th email, correct?

16       A    I don't believe so.  I'll check.  If there is

17    one, I'll send it to you, but I don't think there is

18    one.

19       Q    And, currently, Bristol Farms is not providing

20    Scoobeez with any routes to run, correct?

21       A    Correct.

22       Q    All right.  Do you recall that you had

23    discussions with Amazon middle mile about providing

24    services -- middle-mile services to Amazon?

25       A    Yes.

Page 89

```
 1        Q     And when was the last time you had contact

 2   with anybody at Amazon about providing

 3   middle-mile services?

 4        A     At the end of 2019.

 5        Q     And, currently, you're not providing --

 6   Scoobeez is not providing any middle-mile services to

 7   Amazon, correct?

 8        A     No.

 9        Q     And there's nothing in any of the projections

10   that you prepared that anticipates that Scoobeez will

11   perform services for Amazon middle mile, correct?

12        A     No.  We left those out.  We don't have -- we

13   didn't include -- the reason we didn't include them is

14   not because we don't anticipate it; it's just that we

15   did not include them.

16        Q     Okay.  And you, I believe, testified that --

17   well, let me just ask the question.

18              At some point in time, did you contact

19   representatives of Wal-Mart to solicit business from

20   Wal-Mart?

21        A     I did.

22        Q     And when was the last time you had contact

23   with Wal-Mart?

24        A     My email should indicate the date on there.  I

25   can't remember exactly.
```

Page 90

```
 1              MR. ESTERKIN:   Okay.  Well, let's take a look

 2      at the email.

 3              (Exhibit 0018 was marked for

 4              identification.)

 5              MR. ESTERKIN:   It's marked as Exhibit 18, an

 6      email -- or emails between Mr. Voskanian and Wal-Mart.

 7              THE WITNESS:   Correct.

 8      BY MR. ESTERKIN:

 9         Q    Now that you've had a chance to look at

10      Exhibit 18, does that refresh your recollection as to

11      when your last communication with Wal-Mart was?

12         A    No.  We -- no.  Tom Ward is not the last

13      person I reached out to.  I thought we provided one or

14      two other emails that were -- Tom Ward referred me to

15      others below him, because he's pretty high up in the

16      chain, but it's close around this time.  Like, we

17      haven't communicated in a long time.  So it's roughly

18      around November and December, is the last time we

19      communicated.

20         Q    And November and December of 2019, correct?

21         A    Correct.

22         Q    And at your deposition, at page 95 -- your

23      January deposition, page 95, line 17 and 18, you

24      testified that you tried to talk to Wal-Mart but got

25      nowhere.
```

1          Is that accurate testimony?

2      A    Yes, but, I mean, part of the reason why these

3  companies are shying away is because of our bankruptcy

4  status.  Like, it's -- you know, we get close, but when

5  compliance gets involved, it affects -- all of a sudden

6  we stall because we're in Chapter 11.  That's my sort of

7  conclusion on these.

8      Q    Okay.  And there's nothing in the -- you

9  don't -- and none of your projections anticipate any

10  revenue from Wal-Mart, correct?

11     A    Right, but they were left out purposely.

12  Like, again, we didn't not project those because we

13  didn't assume no business was going to come in.  It's

14  just, those were the instructions I was given, and

15  that's what I did.

16          MR. ESTERKIN:  Okay.  Let's talk about OnTrac.

17          Let me mark, as Exhibit 19, an email string,

18  the most recent of which is May 23, 2020, from you to

19  Rob Klein.

20          (Exhibit 0019 was marked for

21          identification.)

22  BY MR. ESTERKIN:

23     Q    Do you have that?

24     A    Yep.

25     Q    All right.  Do you have any more recent

                                                Page 92

1    communications with OnTrac regarding Scoobeez' provision

2    of services to OnTrac?

3        A    No.  We get emails that are autogenerated from

4    their corporate, telling us where there are openings to

5    take on routes, but more direct communication with

6    Robert, no, this is the latest one.  And with OnTrac, we

7    had great traction and progress with them until

8    compliance got involved, and then, again, things started

9    stalling, and they're asking for more sort of compliance

10   documents before we move forward, and, in our opinion,

11   it's because of the bankruptcy.

12       Q    And do you have any -- my original question

13   was:  Do you have any more recent communications with

14   OnTrac than this May 23, 2020, email that we've marked

15   as Exhibit 19?

16       A    Not directly, but as I mentioned, they

17   auto-generate emails and send it out in sort of a

18   marketing format where it says, "These are the locations

19   where there are opportunities available."  They're not

20   sort of human to human.  I think it's a computer that

21   generates those and sends them out.

22       Q    Okay.  And when was the most recent of those

23   emails that you received?

24       A    Sometime last week maybe.

25       Q    And how often do you receive those emails?

Page 93

1      A    It varies based on their need.  It could be

2    weekly.  It could be monthly.

3           MR. ESTERKIN:  John, I don't believe that this

4    recent email was produced, if you're there.

5           MR. SIMON:  I'm here.

6           MR. ESTERKIN:  All right.  Could you please

7    check and see if there's more recent OnTrac emails that

8    exist?

9           MR. SIMON:  Yeah.  Yes.

10          MR. ESTERKIN:  All right.

11     Q    Mr. Voskanian, as of today, there's no

12   contract between Scoobeez and OnTrac to provide services

13   to OnTrac, correct?

14     A    There is no -- well, we have the terms.  We

15   haven't signed anything.  So nothing's signed, but we've

16   given an indication that if we clear certain hurdles, we

17   could get started with them.

18     Q    Okay.  And what are those hurdles?

19     A    Licensings in California.  This is something

20   that they recently added.  We got past the US DOT

21   number.  We got past the insurance requirements, and

22   then as soon as we were about to start, they asked for

23   one more thing, and it's something specific that has to

24   do with California Transportation Authority that we're

25   working on.  That's something that they recently added,

                                              Page 94

1    and it takes a lot of time to do, especially in light of

2    COVID and no one working, but it just goes to show you

3    that, every time we gain some traction, we -- compliance

4    throws another sort of hurdle, and that's because of the

5    bankruptcy.

6        Q    Well, you just told me that it was because of

7    this California Transportation Authority issue, not --

8    is that -- how does that relate to the bankruptcy?

9        A    That's not what I said.  I said we got past

10   the initial hurdles and all the requirements they asked

11   us to get over.  Once we did that, then they came back

12   and asked for additional stuff that they hadn't told us

13   before, right when we were about to start.  Once we

14   cleared all items, they asked for one more thing that

15   has to do with the California Transportation Authority,

16   and that's something that nobody -- no one has ever

17   asked us to do, and we need to get some sort of a DOT

18   number or some sort of a requirement that we need to

19   pass.

20        But the point I'm trying to make is the

21   initial long list of requirements that they wanted us to

22   have, we passed those, and then they came back and asked

23   for additional stuff, and that's from the compliance

24   side, not the business side.

25        And that's because -- like, you know, we

Page 95

1   believe, because we're in bankruptcy, they're, you know,

2   throwing all these hurdles our way to -- to get around,

3   because -- you know, yeah.

4        Q    Have you finished?

5        A    Yeah.

6        Q    So I'm not sure I understand why you think the

7   bankruptcy has anything to do with any delays or

8   decision by OnTrac not to retain Scoobeez.

9             I mean, you've told me that there were a bunch

10  of regulatory hurdles that you needed to jump over, and

11  you did that and -- except for this one regarding the

12  California Transportation Authority.

13            Why do you believe --

14       A    Well, because the California --

15       Q    Why do you believe that bankruptcy has

16  anything to do with OnTrac's decision about whether to

17  retain or not retain Scoobeez?

18       A    Because when we first started, you know, the

19  negotiations and pricing and so on and so forth,

20  everybody is excited, and the second we got into

21  compliance, everything just started slow rolling and --

22  they have a need.  They have a lot of need right now.

23  There's, you know -- any of the SPs should be able to

24  get a contract with them because -- especially somebody

25  of our size and our compliance requirements and all the

Page 96

1    sort of layers of insurance that we have and the fact

2    that we could satisfy Amazon -- you know, Amazon is one

3    of the toughest standards, and if we can meet those,

4    it's -- it's hard to believe we can't meet someone

5    else's standards.  So once we get -- once we got past

6    the businesspeople, once we get into compliance, we got

7    a long list of things to meet.

8         We sent them the insurance documents, and then

9    they kept asking us to modify the search, to add this,

10   to add that, and none of it made any sense to us.  We

11   still did it anyway.  We complied.  We added -- you

12   know, modified some of the insurance documents.  We got

13   the insurance to change this, change that.

14        Once we got to the final thing, we're, like,

15   "Okay.  Is this it?"  And they're, like, "Yes, it is,"

16   and then all of a sudden we got another email saying,

17   "Hey, you have to go -- by the way, you have to go get

18   something else from California," and this is something

19   Scott could speak more -- more to.

20        But it just seems like the whole process is

21   being stonewalled.  The more we get past the hurdle,

22   then another one comes in.  And this is coming from

23   compliance, and you kind of put two and two together

24   that, you know, maybe they just don't want to work with

25   us because of -- because we are in Chapter 11, because

Page 97

1    we're one of the top-tier VSPs in Amazon ecosystem, as

2    you know.  You've seen the scorecards.  How is it that

3    we could, you know, work with Amazon, comply with all

4    these different requirements, and we can't somehow

5    satisfy OnTrac?

6        Q    Well, isn't it true that if OnTrac didn't want

7    to do business with Scoobeez because it's in bankruptcy,

8    they could have simply said, "Sorry.  We don't want to

9    do business with you because you're in bankruptcy"?

10       A    No, because that adds exposure.  Like, when

11   you apply for a job, they don't necessarily tell you why

12   you don't get the offer, right?  They just kind of give

13   you some boilerplate language, and then off you go.

14            No, I don't think someone would come in and

15   tell you, "This is why," because -- I'm not a lawyer,

16   but I am assuming it would violate a bunch of different

17   laws.

18       Q    Okay.  So right now you're working on trying

19   to get the California Transportation Authority

20   certificate for OnTrac; is that right?

21       A    Yes.

22       Q    Have you received any draft contracts from

23   OnTrac?

24       A    I believe we have.  I'd have to check with

25   Scott, but we're in the final stages.  We're almost

                                          Page 98

1  ready to go, and they've indicated that we can start in

2  LA once we clear those checkboxes, but who knows?  Like,

3  once we clear those, they might come back and ask for

4  more stuff; because we've been here before where we

5  thought we were almost there, but we weren't.

6      Q    Okay.  And you didn't include any income from

7  OnTrac in any of the projections, correct?

8      A    Did not.

9      Q    And you didn't include any income from OnTrac

10  in the budget, correct?

11     A    Did not.  But, again, not because we don't

12  anticipate; it's just, we stuck with the -- Amazon's

13  projections strictly.

14     Q    All right.  And assuming that you are cleared

15  to do business with OnTrac, what's your expectations to

16  the volume of that business?

17     A    Volume?  Oh.  It's -- I would expect to get to

18  maybe a hundred routes pretty quickly over time.

19     Q    And the income?

20     A    "Quickly" means six months to a year.

21          MR. SIMON:  Objection.  Calls for speculation.

22          MR. ESTERKIN:  Sustained.

23     Q    And what is your expectation as to the income

24  from those hundred routes?

25          MR. SIMON:  Objection.  Calls for speculation.

Page 99

1          You can answer.

2          THE WITNESS:  Right now, we're running 400

3    routes with Amazon.  So you would expect 25 percent,

4    roughly, of Amazon's.

5    BY MR. ESTERKIN:

6      Q    And how quickly do you think you would get to

7    those hundred routes?

8          MR. SIMON:  Objection.  Calls for speculation.

9          You can answer.

10         THE WITNESS:  Six months to a year.

11   BY MR. ESTERKIN:

12     Q    And, what, the ramp-up would be gradual from

13   zero to 100 over that period of time; is that right?

14         MR. SIMON:  Objection --

15         THE WITNESS:  It could be very -- it could be

16   very slow.  It could be very fast.  There are a lot of

17   circumstances on a daily basis.  As you know, like,

18   things change so fast that no one -- you know, things

19   move really fast in this environment that no one

20   anticipated.  So it could -- it could go any other way.

21   BY MR. ESTERKIN:

22     Q    Okay.  Do you recall that you had contact with

23   somebody at Lime Logistics about new business?

24     A    Correct.

25     Q    And did that go anywhere?

                                             Page 100

1      A    It did.  We started working with them, but

2   that's not somewhere where I'm personally, you know --

3   it's -- it's too small of a market.  It's too dangerous,

4   but we did some routes.  We -- that one is not worth it.

5      Q    So that's not something that you're --

6   Scoobeez intends to pursue; is that correct?

7      A    I, personally, wouldn't, but I don't make the

8   last call.

9      Q    Well, you're the co-CEO.

10          Have you talked about it with Mr. Sheikh?

11     A    Right, but there's investors who have -- you

12  know, there's people that -- you know, CEOs don't make

13  the final call on those.

14     Q    When was the last time you had any contact

15  with the folks at Lime Logistics?

16     A    Four or five months ago.

17     Q    And do you have any -- has Scoobeez done any

18  work for Lime Logistics in that four- or five-month

19  period of time?

20     A    We ran a route three, four days, and that was

21  it.

22     Q    And when -- and you say three or four days.

23          When were those three or four days?

24     A    This was three, four months ago.  I'll have to

25  check the exact date, but we did it for one week for a

Page 101

1    couple days, and then we stopped.  It was too dangerous.

2        Q    So that would have been sometime in roughly

3    January of this year, correct?

4        A    Don't quote me on it, but it sounds about

5    right.

6        Q    Okay.  So in January you ran one route, and

7    you haven't talked to them since, correct?

8        A    Talk to them as we just stopped, you know,

9    services and said we're just not interested.

10       Q    Right.

11            In January of 2025, correct?

12       A    Yes.

13       Q    And you haven't had communications with them

14   since, correct?

15       A    Correct.

16       Q    And there's no revenue projected for Lime in

17   the projections, correct?

18       A    Correct.

19       Q    And there's no revenue from Lime included

20   within the budget, correct?

21       A    Correct, but, again, not because -- you know,

22   this goes for all of them.  We purposely left out any

23   future business out of the model.

24       Q    All right.  Let's talk for a moment about Uber

25   Freight.

                                          Page 102

```
 1              Did you have contact with representatives at

 2   Uber Freight about providing services to Uber Freight?

 3        A    I do [sic].

 4        Q    And when was that?

 5        A    Three, four months ago last we spoke.

 6        Q    And, at that point in time, how were things

 7   left with Uber Freight?

 8        A    Uber Freight is interested, and that's a big

 9   contract.  So we would require a commitment that we're

10   internally discussing.

11        Q    So -- but there's been no further contact with

12   Uber Freight for three or four months now, correct?

13        A    Well, correct, but they sent us the contract.

14   They're willing to sign.

15        Q    Oh, they did?  When was -- when --

16        A    However --

17        Q    When was that?

18        A    We supplied that to you guys.

19        Q    Well, yeah, I don't want to debate that with

20   you, but you say you supplied it.

21              You provided it to Mr. Sheikh, so it could be

22   produced to us; is that what you're telling me?

23        A    Correct.

24        Q    Okay.  And -- and that was just recently in

25   response to our most recent request to produce
```

Page 103

1  documents, correct?

2      A    Yes.

3      Q    And the contract hasn't been signed by

4  Scoobeez, correct?

5      A    Correct, but Uber contract is similar to when

6  you sign up to drive a car.  So it's -- you know, it's

7  easy to sign up, but the volume that they need would

8  require everybody coming together, because it's not a

9  one- or two-route sort of a contract, and it's Uber

10 Freight, meaning it's the big rig, you know, the 52-foot

11 trucks.  So that's something that -- it's not sort of,

12 like:  Okay.  Let's allocate some vans there and get

13 going.  It's something that needs to be discussed before

14 you jump into, and it would require capital allocation.

15 As you know, at the moment, it's not the -- there's many

16 parties involved that need to speak to that.

17          MR. ESTERKIN:  Well, John, once again, I don't

18 believe we received a copy of that contract.  So please

19 double-check, and if, in fact, you've provided it to

20 your firm to be produced, produce it, please.

21          MR. SIMON:  And no one said it was provided to

22 our firm, but we will check on it.

23          MR. ESTERKIN:  I'm sorry.  I didn't hear you.

24          MR. SIMON:  No one said it was provided to our

25 firm.

                                        Page 104

```
 1              MR. ESTERKIN:  I understand that.

 2              MR. SIMON:  I will check on it.

 3              MR. ESTERKIN:  Yeah, the witness has said he

 4     gave it to Mr. Sheikh.  It could have stopped there and

 5     not gotten to your firm.  I'm not casting aspersions at

 6     your firm.  I just --

 7              MR. SIMON:  I gotcha.

 8              MR. ESTERKIN:  I just -- I want the document

 9     that was requested, and it wasn't produced.

10              MR. SIMON:  Yeah, it's on the list.  Thank

11     you.

12     BY MR. ESTERKIN:

13         Q    And, Mr. Voskanian, there's nothing in the

14     projections for any income from Uber Freight, correct?

15         A    Correct.

16         Q    And nothing in the budget with respect to

17     income from Uber Freight, correct?

18         A    Correct.

19         Q    And in order to do the Uber Freight

20     transaction, you would -- Scoobeez would have to attract

21     additional capital, correct?

22         A    No.  I mean, either we reallocate capital that

23     we currently have or bring in new one.  It depends on

24     what the post, you know, obviously, restructuring looks

25     like.  But it's not something that you could divert a
```

Page 105

```
 1    few vans and get going because it's a large sort of

 2    contract.

 3         Q    And you'd need large 18-wheeled trucks,

 4    correct, not the small --

 5         A    Yes.

 6         Q    -- vans?

 7         A    Correct.

 8         Q    And so you haven't -- have you done any

 9    calculations as to the amount of capital that you would

10    need in order to acquire the large trucks necessary to

11    perform the Uber contract?

12         A    Not detailed ones.  We have a rough estimate

13    of what it would require, and it depends on how many we

14    want to take on.  It's not something that's set in

15    stone.

16         Q    All right.  So -- and what's your rough

17    estimate as to the amount of capital that would be

18    needed in order to enter into the Uber contract?

19         A    One to 5 million.  It depends on how -- you

20    know, how wide you want to go.

21         Q    And have you had any discussions with Hillair

22    about providing that capital so that you could enter

23    into the Uber contract?

24         A    We've had rough discussions, not about

25    providing, because we have enough capital in the company
```

Page 106

```
 1   to divert funds, but as you know, there's interest in
 2   different parties that may or may not come to the table.
 3   I'm not ...
 4        Q    What do you mean there's different parties
 5   that may or may not come to the table?
 6        A    The entire company is not owned by just
 7   Hillair, right?
 8        Q    Well, who else -- after the plaintiffs
 9   confirmed, who else is going to own the company?
10        A    Well, it's in the plan.  There's, you know,
11   minority shareholders.
12        Q    Correct.
13             But the board of directors is going to be
14   appointed by Hillair, correct?
15        A    Correct.  Yes.
16        Q    So who are these other parties that you need
17   to talk to?  If the board approves a transaction, then
18   the company could engage in the transaction, correct?
19        A    Right, but if you're not -- if you're a
20   minority shareholder, you have a voice, right?  You have
21   to take that under account.
22        Q    Right.
23             So have you had any discussions with any of
24   the creditors or the creditors committee about
25   provide -- about the provision of additional capital so
```

Page 107

1    that you could enter into the Uber contract?

2        A    Not directly.

3        Q    Well, what about indirectly?

4        A    No.  I don't know --

5        Q    So you're --

6        A    -- what discussions.

7        Q    You're unaware of any such discussions,

8    correct?

9        A    Correct.

10       Q    And, once again, with regard to Hillair, are

11   you aware of any discussions specific to additional

12   capital that Hillair would contribute in order to enable

13   Scoobeez to enter into the Uber contract?

14       A    Well, they're open to investing more if

15   there's a viable sort of partner coming on board.

16   They're open to that discussion, but the company itself

17   has enough capital to divert.

18       Q    So -- yeah, but that wasn't my question.  My

19   question was whether you had any discussions with

20   Hillair about investing capital to allow the company to

21   perform the Uber contract.

22            Did they view that as being a viable contract

23   that would -- that would cause them to want to invest

24   additional capital in the company?

25       A    Yes.

Page 108

1      Q    They do -- they do view it that way?

2      A    Well, I don't know if they view it that way.

3  We've had the discussions about it, and it's an ongoing

4  thing.  We haven't finalized anything.

5      Q    And what did the people at Hillair say about

6  that?

7      A    That if the numbers make sense, which we

8  haven't finalized, then they would consider it.

9      Q    Well, you have some preliminary numbers,

10  correct?

11      A    No, because it's a marketplace where the price

12  is decided on a daily basis, kind of like Uber.  When

13  you sign up to drive for Uber, you don't know the

14  predetermined price.

15      Q    All right.  So what additional information is

16  Hillair going to receive to enable it to make a decision

17  about whether or not it makes sense for Hillair to

18  invest additional capital so Scoobeez can enter into the

19  contract with Uber?

20          MR. SIMON:  Objection.  Calls for speculation.

21  Objection.  Assumes facts not in evidence.  Objection.

22  Foundation.

23          THE WITNESS:  Answer?  Answer, or no answer?

24          MR. ESTERKIN:  Answer.

25          MR. SIMON:  You can answer.

Page 109

```
 1              THE WITNESS:  Well, we'd have to find others
 2    who have done business and understand the structure,
 3    because my understanding is there are certain margins
 4    that drivers are paid -- or companies are paid to stay
 5    in business, and it's typically 5 to 10 percent,
 6    sometimes 15, and once we -- once I, personally, speak
 7    with those -- and if the margins make sense, then you go
 8    back and, like, okay, is this worth the investment or
 9    not?
10    BY MR. ESTERKIN:
11         Q    So at the moment, then, you -- Scoobeez lacks
12    sufficient information to enable it to make a decision
13    as to whether or not the Uber contract makes economic
14    sense for Scoobeez.
15              Is that a fair summation?
16         A    Correct.  Correct.
17              And, also, with all the stuff that's going on
18    in the background with -- you know, the plan is not
19    confirmed yet.  So it has to be confirmed before you
20    make such decision.
21         Q    Okay.  And, of course, there's nothing in any
22    of the projections about -- sorry.
23              There's nothing -- the projections do not
24    include any anticipated revenue from Uber, correct?
25         A    Correct.
```

Page 110

 1      Q    And the budget doesn't anticipate any income

 2    from Uber, correct?

 3      A    Correct.

 4      Q    All right.  Are there any other entities with

 5    whom Scoobeez has had discussions about new business,

 6    besides the ones we've already talked about?

 7      A    I'm trying to think.  We talked about Bristol,

 8    Wal-Mart, Lime.  We've talked about Uber, LSO, OnTrac.

 9    Those are the ones that come to mind.

10      Q    Sitting here today, you can't recall any

11    others; is that correct?

12      A    Not at the moment, no.

13           MR. ESTERKIN:  Okay.  Give me a minute.  I

14    want to go back and look at my notes.

15           (Pause.)

16           MR. ESTERKIN:  Okay.  I think that I'm done

17    asking questions for today.  We're going to reserve the

18    right to re-call Mr. Voskanian after we determine what

19    happened to the various documents, Mr. Simon, that I've

20    asked you to produce that Mr. Voskanian testified

21    existed but that we didn't receive, at least as of yet.

22           Once we receive those documents, we'll make a

23    determination as to whether or not we need to reconvene

24    Mr. Voskanian's deposition so that we can ask him

25    questions about those documents.

                                              Page 111

1          As a result, given the timeline that we're on,

2     Mr. Simon, I would really -- I would appreciate it if

3     you could provide those documents as quickly as

4     possible.

5          MR. SIMON:  Yes, Richard.  That's the plan.

6          Can you do me the favor, because I know we

7     talked about a variety of things -- and I have my own

8     list, but I don't want to be confused.  So could you

9     send me an email with the documents that you're asking

10    for --

11         MR. ESTERKIN:  Sure.

12         MR. SIMON:  -- to be very clear?

13         MR. ESTERKIN:  Well, the documents I'm asking

14    you for is anything that wasn't produced but that was

15    requested in the request-to-produce documents that was

16    served on your client.  That's -- that's what I'm asking

17    for.

18         Mr. Voskanian has testified as to a number of

19    specific instances in which documents existed that he

20    provided to Mr. Sheikh that somehow didn't find their

21    way to us, along with the other documents that were

22    produced, and those are the documents that are referred

23    to in the deposition, but I want to be very clear that

24    what we expect is a full and complete production of

25    documents pursuant to the request, other than privileged

Page 112

1  documents, and I don't think any of the requests in any

2  way even approach documents that could be privileged.

3          MR. SIMON:  Okay.  I'm asking you for an

4  email, though, because there's a lot of things that he

5  talked about.  So I'm not trying to hide the ball or

6  anything, Richard.  I appreciate your catch-all.  Just

7  send me an email, and we'll get right on it.

8          MR. ESTERKIN:  Well, I'll send you -- once

9  again, I'll send you an email with the documents that he

10 testified about --

11         MR. SIMON:  I --

12         MR. ESTERKIN:  -- but I want to be clear that

13 our request is for the documents that were described in

14 the request to produce, and it's not limited to the

15 documents that Mr. Voskanian testified about that were

16 not produced.

17         MR. SIMON:  Got it.

18         MR. ESTERKIN:  Okay.  With that, why don't we

19 go off the record for a minute.

20         (Discussion off the record.)

21         MR. ESTERKIN:  All right.  Let's go back on

22 the record.

23         While we were off the record, we discussed --

24 I discussed with Mr. Simon entering into a stipulation

25 with regard to the witness's review and signing of the

                                          Page 113

1    deposition.  He declined to do so, and so with that, we

2    are off the record.

3                  (TIME NOTED:  5:40 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 114

1        I, GEORGE VOSKANIAN, do hereby declare under

2  penalty of perjury that I have read the foregoing

3  transcript; that I have made any corrections as appear

4  noted, in ink, initialed by me, or attached hereto; that

5  my testimony as contained herein, as corrected, is true

6  and correct.

7        EXECUTED this _____ day of _____,

8  2020, at _____, _____.

            (City)                    (State)

9

10              _____

                    GEORGE VOSKANIAN

11                      VOLUME I

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 115

```
 1           I, the undersigned, a Certified Shorthand Reporter

 2     of the State of California, do hereby certify:

 3           That the foregoing proceedings were taken before

 4     me at the time and place herein set forth; that any

 5     witnesses in the foregoing proceedings, prior to

 6     testifying, were administered an oath; that a record of

 7     the proceedings was made by me using machine shorthand

 8     which was thereafter transcribed under my direction;

 9     that the foregoing is a true record of the testimony

10     given.

11           Further, that if the foregoing pertains to the

12     original transcript of a deposition in a Federal Case,

13     before completion of the proceedings, review of the

14     transcript [   ] was [   ] was not requested.

15               I further certify that I am neither

16     financially interested in the action nor a relative or

17     employee of any attorney or any party to this action.

18           IN WITNESS WHEREOF, I have this date subscribed my

19     name.

20     Dated:    06/17/2020

21
                     Catherine A. Ryan
22

23               Catherine A. Ryan, RMR, CRR

24               CSR No. 8239

25

                                                Page 116
```

[& - 69]

**&**

**&**   3:4,15 4:4,10
43:5

**0**

**0001**   5:8 38:1
**0002-0004**   6:24
**0002340**   6:9
**0002341**   6:9
**0002342**   6:14
**0002343**   6:14
**0002353**   6:18
**0002356**   6:18
**0005**   5:14 54:10
**0006**   5:22 32:15
**0007-0009**   6:24
**0010**   6:3 45:5
**0011-0015**   6:24
**0016**   6:7 88:12
**0017**   6:24
**0018**   6:11 91:3
**0019**   6:16 92:20
**0020-0021**   6:25
**0022**   6:20 81:16
**06/17/2020**   116:20

**1**

**1**   1:25 37:23 40:19
40:19 52:7 71:2
86:22
**1.5**   40:13
**10**   45:2 110:5
**10,000**   81:12
**100**   100:13
**10016-1314**   3:6
**10250**   4:12
**10th**   4:5
**11**   1:8 2:8 5:8,16
6:3 55:2 92:6
97:25
**11.108**   55:14

**116**   1:25
**11th**   55:21
**12**   78:2
**120**   46:6 67:12
**14**   5:23 33:4,13
37:20
**148,852**   46:5
**14989**   1:5 2:5
**14991**   1:6 2:6
**14997**   1:7 2:7
**15**   1:16 2:17 7:1
37:4 45:21 110:6
**16**   88:10
**17**   91:23
**1700**   4:12
**18**   76:16 91:5,10
91:23 106:3
**18th**   48:3
**19**   6:5,11 45:21
52:10 92:17 93:15
**1st**   27:11

**2**

**2**   40:20 53:3 78:13
**2.3**   82:17
**20**   16:12 47:17
72:1
**2014**   37:4
**2017**   27:6 75:13
76:16
**2018**   76:10 78:16
78:22 79:6,7 80:9
80:11
**2019**   6:11 15:17
27:11,19 44:1,5,9
44:13,18,23 90:4
91:20
**2020**   1:16 2:17 7:1
15:16,18 45:4
55:3 59:5,22 60:2
60:7,17 61:20
67:19 74:23 80:20

**88:4,17,25 92:18**
93:14 115:8
**2023**   85:6
**2025**   102:11
**21**   75:1
**212**   3:7,7
**213**   3:17,18 4:6
**22**   81:14
**229-1234**   4:13
**229-1244**   4:13
**22nd**   3:16
**23**   89:4 92:18
93:14
**2423**   82:24 85:13
**2436**   83:9
**2438**   86:5
**25**   100:3
**28**   88:17
**28th**   74:23 88:25
89:15
**2:19**   1:5,6,7 2:5,6
2:7
**2:39**   2:16 7:2

**3**

**3**   56:9,12,18 57:15
57:18
**3,000**   53:3
**3.1**   85:9,10,12,12
85:13
**30**   16:12 19:21
45:4,11 59:4,7,8
59:22 60:2,9 78:3
**300**   3:16
**30th**   59:2,3,4
**31**   44:13,17 47:9
60:17 67:19
**310**   4:13,13
**312**   3:11,11
**31st**   65:23
**32**   5:22

**324-1001**   3:11
**324-1145**   3:11
**338-3603**   3:7
**37**   6:22
**38**   5:8

**4**

**40**   78:3
**400**   47:16 100:2
**41,310**   47:8
**4137303-2**   1:24
**443-3659**   4:6
**45**   6:3 34:15,16
**4:22**   74:6
**4:23**   74:6
**4:35**   74:7

**5**

**5**   40:19 54:7 71:3
81:12 106:19
110:5
**500**   41:16
**500,000**   40:5,9
41:10,14 42:11,19
51:22 52:3,20
68:9
**52**   104:10
**54**   5:14
**5:40**   2:17 114:3

**6**

**6**   5:19 32:7,17
68:5
**60**   47:9 67:2,11,16
**60601-5094**   3:10
**612-2500**   3:17
**612-2501**   3:18
**613,206**   46:2
**687-2329**   3:7
**69**   5:11 52:10

[7 - approves]

| 7 | | | |
|---|---|---|---|
| **7** 5:4 33:4,13 79:18 | **accrual** 58:3,5,7 58:11 | **alignment** 36:1 | 56:4 57:7 58:6 63:6 64:10 65:15 |
| **7484** 116:22 | **accuracy** 67:4,18 | **alleged** 31:15 | 66:18 72:17 73:11 |
| **754** 37:25 | **accurate** 53:4 65:2 | **allocate** 104:12 | 78:13,25 79:9 |
| **77** 3:10 | 67:21 68:2 75:4 | **allocation** 104:14 | 84:10 100:1,9 |
| **774** 45:3 | 78:19 79:10 89:12 | **allow** 9:24 10:7 | 109:23,23,23,24 |
| **786** 32:19 | 89:13 92:1 | 108:20 | 109:25 |
| **79,360** 52:25 | **accurately** 67:24 | **altogether** 13:17 | **answered** 8:21 |
| **7th** 62:12 63:22 | **acquire** 60:24 61:2 | **amazon** 2:14 3:14 | 48:12 79:13 |

| 8 | | | |
|---|---|---|---|
| | 106:10 | 7:11 34:13 48:22 | **answering** 50:2 |
| **81** 6:20 | **acquired** 37:4 | 49:5,18 50:8 51:1 | **anticipate** 90:14 |
| **8239** 1:23 2:18 116:24 | **action** 116:16,17 | 51:11,11 60:22 | 92:9 99:12 111:1 |
| **865** 4:5 | **actively** 75:6 | 61:3,5,23,25 62:5 | **anticipated** 85:25 |
| **871,230.84.** 52:15 | **actual** 30:3 | 62:12,16,19 63:2 | 100:20 110:24 |
| **88** 6:7 | **add** 97:9,10 | 63:21 64:2,3,21 | **anticipates** 31:20 |
| | **added** 94:20,25 | 67:23 74:14,16,19 | 90:10 |

| 9 | | | |
|---|---|---|---|
| | 97:11 | 75:7,16,19 76:5,17 | **anybody** 13:4 |
| **90** 3:6 | **additional** 70:5,6 | 76:21,24 77:4,5,6 | 41:13 48:16,19 |
| **90017** 4:6 | 70:10,16 73:25 | 77:10,11,24 78:7 | 69:8 90:2 |
| **90067-6253** 4:12 | 79:15,21,22 95:12 | 79:19 82:15 86:16 | **anyway** 97:11 |
| **90071-3132** 3:17 | 95:23 105:21 | 86:19 89:23,24 | **apologize** 26:19 |
| **91** 6:11 | 107:25 108:11,24 | 90:2,7,11 97:2,2 | **appear** 115:3 |
| **92** 6:16 89:4 | 109:15,18 | 98:1,3 100:3 | **appearances** 3:1 |
| **93** 75:1 | **addressed** 71:12 | **amazon's** 99:12 | 4:1 |
| **95** 52:12 78:13 91:22,23 | **adds** 98:10 | 100:4 | **appearing** 2:15 |
| **9th** 66:24 67:2,16 68:24,25 | **administered** 1:6 2:6 7:5 116:6 | **ambiguous** 41:21 | **appears** 45:2 |
| | **advance** 22:2 | **amended** 5:8,15 | 81:14 |
| | **aged** 46:10 | 37:24 38:10 | **appendix** 83:5,8 |

| a | | | |
|---|---|---|---|
| | **ago** 15:16 37:3 | **amount** 35:1 | 85:20 86:1,3,9 |
| **able** 14:22 16:21 32:20 39:23 61:7 96:23 | 55:15 75:11 80:25 101:16,24 103:5 | 51:23 52:25 70:16 71:5 81:9 106:9 106:17 | **applies** 68:2 |
| | **agreement** 6:21 | **amounts** 34:12 | **apply** 8:17 98:11 |
| **access** 11:15 | 81:25 82:4,6,7,10 | 71:2,4 | **appointed** 107:14 |
| **account** 6:5 41:2 68:10 107:21 | 83:6 85:16,19 86:22 87:1,3 | **angeles** 1:3 2:3 3:17 4:6,12 | **appreciate** 25:17 112:2 113:6 |
| **accounting** 31:11 | **agreements** 32:4 | **answer** 9:6,15,20 | **approach** 113:2 |
| **accounts** 31:8 45:23 69:5 | **agrees** 83:13 85:17 | 9:21,23,25 10:4,8 | **appropriate** 85:18 |
| | **al** 1:6 2:6 | 10:14 12:1,2,12 | **approval** 29:22 |
| | **alcohol** 75:22 | 16:8 21:23 40:25 | **approve** 30:17 |
| | | 41:24 44:3,3 49:9 | **approved** 30:15 |
| | | 49:10,11 55:15 | **approves** 107:17 |

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 290

[approximately - boilerplate]

**approximately** 12:8 15:19 52:2

**approximation** 81:9

**april** 27:19 45:4 45:11

**ar** 69:4

**area** 31:7 35:6 36:14 51:24 83:5 83:12,13,15,18,22 84:1,4,15

**areas** 27:24,25 84:19,23

**argumentative** 49:25 56:25 57:12 64:8

**arrived** 30:14 40:9 40:10 56:18

**asap** 26:16

**ascertained** 25:20

**asked** 22:8,22 48:12 49:23 55:7 56:1 57:19 61:15 61:17,22 64:15 67:4 85:6 94:22 95:10,12,14,17,22 111:20

**asking** 9:19,22 17:13 21:7 22:20 23:21 49:8 56:5,8 63:16 67:14 93:9 97:9 111:17 112:9 112:13,16 113:3

**aspect** 28:2,19 51:6

**aspects** 28:11

**aspersions** 105:5

**assert** 8:18

**assume** 9:16 27:5 47:24 48:17 49:5 50:8,13,25 51:9,20

52:24 58:20 60:6 60:21,24 61:2 68:23 92:13

**assumes** 41:21 63:5 64:7 66:3,16 67:8 109:21

**assuming** 29:22 53:9 54:2,4 59:6 65:23 98:16 99:14

**assumption** 53:8 53:24 62:3,4 63:2 63:17

**assumptions** 66:7 66:7

**attached** 24:25 25:3 65:7 115:4

**attachments** 24:3 24:5 25:4 26:10 26:13

**attempt** 50:8,13 53:20

**attempted** 75:9

**attempting** 28:17 74:19 75:2

**attention** 74:13

**attorney** 3:5,9,16 4:5,11 7:11 11:22 12:2,10,13,22 116:17

**attorneys** 12:21 36:3

**attract** 28:17 74:13 105:20

**authority** 30:16 94:24 95:7,15 96:12 98:19

**auto** 93:17

**autogenerated** 93:3

**automatic** 61:7,11

**available** 54:19 93:19

**avenue** 3:6,16

**avoidance** 8:16

**aware** 21:25 29:9 47:23 48:10 53:5 53:18 108:11

**b**

**b** 85:20 86:1,3,9

**b2b** 6:21

**b2c** 6:21

**back** 9:15 14:23 17:23 20:14,18,24 21:2,3 23:18 24:17 25:11,17 34:17 37:4 39:1,3 47:5 53:12 57:2 68:4 76:16 83:11 84:8 87:8 95:11 95:22 99:3 110:8 111:14 113:21

**background** 110:18

**balance** 58:14,23 58:24 59:7 60:1,4

**balances** 68:19,24

**ball** 113:5

**bank** 37:19

**bankruptcy** 1:1 2:1 8:8 27:19 29:9 29:11 30:9 32:19 33:9,12 36:18 37:24 42:21,23 45:3 79:16 92:3 93:11 95:5,8 96:1 96:7,15 98:7,9

**based** 50:5 59:24 94:1

**basis** 58:3,3 82:12 87:5 100:17 109:12

**bates** 6:8,13 82:19

**bedrooms** 16:7,12

**began** 15:16

**beginning** 2:16 80:20

**behalf** 2:14 38:17 39:11 79:4

**believe** 8:10 16:25 21:6 23:17 24:17 26:3,8 37:3 47:5 47:14 51:22 52:5 59:12 80:8,13 85:6 88:24 89:16 90:16 94:3 96:1 96:13,15 97:4 98:24 104:18

**bender** 4:10

**benefit** 54:13 68:10 72:4,24

**benefits** 72:14

**best** 10:25 45:18

**better** 29:20 70:2

**beyond** 60:8,18 70:25 71:5

**big** 36:4 39:18 103:8 104:10

**bill** 43:23 81:10

**billed** 46:14

**billing** 30:18 43:19 47:19 53:4 81:6

**bills** 43:20,22 44:16,22

**bit** 84:2

**bk** 1:5,6,7 2:5,6,7

**blank** 34:8 35:16 35:17

**board** 27:9 40:1 107:13,17 108:15

**bockius** 3:15

**boilerplate** 98:13

Page 3

[books - clients]

**books** 30:4 37:15 46:3
**booster** 51:1,12 52:24
**botch** 67:11
**bothering** 64:16
**bottom** 42:6 82:20 89:4
**boulevard** 4:12
**break** 8:23 74:3,6
**brian** 5:14 30:18 30:20,25 31:1,6 32:1 38:19 44:6 48:24 49:19 54:3 57:16 61:16
**brief** 7:13
**briefly** 27:16 31:23
**brill** 4:10
**bring** 105:23
**bristol** 6:8 21:22 75:9 87:9,11,14,16 87:19,20,24,25 88:11,17,23 89:3,6 89:15,19 111:7
**broad** 21:13 55:12
**brought** 46:12
**buchalter** 43:10 44:20
**bucks** 37:20
**budget** 32:2 33:2 33:22 34:6,24 35:14,23 40:24 65:7 68:14,19,25 69:1 85:2 99:10 102:20 105:16 111:1
**budgets** 31:19,24 31:25
**bunch** 96:9 98:16

**business** 6:3 12:4 14:21,25 15:12 23:20 28:3,18 29:6 50:20 51:6,8 51:17 60:21 61:2 66:8,9 69:16,19,24 71:3,21 74:13,14 75:20,21 76:6,17 76:22 77:1,3,10,13 77:16 78:1 79:4 79:21 90:19 92:13 95:24 98:7,9 99:15,16 100:23 102:23 110:2,5 111:5
**businesspeople** 97:6
**buy** 51:14

**c**

**c** 28:15
**calculations** 106:9
**california** 1:2,15 2:2,16 3:17 4:6,12 7:1 94:19,24 95:7 95:15 96:12,14 97:18 98:19 116:2
**call** 19:17,19,22 62:12,16 65:17 79:19 84:20 101:8 101:13 111:18
**called** 26:18
**calls** 16:1 17:7,11 40:4 49:7,11 62:8 62:9 63:3,4 64:5,6 65:13 66:1,2,15,16 67:7,9 72:15,16 99:21,25 100:8 109:20
**camera** 42:5,6
**capital** 4:3 69:25 70:5,7,10 73:6,11

73:20,25 104:14 105:21,22 106:9 106:17,22,25 107:25 108:12,17 108:20,24 109:18
**car** 86:24 104:6
**cargo** 86:19
**case** 29:10 30:9 32:19 33:9,11 43:1 116:12
**cases** 37:25
**cash** 5:23 6:3 31:15 32:18 33:21 35:6 36:15 37:13 40:4 41:3 42:17 58:2,5,7,11,14 59:10,24 65:7 68:5,18,19,24 69:2 69:4 72:3,7
**casting** 105:5
**catch** 39:23 44:2 113:6
**catherine** 1:22 2:17 116:23
**cause** 46:15 108:23
**caused** 47:21
**caution** 7:22
**cease** 76:15
**central** 1:2 2:2
**ceo** 27:10 28:4 49:21 101:9
**ceos** 101:12
**certain** 42:15 55:18 94:16 110:3
**certificate** 98:20
**certified** 2:18 116:1
**certify** 116:2,15
**cetera** 33:12

**chain** 91:16
**chance** 91:9
**change** 34:23 35:22 36:2,14 97:13,13 100:18
**changed** 34:11 35:25 36:5,11 38:12
**changes** 29:22 34:6,18 35:13
**chapter** 1:8 2:8 5:8,16 6:3 92:6 97:25
**check** 24:17 25:11 46:18 47:15 89:16 94:7 98:24 101:25 104:19,22 105:2
**checkboxes** 99:2
**chicago** 3:10
**chief** 27:2,17
**chose** 47:20
**circulated** 34:2,14
**circumstances** 47:20 73:21,22 100:17
**cities** 46:23
**city** 115:8
**claim** 50:9,14
**clean** 10:11
**clear** 9:3 16:5 25:22 81:7,8 94:16 99:2,3 112:12,23 113:12
**cleared** 95:14 99:14
**client** 11:22 12:2 12:10,13 74:20 112:16
**clients** 12:3 14:6 21:19,20 77:20 79:16

[clock - correct]

| | | | |
|---|---|---|---|
| **clock** 74:6 | **companies** 77:17 | **confirm** 53:20 | 50:25 51:21 52:15 |
| **close** 65:19 67:25 | 80:2 92:3 110:4 | **confirmation** 5:15 | 52:19,24 61:6,24 |
| 91:16 92:4 | **company** 28:1,16 | 53:6 55:9 66:24 | 61:25 62:13,20,23 |
| **closely** 28:10 | 28:20 29:1 37:1,2 | 67:3 | 63:2,22 64:21 |
| **closer** 67:20 | 37:4,6,12 43:19 | **confirmed** 68:24 | 74:16,18 77:6,7 |
| **collateral** 5:23 | 49:22 51:1 57:25 | 107:9 110:19,19 | 79:20 81:15 83:4 |
| 31:15 32:18 33:22 | 66:20,20 72:1 | **confused** 112:8 | 84:25 85:9 86:1 |
| 65:8 68:5 | 75:25 76:16,20,23 | **connection** 8:8,13 | 88:2 94:12 96:24 |
| **collecting** 31:20 | 78:2 106:25 107:6 | 30:9 38:21 | 103:9,13 104:3,5,9 |
| **collections** 34:13 | 107:9,18 108:16 | **connections** 28:24 | 104:18 106:2,11 |
| 34:16 | 108:20,24 | **cons** 72:18 | 106:18,23 108:1 |
| **column** 47:9 | **compensate** 14:23 | **consciously** 47:22 | 108:13,21,22 |
| **combination** 23:1 | **compensation** | **consented** 7:17 | 109:19 110:13 |
| **come** 12:9,17 | 14:24 | **consider** 109:8 | **contracts** 47:25 |
| 17:23 23:24,25 | **compilation** 55:14 | **considered** 59:3 | 48:16,22 50:14 |
| 24:1,2 51:25 | **complete** 9:25 | **consistent** 82:14 | 51:9 78:5,6 98:22 |
| 92:13 98:14 99:3 | 30:24 31:1 112:24 | **consistently** 33:14 | **contribute** 108:12 |
| 107:2,5 111:9 | **completed** 9:21,23 | **constellation** 4:12 | **controlled** 40:5 |
| **comes** 71:18 72:7 | 10:14 21:23 | **consult** 8:19,23 | **conversation** |
| 72:9 97:22 | **completely** 67:11 | 41:13 | 13:10,15 25:23 |
| **coming** 41:1 42:4 | **completion** 116:13 | **consulted** 40:18 | 55:25 62:15,18 |
| 48:11 97:22 104:8 | **complex** 72:22 | **consulting** 8:10 | 63:14 |
| 108:15 | 78:1 | **contact** 19:18 23:2 | **conversations** |
| **comment** 34:3 | **compliance** 92:5 | 55:21 90:1,18,22 | 13:5,8,13 15:16 |
| **comments** 29:25 | 93:8,9 95:3,23 | 100:22 101:14 | 18:2,5,9 19:4,16 |
| **commitment** | 96:21,25 97:6,23 | 103:1,11 | 55:7 |
| 70:13 103:9 | **complicated** 30:15 | **contain** 31:19 | **copies** 22:23 23:10 |
| **committee** 4:9,9 | 76:13 | **contained** 17:16 | 24:12 |
| 5:11,19 34:3,7 | **complied** 97:11 | 23:19 115:5 | **copy** 18:22 25:7 |
| 43:8 107:24 | **comply** 98:3 | **context** 79:11 | 54:8 74:16 81:14 |
| **communicate** 14:5 | **computer** 93:20 | **continuation** | 104:18 |
| **communicated** | **concerned** 51:6 | 61:23 | **coronavirus** 7:17 |
| 91:17,19 | **conclusion** 62:9 | **continue** 50:20 | **corporate** 93:4 |
| **communication** | 63:4 64:6 66:2,17 | 51:17 60:21 63:2 | **correct** 10:7 13:19 |
| 14:1 21:19 91:11 | 67:9 72:16 92:7 | 64:22 | 14:3 15:2,13,14 |
| 93:5 | **conduct** 7:14 | **continued** 4:1 5:22 | 16:15 17:3,4 18:3 |
| **communications** | **conference** 11:16 | 6:1 32:18 79:15 | 18:4,6 19:12 |
| 7:23 8:1 15:20 | 11:17 19:17 | 79:24 | 20:10 22:25 23:4 |
| 16:17,22 17:2 | **confidence** 67:3 | **continuous** 82:11 | 23:5,12,15 24:25 |
| 23:7,14 62:5 93:1 | 67:17 | **contract** 48:23 | 25:1,5,6 27:3,11 |
| 93:13 102:13 | | 49:5,18 50:9,15,15 | 27:12,14,15 28:5,6 |

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 293

[correct - deposition]

29:11,17,18,24
30:1,2,2,5,6,22
31:2,3,10,12,13,17
31:18,21 33:23,25
34:3 35:2,7 36:12
36:13,20 39:11,12
40:16,20 43:5,8,9
43:11,14,15,17,21
45:16,19,20 46:1,4
46:8,22 47:4 48:3
48:8,9,23 49:18
50:22,23 52:4,6,22
53:2 57:21,21
58:18,19,25 59:8,9
59:19,20,22,23
60:3,6,7 61:8,13
62:16 64:22 65:9
65:12,24 66:12,24
67:6,10,19 68:11
68:15,20,21 69:3
70:7,8,10,11,13,14
72:1,10 73:16,25
76:7,8,12 77:5,17
77:20,24 78:24,25
79:16,22,25 80:12
82:10,11 83:19
84:16,19,23 85:1,2
85:3,8 86:2,10,11
86:12,21,22 87:16
87:23 88:25 89:15
89:20,21 90:7,11
91:7,20,21 92:10
94:13 99:7,10
100:24 101:6
102:3,7,11,14,15
102:17,18,20,21
103:12,13,23
104:1,4,5 105:14
105:15,17,18,21
106:4,7 107:12,14
107:15,18 108:8,9

109:10 110:16,16
110:24,25 111:2,3
111:11 115:6
**corrected** 115:5
**corrections** 115:3
**cost** 76:20 77:12
**costs** 42:21
**counsel** 8:18,19,24
16:4 30:13 43:8
43:17
**count** 17:22
**counting** 17:19
**couple** 13:11,16
61:19 102:1
**course** 8:9 10:3
33:8 110:21
**court** 1:1 2:1 9:14
10:19 29:11,23
31:16 38:11 39:23
45:3 54:12 57:1
61:19 84:7
**cover** 43:25 77:24
**covered** 11:11,18
11:20 67:19
**covering** 44:17
**covers** 26:25 34:20
40:23 44:12 45:4
**covid** 95:2
**created** 31:24,25
41:3 56:13
**creditor** 4:3,9
68:10
**creditor's** 43:8
**creditors** 4:9 5:11
5:19 40:5 71:25
107:24,24
**critical** 50:19,22
50:24 63:13
**crr** 1:22 116:23
**csr** 1:23 116:24

**cure** 52:14
**current** 52:4
**currently** 10:23
27:2 38:10 87:18
89:19 90:5 105:23
**customer** 14:20,20
15:1 70:2
**customers** 14:1,8
15:3 24:10

**d**

**daily** 82:12 100:17
109:12
**dallas** 84:5,10,15
**dangerous** 101:3
102:1
**date** 13:9 19:20
48:7,10 58:18,20
58:22,22,24 59:3,6
60:9,15 61:20
65:22,23 67:6
68:18 69:11 75:14
90:24 101:25
116:18
**dated** 6:11 46:14
46:15 88:17
116:20
**dates** 48:4 60:4
68:17
**day** 34:14,15,16
47:9 60:5 67:11
67:12 81:1,3
115:7
**days** 19:21 46:6
67:2,16 80:25
101:20,22,23
102:1
**deal** 70:6,9
**debate** 103:19
**debt** 57:18 71:9,15
71:19 72:7 73:6
73:15,19

**debtor** 58:17
**debtor's** 53:19
**debtors** 1:7,7 2:7,7
5:10,18 30:13
**december** 44:13
44:17 60:17 65:23
67:19 91:18,20
**decided** 76:11
109:12
**decides** 82:7
**decision** 62:22
78:23 79:4 96:8
96:16 109:16
110:12,20
**decisions** 28:12,13
**declaration** 5:14
53:6,10,19 54:3,8
54:18,24 55:8,22
55:24 56:2,3,7,11
56:16
**declarations** 53:13
**declare** 115:1
**declined** 114:1
**define** 42:25
**defined** 83:13
**delay** 47:21
**delayed** 47:22
**delays** 47:19 96:7
**deliveries** 77:19
80:5
**delivery** 6:13,22
75:22 80:11 86:18
87:20,25
**demands** 76:24
**departed** 27:14
**depends** 105:23
106:13,19
**deposed** 8:8 48:21
**deposition** 1:14
2:13 7:12,14,15,18
8:3,7,9,13 10:3,6

Page 6

[deposition - emails]

11:3,6,21 12:7,15
13:2,18,22 16:8
18:1 20:13,24
21:9,14,17 22:2
26:11,24 33:8,15
54:14 68:12 74:22
75:1 78:13 89:2
91:22,23 111:24
112:23 114:1
116:12
**derived**  30:4
**describe**  27:16
31:23
**described**  83:5,14
85:20 113:13
**description**  5:7
6:2
**detailed**  106:12
**details**  21:7 72:22
**determination**
111:23
**determine**  14:24
111:18
**device**  8:11
**dialogue**  75:10
**diamantatos**  3:9
**difference**  71:24
72:11
**different**  15:20
16:17,22 29:3
34:17 36:18 40:23
41:2 51:23 52:2
69:17 98:4,16
107:2,4
**dilute**  72:19,20
**direct**  51:7,7,10,11
93:5
**direction**  116:8
**directly**  38:16
39:15 40:21,25
43:19 55:10,16

72:5 93:16 108:2
**directors**  107:13
**disbursements**  6:4
34:22 35:2
**discontinued**
78:16
**discuss**  28:14
51:24 72:21
**discussed**  21:11,18
39:19 40:2 69:14
104:13 113:23,24
**discussing**  103:10
**discussion**  12:19
12:20,23 38:25
49:14 87:21
108:16 113:20
**discussions**  12:25
32:4 39:14,16
48:15,18 56:15
69:8,13,18,20,22
71:13 73:5,7,8,10
87:10,14,18,24
89:14,23 106:21
106:24 107:23
108:6,7,11,19
109:3 111:5
**displayed**  36:12
**distancing**  7:16
**distinguish**  17:6
**distracted**  76:22
**distributed**  41:11
**district**  1:2 2:2
**diversification**
71:2
**diversify**  12:4 75:3
**divert**  105:25
107:1 108:17
**division**  1:3 2:3
28:7
**docket**  33:12
37:25

**document**  22:21
23:22 24:8 26:21
32:19 33:11,13,17
36:10 39:18 45:3
55:2,2 87:7 105:8
**documents**  11:12
13:21,23,25 14:9
21:8,10,12,16,18
22:1,2,5,8,11,13
22:14,19,20,23
23:3,6 24:25 25:3
25:16,19 33:9
53:15 87:6 93:10
97:8,12 104:1
111:19,22,25
112:3,9,13,15,19
112:21,22,25
113:1,2,9,13,15
**dodge**  86:17
**doing**  12:4 14:21
14:25 18:14 50:20
51:17 60:15 75:21
76:6 77:2 78:24
80:17,23
**dollar**  57:15
**dollars**  41:19
68:25 70:21,25
**dot**  94:20 95:17
**double**  53:4
104:19
**doubt**  8:16
**draft**  30:23 33:24
34:11,19 98:22
**drawn**  9:5
**drive**  3:10 104:6
109:13
**drivers**  110:4
**due**  7:16
**duplicates**  54:15
**duties**  27:17

**e**

**earlier**  47:2 68:11
85:5
**earliest**  89:7
**early**  15:16 61:20
88:4
**easy**  104:7
**eat24**  75:20 76:1
78:15,17,23,24
80:3
**economic**  110:13
**ecosystem**  98:1
**educated**  65:3
**effective**  58:18,20
58:22 59:3,6
61:13 65:22,23
69:11
**effort**  74:13 78:6
**efforts**  77:3
**eight**  67:5
**either**  8:22 13:5
19:13 28:18 34:7
44:3 47:14 73:16
73:17 105:22
**else's**  97:5
**email**  6:7,11,16
19:5 23:7,14 24:1
24:2 34:15 88:16
88:22 89:15 90:24
91:2,6 92:17
93:14 94:4 97:16
112:9 113:4,7,9
**emails**  8:1 14:2,7
17:6,7,10,15,19
19:3,6,11 20:15,24
23:10,19,22 24:20
24:22,24 25:3,4
26:9,11 87:8 88:4
88:6,10 91:6,14
93:3,17,23,25 94:7

Exhibit 2 - page 295

[emanuel - file]

emanuel   4:4 43:16
  43:19
employed   27:7
employee   27:23
  116:17
employees   28:15
empty   32:12
enable   55:8
  108:12 109:16
  110:12
enabled   15:4
ended   87:22
engage   107:18
entails   28:1
enter   14:25 106:18
  106:22 108:1,13
  109:18
entering   113:24
entire   107:6
entities   36:18,23
  111:4
entity   36:24 37:2
environment
  100:19
epidemic   7:17
equity   71:9,15,16
  71:17,19 72:1,8,9
  72:19 73:6,15,19
error   36:1
especially   95:1
  96:24
essentially   70:4
  77:15 82:7
estate   40:4 68:18
  69:2
esterkin   3:15 5:4
  7:9,11 12:5,16
  16:3 25:13,15
  26:3,17 32:6,11,13
  32:17 37:22 38:3
  38:5,23 39:1

41:18,23 45:1,7
  48:14 49:3,16
  50:4 53:17 54:7
  54:12,17 57:1,13
  62:10 63:11 64:1
  64:9 65:5,20
  66:10,22 67:13
  73:1,3 74:5,9,11
  81:13,20,23 84:7
  84:13 88:5,8,15
  91:1,5,8 92:16,22
  94:3,6,10 99:22
  100:5,11,21
  104:17,23 105:1,3
  105:8,12 109:24
  110:10 111:13,16
  112:11,13 113:8
  113:12,18,21
estimate   14:14
  16:21 17:20
  106:12,17
estimation   16:23
et   1:6 2:6 33:12
eventually   84:5,11
everybody   8:17
  72:23 74:7 96:20
  104:8
evidence   41:21
  63:5 64:7 66:3,16
  67:8 109:21
exact   17:23 48:7
  52:25 101:25
exactly   14:18
  53:13 90:25
examination   5:2
  7:8
examined   7:5
example   14:19
  30:13 56:9 70:19
excel   18:14,18
  20:9,11,19 21:3

24:12 25:8
exchanges   46:25
excited   96:20
excuse   35:4
executed   115:7
executory   47:24
  48:16 50:14,15
exempted   40:1
exemptions   39:20
exhibit   5:8,14,22
  6:3,7,11,16,20
  32:7,10,15,17
  37:23 38:1 45:2,5
  52:7 54:10 68:5
  81:14,16 88:10,12
  91:3,5,10 92:17,20
  93:15
exhibits   5:6 6:1,24
  54:13,14
exist   94:8
existed   111:21
  112:19
expand   69:19
  76:18 84:19
expansion   69:16
  71:22 72:24
expect   99:17 100:3
  112:24
expectation   99:23
expectations
  99:15
expend   72:4
expense   69:24
expenses   41:15
explanation   7:13
exponential   76:25
exposure   98:10
ext   6:12
extent   11:25 12:12
  16:1 25:3 46:10

extremely   63:18

f

face   42:4
fact   31:14 63:21
  64:2,3 74:22 97:1
  104:19
facts   41:21 63:5
  64:7 66:3,16 67:8
  109:21
fair   62:4 110:15
fairly   67:23
falters   89:9
familiar   30:10
  31:14 87:10
far   21:13 51:6,8
  66:25 67:25 72:21
  73:23
farm   75:9
farms   21:22 87:9
  87:11,14,16,19,20
  87:24,25 88:11,17
  88:23 89:3,6,15,19
fast   100:16,18,19
fault   46:16
favor   112:6
fax   3:7,11,18 4:13
february   15:18
federal   116:12
fee   37:21 44:9,12
fees   30:8 32:1 34:8
  35:6 37:19 42:21
  42:22 43:4,5,7,10
  43:13,16 44:7,12
  45:16 46:16
fifth   5:22 32:17
figueroa   4:5
figure   25:18 46:2
  64:14
figures   30:14
file   31:16 48:2
  55:22 85:10,12

Exhibit 2 - page 296

**[filed - go]**

filed   27:19 29:10
29:17,22 32:19
33:9 37:25 45:3
47:2,3 53:5,10,13
53:19,25 54:3
56:7 79:16
files   53:23
filing   46:18 48:5
final   6:20 35:11,23
97:14 98:25
101:13
finalized   32:5
109:4,8
finalizes   29:20
finance   68:1 70:5
finances   28:1
financial   15:4,11
15:21 16:18 17:2
17:14,16 18:13,17
18:19,22,25 19:7,7
20:7,14,15 23:11
23:19 24:21 25:8
25:16,25 26:14
27:3,17 28:9
57:19,22 58:17
67:15
financially   116:16
financials   23:8,14
financing   69:19
70:13,16,24
find   24:7 55:19
73:4 110:1 112:20
fine   16:23,24
17:25 18:1 74:5
finish   64:3
finished   9:19 96:4
firm   43:11,13,21
44:16,17,20,22
104:20,22,25
105:5,6

first   5:8,15 7:13
8:7 13:7 15:10
27:5,7 61:20
74:15 75:24 81:24
85:15 96:18
five   15:23 16:23
17:1,7,9,18,20
18:1 19:8,9 23:17
23:19 24:20 68:15
68:20 69:1 101:16
101:18
fixed   36:7
flip   78:1
floor   3:16 4:5
flow   37:13 41:3
58:14 59:10,24
flows   35:6 36:15
flying   53:23
fm   85:17
focus   28:24
focused   76:20 77:3
folder   32:12
foley   3:4 43:5,20
43:24 44:9
foley.com   3:8,12
folk   19:24
folks   17:6 19:23
101:15
follow   17:7 26:15
following   25:23
27:22 65:22 67:2
67:16 69:10 79:18
follows   7:6 57:4
84:9
fonts   36:4
food   80:5,11
foot   15:10 104:10
forecast   65:2
foregoing   115:2
116:3,5,9,11

form   23:25 24:1,2
70:1 71:9,18
73:15
forma   58:16 60:1
format   93:18
forth   17:8 34:17
46:24 79:1 87:8
96:19 116:4
forward   15:9
59:13 93:10
forwarded   15:11
19:13
foundation   41:22
109:22
four   13:18 65:24
76:17 80:23,25
81:1,1,5,11 101:16
101:18,20,22,23
101:24 103:5,12
freight   102:25
103:2,2,7,8,12
104:10 105:14,17
105:19
fritz   4:11
front   76:19
fuel   51:1,12
fuels   52:24
full   112:24
fund   40:5
funds   107:1
funnel   46:23
further   66:11
103:11 116:11,15
future   65:18
102:23

| g |
| --- |

gain   95:3
gathered   24:9
gathering   22:4,7
22:11,12,14,19,25

general   6:5 13:23
13:25 48:18 69:12
69:20,21 73:10
generally   28:19
38:9 66:14,19
68:1
generate   93:17
generated   44:12
generates   93:21
geographic   83:5
83:12,15,18,22
84:3,15
george   1:14 2:13
5:3 7:4 15:24
25:25 49:10 54:2
115:1,10
gestures   8:2
getting   9:8 60:14
64:8
give   13:20 14:13
30:25 32:8 98:12
111:13
given   62:4 63:20
64:2,3 67:22
82:11,14 89:12
92:14 94:16 112:1
116:10
gives   47:24
giving   76:21
glendale   1:15 2:16
7:1
global   36:19,21,25
37:8,9,10,15
go   8:20 9:3 14:23
18:14 20:14,18,18
20:24 21:3 23:18
25:17 32:10 33:15
34:15 38:23 39:1
47:5 51:14,15
64:18 66:11 68:4
69:3,6 71:3 74:9

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 297

[go - indirectly]

76:18 82:12 83:11
84:6,11 97:17,17
98:13 99:1 100:20
100:25 106:20
110:7 111:14
113:19,21
**goals** 37:7
**goes** 30:17 31:4
32:2 42:17 61:12
63:9,10 65:8,10
78:21 95:2 102:22
**going** 7:14 8:12
9:15 26:10 32:6,7
33:7,13 34:16
37:22,23 45:1
48:17 51:8 61:25
62:2 63:18 64:18
65:1,18,24 67:24
78:3 80:24 84:6
84:11 92:13
104:13 106:1
107:9,13 109:16
110:17 111:17
**good** 16:5 53:1
67:12 74:7
**gotcha** 105:7
**gotten** 71:13 72:21
105:5
**gradual** 100:12
**grand** 3:16
**great** 27:1 32:24
33:20 38:8 45:10
54:21 93:7
**gross** 81:4
**growing** 75:7
**growth** 73:19
76:25 78:7
**guess** 15:23,24,25
16:10 17:5,20
63:7 64:11,25

**guessing** 65:4
**guys** 38:20 103:18

**h**

**habit** 17:19
**halfway** 83:11
**hand** 16:16 18:16
**handles** 44:6
**hands** 42:3 46:25
**happen** 63:18,18
**happened** 25:18
111:19
**happens** 7:20 10:6
47:18 87:4
**happy** 73:21 74:15
77:11
**hard** 72:9,9 75:7
97:4
**hear** 39:22 75:24
104:23
**heard** 83:25
**hearing** 66:24
67:3
**helpful** 8:11
**helps** 56:14
**hereto** 115:4
**hertz** 46:21,22
47:14,15 50:16,21
51:12,18,20 52:5
52:15 77:17
**hey** 38:20 82:13
97:17
**hide** 113:5
**high** 91:15
**hillair** 4:3 5:10,18
32:2 34:2,7 43:11
43:14,17 57:18
69:9,15,18 70:4,12
70:15 71:4 106:21
107:7,14 108:10
108:12,20 109:5
109:16,17

**hillair's** 37:1 69:9
**historical** 59:2
65:16 67:23
**historically** 34:24
**hit** 34:16 65:18
**hmm** 52:13 55:5
86:6,13
**hold** 17:25 38:22
72:8
**holder** 71:17
**holders** 71:15
72:20
**holding** 42:2
**hope** 63:19,20
65:18 84:18,20
**hopsy** 75:22 76:7
77:6,24 78:15,17
79:5,7 80:3
**horizon** 73:24
**hours** 13:11,16,18
**house** 16:7,9,13
**hr** 28:11
**hubs** 78:2
**huh** 53:14
**human** 93:20,20
**hundred** 70:20,25
99:18,24 100:7
**hurdle** 95:4 97:21
**hurdles** 94:16,18
95:10 96:2,10
**hypothetical**
14:19

**i**

**idea** 70:2
**identification** 6:25
32:16 38:2 45:6
54:11 81:17 88:13
91:4 92:21
**identify** 28:22
**illinois** 3:10

**imagine** 28:14
47:6
**impact** 51:7
**implying** 73:17
**important** 10:12
**impossible** 55:15
**improper** 7:23
**include** 57:19,22
68:15 69:2 90:13
90:13,15 99:6,9
110:24
**included** 25:10
83:22 84:4 85:1,4
102:19
**includes** 7:25 43:5
43:6,7,10,13,16
**including** 45:4
**income** 51:16
58:14 59:14,16,21
59:25 81:4 84:25
99:6,9,19,23
105:14,17 111:1
**incomplete** 10:5
**incorrect** 10:5
**increased** 35:1
**incurred** 30:9
43:16
**index** 5:1
**indicate** 62:19,22
88:3 90:24
**indicated** 39:10
61:5 64:16 70:4
70:15,20 71:4,7,8
73:20 88:2 89:2
99:1
**indicates** 52:14
**indication** 94:16
**indirectly** 40:22
40:23,25 41:4,7
55:11 72:5 108:3

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 298

[individually - layers]

**individually** 28:25
**individuals** 22:10
    39:20
**inference** 9:4
**influence** 10:23
**information** 8:12
    12:2,13 15:4,11,22
    16:14,18,19,20
    17:3,14,16 19:1,7
    20:7,15 23:11,20
    24:9,21 25:9,16,25
    26:14 30:3 45:19
    55:8,23 56:1,6
    109:15 110:12
**informed** 79:19
**infuse** 73:12,14
**initial** 30:23,24
    33:24 34:11,19
    95:10,21
**initialed** 115:4
**initially** 23:2
    35:19,21 37:7
    84:5,10
**injecting** 73:5
**injection** 73:24
**ink** 115:4
**ins** 37:12
**instances** 112:19
**instructions** 11:7
    11:11,14,15 92:14
**insurance** 94:21
    97:1,8,12,13
**intend** 51:16
**intended** 36:11
    62:19 63:22 79:20
**intending** 49:15
    49:19
**intends** 49:5 50:8
    50:13,25 61:6
    101:6

**intentional** 36:2
    42:8
**intentionally** 36:5
**intentions** 61:9
    69:10
**interest** 107:1
**interested** 14:21
    32:2 33:1 70:23
    102:9 103:8
    116:16
**internal** 14:11
**internally** 14:10
    14:15 103:10
**interrupted** 57:3,3
**invest** 71:6 108:23
    109:18
**investing** 108:14
    108:20
**investment** 71:9
    110:8
**investments** 76:19
**investors** 101:11
**involved** 28:10,21
    29:3,5,7 38:16,17
    39:15 41:4,7
    42:23 46:23 48:5
    51:4,5 55:16
    56:16 92:5 93:8
    104:16
**iphone** 8:10
**irrelevant** 71:14
**issue** 73:8 95:7
**item** 69:3
**items** 28:14 32:1
    35:14 51:16 95:14

**j**

**january** 15:18
    74:23 91:23 102:3
    102:6,11
**jason** 20:2

**jason's** 20:4
**jennifer** 4:4
**jennifernassiri** 4:7
**job** 1:24 67:12
    98:11
**john** 3:5 4:11
    12:24 23:1 25:13
    38:20 49:8 94:3
    104:17
**joint** 5:8,16
**jointly** 1:6 2:6
**jpg** 4:14
**jsimon** 3:8
**judging** 62:6
**judgment** 65:17
**july** 27:6 66:24
    67:2,16 68:24,25
    75:13
**jump** 96:10
    104:14
**june** 1:16 2:17 7:1
    48:3 55:2,21 59:2
    59:3,4,4,7,8,22
    60:2,9 80:20

**k**

**keep** 77:2
**kept** 75:7 77:10
    97:9
**kind** 16:11 55:25
    78:15 97:23 98:12
    109:12
**klein** 92:19
**know** 8:9,21 9:13
    9:24 10:7 14:21
    16:6,8 22:18
    23:24 26:2 28:12
    28:24,25 30:16
    34:15 35:9,10
    36:4 38:6,15,18
    39:23 40:13,15
    41:1,7 42:2 43:3

43:18 45:8 48:4
    49:13,14,17,23
    50:16 51:14,15
    54:3,5 55:20 56:3
    56:10,13,19 61:9
    62:2 63:9,15,16
    66:5,25 68:3 69:4
    70:1,20,21 71:16
    73:8,23 75:10,22
    76:18 78:8 82:9
    86:15,23 92:4
    95:25 96:1,3,18,23
    97:2,12,24 98:2,3
    100:17,18 101:2
    101:12,12 102:8
    102:21 104:6,10
    104:15 105:24
    106:20 107:1,10
    108:4 109:2,13
    110:18 112:6
**knowledge** 14:6
    41:4 45:18 87:2
**knows** 99:2

**l**

**l** 5:23
**la** 99:2
**lack** 78:17,25
**lacks** 110:11
**language** 98:13
**lardner** 3:4 43:5
**large** 106:1,3,10
**late** 15:17 46:16
**latest** 46:17 93:6
**law** 3:5,9,16 4:5
    4:11 10:20 43:10
    43:13,21 44:20
**laws** 98:17
**lawyer** 53:24
    98:15
**layers** 97:1

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 299

[leading - minor]

**leading** 38:14 39:14 82:21
**left** 34:8 90:12 92:11 102:22 103:7
**leftover** 42:17
**legal** 28:11 34:12 48:5 51:5 62:9 63:4 64:6 66:2,17 67:9 72:16
**level** 28:15
**levene** 4:10 43:7 44:16
**lewis** 3:15
**liaison** 44:6
**licensings** 94:19
**lifelong** 62:7
**light** 95:1
**lime** 100:23 101:15,18 102:16 102:19 111:8
**limited** 83:4 84:15 113:14
**line** 30:7 31:25 35:14 47:9 51:15 69:3 71:3 75:1 78:13 89:4 91:23
**liquor** 78:9
**list** 51:15 95:21 97:7 105:10 112:8
**listed** 86:1,10,21 86:24
**literally** 37:20
**litigant** 53:14
**litigation** 40:1
**little** 84:2
**llc** 4:3
**llp** 3:4,15 4:4,10
**lnbyb.com** 4:14
**lo** 80:14

**loan** 37:10
**local** 78:9
**locations** 7:21 93:18
**logistics** 2:14 3:14 7:11 100:23 101:15,18
**long** 13:10,15 47:7 75:10 91:17 95:21 97:7
**longer** 76:6
**look** 11:19 13:21 14:8,15 17:18 20:14,19,24 21:3 21:11,16 23:18 40:24 47:5 54:9 55:21 65:16,18 68:5,17 70:3 74:17 83:8 85:9 88:6 91:1,9 111:14
**looked** 11:7,13 21:8,14
**looking** 32:23 35:24 45:9 54:16 54:20 55:1,13 59:13 71:2 75:6 81:12 82:19 86:9
**looks** 42:3 57:25 105:24
**los** 1:3 2:3 3:17 4:6 4:12
**losing** 77:9
**lot** 42:23,25 43:3 53:15 67:3 76:13 76:19 78:4,4,6 95:1 96:22 100:16 113:4
**lso** 6:20 15:6 19:1 19:7,16,23,24 20:7 20:22,25 21:4,7,11

21:17 24:19 25:9 25:25 26:9 75:21 76:3,4 80:3,15,17 80:22 81:14,25 82:3,7 84:23 85:17 111:8
**luck** 29:2

**m**

**m** 4:11
**machine** 116:7
**madam** 57:1 84:7
**main** 19:18 33:13
**maintaining** 78:7
**management** 4:3
**manner** 7:18
**march** 88:17,25 89:15
**margins** 110:3,7
**mark** 32:7 37:23 45:1 54:7 81:13 88:10 92:17
**marked** 6:25 32:15 38:1 45:5 54:10 81:16 88:12 91:3,5 92:20 93:14
**market** 101:3
**marketing** 93:18
**marketplace** 109:11
**marking** 54:13
**mart** 21:22 90:19 90:20,23 91:6,11 91:24 92:10 111:8
**matching** 59:18
**matter** 13:1 71:18 71:20 79:22
**mean** 11:14 16:11 24:5 25:22 27:20 42:25 55:12 63:8 64:11 66:4 70:19

71:11 72:14,18 75:5,6 77:15 86:24 87:17 92:2 96:9 105:22 107:4
**meaning** 104:10
**means** 7:15 38:16 99:20
**medication** 10:24
**meet** 76:24 97:3,4 97:7
**meetings** 26:22 32:4
**members** 40:1
**memory** 9:7,9
**mentioned** 39:20 44:5 50:21 56:11 56:17 75:25 76:2 78:2 80:2,14 93:16
**mentioning** 42:9
**messages** 8:1 14:4 14:5
**messed** 36:3
**met** 42:16,19
**middle** 89:23,24 90:3,6,11
**mile** 6:13,20 89:23 89:24 90:3,6,11
**million** 40:4,9,19 40:19,20,23 41:10 41:14,16 42:11,19 56:9,12,18 57:15 57:18 68:8,15,20 68:25 69:1 70:21 70:25 71:3 78:3 106:19
**mind** 52:2 111:9
**minimum** 82:3 89:8
**minor** 72:20

Exhibit 2 - page 300

[minority - okay]

**minority**  72:19
107:11,20
**minus**  53:3
**minute**  32:13
51:18 88:9 111:13
113:19
**minutes**  74:4
**misleading**  56:25
57:12
**missed**  58:6
**missing**  58:9
**mm**  52:13 55:5
86:6,13
**model**  14:23 18:11
18:13,17,23 24:16
36:25 56:11,13,23
57:10,19,22,24
58:2,5,7,10,21
59:7,12 63:8
64:11,15,24,24
65:3 66:5,6 67:11
67:12 77:16
102:23
**modeled**  14:11
25:8
**modeling**  20:6
24:13
**models**  14:10,12
15:5 18:19 24:14
24:15 25:24 26:5
58:11 66:12
**modified**  87:1
97:12
**modify**  87:3 97:9
**moment**  74:1
80:23 83:1 102:24
104:15 110:11
111:12
**monday**  1:16 2:17
7:1

**money**  31:20
40:24 77:9
**month**  29:11
37:20 47:16,18
81:12 101:18
**monthly**  37:18
60:7,9,12,14,16,17
94:2
**months**  15:16
37:20 65:2,9,11,25
67:5,5 89:8 99:20
100:10 101:16,24
103:5,12
**morgan**  3:15
**morganlewis.com**
3:18
**morning**  82:13
**motion**  48:3
**move**  93:10
100:19
**moved**  34:12,17

**n**

**name**  7:10 12:22
20:3,4 116:19
**names**  20:1
**nassiri**  4:4 38:20
**nature**  69:21
**neale**  4:10 43:7
44:16
**necessarily**  67:10
67:22 98:11
**necessary**  106:10
**need**  8:23 17:25
29:10 42:16 50:18
50:19 51:23 94:1
95:17,18 96:22,22
104:7,16 106:3,10
107:16 111:23
**needed**  31:15
77:23 96:10
106:18

**needs**  104:13
**negotiated**  46:16
**negotiating**  46:12
**negotiation**  40:11
**negotiations**  38:14
96:19
**negotiator**  39:10
**neighborhood**
17:1
**neither**  116:15
**never**  16:9 37:4
**new**  3:6,6 12:3
28:17 29:6 100:23
105:23 111:5
**note**  37:1
**noted**  114:3 115:4
**notes**  11:8 18:8,12
18:12 23:18
111:14
**nothing's**  94:15
**november**  6:11
91:18,20
**number**  5:7 6:2
17:23 33:8,11,11
34:17 40:9,13,14
40:16,19 41:2
46:17 47:6 51:25
52:2,4,18 53:1,1,4
55:14 56:18,20,21
57:6,8,15,19 70:22
82:3 94:21 95:18
112:18
**numbering**  33:16
**numbers**  14:14,15
18:11 19:5 33:14
35:20,22,22 46:11
52:1 54:17 55:13
59:2 65:1,16
67:24 82:19 109:7
109:9

**o**

**oath**  7:5 39:6
116:6
**object**  16:2
**objecting**  49:11
**objection**  11:22
12:10 16:1 41:17
41:20,20,21,22
49:2,7,25 56:24
57:11 62:8,9 63:3
63:4,4,24 64:5,6,6
64:7,23 65:13
66:1,2,2,13,15,16
67:7,8,8 72:12,15
72:16 99:21,25
100:8,14 109:20
109:21,21
**objections**  8:18
**obligations**  42:16
42:18
**observe**  7:19
**obtain**  9:6 22:1
31:16
**obviously**  11:8
50:18 70:1 105:24
**occasions**  61:19
**occur**  62:25
**occurring**  80:7
**october**  62:12
63:22 79:18
**offer**  98:12
**office**  51:7
**officer**  27:3,17
**officers**  40:1
**official**  4:9 5:10,18
**oh**  11:24 99:17
103:15
**ohanessian**  26:19
27:14
**okay**  7:10 8:6,16
11:2 13:4,12 14:7

[okay - payment]

14:21 15:3,9,20
16:4,11,16 17:9
18:8,25 19:6,15
20:4,6,18,22 21:2
21:6,16,20,25 23:3
24:6,11,19 26:15
26:18 27:1 30:3
32:6,10,21,24 33:3
33:7,24 34:10,18
34:22 35:4,19
36:8,10,22 37:22
38:4,8,13,17 39:6
39:9 40:3 41:9,13
42:18 43:2,7,20,23
44:15,20 45:18,21
45:22 46:5,20
47:1,8,23 48:2,7
48:15,21 49:1
50:12,21 51:3,18
52:10,12,14 53:5
54:7,18,21 55:1,6
56:17 57:14 59:14
61:11,22 62:15
64:20 65:6,21
66:23 68:7 69:14
69:21 71:8 73:14
74:2,8,9,22 75:12
76:5,15 78:12,22
80:10,14,21 81:8
81:13,22,24 82:2
82:16,25 83:1,3,8
83:10,11,21 85:14
86:4,20 87:1,23
88:14,16 89:2
90:16 91:1 92:8
92:16 93:22 94:18
97:15 98:18 99:6
100:22 102:6
103:24 104:12
110:8,21 111:13
111:16 113:3,18

oklahoma  83:24
  84:2,4,22
ols  76:2
olshan  43:13
  44:24
once  8:21 10:13
  25:19 35:21 42:9
  44:2 61:7 63:12
  70:5,6 95:11,13
  97:5,5,6,14 99:2,3
  104:17 108:10
  110:6,6 111:22
  113:8
ones  106:12 111:6
  111:9
ongoing  87:13,22
  109:3
ontrac  6:16 15:6
  15:10,11,12,21
  16:18 17:2,15
  18:3,6,20 20:16,20
  21:7,11,14,18
  23:11,19,21 24:13
  25:2 26:1,9 92:16
  93:1,2,6,14 94:7
  94:12,13 96:8
  98:5,6,20,23 99:7
  99:9,15 111:8
ontrac's  96:16
open  87:22 108:14
  108:16
openings  93:4
operate  50:19
  65:22
operates  84:23
operating  29:10
  29:14 30:7,24
  36:24 37:9,11,12
  37:13,19 45:2,12
  47:2

operations  28:2,11
  37:2,5,11
opinion  93:10
opportunities
  93:19
opposed  9:9 33:16
order  10:11 24:7
  31:14 51:20 52:24
  55:22,22 64:4
  76:23 105:19
  106:10,18 108:12
orders  31:16
original  52:18
  93:12 116:12
originally  35:14
  35:16
outs  37:12
outside  14:13
overall  28:12
oversee  27:25 28:2
  29:15
oversees  28:10
  30:18,20
overstated  69:1
owed  52:19,23
owned  107:6

**p**

p.m.  2:16,17 7:2
  114:3
package  6:22
page  33:4,13,14,15
  33:16 45:21 52:10
  75:1 78:13 82:18
  82:24 83:9,12
  85:13 86:5 89:4
  91:22,23
pages  1:25 5:7,12
  5:20,23 6:2,5,22
paid  41:16 47:13
  68:19 110:4,4

pan  66:7
panel  86:18
paperwork  48:5
paragraph  52:12
  82:17 83:2 85:12
  85:13
parameters  70:15
pardon  71:23
parent  36:25 37:9
park  3:6
part  29:9 38:13
  40:11 42:25 49:6
  50:9,14 56:10,12
  58:6 92:2
participant  55:13
participants  7:20
participate  22:4
  62:11
particular  58:24
parties  7:17 14:13
  30:16 32:2 46:23
  75:15 104:16
  107:2,4,16
partner  108:15
partnership  62:7
parts  83:24 84:4
party  61:3 116:17
pass  95:19
passed  95:22
patrick  4:11
pause  111:15
pay  37:21 41:14
  47:20 51:20 52:5
payable  31:8
  45:23 69:5
payables  46:10
  47:13
paying  72:3
payment  40:4
  47:22 68:15,18
  69:2

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 302

[payout - professionals]

**payout** 34:14
**pdf** 23:25 24:4
**penalty** 10:18
  115:2
**pending** 8:22 9:4
**people** 19:16
  28:15 101:12
  109:5
**percent** 47:17 72:1
  100:3 110:5
**perform** 63:9
  90:11 106:11
  108:21
**performance** 67:2
  67:15
**performed** 24:12
  80:10
**period** 34:13,14
  43:24 44:17,21
  45:4 47:18 59:11
  59:16 60:1 67:16
  67:19 80:6 81:2
  100:13 101:19
**perjury** 10:19
  115:2
**permitted** 31:21
**person** 10:12 22:7
  29:1 65:1 91:13
**personal** 8:11
**personally** 101:2,7
  110:6
**personnel** 28:2
**pertains** 116:11
**petition** 27:19
  45:24
**phone** 17:5,7,11
  18:2,5 19:4,15
  62:12
**piece** 40:2 55:18
**pieces** 39:18 56:14

**place** 70:6,9 116:4
**plaintiff** 3:3
**plaintiffs** 107:8
**plan** 5:8,16 37:24
  38:10,14 39:11,14
  39:15,17 40:3
  41:9,15 47:24
  49:6 52:8 53:6,11
  53:20 54:3 55:9
  55:23 56:7,13
  57:17,25 61:12
  65:23 68:8,23
  69:11 72:2 107:10
  110:18 112:5
**play** 39:13 79:5
**players** 76:23
**playing** 42:3
**please** 8:20 9:12
  9:19,24 10:6,13
  52:8 57:2 84:8
  94:6 104:18,20
**plus** 53:3
**point** 16:5 19:18
  23:2 35:23 55:20
  71:14 72:23 73:2
  75:14 84:18 90:18
  95:20 103:6
**popped** 81:20
**populated** 34:9
  35:5,9,15,16,18,20
  35:22
**portion** 30:25 31:1
  31:3
**portions** 84:22
**posed** 78:14
**possession** 1:8 2:8
  11:13
**possibility** 64:18
  87:19
**possible** 65:19
  69:17 112:4

**post** 45:24 58:1
  105:24
**potential** 14:1,8
  15:1,12 17:16,17
  21:19 23:20
**potentially** 11:18
  11:20
**precisely** 64:4
**predated** 80:8
**predates** 37:3
**predetermined**
  109:14
**predicated** 61:23
  63:1
**predict** 67:24
**preliminary** 109:9
**preparation** 20:23
  45:14 56:16
**prepare** 11:5,10
  13:21 21:8,17
  26:23 29:15 30:23
  55:8 61:15,22
  64:15 67:15 85:7
**prepared** 11:9
  14:10 20:19 21:4
  24:15,16 25:11,25
  33:24 34:11 47:4
  58:2,21 64:11
  90:10
**preparing** 20:13
  29:13,19 55:16
  63:1,13,17
**prescribes** 41:10
**present** 13:4 84:14
  87:13,17
**pretty** 48:11 62:4
  64:21 72:22 91:15
  99:18
**prevent** 10:24
**prevents** 74:19

**previous** 10:5
**price** 109:11,14
**pricing** 46:12
  96:19
**primary** 39:10
**prior** 10:8 52:1
  78:12 116:5
**priority** 77:9
**privilege** 11:23
  12:11
**privileged** 12:2,13
  112:25 113:2
**pro** 58:16,16 60:1
**probably** 16:12,20
  33:7 38:21 81:20
**proceed** 11:2
**proceedings** 116:3
  116:5,7,13
**process** 29:15
  30:15,19,21 31:24
  32:3 34:7 47:19
  48:5 97:20
**processors** 46:24
**produce** 22:1
  103:25 104:20
  111:20 112:15
  113:14
**produced** 22:5
  25:17 26:1,6 87:7
  94:4 103:22
  104:20 105:9
  112:14,22 113:16
**production** 26:10
  112:24
**professional** 30:8
  32:1 34:8 42:21
  42:22 43:4 44:7
  45:16 53:14
**professionals** 35:7
  42:23

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 303

[profitability - refresh]

**profitability** 78:18
**profitable** 76:12
  76:24 77:1,2,6,13
  78:23
**program** 18:15
**progress** 93:7
**project** 59:25 60:4
  67:1,5 92:12
**projected** 102:16
**projecting** 59:21
**projections** 60:20
  61:1,15,23 63:1,13
  63:17 65:21 67:4
  67:15,18,18,25
  85:1,5 90:9 92:9
  99:7,13 102:17
  105:14 110:22,23
**promaster** 86:17
**promising** 82:3
**proper** 83:24
**properly** 36:12
  78:5
**proposed** 5:9,17
**pros** 72:18
**provide** 22:22
  23:6 24:11,22
  25:7,19 70:5,13,17
  74:19 83:13 85:17
  85:25 94:12
  107:25 112:3
**provided** 22:8
  23:3,9,11,21 24:14
  24:24 25:4,24
  26:1,5,8,8,13 31:3
  31:5 32:1 56:20
  56:21 57:6,7,14
  70:12 91:13
  103:21 104:19,21
  104:24 112:20
**provider** 6:13,21
  83:12 85:16 89:7

**provider's** 83:15
**providing** 8:12
  10:25 69:19 70:23
  87:15,15,20 89:19
  89:23 90:2,5,6
  103:2 106:22,25
**provision** 93:1
  107:25
**pulled** 31:11
**pulling** 37:1
**purposely** 92:11
  102:22
**purposes** 60:20
  61:1
**pursuant** 82:4
  112:25
**pursue** 72:10
  101:6
**pushed** 61:20
**put** 22:8 34:13
  38:22 42:12 66:7
  68:9 79:11 97:23

**q**

**qualification** 6:17
**quarterly** 60:8,15
  60:16,18
**question** 8:22 9:4
  9:6,12,14,15,15,16
  9:20,20,22,22,23
  9:24 10:5,14,15
  12:1,17 20:22
  21:13 23:16 34:5
  35:21 41:24 44:4
  44:11 49:11 50:2
  50:5 53:16,17,18
  54:22 55:12,15
  56:4 57:5 64:10
  69:12 74:15 78:14
  78:14 79:2,8,13
  81:24 90:17 93:12
  108:18,19

**questioning** 78:21
**questions** 111:17
  111:25
**quickbooks** 37:18
**quickly** 48:11
  99:18,20 100:6
  112:3
**quinn** 4:4 43:16,19
**quinnemanuel.c...**
  4:7
**quote** 75:2,3 89:7
  102:4

**r**

**raises** 16:4
**ram** 86:12,17,17
**ramp** 80:24
  100:12
**ran** 18:13 101:20
  102:6
**rapidly** 76:18
**reach** 28:25 29:1
**reached** 91:13
**read** 8:6 9:14 57:2
  57:4 78:12 83:1
  84:8,9 85:15
  115:2
**ready** 99:1
**realize** 10:4
**reallocate** 105:22
**really** 67:12 71:18
  75:6 76:18 100:19
  112:2
**reason** 11:2 47:15
  63:20 77:22 90:13
  92:2
**recall** 20:1,4 31:9
  34:5,10,18,20
  35:13 36:15,16
  44:16,21 55:6
  74:24 89:10,22
  100:22 111:10

**receipt** 7:25
**receipts** 6:4
**receive** 7:23 15:3
  15:21 17:15 18:25
  25:15 93:25
  109:16 111:21,22
**received** 11:11
  16:22 17:1,6
  19:12 20:25 22:22
  23:17 25:9,10
  93:23 98:22
  104:18
**receives** 81:5
**recess** 74:10
**recipient** 16:19
**recognize** 33:21
  38:9 45:11 81:24
**recollection** 54:23
  91:10
**reconvene** 111:23
**record** 7:24,25 8:6
  8:18,20,20 9:3,5
  38:24,25 39:2,3,9
  57:4 74:9 84:9
  113:19,20,22,23
  114:2 116:6,9
**records** 30:4 31:12
  37:15 46:3
**reduced** 34:12
  35:3 51:25 52:20
  57:18
**reduction** 52:1
**referred** 83:14
  91:14 112:22
**referring** 21:20
  46:20 58:13
**reflect** 31:20 33:10
**reflected** 68:19,21
  69:5,6
**refresh** 38:4 91:10

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 304

[refreshes - right]

**refreshes**  54:23
**regard**  20:22 21:4
  25:2 42:14 69:10
  69:15,23 108:10
  113:25
**regarding**  5:22
  13:1,18 15:12,21
  16:18 17:2,17
  19:7 20:15 21:11
  23:10,20 32:18
  48:16 49:18 54:23
  62:13 69:9 88:11
  93:1 96:11
**regional**  6:20
**regular**  87:4
**regulatory**  96:10
**relate**  95:8
**related**  42:21
  46:19 85:17
**relationship**  15:12
  17:17 18:20 19:18
  23:20 36:22 69:9
  76:12,15 89:9
**relative**  116:16
**reliable**  66:20
**relief**  64:3
**remains**  53:1
**remember**  19:20
  20:3 44:8 51:13
  53:12,21,22 54:6
  90:25
**remote**  7:15 64:17
**render**  75:15,18
**rendered**  82:9
  85:19
**rent**  47:16 77:16
  77:23
**rental**  77:16
**reorg**  56:13 58:1
**reorganization**  5:9
  5:17 37:24 38:10

49:6 53:7,20
  56:11 57:25
**reorganized**  58:17
  59:8
**repeat**  9:13 44:3
  53:16
**rephrase**  9:13
  44:11
**report**  29:19,21
  30:4,24 31:1 45:2
  45:12,15,15,19
  47:2,7
**reported**  1:21
**reporter**  2:18 9:14
  39:23 57:1,4 84:8
  84:9 116:1
**reporter's**  54:12
**reports**  29:10,14
  30:7,8 31:4,7
  37:19
**representatives**
  62:12,16 87:9
  90:19 103:1
**represents**  43:11
  43:14
**request**  9:6 21:25
  22:21 23:23 24:8
  56:6 87:8 103:25
  112:15,25 113:13
  113:14
**requested**  105:9
  112:15 116:14
**requests**  22:24
  113:1
**require**  69:24
  70:10 73:11,20,24
  103:9 104:8,14
  106:13
**required**  52:5 70:6
  71:1

**requirement**
  95:18
**requirements**
  94:21 95:10,21
  96:25 98:4
**reserve**  111:17
**resources**  75:8
**respect**  11:19
  18:20 20:7,20
  24:13,19 42:22
  44:15 55:24 65:7
  105:16
**respecting**  20:25
**respond**  24:8
  64:15
**response**  22:6
  23:22 39:22 87:7
  103:25
**responsibilities**
  28:7
**responsibility**
  27:24,25 29:4,4
**responsible**  22:11
  28:19
**responsive**  22:23
**restatement**  57:24
**restriction**  8:17
**restrictions**  7:16
**restructure**  78:6
**restructuring**  35:6
  36:15 76:20
  105:24
**result**  7:16 22:5
  34:6 112:1
**resumed**  89:14
**retain**  96:8,17,17
**retained**  87:25
  88:1
**revealing**  12:1,12
**revenue**  12:4
  69:17 71:1 72:4

78:4 92:10 102:16
  102:19 110:24
**review**  7:25 13:25
  14:4 26:21 29:21
  34:7 113:25
  116:13
**reviewed**  13:23
**revisited**  62:23
**ribbons**  33:10
**rich**  64:7
**richard**  3:15 7:11
  50:3 74:3 112:5
  113:6
**richard.esterkin**
  3:18
**rig**  104:10
**right**  9:2 11:5,10
  12:25 16:8,9,14
  17:13,21,22 22:24
  24:6 25:21 26:12
  29:23 33:20 36:17
  42:4,24 43:4 44:8
  45:1,19 46:3
  47:24 49:23 52:7
  55:17,19 57:20
  62:3 63:19 65:11
  66:6 68:4,22 69:2
  70:9 71:15 72:3,6
  72:13,19 73:1,3,22
  73:23 75:12 77:14
  78:1 79:3,11,14
  80:15 82:16 86:3
  87:6 88:5,10
  89:22 92:11,25
  94:6,10 95:13
  96:22 98:12,18,20
  99:14 100:2,13
  101:11 102:5,10
  102:24 106:16
  107:7,19,20,22
  109:15 111:4,18

Page 17

[right - signature]

| | | | |
|---|---|---|---|
| 113:7,21 | 14:25 22:1 27:3,8 | **sec** 81:18 | **services** 74:20 |
| **rmr** 1:22 116:23 | 27:10,14,18,23 | **second** 13:12 32:8 | 75:15,22 80:11 |
| **rob** 92:19 | 30:4 31:12,15,20 | 38:22 96:20 | 82:8,9 83:13 |
| **robert** 93:6 | 36:19,19,21,21,24 | **secondly** 26:7 | 85:17,19,25 87:15 |
| **role** 29:13 39:13 | 36:25 37:11,11,14 | **section** 39:19 | 87:20 89:24,24 |
| **rolling** 96:21 | 37:15,16 38:18 | 45:15 | 90:3,6,11 93:2 |
| **room** 7:19 8:2 | 39:11 46:3 47:24 | **secured** 36:2 | 94:12 102:9 103:2 |
| **rough** 14:14 17:20 | 48:2,16 49:5 50:8 | 57:18 | **set** 37:3,9 106:14 |
| 106:12,16,24 | 50:13,25 51:20 | **secureds** 72:25 | 116:4 |
| **roughly** 12:15 | 59:7 60:21,24 | **see** 28:23 32:20 | **seven** 34:14 |
| 13:16 91:17 100:4 | 61:2,6,12 62:13 | 33:4 38:6,7 42:5 | **share** 32:10 |
| 102:2 | 65:22 67:1,15 | 45:25 46:7 47:10 | **shareholder** |
| **route** 101:20 | 69:9,10 71:6 | 52:16 55:1,4 80:2 | 107:20 |
| 102:6 104:9 | 74:13,18,19 75:13 | 81:22 82:22 83:16 | **shareholders** |
| **routes** 80:21 81:1 | 75:15,18 76:6,11 | 85:21 88:18 94:7 | 107:11 |
| 81:1,5,10,11 82:3 | 77:15 78:22 79:5 | **seeing** 44:8,16,22 | **sheet** 58:15,23,24 |
| 82:11,14,14 86:23 | 79:6,15,19,21 80:4 | 88:7 | 59:7 |
| 86:25 89:20 93:5 | 80:10,17,21 81:4 | **seeking** 29:5 | **sheets** 60:1,5 |
| 99:18,24 100:3,7 | 82:8,20 85:24 | **seen** 43:20,22,24 | **sheikh** 19:14 |
| 101:4 | 87:7,14,15,19 | 44:1 54:25 98:2 | 22:16,18 23:4,6,10 |
| **rows** 36:1,3,6 | 89:20 90:6,10 | **send** 89:17 93:17 | 23:22 24:11,22 |
| **rsp** 6:17 | 93:1 94:12 96:8 | 112:9 113:7,8,9 | 25:4,7 26:5,9 28:5 |
| **run** 14:15,23 15:4 | 96:17 98:7 101:6 | **sends** 93:21 | 28:8,19 101:10 |
| 18:16,19 20:6 | 101:17 104:4 | **senior** 72:8 | 103:21 105:4 |
| 29:16 89:20 | 105:20 108:13 | **sense** 14:16 41:5 | 112:20 |
| **running** 80:21 | 109:18 110:11,14 | 71:16 76:25 79:24 | **short** 8:23 |
| 86:23,25 100:2 | 111:5 | 97:10 109:7,17 | **shorthand** 2:18 |
| **ryan** 1:22 2:18 | **scoobur** 36:19,21 | 110:7,14 | 116:1,7 |
| 116:23 | 37:2,14,17 | **sent** 15:17 17:6 | **shortly** 55:20 |
| | **scope** 70:25 | 35:8,17,17 97:8 | **show** 26:11 32:6 |
| **s** | **scorecards** 62:6 | 103:13 | 37:22 74:16 95:2 |
| **sat** 62:5 | 98:2 | **sentence** 85:15 | **showing** 33:7 |
| **satisfy** 97:2 98:5 | **scotch** 42:3 | **separate** 37:15 | **shows** 45:23 46:5 |
| **saw** 20:15 34:9 | **scott** 19:14,23 | 68:10 | **shying** 92:3 |
| **saying** 8:17 34:15 | 22:15,16 48:18 | **series** 6:7,11,16 | **sic** 51:12 85:18 |
| 68:22 97:16 | 97:19 98:25 | **served** 21:25 | 103:3 |
| **says** 14:20 33:13 | **scott's** 51:4 | 112:16 | **side** 28:9 95:24,24 |
| 41:15 82:20 83:12 | **screwed** 36:6 | **service** 6:13,20 | **sign** 53:15 103:14 |
| 85:15 93:18 | **search** 79:15,21 | 75:18 83:12,14 | 104:6,7 109:13 |
| **scoobeez** 1:6 2:6 | 97:9 | 85:16 87:25 89:6 | **signature** 116:22 |
| 3:3 6:8,9,9,12,14 | | | |
| 6:14,17,18,18 8:8 | | | |

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 306

[signed - sufficient]

**signed** 55:2 94:15
94:15 104:3
**significantly** 51:25
**signing** 113:25
**similar** 82:14
104:5
**simon** 3:5 11:22
11:25 12:10,24
13:1,17 15:24
23:1 25:14,21
26:15,22 38:20
41:17,20 48:12
49:2,7,10,25 50:2
53:16 54:2 56:22
56:24 57:2,3,9,11
62:8 63:3,24 64:5
64:23 65:13,15
66:1,13,15 67:7
72:12,15 74:3,8
94:5,9 99:21,25
100:8,14 104:21
104:24 105:2,7,10
109:20,25 111:19
112:2,5,12 113:3
113:11,17,24
**simple** 77:25
78:11
**simply** 98:8
**single** 65:1
**sir** 75:12
**sitting** 17:19 37:6
50:6 111:10
**six** 67:5 89:8 99:20
100:10
**size** 96:25
**slow** 96:21 100:16
**slowly** 80:24
**small** 6:21 36:4
71:2 101:3 106:4
**smaller** 76:22

**social** 7:16
**solicit** 90:19
**somebody** 96:24
100:23
**soon** 61:7 94:22
**sorry** 30:20 39:22
42:6,7,7 44:2 49:8
60:9,10 75:24
76:5 79:8 80:15
83:25 84:7 98:8
104:23 110:22
**sort** 14:14 44:6
46:22 48:5 67:23
69:24 70:12 78:25
86:12 92:6 93:9
93:17,20 95:4,17
95:18 97:1 104:9
104:11 106:1
108:15
**sought** 64:3
**sound** 65:17
**sounded** 25:23
**sounds** 79:3 102:4
**source** 9:7,8
**south** 3:16 4:5
**speak** 10:12 48:24
59:17 97:19
104:16 110:6
**speaking** 66:14,19
68:1 89:3
**speaks** 45:15
58:24 59:11
**specific** 13:9 31:25
33:15 47:6 48:4
70:2 71:13 94:23
108:11 112:19
**specifically** 53:21
53:22 56:5,12
70:18
**specifics** 69:25
71:10,11

**specified** 83:18
**speculate** 16:12
**speculation** 16:2
16:13,24 49:2,7,12
62:8 63:3 64:5,23
65:3,13 66:1 67:7
72:15 99:21,25
100:8 109:20
**speculative** 64:21
64:25 65:12,14,24
66:5,12
**spend** 31:21
**spilled** 78:16
**spills** 84:2
**split** 28:12
**spoke** 13:17 103:5
**spreadsheet** 18:15
18:18 20:9,11,19
21:3 24:12 25:8
36:4
**sps** 96:23
**stages** 98:25
**stall** 92:6
**stalling** 93:9
**standards** 97:3,5
**start** 80:19 94:22
95:13 99:1
**started** 60:14
75:10,12 78:2
80:17,24 93:8
94:17 96:18,21
101:1
**starting** 9:20
10:14 58:22
**starts** 33:2,4 59:1
**state** 115:8 116:2
**statement** 44:9,12
51:16 58:5,10,10
58:14 59:10,15,16
59:21,25 68:2
77:5

**statements** 7:24
30:18 58:12,13,17
**states** 1:1 2:1 55:2
**status** 92:4
**stay** 61:7,12 64:4
110:4
**stick** 88:2
**stipulation** 5:22
32:18 33:2 65:8
68:6 113:24
**stipulations** 31:16
31:19
**stone** 106:15
**stonewalled** 97:21
**stop** 76:9
**stopped** 38:21
60:14 78:24 79:6
102:1,8 105:4
**store** 78:9
**story** 29:3
**strategic** 28:12
**streams** 69:17
**street** 4:5
**strictly** 99:13
**strike** 15:10 60:25
**string** 92:17
**structurally** 72:8
**structure** 77:12
110:2
**stuck** 99:12
**stuff** 15:17 95:12
95:23 99:4 110:17
**subject** 6:7,12,16
13:1
**submits** 29:21
**subscribed** 116:18
**subsequent** 60:1
**substance** 36:10
**sudden** 92:5 97:16
**sufficient** 14:25
41:14 110:12

Veritext Legal Solutions
Exhibit 2 - page 307
866 299-5127

[suggesting - today]

| | | | |
|---|---|---|---|
| **suggesting** 63:8 | **takes** 95:1 | **testified** 7:6 23:16 | **three** 36:18,23 |
| **suite** 4:12 | **talk** 14:13 15:10 | 35:5 75:2 89:4,7 | 37:20 58:5,10,10 |
| **sullivan** 4:4 | 28:23 30:1 51:18 | 90:16 91:24 | 58:12 59:12,19,22 |
| **summation** 110:15 | 91:24 92:16 102:8 | 111:20 112:18 | 60:5 65:2,8,11 |
| **supervise** 22:10 | 102:24 107:17 | 113:10,15 | 76:17 101:20,22 |
| **supervised** 45:14 | **talked** 26:20,21 | **testifying** 10:19 | 101:23,24 103:5 |
| **supplement** 10:7 | 48:24 68:11 69:22 | 116:6 | 103:12 |
| **supplied** 103:18 | 73:18,19 85:5 | **testimony** 9:8 | **throwing** 77:10 |
| 103:20 | 101:10 102:7 | 10:18,25 16:25 | 96:2 |
| **support** 5:14 53:6 | 111:6,7,8 112:7 | 23:9 26:4,7 52:21 | **throws** 95:4 |
| 53:10,19 55:9,23 | 113:5 | 75:4 78:19,19 | **tied** 36:25 56:2,6 |
| 56:7 | **talking** 14:18,20 | 79:10 89:10,12 | **tier** 98:1 |
| **supposed** 41:10,15 | 23:7 24:14 78:9 | 92:1 115:5 116:9 | **time** 8:7,10,10 |
| 42:11 48:2 68:9 | **talks** 31:7 | **testing** 89:5,6 | 10:12 11:3 27:13 |
| 68:18 86:1 | **tape** 42:4 | **texas** 83:24,25,25 | 27:18 30:17 35:23 |
| **sure** 10:13 23:1 | **target** 28:22 34:25 | 84:1,1,4,6,12,22 | 37:5 43:24 44:9 |
| 27:22 28:23 37:8 | 84:21 | **text** 8:1 14:4,5 | 44:13,17,21 46:25 |
| 38:23 48:6,7 | **targets** 65:19 | **thank** 60:19 79:13 | 55:20 59:11,16 |
| 63:15 77:11,13 | **technically** 11:15 | 105:10 | 60:1 61:21 63:1 |
| 96:6 112:11 | **telecommunicati...** | **thing** 25:2 65:6 | 64:20,20 66:11 |
| **surrounding** | 2:15 | 79:12 94:23 95:14 | 67:20 75:7,11,14 |
| 13:24 17:12 | **teleconference** 3:1 | 97:14 109:4 | 76:19 77:8,12 |
| **sustainable** 76:21 | 4:1 | **things** 40:24 41:2 | 80:6 81:2 84:15 |
| **sustained** 99:22 | **telephone** 79:18 | 47:23 64:19 93:8 | 84:19 87:4,21,23 |
| **swap** 47:17 87:4 | **tell** 26:12 30:12 | 97:7 100:18,18 | 90:1,18,22 91:16 |
| **switch** 78:1 | 32:8 41:6 49:19 | 103:6 112:7 113:4 | 91:17,18 95:1,3 |
| **switched** 60:16 | 82:13 98:11,15 | **think** 26:5 32:14 | 99:18 100:13 |
| 74:7 | **telling** 93:4 103:22 | 34:20 35:25 36:3 | 101:14,19 103:6 |
| | **ten** 15:23 16:23 | 39:1,9,19 42:8 | 114:3 116:4 |
| **t** | 17:1,7,9,18,20 | 52:19,23 78:15 | **timeline** 112:1 |
| **table** 107:2,5 | 18:1 23:17,19 | 80:23,25 89:17 | **times** 61:20 |
| **take** 7:12 8:23 | 74:4 | 93:20 96:6 98:14 | **tinos** 3:9 |
| 13:20 14:19 18:8 | **term** 29:20 85:16 | 100:6 111:7,16 | **tinos.diamantatos** |
| 18:12 30:12 38:13 | **terminate** 61:6,12 | 113:1 | 3:12 |
| 53:12 54:9 70:19 | 62:19,23 63:22 | **thinking** 73:5 | **title** 27:5 |
| 78:4 83:1,8 85:9 | 76:11 79:20 | **thought** 42:7 | **today** 7:12 10:18 |
| 88:5,9 91:1 93:5 | **terminated** 61:8 | 52:18 64:20 91:13 | 10:25 26:24 47:2 |
| 106:14 107:21 | 62:1,3 80:8 | 99:5 | 50:6 67:17 75:14 |
| **taken** 2:14 41:2 | **terms** 8:11 28:17 | **thousand** 28:15 | 79:25 81:11 87:24 |
| 46:2 74:22 78:4 | 29:19 68:8 82:10 | 41:19 | 94:11 111:10,17 |
| 116:3 | 94:14 | | |

Veritext Legal Solutions
Exhibit 2 - page 308
866 299-5127

[today's - want]

**today's** 11:6 12:7
13:2,22 20:23
21:8,17
**told** 22:21 38:20
57:17 63:21 95:6
95:12 96:9
**toll** 46:11
**tolls** 46:14,19
47:14,16 51:24
**tom** 91:12,14
**top** 33:10 42:7
45:23 88:17,19
98:1
**topic** 12:6 13:24
71:12
**topics** 11:17,20
**toughest** 97:3
**traction** 93:7 95:3
**transaction**
105:20 107:17,18
**transcribed** 116:8
**transcript** 8:7
10:11 115:3
116:12,14
**transportation**
85:17 94:24 95:7
95:15 96:12 98:19
**trends** 67:23
**tried** 91:24
**trigger** 46:15
**truck** 86:12,14,18
**trucks** 77:16,19,23
77:23 104:11
106:3,10
**true** 65:6 66:8
98:6 115:5 116:9
**trust** 40:6 68:10
**trustee** 37:21
**try** 8:11 9:21
25:18 28:24 33:14
65:17

**trying** 14:17 24:7
29:7 51:13 55:19
63:12 64:14 73:4
81:18 95:20 98:18
111:7 113:5
**turn** 45:21 52:7
74:12 82:16 86:3
**two** 13:3,7 15:7
19:25 26:21 29:25
80:24,25 91:14
97:23,23 104:9
**type** 85:18 86:14
86:14
**typically** 18:10
110:5

**u**

**uber** 21:22 102:24
103:2,2,7,8,12
104:5,9 105:14,17
105:19 106:11,18
106:23 108:1,13
108:21 109:12,13
109:19 110:13,24
111:2,8
**unaware** 108:7
**underneath** 33:12
**undersigned** 116:1
**understand** 8:4,14
8:25 9:10,12,17
10:1,9,16,21 12:14
14:17 27:2 28:4
33:18 35:19 39:4
39:7 40:3,10 41:9
42:19 51:8 61:5
61:11 83:4 96:6
105:1 110:2
**understanding**
11:8 12:9,18
36:17 40:8 42:1
42:10,14,15 46:9
47:12 48:21 49:4

50:6,7,10,11,12
51:19 61:10 74:17
82:2 83:21 84:3
84:14 85:24 110:3
**understood** 9:16
12:6
**unequivocally**
63:21
**uniforms** 51:14
**unintentionally**
36:6
**united** 1:1 2:1
**unsecured** 4:9
5:11,19 36:2,9
42:17 71:25
**unsecureds** 32:3
72:4,8,10,24
**unsure** 26:4
**upload** 88:8
**ups** 17:7
**urgency** 79:22,24
**urquhart** 4:4
**use** 5:23 32:18
33:14 77:19 82:8
85:18 86:16,19
**uses** 42:11
**utilize** 31:15

**v**

**vague** 41:17,20
**van** 86:19 87:4
**vans** 47:17,17
51:14 104:12
106:1,6
**varies** 94:1
**variety** 112:7
**various** 41:15
111:19
**vehicle** 34:22 35:1
85:18 86:10,14,20
**vehicles** 85:23,24

**vendor** 47:21 51:7
51:11
**vendors** 50:16,19
50:22,24 51:10,12
**verbal** 8:2
**versus** 28:10
**viable** 108:15,22
**video** 2:15 3:1 4:1
**videos** 24:4
**view** 108:22 109:1
109:2
**violate** 98:16
**voice** 72:23 107:20
**volume** 1:17 2:13
5:3 79:1 99:16,17
104:7 115:11
**voskanian** 1:14
2:13 5:3 7:4,10
16:4 26:20 39:3
41:24 42:2 45:8
57:15 62:11 74:12
88:11 91:6 94:11
105:13 111:18,20
112:18 113:15
115:1,10
**voskanian's**
111:24
**vsps** 98:1

**w**

**w** 3:15
**wacker** 3:10
**wait** 9:19,21 10:13
**wal** 21:22 90:19
90:20,23 91:6,11
91:24 92:10 111:8
**want** 17:22 24:6
29:20 53:21 70:20
74:3 97:24 98:6,8
103:19 105:8
106:14,20 108:23
111:14 112:8,23

Veritext Legal Solutions
866 299-5127

Exhibit 2 - page 309

**[want - zoom]**

113:12
**wanted** 34:25
77:10 95:21
**wants** 82:8
**ward** 91:12,14
**wasting** 63:1
**way** 2:14 11:25
46:14 49:17 50:7
64:16 70:21 96:2
97:17 100:20
109:1,2 112:21
113:2
**wb** 1:5,6,7 2:5,6,7
**we've** 9:5 11:11
21:18 26:20,20,21
67:25 69:12 73:19
75:10,21 93:14
94:15 99:4 106:24
109:3 111:6,8
**week** 13:9 93:24
101:25
**weekly** 94:2
**weeks** 34:17
**weiss** 5:14 29:16
29:21 30:18,20
35:5 39:10,16
44:6 48:22 53:5
53:19 55:6,7,21
57:16 63:14 64:15
85:6
**weiss's** 54:8,14,18
54:23
**went** 11:12 21:2
39:9 41:1 79:5
85:5
**west** 3:10
**wheeled** 106:3
**whereof** 116:18
**wide** 106:20
**willing** 71:5
103:14

**wished** 76:11
**withdraw** 53:17
**witness** 2:15 3:3
5:2 10:4,4 11:24
12:3,14 32:10,12
38:4 48:13 49:8
49:13 50:1 54:5,8
54:16 56:23,25
57:2,10,12 63:7
64:24 65:14,16
66:4,14,19 67:10
72:13,18 73:2
81:18,22 88:7,14
91:7 100:2,10,15
105:3 109:23
110:1 116:18
**witness's** 26:4,7
113:25
**witnesses** 116:5
**wondering** 63:14
64:12
**word** 58:8 66:6
**words** 26:13 82:6
**work** 30:17 75:21
77:24,24 78:24
80:4,17 84:1
97:24 98:3 101:18
**working** 77:12
79:6 94:25 95:2
98:18 101:1
**works** 51:2
**world** 68:1
**worth** 101:4 110:8
**writing** 87:2
**written** 70:13

**y**

**yeah** 15:6 16:10
16:10 17:5 22:17
23:18 26:25 27:21
32:11 33:19 36:9
39:21 46:11 47:7

47:11 53:3,9
55:18 58:23 63:12
69:6,7 74:5 81:20
82:23,23 94:9
96:3,5 103:19
105:3,10 108:18
**year** 15:17 55:14
59:4,12 60:10
65:10 99:20
100:10 102:3
**years** 37:3 59:19
59:22 60:5 76:17
**yelp** 75:20 76:1
80:3,4,11
**yep** 15:8 32:25
88:20,21 89:1
92:24
**yesterday** 13:14
**yoo** 4:10
**york** 3:6,6

**z**

**zero** 46:17 78:3,3
100:13
**zeros** 82:21
**zoom** 11:15,17

Page 22

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit 2 - page 311

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit 2 - page 312

# EXHIBIT 3

Exhibit 3 - page 313

08:56:04  1          **UNCERTIFIED ROUGH DRAFT**

          2          This draft is unedited and uncertified and may

          3   contain untranslated stenographic symbols, an occasional

          4   reporter's note, a misspelled proper name and/or

09:28:32  5   nonsensical word combinations.

          6          This is an unedited version of the deposition

          7   transcript and should not be used in place of a

          8   certified copy.  This document should not be duplicated

          9   or sold to other persons or businesses.  This document

09:28:32 10   is not to be relied upon in whole or in part as the

         11   official transcript.  This uncertified rough draft

         12   version has not been reviewed or edited by the certified

         13   shorthand reporter for accuracy.  This unedited

         14   transcript is computer generated and random translations

09:28:32 15   by the computer may be erroneous or different than that

         16   which will appear on the final certified transcript.

         17          Due to the need to correct entries prior to

         18   certification, the use of this draft is only for the

         19   purpose of augmenting counsel's notes and cannot be used

09:28:32 20   to cite in any court proceeding or be distributed to any

         21   other parties.

         22          Acceptance of this draft is an automatic final

         23   copy order.

         24

08:56:04 25                    BRIAN WEISS,

Exhibit 3 - page 314

Rough Draft -
1

↑ 09:30:57  1   having been administered an oath, was examined and

2   testified as follows:

3

4                        EXAMINATION

09:30:58  5   BY MR. ESTERKIN:

6        Q    Okay.  All right.  Mr. Weiss, are you there?

7        A    Yes.

8        Q    And you can hear me just fine with our remote

9   connection?

09:31:16 10        A    Yes, I can.

11        Q    Great.

12             Just some preliminary matters to make sure

13   that we're all on the same page with respect to these

14   matters.

09:31:26 15             We're taking this deposition via remote means

16   due to the restrictions on social distancing as a result

17   of the coronavirus epidemic.  I believe all parties have

18   consented to the taking of the deposition in this

19   manner.  Because we are not all in the same room, we

09:31:40 20   cannot all observe everything that happens in each of

21   the participants' locations.  I would like to caution

22   you that it is important for -- that you not receive --

23   I'm sorry -- that it is improper for you to receive any

Exhibit 3 - page 315

24    communications while we are on the record other than

09:31:55 25    statements that are made on the record.  This includes


Rough Draft -
2

↑ 09:32:00  1    usual receipt or review of text messages, emails or

2    other communications such as verbal gestures that anyone

3    in the room with you may make during the deposition.

4            Do you understand that?

09:32:10  5    A    Yes, I do.

6    Q    Okay.  For the avoidance of that, this does

7    not mean that counsel cannot assert objections on the

8    record or that the witness cannot consult with counsel

9    when we are off the record.  I would like to caution the

09:32:24 10    witness, however, that we will not go off the record

11    while there is a question pending because we do not want

12    anyone to draw an inference that the answer to that

13    question was provided by anyone other than the witness.

14            Do you understand that?

09:32:37 15    A    Yes, I do.

16    Q    Okay.  So if you need to -- to take a break

17    for any reason or need to consult with counsel for any

18    reason, please let me know that after you finished

19    answering a pending question, and we can do that before

09:32:50 20    I ask the next question.

21            Do you understand that?

Exhibit 3 - page 316

22      A    Yes, I do.

23      Q    If you do not understand a question, please

24    let me know that, and I will repeat or rephrase the

09:33:01 25    question or we can have the court reporter read the


Rough Draft -
3
↟ 09:33:03  1    question back.

2            Do you understand that?

3      A    Yes.

4      Q    Please wait until I have finished asking a

09:33:09  5    question before starting your answer to the question.  I

6    will try to wait until you have completed your answer to

7    a question before asking the next question.  If you have

8    not completed your answer to a question before I start

9    to ask the next question, please let me know that, and I

09:33:23 10    will allow -- allow you to complete your answer.

11            Do you understand that?

12      A    Yes.

13      Q    Sometimes during the course of a deposition a

14    witness will realize that an answer that the witness

09:33:35 15    gave to a previous question was incorrect or incomplete.

16    If that happens during this deposition, please let me

17    know that and I will allow you to correct or supplement

18    your prior answer.

19            Do you understand that?

Exhibit 3 - page 317

09:33:47 20        A    Yes.

21        Q    In order that we have a clean transcript, it

22    is important that only one person speak at a time.  So,

23    once again, please be sure to wait until I have

24    completed my question before starting your answer to the

09:33:59 25    next question.


Rough Draft -

4
↑ 09:34:01  1            Do you understand that?

2        A    Yes.

3        Q    Your testimony today is under penalty of

4    perjury the same as if you were testifying in a court of

09:34:09  5    law, and it's also the same oath that you took when you

6    signed your declaration in connection with the debtor's

7    motion to approve its plan of reorganization in this

8    case.

9            Do you understand that?

09:34:22 10        A    Yes.

11        Q    Are you currently under the influence of any

12    medication or is there anything else that would prevent

13    you from providing your best testimony today?

14        A    No.

09:34:33 15        Q    All right.  What did you do to prepare for

16    today's deposition?

17        A    I received -- I think it was on Friday -- an

Exhibit 3 - page 318

18    email from Veritext to, one, log in -- create a log-in

19    for the Exhibit Share, and then, number 2, is to test my

09:34:51 20    remote connection via their link that was -- I don't

21    remember the name of it, but it's a test link to make

22    sure that my system was working, and that's all I did to

23    prepare.

24         Q    You did not have any discussion with anybody

09:35:05 25    regarding the -- today's deposition other than the


                                                    Rough Draft -
5
↑ 09:35:08  1    communications with Veritext?

2         A    No, I did not.

3         Q    Did you review any documents to prepare for

4    your deposition today?

09:35:15  5    A    No, I have not.

6         Q    Okay.  You're currently serving as the chief

7    restructuring officer of Scoobeez and its related

8    debtors, correct?

9         A    Yes.

09:35:24 10    Q    And you've been doing that since mid May of

11    2019, correct?

12         A    Yes.

13         Q    I assume you're currently sheltering in place

14    due to the COVID virus; is that correct?

09:35:38 15    A    Define "sheltering in place."


Exhibit 3 - page 319

16      Q    Well, you're basically working from home; is

17   that correct?

18      A    Generally I've been working from home,

19   however, today I did go to my office to ensure that we

09:35:49 20   had good bandwidth and a nice quiet environment.

21      Q    Okay.  So today you're actually testifying

22   from your office?

23      A    Yes, I am.

24      Q    Okay.  When was the last time you visited

09:36:01 25   Scoobeez's offices?

Rough Draft -
6
↑ 09:36:03  1      A    It's been some time now.  Several months.

2      Q    Okay.  And that's due to the COVID situation;

3   is that correct?

4      A    Partially.

09:36:16  5      Q    Why else -- why else have you not visited

6   Scoobeez' office in the last several months?

7      A    Because, you know, we are the holiday season.

8   The business operations are running relatively smoothly.

9   We've been busy trying to get the plan of reorganization

09:36:32 10   together.  So that's.

11      Q    And you've done all of that remotely?

12      A    Yes.

13      Q    Have you had any other assignments or -- other

Exhibit 3 - page 320

```
          14   than working in conjunction with the Scoobeez case
09:36:46  15   during the period of time that you've served as the
          16   chief restructuring officer for Scoobeez?
          17        A    If you can clarify that.
          18        Q    Sure you're -- you had -- you work for a
          19   consulting firm, correct?
09:36:57  20        A    Yes, I'm the cofounder of a restructuring
          21   firm.
          22        Q    And the name of that firm is what?
          23        A    Force ten partners LLC.
          24        Q    And has force ten partners LLC been retained
09:37:09  25   in any other matters during the period of time that
```

Rough Draft -
7
↑ 09:37:11  1   you've been acting as the chief restructuring officer

```
           2   for Scoobeez?
           3        A    Yes.
           4        Q    How many other matters?
09:37:17   5        A    Are you referring to force ten or matters that
           6   I am involved with?
           7        Q    Well, I'm -- right now I'm referring to force
           8   10T next question will be the extent of your involvement
           9   in those matters.
09:37:28  10        A    Okay.  So with respect to force ten, I mean, I
          11   -- I don't know.  You know, I can go through our time
```

Exhibit 3 - page 321

```
          12    and billing software and kind of, you know, count the

          13    number of active clients, you know, that we billed for

          14    last month, two months ago, three months ago, et cetera,

09:37:43  15    but as we sit here today I don't have the -- the answer

          16    for that.

          17         Q    Okay.  Approximately what percentage of your

          18    time during the last three months have you spent on

          19    matters pertaining to Scoobeez?

09:37:56  20         A    Probably 20 -- 20 to 25 percent.

          21         Q    And what matters, in particular, have you

          22    worked on in the last three months in relationship to

          23    Scoobeez?

          24         A    What matters with respect to Scoobeez in

09:38:20  25    particular?
```

                                              Rough Draft -
8
⬆ 09:38:21  1      Q    Yes.  What -- what are the subject matters of

```
          2     -- what's the subject matter of the issues that you've

          3     been working on with respect to Scoobeez over the last

          4     three months?

09:38:31  5         A    You -- I'm sorry.  Just for clarification

          6     purpose.  You said "issues."  You mean is it more

          7     matters like what have I been doing from a, you know, --

          8     a work standpoint?  I just want to make sure we're clear

          9     on, you know, you know, is issues represent a crisis or
```

Exhibit 3 - page 322

09:38:47 10    issue represent matters.

11        Q    I'm trying to find out what you did over the

12    last three months in relationship to Scoobeez.  Just the

13    general categories of things that you worked on?

14        A    Perfect.  Oversight of, you know, co-CEO

09:39:00 15    George Voskanian and Scott Sheikh.  Working with debtors

16    counsel on our plan of reorganization and disclosure

17    statement, overseeing, you know, financial projections

18    and then overseeing the preparation of cash budgets as

19    well as reviewing and commenting on cash collateral

09:39:22 20    various reports.

21            Reviewing monthly financial performance.

22        Q    Have you finished your answer?

23        A    Yes, I have.

24        Q    Okay.  All right.  Well, let's start with the

09:40:00 25    plan of reorganization.


                                                    Rough Draft -
9
♠ 09:40:04  1            You said that you worked on the plan of

2    reorganization.

3            Who else worked on the plan of reorganization?

4        A    It would have been John Simon with Foley

09:40:15  5    Lardner and then other associates that he has brought

6    into the case, primarily Shane Moses and I think Tamar

7    Dolcourt with -- and then on the secured lender side,

Exhibit 3 - page 323

```
        8    I've had communications -- various communications with

        9    Scott Kaufman of Hillair Capital.

09:40:50 10        Q    And what about with respect to the committee?

       11        A    We've had -- actually I haven't had -- over

       12    the past couple months I haven't had direct

       13    communication with the committee.

       14        Q    So any communications that occurred with the

09:41:01 15    committee were done through counsel; is that correct?

       16        A    Yes.

       17        Q    Okay.  And there's currently a cash -- the

       18    current cash collateral budget was filed with a

       19    stipulation on June 4th, correct?

09:41:26 20        A    Approximately.

       21        Q    Okay.

       22        A    I don't know the exact date it was filed.

       23        Q    All right.  We'll show you a copy of that

       24    later, and we can pinpoint the date.

09:41:37 25             Who worked on the -- the attached to that
```

Rough Draft -
10

```
↑ 09:41:41  1   stipulation there was a budget, correct?

        2        A    Yes.

        3        Q    And that budget went from roughly the first

        4    part of June all the way through December 31st, correct?

09:41:51  5        A    January 1st, I think, yes.
```

Exhibit 3 - page 324

6        Q    And who prepared that budget?

7        A    George Voskanian.

8        Q    The budget that's actually attached to this

9    stipulation, is that the original budget that

09:42:12 10    Mr. Voskanian proposed or were there changes in the

11    budget over time?

12        A    In that particular budget, I believe there

13    were, you know, a couple of versions that went -- went

14    through.

09:42:27 15        Q    And those versions were shared back and forth

16    with hall layer; is that correct?

17        A    Not through George, but through me, yes.

18        Q    And who at hell layer did you deal with with

19    respect to the budget?

09:42:42 20        A    Scott Coffman.

21        Q    And what changes were made to the budget from

22    the initial draft that was created by Mr. Voskanian to

23    the final draft that was filed with the court?

24        A    I don't recall except for, you know, with

09:43:05 25    respect for professional fees Kaufman and I had

Rough Draft -
11
↟ 09:43:08  1    discussed we had made some a couple of iterations on

2    those, but from an operations standpoint, I don't

3    recall.

Exhibit 3 - page 325

            4       Q     Okay.  Well let's talk about the professional

09:43:18  5    fees, then.

            6             What changes were made with respect to the

            7    professional fees from the original budget prepared by

            8    Mr. Voskanian until the final version filed with the

            9    court?

09:43:28 10    A     There were reductions in the fees for debtors

           11    counsel, hell layer's counsel and I believe the

           12    committee.

           13       Q     What was the original amount of the budget for

           14    debtors counsel in the original budget that was prepared

09:43:55 15    by Mr. Voskanian?

           16       A     I believe it was $50,000 per month.

           17       Q     That was in the original one?

           18       A     Yes.

           19             MR. ESTERKIN:  And -- all right.  Let's see if

09:44:17 20    we can actually show you an exhibit.

           21             THE WITNESS:  Sure.

           22             MR. ESTERKIN:  Let's see how this works.

           23             (Exhibit     was marked for identification.)

           24             MR. ESTERKIN:  All right.  So for the record,

09:44:40 25    I'm going to mark this document as Exhibit 6.  I had


                                                        Rough Draft -
12
⬆ 09:44:43  1    planned to show it to you somewhat later in the

Exhibit 3 - page 326

2    deposition, and I numbered the exhibits sequentially.

3    So I'm going to identify this document as Exhibit 6.

4    It's a copy of the fifth stipulation regarding continued

09:44:58  5    use of cash collateral filed with the bankruptcy court

6    on June 4th, 2020, as document No. 786.

7            And everybody should now have that exhibit and

8    be able to see it.

9            THE WITNESS:  I don't see it.

09:45:32 10    Q    Have you logged on to the Exhibit Share?

11    A    I'm in Exhibit Share.

12            MR. ESTERKIN:  Okay.  Why don't we go off the

13    record for a minute while we see if we can deal with the

14    technical issues.

09:45:50 15            (Discussion off the record.)

16            MR. ESTERKIN:  Why don't we go back on the

17    record.

18    Q    So while we were off the record, I think we

19    were able to solve the technical issue.

09:46:33 20            And Mr. Weiss, you now have the exhibit in

21    front of you?

22    A    Yes.

23    Q    And you're able to review it, correct?

24    A    Yes.

09:46:39 25    Q    All right.  So if you would turn to -- I'm

Exhibit 3 - page 327

Rough Draft -
13

09:46:43  1   going to refer to the page numbering at the top of the

2   exhibit where the court's banner appears where it says,

3   in the second line, main document.

4          Do you see that?

09:46:54  5      A   Yes, I do.

6      Q   Okay.  If you would turn to page 7 of 14,

7   please.  Let me know when you've -- you're there.  You

8   do wear glasses?

9      A   For reading small font, yes.

09:47:14 10      Q   All right.  Do you have that now?

11      A   Yes, I do.

12      Q   All right.  And so if you go down about two

13   thirds of the way down the page, there's a bold print

14   restructuring cash flows.

09:47:24 15          Do you see that?

16      A   Yes, I do.

17      Q   All right.  And then the first line in there

18   is debtor's counsel.

19          Do you see that?

09:47:30 20      A   Yes.

21      Q   And we have the luxury of actually having

22   color showing on the PDFs that we're looking at.  It

23   shows $50,000 on June 19th, correct?

24      A   Yes.

Exhibit 3 - page 328

09:47:42 25      Q    And then another 50,000 on July 27th, correct?

09:47:49  1      A    Yes.

2      Q    All right.  So it's approximately 50,000 a

3      month; is that correct, at least for these first three

4      months?

09:47:56  5      A    For the three months in the forecast period,

6      yes.

7      Q    And was that those the original amounts and

8      the original budget that was proposed by Mr. Voskanian?

9      A    I believe so.

09:48:10 10      Q    Okay.  I think you said that there were some

11     changes to the budget for the debtors counsel from the

12     original version prepared by Mr. Voskanian.

13         What were the changes, now that you have this

14     in front of you?  And you can certainly refer to the

09:48:24 15     next page, if you'd like, which picks up the months

16     through the end of the year?

17     A    Sure.  Based on my recollection, the fees for

18     debtors counsel in the -- you know, the period ending

19     September 18th and forward were reduced from $50,000 a

09:48:44 20     month to $25,000 per month.

21     Q    And what was the -- do you recall any

22     discussions as to the rationale for that reduction?

Exhibit 3 - page 329

23      A    That was a discussion I had with Scott Coffman

24    with Hillair Capital.

09:49:02 25      Q    And what was the substance of that discussion?


Rough Draft -
15
↑ 09:49:05  1      A    That, based on, you know, the plan hopefully

2    being confirmed in July, that subsequent to that time

3    period there would be a little bit of clean-up work and

4    then the case would hopefully be, you know, winding down

09:49:21  5    from a legal fees perspective.  So as a result, the

6    professional fees were reduced beginning in September

7    forward to account for the hopefully reduced time that's

8    going to be spent by debtors counsel in the case.

9      Q    Okay.  And then if we can look at about --

09:49:46 10    what is it?  -- further down towards the bottom of the

11    restructuring cash flows section of the budget, there is

12    a line item for committee counsel.

13           Do you see that?

14      A    Yes, I do.

09:49:59 15      Q    And the amounts in that budget -- were those

16    the amounts -- excuse me -- the amounts in that line

17    item, were those the amounts that were originally

18    proposed by Mr. Voskanian?

19      A    Well, they would have been in the budget,

09:50:12 20    which I gave him a template of, but the original

Exhibit 3 - page 330

21    amounts, I believe, were $12,500 for the first two

22    months, which were reduced now to the 10,000.

23        Q    And what about in the month -- as I'm looking

24    at it starting on August 21st, the committee council

09:50:38 25    fees budget is reduced to $5,000 a month, and then that

Rough Draft -
16

⬆ 09:50:44  1    continues through the end of the period covered by the

2    budget.

3         Were those the original amounts proposed by

4    Mr. Voskanian?

09:50:52  5        A    Remember, I think I just said that I gave him

6    a budget with these numbers, and then after discussions

7    with Kaufman, we reduced these numbers -- reduced the

8    original numbers.  So the original numbers would have

9    been, I believe, -- again, this is just my recollection,

09:51:08 10    and this is, you know, a little time ago, so -- but it

11    was 12,500 per month that then got reduced to 10,000 per

12    month for the first two months of the forecast period,

13    then $5,000 per month thereafter.

14        Q    So the original budget was 12,500 through the

09:51:29 15    entire period of the budget; is that correct?

16        A    I believe so.

17        Q    All right.  Did you have any discussions with

18    anybody at debtors counsel regarding the reduction in

Exhibit 3 - page 331

```
         19    the budget?

09:51:44 20             MR. SIMON:  Objection.  Attorney-client

         21    privileged.

         22    BY MR. ESTERKIN:

         23         Q    You can answer the question?

         24         A    John, can I answer the question?

09:51:51 25             MR. SIMON:  You can answer the question.
```

Rough Draft -
17
```
↑ 09:51:53  1             THE WITNESS:  Yes, I did.  I had discussions

          2    with Mr. Simon regarding the amounts set forth in the

          3    budget, both the original $50,000 that was originally in

          4    the budget and then the reduced amounts.

09:52:04  5    BY MR. ESTERKIN:

          6         Q    And did debtors counsel indicate to you that

          7    the budgeted amount would be sufficient to pay their

          8    fees during the period of time covered by the budget

          9    and?

09:52:14 10             MR. SIMON:  Objection.  Attorney-client

         11    privilege.

         12             MR. ESTERKIN:  Excuse me.  Let me finish the

         13    question, John, before you object.

         14         Q    Did debtors counsel indicate that the 50,000

09:52:21 15    -- that the original amount set forth in the budget

         16    would be sufficient to pay their fees that they believed
```

Exhibit 3 - page 332

```
          17   they would incur during the period of the budget?

          18        A    We didn't have discussions with respect to

          19   whether they were sufficient to cover the costs that

09:52:35  20   were being incurred.

          21        Q    I'm sorry.  I just didn't hear your answer.

          22   If the court reporter can read it back or you can repeat

          23   it, if you want to repeat it?

          24        A    Could the court reporter repeat it back,

09:52:46  25   please.
```

Rough Draft -
18
```
↑ 09:52:47  1              MR. ESTERKIN:  Sure.

            2              (Record read by the reporter as follows:

            3                   "ANSWER:  We didn't have discussions

            4                   with respect to whether they were

09:53:05    5                   sufficient to cover the costs that were

            6                   being incurred.")

            7   BY MR. ESTERKIN:

            8        Q    So just to be clear, it's your testimony that

            9   this budget was prepared -- even though this budget was

09:53:19   10   prepared, which estimated debtors counsels fees, you did

           11   not have discussion with debtors counsel regarding

           12   whether the estimated fees would be sufficient to pay

           13   the actual fees?

           14        A    That is correct.
```

Exhibit 3 - page 333

09:53:31 15          MR. SIMON:  Objection.  Attorney-client

16   privileged.

17          MR. ESTERKIN:  Well, to the extent there is a

18   privilege, it's been waived by his answer to the last

19   question.

09:53:41 20          MR. ESTERKIN:  Please.

21          MR. SIMON:  I objected to the last question.

22          MR. ESTERKIN:  You didn't instruct him not to

23   answer and he did answer and, therefore, there's been a

24   waiver.

09:53:46 25     Q   Please answer the question.


                                              Rough Draft -
19
↑ 09:53:50  1     A   John, may I answer the question?

2          MR. SIMON:  You can answer the question.

3          THE WITNESS:  So -- and these fees are not

4   necessarily meant to cover the actual costs, but they're

09:54:05  5   the amounts set forth in the budget repaid basis.

6          MR. ESTERKIN:  And do you have an estimate as

7   to what the actual fees will be during the period

8   covered by the budget?

9     A   I do not.

09:54:15 10     Q   Did debtors counsel provide you with an

11   estimate of the fees that they believed they would incur

12   during the period covered by this budget?

Exhibit 3 - page 334

```
        13      A   No, they did not.

        14      Q   Did you have any conversations or strike that.

09:54:38 15          To your knowledge were there any conversations

        16   with committee counsel regarding whether or not the

        17   amount set forth in the budget would be adequate to

        18   cover committee counsel's fees during the period covered

        19   by the budget?

09:54:51 20      A   I have not had discussions with the committee,

        21   and I don't know what discussions my counsel had with

        22   committee counsel.

        23          MR. ESTERKIN:  Okay.  Let's see if I can

        24   actually mark another exhibit for you.

09:55:29 25          (Exhibit    was marked for identification.)
```

Rough Draft -
20
```
↑ 09:55:30  1          MR. ESTERKIN:  Let's mark, as Exhibit 1 -- let

        2   me make sure I've got the right document here -- yeah.

        3   We'll mark, as Exhibit 1, a copy of the first amended

        4   chapter 11 joint plan of reorganization, as proposed by

09:55:51  5   the debtors he'll layer and the official committee of

        6   unsecured creditors.  It was filed in the bankruptcy

        7   case as document 754 on April 28, 2020.

        8      Q   And, Mr. Weiss, you can go ahead and open that

        9   document, assuming?

09:56:13 10      A   I have the document open.
```

Exhibit 3 - page 335

                11        Q    Great all right so I'm going to ask you a

                12    series of questions about the plan, and at any time

                13    during the course of the questioning about -- about the

                14    plan, if you feel a need to look at the plan, feel free

09:56:27  15    to do so.  And during the course of these questions, I

                16    may direct you to specific plan provisions as well.

                17            Do you understand that?

                18        A    Yes.

                19        Q    Great.

09:56:38  20            Okay.  So I believe that you testified that

                21    you were involved in the negotiating the plan, correct?

                22        A    Yes.

                23        Q    And would you characterize your role as the

                24    lead negotiator on behalf of Scoobeez?

09:56:54  25        A    Yes.


                                                          Rough Draft -
21
↑ 09:56:55  1        Q    And who was the lead -- and Mr. -- I believe

                2    you said Mr. Coughman was the lead negotiator from a

                3    business perspective on behalf of hell layer; is that

                4    correct?

09:57:06  5        A    Yes.

                6        Q    And to your knowledge, who is the lead

                7    negotiator on behalf of the committee?

                8        A    I have not had interactions with the committee

Exhibit 3 - page 336

```
           9   members themselves.  So I don't know.

09:57:21  10      Q    Okay.  If you go to -- I think it's probably

          11   the last page of this document before you get to the

          12   exhibit.  There's what appears to be your signature.

          13           You signed this plan, correct?

          14      A    Yes, I did.

09:57:36  15      Q    And when you signed it, you had an

          16   understanding of what the plan meant, correct?

          17      A    Yes.

          18      Q    And what was intended by the plan, correct?

          19      A    Yes.

09:57:54  20      Q    All right.  If you would turn to page 22 of 69

          21   in the plan.

          22      A    Is that 22 based on the court stamp page

          23   number or the footer page number?

          24      Q    The court stamp number.  I'm going to

09:58:09  25   consistently use court stamp numbers when I direct you
```

Rough Draft -
22
```
↑ 09:58:13  1   to a particular page of a document that's been filed

          2   with the court.

          3      A   I'm just trying to make sure we're clear.

          4      Q   Yeah.  No.  That's fine.  I understand.

09:58:23  5          MR. SIMON:  Which page, Richard?

          6          MR. ESTERKIN:  Twenty -- I'm sorry.
```

Exhibit 3 - page 337

         7    Twenty-two of 69.

         8    Q    Mr. Weiss, let me know when you're there.

         9    A    I'm here.

09:58:50 10    Q    Okay.  Great.  The third line down there's a

        11    sentence that reads as follows:  On or before May 28,

        12    2020, the debt or shall file for court approval a

        13    proposed cash collateral budget for the period from June

        14    5, 2020, through December 31, 2020, provided all parties

09:59:09 15    rights are reserved as to such budget, period.

        16         Do you see that?

        17    A    Yes.

        18    Q    That in fact did not occur; is it correct?

        19    A    You mean the actual date of the filing of the

09:59:25 20    budget?

        21    Q    Correct.

        22    A    Or are you referring to the cash collateral

        23    budget from the period June 5th to December 31st?

        24    Q    This sentence indicates that the proposed cash

09:59:35 25    collateral budget for the period from June 5, 2020,


                                              Rough Draft -
23
⬆ 09:59:39  1  through December 31, 2020, was supposed to be filed on

         2    or before May 28th, correct?

         3    A    Well, there's two conditions here, right.  One

         4    is a budget filed on or before May 28th, and the other

Exhibit 3 - page 338

09:59:52  5    is a budget for the period from June 5th to December

          6    31st.  So if you can -- if you could please clarify for

          7    me which condition you would like me to refer to first.

          8        Q    Was the budget timely filed?

          9        A    In accordance with this May 28th date, no.

10:00:09 10        Q    So the debtor defaulted under the plan prior

         11    to the time?

         12            MR. SIMON:  Objection.

         13    BY MR. ESTERKIN:

         14        Q    The?

10:00:16 15            MR. SIMON:  Calls for a legal conclusion.

         16    BY MR. ESTERKIN:

         17        Q    Prior to the time that the plan even came up

         18    for confirmation, correct?

         19            MR. SIMON:  Objection.  Calls for a legal

10:00:22 20    conclusion.

         21    BY MR. ESTERKIN:

         22        Q    You can answer?

         23            MR. SIMON:  Objection.  Vague.  Ambiguous.

         24    Objection.  Misleading.

10:00:34 25            THE WITNESS:  I have not received a default


                                                   Rough Draft -
24
↑ 10:00:36  1    notice from anybody with respect to not filing the cash

          2    collateral budget by this date.

Exhibit 3 - page 339

         3    BY MR. ESTERKIN:

         4        Q    All right.  So let's switch topics for a

10:00:55 5    moment.

         6             Under the terms of the plan, there's something

         7    called the estate cash payment, correct?

         8        A    Yes.

         9        Q    And that's a million $500,000, correct?

10:01:07 10       A    Yes.

        11        Q    And that's supposed to be paid into -- I'll

        12    call it a trust account for the benefit of the creditor

        13    trust to be formed under the plan, correct?

        14        A    Yes.

10:01:19 15       Q    And that's supposed to be paid to the -- in

        16    this trust account on the confirmation date, that is the

        17    date is plan is confirmed, correct?

        18        A    Yes.

        19        Q    And under the terms of the plan -- or strike

10:01:33 20   that.

        21             The plan prescribes the ultimate disposition

        22    of those funds, correct?

        23        A    Yes.

        24        Q    And one of the things that those funds are

10:01:48 25   supposed to pay are unpaid counsel fees in excess of the


                                                 Rough Draft -

25

Exhibit 3 - page 340

↑ 10:01:52  1    budget, correct?

2        A    Yeah, debtors counsel, committee counsel, hell

3    layer counsel, correct.

4        Q    It's all three?

10:02:12  5        A    Yes.

6        Q    And the budget that's being referred to here

7    are the cumulative cash collateral budgets from the

8    beginning of the case through the December 31st budget

9    that we looked at a few minutes ago, correct?

10:02:39 10        A    I'm sorry.  I -- I didn't understand that.

11        Q    Sure.  The -- the -- the fees in excess of

12    budget that the million $500,000 is supposed to pay,

13    that would be the cumulative fees in excess of the

14    amounts in all of the cash collateral budgets from the

10:02:58 15    beginning of the case through the end of the case,

16    correct?

17        A    If I could state it a different way, it's the

18    -- just to make sure that we all understand -- this is

19    the amount of unpaid fees through the end of the case,

10:03:17 20    would be paid from this $1.5 million.

21        Q    And the fees that are to be -- so let's make

22    sure that we understand each other.

23            From the beginning of the case to the end of

24    the case, let's just take debtors counsel as an example.

10:03:36 25    Debtors counsel will have earned fees of X.

Exhibit 3 - page 341

Rough Draft -
26

⬆ 10:03:40  1              Do you understand what I'm -- what I'm saying?

        2       A    Yes.

        3       Q    And during the course of the case, there were

        4    cash collateral budgets that permitted Scoobeez to pay

10:03:49  5    its counsel fees at least in part, correct?

        6       A    Yes.

        7       Q    And let's just call that the cumulative amount

        8    in those budgets Y.

        9              Do you understand that?

10:04:02 10       A    Yes.

       11       Q    And so the amount that is supposed to be paid

       12    out of the million five for debtors counsel would be X

       13    minus Y, correct?

       14       A    No.

10:04:14 15       Q    I'm sorry no?

       16       A    No.

       17       Q    Okay.  Perhaps, then, you can explain to me

       18    what fees the million five is supposed to pay.

       19       A    Sure.  It's supposed to pay the un-- unpaid

10:04:28 20    fees of the debtor, the committee and hell layer's

       21    counsel, not just debtors counsel.

       22       Q    Correct.  But I was trying to get to the

       23    amount that would be paid on account of debtors counsel

Exhibit 3 - page 342

```
          24   as distinguished from the other three.  I understand --
10:04:46  25   I'm sorry.  The other two, so that we would understand
```

```
                                                      Rough Draft -
27
↑ 10:04:50  1   exactly what the million five was supposed to cover.

            2          So it covers the fees throughout the course of

            3   the case less the amounts that are paid during the

            4   course of the case pursuant to the cash collateral

10:05:04    5   budgets, correct?

            6     A    Yes.

            7     Q    And that would be true for Hillair, the

            8   debtors counsel and the committee counsel, correct?

            9     A    Collectively, yes.

10:05:16   10     Q    I'm sorry.  I didn't hear the first part of

           11   your answer again.

           12     A    Collectively, yes.

           13     Q    Thank you.  I didn't hear the "collectively."

           14          Okay.  As I read the plan, the million five is

10:05:39   15   also supposed to pay any accrued and unpaid

           16   administrative claims through December 31st, 2020; is

           17   that correct.

           18     A    Could you take me to the section of the plan

           19   that deals with that, please.

10:05:53   20     Q    Sure.  You'll have to give me a minute because

           21   my notes only have the section.  Okay.  Yeah, if you
```

Exhibit 3 - page 343

22    turn to page 21 of 69.

23         A    Okay.

24         Q    And in section three, administrative expenses

10:06:53 25    -- do you see that?


Rough Draft -
28
↑ 10:06:54  1         A    Yes.

2         Q    And why don't you just -- the sentence is

3    really long.  So why don't you just read the beginning

4    of that paragraph rather than my reading the entire

10:07:04  5    thing into the record.  Let me know when you've read

6    enough of that so you can answer my question.

7         A    Okay.

8         (Pause.)

9         A    Okay.  I've read this.

10:08:11 10    Q    Okay.  So it starts off by saying:  The

11    creditor trustee shall pay to the holder of each alotted

12    administrative expense claim, et cetera.

13         So the -- the only money that the trust -- the

14    creditor trust is getting, at least initially, is the

10:08:23 15    million and a half dollars from the estate cash payment,

16    correct?

17         A    That's correct.

18         Q    So was it anticipated that the creditor

19    trustee would pay -- let me back up.

Exhibit 3 - page 344

10:08:34 20          And so the administrative expense claims are

21    to be paid on the effective date, correct, or when

22    they're allowed, correct?

23        A    Yes, when allowed.

24            MR. SIMON:  Objection.  Calls for a legal

10:08:45 25    conclusion.


                                          Rough Draft -
29
↑ 10:08:48  1          You can answer.

2            THE WITNESS:  When allowed.

3    BY MR. ESTERKIN:

4        Q    And so it was anticipated, was it not, that

10:08:55  5    the million and a half would be used to pay

6    administrative claims?

7        A    Are you -- is that a question?

8        Q    Yes.  The million and a half dollars of the

9    estate cash payment was also to be utilized to pay

10:09:14 10    administrative claims, correct?

11        A    Yeah, the professionally -- the professional

12    fees, yes.

13        Q    Well, it doesn't -- this says allowed

14    administrative expense claim.  We can go through the

10:09:27 15    definitions.  That's not limited to professional fees,

16    is it?

17        A    Let's go up to -- up to the definition.


Exhibit 3 - page 345

18       Q     Sure.  Definition one.  Administrative expense

19    claim means any cost or expense to administration of the

10:09:58 20    chapter 11 cases.  It's not limited to professional

21    fees, correct?  And just for the record that is at

22    section 2A1 of the plan.

23          MR. SIMON:  Objection.  Calls for a legal

24    conclusion.

10:10:26 25          THE WITNESS:  My understanding was that the

Rough Draft -
30
↑ 10:10:28  1   professional fees get paid from the $1.5 million estate

2    cash payment, and then the other creditor post petition

3    creditor would be paid from, you know, cash on hand and,

4    you know, in the ordinary course of business as the

10:10:43  5    bills become due.

6    BY MR. ESTERKIN:

7       Q     All right.  Well you signed this document.

8          Having now looked at the definition of

9    administrative expense claims, do you think that this

10:11:03 10    document is -- accords with your understanding as you

11    just related it on the record?

12          MR. SIMON:  Objection.  Calls for a legal

13    conclusion.

14          THE WITNESS:  Well, if I read, you know, going

10:11:15 15    back to page 21, that, you know, it deals with

Exhibit 3 - page 346

                16   administrative expense claims with the exception of

                17   monthly interim or final allowed non-Hillair

                18   professional fee claims which shall be paid under the

                19   quarter proof cash filed budgets or cash payment shall

10:11:39   20   be paid in the ordinary course of business from cash on

                21   hand and cash flow based on the contractual terms with

                22   each respective vendor or in the case of payroll

                23   obligation, when the obligation becomes due and payable

                24   and as required for confirmation and effectiveness of

10:12:00   25   the plan.


                                                        Rough Draft -
31
↑ 10:12:04   1            Based on that language, the plan is accurately

                2    -- it's accurate.

                3    BY MR. ESTERKIN:

                4        Q    Well, what does the language -- well, the

10:12:21   5    beginning of this section on administrative expenses

                6    said the creditor trustee shall pay the administrative

                7    claims, doesn't it?

                8            MR. SIMON:  Objection.  The document speaks

                9    for itself.  Objection.  Calls for a legal conclusion

10:12:36  10   objection.  Asked and answered.

                11   BY MR. ESTERKIN:

                12       Q    Go ahead.  You can answer the question.

                13       A    Based on my reading of the plan and this

Exhibit 3 - page 347

    14    section, the plan is accurate.

10:12:55 15        Q    So it's your testimony that the only

    16    administrative expenses that are supposed to be paid out

    17    of the million five estate cash payment are the

    18    professional fees in excess of those paid under the

    19    budget, correct?

10:13:10 20        A    Yes.

    21            MR. SIMON:  Objection.  Calls for a legal

    22    conclusion.

    23            You can answer.

    24            THE WITNESS:  That's my understanding, yes.

10:13:23 25            MR. ESTERKIN:  Let's go off the record for a


                                        Rough Draft -
32
↑ 10:13:24  1    moment.

     2            (Discussion off the record.)

     3            MR. ESTERKIN:  Okay.  We can go back on the

     4    record.

10:14:40  5        Q    All right.  Mr. Weiss, let's talk for a moment

     6    about priority tax claims.

     7            Do you have an understanding as to the source

     8    of the funds that are supposed to be utilized to pay

     9    priority tax claims under the plan?

10:14:52 10        A    Yes.

    11        Q    And what's your understanding in that regard?

Exhibit 3 - page 348

12        A    That there aren't any priority tax claims.

13             MR. ESTERKIN:  Okay.  I'm going to mark

14    another document as an exhibit.

10:15:24 15             (Exhibit    was marked for identification.)

16             MR. ESTERKIN:  Let's mark as Exhibit 2 a

17    priority tax claim.  It's claim number 4, filed by the

18    Franchise Tax Board.

19        Q    Let me know when you have that.

10:16:08 20        A    I have it.

21        Q    All right.  Have you -- were you aware that

22    this claim had been filed?

23        A    Give me one second to review it.

24        Q    Sure.

10:16:32 25        A    I was not aware this was filed.


                                              Rough Draft -
33
↑ 10:16:50  1             MR. ESTERKIN:  I'm going to show you another

2    exhibit in a second.  I'm waiting for my computer.

3             (Exhibit    was marked for identification.)

4             MR. ESTERKIN:  Let's mark as Exhibit 3 a

10:17:09  5    priority tax claim filed by the department of the

6    treasury, Internal Revenue Service.

7             THE WITNESS:  I have this exhibit open.

8    BY MR. ESTERKIN:

9        Q    I'm sorry.  Do you have the exhibit now?

Exhibit 3 - page 349

10:17:34 10        A    Yes, I have it open.

        11         Q    Okay.  Were you aware that this claim had been

        12    filed?

        13         A    I had recently been aware -- made aware of

        14    this claim, why he.

10:17:42 15        Q    When were you first made aware of this claim?

        16         A    It was probably two to three weeks ago.

        17         Q    And how did this claim come to your attention?

        18         A    Scott Sheikh had brought it to my attention.

        19         Q    And did you have any discussions with

10:17:59 20    Mr. Sheikh regarding this claim?

        21         A    Yes.

        22         Q    What were -- what were the substance of your

        23    discussions with Mr. Sheikh regarding this claim?

        24              MR. SIMON:  Objection to the extent

10:18:09 25    attorney-client privilege based on the fact that


                                                    Rough Draft -
34
↟ 10:18:11  1   Mr. Sheikh is the general counsel of the company.

         2              To the extent you can answer without waiving

         3    the privilege, you may do so.

         4              THE WITNESS:  Okay.  Just to see if he was

10:18:22  5    aware of this claim and the validity of the claim and

         6    how it arose.

         7    BY MR. ESTERKIN:

Exhibit 3 - page 350

8       Q    And what did he say in that regard?

9       A    He is aware that the claim is valid, and he

10:18:37 10    explained to me why there is this liability.

11             MR. ESTERKIN:  Okay.  Give me a minute.  We've

12    got one more.

13             (Exhibit    was marked for identification.)

14             MR. ESTERKIN:  Let's mark, as Exhibit 4, a

10:19:20 15    copy of a proof of claim filed by the Texas controller

16    of public accounts.  It's claim number 35.

17      Q    Let me know when you have that, Mr. Weiss.

18      A    I have it.

19      Q    Okay.  Prior to the time that I just showed

10:19:49 20    you the claim, were you aware that this claim had been

21    filed?

22      A    I don't recall.

23      Q    All right.  Looking for just you don't need

24    you can pull it look at it you'd like to Exhibit 3 which

10:20:29 25    is the Franchise Tax Board claims, do you have any

Rough Draft -

35

↑ 10:20:31  1    understanding as to whether or not that claim is valid?

2      A    I do not.

3      Q    Okay.

4      A    It doesn't specify what these taxes relate to.

10:21:13  5    Q    Are you finished, your statement?

Exhibit 3 - page 351

```
          6      A    Yes.

          7      Q    And I believe you testified that you believe

          8  the IRS claim to be valid, correct?

          9      A    Yes.

10:21:28 10      Q    And do you have any understanding as to

         11  whether the Texas controller's claim is valid?

         12      A    I do not.

         13      Q    All right.  Let's take a look at the amended

         14  plan for a moment.  If you would turn to page 7 of 69.

10:22:10 15      A    Okay.

         16      Q    And specifically paragraph No. 10, the

         17  definition of available cash.  This concept of available

         18  cash, that was created in order to define the cash that

         19  would be available in the creditor's trust in order to

10:22:32 20  pay unsecured creditors, correct?

         21          MR. SIMON:  Objection.  Misleading.

         22  Objection.  Calls for a legal conclusion.

         23          But you may answer.

         24          THE WITNESS:  You said that this is cash

10:22:42 25  that's available to pay unsecured creditors.
```

                                        Rough Draft -
36
⬆ 10:22:44  1  BY MR. ESTERKIN:

          2      Q    Unsecured creditors and the cost of

          3  administering the trust.

Exhibit 3 - page 352

```
            4      A    I just read the definition again.

10:23:31  5            Would you mind reasking the question, please.

            6            MR. ESTERKIN:  Could the reporter please read

            7      it back.

            8            (Record read by the reporter as follows:

            9             "QUESTION:  And specifically

10:23:55 10            paragraph No. 10, the definition of

           11            available cash.  This concept of available

           12            cash, that was created in order to define

           13            the cash that would be available in the

           14            creditor's trust in order to pay unsecured

10:23:55 15            creditors, correct?")

           16            THE WITNESS:  The definition doesn't

           17      specifically state that it's there to pay general

           18      unsecured creditors.

           19      BY MR. ESTERKIN:

10:24:08 20      Q    Okay.  All right.  Let me just ask the

           21      question directly.

           22            What's the -- what -- under the terms of the

           23      plan, as you understand it, what is the source of the

           24      funds to pay priority tax claims?

10:25:03 25      A    That.
```

Rough Draft -
37

↑ 10:25:03  1      Q    Does it come from the creditors trust or is

Exhibit 3 - page 353

2      that something that the reorganized debtor has to pay?

3           MR. SIMON:  Objection.  Calls for a legal

4      conclusion.  You can answer.

10:25:12  5           THE WITNESS:  I believe it would come from the

6      -- not from the creditors trust.

7      BY MR. ESTERKIN:

8           Q    So it would be a continuing obligation of the

9      reorganized debtors; is that correct?

10:25:31 10           MR. SIMON:  Objection.  Misleading.

11      Objection.  Calls for a legal conclusion.

12           THE WITNESS:  Yes, it would be paid from the

13      cash on hand at the debtor -- from the debtors.

14      BY MR. ESTERKIN:

10:26:27 15           Q    All right.  Let's turn to page 23 of 69.  And

16      in particular the paragraph four at the bottom of that

17      page that talks about priority tax claims.

18           Do you have that?

19           A    I'm scrolling to it.  I am on page 23.

10:26:51 20           Q    Okay.  Towards the bottom.

21           Do you have it?

22           A    Yes.

23           Q    If you want to take a moment to read it, you

24      can.  Let me tell you what the first question is going

10:27:10 25      to be.

Exhibit 3 - page 354

Rough Draft -
38

⬆ 10:27:11  1          The first sentence that priority tax claim

2    shall be paid in full within five years of the petition

3    date in accordance with section 1129A9C of the

4    bankruptcy code.

10:27:24  5          What is your understanding with respect to the

6    intervals under which those payments would be made?  In

7    other words, are they all paid at the end of five years?

8    Are there installment payments between the effective

9    date of the plan and the petition date?  And if so, what

10:27:40 10  are the installments?  How often are they made?

11        A    Let me read the plan treatment.

12        Q    Sure.

13            MR. SIMON:  Objection.  Calls for a legal

14    conclusion.

10:28:28 15            THE WITNESS:  Yes, I'm done reading this

16    section.

17            MR. ESTERKIN:  Okay.  Right.

18        Q    Are so the question related to the timing of

19    these payments to the holders of priority tax claims.

10:28:42 20  How frequently are the payments made during the five

21    years prescribed in the plan?

22        A    The frequency is not set forth, you know, in

23    this section.

24        Q    All right.  Well, what is your understanding

Exhibit 3 - page 355

10:28:54 25   as to the frequency of those payments, if you have one

↑ 10:28:58  1   or don't you?  Go ahead.  You signed the plan?

2          MR. SIMON:  Objection.  Compound.  Objection.

3   Ambiguous and vague.

4          Can you restate the question?

10:29:08  5          MR. ESTERKIN:  Yeah.

6     Q    What is your understanding as to the frequency

7   with which the payments to priority tax claims are

8   supposed to be made under this plan?  You signed it.

9   You negotiated it.  What's your understanding?

10:29:20 10     A    I thought I had answered that just a second

11   ago.

12     Q    Well, you said it doesn't seem to be

13   prescribed in this section.

14          Is there another section where it's

10:29:31 15   prescribed?

16     A    Let me -- let me scroll through the plan just

17   a minute.

18     Q    Sure.  As I indicated earlier --

19          (Simultaneous speaking.)

10:29:42 20     Q    Both --

21     A    You're giving me a section and then asking me

22   to conclude on -- you know, on one paragraph on a 69

Exhibit 3 - page 356

23    page document.  So let me just, you know, scroll through

24    this and see if I can see if there's any other

10:29:59 25    provisions that deal with this.


Rough Draft -
40
↑ 10:30:00  1        Q    Sure.

2        A    Okay.  I'm done scrolling through the plan.

3        Q    Okay.

4        A    The plan does not set forth what the repayment

10:31:19  5    terms other than within five years of the petition date

6    are.  I mean, there's no explanation of the frequency of

7    the payments.

8        Q    All right.  And do you understand that the

9    amount that the priority tax claimants are supposed to

10:31:35 10    receive is equal to the present value of the amount of

11    their claims?

12        MR. SIMON:  Objection.  Calls for a legal

13    conclusion.  Objection.  Foundation.

14        THE WITNESS:  Yes.

10:31:47 15    BY MR. ESTERKIN:

16        Q    And what interest rate is -- does the plan

17    prescribe in order to present value the stream of

18    payments that are to be made to the priority tax

19    claimants under the plan?

10:32:03 20        MR. SIMON:  Objection.  Foundation.

Exhibit 3 - page 357

21    Objection.  Assumes facts not in evidence.

22              MR. ESTERKIN:  Oh, I'll restate the question.

23         Q    What is your understanding as to the interest

24    rate to be used in order to present value the stream of

10:32:17 25    payments to be made to priority tax claimants under the


                                              Rough Draft -
41
⬆ 10:32:20  1    plan?

2         A    Let me go back to the priority tax plan.

3              The actual interest rate on each respective

4    claim isn't set forth specifically in the plan.

10:33:02  5         Q    Do you have an understanding as to the

6    interest rate that's supposed to be used?

7              MR. SIMON:  Objection.  Calls for a legal

8    conclusion.  Objection.  Assumes a fact not in evidence.

9    Objection.

10:33:15 10              THE WITNESS:  Should I answer beings John?

11              MR. SIMON:  At this point, foundation.  Vague

12    and ambiguous.

13              You can answer.

14              THE WITNESS:  Generally, the tax claims are,

10:33:29 15    you know, paid at an interest rate commensurate with

16    respect to each taxing agency's requirements.

17    BY MR. ESTERKIN:

18         Q    So it would be the interest rate charged by

Exhibit 3 - page 358

```
           19   the various taxing -- particular taxing agency on

10:33:45   20   deferred payments to the -- I'm sorry.  Let me start

           21   this question over again.

           22        So the interest rate that would be used, in

           23   your view, would be the interest rate that the taxing

           24   agency charges on delinquent payments; is that correct?

10:34:00   25        MR. SIMON:  Objection.  Calls for speculation.
```

Rough Draft -
42
```
↑ 10:34:02  1   Objection.  Calls for a legal conclusion.

            2        THE WITNESS:  For companies that are in

            3   bankruptcy, yes.

            4   BY MR. ESTERKIN:

10:34:26    5   Q    All right.  The -- the plan lists two con --

            6   executory contracts.  Let me strike that.

            7        We're going to move on to talk about executory

            8   contracts for a -- for a moment.  I was just -- John, I

            9   was just advised that somebody has called into the

10:34:52   10   conference.  I'm not sure who that is because it's just

           11   a phone number.  If it's Mr. Voskanian, perhaps you can

           12   reach out to him and ask him to hang up.

           13        MS. NIX-HINES:  Richard this is me.  I'm

           14   having some Internet troubles so I'm having it on phone

10:35:11   15   as well?

           16        MR. ESTERKIN:  I'm sorry.  Who is speaking?
```

Exhibit 3 - page 359

```
        17            MS. NIX-HINES:  Crystal.

        18            MR. ESTERKIN:  Oh, I'm sorry.  Okay.  Thank

        19    you, Crystal.

10:35:19 20    BY MR. ESTERKIN:

        21       Q    All right.  So, let's talk about -- spend a

        22    few minutes talking about executory contracts.

        23            The plan -- under the terms of the plan, the

        24    debtor is not required to file its schedule of executory

10:35:31 25    contracts to be assumed pursuant to the plan until June
```

                                                    Rough Draft -
43
```
↑ 10:35:36  1    18th, correct?

         2       A    I'm not.  I don't know the exact dates, so

         3    I'll defer to counsel, but I know that there is a

         4    deadline coming up.

10:35:47  5    BY MR. ESTERKIN:

         6       Q    Okay.  We haven't gotten to the deadline yet,

         7    I guess, is the point, correct?

         8       A    Correct.

         9       Q    And I assume that the debtor has been at least

10:35:54 10    thinking about the executory contracts that it intends

        11    to assume, correct?

        12       A    Yes.

        13       Q    And is there a preliminary list that exists as

        14    of this time?
```

Exhibit 3 - page 360

10:36:07 15    A    There is a list that's starting to be formed,

16    yes.

17    Q    Okay.  And who is on that list?

18    A    Well, it's not necessarily a list of what's

19    going to be assumed versus not assumed, but there's a

10:36:19 20    list of contracts that we need to make a decision on,

21    and there -- so you're asking, you know, for that list?

22    Q    No.  I'm asking for the -- the -- not the

23    entire list of executory contracts because I can read

24    the schedules to get that.  What I'm asking for is the

10:36:36 25    debtors current thoughts on the list of contracts that

Rough Draft -

44

▲ 10:36:40  1    it intends to assume.

2    A    I.

3    Q    Understanding -- understanding --

4    understanding that the debtor still has three days

10:36:47  5    within which to finalize the list and that it could

6    change?

7    A    It's still a work in process, but, you know,

8    the one contract on there that we're certain we will

9    assume is the Amazon contract.

10:37:15 10    Q    Okay.  The plan lists two contracts as, quote,

11    specified cure claims.

12    Do you recall that?

Exhibit 3 - page 361

13      A    I do.

14      Q    Okay.  And one of those is Hertz.

10:37:29 15          Do you recall that?

16      A    Yes.

17      Q    Has the debtor made a determination as to

18   whether or not it intends to assume or reject the Hertz

19   contract?

10:37:37 20     A    Not at this point.

21      Q    Is there an inclination one way or the other?

22      A    It's still under discussion.

23      Q    Correct, but my question was whether there was

24   an inclination one way or the other.

10:37:49 25     A    There is not.


Rough Draft -
45
↑ 10:37:50  1          MR. SIMON:  Objection.  Calls for speculation.

2   Objection.  Asked and answered.

3   BY MR. ESTERKIN:

4      Q    Please answer the question?

10:37:58  5     A    Not at this point in time, there is not.

6      Q    Okay.  Okay.  The -- you can look at the plan

7   if you want to or you can just take my word for it, but

8   at page 19 of 69 there's a definition specified cure

9   claims, and it says apparently that the cure claim for

10:38:31 10  the Hertz contract is $871,230.84.


Exhibit 3 - page 362

        11              Is that your understanding as to the amount

        12      that would be necessary to pay Hertz if the debtor made

        13      a determination to assume the Hertz contract?

        14          A    Would you tell further negotiation of that

10:38:46 15      amount with Hertz, yes.

        16          Q    Okay.  And is -- to your knowledge, is anybody

        17      at the debtor currently in negotiations with Hertz to --

        18      with respect to that amount?

        19          A    I'm not aware of whether or not Mr. Voskanian

10:39:00 20      is in communication with them on this particular matter.

        21          Q    I'm sorry.  I couldn't hear the last part of

        22      your answer?

        23          A    I'm not aware as to whether Mr. Voskanian is

        24      in discussions with Hertz on this particular matter.

10:39:14 25          Q    Okay.  Mr. Voskanian would be the one who


                                                        Rough Draft -
46
↑ 10:39:18  1    would be engaged in those discussions if they're

         2      occurring; is that correct?

         3              MR. SIMON:  Objection.  Calls for speculation.

         4      Objection.  Foundation.

10:39:30  5              MR. ESTERKIN:  All right.  I'll rephrase the

         6      question.

         7          Q    As you understand the division of

         8      responsibilities within Scoobeez, do you believe that


Exhibit 3 - page 363

          9    Mr. Voskanian would be the person responsible for

10:39:42 10    engaging in those discussions with Hertz?

         11    A    Yes.

         12    Q    The other contract that's -- I'm sorry.  Was

         13    someone going to say something?  No?

         14         MR. SIMON:  I think I just coughed Richard.

10:40:10 15         MR. ESTERKIN:  Oh.

         16         MR. SIMON:  Pardon me.

         17         MR. ESTERKIN:  That's okay.  I just didn't

         18    want to interrupt somebody if they were getting ready to

         19    say something.

10:40:16 20    Q    The other contract that's listed in this

         21    definition is the booster fuels contract, and it shows a

         22    cure amount of $79,360.71, correct?

         23    A    Yes.

         24    Q    And is that the amount that would be needed to

10:40:32 25    pay booster fuels, in your understanding in the event

                                                    Rough Draft -
47
⬆ 10:40:36  1    the booster fuels contract was assumed?

          2    A    Yes.

          3    Q    Are you aware of any discussions with boost

          4    earfuls regarding a renegotiation of that cure amount?

10:40:51  5    A    I know Mr. Voskanian has regular

          6    communications with booster fuels, so I'll need to -- I

Exhibit 3 - page 364

```
          7    don't have any knowledge at this time.  I can refresh my

          8    memory or I'll confer with him.

          9         Q    All right.  So once again, as you understand

10:41:06 10    the division of responsibilities at Scoobeez, if there

         11    were such negotiations, they would fall within

         12    Mr. Voskanian's area of responsibility?

         13         A    Yes, they would.

         14         Q    What services or goods does Hertz provide to

10:41:24 15    Scoobeez?

         16         A    They provide the vans.

         17         Q    All of the vans?

         18         A    I don't know if it's a hundred percent, but

         19    it's substantial.  If it's not a hundred percent, it's

10:41:42 20    substantially all vans.

         21         Q    Okay.  And do you know what the duration of

         22    the Hertz contract -- Hertz contract is?

         23         A    I don't.

         24         Q    And what goods or services does booster fuels

10:41:56 25    provide to Scoobeez?
```

Rough Draft -
48
↑ 10:41:58 1        A    They provide fuel for the trucks.

```
          2         Q    And do you know what the duration of the

          3    booster fuels contract is?

          4         A    No, I don't -- I don't recall.
```

Exhibit 3 - page 365

10:42:16  5      Q    All right.  So we've talked about three

        6   executory contracts:  The Amazon contract, the booster

        7   fuels contract, and the Hertz contract.

        8          Well, actually, let's take a minute on the

        9   Amazon contract.

10:42:29 10          Do you have any understanding as to what the

        11  cure amount would be with respect to the Amazon

        12  contract?

        13     A    I do not.

        14     Q    And who at Scoobeez, as you understand the

10:42:41 15  responsibilities, would be responsible for determining

        16  the cure amount under the Amazon contract?

        17     A    I believe that would be more of a legal

        18  determination.

        19     Q    So that would fall -- I'm sorry.  I

10:42:54 20  interrupted you.  Go ahead?

        21     A    It would be a determ -- we would be relying

        22  upon legal for that determination.

        23     Q    And so that would be either Mr. Sheikh or

        24  outside counsel?

10:43:05 25     A    Correct.


                                              Rough Draft -
49
↑ 10:43:10  1      Q    All right.  Are there any other executory

        2   contracts that Scoobeez is seriously considering

Exhibit 3 - page 366

                3    assuming besides the Amazon contract, the Hertz contract

                4    and the booster fuels contract?

10:43:25    5         A    Not that I'm aware of.

                6         Q    Okay.  With respect to your tenure as chief

                7    restructuring officer over the -- let's look at the last

                8    three months, who reports -- who at Scoobeez reports to

                9    you?

10:44:08   10         A    George Voskanian and Scott shaken.

               11         Q    And they're the only two people that report to

               12    you?

               13         A    Yes.

               14         Q    Is that correct?  Okay.

10:44:18   15              And do you have access to -- without going to

               16    Scoobeez's offices, do you have access to Scoobeez's

               17    records?  In other words, for example, do you have a

               18    computer link to Scoobeez where you could access

               19    accounting records online?

10:44:35   20         A    No, I don't.

               21         Q    So with respect to information that you have

               22    obtained regarding Scoobeez's finances you're relying

               23    upon information provided to you by either Mr. Voskanian

               24    or Mr. Sheikh, correct?

10:44:52   25         A    Yes.


                                                        Rough Draft -

50

Exhibit 3 - page 367

10:44:59  1        Q    And how do they communicate with you?  Strike

          2    that.

          3             How does Mr. Voskanian communicate with you?

          4        A    Telephone, email.

10:45:12  5        Q    When was the last time you met with

          6    Mr. Voskanian in person?

          7        A    It would have been a few months ago.

          8        Q    Okay.  And same questions for Mr. Sheikh.

          9             When did -- how did Mr. Sheikh communicate

10:45:28 10    with you?

         11        A    Telephone and email.

         12        Q    And when was the last time you met face to

         13    face with Mr. Sheikh?

         14        A    That would have been a few months ago also.

10:45:39 15        Q    Prior to the time that the COVID sheltering in

         16    place directives came down; is that correct?

         17        A    That is correct.

         18        Q    And in this bankruptcy case, there's three

         19    debtors, correct?

10:45:59 20        A    Yes.

         21        Q    Scoobeez, Scoobur and Scoobeez Global,

         22    correct?

         23        A    Yes.

         24        Q    Do you have an understanding as to the

10:46:09 25    relationship among the three debtors?

Exhibit 3 - page 368

Rough Draft -
51

↑ 10:46:13   1        A    Generally, yes.

2        Q    What's your understanding in that regard?

3        A    That Scoobeez Global owns Scoobeez, and then

4    Scoobur is an inactive entity that I believe is also

10:46:26   5    owned by Scoobeez Global.

6        Q    So Scoobeez Global acts as a hold company for

7    the other two entities, correct?

8        A    Yes.

9        Q    Does Scoobeez Global engage in any business

10:46:37  10    other than that of a holding company?

11        A    Not that I'm aware of, no.

12        Q    Okay.  And what business does Scoobur engage

13    in?

14        A    There's -- there's no business activities.

10:47:03  15        Q    Are there separate books and records for each

16    of the three debtors?

17        A    Yes, there are.

18        MR. ESTERKIN:  Okay.  I'm going to mark, as

19    the next exhibit, Exhibit 5, a copy of the declaration

10:48:22  20    that you -- that you signed -- or apparently signed and

21    was filed on June 11th as document No. 791 in the

22    bankruptcy cases.

23        (Exhibit    was marked for identification.)

Exhibit 3 - page 369

          24   BY MR. ESTERKIN:

10:48:51 25        Q    Let me know when you have that.


                                                        Rough Draft -
52
↑ 10:48:56  1        A    I'm refreshing my screen.  Okay okay.  I have

          2   the document open.

          3        Q    Okay.  Great.  This is a copy of your

          4   declaration, correct?

10:49:15  5        A    Yes, it is in support of the confirmation of

          6   first amended chapter 11 joint plan of reorganization

          7   proposed by the debtors Hillair and the official

          8   committee of unsecured creditors.

          9        Q    Okay.  And if you turn to page 6, that's your

10:49:30 10   signature right above where it says Brian Weiss?

         11        A    Yes, it is.

         12        Q    And you read this declaration before you

         13   signed it, correct?

         14        A    Yes, I did.

10:49:40 15        Q    And you understood that when you signed it,

         16   you were signing it under penalty of perjury?

         17        A    Yes.

         18        Q    And that that's the same oath that you would

         19   take if you were testifying live in court and the same

10:49:51 20   oath that you were given prior to the commencement of

         21   this deposition, correct?

Exhibit 3 - page 370

22    A   I know I was under oath under penalty of

23    perjury.  I don't know if it would be the same

24    declaration I'd give with respect to this deposition

10:50:08 25    because I think there was, you know, multiple phases of

Rough Draft -
53

↑ 10:50:11  1   it that you had read to me, but it would definitely be

2    under penalty of perjury.

3    Q   If you would turn to, actually, the last page,

4    paragraph number 16.

10:50:56  5    A   The last page.  Is that the one where it says

6    "I declare under penalty of perjury"?

7    Q   Sorry.  No.  That's actually the page before

8    that.  Paragraph 16.

9    A   Okay.

10:51:11 10    Q   It says o, beginning based on the debtors

11    projections there will be sufficient cash, et cetera.

12    Do you see that?

13    A   Yes, I do.Le.

14    Q   Okay.  Are the projections that you're

10:51:21 15    referring to at that point in your declaration the

16    budget that we discussed earlier in your deposition that

17    was attached to the cash collateral stipulation?

18    A   No.

19    Q   What projections are you referring to in that

Exhibit 3 - page 371

10:51:36 20    sentence?

21        A    We have other financial projections that shows

22    what the financial performance of the debtor is through

23    the December 31st proposed effective date, you know,

24    that's on a more of an accrual basis as opposed to a

10:51:54 25    cash basis.


                                                    Rough Draft -
54
↑ 10:53:21  1        Q    Okay.  Let's go back to Exhibit 6, which is

2    the cash collateral budget.  Actually, after the cash

3    collateral stipulation to which the budget is appended.

4        A    Exhibit 6.  Okay.

10:53:55  5        Q    This budget reflects your -- the debtors best

6    estimates on a cash basis as to the cash inflows and

7    outflows during the period covered by the budget., is

8    that correct?

9            MR. SIMON:  Objection.  Misstates facts not in

10:54:07 10    evidence.  Objection.  Foundation.  Objection.  Calls

11    for a legal conclusion.

12    BY MR. ESTERKIN:

13        Q    You can answer.

14        A    Yes.

10:54:27 15        Q    On the very top it shows -- there's a line for

16    the -- for income, and it talks about invoiced routes.

17            Do you see that?


Exhibit 3 - page 372

18          A    Could you please refer me to a page number?

19          Q    Oh, sure.  I'm looking at -- I'm looking at

10:54:52 20   the budget that was attached to the cash collateral

21   stipulation, Exhibit 6.

22          A    Page 8 of 14 or 7 of 14 or 6 of -- 7, 8.

23          Q    We can just -- page 7 of 14 is fine.

24          A    Okay.

10:55:11 25   Q    I'm going to ask you -- I just want to ask you

Rough Draft -
55
↑ 10:55:13  1   some questions about the categories on each -- on the

2   lines, and because those categories are the same on

3   seven and eight, it doesn't really matter which of the

4   two you look at, right?

10:55:24  5   A    Correct.

6          Q    Okay.  So we're on page 7 of 14, and there is

7   a line item for invoiced routes.

8              Do you see that?

9          A    Yes.

10:55:34 10   Q    And that's the debtor's anticipation of the

11   routes that Amazon will award to Scoobeez and the

12   payments that Amazon will make to Scoobeez based on

13   those routes.

14              MR. SIMON:  Objection.  Calls for a legal

10:55:45 15   conclusion.  Objection.  Assumes facts not in evidence.

Exhibit 3 - page 373

16    Objection.  Vague and ambiguous.

17           You can answer.

18           THE WITNESS:  So the invoiced routes is the

19    awarded routes.  You mentioned something about

10:55:57 20    collections, which is different than the amount of

21    invoiced routes for the same period.  So if we can

22    clarify your question so I can go forward.

23           MR. ESTERKIN:  Sure.

24    Q     The -- the budget is based on -- is

10:56:12 25    articulated on a cash basis, correct?


                                                Rough Draft -
56
↑ 10:56:15  1        A    Yes.

2        Q    And Amazon pays for the services that Scoobeez

3    renders some period of time after those services are

4    actually rendered, correct?

10:56:27  5        A    Yes.

6        Q    And so this line invoiced routes is referring

7    to the cash that Scoobeez expects to receive from Amazon

8    based upon routes that Scoobeez ran for Amazon, correct?

9        A    They are invoiced routes that we expect to

10:56:48 10    receive cash at a future date from those routes during

11    that -- that week that services are rendered.

12        Q    So Amazon pays approximately 30 days after the

13    -- in arrears, correct?

Exhibit 3 - page 374

                14      A    It's about 40 days, historically, but there

10:57:09  15    has been -- due to the COVID-19, you know, pandemic,

                16      Amazon has, up until the end of May, paid in

                17      approximately seven days for -- you know for a

                18      couple-month period of time.

                19      Q    Yeah.  My -- okay.  I'm not really interested

10:57:28  20    in necessarily debating whether it's seven days or 30

                21      days or 40 days.

                22            I guess my question is:  When we look at the

                23      forecast for June 12th it says eight -- $900,000, I

                24      believe.  Correct?

10:57:44  25      A    Yeah.


                                                    Rough Draft -
57
↑ 10:57:44  1      Q    Is that based on routes that were run at some

                2      period prior to June 12 or is that based on routes that

                3      would be run the week of June 12th?

                4      A    That's for the routes that we would run on the

10:57:58  5      week of June 12.

                6      Q    All right.  And as I'm looking at the budget,

                7      the payments on account of the Amazon routes are the

                8      only -- is the only cash income reflected on the budget,

                9      correct?

10:58:26  10      A    Yes.

                11      Q    And once again, just so we understand the

Exhibit 3 - page 375

12    manner in which the information in the budget is

13    displayed, we're showing, in the June 12, 2020 column,

14    beginning cash of -- of 5,436,950, correct?

10:59:07 15         A    Yes.

16         Q    And is that inclusive of the $900,000 for the

17    Amazon routes in that week?

18         A    No.

19         Q    So -- so the amount of cash plus the Amazon

10:59:22 20    routes would be, give or take, $6.3 million and change,

21    correct?

22         A    The proper way to read it is the beginning

23    cash is your starting point for cash, and then the line

24    item below collections would be additive to the cash

10:59:39 25    balance.  The $900,000 of invoiced routes gets collected

Rough Draft -
58
↑ 10:59:46  1  at a future period in time.

2         Q    All right.  So you're showing $950,000

3    collections the week of July 3, correct?

4         A    Yes.

11:00:01  5         Q    What's the source of the -- of the -- of that

6    $950,000?

7         A    That would be for the work that Scoobeez

8    performed for Amazon for the period prior to June 12th.

9    So it would be, you know, approximately, you know, 35 to

Exhibit 3 - page 376

11:00:20 10    40 days of -- of AR outstanding as of that point in

11    time.

12        Q    Okay.  So the 900,000 in invoiced routes that

13    you're showing on June 12th -- I'm just looking --

14    you're projecting that you're going to collect the cash

11:00:40 15    in the week of July 20 -- July 17th?

16        A    That is correct.

17        Q    And then in the next section below that you're

18    showing cash disbursements, correct?

19        A    Yes, we are.

11:01:02 20    Q    And it then -- where where the line it says

21    total, operating cash disbursements is just a sum of the

22    figures above that in the cash disbursement section?

23        A    Correct.  Beginning on the line item fuel and

24    ending in the line item other expenses.

11:01:20 25    Q    Okay.  All right.  And then if you take the


                                                    Rough Draft -
59
↑ 11:01:36  1    operating -- you take the beginning cash minus the

2    operating cash flow, which in the week of June 12th is a

3    negative, you come to the beginning cash balance for the

4    next period?

11:01:49  5    A    No.

6        Q    All right.  So you have also financing cash

7    flows?


Exhibit 3 - page 377

8      A    Correct.

9      Q    And then you also have restructuring cash

11:02:00 10   flows, correct?

11     A    Yes.

12     Q    And so what you would do, then, is below where

13   it says restructuring cash flows, you have at the moment

14   cash flow in/out and in the first week it's 300 -- I'm

11:02:16 15   trying to read it.  329,650?

16     A    Yes.

17     Q    Negative.  So you take the 5,000,004 minus the

18   329,000 you get to 5,000,107, which then becomes the

19   beginning cash flow of the next period, correct?

11:02:31 20    A    Yes.

21     Q    And then those numbers just flow through the

22   remainder of the budget period, correct, in the same

23   way?

24     A    Correct.

11:02:53 25    Q    Now, we talked earlier that there is an estate


                                            Rough Draft -
60
↑ 11:02:55  1   cash payment of a million $500,000 that was supposed to

2   be made on the confirmation date, correct?

3      A    Yes.

4      Q    Is that accounted for in the budget?

11:03:06  5    A    No, it is not.

Exhibit 3 - page 378

         6        Q    So if -- if we assumed, just for purposes of

         7    discussion, that the plan is confirmed on July 9th for

         8    the periods of time after July 9th in order to determine

         9    the actual cash you'd have -- according to the budget,

11:03:24 10    you'd have to take a million and a half dollars,

        11    correct?

        12        A    From the cash on hand, yes.

        13        Q    I'm sorry.  You said from the cash on hand.  I

        14    didn't hear the rest of your answer?

11:03:40 15        A    That was it.  From the cash on hand.

        16        Q    Okay.  So if we go to the end of the budget,

        17    it shows the ending cash on hand, I believe, starting

        18    the week of January 1 is 3,230,322, correct?

        19        A    I show it as 3,844,172.  You're referring to

11:04:29 20    that 1/1 of 21?

        21        Q    Yes.

        22        A    Yes.

        23        Q    So this forecast shows that the cash at

        24    January 1, 2021, would be 3,280,322, correct?

11:04:49 25        A    So I'm sorry.  I'm looking at the cash flow


                                                      Rough Draft -
61
↑ 11:04:55  1    stipulation on page 8 --

         2        Q    Yes.

         3        A    -- your Exhibit 6.

Exhibit 3 - page 379

```
         4      Q    Yes.

11:05:01 5      A    That shows 3844172 as the ending cash.  You're

         6    looking at the beginning cash.

         7      Q    Yeah, I was looking at the beginning cash

         8    beginning on January 1, 2021, the beginning cash was 3

         9    million 2, and then there's collections and at the

11:05:21 10   end -- the ending cash is, as you say, 3 million 8 and

         11   change, right?

         12     A    No.  Just for clarification purposes, that

         13   3,230,322 would be the cash balance as of 12/25 of '20.

         14   That's a beginning cash balance, beginning of the week.

11:05:42 15     Q    Okay.  So it's 3,844,172 at the -- at January

         16   1, 2021?

         17     A    Yes.

         18     Q    And you'll have to take off the million five

         19   for the estate cash payment, correct?

11:05:55 20     A    Yes.

         21     Q    So the real projected cash balance, then,

         22   would be 2,344,172, correct?

         23     A    Assume the plan goes effective, then yes.

         24          MR. ESTERKIN:  All right.  We've been going

11:06:31 25   for about two hours.  I would suggest that we take a
```

Rough Draft -
62
↑ 11:06:34  1   five or ten-minute break now so people can stretch their

Exhibit 3 - page 380

2    legs, the court reporter can stretch her fingers, and

3    then we can come back and proceed with the deposition.

4    I do have -- I have a conference call that I have to

11:06:50  5    take at 12:30, and I -- so I was planning on taking our

6    lunch break at that time for approximately an hour if we

7    don't complete the deposition before then just to give

8    everybody a little heads up on the future schedule.  So

9    with that, it's 11:07 a.m., according to my computer at

11:07:10 10    the moment.  Why don't we come back at say 11:15.  And

11    we can go off the record now.

12              (Recess.)

13              MR. ESTERKIN:  Okay.  Let's go back on the

14    record.

11:20:51 15    Q    All right.  Mr. Weiss, we're back on the

16    record now.  During our break, did you have any

17    conversations with anyone regarding the substance of

18    your testimony?

19    A    I had a conversation with Mr. Simon, but it

11:21:04 20    wasn't regarding my testimony.

21    Q    During the course of your conversation with

22    Mr. Simon, did you discuss potential areas of

23    questioning for this afternoon?

24    A    No.

11:21:20 25    Q    I shouldn't say this afternoon.

Exhibit 3 - page 381

Rough Draft -
63

⬆ 11:21:21  1            MR. SIMON:  Objection.  Attorney-client

          2    privilege.

          3            MR. ESTERKIN:  Let me --

          4            MR. SIMON:  Mr. Weiss, if you can answer

11:21:29  5    without releasing privileged information, you can

          6    answer.

          7            MR. ESTERKIN:  Let me go back and ask the

          8    question question again because --

          9      Q    During your conversation with Mr. Simon, did

11:21:39 10    you have any discussions regarding potential questioning

         11    in the remainder of your deposition?

         12      A    No.

         13      Q    All right.  Before we went off the record, we

         14    were looking at your declaration in support of plan

11:21:52 15    confirmation paragraph 16, where you talked about

         16    debtors projections.

         17            Do you recall that?

         18      A    Yes.

         19            MR. ESTERKIN:  All right.  Mr. Simon, I'd like

11:22:04 20    to request that you provide us with a copy of those

         21    projections.

         22            MR. SIMON:  And I'll get back to you on that,

         23    Richard.

         24            MR. ESTERKIN:  All right.  When do you think

Exhibit 3 - page 382

11:22:14 25    you'll be able to get back to me on that?

⬆ 11:22:17  1         MR. SIMON:  Hopefully late today.

2         MR. ESTERKIN:  Okay.  Great.  If we have to,

3    we'll serve a formal request to produce, because I think

4    we're entitled to see the projections upon which this

11:22:28  5    declaration is based.

6    Q    All right.  So let's talk a minute about those

7    projections.

8         Do those projections -- I think you said that

9    those projections are stated on an accrual basis as

11:22:41 10    opposed to a cash basis, correct?

11    A    Correct.

12    Q    And are there any substantive differences

13    taking into account, you know, the difference between

14    cash and accrual between those projections and the

11:22:57 15    budget?

16    A    The only thing off the top of my head that's a

17    difference is in those projections we have the

18    $1.5 million estate cash payment deducted from the

19    projected cash balance.  I think it starts on the

11:23:21 20    confirmation date.  So that's, I think the only --

21    that's the only delta.

22    Q    Okay.  So you -- you're still projecting on

Exhibit 3 - page 383

```
        23    the same amount of cash flow from Amazon, correct?

        24         A    Yes.

11:23:34 25         Q    And do you have -- in those projections do you
```

```
⬆ 11:23:37  1    include any income from any other source besides Amazon?

         2         A    No.

         3         Q    And how far out -- how far out in time do

         4    those projections go?

11:23:56  5         A    We have them through 12/31 of '21 -- I'm

         6    sorry -- 12/31 of 23.

         7         Q    I'm sorry.  7/31/2020?

         8         A    Yes.  And then we also have some, you know,

         9    longer range projections but those aren't really be used

11:24:14 10    for -- those are included in that same model, but

        11    they're not really be being used for this purpose

        12         Q    And how far out do those longer range

        13    projections go?

        14         A    2000 -- the end of 2023, I believe.

11:24:39 15         MR. ESTERKIN:  Okay.  John, we'd like those

        16    longer-range projections as well, please.  So if you

        17    could get back to us on that as well, I would appreciate

        18    it.

        19         Q    The longer-range projections that you just

11:24:53 20    referred to, those are also stated on an accrual basis;
```

Exhibit 3 - page 384

21    is that correct?

22         A    Yes.

23         Q    And do those include any revenue from Amazon

24    after December 31, 2020?

11:25:06 25    A    See, they're draft projections.  They don't

↑ 11:25:09  1    really specify revenue targets.  It just has numbers in

2    there, and when the new board of directors comes on

3    board, new managers of Scoobeez, you know, then they'll

4    be covering what the business model is for Scoobeez.

11:25:27  5    Q    Okay.  I'm not hearing a hundred percent.

6    A    Those projections don't really have -- you

7    know, they're not published.  They're not used for any

8    real basis other than they're part of a model, but,

9    again, they're not part of the plan.

11:25:38 10    Q    Okay.  So you don't have any projections that

11    you would rely upon that would show what the debtors

12    projected financial performance after December 31 of

13    2020; is that correct?

14    A    Correct.  Not that's to be relied upon.

11:25:55 15    Q    Okay.  Okay.  I'm marking, as Exhibit 7, a

16    copy of the operating report filed by Scoobeez in the

17    bankruptcy case for the period ending January 31, 2020.

18    It was filed as document No. 610.


Exhibit 3 - page 385

            19              (Exhibit     was marked for identification.)

11:27:30 20    BY MR. ESTERKIN:

            21        Q    You should have that in front of you.

            22             Do you have that?

            23        A    Yes, I do.

            24        Q    Did you -- did you participate in the

11:27:40 25    preparation of this operating report?


                                                    Rough Draft -
67
↑ 11:27:44  1        A    You mean, did I -- did I perform the

            2    accounting or did I review and ask the appropriate

            3    questions?

            4        Q    The latter.

11:27:52  5        A    I reviewed it and provided, you know,

            6    questions and approved the filing of it.

            7        Q    All right.  And who was primarily responsible

            8    for assembling the information in this operating report?

            9        A    That would be the accounting group for

11:28:10 10    Scoobeez.

            11        Q    And is there somebody who is the head of the

            12    accounting group at Scoobeez?

            13        A    Yes, that would be George Voskanian.

            14        Q    Okay.  And did you interact with Mr. Voskanian

11:28:22 15    regarding the preparation of this operating report?

            16        A    Yes.

Exhibit 3 - page 386

17    Q   Okay.  Let's just talk about the operating

18    reports in general, and I'm only going to be dealing

19    with the operating reports starting with this one for

11:28:38 20    January of 2020 and then going through the last

21    operating report that was filed, which I believe covers

22    the period through April 30 of 2020.  So with respect to

23    those operating reports, could you just briefly describe

24    the process by which the operating report was prepared

11:28:53 25    and your role in that process.

Rough Draft -
68

↑ 11:28:58 1    A   So I can describe my role in the process.  I

2    would have to defer you to George Voskanian to detail,

3    you know, his -- his preparation of his reports.

4    Q   Okay.  So I'd like to know what your role was.

11:29:19 5    I'd like you to tell me what, if anything, Mr. Voskanian

6    told you about how it was prepared by the time it hit

7    your desk.

8    A   Well, you know, he sent me the report.  The

9    report is prepared, you know, in accordance with, you

11:29:32 10    know, with accrual basis accounting, and, you know, he

11    lists all of the receipts and diseurs always of the

12    company as well as, you know, records the necessary

13    accruals for the financial statements.  When those are

14    sent to me, I review them and provide comments to him.

Exhibit 3 - page 387

11:29:53 15    The one area that I specifically handle in the monthly

16    operating reports is the tracking of the professional

17    fees, and I send him the schedule on that.

18        Q    And so how do you track the professional fees?

19        A    It's based on estimates and actual fee

11:30:15 20    statements that are -- that have been filed.

21        Q    So I understand the process for submitting

22    interim fee applications to the bankruptcy court.  So

23    you've looked apt those interim fee applications,

24    correct?

11:30:29 25        A    Correct.

Rough Draft -
69
↑ 11:30:30  1        Q    And there have been two interim fee

2    applications so far in the Scoobeez case, correct?

3        A    Yes.

4        Q    When I say two, I mean there were two sets of

11:30:39  5    them.  There were multiple professionals that filed each

6    time, correct?

7        A    Correct.  The first.

8        Q    All right.

9        A    Interim and the second interim.

11:30:47 10        Q    I'm sorry.  I couldn't hear your answer?

11        A    I said the first interim application and the

12    second interim application.

Exhibit 3 - page 388

13      Q    Right.  And so you looked at those, and you

14    had information based upon those operating report -- I'm

11:31:00 15    sorry -- the fee applications as to how much in fees and

16    expenses each of the professionals is requesting,

17    correct?

18      A    Correct.

19      Q    And then the court entered an award of those

11:31:14 20    with respect to the applications, correct?

21      A    Correct.

22      Q    And I could show -- I'm going to show you the

23    court's orders, but, in general, the court allowed fees

24    in some number and then authorized Scoobeez to pay fees

11:31:33 25    in a different number, correct?

Rough Draft -

70

↑ 11:31:36  1      A    Correct.

2      Q    And the -- the difference was that the amount

3    that was permitted to be paid was in accordance with the

4    cash collateral budgets that had been approved by the

11:31:46  5    court, correct?

6      A    You mean with respect to what's being recorded

7    in the financial statements?

8      Q    I'm sorry.  I --

9      A    With respect to what's being recorded in the

11:32:00 10    financial statements?

Exhibit 3 - page 389

             11      Q     No, no, no.  I'm asking you about the orders.

             12   The difference -- the difference between the amount

             13   awarded and the amount that was authorized to be paid

             14   was based upon the fact that the cash collateral budgets

11:32:15 15   permitted payment in amounts less than the actual

             16   amounts awarded, correct?

             17      A     That's correct.

             18      Q     And so, as I recall it, at least, the last

             19   interim fee application covered fees between -- through

11:32:33 20   and including December 31, 2019.

             21         Do -- do you recall that?

             22      A     I don't recall the exact date, but I'll take

             23   your word for it.

             24      Q     Okay.  Well, let me see if I can find the

11:32:46 25   order and -- so you don't have to take my word for it.


                                                     Rough Draft -
71
⬆ 11:32:51  1      A     Okay.

              2      Q     I'm waiting on my computer.  Just give me a

              3   minute, hopefully.  My computer is working on it.  Okay.

              4   Let's mark as Exhibit 12 -- and once again, there's a

11:34:40  5   gap in the exhibit numbers, a copy of an "ORDER GRANTING

              6   INTERIM FEE APPLICATIONS OF FOLEY & LARDNER, LPP; CONWAY

              7   MACKENZIE, INC.; O'KEEFE & ASSOCIATES; AND LEVENE NEALE

              8   BENDER YOO & BRILL, LLP."  File of this document number

Exhibit 3 - page 390

          9    772 in the bankruptcy cases on May 12, 2020.

11:35:00 10          (Exhibit 0012 was marked for

         11          identification.)

         12    BY MR. ESTERKIN:

         13    Q    It should be popping up on your screen

         14    momentarily if it hasn't already.

11:35:22 15    A    It just popped up.  I have it open.

         16    Q    Okay.  If you just take a quick look at this.

         17    And the question I had asked you was that to confirm

         18    that the -- this second interim fee application covered

         19    fees through and including December 31, 2019.  If you

11:35:37 20    could just read this and confirm that, that would be

         21    great.

         22    A    Yeah, the fee application includes fees

         23    through December 31st, 2019.

         24    Q    Okay.  So -- and this was -- these -- this

11:35:50 25    order grants the most recent fee applications have been

                                                      Rough Draft -
72
⋏ 11:35:55  1    filed with the court, correct?

          2    A    Yes.

          3    Q    Okay.  And so for purposes of the operating

          4    reports, you estimated or included some figure for

11:36:08  5    attorneys fees for the estate professionals after

          6    December 31, 2019, correct?

Exhibit 3 - page 391

```
        7        A    That is correct.

        8        Q    And how did you arrive at those numbers?

        9        A    So it would be, you know, looking at the fee

11:36:25 10   statements that were filed, you know, for example for

       11   December and then also just estimating what the fees

       12   would be, you know, per professional.

       13        Q    For the period after December 31st?

       14        A    Yes.

11:36:37 15        Q    Okay.  I'm just concentrating on the period

       16   after December 31st now.

       17             So after December 31st, you -- you included an

       18   estimate for the fees on a monthly basis in the monthly

       19   operating reports, correct?

11:36:51 20        A    Yes.

       21        Q    And how did you arrive at that estimate?

       22        A    Based on, you know, inquiries, you know, with

       23   debtors counsel as well as, you know, looking at

       24   historical trends for the committee and secure -- and

11:37:07 25   hail layer's counsel.
```

                                                    Rough Draft -
73
↑ 11:37:09  1        Q    All right.  Did you actually receive fee

        2   statements from any of the professionals in order to

        3   arrive at those estimates?

        4        A    Yes.

Exhibit 3 - page 392

11:37:21  5      Q    And what professionals did you receive fee --

        6    fee statements from in order to arrive at those

        7    estimates?

        8      A    Well, it varied by month, but from -- it

        9    varied by month.

11:37:31 10      Q    So sometimes you got them from Foley &

       11    Lardner; is that correct?

       12      A    Yes.

       13      Q    And when you received those, you -- what --

       14    they were in the same basically -- same basic form as

11:37:44 15    the fee statements that were filed in support of the

       16    interim fee applications; is that correct?

       17      A    In the same form -- it wasn't through a fee

       18    application.  It was through -- they would just give me

       19    invoices.

11:37:58 20      Q    Right.  So there was?

       21      A    There was a lag time so I made inquiries with

       22    John Simon, and John Simon would provide me some

       23    estimates as well as, you know, other counsel.  So at

       24    the end of the month, we recorded the -- the estimates

11:38:14 25    and for prior months and come to what we thought would


                                                Rough Draft -
74
↟ 11:38:17  1   be the most representative number.

        2      Q    Okay.  So with respect to the fee statements

Exhibit 3 - page 393

          3    that you received, I mean, you received a detailed

          4    billing that showed what attorney did the work, what --

11:38:28  5    the brief description of what they did, the date they

          6    did it, the amount of time they spent and then the

          7    charges based on hourly rates for that work, correct?

          8         A    Correct, and that's -- you referred to fee

          9    statements.  I look more at special fee statements that

11:38:44 10    get filed with the courts and served as opposed to the

         11    invoices.  So I received invoices or estimates from the

         12    -- you know, from counsel to the extent there have been

         13    filed fee statements.

         14         Q    Right.  But what I'm trying to confirm is that

11:38:57 15    when you got the invoices from counsel, they were

         16    detailed invoices that had the same sort of information

         17    that was included in the applications for interim

         18    compensation that were filed with the court.

         19              So you had information regarding the attorney,

11:39:13 20    what they did, how many hours, the date, and what the

         21    charges were for that work.

         22         A    Yes, it was detailed information with all that

         23    information.

         24              THE REPORTER:  Can you repeat that?

11:39:30 25              THE WITNESS:  Yes, it was detailed information

                                                      Rough Draft -

75

Exhibit 3 - page 394

⬆ 11:39:30  1   with all that information.

2   BY MR. ESTERKIN:

3       Q    Just as an aside, sometimes you tend to drop

4   your voice as you're completing your answer and so

11:39:37  5   that's why I'm occasionally having trouble understanding

6   your answers, and I think the court reporter just had

7   the same issue?

8       A    I'm a couple fete away from my computer so

9   people can't see my mug real close up.  So I'll try to

11:39:51 10   speak louder.

11      Q    All right.  All right.  Let's go back to

12   Exhibit seven, which is the operating report.  And if

13   you go to page 19 of 21,?

14      A    Okay.  I'm on page 19.

11:40:54 15      Q    I just may have given you the wrong -- oh,

16   there we go.  Okay.  And if you look in the section

17   about a little more than halfway down, there's a section

18   for nonoperating expenses, interest expense and then

19   legal and professional.

11:41:24 20          Do you see that?

21      A    Yes.

22      Q    And there's a line item there for debtor

23   counsel.

24          Do you see that?

11:41:30 25      A    Yes.

Exhibit 3 - page 395

Rough Draft -
76

11:41:31  1      Q    Okay.  So it shows there the cumulative post

        2    petition balance of debtor counsel fees was a million

        3    725588, if I'm reading it correctly.

        4          Do you see that?

11:41:49  5      A    Yes.

        6      Q    So to the best of your information at this

        7    point in time, the cumulated total fees for the debtor's

        8    counsel were a million 715 -- I'm sorry -- I can't --

        9    I'm having trouble reading it -- seven?

11:42:09 10      A    $1,725,588.

       11      Q    Thank you.

       12          That -- that's the number for the cumulated

       13    fees as of that date?

       14      A    The estimated cumulated fees, yes.

11:42:21 15      Q    And then you have an estimate for the prior

       16    month of $150,000; is that correct?

       17      A    That's for the current month.

       18      Q    The month of January?

       19      A    Yes.

11:42:31 20      Q    Yes.

       21      A    The prior month would have been January -- or

       22    December.

       23      Q    Right.  And the 150,000 is included within

Exhibit 3 - page 396

```
      24   that million seven, correct?

11:42:41 25      A   Yes, it is.
```

Rough Draft -
77
```
↑ 11:42:43  1      Q   Okay.  And then you also have a line item

          2   there for committee counsel, correct?

          3      A   Yes.

          4      Q   With an estimate of $18,000 and change?

11:42:57  5      A   It's actually a negative because it's a

          6   true-up or an overaccrual.

          7      Q   So in a prior month, you had overestimated the

          8   fees and then when the fees turned out to be less, you

          9   netted the prior -- the prior overaccrual and the

11:43:16 10   current fees, and it turned out to be an $18,000 credit

         11   as opposed to an additional fee?

         12      A   Yes.

         13      Q   Okay.  And then after including that, you've

         14   got 474,000 in committee fees through the date of this

11:43:32 15   report, correct?

         16      A   Yes.

         17      Q   And then same for secured lender counsel,

         18   correct?

         19      A   Yes.

11:43:47 20      Q   And who is your point of contact with the

         21   secured -- the secured lender is Hillair, right?
```

Exhibit 3 - page 397

22      A    Yes.

23      Q    Okay.  Who is your point of contact at Hillair

24   in order to obtain the amount of their fees?

11:44:00 25      A    Scott Coffman.


Rough Draft -
78
↑ 11:44:02  1      Q    And do you know -- so Kaufman would tell you

2   what their estimated fees were to be included in this

3   report; is that right?

4      A    Actually, it would be invoices received by

11:44:14  5   Tony nap pal tone know of Buchalter Nemer.

6      Q    And did you receive copies of those invoices

7   or did Mr. Nap pal tan know just report to you the

8   amount -- the total amount that was being billed?

9      A    For, you know, a bunch of the months, I would

11:44:34 10   just take an average of what the historicals were

11   running at to the extent I didn't actually receive the

12   invoices yet.

13      Q    Okay.  But you actually did receive invoices

14   from Hillair's counsel?

11:44:48 15      A    Yes, they do serve them on the noticed

16   parties.

17      Q    And the Hillair's counsel served copies of

18   their attorney's invoices on the noticed parties; is

19   that right?

Exhibit 3 - page 398

11:45:12 20        A    I got them.

        21        Q    Okay.  And how -- how did you receive them?

        22        A    Via email.

        23        Q    And from Mr. Nap pal tan know?

        24        A    Yes.

11:45:24 25        Q    And were those also detailed fee statements


                                              Rough Draft -
79
↑ 11:45:28  1   that included, you know, the attorney who did the work,

         2   the description of the work, et cetera?

         3        A    They were detailed invoices that included all

         4   that information.

11:45:38  5        Q    And have you received those invoices for all

         6   of the months in the bankruptcy case so far to the

         7   current month?

         8        A    I'd have to go back.  I don't know if I've

         9   received May or not, but I know I received April.

11:45:58 10        Q    And did you receive all of the invoices for

        11   all of the months prior to April?

        12        A    Yes.

        13        MR. ESTERKIN:  All right.  John, we'd like to

        14   get copies of those invoices, please.

11:46:28 15        MR. SIMON:  Gotcha.

        16        MR. ESTERKIN:  Okay.  One more thing to add to

        17   the list.

Exhibit 3 - page 399

18      Q      The invoices that you received from Hillair's

19      counsel, as I understand it Hillair has two counsel.

11:46:41 20     They have the Buchalter firm and the Quinn Emanuel firm,

21      correct?

22          A      And one other.

23          Q      What's the other form?

24          A      Olshan.

11:46:53 25     Q      And did you receive fee statements from all

Rough Draft -
80
↑ 11:46:55  1    three firms or just some of them?

2          A      I received fee statements for Olshan,

3      Buchalter and Tony Napolitano served to me or provided

4      to me the old ocean statement and the Buchalter

11:47:14  5     statements.

6          Q      Did you ever receive fee statements from Quinn

7      Emanuel?

8          A      No.

9          Q      The estimated fees that you have in the

11:47:41 10     operating reports with respect to Hillair counsel, do

11      those include any fees on account of Quinn Emanuel?

12          A      Not to my recollection.

13          Q      So if we scroll forward -- and I'm going to

14      show you the other fees -- the other operating reports,

11:48:03 15     but if you want, I can show them to you now, but as we

Exhibit 3 - page 400

16    look at their line item for debt for secured lender

17    counsel, that's not going to include any Quinn Emanuel

18    fees, correct?

19         A    That is correct.

11:48:32 20         Q    All right.  You earlier I believe testified

21    that the million five estate cash payment was supposed

22    to be used -- utilized to pay professional fees by the

23    debtor of the committee and Hillair; is that correct?

24         A    It's to be used.

11:48:52 25         Q    Correct.  It's -- that's -- the million five

Rough Draft -
81

↟ 11:48:55  1    is to be used to pay any accrued fees for those three

2    groups of professionals above those amounts set forth in

3    the budgets, correct?

4         A    Yes.

11:49:07  5         Q    And with respect to the secured lender fees do

6    you believe -- do you understand that that includes fees

7    generated by Quinn Emanuel?

8         A    No, they do not.

9         Q    So it would be -- in your -- to your

11:49:24 10    understanding, it would just be fees by -- incurred by

11    Buchalter and ocean?

12         A    On behalf of the secured lender, yes.  Secured

13    lender Hillair, yes.

Exhibit 3 - page 401

           14      Q    Yes.  All right.  You testified earlier that

11:50:09 15    the estimated fees that you included in the operating

           16    report -- or that Scoobeez included in the operating

           17    reports for the professionals sometimes were based upon

           18    actual fee statements that you received and sometimes

           19    they were based just upon estimates without the fee

11:50:26 20    statements.

           21           As you received fee statements in

           22    circumstances where you had earlier just estimated the

           23    fees without the fee statements, did you then adjust the

           24    estimated fees for that month predicated on any

11:50:39 25    differences between your original estimate and the fee


                                                    Rough Draft -
82
↑ 11:50:43  1    statement that you later received?

            2      A    Yes.

            3      Q    When is the most -- what period of time is

            4    covered by the most recent fee statement that you

11:50:59  5    received from debtors counsel?

            6      A    Well, let's -- if we can just clarify fee

            7    statement.

            8      Q    And when I say fee statement, I'm referring to

            9    the invoices.  I'm not referring to interim fee

11:51:10 10    applications.

           11      A    I received invoices from Foley through March

Exhibit 3 - page 402

```
         12   31st that I had reviewed, and I believe on Thursday or

         13   Friday I had received their April invoice, which I have

         14   not yet reviewed.

11:51:38 15       Q    And did you brief look at that invoice when

         16   you received it?

         17       A    For Foley I had not.

         18       Q    You didn't look at it at all?

         19       A    No, it's still sitting on my --

11:51:49 20       Q    I'm sorry.  I couldn't hear what you just

         21   said?

         22       A    It is still sitting in my in-box.

         23       Q    Okay.  Unopened?

         24       A    Up opened on my to do list after today's

11:51:58 25   deposition.
```

Rough Draft -
83
↑ 11:52:13  1       Q    All right.  What about committee counsel?

```
          2   When is the last fee statement you got from committee

          3   counsel?

          4       A    I don't recall if it was April or March 1 of

11:52:29  5   the two months.

          6       Q    When you say April or mar do you mean April 30

          7   or April 1st?

          8       A    End of the month, it would be.

          9       Q    April?
```

Exhibit 3 - page 403

11:52:36 10      A    In arrears.  So it would have been either the

11      invoice for March 2020 or April of 2020.

12      Q    And what about the last invoice you received

13      from -- with respect to Buchalter fees?

14      A    I -- it would be -- it would have been either

11:52:56 15      April 30th or May 31st.  I -- I don't recall which date

16      off the top of my head.

17      Q    And how about for Olshan?

18      A    That would have been the same for buck halter.

19      Either April or May.  I'm not sure which -- which one of

11:53:16 20      those it is.

21      Q    Okay.  So if we look just -- if we look just

22      at this January operating report, it shows that the

23      accrued fees for debtor counsel were 150,000.

24           Do you see that?

11:53:43 25      A    For the month of April, yes.  I'm sorry.  For


                                                      Rough Draft -
84
↑ 11:53:47  1   the month of February of 2000.

2      Q    Right.  Right.  Because that's such an even

3      number, do you suspect that that was probably just an

4      estimate as opposed to something based upon an actual

11:53:57  5   fee statement?

6      A    It was an estimate.

7      Q    Okay.  And if you look at the secured lender


Exhibit 3 - page 404

8    counsel, the -- it's 176,839, correct?

9         A    Yes.

11:54:09 10    Q    And because it's, you know, an odd number, a

11    precise number, do you believe that would have been

12    based upon a fee statement?

13         A    No, it would be a combination of a fee

14    statement and an estimate.  So if we had -- if we made

11:54:24 15    an estimate of five month that need to be trued up and

16    we got a -- you know, received an actual invoice, we

17    would true that up and then make an estimate going, you

18    know, for the current month.

19         Q    Right.  So -- but, I mean, so if I'm looking

11:54:37 20    at this, by the time this operating report was prepared,

21    it's based upon the fact that this is an odd number, it

22    would be a fair inference that you had actually received

23    a fee statement covering the month of January from the

24    secured lender counsel, correct?

11:54:56 25         A    Because when we receive a fee invoice from the

Rough Draft -
85
▲ 11:55:02  1    secured lender on January -- you know, for January 31st,

2    you know, within likely the 15 days of filing, so it's

3    likely a combination of a true-up of an accrual for

4    example of receipt of January -- in December invoices

11:55:19  5    inputting that trueing up the accrual and then an

Exhibit 3 - page 405

 6    estimate for January.

 7         Q    Got it.  Thank you.

 8              All right.  So long as we're on the January

 9    operating report, on page 17 of 21, if you could turn to

11:56:19 10   that.  Let me know when you're there.

11         A    I'm here.

12         Q    Okay.  At the top there's a box that talks

13    about accounts payable post petition.

14              Do you see that?

11:56:38 15        A    Yes.

16         Q    And it shows that the total accounts payable

17    post petition 536851?

18         A    Yes.

19         Q    Do you see that?  So those would be the

11:56:48 20   account -- post petition accounts payable as of January

21    31, 2020, correct?

22         A    Yes.

23         Q    It shows that there are 168,472 in accounts

24    payable post petition that are over 120 days.

11:57:11 25        Do you see that?


                                             Rough Draft -
86
↑ 11:57:12  1        A    Yes.

 2         Q    Do you have any understanding as to why there

 3    are accounts payable that have aged out to 120 days on a

Exhibit 3 - page 406

```
              4    post petition basis?
11:57:27      5         A    I -- I don't want to speculate.
              6              MR. SIMON:  Objection.  Speculation.  Calls
              7    for speculation.
              8              MR. ESTERKIN:  He hasn't said anything yet.
              9              THE WITNESS:  But my estimate would be that we
11:57:43     10    had some disputed tolls for Hertz that were in dispute.
             11    So we didn't pay them until it got resolved -- until it
             12    was getting resolved.  So I believe -- and again,
             13    Mr. Voskanian will have a little more insight on this,
             14    but I believe that's what it's for.
11:58:28     15              MR. ESTERKIN:  All right.  Let's mark, as
             16    Exhibit 8, the operating report for the period ending --
             17    I think it's February 29th or -- excuse me -- 28 --
             18    yeah, 29th, 2020.  And give me a second for it to pop up
             19    on my screen.  File of the this document is 693 in the
11:59:01     20    bankruptcy case.
             21              (Exhibit    was marked for
             22              identification.).
             23    BY MR. ESTERKIN:
             24         Q    Let me know when you have that.
11:59:06     25         A    I have it.
```

                                                    Rough Draft -
87
↑ 11:59:07  1         Q    Okay.  Let's go to page 18 of 32.  Oh boy?

Exhibit 3 - page 407

2          A     Okay.  I'm on page 18.

3          Q     You beat me to it.  Okay.  Yeah, that's weird.

4     All right.  So if we go to the attorneys' fees line,

11:59:46  5     again, same thing.  You're showing, for each of the --

6     each of the professionals, an estimate of the accrued

7     fees during the month of February, correct?

8          A     Correct.

9          Q     And then at close over --

12:00:02 10          A     Not accrued fees.  Incurred fees.

11          Q     Incurred fee, yeah.  Accrued in the sense that

12     they haven't been paid yet?

13          A     Well, that would -- an accrued fee to the

14     sense they wouldn't be paid would be on the balance

12:00:16 15     sheet under the accrued professional fees.

16          Q     All right.  So you're showing the estimated

17     fees that were incurred during the month of February,

18     correct?

19          A     Yes, net of trueups for January.

12:00:28 20          Q     And then in the right-hand column you're

21     showing the total fees which are based upon the allowed

22     -- the interim fees awarded through December 31st, plus

23     the post December 30 estimates, right?

24          A     Yes.

12:00:48 25          Q     And if we go up to page 16 of 32, you're

Exhibit 3 - page 408

Rough Draft -
88

⬆ 12:00:53  1   showing the accounts payable again?

          2     A    Yes.

          3     Q    Of 621343, correct?

          4     A    Yeah, the accounts payable post petition.

12:01:11  5     Q    Correct.  621343, correct.

          6     A    Yes.

          7          MR. ESTERKIN:  Okay.  Let's mark, as Exhibit

          8   9, the operating report for the period ending March 31,

          9   2020.

12:02:06 10          (Exhibit    was marked for identification.)

         11          THE WITNESS:  I have it open.

         12   BY MR. ESTERKIN:

         13     Q    Okay.  And let's go to page 17 of 29.

         14     A    I am at page 17.

12:02:25 15     Q    And once again, we're showing the estimated

         16   fees for the month of March, correct, with the true-up

         17   from the prior periods?

         18     A    Yes.

         19     Q    Okay.  And then you've got the -- that flows

12:02:38 20   over into the total columns, correct?

         21     A    Yes.

         22     Q    Okay.  Same as the other operating reports,

         23   right?

         24     A    Yes.

Exhibit 3 - page 409

12:02:50 25         Q    And then if we go up to page 15, we're showing


                                                        Rough Draft -
89
↑ 12:02:57  1    once again the accounts payable.  This time it's 751651?

         2         A    Yes, post petition p.

         3         Q    All right.  And we're still looking -- we're

         4    still seeing that 168,000 in the over 120 day column but

12:03:12  5    we're also now seeing 30,770 in the 61 to 90 days

         6    column.

         7              Do you have any understanding as to why those

         8    amounts were -- had not been paid as of this time?

         9         A    I don't know.

12:04:14 10              MR. ESTERKIN:  We're going to mark, as Exhibit

        11    10, the April operating report.  I'm just waiting for my

        12    computer to up load it deal with it.  The file of this

        13    document is 774 in the bankruptcy case.

        14              (Exhibit     was marked for identification.)

12:04:35 15    BY MR. ESTERKIN:

        16         Q    And you should be able to look at it now.

        17         A    I have it open.

        18         Q    Turn to page 17.

        19         A    I'm on page 17.

12:05:10 20         Q    And once again in the professional fees area

        21    we have estimates for that month and then totals through

        22    the end of the month, correct?

Exhibit 3 - page 410

23    A    It's the estimate for the current month and

24    then trueups, if any, of buyer accrual amounts in the

12:05:28 25    prior month.


Rough Draft -
90
↑ 12:05:28  1    Q    All right.  And as of -- so this is, I

2    believe, the most current operating report that's been

3    filed.

4         Have you review the operating report for the

12:05:42  5    month of May 2020 yet?

6    A    Yes.

7    Q    Do you have any understanding as to when

8    that's going to be filed with the bankruptcy court?

9    A    It should be filed today or tomorrow.

12:06:06 10    Q    So that operating report has now been

11    finalized, and you're just waiting for counsel to file

12    it?

13    A    Correct.

14    Q    Do you have any recollection as to the

12:06:20 15    estimate for the debtors professional fees in that

16    operating report?

17    A    I do not.

18    Q    How about the committee fees?

19    A    I do not.

12:06:31 20    Q    What about Hillair fees?

Exhibit 3 - page 411

21      A    I do not.

22      Q    With respect to the preparation of the report,

23   did you follow the same procedures for estimating the

24   May fees as you've already testified to with respect to

12:06:56 25   the prior months?

Rough Draft -
91
↑ 12:06:57  1      A    Yes.

2           MR. ESTERKIN:  Okay.  I'm marking, as Exhibit

3   11, a copy of the order granting the first interim fee

4   applications of Foley Lardner LLP Conway Mc Kensee Inc.

12:08:11  5   armory securities LLC and will have seen Neil bender U

6   and grill LLP file of this document is number 563 in the

7   bankruptcy cases.

8           (Exhibit    was marked for identification.)

9   BY MR. ESTERKIN:

12:08:23 10      Q    You should -- you should be able to view that

11   document now.

12      A    I have it open.

13      Q    Okay.  Your computer is faster than mine.

14           All right.  If you turn to the bottom of page

12:08:58 15   3 of 6 -- let me know when you're there.

16      A    I am here.

17      Q    All right.  I just want to make sure that

18   we're reading this correctly in how it integrates with

Exhibit 3 - page 412

19    the operating reports that were filed.  So I'm just

12:09:17 20    going to take Foley & Lardner as an example.  If you

21    look at lines 13 and 14, it appears Foley & Lardner was

22    awarded total fees of 1,050,934.65; is that correct?

23        A    I'm sorry.  You're looking at page -- I'm

24    sorry.  Page 3.  Sorry.  Wrong page.

12:09:44 25        Q    Right.  There's a chart kind of at lines 11

                                                    Rough Draft -
92
↟ 12:09:48  1    and a half to 21?

2        A    Yeah.

3        Q    Do you see that?

4        A    I apologize.  I was on page 4.  So I'm on page

12:09:54  5    3 now.

6        Q    So the total interim award of Foley was a

7    million 1,050,934.65, right?

8        A    Yes.

9        Q    And then if you go down to paragraph 2A, it

12:10:11 10    says that the debtor's authorized to pay Foley a total

11    of $748,000, correct?

12        A    Yes.

13        Q    So just -- I just want to talk approximate

14    numbers, but approximately $300,000 of the interim fee

12:10:29 15    award was not authorized to be paid, correct?

16        A    Correct.

Exhibit 3 - page 413

17        Q    And so that is currently assuming that the

18   court awards final fees in the amount of the interim,

19   that would be some amount -- that 330,000 would have to

12:10:46 20   be paid to Foley end of the case, correct?

21        A    At some point in time, whether it's during the

22   case or at the end of the case, correct.

23        Q    And under the terms of the plan, that 300,000

24   would be paid out of the estate cash payment, the

12:11:01 25   million five, right?


Rough Draft -
93
⬆ 12:11:04  1        A    Yes.

2        Q    And then the same is true with respect to the

3   other professionals.  To the extent that they were

4   awarded interim fees, the final fee awards come in at

12:11:16  5   the same amount, and the payments that are authorized by

6   this order are less than the fee awards, correct?

7        A    Correct.

8        Q    And the -- the million $50,000 figure that was

9   awarded to Foley here is a number that would be included

12:11:35 10   within the total fee column in the operating reports

11   that we looked at, correct?

12        A    Yeah, it would be in the -- depending on which

13   viewpoint you looked at, yes, but the amounts are

14   included and trued up on a regular basis -- monthly

Exhibit 3 - page 414

12:11:53 15    basis, actually.

16        Q    Right.  So since we're all operating

17    electronically, you can't -- I don't know if you can

18    look at two exhibits at the same time, but let's just

19    pick the April fee statement as an example.  It's

12:12:09 20    Exhibit 10.

21        A    I'm sorry.  Did you say April fee statement or

22    April report?

23        Q    I'm sorry.  I misspoke.  The April operating

24    report.

12:12:32 25            And the -- and the fees are on page 17 of 19.


                                                    Rough Draft -
94
↑ 12:12:37  1    So, you know, the total fees for debtor counsel,

2    according to this, were 2 million odd.

3            Do you see that?

4        A    Yes.

12:12:45  5        Q    And the million 50 that was in the interim fee

6    award would be part of that 2 million odd, correct?

7        A    Correct.

8        Q    And the same thing would be true for all of

9    the other professionals that are shown here except for

12:13:00 10    Hillair counsel because Hillair counsel doesn't file fee

11    applications, right?

12        A    That is correct.

Exhibit 3 - page 415

13    Q   Okay.  All right.  Let's turn to Exhibit 12,

14  which is the second interim -- the second -- or the

12:13:27 15  order on the second interim fee application.

16        (Exhibit    was marked for identification.)

17        THE WITNESS:  I'm here.

18  BY MR. ESTERKIN:

19    Q   And if you look at the chart that's on page 3

12:13:37 20  of 7?

21    A   Okay.

22    Q   It shows -- once again, I'm just going to use

23  Foley as an example.  It shows total interim award of

24  540,957.58, correct?

12:13:53 25    A   Yes.


Rough Draft -
95

⬆ 12:13:53  1    Q   And it allows payment for 484,000 of that

2  because that's the amount in the budgets, correct, with

3  the 10 percent variance?

4    A   Correct.

12:14:05  5    Q   And so the difference between the 540,000 and

6  the 484,000 would be carried forward and have to be paid

7  at some point in time out of the estate cash payment

8  under the plan, correct?

9    A   Correct.

12:14:21 10    Q   And the same thing would be true with respect

Exhibit 3 - page 416

```
          11    to the other professionals, comparing their total

          12    interim award to the amounts that were authorized to be

          13    paid, correct?

          14        A    Yes.

12:14:46  15             MR. ESTERKIN:  Okay.  It's 12:15 now.  I

          16    indicated that we were going to break around 12:30.

          17    We're going to start moving off into another area now,

          18    according to my outline.  My outline probably governs.

          19    So I would suggest that we take our lunch break now and

12:15:04  20    come back at approximately 1:30, if that's okay with

          21    everybody.

          22             THE WITNESS:  Okay.  How much time do we have

          23    when we come back because I've got another appointment

          24    at 2:00 so --

12:15:17  25             MR. ESTERKIN:  We're not going to finish in
```

Rough Draft -

96
```
↑ 12:15:18  1   half an hour.  Even if we went straight through, we

           2    wouldn't be able to finish in half an hour.  So how long

           3    is your appointment at two?

           4             THE WITNESS:  A couple hour meeting but I

12:15:28   5    guess I'll -- I'll postpone it.

           6             MR. ESTERKIN:  Why don't we go off the record,

           7    and we can can talk about scheduling.

           8             (Lunch Recess.)
```

Exhibit 3 - page 417

            9            MR. ESTERKIN:  All right.  We're back on the

13:35:44 10   record.  And we're back from our lunch break.

           11       Q    Let me just started by asking Mr. Weiss

           12   whether, during the lunch break, anything occurred to

           13   you that would cause you to want to either change or

           14   supplement any of the answers you gave to questions this

13:35:57 15   morning.

           16       A    No.

           17            MR. ESTERKIN:  One second here.

           18       Q    All right.  Let's take a look at Exhibit 5,

           19   which is your declaration and specifically at paragraph

13:36:28 20   ten and also at paragraph 17.  If you could just take a

           21   moment and read those paragraphs.

           22            MR. SIMON:  Richard.  I lost you for a minute.

           23   Where are you at?

           24            MR. ESTERKIN:  Exhibit 5, the declaration in

13:36:57 25   support of confirmation, and I had asked Mr. Weiss to


                                                      Rough Draft -
97
↑ 13:37:01  1   look at paragraphs ten and 17.

            2            MR. SIMON:  Thank you.

            3            THE WITNESS:  Okay.  I've reviewed them.

            4   BY MR. ESTERKIN:

13:37:13  5       Q    Sorry?

            6       A    I have reviewed them.

Exhibit 3 - page 418

           7      Q    Okay.  In these paragraphs, you talk about the

           8   debtors working with Hillair post confirmation with

           9   respect to the debtors business, correct?

13:37:28  10      A    Yes.

          11      Q    Okay.  What conversations have you had with

          12   Hillair about Hillair providing assistance to the

          13   debtors post confirmation?

          14      A    I've had multiple discussions with Scott

13:37:43  15   Coffman.

          16      Q    And what's the substance of those

          17   conversations?  What sort of assistance do you expect

          18   Hillary to provide to the debtors post confirmation?

          19      A    The ability to attract new customers and the

13:37:57  20   ability to explore going into verticals related to the

          21   transportation industry.

          22           MR. ESTERKIN:  I'm sorry.  Could you read --

          23   Cathy, could you read the last -- the answer back?  I

          24   lost the last part of it.

13:38:26  25           (Record read by the reporter as follows:


                                                      Rough Draft -
98
↑ 13:38:26   1              "ANSWER:  The ability to attract new

            2              customers and the ability to explore going

            3              into verticals related to the

            4              transportation industry.")

Exhibit 3 - page 419

13:38:36  5  BY MR. ESTERKIN:

6      Q    All right.  Let's start with the ability to

7  attract new customers.

8           Have -- has Scoobeez, to date requested that

9  Hillair assist it with regard to attracting new

13:38:47 10  customers?

11      A    Very little, but yes.

12      Q    And what assistance in that regard did

13  Scoobeez request?

14      A    To help them reach out to some key contacts

13:38:59 15  such as Wal-Mart to see if anybody wherein their network

16  that there's some contacts that we can, you know,

17  potentially approach there.

18      Q    Have you finished?

19      A    Yes.

13:39:11 20      Q    Okay.  So you mentioned Wal-Mart.  Are there

21  any other potential new customers that Hillair has

22  reached out to?

23      A    Not that I'm aware of.

24      Q    And when did Scoobeez first suggest to Hillair

13:39:30 25  that it might be of assistance in attracting new

Rough Draft -
99
↑ 13:39:33  1  customers, to your knowledge?

2      A    Within the past, I would say, six months or

Exhibit 3 - page 420

```
          3    so.

          4         Q    And when did Hillair reach out to Wal-Mart?

13:39:50  5         A    I don't -- I don't know the exact date or

          6    month.

          7         Q    Okay.  Well, what's your best estimate as to

          8    when that occurred?

          9         A    Probably in Q1.

13:40:00 10         Q    Sorry.  February 1?

         11         A    Q1 2020.

         12         Q    I'm sorry.  I'm not -- I'm not understanding

         13    your answer.

         14         A    Okay.  Q1 2020.

13:40:15 15         Q    Oh.  Okay.  The first quarter of 2020?

         16         A    Yes, Q1, yes.

         17         Q    Okay.  And do you have any understanding as to

         18    how Wal-Mart responded to the Hillair contact?

         19         A    I don't.

13:40:43 20         Q    And Scoobeez currently doesn't receive any

         21    business from Wal-Mart, correct?

         22         A    Correct.

         23         Q    For purposes of the cash collateral budget,

         24    you didn't anticipate any income from Wal-Mart, correct?

13:40:56 25         A    Correct.
```

Rough Draft -

100

Exhibit 3 - page 421

⬆ 13:40:56  1        Q    And for purposes of the projections that you

          2    referred to at paragraph 16 of your declaration, you

          3    didn't anticipate any income from Wal-Mart, correct?

          4        A    Correct.

13:41:09  5        Q    And you also referred to some projections that

          6    go out to 2023.

          7             You didn't include any Wal-Mart income in

          8    those projections either, did you?

          9        A    No, those.

13:41:22 10             MR. SIMON:  Hey, Richard I'm having a really

         11    hard time following or not -- it's getting broken up

         12    here.  I'm going to try to leave and come back with the

         13    phone.

         14             MR. ESTERKIN:  Who is speaking?

13:41:33 15             THE WITNESS:  That was John Simon.

         16             MR. ESTERKIN:  Okay, John, why don't you go

         17    ahead and do that.  When you come back in through the

         18    phone line, let us know that you're back, and I'll

         19    suspend questioning until you return.

13:43:48 20             MR. ESTERKIN:  All right.  John are you back?

         21             MR. SIMON:  Yes.  Thank you.

         22             MR. ESTERKIN:  No problem.

         23        Q    All right.  So have you had any discussions

         24    with Hillair about potential sources of business for

13:44:04 25    Scoobeez other than Wal Mart?

Exhibit 3 - page 422

Rough Draft -
101

↑ 13:44:06  1        A    Yes.

2        Q    In other words, did they mention any other

3    names to you?

4        A    Names, no.

13:44:14  5        Q    And the other discussions were just generally

6    that they would reach out to their network?

7        A    Correct, and then also looking at going into

8    other verticals such as mid mile transportation and then

9    once we, you know, get the plan confirmed, then start

13:44:30 10    doing a much, you know, broader reach on attempting to

11    attract new business.

12        Q    Okay.  And none of those discussions included

13    the names of any particular potential customers for

14    Scoobeez other than Wal-Mart, correct?

13:44:57 15        A    That they would be reaching out to, no.

16        Q    I'm sorry.  I couldn't -- I lost the first

17    part of your answer?

18        A    That they would be reaching out to, the answer

19    is no.

13:45:04 20        Q    And what about other entities that Scoobeez

21    might reach out to, either for vertical transportation

22    or other potential prospects?

23        A    Yeah, Scoobeez has reached out to -- to

Exhibit 3 - page 423

24    multiple companies.

13:45:26 25    Q    Okay.  We'll get to that in a minute, then.


Rough Draft -
102
↑ 13:45:32  1    Are there any other ways in which Hillair has

2    suggested that it would support Scoobeez following

3    confirmation of its plan?

4    A    Mean -- support meaning in what way?

13:45:48  5    Financial support?  Operation support?  Business

6    development support?

7    Q    I don't know.  I mean, your -- your

8    declaration at paragraph 17 says that post effective

9    date Hillair quote has expressed to me that they plan to

13:46:01 10    support the business.

11    A    Right.  But you asked.

12    Q    I'm trying to find out what you meant.

13    A    You asked me a general question.  So I'm -- I

14    wanted to try to get at more specifics.  So if you have

13:46:11 15    a specific question, I'd be more than happy to answer it

16    for you.

17    Q    Yeah, my specific question is when you said

18    that Hillair has expressed to you that they plan to

19    support the business, what is your understanding as to

13:46:23 20    how Hillair intends to support the business post

21    confirmation?

Exhibit 3 - page 424

22        A    Well --

23        Q    Other than -- other than the things we've

24   talked about regarding seeking new business?

13:46:33 25        A    Sure.  So, you know, that's first and foremost


                                                    Rough Draft -
103
⬆ 13:46:35  1   is we do not want to help us in support getting new

        2   business post effective date.  They will have -- they

        3   had will be able to control the board of directors.

        4            THE REPORTER:  I'm sorry.  Can you repeat

13:46:50  5   that?

        6            THE WITNESS:  I think there's feedback on

        7   someone's line.

        8            MR. ESTERKIN:  John, did you mute the audio on

        9   the Zoom?  That may be the feedback if you're on both

13:47:04 10   Zoom and phone.

       11            THE WITNESS:  I'll repeat what I had just

       12   said.  So from a new business development standpoint

       13   Hillair post effective date will have, you know, control

       14   of the board of directors and management and will still,

13:47:24 15   you know, management and board in place to help it grow

       16   its business.  From a financial perspective, you know,

       17   Hillair has expressed to me that they do have capital to

       18   invest in the business going forward, and, again, that's

       19   around the idea of attracting, you know, new business in

Exhibit 3 - page 425

13:47:44 20    both the kind of last mile as well as the mid mile

21    business kind of business plan.

22    BY MR. ESTERKIN:

23        Q    Okay.  Has Hillair indicated how much capital

24    they're prepared to inject into Scoobeez in order to

13:48:03 25    assist it post confirmation?

Rough Draft -
104
⬆ 13:48:04  1        A    No.

2        Q    You don't have a commitment letter, correct?

3        A    No.

4        Q    You don't have any loan documents, correct?

13:48:09  5        A    No.

6        Q    And it's also correct that the plan doesn't --

7    isn't contingent in any way on Hillair applying post

8    confirmation funding, correct?

9        A    The plan is not contingent upon them providing

13:48:26 10    post confirmation financing or post --

11        Q    And there's nothing in the plan about Hillair

12    providing post confirmation funding, correct?

13        A    Correct.

14        Q    Has Hillair ever indicated to you the amount

13:48:40 15    of additional financial support that it might provide to

16    Scoobeez post confirmation?

17        A    No.

Exhibit 3 - page 426

18      Q    And has Hillair ever discussed with you the

19   terms under which it might provide post confirmation

13:48:52 20   financing, interest rates, term of loan, whether the --

21   whether the financing would be equity or debt, anything

22   like that?

23      A    No.

24      Q    You understand that once the plan becomes

13:49:23 25   effective, Amazon intends to terminate the Amazon


Rough Draft -

105

↑ 13:49:27  1   contract as quickly as it can?

2      A    I have heard from counsel that that's Amazon's

3   plan.

4      Q    And have you ever heard anything different?

13:49:37  5      A    No.

6      Q    All right.  And do you have any understanding

7   as to any steps that Scoobeez may take in order to

8   prevent Amazon from exercising its contractual

9   termination right?

13:49:48 10           MR. SIMON:  Objection.  Attorney-client

11   privilege.  To the extent that you're not disclosing

12   attorney-client privileged information, you may respond.

13   And objection to the extent it calls for a legal

14   conclusion.

13:49:59 15           THE WITNESS:  I'm not aware of any instances

Exhibit 3 - page 427

16    or actions.

17    BY MR. ESTERKIN:

18         Q    Have you ever reviewed the Amazon contract?

19         A    I -- yes, I have.

13:50:30 20    Q    Okay.  When was the last time that you took a

21    look at that contract?

22         A    The date is -- I don't know the exact date,

23    but it was when teen know had put it in front of me

24    during my deposition.

13:50:47 25    Q    Okay.


                                            Rough Draft -
106
↑ 13:50:49  1    A    Teen know, do you remember that date?

2              MR. *EURBGS:  I thought it would be much more

3    memorable to you, Brian.  I think it was sometime in

4    January of this year.  I don't have the exact date in

13:50:58  5    front of me, but sometime in January.  Somebody can

6    correct me on this one.

7              THE WITNESS:  The depo is memorable.  It's

8    just the date.

9              MR. DIANANTATOS:  Okay.  Good.  Then I'm not

13:51:06 10    offended.

11             MS. NASSIRI:  It was January 30th, I think.

12             THE WITNESS:  Thank you.

13             MR. ESTERKIN:  All right.  Well, the precise

Exhibit 3 - page 428

14    date really isn't important.

13:51:16 15        Q    So it was a number of months ago, correct?

16        A    Yes.

17        Q    All right.  And you recall the contract,

18    really is composed of three different parts?  There's

19    global terms of service, a work order and then a series

13:51:28 20    of 18 amendments?

21        A    I'm not aware of the specifics.  I'm not sure

22    there are three parts.  I didn't know there's 18

23    amendments.

24        Q    Okay.  Based upon your review of the contract,

13:51:43 25    do you have any understanding as to whether the contract

Rough Draft -
107

↑ 13:51:45  1    precluded Scoobeez from seeking additional business

2    besides the Amazon business?

3        A    I don't recall.

4        Q    Have you ever heard that Amazon precluded --

13:51:56  5    told Scoobeez not to go out and seek additional

6    business?

7        A    I don't recall if that's in the contract or

8    not.

9        Q    No.  My question was whether anybody ever told

13:52:04 10    you that Amazon prohibited Scoobeez from seeking

11    additional business.

Exhibit 3 - page 429

    12        A    Not that I'm aware of.

    13        Q    All right.  Let me show you a couple of the

    14    pieces of the Amazon contract.  I'm not going to go --

13:52:45 15    I'm not going to bother with the amendments because

    16    there's 18 of them.  There's no point in cluttering the

    17    record with those.  I'm waiting for the document to load

    18    so you can look at it.

    19            (Exhibit    was marked for identification.)

13:53:57 20            MR. ESTERKIN:  Okay.  I'm going to mark, as

    21    Exhibit 13, a copy of the delivery provider terms of

    22    service which I believe is part of the Amazon contract.

    23        Q    You should be able to look at that now.

    24            Do you have it?

13:54:09 25        A    It has opened.


                                                Rough Draft -
108
↑ 13:54:11  1        Q    Okay.  And you can take as much time or --

    2    time as you need to to look at it.

    3            Do you recognize this as being a part of the

    4    Amazon contract with Scoobeez?

13:54:21  5        A    I'm going to rely upon your representation

    6    that it is.

    7        Q    Okay.  So represented.

    8            Let's mark, as Exhibit 14, the work order.

    9            (Exhibit    was marked for identification.)

Exhibit 3 - page 430

13:54:48 10          THE WITNESS:  Do you want me to read this

11    agreement now.

12          MR. ESTERKIN:  You don't need to.  I'll direct

13    you to anything I want you to look at.  All I'm really

14    introducing it for is so you can identify it as the

13:55:01 15    contract or you can take my representation that it's the

16    contract if you prefer to do that.

17          THE WITNESS:  The latter is my preference.

18    Q    Okay.  Do you have Exhibit 14 in front of you?

19    A    I now have it open.

13:55:28 20    Q    Okay.  And once again, I'll represent to you

21    that this is -- this work order is the second part of

22    the Amazon contract.

23          I've now repped to you that Exhibits 13 and 14

24    are the -- constitute the Amazon contract other than the

13:55:45 25    amendments, which changed the delivery stations from


                                              Rough Draft -
109
↑ 13:55:48  1   which Scoobeez operated and the -- some of the pricing

2    and things like that that were specific as to delivery

3    stations.

4          Do you have any reason to believe that my

13:55:58 5    representations regarding Exhibits 13 and 14 are

6    incorrect?

7          A    Yeah, I can't make the statement, you know,


Exhibit 3 - page 431

           8    affirming or not affirming it.

           9        Q    No.  I understand.  My question?

13:56:09 10        A    You can make a representation to me that these

          11    are the contracts, then, I'll rely upon those

          12    representations.

          13        Q    My question is whether or not you have any

          14    reason to believe that my representations are not

13:56:21 15    correct.  If you don't know one way or the other, you

          16    can say that but if you think that somehow I'm trying to

          17    fool you, I want to know that?

          18        A    No, I don't think you're trying to fool me.

          19    So.  ...

13:56:31 20        Q    Okay.  Great.

          21             So if you look at the work order, it's dated

          22    as of September 2, 2015.

          23             Do you see that?

          24        A    Yes.

13:56:46 25        Q    Do you have any -- and Scoobeez filed


                                                     Rough Draft -
110
↑ 13:56:49  1    bankruptcy on April 19, 2019, correct?

           2        A    John was it the 19th or was it a little bit

           3    after that?  It was -- I believe it was in April.  I'm

           4    not sure if it was April 19th.

13:57:09  5    BY MR. ESTERKIN:


Exhibit 3 - page 432

6       Q    Okay.  We don't need the exact date so let's

7    just -- can we agree it's mid April 2019?

8       A    Let's call it April 2019.

9       Q    Okay.  So between -- do you have any reason to

13:57:22 10   believe that Scoobeez was undercapitalized at any time

11   between September 2, 2015, and April 2019 when it filed

12   bankruptcy?

13      A    I have not done a solvency analysis to

14   determine whether the business was undercapitalized or

13:57:38 15   not.

16      Q    And, therefore, you have no reason to believe

17   it was undercapitalized, correct?

18      A    I have no reason to believe it was

19   undercapitalized adequately capitalized or

13:57:47 20   overcapitalized.

21         MR. SIMON:  Objection.  Vague and ambiguous.

22   Objection.  Calls for a legal conclusion.

23   BY MR. ESTERKIN:

24      Q    And do you have any understanding as to

13:58:01 25   whether or not Scoobeez was attempting to obtain

Rough Draft -
111
↟ 13:58:04  1   business other than business from Amazon during the

2    period from September 2, 2015, through April of 2019,

3    when it filed bankruptcy?

Exhibit 3 - page 433

          4          A     That was prior to my appointment as a CRO, so

13:58:19  5    I don't have any knowledge to the affirmative or the

          6    negative.

          7          Q     So no one at Scoobeez ever told you what they

          8    were attempting to do to attract business prior to the

          9    time that you were appointed as CRO?

13:58:29 10          A     No.

         11          Q     Do you have any reason to believe that there

         12    was any uncertainty in the business community regarding

         13    Scoobeez's ability to continue in business until the

         14    time that it filed bankruptcy in April of 2019?

13:59:03 15          A     I don't -- I don't have knowledge one way or

         16    the other.

         17          Q     But what you do know is that Scoobeez did not

         18    acquire any substantial new business between September

         19    of 2015 when the Amazon contract was signed and April of

13:59:19 20    2019 when it filed bankruptcy, correct?

         21               MR. SIMON:  Objection.  Misleading.

         22               THE WITNESS:  I can't --

         23               MR. SIMON:  Objection.  Vague and ambiguous.

         24               THE WITNESS:  Again, I can't opine on

13:59:35 25    information dating back to 2015, '16, '17, '18, early


                                                      Rough Draft -
112
↑ 13:59:41  1    '19 as a petition date.  What I can say is that Amazon

Exhibit 3 - page 434

2    was the company's sole customer.

3    BY MR. ESTERKIN:

4         Q    Well, do you have any reason to believe that

13:59:52  5    Scoobeez acquired any substantial new business other

6    than Amazon between September of 2015 and April of 2019?

7         A    I don't have knowledge one way or the other.

8         Q    Okay.  So you became the CRO in May of 2019,

9    correct?

14:00:22 10         A    Correct.

11         Q    When did you start discussions with anybody at

12    Scoobeez about diversifying its client base from being

13    100 percent Amazon?

14         A    I would say probably within the first 30 to 60

14:00:40 15    days.

16         Q    And with whom did you have those discussions?

17         A    I would have had them with Mr. Voskanian and

18    Mr. Shake.

19         Q    And what was -- what did you discuss with

14:00:50 20    Mr. Voskanian when you first began discussing

21    diversification of the client base?

22         A    You know, basically why we don't have

23    additional customers and then, you know, what can we do

24    to go get additional customers.

14:01:06 25         Q    What did Mr. Voskanian say in response to

Exhibit 3 - page 435

Rough Draft -
113
⬆ 14:01:08  1   those inquiries?

2       A    That, you know, we were so focused on the

3   Amazon -- we've been so focused on the Amazon business,

4   you know, making sure the operations continue to perform

14:01:22  5   for Amazon that there just wasn't the -- there wasn't

6   enough time.

7       Q    Did Mr. Voskanian say anything about any

8   potential prospects for new business at that time?

9       A    No.

14:01:35 10       Q    And how did you respond to Mr. Voskanian's

11   telling you that there just wasn't time to seek new

12   business?  Is that something that you just accepted?

13   Did you suggest to him that he should perhaps start

14   looking for business?

14:01:47 15       A    I believe.

16       Q    What was your response?

17       A    So we discussed it, but I think what we were

18   realizing is that he -- he had contacted a couple of

19   companies and, you know, including I believe it was

14:01:58 20   Wal-Mart and at that point there just wasn't any

21   interest in -- in being able to work with us while we're

22   in bankruptcy.

23       Q    So it's your understanding that the reason

24   these contacts didn't come to fruition was because there

Exhibit 3 - page 436

14:02:16 25    was no interest in having discussions due to the

Rough Draft -
114

14:02:18  1    bankruptcy?

2        A    I believe so, yes.

3        Q    And how did you obtain that information?

4        A    From Mr. Voskanian.

14:02:25 5    Q    He told you that?

6        A    Yes.

7        Q    Okay.  And do you remember the names of the

8    companies that he contacted and that didn't want to

9    engage in discussions with Scoobeez because of the

14:02:37 10    bankruptcy besides Wal-Mart?

11       A    I know he had discussions with target.  I

12   think there was another company -- a scooter company

13   that we had discussions with, and that I'm not sure if

14   it was because we were in bankruptcy, but we just --

14:02:59 15    nothing came to fruition.

16       Q    Did the target discussions -- did target

17   indicate they weren't interested in discussing business

18   with Amazon I'm sorry with Scoobeez because Scoobeez was

19   in bankruptcy?

14:03:12 20    A    Well, we had initial discussions with, you

21   know, Wal-Mart, and I think it was with target also and,

22   you know, it seems like, you know, maybe there's a

Exhibit 3 - page 437

23    little interest but then, you know, with them, you know,

24    I believe some other customers we just didn't make it

14:03:28 25    past -- we had discussions with business folks, but then

Rough Draft -
115

↑ 14:03:31  1    when it came to the compliance, it just went radio

2    silent.

3        Q    Well, my question was whether or not it went

4    radio silent -- whether you were told that it went radio

14:03:43  5    silence because of the bankruptcy or did it just go

6    radio silence and you're not sure of the reason?

7        A    It went radio silent.  I'm not sure of the

8    reason, but Mr. Voskanian said that we couldn't get past

9    the compliance department, which led me to believe part

14:03:58 10    of it may be due to us being in bankruptcy.

11        Q    I'm sorry.  I lost the last part of your

12    answer again.  Part of it may be due to?

13        A    The fact that we are in bankruptcy.

14        Q    Mr. Voskanian didn't tell you directly that it

14:04:12 15    was because Scoobeez was in bankruptcy, correct?

16        A    Correct.

17        Q    And that was -- and that was specific as to

18    target, your description of how the discussions ended?

19        A    That was more specific with respect to

14:04:26 20    Wal-Mart.

Exhibit 3 - page 438

21        Q    And what about with respect to target?

22        A    I think it was the same thing.

23        Q    So you couldn't get past compliance; you're

24    not sure of the reason; is that correct?

14:04:36 25        A    Correct.

Rough Draft -
116
↑ 14:04:40  1        Q    Okay.  You mentioned the scooter company.

2    That was lime, correct?

3        A    Lime or beggar.  One of the two.  The pro

4    called lime.

14:04:53  5        Q    Well, I'm going to show you the documents.

6    There were documents that were produced that show some

7    emails back and forth from lime.  I'll show them to you

8    a little bit later but I'm right now trying to assess

9    your recollection without having seen the document.

14:05:06 10    (Mark) (Mark) doc.

11            So how did the discussions with the scooter

12    company end?

13        A    I don't think it made -- my recollection is it

14    didn't make economic sense for us Mr. Voskanian told me.

14:05:23 15        Q    And do you recall it did not make economic

16    sense?

17        A    Because we wouldn't make money.

18        Q    That's a pretty general answer to the

Exhibit 3 - page 439

19    question, I guess.

14:05:35 20            And -- and do you have -- do you have an

21    understanding as to why you couldn't make money from the

22    scooter -- a customer relationship with the scooter

23    company?

24        A    I don't mean to sound, you know, facetious or

14:05:50 25    smart ass when I say this, but the cost of the business

Rough Draft -
117
↑ 14:05:53  1    would exceed the revenue it would generate from it.

2        Q    Okay.

3        A    It would just be unprofitable.

4        Q    Okay.  Do you recall any other overtures to

14:06:04  5    potential customers during the bankruptcy case other

6    than Wal-Mart, target and the scooter company?

7        A    Yes.

8        Q    Who else do you recall that was approached

9    about doing business with Scoobeez?

14:06:16 10        A    On track and LSO, which I think is loan star

11    overnight as well as I think there's been some recent

12    discussions with Uber freight.

13        Q    Have you completed your answer?

14        A    Yes.

14:06:45 15        Q    Okay.  And how -- where -- where are you with

16    regard to the discussions with on track?

Exhibit 3 - page 440

17      A    I believe they're going to be sending us a

18    small number of routes in the very, very near future.

19      Q    And what is that belief based on?

14:07:08 20      A    Discussions with Mr. Voskanian.

21      Q    What did Mr. Voskanian say to you with regard

22    to the routes that you may be receive -- Scoobeez may be

23    receiving from on track?

24      A    That they may start out by giving us a few

14:07:23 25    small routes for us to prove ourselves.


Rough Draft -

118

⬆ 14:07:27  1      Q    And how many routes -- do you have any

2    understanding how many routes a few small routes

3    constitutes?

4      A    Not yet.

14:07:35  5      Q    Do you have any understanding as to the

6    geographic location which the routes would be run?

7      A    I believe it would be southern California.

8      Q    Anything more specific than that?

9      A    No.

14:07:48 10      Q    And when did Mr. Voskanian tell you that on

11    track was likely to provide Scoobeez with a few small

12    routes?

13      A    Over the past month or so.

14      Q    Do you have any understanding when those

Exhibit 3 - page 441

14:08:12 15    routes may irrelevancy start being awarded to Scoobeez?

16         A    I don't have the exact timing.

17         Q    Well, do you have any general idea?

18         A    I think it should be starting -- my

19    understanding would be in the next couple of weeks to a

14:08:26 20    month.

21         Q    Okay.  And where do things stand with Uber

22    freight, as you understand it?

23         A    With Uber freight, nowhere right now.  Uber

24    freight is more of a mid mile delivery system, which

14:08:54 25    would require a significant capital investment by

Rough Draft -
119
↑ 14:08:57  1    Scoobeez in order to get started.

2         Q    And when was the last time there were

3    discussions with Uber freight?

4         A    George was having those discussions.  So I

14:09:19  5    don't know the exact timing, but I know within the last

6    45 days or so.

7         Q    And have -- to your knowledge, has anybody at

8    Scoobeez had any conversations with Hillair about

9    providing the capital needed to commence doing business

14:09:36 10    with Uber freight?

11         A    That's something that post con -- yes, and

12    that's something that post confirmation we're going to

Exhibit 3 - page 442

13    explore.

14        Q    Well, had there been discussions already with

14:09:48 15    respect to Hillair providing capital for the Uber

16    freight business if it -- if you're able to attract it?

17        A    If it makes economic sense, yes.  They would

18    they're willing to support the business.

19        Q    Well, have you had specific discussions with

14:10:03 20    Hillair such as how much capital they'd be willing to

21    provide to the company to support the Uber freight

22    contract if you're able to obtain it?

23        A    No.

24        Q    So just a general sense that if -- if you can

14:10:17 25    attract the business and it makes economic sense,

Rough Draft -
120

↑ 14:10:21  1    Hillair would consider consider supporting it; is that

2    correct?

3        A    That is correct.

4        Q    All right.  And where do things stand with

14:10:40  5    loan star?

6        A    I believe that if we haven't already, we

7    should be doing some small routes for them, if it hasn't

8    -- if it hasn't started yet, I think it will start

9    within the next -- based on my understanding from

14:10:55 10    Mr. Voskanian, within the next 30 to 45 days also.

Exhibit 3 - page 443

11        Q    Do you have any understanding as to the volume

12    of routes that Scoobeez expects to receive from lone

13    star?

14        A    No, not exact numbers, but I think, as with on

14:11:13 15    track it would be a small number of routes to begin

16    with.

17        Q    Do you have any understanding as to the

18    approximate revenue that the lone star contract or

19    routes would generate for Scoobeez?

14:11:24 20        A    Not at this time.

21        Q    Do -- is there a signed contract with lone

22    star?

23        A    I -- I haven't seen one.  I don't know if it's

24    a -- I don't know.

14:12:27 25        MR. ESTERKIN:  Okay.  I'm going to mark, as


                                                    Rough Draft -
121
↑ 14:12:29  1    Exhibit 22, a copy of an LSO final mile agreement dated

2    May 1, 2020.

3        (Exhibit    was marked for identification.)

4    BY MR. ESTERKIN:

14:12:41  5        Q    Let me know when you have that.

6        Do you have it?

7        A    Nope.

8        Q    You can take a few minutes.


Exhibit 3 - page 444

9          Have you ever seen this document before?

14:13:46 10      A    I said no, I haven't received it.

11      Q    Oh, you have not received it.  It should be on

12   your screen.

13      A    It's not on my screen.

14          MR. SIMON:  I don't have it either, Richard.

14:14:03 15   Maybe it's large and it's taking time to get through the

16   system, but it's not showing in mine either.

17          MR. ESTERKIN:  Let me try it again.  Maybe

18   it's my end.

19          THE WITNESS:  Okay.  I now have it.

14:14:33 20   BY MR. ESTERKIN:

21      Q    Okay.  I probably clicked on a wrong button.

22          MR. SIMON:  Now I see it on mine, Exhibit 22?

23          MR. ESTERKIN:  Yeah, it's 22.

24      Q    Okay.  Mr. Weiss, have you seen this document

14:15:19 25   before?


                                        Rough Draft -
122
⬆ 14:15:19  1      A    Yeah, I already responded that I had it open.

2      Q    I'm sorry?

3      A    I previously responded that I had it open.

4      Q    Right.  My question was:  Have you seen it --

14:15:29  5   did you see it before today?

6      A    No, I had not.

Exhibit 3 - page 445

            7        Q    Okay.  And so I'm assuming, Mr. Weiss, to your

            8    knowledge, this agreement has not been presented to the

            9    bankrupt court for the purpose of seeking court

14:15:54  10    authority on behalf of Scoobeez to enter into the

            11    agreement, correct?

            12        A    I don't believe it has been.

            13        Q    Okay.  All right.  Do you recall on October

            14    7th there was a conference call at which Amazon

14:16:46  15    indicated to Scoobeez's representatives on the call that

            16    Amazon intended to terminate the Scoobeez agreement as

            17    soon as it was able to do so?

            18        A    Yes.

            19        Q    And following that call, did you have any

14:17:00  20    further discussions with anybody at Scoobeez about the

            21    need for Scoobeez to find business other than the Amazon

            22    business?

            23        A    Yes.

            24        Q    And is it -- would it be correct to say that,

14:17:13  25    following that call, there was an increased sense of


                                                    Rough Draft -
123
↑ 14:17:16   1    urgency in terms of finding new business for Scoobeez?

             2        A    Yes.

             3        Q    And you -- did you express that view to

             4    Mr. Voskanian?

Exhibit 3 - page 446

14:17:29  5        A    Yes.

        6        Q    Did you express that view to Mr. Sheikh?

        7        A    Yes.

        8        Q    And when you expressed that view to them, how

        9   did they respond?

14:17:40 10        A    They -- you know, we went out to try to seek

       11   new business.

       12        Q    And as of today, are there -- is there any new

       13   business in prospect immediately for Scoobeez other than

       14   the lone star and on track business?

14:18:19 15        A    In the immediate future, you know, we -- prior

       16   to having a confirmed bankruptcy plan, no.

       17        Q    All right.  Are you aware that Mr. Voskanian

       18   at one point in time attempted to obtain new business

       19   for Scoobeez from Bristol farms?

14:18:52 20        A    Yeah, yeah, he's -- he's contacted, you know,

       21   other parties, yes.

       22        Q    Okay.  Well I'm speaking specifically now

       23   about Bristol farms.

       24             So you're aware of the efforts to obtain

14:19:06 25   business from Bristol farms?


                                                    Rough Draft -
124
↑ 14:19:08  1        A    Yes.

        2        Q    What's the current status of those efforts?

Exhibit 3 - page 447

          3          A    I don't believe they've progressed.

          4          Q    And you're aware that at some point in time

14:19:20  5    Mr. Voskanian attempted to obtain business middle mile

          6    business from Amazon, correct?

          7          A    Yes.

          8          Q    And what's the status of those efforts?

          9          A    We do not have a contract.

14:19:35 10          Q    And are those discussions ongoing or are they

         11    stopped?

         12          A    I believe they stopped.

         13          Q    Okay.  You've already testified about

         14    Wal-Mart, on track and the scooter company.  Uber

14:19:50 15    freight you've already talked about.

         16               Are there any other discussions that are

         17    currently ongoing with perspective business partners for

         18    Scoobeez?

         19          A    Nothing that I can remember off the top of my

14:20:02 20    head.

         21          Q    So I mean, just to sort of summarize scab

         22    bee's future business prospects once the plan is

         23    confirmed, you have a small number of routes that you

         24    expect to get from on track, correct?

14:20:33 25          A    Yes.


                                                    Rough Draft -

125

Exhibit 3 - page 448

⬆ 14:20:33  1        Q    You have a small number of routes that you

         2    expect to get from lone star, correct?

         3            MR. SIMON:  Objection.  Speculation.

         4    Objection.  Vague and ambiguous.  Objection assumption.

14:20:51  5    BY MR. ESTERKIN:

         6        Q    You can answer the question?

         7        A    Yes.

         8        Q    Okay.  And you expect that the Amazon contract

         9    will be terminated as soon as the automatic stay is

14:21:05 10    terminated, correct?

        11        A    Based on your representations today, yes.

        12        Q    And so it would seem that the success of the

        13    plan of reorganization hinges on increased business from

        14    lone star, increased business from on track or finding

14:21:23 15    business from a prospect as yet unidentified, correct?

        16        A    Yes.

        17    BY MR. ESTERKIN:

        18            MR. ESTERKIN:  Okay.  I don't think I have

        19    anything further, Mr. Weiss.

14:21:57 20            THE WITNESS:  Okay.

        21            MR. ESTERKIN:  I thank you -- I thank you for

        22    your time and sorry that we ran into your other meeting

        23    by, according to my clock 22 minutes.  Hopefully you can

        24    pick up your other meeting half an hour late or so.

14:22:10 25            THE WITNESS:  Tomorrow morning 8:00 a.m.

Exhibit 3 - page 449

Rough Draft -
126
↑ 14:22:12  1   That's fine.

2        MR. ESTERKIN:  All right.  Thank you again

3   very much we can go off the record.  Actually, we should

4   talk about signing and reviewing the deposition.  Why

14:22:24  5   don't we go off the record while we have that

6   discussion.

7        (Discussion off the record.)

8        MR. ESTERKIN:  Okay.  While we were off the

9   record, we discussed the concept of entering into a

14:24:23 10   stipulation with respect to the witness's reviewing and

11   signing of the transcript, and Mr. Simon, on behalf of

12   the witness, declined to enter into such a stipulation,

13   and with that we can go off the record.  Thank you.

14

15

16

17

18

19

20

21

22

23

Exhibit 3 - page 450

24

25

Rough Draft -

127

↑

Exhibit 3 - page 451

**ERTIFICATE OF SERVICE FORM**

**FOR ELECTRONIC FILINGS**

I hereby certify that on June 26, 2020, I electronically filed the foregoing document, **DECLARATION OF RICHARD W. ESTERKIN IN SUPPORT OF AMAZON LOGISTICS, INC.'S:  (1) LIMITED OBJECTION TO MOTION TO ASSUME CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND REJECT CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365; AND (2) PLAN CONFIRMATION,** with the Clerk of the United States Bankruptcy Court, Central District of California, Los Angeles Division, using the CM/ECF system, which will send notification of such filing to those parties registered to receive notice on this matter.

_____

Renee Robles

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 39177197.1

452

DECLARATION OF RICHARD W.
ESTERKIN ISO OBJECTION

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Morgan Lewis & Bockius LLP
300 S Grand Ave Fl 22, Los Angeles CA  90071-3132

A true and correct copy of the foregoing document entitled (*specify*):  Declaration of Richard W. Esterkin in Support of
Amazon Logistics, Inc.'s:  (1) Limited Objection to Motion to Assume Certain Executory Contracts and Unexpired
Leases and Reject Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365; and (2) Plan
Confirmation
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
_____06/26/2020_____ , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

   See Service List attached

☑ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ___06/26/2020___ , I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

  See E-Mail Only Service List, attached.

☑ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 06/26/2020 | Renee Robles | *Renee Robles* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**2:19-bk-14989-WB Service List:**

Richard T Baum on behalf of Stockholder Rosenthal Family Trust
rickbaum@hotmail.com, rickbaum@ecfinforuptcy.com

Richard W Esterkin on behalf of Creditor Amazon Logistics, Inc.
richard.esterkin@morganlewis.com

John-Patrick M Fritz on behalf of Attorney Official Committee Of
Unsecured Creditors jpf@lnbyb.com,
JPF.LNBYB@ecf.inforuptcy.com

John-Patrick M Fritz on behalf of Creditor Committee Official Committee of
Unsecured Creditors jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com

John-Patrick M Fritz on behalf of Interested Party Levene, Neale, Bender,
Yoo & Brill L.L.P. jpf@lnbyb.com, JPF.LNBYB@ecf. inforuptcy.com

John-Patrick M Fritz on behalf of Plaintiff Official Committee of Unsecured Creditors of the
Estates of Scoobeez

and Scoobeez Global, Inc.

jpf@lnbyb.com, JPF.LNBYB@ecf.inforuptcy.com

Riebert Sterling Henderson on behalf of Interested Party Courtesy NEF
shenderson@gibbsgiden.com

Vivian Ho on behalf of Creditor FRANCHISE TAX BOARD
BKClaimConfirmation@ftb.ca.gov

David Brian Lally on behalf of Attorney Grigori Sedrakyan
davidlallylaw@gmail.com

David Brian Lally on behalf of Attorney Peter and Barbara Ro Trustees of the Rosenthal Family
Trust UTD

3/25/1988

davidlallylaw@gmail.com

Alvin Mar on behalf of U.S. Trustee United States Trustee (LA)
alvin.mar@usdoj.gov, dare.law@usdoj.gov

Ashley M McDow on behalf of Debtor Scoobeez

amcdow@foley.com,
sgaeta@foley.com;mhebbeln@foley.com;swilson@foley.com;jsimon@foley.com

Ashley M McDow on behalf of Debtor Scoobeez Global, Inc.

amcdow@foley.com,
sgaeta@foley.com;mhebbeln@foley.com;swilson@foley.com;jsimon@foley.com

Ashley M McDow on behalf of Debtor Scoobur LLC

amcdow@foley.com,
sgaeta@foley.com;mhebbeln@foley.com;swilson@foley.com;jsimon@foley.com

Ashley M McDow on behalf of Plaintiff Scoobeez, Inc.

amcdow@foley.com,
sgaeta@foley.com;mhebbeln@foley.com;swilson@foley.com;jsimon@foley.com

Stacey A Miller on behalf of Creditor Porsche Financial Services, Inc.
smiller@tharpe-howell.com

Stacey A Miller on behalf of Creditor Porsche Financial Services, Inc. dba Bentley
Financial Services smiller@tharpe-howell.com

Stacey A Miller on behalf of Creditor Porsche Leasing Ltd.
smiller@tharpe-howell.com

Kevin H Morse on behalf of Creditor Avitus Group, Inc.
kmorse@clarkhill.com, blambert@clarkhill.com

Shane J Moses on behalf of Debtor Scoobeez
smoses@foley.com

Shane J Moses on behalf of Plaintiff Scoobeez, Inc.
smoses@foley.com

Akop J Nalbandyan on behalf of Creditor Roy Anthony Catellanos
jnalbandyan@LNtriallawyers.com, cbautista@LNtriallawyers.com

Akop J Nalbandyan on behalf of Interested Party INTERESTED PARTY
jnalbandyan@LNtriallawyers.com, cbautista@LNtriallawyers.com

Rejoy Nalkara on behalf of Creditor BMW Financial Services NA, LLC, c/o AIS
Portfolio Services, LP rejoy.nalkara@americaninfosource.com

Anthony J Napolitano on behalf of Creditor Hillair Capital Management LLC
anapolitano@buchalter.com,
IFS_filing@buchalter.com;salarcon@buchalter.com

David L. Neale on behalf of Attorney Official Committee Of Unsecured
Creditors dln@lnbyb.com

David L. Neale on behalf of Creditor Committee Official Committee of Unsecured
Creditors dln@lnbyb.com

David L. Neale on behalf of Interested Party Levene, Neale, Bender, Yoo & Brill
L.L.P. dln@lnbyb.com

Aram Ordubegian on behalf of Interested Party Courtesy NEF
ordubegian.aram@arentfox.com

Hamid R Rafatjoo on behalf of Creditor Shahan Ohanessian
hrafatjoo@raineslaw.com,
bclark@raineslaw.com;cwilliams@raineslaw.com

Gregory M Salvato on behalf of Creditor Azad Baban

gsalvato@salvatolawoffices.com,

calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf. inforuptcy.com

Gregory M Salvato on behalf of Interested Party INTERESTED PARTY
gsalvato@salvatolawoffices.com,

calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf. inforuptcy.com

Jeffrey S Shinbrot on behalf of Creditor Shahan Ohanessian
jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com

Steven M Spector on behalf of Creditor Hillair Capital Management LLC
sspector@buchalter.com,
IFS_efiling@buchalter.com;salarcon@buchalter.com

United States Trustee (LA)
ustpregion16.1a.ecf@usdoj.gov

Kimberly Walsh on behalf of Creditor Texas Comptroller of Public
Accounts bk-kwalsh@texasattorneygeneral.gov

Eric D Winston on behalf of Creditor Hillair Capital Management, LLC
ericwinston@quinnemanuel.com

Eric K Yaeckel on behalf of Creditor Arturo Vega
yaeckel@sullivanlawgroupapc.com

**2:19-bk-14989-WB Electronic Mail-Only Service List**

Adam Friedman on behalf of Creditor, Hillair Capital Management, LLC
Olshane Frome Wolosky LLP
afriedman@olshanlaw.com

John A. Simon on behalf of Debtor, Scoobeez, Inc.
Foley & Lardner, LLP
jsimon@foley.com